## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THERISA D. ESCUE, BILLY R. ESCUE, JR., KIM SCHELBE, and BRIAN P. WEATHERILL, on behalf of themselves and all others similarly situated,<br><br>                           Plaintiffs,<br><br>              v.<br><br>UNITED WHOLESALE MORTGAGE, LLC, UWM HOLDINGS CORPORATION, SFS HOLDING CORP., and MATHEW RANDALL ISHBIA,<br><br>                        Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |

## <u>CLASS ACTION COMPLAINT</u>

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

THE PARTIES.................................................................................................... 5

JURISDICTION AND VENUE ........................................................................ 6

FACTUAL ALLEGATIONS ............................................................................ 7

    I.      Wholesale Mortgages, Unlike Retail Mortgages, Are Originated Through Third Party Intermediaries: "Independent" Mortgage Brokers ........................... 7

    II.     Independent Mortgage Brokers Represent the Borrower in the Mortgage Origination Process and Have a Duty to Shop, on the Borrower's Behalf, for a Loan in the Borrower's Best Interest............................................................ 8

    III.    UWM's Position in the Wholesale Mortgage Industry........................................ 16

    IV.    UWM Employs Tactics Designed to "Cultivate Loyalist Brokers" Who Steer Borrowers into UWM Mortgages Even When Those Mortgages Are Not in the Borrowers' Best Interest .................................................................. 19

            A.     UWM Imposes Contractual Requirements on Brokers to Prevent Them from Exercising Independent Judgment ....................................... 19

            B.     UWM Punishes Brokers Who Honor Their Fiduciary and Agency Duties to Borrowers by Shopping for Lower Rates With UWM's Competitors............................................................................................ 26

    V.     UWM's Tactics Have Caused Mortgage Brokers to Funnel Loans to UWM, Costing UWM Borrowers Billions in Above-Market Costs.................. 27

    VI.    UWM Sustains and Grows Its Group of Corrupted Broker Partners by Offering Value to Brokers If They First Prove Their Commitment to Funneling Loans to UWM ................................................................................. 34

    VII.   Plaintiffs' Mortgage Loans With UWM ............................................................ 47

            A.     Plaintiffs Therisa and Billy Escue's UWM Mortgage ........................... 47

            B.     Plaintiff Kim Schelble's UWM Mortgage .............................................. 52

            C.     Plaintiff Brian Weatherill's UWM Mortgage ......................................... 60

CLASS ACTION ALLEGATIONS ................................................................. 65

    I.      Class Definitions................................................................................................ 65

    II.     Rule 23 Allegations........................................................................................... 67

CLAIMS FOR RELIEF ................................................................................................ 71

    I.      Claims of the Nationwide Class ......................................................................... 71

    II.     Claims of the State/Multi-State Subclasses ....................................................... 95

PRAYER FOR RELIEF .......................................................................................... 103

Plaintiffs Therisa D. Escue, Billy R. Escue, Kim Schelble, and Brian P. Weatherill on behalf of themselves and all others similarly situated, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## INTRODUCTION

1.       This straightforward case seeks to hold the largest wholesale mortgage lender in the United States, Defendant United Wholesale Mortgage, LLC ("UWM"), accountable for orchestrating and executing a deliberate scheme, in coordination with a host of corrupted mortgage brokers, to cheat hundreds of thousands of borrowers out of billions of dollars in excess fees and costs that they paid to finance their homes.  The illicit scheme and enterprise go to the heart of the wholesale mortgage industry in America.  UWM and the brokers hired by class members hold out the wholesale channel as the best way for borrowers to obtain the most affordable mortgages because, unlike in the retail channel, borrowers in the wholesale channel are represented and guided by "independent" mortgage brokers who survey options on their behalf and shop for the most competitive prices and rates.  But UWM and its captive broker partners have systematically undermined the basic structure and purpose of the wholesale channel.   By means of misrepresentations, deception, and unlawful inducements, UWM has infiltrated the fiduciary and agency relationship between class members and their hired mortgage brokers with the purpose, intent, and effect of corrupting brokers' independence so that they intentionally funnel unsuspecting borrowers into UWM loans that are significantly more expensive than the available alternatives.  As a result, UWM has moved billions of dollars from the pockets of borrowers across the country into its own.

2.       The mortgage industry is divided into two channels:  retail and wholesale. American borrowers are likely most familiar with the retail channel, which constitutes about 60% of the overall mortgage market.  The retail channel is made up of numerous large national and

regional financial institutions such as Chase, Bank of America, Citi, and many other household names.  To obtain a mortgage through the retail channel, a prospective borrower reaches out directly to the financial institution itself and interacts with a loan officer who works for that specific institution.  The loan officer then provides the prospective borrower with information and prices about the mortgage options offered only by that specific financial institution.

3.      The key difference between the wholesale and retail channels is that, in the wholesale channel, the prospective borrower does not speak directly to the lenders (e.g., they cannot simply walk into a bank and speak to that bank's loan officer).  Instead, to access offerings in the wholesale channel, the prospective borrower must hire an "independent mortgage broker" whose duties include, among other things, surveying the pricing and options offered by a variety of wholesale lenders, presenting the information to the borrower, and helping the borrower complete and submit loan application paperwork to lenders.  For doing this work, the independent mortgage broker is handsomely rewarded with a fee that is usually between 1-2% of the principal amount of the loan upon closing.

4.      Independent mortgage brokers—who must be licensed—are supposed to be just that: independent.  Unlike a loan officer at a retail lender, an "independent" mortgage broker owes loyalty to the borrower, not the bank.  And because the broker is not tied to any particular lending institution, the broker can collect and present options from many different lenders to ensure the borrower receives the most competitively priced options in their best financial interest.

5.      Here is how Defendant Mat Ishbia, the Chief Executive Officer of UWM, describes the role of the mortgage broker in the wholesale industry:

> "Mortgage brokers are completely independent. They are not
> captive or connected to my company or any company. They are
> independently shopping. . . . We really believe that the best place for
> a borrower to get a loan, that's at an independent mortgage broker.

> That's because the broker has access to multiple lenders instead of just one lender. If you are a banker, you have access to just your lender."[1]

6. And here is Mr. Ishbia again extolling the benefits of the wholesale channel over the retail channel:

> "***Brokers have more products than any retail lender or big bank because they have access to multiple lenders***. So if UWM has a unique product, brokers have access to that, just as they have access to Flagstar or Caliber's unique products. ***So being a broker gives you more product options, not less, because brokers have access to all lenders.***"[2]

7. And here again is Mr. Ishbia touting the ability of independent mortgage brokers to secure "the best deal" for borrowers by shopping the wholesale market including at UWM's competitors like Quicken:

> "And so, what's going to take us to number one is really just educating consumers because when people realize the best way to get a mortgage is cheaper, faster, and easier to go to a mortgage broker. ***So go to findamortgagebroker.com. You find a local mortgage broker. And they shop. They send you to me at UWM, or to Quicken, or whoever the best deal for you is. But you get a lower rate***."[3]

8. This is, of course, what independent brokers themselves represent to their customers as well. The problem is that this is all a giant put-on by UWM. While UWM proclaims that "brokers are better" because they are "not captive or connected" to any one lender, but instead "independently shop" to get borrowers the "best deal," the reality is that UWM has corrupted

---

[1]    Tracey Velt, *Transcript of Interview with Mat Ishbia*, Feb. 15, 2019, available at https://www.realtrends.com/articles/mat-ishbia-ceo-united-wholesale-mortgage/.

[2]  Kimberly Greene, *In order to grow, mortgage brokers need to know how to combat falsehoods*, Mortgage Professional America, Mar. 13, 2019, https://www.mpamag.com/us/mortgage-industry/business-growth/fighting-myths-one-at-a-time/162167.

[3]    *Interview with Mat Ishbia*, Yahoo! Finance Live, Dec. 4, 2020, https://www.facebook.com/MatIshbiaUWM/videos/1330920580574049/.

thousands of so-called "independent" mortgage brokers to make them *captive and connected to UWM*, so that they *do not* "independently shop." This means borrowers *do not get the "best deal."* Instead, *they get the UWM deal*—no matter what—*even if it is significantly more expensive, as it almost always is.*

9.      As a result, nearly half of all UWM mortgages are originated by brokers who refer 75% or more of their business to UWM. Over the past three years, UWM has issued nearly $39 billion in mortgages through "independent" brokers *who refer 99% of their business* to UWM. And during last year alone, more than 8,000 so-called "independent" brokers funneled 99% or more of their mortgages to UWM, worth at least $11.7 billion. In short, those brokers are not shopping around to other lenders. They are not seeking the best prices for their principals. They are instead captive to UWM. Through a series of intentional and illegal practices, UWM has thus corrupted a large swath of "independent" brokers and turned them into the functional equivalent of the "loan officers" that retail financial institutions use. These corrupted brokers are in essence employees in the UWM enterprise. And while doing that, both UWM and the corrupted brokers have concealed this fact from consumers who have been led to believe their "independent" brokers are working for them and shopping around to multiple lenders.

10.      The consequences to UWM's borrowers have been devastating. UWM rarely offered the best available pricing throughout the past four years and routinely charged fees that substantially exceeded their competitors' offerings to the tune of billions of dollars. While UWM's borrowers believed that their "independent" brokers were working for them, in reality, UWM induced thousands of these brokers to participate in their funneling scheme and enterprise by successfully infiltrating and corrupting their duties to the Plaintiffs and the class.

11.     At bottom, UWM and its corrupted brokers have been richly rewarded for their illicit activities, siphoning billions of dollars from consumers in excess fees and costs by funneling them to UWM loans against their financial interests.  And consumers, of course, are the unwitting victims in the scheme, mere afterthoughts in UWM's perverse effort to enrich itself.  This action therefore seeks to rectify UWM's cynical, destructive campaign to take advantage of American borrowers who sought exactly what UWM, its CEO Mat Ishbia, and their corrupted brokers promised—"independent[] shopping," honest "access to multiple lenders instead of just one lender," and "the best deal" at the "lowest rate"—but who received exactly the opposite, costing them billions of dollars.

## THE PARTIES

12.     Plaintiff Kim Schelble is a resident of North Carolina.

13.     Plaintiffs Therisa D. Escue and Billy R. Escue are residents of Tennessee.

14.     Plaintiff Brian P. Weatherill is a resident of Florida.

15.     Defendant United Wholesale Mortgage, LLC ("UWM"), formerly known as United Shore Financial Services, LLC, is a limited liability company formed in the state of Michigan with a principal place of business in Pontiac, Michigan.

16.     UWM Holdings, LLC ("Holdings LLC") is a limited liability company formed in the state of Delaware with a principal place of business in Pontiac, Michigan.  Holdings LLC is the sole member and manager of UWM.

17.     Defendant UWM Holdings Corporation ("Holdings Corp.") is a Delaware corporation with a principal place of business in Pontiac, Michigan.  Holdings is the publicly traded corporate parent of Holdings LLC and its operating subsidiary, UWM.

18.     Defendant SFS Holding Corp. ("SFS Corp.") is a Michigan corporation with a principal place of business in Pontiac, Michigan.  Prior to the closing of a business combination

transaction in January 2021, SFS Corp. was the sole member and owner of UWM.  Currently, SFS Corp. holds and controls approximately 79% of the combined voting power of the common stock of Holdings Corp. and thereby controls Holdings Corp. and its subsidiaries, including Holdings LLC and UWM.  With respect to Holdings Corp., SFS Corp. "[has] the ability to determine all corporate actions requiring stockholder approval, including the election and removal of directors and the size of [its] Board, any amendment to [its] certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of [its] assets."[4]  SFS Corp. is owned and controlled by members of the Ishbia family, including Mathew Ishbia, his brother Justin Ishbia, and his father Jeffrey A. Ishbia.  SFS Corp., Holdings Corp., Holdings LLC, and UWM are referred to collectively herein as the "UWM Entities".

19.     Defendant Mathew Randall Ishbia is the Chief Executive Officer of UWM, the Chairman, President and Chief Executive Officer of Holdings Corp., the Secretary and Director of SFS, and a resident of Bloomfield Township in the state of Michigan.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

21.     Personal jurisdiction over Defendants is proper because Defendants either (i) reside, are headquartered and/or incorporated in Michigan; (ii) regularly conduct business in Michigan, and/or (iii) have otherwise intentionally availed themselves of the Michigan consumer

---

[4] UWM Holdings Corporation, Annual Report (Form 10-K) ("UWM 2023 Form 10-K") at 33 (Feb. 28, 2024), https://www.sec.gov/edgar/browse/?CIK=1783398&owner=exclude.

market by engaging in or facilitating mortgage loan transactions with consumers in Michigan. Personal jurisdiction is also proper because Defendants knowingly entered into a conspiracy with Michigan-based Defendants to deceive Plaintiffs and the class and deprive them of benefits of hiring mortgage brokers, and overt acts in furtherance of the conspiracy were committed in Michigan for the benefit of Defendants. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because numerous of Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

## FACTUAL ALLEGATIONS

**I.     Wholesale Mortgages, Unlike Retail Mortgages, Are Originated Through Third Party Intermediaries: "Independent" Mortgage Brokers**

23.     Residential mortgage loans in the United States generally fall into one of two categories: (1) retail mortgage loans, and (2) wholesale mortgage loans.

24.     Retail mortgage loans are originated through a direct interaction between the prospective borrower and the lender.  In the retail setting, the borrower's financial interests are not represented by a third party broker with fiduciary duties to the borrower.  The borrower approaches the lender directly and works with an in-house loan officer to (i) complete a loan application, (ii) consider the various mortgage products offered by the lender, and (iii) submit the necessary documentation for income verification and underwriting.  The entire loan origination transaction occurs within the corporate structure of the retail lender and the loan is closed using lender-

supplied funds.[5]  Direct-to-consumer mortgage loans account for the majority of mortgage loans in the United States—over 61.2% (or $982 billion) as of 2023.[6]  Major retail lenders include big banks (like Wells Fargo, Bank of America, and Chase), online non-bank mortgage lenders (like Rocket Mortgage and LoanDepot), and credit unions (like Navy Federal Credit Union).

25.     The remaining 38.8% (or $623 billion) of mortgage loans are originated through what is often called the "wholesale channel."[7]  Wholesale mortgage loans, unlike retail mortgage loans, are originated through a process that involves a third-party intermediary—an independent mortgage broker.  Instead of interacting directly with the lender, the prospective borrower hires the services of a mortgage broker who (i) collects relevant information about the borrower's finances and the amount of the desired loan, (ii) surveys the wholesale market to determine what loan products and rates are available to the borrower from a variety of wholesale mortgage lenders, (iii) helps the borrower evaluate the options to select the loan with the best pricing, and (iv) communicates with the lender on the borrower's behalf to complete the application and close the loan.  Borrowers rely on the relationships and expertise of their broker to find and recommend the loan product that is most affordable.

## II.     Independent Mortgage Brokers Represent the Borrower in the Mortgage Origination Process and Have a Duty to Shop, on the Borrower's Behalf, for a Loan in the Borrower's Best Interest

26.     The key distinguishing feature of a wholesale mortgage as compared to a retail mortgage is the presence of an independent mortgage broker who represents the borrower through

---

[5] *See* Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 FR 11280, 11284,             https://www.federalregister.gov/documents/2013/02/15/2013-01503/loan-originator-compensation-requirements-under-the-truth-in-lending-act-regulation-z.

[6] Inside Mortg. Fin., *First-Lien Mortgage Originations by Production Channel* (published Feb. 29, 2024), https://www.insidemortgagefinance.com/products/313551-originations-by-production-channel-2003-4q23-pdf.

[7] *Id.*  This channel is sometimes called the "third-party origination" or "TPO" channel as well.

the open market process.  Indeed, as one UWM-funded industry trade group, the Association of Independent Mortgage Experts ("AIME"), has explained, the core value proposition of a wholesale mortgage loan is the independent mortgage broker's ability "review loan offerings from different lenders to find the best option for borrowers" and to "negotiate with mortgage lenders to get the most competitive interest rates and pricing."[8]

*Figure 1*



27.     Buying a home is the most consequential financial transaction that most Americans will make in their lifetimes.  For many, the process can be overwhelming.  Prospective borrowers hire mortgage brokers so that they can have confidence that a trusted fiduciary is guiding them in this process.  The assurance of the mortgage broker's "independence" and undivided loyalty is really what the borrower is paying for.  When a borrower hires an independent broker, the borrower is paying for assuredness that the broker will honestly serve his or her principal in an unconflicted

---

[8] *See* Figure 1, *Independent Mortgage Brokers Create Value for Homeowners Across America*, AIME Infographic, https://aimegroup.com/wp-content/uploads/2022/07/AIME-Infographic-Print-Original-Format-1.pdf.

manner, and that the broker does not maintain relationships with lenders that limit, and are designed to limit, the broker's ability to present affordable mortgage options.

28.     As UWM explains in a post on Instagram describing the "Anatomy of a Mortgage Broker," an independent mortgage broker "WORKS ON YOUR BEHALF," "PROVIDES MORE LOAN OPTIONS," and is "NOT TIED TO ONE LENDER."[9]

*Figure 2*



29.     Numerous industry websites, publications, and experts, along with brokers themselves, routinely tout the "independence" of mortgage brokers as the central reason why borrowers should hire and rely on them.  A broker's lack of attachment to any particular lender, they often explain, creates flexibility enabling the broker to shop across multiple lenders to find the borrower the best available loan.  For example, industry experts and trade groups, including organizations funded by UWM, have said:

---

[9] Figure 2, @uwmlending, Instagram (Oct. 30, 2020), https://www.instagram.com/p/CG-jVgGJTrI/.

a. "Brokers work for the borrower, not the bank. *Independent mortgage brokers have flexibility to shop rates from multiple lenders* with unmatched earning potential."[10]

b. "*One of the most important things for brokers, and what makes them brokers, is their ability to work with a variety of lenders. Not only does that ability allow brokers to shop for the best price and process for their clients, but also allows them to handle unconventional loans.* That optionality may be even more important as a more diverse and younger group of people begin looking for homes."[11]

c. "Mortgage brokers are the matchmakers of the home-buying process. *They work on the homebuyer's behalf and shop multiple lenders to find the rates and terms that meet their clients' needs*. Mortgage brokers usually rely on their relationships with wholesale lenders . . . who offer discounted rates that aren't available directly."[12]

d. "Typically, *brokers provide . . . [m]ore options to the consumer, by enabling them to shop the market for the best price*."[13]

e. "A mortgage broker works to connect home buyers or homeowners with the best mortgage rates possible. . . . *[W]ith a mortgage broker in your corner, you gain access to a wider network of lenders* – and that alone could pave the way to a really good deal."[14]

f. "A loan officer is an employee of a bank or retail lender that can only offer mortgage loan products and rates on behalf of their employer. In contrast, *a mortgage broker works on your behalf to secure the home loan that best suits your situation and needs.* Brokers can work alone or within a mortgage brokerage, but *they all leverage access to multiple lenders to present the best loan options available*."[15]

g. "If you're the type of shopper who always buys at the first store or gets overwhelmed by options, a bank or online lender may be best. *If you want a*

---

[10] *Why Brokers Are Better*, brokersarebetter.com, https://brokersarebetter.com/why-brokers-are-better/.

[11] *How To Grow Your Brokerage By Diversifying Your Mortgage Lenders*, AIME Group, Jul. 7, 2021, https://aimegroup.com/how-to-grow-your-brokerage-by-diversifying-your-mortgage-lenders/.

[12] *Wholesale Mortgage vs Retail Mortgage: What's the Difference?*, beamortgagebroker.com, Mar. 27, 2020, https://www.beamortgagebroker.com/blueprint-blog/wholesale-mortgage-vs-retail-mortgage.

[13] *Mortgage 101: What's the Difference Between a Mortgage Broker and a Mortgage Banker?*, AIME Group, https://aimegroup.com/wp-content/uploads/2022/07/AIME_BankerVsBroker.pdf.

[14] Maurie Backman, *What Is a Mortgage Broker*, The Ascent, Feb. 22, 2023, https://www.fool.com/the-ascent/mortgages/what-mortgage-broker/.

[15] *5 Facts about Your Local Mortgage Broker*, MortgageMatchup.com, https://mortgagematchup.com/resources/blog/5-facts-about-your-local-mortgage-broker.

*mortgage veteran to shop loans and communicate with lenders on your behalf to find you the best rate (think lower monthly payments), you'll need to find a mortgage broker.*"[16]

h. "As a mortgage broker at Epoch Lending, *I'm not captive to what only one company or lender can offer* . . . I have options to suit all of my clients' needs – if the program exists, I can get access to it. This allows me, and every other broker, to help more people achieve homeownership."[17]

30.     UWM has often echoed and amplified the same messages concerning the critical importance of a broker's independence.  In particular, UWM's CEO Mat Ishbia regularly and publicly touts independent mortgage brokers' ability to shop options from multiple lenders as a key reason why the "broker" channel is more beneficial than retail.  For example, Ishbia has said:

a. "*Mortgage brokers are completely independent. They are not captive or connected to my company or any company. They are independently shopping.* . . . We really believe that the best place for a borrower to get a loan, that's at an independent mortgage broker. That's because *the broker has access to multiple lenders instead of just one lender*. If you are a banker, you have access to just your lender."[18]

b. "The broker versus banker, we're all originators out there trying to help consumers, which is great. *We believe that options are better*, more options are better than less and that's why we believe in the broker channel and that's why we've invested all of our time and effort in trying to help the broker channel grow and thrive because it's best for consumers and best for our loans and that's where we've been aligned for the last couple of years."[19]

c. "*Brokers have more products than any retail lender or big bank because they have access to multiple lenders*. So if UWM has a unique product, brokers have access to that, just as they have access to Flagstar or Caliber's unique products.

---

[16] *Id.*

[17] Quote from Chad Cattani of Epoch Lending in *Mortgage Banker Vs. Mortgage Broker: Why Independence Is Better*, AIME Group, Mar. 1, 2022, available at https://aimegroup.com/mortgage-banker-vs-mortgage-broker-why-independence-is-better/.

[18] Tracey Velt, *Transcript of Interview with Mat Ishbia*, Feb. 15, 2019, available at https://www.realtrends.com/articles/mat-ishbia-ceo-united-wholesale-mortgage/.

[19] *Id.*

*So being a broker gives you more product options, not less, because brokers have access to all lenders.*"[20]

d. "Wholesale lenders must offer competitive pricing to compete. They don't have a captive loan like big banks and retail lenders do. Retail lenders know that if a loan comes to their system, they are getting that loan whether their price is 4.5% or 4.625%, it doesn't matter. ***In wholesale, if their rate is 4.625% instead of 4.5%, they don't have a chance to compete. The loan will go somewhere else.*** So thinking that it's more expensive to go to a middleman is just not true."[21]

e. "Whether you're shopping for a house, an airline ticket or groceries, ***it's always better to have options.*** Imagine what life would be like if you were limited to only one choice for everything. It's the same thing when it comes to mortgages. ***Loan originators on the retail side are captive to one set of programs***, one set of rates and one set of turn times. They're limited to the products, pricing and programs that they have in-house. ***On the other hand, brokers have access to numerous lenders, which ensures they have far more options when it comes to products, pricing, guidelines, and turn times, which in turn means better solutions for clients***."[22]

f. "And so, what's going to take us to number one is really just educating consumers because when people realize the best way to get a mortgage is cheaper, faster, and easier to go to a mortgage broker. ***So go to findamortgagebroker.com. You find a local mortgage broker. And they shop. They send you to me at UWM, or to Quicken, or whoever the best deal for you is. But you get a lower rate***."[23]

31. Indeed, in UWM's 2022 Annual Report to the Securities and Exchange Commission, the company included a section explaining the benefits of the wholesale channel for borrowers, which stated: "Independent Mortgage Brokers are able to provide borrowers with multiple options on product structure and pricing rather than being rooted in a single platform offering, which we believe empowers borrowers and enhances their borrowing experience." It

---

[20] Kimberly Greene, *In order to grow, mortgage brokers need to know how to combat falsehoods*, Mortgage Professional America, Mar. 13, 2019, https://www.mpamag.com/us/mortgage-industry/business-growth/fighting-myths-one-at-a-time/162167.

[21] *Id.*

[22] Mat Ishbia, *Game over: Independent mortgage broker shops are obvious choice for LOs*, HousingWire, Apr. 1, 2019, https://www.housingwire.com/articles/48679-game-over-independent-mortgage-broker-shops-are-obvious-choice-for-los/.

[23] *Interview with Mat Ishbia*, Yahoo! Finance Live, Dec. 4, 2020, https://www.facebook.com/MatIshbiaUWM/videos/1330920580574049/.

13

further stated:  "In the wholesale channel, the interests of the Independent Mortgage Broker and the borrower are aligned to achieve the best outcome for the borrower . . . ."[24]

32.     UWM's representations concerning the importance of a broker's independence and access to pricing options are so pervasive they can be characterized as the cornerstone of UWM's marketing message.  The purpose and effect of these messages is to convey not only that a broker's independence is essential to her or his ability to source competitive loan pricing for borrowers, but also that each broker who originates a loan through UWM is "completely independent," has "access to all lenders," "shops" for the best price without being "captive or connected" to UWM, and they choose UWM to "get a lower rate."  (As explained below in Sections IV, V, and VI *infra*, however, UWM knows these representations are materially false.)

33.     After the independent mortgage broker surveys available loan products for the best rates and pricing, he or she gathers and presents options to the borrower, advises the borrower in the application process, and then communicates with the selected lender on the borrower's behalf to provide the information necessary to close the loan.

34.     Upon closing, mortgage brokers receive compensation, typically in the form of a fee or commission equivalent to between 1% and 2% of the principal amount of the loan.  Broker compensation is usually paid through the lender, though in some cases, the borrower may pay instead.

35.     Independent mortgage brokers' conduct and compensation is subject to standards and limits prescribed by various federal and state statutes and authorities.  In the wake of the financial crisis of 2008, which was fueled in part by incentives that drove deceptive and reckless

---

[24] UWM Holdings Corporation, Annual Report (Form 10-K) ("UWM 2022 Form 10-K") at 5 (Mar. 1, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783398/000178339823000008/uwmc-20221231.htm.  Notably, UWM removed this language from its 2023 Annual Report.

business practices on the part of mortgage brokers,[25] legislation at federal and state level sought to strengthen and codify rules concerning brokers' duties to their clients and the manner in which brokers may be compensated.[26]

36.    At the federal level, mortgage brokers are subject to requirements under the Truth in Lending Act ("TILA"), as modified by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which places limitations and caps on broker compensation,[27] and prohibits brokers from steering consumers into higher-cost mortgage loans based on the prospect of additional benefit to the broker unless such loans are in the borrower's interest.[28]  Mortgage brokers are also subject to the Real Estate Settlement Practices Act ("RESPA"), which prohibits a lender from providing any "fee, kickback or thing of value" to a broker pursuant to any agreement or understanding that the broker will refer mortgage loan business to a particular lender.[29]

37.    At the state level, numerous state legislatures have passed statutes concerning mortgage brokers' duties to borrowers.[30]  Moreover, even aside from the statutes specifically

---

[25] *See, e.g.*, Charles W. Murdock, *How Incentives Drove the Subprime Crisis*, Social Justice at 8-14 (2014), https://ecommons.luc.edu/social_justice/37/; Martin Neil Baily et al., *The Origins of the Financial Crisis*, The Brookings Institution at 7-9, 17-18 (Nov. 2008), https://www.brookings.edu/wp-content/uploads/2016/06/11_origins_crisis_baily_litan.pdf; Antje Berndt et al., *The Role of Mortgage Brokers in the Subprime Crisis*, NBER Working Paper No. w16175, https://ssrn.com/abstract=1636644.

[26] *See* Andrea Lee Negroni et al., *Meltdown Pushes More Fiduciary Duties on Brokers*, Mortgage Bankers Association (Oct. 2010), https://buckleyfirm.com/uploads/36/doc/mortgage%20banking%20fiduciary%20oct10.pdf.

[27] *See, e.g.*, 12 C.F.R. § 1026.43(e)(3)(i); Consumer Financial Protection Bureau, *Summary of the final rule on mortgage loan originator qualification and compensation practices* (Jan. 2013), https://files.consumerfinance.gov/f/201301_cfpb_loan-originator-compensation-rule_summary.pdf.

[28] *See, e.g.*, 15 U.S.C. § 1639(p)(2); 12 C.F.R. § 1026.36(e).

[29] *See* 12 U.S.C. § 2607(a); 12 C.F.R. § 1024.14(b).

[30] *See, e.g.*, Cal. Civ. Code § 2923.1 ("A mortgage broker providing mortgage brokerage services to a borrower is the fiduciary of the borrower"); N.C. Gen. Stat. Ann. § 53-244.109(9)-(10) ("Any mortgage broker engaged in the mortgage business . . . shall . . . [r]epresent the borrower's best interest in the course of brokering a mortgage loan . . . [and] have a duty of loyalty to the borrower, which shall include a duty not to compromise a borrower's right or interest in favor of another's right or interest, including a right or interest of the mortgage broker."); N.M. Stat. Ann. § 58-21B-20 ("A mortgage loan originator shall, enter into a fiduciary relationship with the borrower . . . [and] disclose to the borrower the existence of all loans available to the mortgage loan originator, for which the borrower qualifies,

defining a mortgage broker's duty, states across the country have recognized a mortgage broker's heightened responsibility based on its agency or fiduciary relationship with the borrower.

38.     Lenders like UWM—who are also regulated under TILA, RESPA, and various state statutes—are keenly aware of brokers' obligations to their borrowers under state and federal law. Indeed, in its most recent Annual Report submitted to the Securities and Exchange Commission ("SEC"), UWM advises investors that brokers "are subject to parallel and separate legal obligations" and that "[w]hile these laws may not explicitly hold the originating lenders responsible for the legal violations of [brokers], U.S. federal and state agencies increasingly have sought to impose such liability."[31]

## III.     UWM's Position in the Wholesale Mortgage Industry

39.     In 2012, shortly after Mr. Ishbia assumed the role of UWM's CEO, UWM was the eighth-largest wholesale lender for broker-originated loans in the country, responsible for more than $5.9 billion in loans and more than 3% of all broker-originations annually.[32]

40.     Over the next decade, UWM's annual originations and market share for broker-originated loans continued to grow.[33]  In 2020, UWM became the largest wholesale lender.[34]  It subsequently became the largest mortgage lender overall—retail or wholesale—accounting for more than $107.9 billion of mortgage originations annually.[35]

---

that have terms that are as favorable or more favorable than those loans offered to the borrower by the mortgage loan originator").

[31] UWM 2023 Form 10-K at 15.

[32] Inside Mortg. Fin., *Top Broker and Correspondent Producers 2012* (published Aug. 22, 2018), https://www.insidemortgagefinance.com/ext/resources/files/pdfs/imfpubs_reports/t/o/p/_/b/top_broker_corresponde nt_producers_4q12.pdf?1558553175.

[33] *See* Figure 3, UWM Broker Origination & Market Share (2012-2023), based on Inside Mortg. Fin. data.

[34] Inside Mortg. Fin., *Top Third-Party Originators: 12M20* (published Feb. 18, 2021), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2020/4Q20/IMF2107-03.pdf?1613667066

[35] Inside Mortg. Fin., *Top 50 Mortgage Lenders: 12M23* (published Jan. 25, 2024), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2023/4Q23/IMF2404-01.pdf?1706200716.

41.     UWM's business practices in pursuit of greater market share are widely regarded as bitterly aggressive.  For example, one of UWM's competitors is Rocket Mortgage, LLC ("Rocket Mortgage") (formerly known as Quicken Loans).[36]  Ishbia explained in a recent interview in regard to Rocket Mortgage's CEO, Dan Gilbert: "He doesn't like me and I don't like him. That's how it is. . . . His company used to be No 1 in mortgage; UWM, my business, is No. 1 in mortgage. I don't like the way they do business in a lot of things. He probably doesn't like the way we do things. We're in the same town. We compete. We're winning. That's what it is right now."[37]

42.     During 2020 and 2021, the hostility between UWM and Rocket Mortgage reached new levels.  In September 2020, Rocket Mortgage's wholesale lending division rebranded as "Rocket Pro TPO" and increased its service offerings to mortgage brokers, hoping to cut into UWM's share of the broker origination market.[38]  Rocket's expansion in the wholesale channel threatened UWM's share of the broker origination market because Rocket was regularly able to offer lower pricing, and had other advantages in the marketplace (including, for example, that Rocket was ranked higher than UWM in industry publications like Bankrate and J.D. Power in regards to satisfaction, affordability, availability, and borrower experience).

43.     What followed was what many industry observers called a "mortgage war" between the companies, with each side deploying increasingly aggressive public relations and commercial

---

[36] *See, e.g.*, David Krechevsky, *Ishbia Takes Shots At Gilbert, His Lending & NBA Rival*, National Mortgage Professional, May 4, 2023, https://nationalmortgageprofessional.com/news/ishbia-takes-shots-gilbert-his-lending-nba-rival; Arnie Aurellano, *UWM vs. Rocket Mortgage: Here's where things stand now*, Scotsman Guide, Mar. 29, 2021, https://www.scotsmanguide.com/news/uwm-vs-rocket-mortgage-heres-where-things-stand-now/.

[37] *AD Wreaks Havoc With Kevin O'Connor, Suns Owner Mat Ishbia Stops By, Plus Chris Mannix on the Failing Celtics* at 00:59:04–21, The Bill Simmons Podcast, May 3, 2023, https://podcasts.apple.com/us/podcast/ad-wreaks-havoc-with-kevin-oconnor-suns-owner-mat/id1043699613?i=1000611550020.

[38] Michael Bates, *Quicken Loans Unit to Be Rebranded Rocket Pro TPO*, MortgageOrb, Sep. 22, 2020, https://mortgageorb.com/quicken-loans-unit-to-be-rebranded-rocket-pro-tpo; *QLMS Is Becoming Rocket Pro TPO*, YouTube, Sep. 22, 2020, https://www.youtube.com/watch?v=l5sCGnCpsL4.

tactics to gain an edge over the other.[39]  This "mortgage war," which included dueling Super Bowl ads, culminated in UWM's implementation and enforcement of a contractual ultimatum, which effectively prohibited any broker who does business with UWM from submitting any mortgage loan applications to Rocket Mortgage, as discussed in greater detail in Section IV below.

44.    Amidst this increasingly hostile competitive environment, in January 2021, the UWM Entities completed a merger transaction with Gores Holdings IV, Inc., a special purpose acquisition company (a "SPAC").  As a result of the SPAC transaction, Holdings Corp., UWM's corporate parent, became a publicly traded company initially valued at $16.1 billion.

45.    The Ishbia family has maintained majority ownership and control of the UWM Entities and their affiliates both before and after the SPAC merger.  In addition to Mat Ishbia, Mat's father Jeffrey Ishbia, and his brother, Justin Ishbia, also sit on the board of UWM's corporate parent, Holdings Corp.  Justin Ishbia likewise manages the family's holding company, SFS Corp., which remains the majority and controlling owner of Holdings Corp.'s stock.

46.    Today, UWM is the largest wholesale mortgage lender with a market share of more than 48.1% of all broker-originated mortgage loans.[40]  It is also the largest mortgage lender *overall*, responsible for more than 7.8% of all mortgage origination volume in the country.[41]  According to UWM's own statements, the company secured and has maintained this dominant market position

---

[39] Breana Noble, *Pontiac's United Shore roughs up Detroit's Rocket Mortgage in Super Bowl ad*, The Detroit News, Jan. 31, 2020, https://www.detroitnews.com/story/business/2020/01/31/pontiacs-united-shore-roughs-up-detroits-rocket-mortgage-super-bowl-ad/2858164001/; JC Reindl, *UWM CEO issues ultimatum, escalates war against Rocket Companies*, Detroit Free Press, Mar. 4, 2021, https://www.freep.com/story/money/business/2021/03/04/united-wholesale-mortgage-ultimatum-rocket-companies/4578357001/; James Kleimann, UWM & Rocket both declare victory in broker war, HousingWire, Mar. 18, 2021, https://www.housingwire.com/articles/uwm-rocket-both-declare-victory-in-broker-war/.

[40] Inside Mortg. Fin., *Top Wholesale-Broker Platforms: 12M23* (published Feb. 29, 2024), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2023/4Q23/IMF2409-04.pdf?1709219683.

[41] Inside Mortg. Fin., *Top 50 Mortgage Lenders: 12M23* (published Jan. 25, 2024), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2023/4Q23/IMF2404-01.pdf?1706200716.

by building what it calls a "Competitive Moat" through its "unique partnership model" which results in "a continually sticky customer base and significant pricing power."[42]

IV.   **UWM Employs Tactics Designed to "Cultivate Loyalist Brokers" Who Steer Borrowers into UWM Mortgages Even When Those Mortgages Are Not in the Borrowers' Best Interest**

A.    **UWM Imposes Contractual Requirements on Brokers to Prevent Them from Exercising Independent Judgment**

47.    As UWM explains to its investors, a core aim of its business model is to "*cultivate 'loyalist' brokers who then expand the customer network*."[43]  When UWM refers to "loyalist" brokers, it means brokers who direct their loyalty, first and foremost, *to UWM*—not to the hundreds of thousands of American consumers whose best financial interests those brokers are duty-bound to represent and protect.

48.    One of UWM's primary means of "cultivating 'loyalist' brokers" and eliminating their "independence," is the enforcement of onerous and restrictive provisions in its Wholesale Broker Agreement.  UWM mandates that any broker who wishes to do business with UWM must first agree to its Wholesale Broker Agreement.  The Wholesale Broker Agreement sets forth, among other things, the terms and conditions under which UWM agrees to consider purchasing and/or funding mortgage loans provided by the broker, and which govern UWM's payment of fees to the broker.  UWM will not fund loans from or pay the fees of brokers who refuse to be bound by its Wholesale Broker Agreement.

49.    At least two provisions in UWM's Wholesale Broker Agreement specifically and explicitly bar brokers from shopping for loans in the best financial interest of their clients by

---

[42] UWM Holdings Corporation Presentation at 18, Mar. 1, 2024, https://investors.uwm.com/news-and-events/events-and-presentations/default.aspx.

[43] UWM Holdings Corporation Presentation at 6, Mar. 1, 2024, https://investors.uwm.com/news-and-events/events-and-presentations/default.aspx.

forcing them to either ignore more competitive offerings from non-UWM lenders or to conceal them from their clients.  Violating either provision exposes a broker to termination of their relationship with UWM and/or exorbitant financial penalties.

50.     *First*, UWM has implemented and continues to enforce a policy—the "All In" policy—that contractually prohibits any broker who does business with UWM from shopping for loans from two of its competitors, Rocket Mortgage and Fairway Mortgage.  The prohibition is categorical: it applies regardless of circumstance, without exception—even if the loan products offered by those lenders are lower-cost and in the best interest of the broker's client.

51.     By way of background, in September 2020, Rocket Mortgage launched its new rebranded wholesale lending services division, "Rocket Pro TPO."[44]   At the time, Rocket Mortgage was the number one overall mortgage lender in the country, with UWM ranking third,[45] while UWM was the number one wholesale mortgage lender, with Rocket Mortgage ranking second in that category.[46]  UWM viewed Rocket Mortgage's increased investment in the wholesale channel as a threat.

52.     Several months after Rocket Mortgage's wholesale lending rebrand, UWM decided to take a drastic and controversial step.  On or around March 4, 2021, UWM distributed a written amendment to its Wholesale Broker Agreement to every broker in its network.  Many brokers received the amendment electronically through UWM's EASE platform, and others received it through communications with UWM account executives or other personnel.  The amendment provided:

---

[44] *QLMS Is Becoming Rocket Pro TPO*, YouTube, Sep. 22, 2020, https://www.youtube.com/watch?v=l5sCGnCpsL4.

[45] Inside Mortg. Fin., *Top 100 Mortgage Lenders: 9M2020* (published Dec. 8, 2020), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2020/3Q20/IMF2048_01.pdf?1607619759.

[46] Inside Mortg. Fin., *Top Wholesale-Broker Channels: 9M2020* (published Nov. 25, 2020), https://www.insidemortgagefinance.com/ext/resources/Data-charts/2020/3Q20/IMF2046_07.pdf?1606322169.

United Mortgage Whole, LLC ("UWM") is amending its broker, correspondent and financial institution agreements by adding a representation and warranty that its clients will not submit loans to either Rocket Mortgage or Fairway Independent Mortgage. Client acknowledges and agrees, that until client provides written notice terminating its agreement with UWM, client and its employees will not submit mortgage loan applications or mortgage loans to either Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase and/or funding (unless such loan was locked with Rocket Mortgage or Fairway Independent Mortgage prior to March 15, 2021). If client or client's employees breach this representation and warranty, client agrees to pay liquidated damages to UWM of: (i) Five Thousand Dollars ($5,000.00) per loan closed with UWM, or (ii) Fifty Thousand Dollars ($50,000.00), whichever is greater.[47]

*Figure 3*



53. Brokers who received the amendment electronically were presented with an option at the bottom of their screens to either accept or decline the amendment. Those who declined the amendment were shown a message which stated: "By declining this amendment you are

---

[47] Figure 3, ECF No. 1-1, Ex. A at 3, *The Okavage Group, LLC v. UWM Holdings Corporation et al.*, 21-cv-00448-WWB-LLL (M.D. Fla. Apr. 23, 2022)

terminating your relationship with United Wholesale Mortgage.  You will be able to close any loans currently in our pipeline, however.  Please confirm below."

54.     For brokers who had not yet signed UWM's Wholesale Broker Agreement before the effective date of the ultimatum (March 15, 2021), UWM altered its standard Wholesale Broker Agreement by adding a provision at Section 3.03(x) requiring all brokers to represent, warrant, and covenant, with respect to each mortgage loan the broker submits to UWM, that the broker "will not submit a mortgage loan or mortgage loan application to Rocket Mortgage or Fairway Independent Mortgage for review, underwriting, purchase, and/or funding."  UWM also added a liquidated damages provision at Section 7.30 which specifies the damages for a breach of Section 3.03(x) shall be "the greater of: (i) Five Thousand Dollars ($5,000.00) per loan closed with Rocket Mortgage, Fairway Independent Mortgage . . . , or (ii) Fifty Thousand Dollars ($50,000.00), as liquidated damages for such breach without the need for proof of damages by UWM."[48]

55.     The implementation of UWM's "All-In" ultimatum had an immediate impact. According to UWM, within one week of the announcement "a majority of the largest independent mortgage broker shops across the country . . . signed the UWM all-in addendum representing over 90% of broker shops who will no longer work with Rocket Mortgage or Fairway Independent Mortgage Corporation."[49]  During an earnings call in or around May 2021, Ishbia stated of the "All-In" ultimatum initiative:  "I couldn't have imagined it going so well."  According to UWM, of the 12,000 brokers in its network before the ultimatum became effective, only 600 refused to

---

[48] ECF No. 1-2 at 3.03(x), 7.30, *United Wholesale Mortgage, LLC v. America's Moneyline, Inc.*, 22-cv-10228-LJM-EAS (E.D. Mich. Feb. 3, 2022).

[49] Press Release, *LARGEST MORTGAGE BROKER SHOPS IN AMERICA ARE ALL-IN WITH UNITED WHOLESALE MORTGAGE*, UWM, Mar. 11, 2021, https://www.uwm.com/about-us/media-resources/press-releases/2021/march-11-2021.

sign and 1,000 did not respond.  In the first month after the ultimatum took effect (April 2021), brokers submitted 17,000 more loan applications to UWM than they had in February.[50]

56.     UWM's effort to compel brokers to funnel more loans to it (and away from its competition) by threatening brokers' interests as opposed to enriching borrowers' interests was having its intended effect.  As Ishbia explained in a February 2023 interview:  "The penalty of working with Rocket . . . is you don't get to work with UWM.  And nobody is willing to take that chance. . . . Once you have brokers that don't work [with] UWM, they lose out.  That's why of the 12,000 brokers, 11,500 all stayed with UWM."[51]

57.     Not all brokers succumbed to UWM's strong-arm tactics.  In an interview with National Mortgage Professional in August 2023, one such broker, who previously sent loans to both UWM and Rocket Mortgage, explained:  "When the ultimatum came out in 2021 that was a deal breaker for me.  If you lose that ability to choose it's an entire danger to the whole broker community."  Another broker who declined the "All-In" ultimatum, called UWM the "anti-broker model."  He elaborated: "[T]hey always say brokers are better.  Whoever says one thing and does the other thing, you shouldn't work with them."[52]   Another such broker was asked by an interviewer: "If there was never an ultimatum . . . if that never existed, would you have continued using Rocket and United Wholesale depending on which one better served your client at the time?"

---

[50] JC Reindl, *United Wholesale CEO: Our hardball tactic against Dan Gilbert firm a big success*, Detroit Free Press, May 11, 2021, https://www.freep.com/story/money/business/2021/05/11/united-wholesale-mortgage-rocket-companies/5021895001/.

[51] Brenda Noble, *Mat Ishbia happy to take battle with Dan Gilbert into new arena*, The Detroit News, Feb. 14, 2023, https://www.detroitnews.com/story/business/2023/02/14/mat-ishbia-happy-to-take-battle-with-dan-gilbert-into-new-arena/69900833007/.

[52] Katie Jensen, *Brokerage Brawlers Discuss Ultimatum & Broker Independence*, National Mortgage Professional, Aug. 29, 2023, https://nationalmortgageprofessional.com/news/brokerage-brawlers-discuss-ultimatum-broker-independence.

23

Swindell's response was:  "One hundred percent.  That's our job—it's to provide the best options for our clients."[53]

58.     Consistent with UWM's intent and these brokers' observations, UWM's "All-In" policy has resulted in an increasingly captive network of brokers.  UWM forces brokers to consent to its "All-In" ultimatum as a precondition of submitting any loan application to the company, or accessing any of UWM's technology or services.  Consequently, any borrower who hires a broker that does business with UWM is necessarily missing out on loan products offered by other lenders, including where those loan products have a lower rate and/or lower origination costs.  Essentially, because of the ultimatum, brokers are forced to go "All-In" for UWM as opposed to their clients.

59.     *Second*, in addition to the "All-In" policy, UWM mandates that every broker who wishes to do business with UWM must accept the restrictive rate "Lock-In" policy, which is also operationalized through its Wholesale Broker Agreement.  It is common in mortgage loan transactions for borrowers to seek to "lock-in" the interest rate in a lender's offer to protect against the possibility that the interest rate may increase between the rate quote and the execution of loan documents, which could be weeks later.  Lenders offer to lock-in their quoted interest rates at the beginning of the loan origination process to provide borrowers certainty that the quoted price will be honored on the closing date, even if interest rates have increased in the interim.  But such "Lock-In" offers generally bind ***the lender*** to the interest rate; they do not preclude ***the borrower or the broker*** from continuing to shop the market for better terms in the lead up to closing.

60.     UWM, however, imposes decidedly anti-consumer "Lock-In" terms.  In particular, Section 2.03(a) of the Wholesale Broker Agreement provides:

---

[53]     *Brokers    under    fire    for    working    with    UWM*,    YouTube,    Feb.    1,    2024, https://www.youtube.com/watch?v=4vyb5j0Tr6s.

UWM will provide price protection for the Mortgage Loans which it agrees to purchase and/or fund hereunder in the form of a written lock-in confirmation pursuant to its lock-in policies and in accordance with UWM's lending requirements. The time at which the interest rate for a Mortgage Loan is locked in shall be at Broker's option, provided, however, a Mortgage Loan with a locked in interest rate must be presented to UWM for purchase and/or funding before the expiration of the lock-in period. For purposes of the Agreement, the "lock-in period" shall be determined in accordance with UWM's lending requirements. If a Mortgage Loan is not presented for funding by UWM within the lock-in period, such Loan may be re-priced at the sole option of UWM. ***The transfer or sale by Broker of a Mortgage Loan locked in by UWM during the lock-in period to another entity, shall constitute a violation of the Agreement, and the Broker shall be liable, and promptly indemnify UWM, for any loss sustained as a result thereof by UWM.*** In addition, Broker shall notify UWM immediately should any commitment by UWM for a locked-in Mortgage Loan be canceled, withdrawn, or otherwise determined not to be set for purchase and/or funding by UWM.[54]

61.     Under Section 2.03(a), accordingly, once a mortgage broker obtains a "locked-in" rate quote from UWM on the borrower's behalf, the broker is effectively precluded from shopping for a loan from another lender that would be more advantageous for the borrower—even if such offers from other lenders exist.  If, after the rate is locked-in with UWM, the broker tries to fulfill his or her responsibilities to the borrower by finding and placing a mortgage loan with another lender on better terms, "the Broker shall then be liable, and promptly indemnify UWM, for any loss sustained as a result thereof by UWM."

62.     No other wholesale lender imposes such strict no-shop restrictions in connection with rate-locks.  This provision is unique to UWM.  The effect is that a rate-lock with UWM not only "locks-in" the interest rate, it "locks-in" the borrower to a UWM mortgage, even if there are better options elsewhere that broker is precluded from presenting.

---

[54] Wholesale Broker Agreement § 2.03(a) (emphasis added).

B.     **UWM Punishes Brokers Who Honor Their Fiduciary and Agency Duties to Borrowers by Shopping for Lower Rates With UWM's Competitors**

63.     Importantly, UWM's "All-In" and "Lock-In" policies are not just public relations stunts or empty threats.  UWM expends significant resources to police brokers' transactions to ensure that none of the brokers in its network submit a single loan or loan application that violates any provisions in its Wholesale Broker Agreement, including its "All-In" and "Lock-In" policies.

64.     Among other things, UWM compiles and closely monitors information available from public and private databases, which enables it to track every mortgage loan in which each of the brokers in its network is involved.  Whenever a broker closes a loan that is not in compliance with the company's "All-In" or "Lock-In" policies, UWM is aware.

65.     In the three years since UWM first implemented its "All-In" ultimatum, the company has brought at least four lawsuits against various brokerage firms seeking damages for alleged breaches of the ultimatum provisions in its Wholesale Broker Agreement.

a.     In February 2022, UWM sued Mid Valley Funding & Investment, Inc. in the Eastern District of Michigan seeking at least $310,000.00 in damages.  The parties settled the dispute on June 5, 2023.[55]

b.     In February 2022, UWM sued California broker America's Moneyline, Inc. in the Eastern District of Michigan seeking at least $2,800,000 in damages.  The litigation remains pending.[56]

---

[55] *United Wholesale Mortg., LLC v. Mid Valley Funding & Inv., Inc.*, Case No. 22-cv-10396-LJM-CI (E.D. Mich.); *see also* Flávia Furlan Nune, "UWM and broker shop Mid Valley settle 'ultimatum' lawsuit," HOUSINGWIRE, June 6, 2023, https://archive.ph/G3grj#selection-1269.2-1271.19.

[56] *United Wholesale Mortg., LLC v. Am.'s Moneyline, Inc.*, Case No. 22-cv-10228-LJM-EAS (E.D. Mich.).

26

c.   Also in February 2022, UWM also sued Kevron Investments Inc. in the Eastern District of Michigan, seeking at least $110,000 in liquidated damages.  The action remains pending.[57]

d.   Finally, in January 2024, UWM sued Atlantic Trust Mortgage Corporation in the Eastern District of Michigan, seeking at least $355,000.00 in damages. The action also remains pending.[58]

## V.   UWM's Tactics Have Caused Mortgage Brokers to Funnel Loans to UWM, Costing UWM Borrowers Billions in Above-Market Costs

66.   UWM's tactics have been intended to and did cause a steadily increasing proportion of mortgage brokers to reflexively refer the vast majority of their borrower-clients to UWM without shopping for loans that are in those borrower-clients' best financial interests.  This trend is evident throughout wholesale mortgage industry—up and down the market, in every geography.

67.   According to publicly available data, as early as 2020, an already high proportion of mortgage brokers in UWM's network were steering most of their loans to UWM.  Of the 28,422 brokers who sent at least one loan to UWM in 2020, nearly a quarter—6,359 brokers—sent more than 75% of their loans to UWM.  And within that population, 3,822 sent more than 99% of the loans to UWM, meaning those brokers essentially *never* sent a loan to any of the dozens of other lenders who offer wholesale mortgages.

68.   In each year after 2021, the year UWM's "All-In" ultimatum went into effect, the proportion of brokers who steer 75% or more of their loans to UWM has expanded dramatically.  By last year, 2023, of the 30,229 brokers who sent at least one loan to UWM, 12,936 brokers (more than 42%) sent more than 75% of their loans to UWM.  And of those brokers, 8,665 sent more

---

[57] *United Wholesale Mortg., LLC v. Kevron Invs., Inc.*, Case No. 2:22-CV-10395-LJM-EAS (E.D. Mich.).

[58] *United Wholesale Mortg., LLC v. Atlantic Trust Mortg. Corp.*, Case No. 24-cv-10216-TGB-DRG (E.D. Mich.).

than 99% of their loans to UWM.  Between 2020 and 2023, the proportion of brokers who steer virtually all (99% or more) of their loans to UWM more than doubled, increasing from 13.4% of the total UWM broker population to over 28.7% of the broker population.[59]

*Figure 4*



*Figure 5*



---

[59] Figures 4 & 5, Analysis of publicly available data.

69.     As the population of brokers who artificially steer loans to UWM has expanded, the loans that are generated by those brokers have become an increasingly critical component of UWM's business overall.  Figure 6 below shows this trend.  In 2020, brokers who sent 99% or more of their loans to UWM accounted for 4% of UWM's loans.  By 2023, that number had more than tripled to 14%.  Similarly in 2020, brokers who sent more than 75% of their loans to UWM accounted for 24% of UWM's total loans.  By 2023, that number had expanded to 48%.[60]

*Figure 6*



70.     In particular, the loan volume attributable to the brokers who are the most prolific loan-funnelers—those who send 99% or more of their loans to UWM—has accounted for an increasing amount of UWM's business.  In the last three years, these fully capitve brokers, who send 99% or more of their business to UWM, have accounted for approximately $39 billion of UWM's loan volume.

---

[60] Figure 6, Analysis of publicly available data.

71.     The data is clear, moreover, that this loan funneling behavior is neither a naturally occurring phenomenon, nor a function of UWM offering more affordable loans than the competition.  One way to evaluate this is to compare UWM's loan origination fees to those of other lenders for mortgage loans at comparable interest rates.  Origination fees are upfront fees paid by the borrower to the lender as compensation for executing and processing the loan.  Origination fees do not correlate with anything of value to the borrower; they are simply higher costs that inure to the benefit of the lender (and the broker, to the extent the broker's fee is paid out of the overall origination fee).  Thus, among the loan products with the same interest rates, the borrower's only financial motivation is to obtain the product with the lowest origination fee.

72.     Publicly available data published pursuant to the Home Mortgage Disclosure Act ("HMDA") demonstrates that UWM consistently charges higher origination fees than the *median* wholesale lender—let alone the most competitively priced lenders.  According to one analysis of HMDA data, in 2020, borrowers paid on average $211 more in closing costs for a UWM loan as compared to a borrower who paid the median amount of closing costs for a similar loan from another wholesale lender controlling for interest rates.  By 2023, that discrepancy had more than quadrupled.  Borrowers paid over $865 more than the median for a UWM loan, controlling for loan type and interest rate.

73.     When comparing UWM borrowers' origination costs to more competitively priced lenders (those whose origination costs are at the twentieth percentile), UWM borrowers paid, on average, approximately $2,500 more in 2023.

74.     In addition to having higher costs (while controlling for interest rates), UWM also does not offer lower interest rates when controlling for costs.  In 2023, its rates were consistently at or above the median.  Indeed, Defendant Ishbia has boasted to investors that he can "set the

margins daily" and dictate the costs and rates borrowers pay.  "It's not market-driven," Ishbia said on an earnings call last year. "Every day, I look at the pricing, I set it with our capital markets team. Personally, I do it."

75.     On its face, the behavior of a broker who steers such high proportions of her loans to a single lender—UWM—is incompatible with that broker's fiduciary and agency responsibility to her clients.  In fact, it is essentially statistically impossible for the corrupted brokers to be actually doing their duty—and the job for which they are being handsomely paid—to survey the market for multiple lenders and present their borrower clients with the best mortgage option.   As a former member of the National Association of Mortgage Brokers has stated:  "I have been tracking rate sheets on wholesale lenders for 17 years, and I can tell you there's not one time in history, not one time close in history, when I can see consistently sending more than 40% of loans—and that's generous, usually it's closer to 20% or 30%—to any one lender."  Another professional in the mortgage lending industry, who provided over $2.6 billion in loans in 2023, stated that brokers should generally be working with "seven to ten" lenders, unless they are receiving incentives for doing particularly high volume, in which case he said they should rotate between at least "three to five."

76.     But for UWM's tactics, the brokers who do business with UWM would have maintained their independence and continued evaluating options from multiple lenders to send their borrowers into economically advantageous mortgages.  However, because of UWM's tactics, thousands of brokers have abandoned their duty to their clients, and instead are funneling increasingly higher percentages of their business to UWM alone.  The upshot is if UWM borrowers had worked with brokers that did not participate in the UWM scheme, they would have been placed

into more competitively priced mortgages.  Instead, UWM borrowers are on the hook for billions of dollars in excessive fees and costs.

77.     UWM's representations at the core of its advertising and marketing materials—that "brokers are better" because they are "not captive or connected" to any one lender, and instead "independently shop" to get borrowers the "best deal"—are therefore false.  The data demonstrates that brokers in UWM's network are captive; they are not independently shopping; and they are certainly not getting borrowers the "best deal."   And these representations are not false by coincidence—they are false because *UWM and its corrupted brokers are structuring their relationships for the purpose of making those representations false*.  UWM monitors the activities of the brokers who have signed the "All-in" ultimatum and knows precisely with whom those brokers have placed their mortgages.

78.     UWM has reaped enormous rewards from the increasing prevalence of brokers' loan funneling conduct, which it deliberately causes and substantially assists through its business practices.  The increases in loan funneling within UWM's broker network have translated directly into increases in market share, fueling and sustaining the company's position as the originator of more than 48.1% of all broker-originated mortgages loans in the country and nearly 8% of all mortgages regardless of channel.

79.     In November 2022, as a result of this surge of growth, UWM surpassed Rocket Mortgage to become the largest mortgage lender by volume in the United States—retail or wholesale.  For Ishbia, as somebody driven by a relentless desire for UWM to be recognized as "number one," attaining that distinction was a massive personal and professional triumph.  It also earned him bragging rights in his bitter rivalry with fellow billionaire and NBA team owner Dan Gilbert, the founder and owner of Rocket Mortgage.  In a November 2022 voicemail Ishbia left

for the CEO of AIME (a UWM-bankrolled broker trade group) which reveals his mindset and
motivations, Ishbia said, of Gilbert and Rocket Mortgage:

> "We fucking took those cocksuckers down.  Fuck them.  And we're
> gonna keep fucking sticking it to them forever.  Fuck those guys.
> We're number one.  We kicked the shit out of them.  Brokers are
> number one.  UWM is number one.  You're number one.  We're all
> number one together.  And fuck them.  I fucking hate them with all
> my heart.  And we're gonna keep kicking their ass every fucking
> day. . . ."[61]

80.    UWM's aggressive business practices and market share growth have translated into
increasing revenue for UWM directly at borrowers' expense.  According to an analysis of publicly
available data, between 2020 and 2023, UWM dramatically drove up closing costs for borrowers
by charging substantially higher origination fees than its competitors particularly with respect to
loans originated through brokers who steer a majority of their business to UWM.  The data
establishes, moreover, that the more a broker funnels loans to UWM, the more the borrowers on
those loans overpay.  So, for example, in 2022, borrowers who obtained a mortgage loan through
a broker who funnels 50% of her loans to UWM paid, on average, hundreds of dollars more in
origination fees than the median amount of origination fees in the wholesale market for comparable
loans, while borrowers who got a loan from a 99% steerer paid over a thousand dollars more.

81.    If mortgage brokers were actually shopping in a functioning wholesale market,
UWM would also have a strong incentive to lower its origination fees to make its offerings more
competitive relative to other lenders.  And a large mortgage company like UWM should have a
*greater* ability to drive its overall origination costs down by capitalizing on efficiencies and

---

[61] *From FB Group Rocket Pro TPO vs UWM: Voicemail Mat Ishbia left Anthony Casa.*, Reddit, Feb. 24, 2024,
https://www.reddit.com/r/pillar7/comments/1ay3wcb/from_fb_group_rocket_pro_tpo_vs_uwm_voicemail_mat/.

economies of scale to offset overhead expenses related to loan administration and processing. These dynamics make UWM's substantially higher origination fees all the more jarring.

82.     In the aggregate and when controlling for interest rate and loan type, between 2021 and 2023, UWM borrowers who got a mortgage through brokers who send at least 75% of their business to UWM paid at least $400,000,000 more in origination fees than those borrowers would have if their brokers had simply shopped around and obtained a loan for them with the median amount of origination fees.

83.     But as UWM represents to the public, independent brokers have a duty not merely to find a median deal for their clients—rather, they have a duty to shop around to find them the best deal they can.  If the brokers who send 75% or more of their loans to UWM had actually shopped around to find their borrowers the best deal possible—*i.e.*, a loan with the lowest origination fees available on the market—those borrowers would have saved, in the aggregate, well over $2.7 billion.  As a direct and proximate result of UWM's scheme, UWM has profited, and borrowers have lost, billions of dollars.

**VI.   UWM Sustains and Grows Its Group of Corrupted Broker Partners by Offering Value to Brokers If They First Prove Their Commitment to Funneling Loans to UWM**

84.     In view of its market position, UWM is uniquely suited to direct borrowers to brokers and thus to control brokers' deal-flow—the lifeblood of a broker's revenue stream. Leveraging that position, in May 2018, UWM launched a borrower-facing website called FindAMortgageBroker.com.  The website, according to UWM, purportedly was designed to serve both as a national search engine that prospective borrowers could use to locate a mortgage broker in their area, and as an educational guide with written and video content explaining the value of using a mortgage broker.  As UWM's CEO Mat Ishbia stated in the press release announcing the

new website: "FindAMortgageBroker.com gives consumers nationwide a platform to easily locate nearby mortgage brokers and learn about why they're the best choice for getting a mortgage."[62]

85.     Since its launch, the website has featured content describing the supposed value proposition for using an independent mortgage broker—namely that a broker's allegiance lies with the borrower, not an individual lender, and thus a broker can shop offers from multiple lenders to find the best deal for the borrower.  For example, beginning no later than May 2021 the front pages of the website stated:  "Connecting with an independent mortgage broker means having a local expert by your side for one of life's biggest financial decisions.  **Because they are independent, licensed professionals, mortgage brokers can shop multiple lenders — giving them access to more home loan options than what a bank or online lender can offer.**  The result is a cheaper, faster and easier mortgage for you. . . ."[63]

*Figure 8*



---

[62] Caroline Basile, *United Wholesale Mortgage launches consumer-facing broker website*, HousingWire, May 8, 2018, https://www.housingwire.com/articles/43304-uwm-launches-consumer-facing-broker-website/.

[63] Figure 8, https://findamortgagebroker.com, Retrieved from *Internet Archive*, (archived on May 18, 2021), https://web.archive.org/web/20210518114811/https://findamortgagebroker.com/.

86.     The explanatory video that resided at the top of the homepage conveys a similar message.  The narrator explains:  "Most banks and big online lenders only offer their own mortgage products, with limited options, limited communication, and lengthy waiting periods that can drag out your closing.  When you work with an independent mortgage broker, you have a local mortgage expert on your side to personally advise you throughout the process, and who has your best interest in mind.  **They'll shop dozens of lenders to find the right home loan for your needs**. . . ."[64]

*Figure 9*



87.     Other "Guides" and articles on the website likewise describe a mortgage broker as "a home loan expert that connects prospective homeowners with willing mortgage lenders" and who "shop[s] around to find the best interest rates, terms, and loan products" that meet the borrower's needs.[65]

---

[64] Figure 9, https://findamortgagebroker.com, Retrieved from *Internet Archive* (archived on May 18, 2021), https://web.archive.org/web/20210518114811/https://findamortgagebroker.com/.

[65] *5 Facts About Your Local Mortgage Broker*, Jan. 22, 2021, https://findamortgagebroker.com/resources/guides/all-guides/guides/2021/01/23/5-facts-about-working-with-a-local-mortgage-broker, Retrieved from *Internet Archive* (archived on May 18, 2021), https://web.archive.org/web/20210518100649/https://findamortgagebroker.com/resources/guides/all-guides/guides/2021/01/23/5-facts-about-working-with-a-local-mortgage-broker.

88.     In January 2024, UWM rebranded FindAMortgageBroker.com, changing its name to MortgageMatchup.com.[66]  The rebranded website contains much of the same content, including the broker search directory and UWM's representations that mortgage brokers "shop around to find the best interest rates, terms, and loan products that meet your needs."[67]

89.     UWM has spent, and continues to spend, considerable effort and millions of dollars in advertisements to promote its website in order to drive more web traffic to the content it features. Among other things, UWM promoted FindAMortgageBroker.com in two television commercials that aired during Super Bowl LIV in 2020 and Super Bowl LV in 2021 respectively.[68]

*Figure 10*

 

90.     UWM's CEO Mat Ishbia also frequently promotes the website during interviews and on social media.[69]   For example, in a January 2021 interview with Bloomberg, Ishbia explained:  "You know, it's all about you know finding great mortgage brokers.  So we work with

---

[66] Press Release, *UWM Rebrands FindAMortgageBroker.com to Mortgage Matchup*, UWM.com, Jan. 17, 2024, https://www.uwm.com/about-us/media-resources/press-releases/2024/january-17-2024.

[67] *See Facts About Your Local Mortgage Broker*, https://mortgagematchup.com/resources/blog/facts-about-your-local-mortgage-broker.

[68] Figure 10, Kimberly Greene, UWM challenges Rocket Mortgage in first-ever Super Bowl ad, MPAmag.com, Jan 31, 2020, https://www.mpamag.com/us/news/general/uwm-challenges-rocket-mortgage-in-first-ever-super-bowl-ad/212162; *FindAMortgageBroker.com Superbowl LV Commercial*, Mat Ishbia's Facebook Page, Feb. 2, 2021, https://www.facebook.com/MatIshbiaUWM/videos/421213375778520/.

[69] *See, e.g.*, Figure 11, *Mat Ishbia Bloomberg 1.15.21*, Mat Ishbia's Facebook Page, Jan. 15, 2021, https://www.facebook.com/MatIshbiaUWM/videos/432886534423072/; Mat Ishbia's Facebook Page, Mar. 4, 2021 at 1:38 PM, https://www.facebook.com/MatIshbiaUWM.

great mortgage brokers.  FindAMortgageBroker.com.  There's a lot of great mortgage brokers. It's the cheapest, fastest, easiest way to get a mortgage.  And so what we're really big on is helping advocate for them, and help educate consumers that the best way to get a mortgage is to go through them.  Then you get great partners. . . ."

*Figure 11*



91.     In reality, FindAMortgageBroker.com (and now MortgageMatchup.com) is a tool for UWM compel brokers to steer loans to UWM.

92.     From the brokers' perspective, accordingly, it is critical to be featured on FindAMortgageBroker.com just as any other business invests heavily in securing priority search results on Google, for example.  This means that UWM has enormous market power through its directory website.

93.     And it leverages that power.  In short, UWM uses the website to steer borrowers on FindAMortgageBroker.com ***to the borrowers that steer the most loans to UWM by featuring them in search results***.  The message to brokers is simple: ***the more you steer borrowers to UWM, the more UWM will steer borrowers to you on FindAMortgageBroker.com and thus increase your deal-flow and revenue.***

94.     The specifics are as follows:  As an initial matter, to be listed on UWM's broker directory, a broker must be a "UWM Partner" who has signed UWM's Wholesale Broker Agreement.  The directory on the website thus excludes brokers who do not do business with UWM.  None of this is disclosed on the website.  On the contrary, the statements on the website, in combination with pervasive public representations by company representatives (*see supra* Section II), are intended to mislead consumers into believing the brokers do not have undisclosed allegiances or connections to UWM.

95.     When borrowers visit the website, they are invited to enter their address, city, or ZIP code into a search bar at the top of the screen.[70]  The algorithm that determines the search results, however, ranks brokers according to their "PRO Score," a numerical value that UWM assigns every broker in its network as part of its "PRO Rankings" system.  As UWM explains on its broker-facing website, "[t]he higher your PRO Score . . . the more visibility you'll have on Mortgage Matchup."[71]

*Figure 12*



---

[70] Figure 12, https://mortgagematchup.com/ (accessed Mar. 16, 2024).

[71] *PRO Rankings*, https://www.uwm.com/pro-rankings (accessed Mar. 16, 2024).

96.     A broker's "PRO Score" is calculated each month based on actions the broker has taken in the prior month.  Brokers earn "points" toward their PRO Score by, among other things, (i) submitting loan applications with UWM, (ii) visiting UWM's campus, (iii) communicating with UWM account executives, and (iv) engaging with UWM's content online.[72]

*Figure 13*



97.     Each of these components of a broker's PRO Score is a proxy for loyalty to UWM. The brokers who are most loyal to UWM, and who place the highest proportions of their loans with UWM, receive the highest PRO Scores and the accompanying promotional services and access to other benefits.

---

[72] Figure 13, *PRO Rankings Scoring Key*, https://www.uwm.com/pro-rankings-scoring-key (accessed Mar. 16, 2024).

98.     For example, brokers can earn up to 50 points each month by achieving up to six "Ultimate Loan Submissions."  To achieve an "Ultimate Loan Submission" a broker must submit a loan application while using at least five of UWM's exclusive tools for compiling, organizing, and verifying borrower information—tools that can only be used in connection with UWM loan submission.[73]  Similarly, brokers can earn points by ordering a "Memory Maker" on high proportions of their loans (5 points for 50-69% of their loans; 10 points for 70% or more of their loans).  But "Memory Makers"—personalized thank you gifts for real estate agents or borrowers, like cutting boards or welcome mats—can only be ordered for loans placed with UWM.  So essentially, brokers can earn these points only if they place an increasing proportion of their loans overall with UWM.

99.     As a result, the search results on FindAMortgageBroker.com (and now MortgageMatchup.com) are deliberately biased toward brokers who are corrupted in favor of UWM.  In other words, the website is designed to steer borrowers to brokers who funnel nearly all their business to UWM, regardless of whether UWM offers the most competitive loan terms.  Conversely, brokers who do not funnel loans to UWM can expect UWM (through FindAMortgageBroker.com) to *decrease* the number of borrowers that seek their services.

100.    To illustrate the point, if a borrower enters a ZIP code in Chapel Hill, North Carolina into the search bar, the top six brokers that appear in the results are Patrick Roman (NMLS #204441), Whitney Bulbrook (NMLS #48522), Stephen Fitzpatrick (NMLS #92185), Teante Gray (NMLS #2080243), Erica Sanders (NMLS #390083), and Robert Bajakian (NMLS #77324).[74]  Each of those brokers funnel nearly all of her or his loans to UWM.  Roman sends upwards of 80%

---

[73] *Ultimate Loan Submission*, https://www.uwm.com/ultimate-loan-submission (accessed Mar. 16, 2024).

[74] Figure 14, https://mortgagematchup.com/search?query=27514 (accessed Mar. 16, 2024).

of his loans to UWM.  Bulbrook sends 99%.  Fitzpatrick sends 100%.  Gray sends 89%.  Sanders

sends 86%.  Bajakian sends 92%.  Accordingly, none of these brokers is actually shopping across

multiple lenders for the best loans available for their clients.  Instead, they are sending their clients

to one lender: UWM.

*Figure 14*



101.    Together, the website and PRO Score system create a powerful mechanism to

corrupt so-called "independent" brokers into UWM loyalists.  With up to tens of thousands unique

visitors per month, UWM's website has become a critical component of UWM's participation in

funneling borrowers to UWM against their interests.

102.    UWM not only corrupts brokers through FindAMortgageBroker.com, but UWM uses its PRO Rankings and LO Partner Points systems to provide financial and other benefits to brokers who steer their cusomters to UWM.

103.    In short, and with respect to the Pro Rankings System, brokers increase their "PRO Score" and "PRO Ranking status" by funneling more borrowers to UWM.[75]  The "PRO Score" that UWM assigns to each broker in its network provides them access to one of three "status" tiers—PRO Basic (for scores of 0-49), PRO Plus (for scores of 50-69), or PRO Elite (for scores of 70+).[76]

*Figure 15*




104.    UWM provides increasingly attractive financial and other benefits to brokers depending on the "status" tier they achieve by funneling loans to UWM.  As Ishbia recently

---

[75] *PRO Rankings*, https://www.uwm.com/pro-rankings.

[76]    Figure 15, UWM's Facebook Page, Mar. 15, 2024 at 4:15 PM, https://www.facebook.com/UnitedWholesaleMortgage, UWM's LinkedIn Page, https://www.linkedin.com/posts/united-wholesale-mortgage_weve-made-some-powerful-changes-that-make-activity-7022203122810839040-lt9P/.

explained on UWM's Instagram feed:  "Being PRO Elite matters.  You get more FindAMortgageBroker.com leads.  You get more opportunity.  Faster turn times.  All the things matter with PRO Elite."[77] Whether characterized as getting "more leads" or "more opportunities," in substance what brokers receive is UWM's valuable assistance in making more money for themselves, regardless of the consequences to borrowers.

105.    One particularly crucial benefit for brokers who achieve PRO Plus or PRO Elite status is faster turn times, a highly valuable benefit for a mortgage brokers.  The more time that passes between the beginning of the approval process and closing, the greater the chance that something might derail the transaction—an interest rate fluctuation, cold feet from the buyer, etc.  Because brokers only get compensated if the mortgage loan closes, speed is therefore paramount.  Time spent on a transaction that was too slow to close is time that was wasted.  The faster transactions can close, the more deal-flow brokers can generate and process, the more money they can make for themselves.

106.    Generally, when a new loan file is submitted to UWM for underwriting, it will take more than two days for UWM's underwriters to review and verify the information in the file and send it back to the broker.  For brokers who achieve PRO Plus status, however, UWM's underwriters will guarantee completion of initial underwriting within two days.  For brokers who achieve PRO Elite status, the initial underwriting turn time is guaranteed within one day.  And if the file is returned with conditions—that is, if the underwriter is requesting additional documentation or clarification concerning certain information in the file—UWM will ensure the

---

[77] @uwmlending, Instagram, Oct. 2, 2023, https://www.instagram.com/p/Cx5sgI1uFee/?img_index=1.

additional information is reviewed and confirmed also within one day, but again, only if the
submitting broker has PRO Plus or PRO Elite status.[78]

*Figure 16*

| | PRO Elite | | PRO Plus | | PRO Basic | |
| | PRO Score of 70+ | | PRO Score of 30-69 | | PRO Score of 29 or lower | |
| | Initial UW | Conditions | Initial UW | Conditions | Initial UW | Conditions |
|---|---|---|---|---|---|---|
| Conventional | 1 | 1 | 2 | 1 | 2+ | 1+ |
| FHA | 1 | 1 | 2 | 1 | 2+ | 1+ |
| Non-Agency* | 2 | 1 | 3 | 2 | 3+ | 2+ |
| USDA | 1 | 1 | 2 | 1 | 2+ | 1+ |
| VA | 1 | 1 | 2 | 1 | 2+ | 1+ |
| Last updated on March 17, 2024 | | | | | | Turn Times Details |

107.    Again, the message that UWM sends to brokers through this scheme is clear:  the
more loans you funnel to UWM, the faster UWM will process loans for you, and the more money
you will make.

108.    Through its Pro Rankings and LO Partner Points programs, UWM also offers teaser
products such as interest rate discounts, "1% down" products, and rate relocks.  But, again, ***these
are offered only to those brokers who first prove their loyalty by funneling borrowers to UWM***.
And even those offerings generally do not convert into actual savings for clients.  As discussed
above in Section V, even after accounting for such offerings, UWM borrowers who worked with
UWM's corrupted brokers routinely pay hundreds more than they would have with even just a
median loan product (much less, the most competitive product at the time).

109.    Through its FindAMortgageBroker.com website and its PRO Rankings and LO
Partner Points programs, accordingly, UWM sends a clear and unmistakable message to the
population of "independent brokers" in the market:  If you funnel loans to UWM rather than shop

---

[78] Figure 16, *PRO Rankings*, https://www.uwm.com/pro-rankings.

on behalf of your customers, UWM will enrich you.  The predictable result is that brokers—chasing their self-interest—accede to UWM's corrupt proposition, resulting in the dynamic described above in Section V, where UWM and thousands of brokers are working together to drive an unconscionable proportion of borrowers to UWM who would be better off getting their loans elsewhere.

110.    UWM also provides its corrupted brokers with template advertising materials that have been produced by UWM for no cost.  These benefits are not disclosed to borrowers.  Among other things, UWM provides its corrupted brokers tools called "Brand 360" and "Brand Builder," which it describes as "like having your own team of marketing professionals without the expense." These tools enable UWM enable corrupted brokers to take UWM-produced social media and video content, strip it of any reference to UWM, insert the broker's own branding, and present it as their own.[79]  For example, individual brokers and brokerage firms can take the television commercial UWM produced for the Super Bowl to promote FindAMortgageBroker.com and pass it off as their own, as One Stop Financial Group, LLC—a firm whose brokers funnel over 90% of their loans to UWM—does on its Facebook page.[80]

*Figure 17*

 

---

[79] *Brand 360 Brand Builder*, https://www.uwm.com/grow-your-business/brand-builder.

[80] Figure 17, One Stop Financial Group, LLC's Facebook Page, Oct. 20, 2023, https://www.facebook.com/onestopfinancialgroupllc/videos/358371569860194; United Wholesale Mortgage's YouTube Channel, Jan. 31, 2020, https://www.youtube.com/watch?v=-X4dvNICep4.

111.    UWM also frequently flies corrupted brokers to its campus in Pontiac, Michigan for days-long conventions, training courses, and events, which often feature lavish meals and live entertainment, all at UWM's expense.   Numerous brokers who have attended UWM's live events and trainings describe them as raucous parties, heavy on free perks for attendees.   For example, brokers who have attended these events and trainings have said on social media:

    a.  "I stayed at the bar every night and had a blast. You will get something out of it.  Go."

    b.  "The training was whatever.  The free food was good."

    c.  "They serve delicious Kool aid there."[81]

## VII.    Plaintiffs' Mortgage Loans With UWM

### A.    Plaintiffs Therisa and Billy Escue's UWM Mortgage

112.    Plaintiffs Billy and Diane Escue (together, the "Escues") bought their home located in Portland, Tennessee in or around 2001.

113.    In or around February 2022, the Escues decided to refinance the mortgage on their home.  Rather than approaching a retail lender, the Escues hired a mortgage broker—James Elkins, a senior loan officer at NEXA Mortgage, LLC ("NEXA Mortgage").

114.    Elkins has worked as a mortgage broker for over 25 years.   According to information available through the Nationwide Multistate Licensing System ("NMLS"), Elkins is licensed to originate mortgages in two states—Tennessee and Florida—and heads a branch of NEXA Mortgage which operates the website LendNationwide.com.

115.    Elkins's firm, NEXA Mortgage, is a large residential mortgage brokerage firm headquartered in Chandler, Arizona.  The firm is licensed to do business in 48 states, along with

---

[81]    *Has anyone done the trainings at UWM?*, r/loanoriginators, Reddit, Aug. 5, 2022, https://www.reddit.com/r/loanoriginators/comments/wh4mcz/has_anyone_done_the_trainings_at_uwm/.

the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.  In 2023, NEXA Mortgage originated more than 16,793 mortgage loans across the country totaling over $5.7 billion in loan volume.  NEXA Mortgage is what is known in the industry as a "mega broker," a full-service brokerage firm with in house loan processing capabilities that works with thousands of individual loan officers across the country.

116.    Elkins and NEXA Mortgage market themselves as "independent" mortgage brokers.  For example, on LendNationwide.com, the website for the NEXA Mortgage branch Elkins operates, Elkins and the firm represent to the public:  "We work with multiple lenders and we can provide our clients with extremely competitive pricing.  Now you can do all your comparison shopping with one company without wasting time with several banks or brokers."[82]  Elkins also represents on his personal Facebook pages that he offers a "Full Suite of Loan Products with Over 200 Lenders."[83]

*Figure 18*



---

[82] https://lendnationwide.com/index.php.

[83] Figure 18, https://www.facebook.com/photo/?fbid=246469271468519&set=pb.100083163430611.-2207520000; https://www.facebook.com/photo/?fbid=1447670722721948&set=ecnf.100024371028946.

117.     The Escues hired Elkins to serve as their agent in the refinancing process and advise them as to the best and most affordable mortgage loan options available, regardless of which entity would act as the lender.

118.     As a result of the confidential relationship of trust and reliance between the Escues, on the one hand, and Elkins, on the other, and the fact that Escues hired Elkins to serve as their mortgage broker and agent in connection with the refinancing of their home, under Tennessee and federal law, Elkins owed fiduciary duties to the Escues.  In his capacity as fiduciaries, Elkins had a duty, among other things, to (i) put the Escues' interests before his own, (ii) diligently survey the wholesale market on the Escues' behalf; (iii) present the Escues with the best and most affordable loan options available to them; and (iv) disclose to the Escues all material facts that might affect his ability to perform his responsibilities in a diligent and unconflicted manner.

119.     Despite his representations to the contrary, Elkins is not, in fact, an "independent" mortgage broker under any definition.  Instead, he is a corrupt UWM loyalist.

120.     According to publicly available data, in 2021, Elkins sent 99.5% of his loan volume to UWM.  In 2022, he sent 100%.

121.     Elkins, moreover, is among the top mortgage brokers in Tennessee.  Between 2020 and 2022, Elkins originated more than $242,160,000 in mortgage loans.

122.     Elkins does not independently shop for the most competitively priced mortgage loans for his borrowers.  Rather, he intentionally funnels his borrowers to UWM.

123.     Elkins signed UWM's Wholesale Broker Agreement and, at all relevant times, has been bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits Elkins from sending any loans to Rocket Mortgage.  Elkins has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has

not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021.  Elkins participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs.  He has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and to participate in UWM-organized training sessions.

124.    When the Escues first approached Elkins about their desire to refinance their home, Elkins knew he would refer them to UWM regardless of UWM's pricing vis-à-vis other available options.

125.    Despite that knowledge, Elkins advised the Escues that he intended to diligently survey the loan options available from numerous other wholesale mortgage lenders and find the option that was most affordable and best aligned with the Escues' financing needs.  The Escues believed and relied upon Elkins's representations that he would diligently and independently shop for a loan in their best financial interests.  Indeed, the expectation that Elkins would shop for the best loan on their behalf was the entire reason why the Escues hired Elkins in the first place.

126.    Notwithstanding Elkins's representations to the Escues and in his borrower-facing advertising, Elkins never in fact conducted any meaningful search of loan options from non-UWM lenders at all.  Instead, Elkins searched for and recommended only loan options from UWM. Elkins never seriously considered sending the Escues to any lender other than UWM.

127.    Elkins never disclosed to the Escues that he had signed an agreement—UWM's Wholesale Broker Agreement—which meaningfully restricted his ability to shop for mortgage loans in their best interest.  Elkins also never disclosed to the Escues that he sent the vast majority of his clients to UWM, and that he received valuable benefits from UWM in exchange.

128.     At all relevant times, UWM was aware of Elkins's and NEXA Mortgage's fiduciary relationship and responsibilities with respect to their clients, including the Escues.  However, in pursuit of attaining and sustaining ever increasing market share, UWM induced and substantially assisted Elkins's and NEXA Mortgage's breach of their fiduciary responsibilities vis-à-vis the Escues through its aggressive tactics of restricting Elkins's and NEXA Mortgage's ability to shop multiple lenders and to exercise independent judgment while simultaneously providing them value in exchange for steering.  UWM was fully aware that in sending the vast majority of his loans to a single lender—UWM—Elkins was breaching the fiduciary duties he owed to his clients, including the Escues.

129.     Ultimately, on February 28, 2022, Elkins originated the Escues' refinancing loan from UWM.  The Escues' UWM loan was a conventional loan for a principal amount of $243,200.

130.     Among the closing costs the Escues paid was an origination fee paid directly to UWM.

131.     As a fee for his services, Elkins earned a commission, which was paid by UWM.

132.     According to publicly available data, the mortgage loan Elkins procured for the Escues was not the most affordable option on the market.  In the same month that Elkins originated the Escues' loan, multiple other wholesale lenders, in the same geographic location, were offering loans with the same parameters in all material respects—same type of loans, at the same or similar interest rates—while charging significantly lower origination fees.

133.     However, because Elkins only presented the Escues with options from UWM and no other lender, the Escues overpaid significantly for their mortgage loan.

134.     The Escues' story is just one among thousands.  During February 2022, the same month the Escues got their UWM loan, Elkins was involved in 13 other loan transactions.  All 13

went to UWM.  Between 2021 and 2022, Elkins was involved in 451 loan transactions, 449 of which went to UWM.  In the aggregate, UWM borrowers who used Elkins over the last three years paid at least hundreds of thousands more in origination fees than they otherwise would have if Elkins had found them the most affordable loan available.

135.    This result is precisely what UWM's scheme and enterprise is designed to produce. UWM ensured that Elkins would put the financial interests of UWM and himself above the borrower's interests by contractually restricting Elkins's ability to independently shop while offering valuable benefits in exchange for an increasing rate of referrals.

136.    The Escues are among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

**B.    Plaintiff Kim Schelble's UWM Mortgage**

137.    Plaintiff Kim Schelble and his wife, Yvette Cho, bought their home in Chapel Hill, North Carolina on June 3, 2021.

138.    Schelble sought to finance 80% of the purchase price and, like all borrowers, sought to find a competitively priced mortgage.

139.    Schelble hired Whitney Bulbrook as his mortgage broker.

140.    Bulbrook is the founder, owner and president of mortgage brokerage firm called Carolina Ventures Mortgage, LLC ("Carolina Ventures").

141.    Bulbrook has been the top producing mortgage broker in North Carolina in each of the last six years.  In 2023 alone, she originated $108,075,822 in mortgage loan volume, the twenty-seventh highest total of any broker in the country.[84]  Carolina Ventures, is likewise among the top producing firms in the state.

---

[84] *2023 Top Mortgage Brokers*, Scotsman Guide.

142.    In borrower-facing marketing materials and social media, Bulbrook holds herself out as a "trusted guide" for her clients whose independence from any particular lender allows her to pursue her clients' "best interest."[85]

*Figure 19*




143.    The homepage of Bulbrook's website features a video that emphasizes the concepts of "shopping" and "choices" in describing the benefits of working with a mortgage broker as opposed to a retail lender like a bank.  The narrator of the video says the following:

> Meet your local licensed mortgage broker.  She's not a big corporation or a bank.  She doesn't advertise on TV.  She doesn't do car loans, trade stocks, or offer checking accounts.  She does one thing.  And she does it better than anyone else.  She shops for great deals on mortgages.  So why get a personal shopper for your mortgage?  Because you want an advocate.  And choices.  Lot's of choices.  Choices set up competition between lenders.  And that's good for you.  The sales people at banks and big lenders can't show you the big picture.  But a broker compares deals from hundreds of banks and lenders of all sizes across the U.S., then organizes and presents those choices based on your location, financial situation,

---

[85] Figure 19, Carolina Ventures' Facebook Page, Sep. 27, 2023 at 2:00 PM & Mar. 28, 2024 at 2:00 PM, https://www.facebook.com/CarolinaVenturesMortgage/.

timeline and other factors.  She can then help you choose the best mortgage for your circumstances.  And a better mortgage can save you time, frustration, and most importantly, $20, $50, or even $100 or more off your monthly payments.  So when it comes to the biggest purchase of your life, don't take the first offer that comes along.  Get an expert who shops on your behalf.  Get an independent mortgage broker.[86]

*Figure 20*



144.    Similarly, in her realtor-facing marketing materials, Bulbrook emphasizes her ability to "shop" on your clients' behalf until she drops their interest rates.[87]

*Figure 21*



145.    Under North Carolina and federal law, Bulbrook was a fiduciary who owed a duty of loyalty to her client, Schelble.  In her capacity as a fiduciary, it was Bulbrook's responsibility,

---

[86] Figure 20, https://www.carolinaventures.com/

[87]    Figure    21,    Carolina    Ventures    Mortgage's    Facebook    Page,    Jun.    1,    2023, https://www.facebook.com/CarolinaVenturesMortgage/videos/932812668028132.

among other things, to (i) put Schelble's interests before her own, (ii) diligently survey the wholesale market on Schelble's behalf; (iii) present Schelble with the best and most affordable loan options available to him; and (iv) disclose to Schelble all material facts that might affect her ability to discharge her duties in a diligent and unconflicted manner.

146.    Despite her representations to the contrary, Bulbrook is not, in fact, an "independent" mortgage broker under any reasonable definition.  Instead, she is a corrupt UWM loyalist.  Bulbrook does not independently shop for the most competitively priced mortgage loans for her borrowers.  Rather, she intentionally funnels her borrowers to UWM.

147.    According to publicly available data, from 2019 to 2023, Bulbrook sent virtually all—***99.6%***—of her business to UWM.  In other words, Bulbrook sent $552,104,915 of loan volume to UWM and only $2,163,000 to all other wholesale lenders.[88]

*Figure 22*



148.    In 2021, she sent 509 loans (99.4% of all her loans) to UWM, and 3 loans to another lender.  In 2022 and 2023, she all her loans (100%) to UWM.

---

[88] Figure 22, Analysis of publicly available data.

149.    Bulbrook has signed UWM's Wholesale Broker Agreement and is bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits Bulbrook from sending any loans to Rocket Mortgage.  Bulbrook has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021.  Bulbrook also participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs.  Bulbrook has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and to participate in UWM-organized training sessions.  And she has been a featured speaker at UWM-sponsored events to present UWM's sales and communication strategies to other brokers.[89]  UWM, in fact, created the video on Bulbrook's homepage.[90]

*Figure 23*



---

[89]    Figure 23, United Wholesale Mortgage's Facebook Page, Nov. 18, 2021, https://www.facebook.com/UnitedWholesaleMortgage/videos/6374415879299453/.

[90]    United Wholesale Mortgage's Facebook Page, Aug. 9, 2016, https://www.facebook.com/UnitedWholesaleMortgage/videos/10153577260762000/.

150.    As a result of Bulbrook's repeated demonstrations of loyalty and referrals of business to UWM, when Schelble's ZIP code is typed into MortgageMatchup.com—UWM's online broker directory—Bulbrook appears among the top three results.  In addition, the company has rewarded her with meals, travel, and entertainment.  For example, six months after UWM went public in 2021, Bulbrook was among the select group of brokers that UWM invited on an all expenses paid trip to New York to ring the closing bell at the New York Stock Exchange with CEO Mat Ishbia in celebration of National Mortgage Broker's Day.  Bulbrook attended and stood immediately to Ishbia's right as he rung the closing bell on July 21, 2021.[91]

*Figure 24*



---

[91] Figure 24, Whitney Bulbrook's LinkedIn Page, https://www.linkedin.com/posts/whitney-bulbrook-cv_congrats-to-my-broker-partner-whitney-bulbrook-activity-6825845793128255488-h9i4/?trk=public_profile_like_view.

151.     When Schelble first approached Bulbrook about his need for a loan to purchase his home, Bulbrook knew she would very likely place Schelble in a UWM loan.

152.     Despite that intention, Bulbrook advised Schelble that she intended to diligently survey the loan options available from numerous other wholesale mortgage lenders, and find the option that was most affordable and best aligned with Schelble's financing needs.  Schelble believed and relied upon Bulbrook's representations that she would diligently and independently shop for a loan in his best interests.  Indeed, the expectation that Bulbrook would shop for the best loan on her behalf was the entire reason why Schelble hired Bulbrook in the first place.

153.     Notwithstanding Bulbrook's representations, Bulbrook never in fact conducted any meaningful search of loan options from non-UWM lenders at all.  Instead, Bulbrook searched for and recommended only loan options from UWM.  Bulbrook never seriously considered sending Schelble to any lender other than UWM.

154.     Bulkbrook never disclosed to Schelble that she had signed an agreement—UWM's Wholesale Broker Agreement—which meaningfully restricted her ability to shop for mortgage loans in his best interest.  Bulbrook also never disclosed to Schelble that she sent virtually all of her clients to UWM, and that she received valuable benefits and perquisites from UWM.

155.     At all relevant times, UWM was aware of Bulbrook's fiduciary relationship and responsibilities with respect to her clients, including Schelble.  However, in pursuit of attaining and sustaining increasing market share, UWM induced and substantially assisted Bulbrook's breach of her fiduciary responsibilities vis-à-vis Schelble through its aggressive tactics of restricting Bulbrook's ability to shop multiple lenders and to exercise independent judgment while simultaneously providing Bulbrook value in exchange for steering.  UWM was fully aware that in

58

sending the vast majority of her loans to a single lender—UWM—Bulbrook was breaching the fiduciary duties she owned to her clients, including Schelble.

156.    Ultimately, on June 3, 2021, Bulbrook originated Schelble's loan from UWM. Schelble's UWM loan was a conventional 30-year mortgage loan at a fixed interest rate.

157.    Schelble paid closing costs totaling $13,462.23, of which $5,907.41 were categorized as loan costs.  Among Schelble's loan costs was a $2,953.41 origination fee paid directly to UWM.

158.    Additionally, as a fee for her services, Bulbrook earned a 2% commission on the principal amount of the loan, totaling $10,720.00, which UWM paid to Carolina Ventures Mortgage, LLC.

159.    Publicly available data shows the mortgage loan Bulbrook procured for Schelble was not the most affordable option on the market.  Multiple lenders in June 2021 were offering comparable loans at comparable interest rates for substantially lower origination costs.

160.    In 2021, the year Bulbrook originated Schelble's loan, Bulbrook's loans were, on average, 74 basis points more expensive than non-UWM loans available in North Carolina with origination costs at the twentieth percentile, controlling for loan type and interest rate.  In other words, on average, Bulbrook's borrowers paid thousand's more for their loans than they would have if she shopped around to non-UWM lenders.

161.    Between 2021 and 2023, Bulbrook was involved in at least 985 loan transactions, 982 of which went to UWM.  For originating those loans, Bulbrook earned approximately $7 million in commissions as compensation for the services she provided her borrowers.  But over that time period, her borrowers paid, in the aggregate, at least $3.3 million more in origination fees

than they otherwise would have if Bulbrook had found them the most affordable loan available. Nearly all of those additional fees went directly to UWM.

162.    This result is precisely what UWM's scheme is designed to produce.  UWM ensured that Bulbrook would put the financial interests of UWM and herself above the borrower's interests by contractually restricting Bulbrook's ability to independently shop while offering benefits in exchange for steering.

163.    Schelble is among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

### C.    Plaintiff Brian Weatherill's UWM Mortgage

164.    Plaintiff Brian Weatherill purchased his home located in Bushnell, Florida in or around June 2021.

165.    Weatherill hired Toni Raulerson as his mortgage broker.

166.    Raulerson is affiliated with the Plant City Mortgage Corporation, which also does business as Florida Mortgage Firm.

167.    Florida Mortgage Firm, which operates the website "BestFloridaRate.com," markets itself as an independent mortgage brokerage firm.  On its social media, it tells prospective clients:  "Since a second opinion is never a bad idea when it comes to a large transaction, think outside the box and talk to an independent brokerage when buying a house. Never BLINDLY use an "in-house" lender. In fact, the lender you choose can have a greater impact on your interest rate than your actual credit score, in many cases."[92]  It also emphasizes, in its marketing, that an independent mortgage broker, unlike a retail lender, "Provides consumers multiple loan options."[93]

---

[92] Florida Mortgage Firm's Facebook Page, Jan. 15, 2019, https://www.facebook.com/FloridaMortgageFirm.

[93]    Figure    25,    Florida    Mortgage    Firm's    Facebook    Page,    Jul.    18,    2022, https://www.facebook.com/FloridaMortgageFirm.

*Figure 25*



168.    Raulerson is among the top mortgage brokers affiliated with Florida Mortgage Firm.  For six years in a row, from 2016 through 2022, Raulerson was ranked among the top 1% of mortgage brokers in the country in terms of loan volume originated.  From 2021 through 2023, she originated 818 mortgages, accounting for more than $219.2 million in loan volume.

169.    On her website, she represents to her prospective clients:  "Whether purchasing your first home, refinancing your existing home or investing in a second home, I will ensure you get the loan program and rates that fit your individual mortgage needs, all with service that is unsurpassed."[94]

170.    Weatherill hired Raulerson to serve as his agent in obtaining a mortgage to finance his home and to advise him as to the best and most affordable mortgage loan options available, regardless of which entity would act as the lender.

---

[94] https://flamortgagefirm.com/getting-started-with-toni/.

171.    As a result of the confidential relationship of trust and reliance between Weatherill, on the one hand, and Raulerson, on the other, under Florida and federal law, Raulerson owed fiduciary duties to Weatherill in connection with obtaining a mortgage for his Bushnell, Florida home.  In her capacity a fiduciary, Raulerson had a duty, among other things, to (i) put Weatherill's interests before her own, (ii) diligently survey the wholesale market on Weatherill's behalf; (iii) present Weatherill with the best and most affordable loan options available to him; and (iv) disclose to Weatherill all material facts that might affect her ability to perform her responsibilities in a diligent and unconflicted manner.

172.    Despite her representations to the contrary, however, Raulerson is not, in fact, an "independent" mortgage broker under any definition.  Instead, she is a corrupt UWM loyalist.

173.    According to publicly available data, in 2021, Raulerson sent 80.5% of her loan volume to UWM.  In 2022, she sent 86.2%.  In 2023, she sent 90.3%.

174.    Raulerson does not independently shop for the most competitively priced mortgage loans for her borrowers.  Rather, she intentionally funnels her borrowers to UWM.

175.    Raulerson signed UWM's Wholesale Broker Agreement and, at all relevant times, has been bound by the terms and conditions therein, including UWM's "All-In" ultimatum, which prohibits her from sending any loans to Rocket Mortgage.  Raulerson has complied with the provisions of UWM's Wholesale Broker Agreement, including the "All-In" ultimatum, and has not sent any loans to Rocket Mortgage since it went into effect on March 15, 2021.  Raulerson participates in UWM's loyalty rewards programs, including the PRO Rankings and LO Partner Points programs.  She has also visited UWM's campus multiple times, including to network with UWM personnel and other brokers, to attend UWM-sponsored meals and parties, and to participate in UWM-organized training sessions.

176.    When Weatherill first approached Raulerson about searching for a mortgage for his home, Raulerson knew she would refer him to UWM regardless of UWM's pricing vis-à-vis other available options.

177.    Despite that knowledge, Raulerson advised Weatherill that she would diligently survey the loan options available from numerous other wholesale mortgage lenders and find the option that was most affordable and best aligned with Weatherill's financing needs.  Weatherill believed and relied upon Raulerson's representations that she would diligently and independently shop for a loan in his best financial interests.  Indeed, the expectation that Raulerson would shop for the most affordable loan on his behalf was the entire reason why Weatherill hired Raulerson in the first place.

178.    Notwithstanding Raulerson's representations to Weatherill, Raulerson never in fact conducted any meaningful search of loan options from non-UWM lenders at all.  Instead, Raulerson searched for and recommended only loan options from UWM.  Raulerson never seriously considered sending Weatherill to any lender other than UWM.

179.    Raulerson never disclosed to Weatherill that she had signed an agreement— UWM's Wholesale Broker Agreement—which meaningfully restricted his ability to shop for mortgage loans in their best interest.  Raulerson also never disclosed to Weatherill that she sent the vast majority of her clients to UWM, and that she received valuable benefits from UWM in exchange.

180.    At all relevant times, UWM was aware of Raulerson's fiduciary relationship and responsibilities with respect to her clients, including Weatherill.  However, in pursuit of attaining and sustaining ever increasing market share, UWM induced and substantially assisted Raulerson's breach of her fiduciary responsibilities vis-à-vis Weatherill through its aggressive tactics of

restricting Raulerson's ability to shop multiple lenders and to exercise independent judgment while simultaneously providing them value in exchange for steering. UWM was fully aware that in sending the vast majority of her loans to a single lender—UWM—Raulerson was breaching the fiduciary duties she owed to her clients, including Weatherill.

181.    Ultimately, on June 8, 2021, Raulerson originated Weatherill's $343,200 mortgage loan from UWM at a 2.999% interest rate.

182.    Weatherill paid $10,682.50 in closing costs, which included an origination fee of $3,071.64 (0.895% of the loan amount) paid to UWM.

183.    As a fee for her services, Raulerson earned a commission of $9,438.00 (2.75% of the loan amount), which was paid by UWM.

184.    According to publicly available data, the mortgage loan Raulerson procured for Weatherill was not the most affordable option on the market. In the same month that Raulerson originated Weatherill's loan, multiple other wholesale lenders, in the same geographic location, were offering loans with the same parameters in all material respects—same type of loans, at the same or similar interest rates—while charging significantly lower origination fees.

185.    However, because Raulerson only presented Weatherill with options from UWM and no other lender, Weatherill overpaid significantly for his mortgage loan.

186.    Hundreds of other borrowers are in the exact same position as Weatherill. During 2021, the same year Weatherill got his UWM loan, Raulerson was involved in 446 other loan transactions, 359 of which went to UWM. Between 2021 and 2023, Raulerson was involved in 818 loan transactions, 686 of which went to UWM. In the aggregate, UWM borrowers who used Raulerson over the last three years paid millions more in origination fees than they otherwise would have if Raulerson had found them the most affordable loan available.

187.    UWM ensured that Raulerson would put the financial interests of UWM, her brokerage firm, and herself above the borrower's interests by contractually restricting her ability to independently shop and offering valuable benefits in exchange for an increasing rate of referrals.

188.    Weatherill is among the classes of individuals who were injured by UWM's conduct alleged in this complaint.

## CLASS ACTION ALLEGATIONS

189.    The classes' claims all derive directly from a single course of conduct by the UWM Defendants.  Defendants have engaged in uniform and standardized conduct toward the classes. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual class members.  Within each claim for relief asserted by the respective classes, the same legal standards govern.  Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all claims.  Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.    Class Definitions

### THE NATIONWIDE CLASS

190.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Class defined as follows:

All persons in the United States with claims arising within the applicable statute of limitations who obtained a UWM mortgage from March 15, 2021 through the present ("the Class Period") that was originated by a mortgage broker who (a) at the time the mortgage was originated, was subject to UWM's Wholesale Broker Agreement, and (b) who during the Class Period both: (i) referred 75% or more of his or her mortgage loans to UWM; and (ii) originated at least 5 separate loans with UWM, or if not, is employed by a brokerage firm that refers at least 75% of its mortgage loans to UWM.

### *THE STATEWIDE/MUTLI-STATE SUBCLASSES*

191.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and statewide and multi-state subclasses defined as:

All persons in the states set forth in Table A below who obtained a UWM mortgage loan in the State of _____ (e.g., Tennessee) from March 15, 2021 through the present ("the Class Period") that was originated by a mortgage broker who (a) at the time the mortgage was originated, was subject to UWM's Wholesale Broker Agreement, and (b) who during the Class Period both: (i) referred 75% or more of his or her mortgage loans to UWM; and (ii) originated at least 5 separate loans with UWM, or if not, is employed by a brokerage firm that refers at least 75% of its mortgage loans to UWM.

**Table A**

| | |
|---|---|
| Arizona | Montana |
| Arkansas | Nevada |
| California | New Jersey |
| Connecticut | New Mexico |
| Delaware | New York |
| District of Columbia | North Carolina |
| Florida | North Dakota |
| Hawaii | Oklahoma |
| Idaho | South Carolina |
| Illinois | South Dakota |
| Kansas | Tennessee |
| Kentucky | Utah |
| Minnesota | Vermont |
| Missouri | Washington |

192.    The Nationwide Class and State/Multi-State Subclasses and their members are sometimes referred to herein as the "class" or "classes."

193.    Plaintiffs reserve the right to revise the definition of the classes based upon subsequently discovered information and reserve the right to establish sub-classes where appropriate.

194.    Excluded from any class are Defendants, its employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates; class counsel and their employees; and judicial officers and their immediate family members and associated court staff assigned to this case.

## II.    Rule 23 Allegations

### *Numerosity and Ascertainability*

195.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are hundreds of thousands of at-issue mortgage loans nationwide. Individual joinder of all class members is impracticable.

196.    Each of the classes is ascertainable because its members can be readily identified using records kept by UWM or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

### *Predominance of Common Issues*

197.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the

respective classes predominate over questions affecting only individual class members. These include, without limitation, the following:

    a. Whether Defendants knew or should have known about fiduciary duties that brokers owed to class members;

    b. Whether Defendants engaged in conduct to influence the affairs of brokers in relation to their carrying out fiduciary duties to class members;

    c. Whether representations concerning the independence of brokers constitutes a material fact that reasonable borrowers would have considered in deciding whether to hire brokers who had agreed to UWM's "ultimatum" and its Wholesale Broker Agreement;

    d. Whether UWM provides things of value to brokers with the intent to influence brokers to steer business to UWM;

    e. Whether UWM induces brokers to steer customers to UWM even when it is not the best priced option;

    f. Whether Defendants omitted and failed to disclose material facts about the mortgage products sold to class Members;

    g. Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce;

    h. Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

    i. Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.  Whether Defendants' statements, concealments and omissions regarding its relationship with brokers were material, in that a reasonable consumer could consider them important in making financial decisions;

k.  Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

l.  Whether Defendants have been unjustly enriched by their conduct;

m.  Whether the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

n.  What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

o.  Whether certain Defendants conspired together to violate RICO; and

p.  Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

*Typicality*

198.  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the class members and arise from the same course of conduct by UWM.  The relief Plaintiffs seek is typical of the relief sought for the absent class members.

*Adequate Representation*

199.  Plaintiffs will fairly and adequately represent and protect the interests of the classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions and financial misconduct.

*Superiority*

200.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

201.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.   The common questions of law and of fact regarding UWM's conduct and responsibility predominate over any questions affecting only individual class members.

202.    Because the damages suffered by each individual class member may be relatively small compared to the cost of prosecuting his or her individual claims, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

203.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each class member than would piecemeal litigation.   Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of

class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

204.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into subclasses.

## CLAIMS FOR RELIEF[95]

### I.   Claims of the Nationwide Class

### COUNT 1
### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)

### (All Plaintiffs Against UWM and Mat Ishbia)

205.   Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

206.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

207.   UWM and Mat Ishbia ("Ishbia") are each a "person" under 18 U.S.C. § 1961(3).

---

[95] Unless otherwise indicated, references to "brokers" or "mortgage brokers" in these Counts refers to the brokers hired by Plaintiffs and the class.

208.    UWM and Ishbia each violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an Enterprise through a pattern of racketeering activity.

209.    Plaintiffs and class members are "person[s] injured in his or her business or property" by reason of the UWM's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The RICO Enterprise

210.    The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the "Steering Enterprise" or "Enterprise":

      a.    UWM, which orchestrated the fraudulent scheme and engaged in a pattern of conduct that involved misrepresenting material facts, causing or conspiring with brokers to withhold information from homebuyers about affordable lenders, offering inducements and things of value to brokers to corrupt their independence and to prevent them from providing honest services.

      b.    UWM officers and executives, including Defendant Ishbia, who collaborated and colluded with each other and with other associates in fact in the Steering Enterprise by disseminating intentionally misleading information to conceal the relationship between UWM and brokers, funding and influencing the affairs of trade associations that published information that facilitated the deceptive scheme, and employing fraudulent tactics to cause Plaintiffs to purchase UWM loans under false pretenses and without the benefit of disclosures and services that Plaintiffs were entitled to receive.

      c.    Mortgage brokers and brokerage firms, which breached their fiduciary duties by not acting in Plaintiffs' best interests. They made misrepresentations and material omissions, colluded with UWM to withhold information, accepted

things of value from UWM to influence the affairs of the Plaintiffs, and otherwise engaged in the conduct alleged in this complaint.

211.    Decisions about buying and financing a home are among the most consequential investment decisions most Americans make in their lifetimes. Plaintiffs hired mortgage brokers to provide honest and candid services in this process, and the mortgage brokers were paid for their services. The price of a mortgage broker includes the assurance that the broker is acting as a fiduciary and with undivided loyalty toward his or her principal, free from conflict, influence, or unauthorized influence from another party.

212.    Plaintiffs' mortgage brokers breached their fiduciary duties by colluding with UWM to withhold information about more affordable loan options, accepting things of value from UWM to influence the affairs of the Plaintiffs, entering agreements with UWM that created conflicts of interest and prevented them from providing honest services, and otherwise participating in the Steering Enterprise to deceive the plaintiffs.

213.    The Steering Enterprise is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Enterprise, which acted within and affected interstate commerce, had an ongoing organization with an ascertainable structure, and it functioned as a continuing unit with separate roles and responsibilities.

214.    While UWM participated in the conduct of the Steering Enterprise, it had an existence separate and distinct from the Enterprise. Further, the Enterprise was separate and distinct from the pattern of racketeering in which UWM engaged.

215.    At all relevant times, UWM operated, controlled, or managed the Steering Enterprise, through a variety of actions. UWM's participation in the Enterprise was necessary for

the successful operation of its scheme to defraud because UWM sold the mortgages, coordinated with brokers, disseminated false information to conceal the corruption, purchased and maintained valuable advertising platforms that it offered to brokers as inducements, and profited from such concealment.

216.    The members of the Steering Enterprise all served a common purpose: to sell as many mortgages as possible, and thereby maximize the revenue and profitability of the Enterprise's members.  The members of the Steering Enterprise shared the bounty generated by the enterprise, i.e., by sharing in the economics derived from increased sales revenue generated by the scheme. Each member of the Steering Enterprise benefited from the common purpose: UWM sold more loans and received more profit that it would have otherwise had and gained market share which allowed it to impose restrictions on brokers; Ishbia and the UWM officers and executives generated more pecuniary gain for themselves; and the brokers generated more commissions and tangible and intangible value, and were able to obtain valuable advertising and promotion from UWM of their brokerage services, thereby generating more commissions and business, which, in turn, they funneled to UWM.

**Pattern of Racketeering Activity**

217.    UWM conducted and participated in the conduct of the affairs of the Steering Enterprise through a pattern of racketeering activity that has lasted years, and continues to this day, and that consisted of numerous and repeated violations of:

218.    The federal mail and wire fraud statutes,18 U.S.C. §§ 1341, 1343, and 1346, which prohibit the use of any interstate mail or wire facility for the purpose of executing a scheme or artifice to deprive another of money, property, and/or "the intangible right of honest services" under 18 U.S.C. § 1346, violation of which constitutes racketeering under 18 U.S.C. § 1961(1)(B);

219.    The Travel Act, 18 U.S.C. § 1952, which prohibits "unlawful activity" in interstate commerce, including "bribery . . . in violation of the laws of the State in which committed," which the U.S. Supreme Court has held includes commercial bribery. Many states' commercial bribery statutes punish anyone who offers things of value to influence a fiduciary's performance of his or her duties.

220.    State bribery laws, the violation of which constitutes racketeering under 18 U.S.C. § 1961(1)(A) ("racketeering activity" means (A) any act or threat involving . . . bribery").

221.    For UWM, the purpose of the scheme was to deceive homebuyers about the relationship between UWM and brokers, while preventing homebuyers from being presented with affordable mortgage options from other lenders. By infiltrating and corrupting the fiduciary relationship that existed between homebuyers and their hired agents, UWM was able to charge non-competitive prices, impose over-market closing costs, increase sales, and avoid competition, knowing that the brokers had been influenced to withhold information about available loan options. UWM also maintained and boosted consumer confidence in the UWM brand and the value and independence of brokers by publishing false and deceptive information about UWM brokers and funding organizations to amplify UWM's false information, all of which furthered the scheme to defraud and helped UWM sell more loans at higher prices than they would have sold otherwise.

222.    To further the scheme to defraud, UWM repeatedly misrepresented and concealed the relationship between itself and brokers, disseminated false information about the independence of brokers, funded trade associations to amplify UWM's deceptive public messages, offered and provided things of value to induce brokers to funnel business to UWM, conspired and agreed with brokers for them to withhold from their clients material information, and infiltrated the fiduciary

relationship between brokers and homebuyers to corrupt their independence, which UWM repeatedly represented was essential to the operation of the wholesale mortgage market.

223.    UWM conducted or participated in the affairs of the Steering Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1346 (honest services fraud):

       a.  UWM devised and furthered the scheme to defraud by use of the mail, telephone, wires, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate commerce, writing(s) and/or signal(s), including the UWM website and websites funded and maintained by UWM, communications with brokers, statements to the press, advertisements targeted at consumers, and communications with other members of the Enterprise; and

       b.  UWM utilized the interstate mail and wires for the purpose of obtaining money or property, or depriving class members of the intangible right of honest services from their brokers.

224.    Having devised or intending to devise a scheme to defraud, UWM engaged in or substantially participated in following acts, among others, using interstate mails or wires in furtherance of the scheme:

       a.  On approximately July 7, 2021, a trade association funded by UWM represented in its publicity materials that Plaintiffs' brokers were defined by their unrestricted "ability to work with a variety of lenders," which would "allow the brokers to shop for the best price and process for their clients."

During all or part of the Class Period, however, Plaintiffs' brokers were restricted from shopping from some of the largest and most affordable wholesale lenders in America. Additionally, brokers were categorically restricted from shopping for better prices from any lenders once Plaintiffs received price quotes from UWM—even though Plaintiffs were not yet bound to UWM and were entitled to learn about better prices from their brokers.

b. Continuously during all or part of the Class Period, UWM represented and advertised on its website MortgageMatchup.com under the title "5 Facts about Your Local Mortgage Broker" that Plaintiffs' brokers would "work[]s on your behalf" to "present the best loan options available," which UWM knew to be materially false because (a) UWM actively took measures to prevent Plaintiffs from being presented with loan options; and (b) UWM had access to information demonstrating to a degree of statistical certainty that UWM had successfully induced brokers to regularly withhold the best loan options available, because, for example, UWM brokers frequently referred upwards of 95% or even 99% of their business to UWM even though UWM offered the best overall prices only a fraction of time.

c. During all or part of the Class Period, UWM's website advertisements deceptively implied that Plaintiffs' brokers were the opposite of "the type of shopper who always buys at the first store" and would instead "shop loans . . . on your behalf to find you the best rate." This was materially false, as UWM took measures to restrict Plaintiffs' ability to obtain the best rates and knew their brokers and were not shopping on behalf of their clients.

d.  On February 15, 2019, UWM's CEO publicly represented in the media that "Mortgage brokers are completely independent. They are not captive or connected to my company or any company. They are independently shopping. . . ."  On information and belief, the substance of UWM's marketing and advertisements has been materially consistent with this statement during the relevant time period.

e.  On March 13, 2019, UWM's CEO stated "brokers have access to all lenders" and access to all unique products offered by lenders. On information and belief, UWM disseminated this representation on other occasions.

f.  On December 4, 2020, UWM's CEO publicly represented the brokers listed on FindaMortgageBroker.com would shop for "cheaper" mortgages and present whichever has the "lower rate," even though undisclosed the purpose and effect of the website was, in fact, to funnel customers to brokers who UWM knew were least likely to shop for the lowest rate on behalf of their clients. On information and belief, UWM repeated this representation, in substance, multiple times during the relevant time period.

g.  During all or part of the Class Period, UWM published and maintained its FindaMortgageBroker.com and/or MortgageMatchup.com websites that published false and misleading advertisements and information about the relationship between UWM and brokers, as well as about the brokers' purported duty to shop for the best prices on behalf of Plaintiffs. These advertisements were intentionally deceptive.

h. Constantly throughout the Class Period, UWM transmitted through interstate mail or wires its Wholesale Broker Agreement, which contained provisions that, in substance, required brokers to perpetrate honest services fraud on Plaintiffs and make fraudulent omissions of material fact. Those Agreements imposed penalties on brokers who recommended loan options from UWM's competitors (even when such competitors offered substantially lower prices or costs for mortgage services), and did not permit brokers to present any loan options to Plaintiffs after they had received a price quote from UWM (even though Plaintiffs themselves never agreed to such a condition and were legally entitled to price shop). As a result of this, UWM participated the brokers' breach of fiduciary duty, deprived consumers the benefit of honest services, and caused them to pay for mortgages or mortgage-related services under false pretenses and with incomplete disclosures.

225. In addition, to carry out or attempt to carry out the scheme, UWM conducted or participated in the affairs of the Steering Enterprise through a pattern of predicate acts constituting: (i) bribery, which is racketeering under 18 U.S.C. § 1961(1)(A); and/or (ii) violations of 18 U.S.C. § 1952, the Travel Act, which prohibits carrying on "unlawful activity" in interstate commerce, defined as "bribery . . . in violation of the laws of the State in which committed," and which constitute racketeering under 18 U.S.C. § 1961(1)(B). Specifically, Plaintiffs and the class allege:

a. Constantly throughout the relevant period, UWM committed acts constituting bribery under the laws of the State of North Carolina. A person commits commercial bribery under North Carolina law by giving gifts, discounts, bonuses, gratuity, or other consideration to an agent in return for the agent's

79

efforts to further that person's interests in business dealings with the principal.

Specifically, North Carolina's bribery statute states:

> Any person who gives, offers or promises to an agent, employee or servant any gift or gratuity whatever with intent to influence his action in relation to his principal's, employer's or master's business . . . [and] any agent, employee or servant who, being authorized to procure materials, supplies or other articles either by purchase or contract for his principal, employer or master, or to employ service or labor for his principal, employer or master, receives, directly or indirectly, for himself or for another, a commission, discount or bonus from the person who makes such sale or contract, or furnishes such materials, supplies or other articles, or from a person who renders such service or labor; and any person who gives or offers such an agent, employee or servant such commission, discount or bonus, shall be guilty of a Class 2 misdemeanor.

N.C.G.S.A. § 14-353.

b. In violation of § 14-353, UWM conferred things of value to brokers, including advertising, promotion, gifts, discounts, and benefits provided at various loyalty or funneling benchmarks.[96] UWM provides these incentives, gifts, and consideration to influence brokers in the scope of their agency for Plaintiffs, to exploit their position of trust and confidence, and to steer Plaintiffs to UWM. UWM used mail and wire facilities in interstate commerce to intentionally promote, carry on, and facilitate the unlawful activity of bribery, as defined by 18 U.S.C. § 1952(b)(2).

---

[96] Between 2020 and 2021, UWM spent over $10 million to publicize its broker referral website during consecutive Super Bowls, making it one of the most valuable and high-profile advertising opportunities for brokers. UWM continues to spend considerable money for MortgageMatchup to occupy the top "sponsored" search result from Google for queries related to finding a mortgage broker. Having established its website as a uniquely valuable advertising platform—one with more consumer traffic than most brokers could afford to purchase on their own— UWM confers lucrative advertising opportunities and high visibility placement on the website to brokers who compromise their duties of loyalty and candor to Plaintiffs and the class—i.e., either because the brokers agreed to the pro-UWM provisions in the Wholesale Broker Agreement, and/or because their referral rates demonstrate they funnel to UWM without shopping for the best price. The advertising is conditioned on brokers maintaining a high degree of fidelity to UWM.

    c.   Constantly throughout the relevant period, UWM committed acts constituting

bribery under the laws of the State of Florida. Specifically, Florida's bribery

statute states:

> Commercial bribery.
>
> (1) A person commits the crime of commercial bribery if, knowing that another is subject to a duty described in s. 838.15(1) and with intent to influence the other person to violate that duty, the person confers, offers to confer, or agrees to confer a benefit on the other.
>
> (2) Commercial bribery is a third degree felony, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
>
> Fla. Stat. Ann. § 838.16

    d.   In violation of § 838.16, UWM conferred, offered to confer, or agreed to confer

benefit on brokers, including advertising, promotion, gifts, discounts, and

benefits provided at various loyalty or funneling benchmarks, knowing the

brokers were subject to fiduciary duties. UWM offered this benefit to influence

brokers in the scope of their agency for Plaintiffs, to exploit their position of

trust and confidence, and to steer Plaintiffs to UWM. UWM used mail and wire

facilities in interstate commerce to intentionally promote, carry on, and

facilitate unlawful activity of bribery, as defined by 18 U.S.C. § 1952(b)(2).

226.    The UWM's conduct in furtherance of this scheme was intentional.  Plaintiffs and

class members were directly harmed as a result of UWM's conduct.

227.    As described throughout this Complaint, UWM engaged in a pattern of related and

continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities,

conducted with the common purpose of obtaining from Plaintiffs and the class money, revenue,

and market share that UWM otherwise would not have received. The common purpose involved

avoiding competition from lenders who offered affordable loans and closing costs, by infiltrating the fiduciary relationship between homebuyers and brokers. The predicate acts had the same or similar results, participants, victims, and methods of commission. The predicate acts were committed or caused to be committed by UWM through their participation in the Steering Enterprise and in furtherance of its fraudulent scheme. The predicate acts were interrelated and not isolated events.

228.    By reason of and as a result of the conduct of UWM its substantial participation in the steering scheme in violation of 18 U.S.C. § 1962(c), Plaintiffs and the class were injured in their business and/or property in multiple ways, including paying the prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers. Alternatively, Plaintiffs and the class suffered the economic harms of overpaying for mortgages and for broker services, including excess prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers.

229.    Plaintiffs and the class were also injured in their business and/or property and suffered the economic harms associated with being deprived of their rights to:

     a.   Hire a loyal, honest, and non-conflicted broker;

     b.   Receive complete and candid disclosures and information;

     c.   Not be exposed to materially deceptive and false advertising;

     d.   Obtain a mortgage with the lowest costs, fees, or pricing;

     e.   Obtain a mortgage from a restricted lender;

     f.   Make an informed decision based on complete information; and

     g.   Receive the services that they paid for.

230.    As a result of the racketeering activity and conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs and the class suffered economic injury by paying prices, rates, closing costs, commissions, and fees they would not have otherwise paid, and for services they did not receive.

231.    UWM's actions alleged herein were reasonably calculated to deceive persons of ordinary prudence and comprehension, and they were committed with reckless indifference to the truth if not the outright intent to deceive, and with the intent to deprive Plaintiffs and the class from receiving the disclosures and loyalty required by law from independent brokers.

232.    The violations of 18 U.S.C. § 1962(c) were committed with the specific intent to defraud, thereby entitling Plaintiffs and the class to treble damages under 18 U.S.C. § 1964(c), as well as injunctive/equitable relief and costs and reasonable attorneys' fees.


**COUNT 2**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**By Conspiring to Violate 18 U.S.C. § 1962(c) ("RICO Conspiracy")**

**(All Plaintiffs Against UWM and Mat Ishbia)**

233.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

234.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

235.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

236.    UWM, Mat Ishbia, and the mortgage brokers (collectively, "Coconspirators") who were hired by Plaintiffs and the class have violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of the conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Steering Enterprise described previously through a pattern of racketeering activity.

237.    As set forth in detail above, the Coconspirators have engaged in numerous overt and predicate unlawful and fraudulent acts, constituting a pattern of racketeering activity, in furtherance of the conspiracy.

238.    Coconspirators intended to engage in the scheme causing Plaintiffs and the class to incur costs, commissions, fees, and other expenses associated with their mortgages and to pay for the honest services of their brokers that they would not have paid but for the conspiracies to violate 18 U.S.C. § 1962(c).

239.    Coconspirators knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes outlined herein.

240.    The nature of the deceptive conduct, material misrepresentations and omissions, and concerted actions to steer Plaintiffs in furtherance of the conspiracy, as set forth in detail above, demonstrates or gives rise to an inference that Coconspirators not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but that they were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of racketeering activity.

241.    Coconspirators have engaged (and continue to engage) in the commission of overt acts in furtherance of the Steering Enterprise scheme, including the following unlawful racketeering predicate acts (as outlined in detail above):

   a.   Multiple instances of mail fraud in violations of 18 U.S.C. § 1341;

   b.   Multiple instances of wire fraud in violations of 18 U.S.C. § 1343.

   c.   Multiple instances of honest services fraud under 18 U.S.C. § 1346; and

   d.   Multiple instances of unlawful bribery in violation of 18 U.S.C. § 1952 and various state laws comprising racketeering activity under 18 U.S.C. § 1961.

84

242. Coconspirators shared information, concealed information, acted in concert to steer borrowers, entered written agreements, provided and received things of value between each other in furtherance of the conspiracy, shared in the spoils, and consistently maintained a false or deceptive public posture regarding the relationship between UWM and brokers. Their close cooperation surrounding the steering scheme and joint participation in predicate acts is evidence of the conspiracy.

243. Had Coconspirators not concealed or misrepresented these material facts, not conspired to violate fiduciary duties, and not engaged in concerted conduct in support of the steering scheme in violation of 18 U.S.C. § 1962(c) and (d), Plaintiffs would not have suffered economic harms of paying for mortgages and for broker services as a result of the unlawful scheme, including prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers. Alternatively, Plaintiffs would not have suffered the economic harms of overpaying for mortgages and for broker services, including excess prices, rates, closing costs, commissions, and fees that Plaintiffs paid, directly or indirectly, to UWM and brokers.

244. Plaintiffs also suffered the harms associated with being deprived of their rights to:

    a. Hire a loyal, honest, and non-conflicted broker;

    b. Receive complete and candid disclosures and information;

    c. Not be exposed to materially deceptive and false advertising;

    d. Obtain a mortgage with the lowest costs, fees, or pricing;

    e. Obtain a mortgage from a lender that the Coconspirators agreed to restrict;

    f. Make an informed decision based on complete information;

    g. Receive the services that they paid for.

245.    As a result of the racketeering activity and conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs suffered economic injury by paying prices, rates, closing costs, commissions, and fees that Plaintiffs would not have otherwise paid, and for services Plaintiffs did not receive.

246.    Coconspirators' actions alleged herein were reasonably calculated to deceive persons of ordinary prudence and comprehension, and were committed with the intent to deceive and deprive Plaintiffs from receiving the disclosures and loyalty required by law from independent brokers.

247.    The violations of 18 U.S.C. § 1962(c) were committed with the specific intent to defraud, thereby entitling Plaintiffs and the class to treble damages under 18 U.S.C. § 1964(c), as well as injunctive/equitable relief and costs and reasonable attorneys' fees.

## COUNT 3
**Violation of the Real Estate Settlement Procedures Act ("RESPA"),**
**12 U.S.C. § 2607**

**(All Plaintiffs Against UWM)**

248.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

249.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

250.    All transactions at issue in the instant complaint are incident to or part of real estate settlement services involving federally related mortgage loans and thereby are subject to the provisions of RESPA, 12 U.S.C. § 2601, *et seq.*

251.    Throughout the Class Period, UWM and the mortgage brokers provided "settlement services" and/or engaged in business incident to real estate settlement services in respect of "federally-related mortgage loans," as such terms are defined by RESPA Sections 2602(1) and (3).

252.    Plaintiffs and the class obtained federally-related residential mortgage loans through UWM. All loans referred to UWM under the steering scheme were secured by first or subordinate liens on residential real property and were made in whole or in part by UWM and/or its affiliates whose deposits or accounts are insured by the Federal Government and/or who are regulated by an agency of the Federal Government.

253.    12 U.S.C. § 2607 prohibits referrals and splitting charges in the performance of real estate settlement services:

> (a) Business referrals
>
> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
>
> (b) Splitting charges
>
> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

254.    In connection with transactions involving federally-related mortgage loans, UWM made payments and/or gave things of value to brokers, pursuant to an agreement or understanding, in exchange for the assignment and referral of business incident to or part of a real estate settlement service, in violation 12 U.S.C. § 2607(a), which prohibits the payment of referral fees in connection with the origination or brokering of federally related mortgage loans.

255.    Additionally, in connection with transactions involving federally-related mortgage loans, UWM gave, and brokers accepted, a portion, split or percentage of charges received by Plaintiffs and the class for the rendering of real estate settlement services and/or business incident to real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. § 2607(b).

256.     Plaintiffs and the class were subjected to settlement services and/or business incident to real estate settlement services tainted by kickbacks or referrals of business inherently tainted and biased by UWM's unlawful steering scheme. UWM's arrangements with brokers harmed borrowers' ability to obtain affordable mortgages by placing inherent limits on settlement service choice and competition.

257.     Plaintiffs and the class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful steering, referral, and/or fee-splitting schemes. Congress bestowed upon Plaintiffs and the class a right to real estate settlement procedures that are free from corruption, unearned commissions, and collusion, and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties. *See* 12 U.S.C. §§ 2601, 2607(d)(2).

258.     As a result of UWM's steering scheme and the misconduct alleged in this complaint, brokers funneled business to UWM out of consideration for their own pecuniary interests, and because UWM provided things of value (including promotions, free advertising, gifts, valuable access to services after reaching certain benchmarks of loyalty and referrals, etc.). Their decisions were not based upon an independent evaluation of the overall price and costs that Plaintiffs would pay for their home mortgages.

259.     Payment from UWM to the brokers were not associated with any goods or services actually provided by the brokers, or in the alternative, the value of any goods or services provided claimed to be provided by the brokers to UWM is not reasonably related to the payment from UWM such that the payment is not "bona fide" or within the protection of 12 U.S.C. § 2607(c)(2).

260.    UWM did not disclose the true nature of its relationship with brokers. To the contrary, UWM intended to actively mislead consumers that brokers were "completely independent" and shopped for the lowest price without restriction. The reduction in healthy competition was itself a harm to Plaintiffs and the class. The scheme and unearned fees unnecessarily and artificially inflated the price Plaintiffs and the class paid for settlement services.

261.    The RESPA violations resulted in Plaintiffs and the class paying extra charges, fees, or commissions in connection with the closing of their loans, including the money paid directly or indirectly to brokers for services they did not provide.

262.    For the reasons set forth above, UWM violated RESPA, 12 U.S.C. §§ 2607(a) and (b). Pursuant 12 U.S.C. § 2607(d), UWM is liable to Plaintiffs and the class members charged for the settlement services involved in UWM's violation in an amount equal to three times the amount of any charge paid for such settlement service. In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit.

**COUNT 4**
**Aiding and Abetting Breach of Fiduciary Duty**

**(All Plaintiffs Against All Defendants)**

263.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

264.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of aiding and abetting breach of fiduciary duty, as there are no true conflicts (case-dispositive differences) among various states' laws. In the alternative, Plaintiffs each bring this claim under the respective laws of the states where they purchased mortgages from UWM on behalf of a subclass comprised of (a) all class members who purchased UWM mortgages in those

states, and (b) all class members who purchased UWM mortgages in states with substantially similar common law of aiding and abetting breach of fiduciary duty.

265. A fiduciary relationship existed between Plaintiffs' mortgage brokers and Plaintiffs.

266. The brokers owed fiduciary duties to Plaintiffs and the class and were required to act in the their best interests, with a duty of utmost good faith, trust, confidence, and candor, and a duty to act with the highest degree of honesty and loyalty.

267. The decisions surrounding the purchase and financing of a home are among the most consequential financial decisions most Americans make in their lifetimes. Plaintiffs and the class hired mortgage brokers to provide honest and candid services in this process, and the mortgage brokers were paid commissions for their services. The price of a mortgage broker includes the assurance that the broker is acting as a fiduciary and with undivided loyalty toward his or her principal, free from conflict, influence, or inducement from another party.

268. The brokers breached their fiduciary duties by not acting in the best interests of Plaintiffs and the class, demonstrating divided loyalties, failing to disclose material facts, colluding with UWM to withhold information about more affordable loan options, accepting things of value from UWM to influence the affairs of their principals, entering agreements with UWM that created conflicts of interest and prevented them from providing honest services, and otherwise participating in the scheme alleged in this complaint.

269. The brokers consented to and benefitted from being falsely advertised by UWM as having characteristics they did not possess and/or as performing services they could not perform in good faith as advertised.

270.     UWM knew that mortgage brokers owed a fiduciary duty to Plaintiffs, and UWM had actual knowledge of breaches of fiduciary duties owed to Plaintiffs by their brokers.

271.     UWM knowingly and substantially assisted, enabled, and facilitated, without authorization from Plaintiffs, systematic breaches of fiduciary duties owed to Plaintiffs. UWM enacted company policies and procedures whose purpose and effect was to achieve this result, including UWM's Wholesale Broker Agreement, which was intended to prevent brokers from using their independent judgment on behalf of Plaintiffs and to categorically restrict brokers from providing lender options even when they were more affordable.  Plaintiffs' brokers were prevented by UWM from providing unconflicted recommendations about lenders and pricing.

272.     As a direct and proximate result of UWM's actions, substantial participation, and aiding and abetting brokers' breach of fiduciary duty, Plaintiffs and the class were damaged.

273.     Because UWM's acts of aiding and abetting breach of fiduciary duty were malicious, willful, and wanton, Plaintiffs and the class are entitled to punitive damages.

**COUNT 5**
**Civil Conspiracy**

**(All Plaintiffs Against All Defendants)**

274.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

275.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of aiding and abetting breach of fiduciary duty, as there are no true conflicts (case-dispositive differences) among various states' laws. In the alternative, Plaintiffs each bring this claim under the respective laws of the states where they purchased mortgages from UWM on behalf of a subclass comprised of (a) all class members who purchased UWM mortgages in those

states, and (b) all class members who purchased UWM mortgages in states with substantially similar common law of civil conspiracy.

276.     A fiduciary relationship existed between Plaintiffs and their mortgage brokers.

277.     The Plaintiffs' mortgage brokers owed fiduciary duties to Plaintiffs and were only permitted to act in the best interests of Plaintiffs.

278.     Plaintiffs' mortgage brokers breached their fiduciary duties by not acting in Plaintiffs' best interests, demonstrating divided loyalties, failing to disclose material facts and conflicts of interest, colluding with UWM to withhold information about affordable loan options, accepting things of value from UWM to influence the affairs of the Plaintiffs and the class, entering agreements with UWM that created conflicts of interest and prevented brokers from providing honest services, and otherwise participating in the scheme alleged in this complaint.

279.     The brokers consented to and benefitted from being deceptively advertised by UWM as having characteristics they did not possess and/or as performing services they could not perform in good faith as advertised. These advertisements were designed to influence reasonable homebuyers based on false or misleading premises.

280.     UWM entered into one or more express or implied agreements with mortgage brokers with the purpose of breaching fiduciary duties owed to Plaintiffs and the class.

281.     UWM engaged in unlawful acts with mortgage brokers in furtherance of the conspiracy, including publishing false and deceptive advertising, colluding to deprive class members of honest services, entering agreements to prevent class members from being informed about affordable loan options from UWM's competitors, providing things of value to influence brokers to steer business to UWM, causing brokers to make fraudulent omissions or misrepresentations, and otherwise engaging in the conduct alleged in this complaint.

282.    UWM's conspiracy substantially assisted or encouraged the wrongdoing conducted by the mortgage brokers; further, UWM had knowledge of this wrongdoing, and UWM's actions taken in furtherance of the conspiracy were committed pursuant to a common scheme.

283.    As a direct and proximate result of UWM's actions and participation in the conspiracy, Plaintiffs and the class were damaged in an amount to be proven at trial. Because UWM's acts were malicious, willful, and wanton, Plaintiffs and the class are entitled to punitive damages.

## COUNT 6
### Unjust Enrichment

### (All Plaintiffs Against All Defendants)

284.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

285.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

286.    Plaintiffs bring this claim on behalf of the Nationwide Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Plaintiffs each bring this claim under the respective laws of the states where they purchased mortgages from UWM on behalf of a subclass comprised of (a) all class members who purchased UWM mortgages in those states, and (b) all class members who purchased UWM mortgages in states with substantially similar common law of unjust enrichment.

287.    Plaintiffs and the class have conferred direct benefits on Defendants in the form of significant payments for closing costs, interest, and other fees in relation to the mortgages UWM

sold to them, and Defendants have knowledge of those benefits vis-à-vis the hundreds of millions of dollars reaped through its scheme.

288.   Defendants voluntarily accepted payments and other associated benefits conveyed by the class as a result of UWM's unjust and inequitable conduct. In so doing, Defendants acted with conscious disregard for the rights of the class.

289.   It would be inequitable for Defendants to retain the payments and benefits, including because the deception and steering scheme would not have been possible without Defendants' intentional infiltration and corruption of the fiduciary relationships between brokers and homebuyers who were making one of the most consequential financial decisions in their lives.

290.   Defendants received money and value from their promotion and sale of mortgage loans that traceable to the conduct alleged herein; these gains have been improperly retained and in good conscience should be returned to Plaintiffs and the class.

291.   In addition, Defendants parlayed hundreds of millions of dollars in gains from unscrupulously selling mortgages into dominant market share in the wholesale mortgage channel, with an economic value to be determined at trial, and for which disgorgement should be ordered.

292.   The financial benefits derived by Defendants rightfully belong to Plaintiffs and the class. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the class all inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants.

293.   Plaintiffs and the class have no adequate remedy at law.

II.      **Claims of the State/Multi-State Subclasses**

<u>**COUNT 7**</u>
**Violation of the North Carolina Unfair and Deceptive Practices Act ("NCUDPA"),**
**N.C. Code §§ 75-1.1 *et seq.***

**(Plaintiff Kim Schelble Against All Defendants)**

294.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

295.    Plaintiff Kim Schelble brings this claim under laws of North Carolina on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) North Carolina, and (b) all states with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiff brings this claim on behalf of a subclass of only those whose claims arise under North Carolina law.

296.    NCUDPA provides civil liability for "unfair or deceptive acts or practices in or affecting commerce . . . ." § 75-1.1.  Defendants are liable for committing an unfair or deceptive act or practice, in or affecting commerce, that proximately caused injury to Plaintiffs and the class.

297.    Defendants' steering scheme constitutes an unfair or deceptive act or practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers. Defendants unfair or deceptive conduct, all of which was affecting commerce, offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

298.    Decisions about financing a home are among the most consequential financial decisions most Americans make, and they involve the most significant financial asset most Americans own. Defendants knew that most people have little experience surveying loan options for the best overall pricing (including interest rates, closing costs, commissions, fees, etc.), since

most people have relatively few opportunities to purchase homes in their lifetimes. Defendants scheme depended on exploiting this fact.

299.     While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

300.     Defendants' representations, omissions, and scheming were unfair, deceptive, and designed to mislead reasonable consumers. As the intended and inevitable result of Defendants' conduct, Plaintiff and the class were subject to material omissions and non-disclosures from their agents.

301.     Defendants owed Plaintiff and the class a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) intentionally concealed the foregoing from Plaintiff and the class; and (c) made incomplete representations while purposefully withholding material facts that contradicted these representations.

302.     Defendants' also provided things of value to brokers for the purpose of influencing them in their dealings with Plaintiff and the class, in violation of North Carolina's commercial bribery statute, § 14-353, a violation of which is also a violation of G.S. 75-1.1 as an unfair and deceptive trade practice.

303.     As a direct and proximate result of its acts and omissions as set forth herein, Plaintiff and the class suffered actual damages in an amount to be determined at trial. When a party

is injured by a violation of the UDPA, treble damages must be awarded under N.C.G.S.A. § 75-16, in addition to attorneys' fees.

## COUNT 8
### Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47–18–101 *et seq.*

### (Plaintiffs Therisa and Billy Escue Against All Defendants)

304.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

305.    Plaintiffs Therisa D. Escue and Billy R. Escue, Jr. bring this claim under laws of Tennessee on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) Tennessee, and (b) all states with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiffs bring this claim on behalf of a subclass of only those whose claims arise under Tennessee.

306.    Plaintiffs and the class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

307.    Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2) (the "Act").

308.    Defendants' conduct complained of herein affected "trade," "commerce," or "consumer transactions," within the meaning of Tenn. Code Ann. § 47-18-103(19).

309.    The TCPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "[r]epresenting that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have . . .;" "[r]epresenting that . . . services are of a particular standard, quality or grade . . . if they are of another;" "[a]dvertising goods or services with intent not to sell them as advertised" and "[u]sing statements . . . in any

advertisement which create a false impression of . . . quality . . . value . . . [or] usability [of] services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services." Tenn. Code Ann. § 47-18-104.

310.    Defendants' steering scheme constitutes an unfair and fraudulent act or practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers, in the purchase of products or services. Defendants conduct offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

311.    Decisions about financing a home are among the most consequential financial decisions most Americans make, and they involve the most significant financial asset most Americans own. Defendants knew that most people have little experience surveying loan options for the best overall pricing (including interest rates, closing costs, commissions, fees, etc.), since most people have relatively few opportunities to purchase homes in their lifetimes. Defendants' scheme depended on exploiting this fact, and counted on Plaintiff and the class to be susceptible to misrepresentations and omissions that Defendants made or caused to be made.

312.    While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

313.    Defendants violated the TCPA by engaging in unfair or deceptive acts, including representing that "independent" brokers had characteristics or benefits that they did not have;

representing the brokers listed on UWM website have value or functions that they did not have, and advertising with intent that Plaintiff and the class did not receive what was advertised.

314.     In the course of their business, Defendants failed to disclose and actively concealed the corrupt relationship between UWM and brokers, including the brokers which UWM promoted and conferred with free advertising to influence them to participate in the steering scheme.

315.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon concealment, suppression or omission, in connection with selling home mortgages to Plaintiff and the class.

316.     At all relevant times, Defendants have known their steering scheme, deceptive advertising, and misrepresentations or omissions caused homebuyers to pay more for the costs associated with home loans because their brokers were not providing "completely independent" services and were not shopping for loans to find the lowest prices, as Defendants falsely asserted.

317.     Defendants' deceptive practices had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff and the class, about the relationship between UWM and brokers, and the brokers intent and ability to provide loyal and independent services to present the most affordable loan options.

318.     Defendants knew or should have known their conduct violated the TCPA.

319.     Defendants owed Plaintiff and the class a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) intentionally concealed the foregoing from Plaintiff and the class; and (c) made

incomplete representations while purposefully withholding material facts that contradicted these representations.

320.     Plaintiffs and the class suffered ascertainable loss caused by the Defendants' misrepresentations, false advertising, and failure to disclose material information. But for these violations of the TCPA, Plaintiffs and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. Plaintiffs and the class did not receive the benefit of their bargain as a result of the Defendants' misconduct.

321.     Defendants' violations present a continuing risk to Plaintiffs and the class, and the general public. Defendants' unlawful acts and practices complained of here affect the public interest.

322.     As a direct and proximate result of Defendants' violations of the TCPA, Plaintiffs and the class have suffered injury-in-fact and/or actual damage. Pursuant to Tenn. Code Ann. § 74-18-109(a), they seek monetary relief against the Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of the Defendants' willful or knowing violations, and any other just and proper relief available under the TCPA, including injunctive relief.

### COUNT 9
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),**
**Fla. Stat. §§ 501.201, *et seq.***

**(Plaintiff Brian P. Weatherill Against All Defendants)**

323.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

324.     Plaintiff Weatherill brings this claim under laws of Florida on behalf of a subclass comprised of all class members who purchased UWM mortgages in (a) Florida, and (b) all states

with substantially similar consumer protection statutes prohibiting unfair and deceptive trade practices. In the alternative, Plaintiff brings this claim on behalf of a subclass of only those whose claims arise under Florida law.

325.   Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204, et seq., by engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

326.   Defendants' steering scheme constitutes both an unfair act or practice, and a deceptive act or practice, which offends established public policy and is substantially injurious to consumers. Defendants made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, exploiting UWM's power and position, and causing Plaintiff and the class to be deceived by their brokers.

327.   While representing that consumers are entitled to rely on "completely independent" brokers to shop for the best price, free from restrictions on their independent judgment, UWM was secretly and causing brokers to systematically violate their fiduciary duties to steer business to UWM.

328.   As the intended and inevitable result of Defendants' conduct, Plaintiff and the class were subjected to material omissions and non-disclosures from their agents, who received unauthorized things of value from UWM for the purpose of influencing them in their dealings with Plaintiff and the class.

329.   Defendants failed to disclose, actively concealed, and affirmatively misled Plaintiff and the class about the corrupt relationship between UWM and brokers. Defendants falsely represented and advertised the brokers listed on UWM website as having value or functions that

they did not have, with intent that Plaintiff and the class would pay for products or services they did not receive.

330.     Defendants' misrepresentations and material omissions were likely to deceive a reasonable person under the circumstances, and Defendants knew this. Defendants owed a duty to disclose the true facts about the influence UWM exerted over brokers because: (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best prices on behalf of their clients; (b) concealed the foregoing from Plaintiff and the class; and (c) made incomplete representations while purposefully withholding material facts that contradicted these representations.

331.     But for the misrepresentations and unscrupulous conduct, Plaintiff and the class would not have paid to hire a conflicted broker and would not have paid as much for a home mortgage. The injury to Plaintiff and the class is not outweighed by any off-setting consumer or competitive benefits, and the injury is one which consumers could not reasonably have avoided.

332.     Defendants' violations present a continuing risk to Plaintiff and the class, and the general public. Defendants' unlawful acts and practices complained of here affect the public interest. Plaintiff and the class seek monetary relief against the Defendants measured as actual damages in an amount to be determined at trial and any other just and proper relief under Florida law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, both individually and on behalf of the Nationwide Class and State/Mutli-State Subclasses, demand a trial by jury on all claims so triable, and respectfully request that the Court (i) certify the proposed Nationwide and State Classes, (ii) designate the named Plaintiffs as representatives of the Nationwide Class and their respective State/Multi-State Subclasses, (iii) appoint the undersigned as Class Counsel, (iv) designate any appropriate issue classes under the applicable provisions of Federal Rule of Civil Procedure 23, and (v) enter judgment in Plaintiffs' favor against Defendants including the following relief:

A.   Compensatory damages and costs for economic loss;

B.   Restitution and disgorgement of all profits, direct or indirect, illegally obtained;

C.   Equitable and injunctive relief, as permitted by law or equity;

D.   Statutory damages, treble damages, and penalties;

E.   Punitive and exemplary damages as permitted by law;

F.   A determination that Defendants are jointly and severally liable for all monetary damages awarded;

G.   A determination that Defendants are financially responsible for all Class notices and the administration of Class relief;

H.   An award of Plaintiffs' attorneys' fees, costs, and expenses in this action to the maximum extent permitted by law;

I.   An award of pre-judgment and post-judgment interest to the maximum extent permitted by law; and

J.   Such other and further relief as the Court deems just and proper.

Dated: April 2, 2024
      Detroit, Michigan

By: /s/ *Brandon C. Hubbard*

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

John T. Zach
Marc Ayala
David L. Simons
Andrew P. Steinmetz
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300

Tyler Ulrich
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street, Suite 2800
Miami, Florida 33131
Tel.: (305) 357-8422

Mark C. Mao
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Tel.: (415) 293-6800

*Attorneys for Plaintiffs*