## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, and Brian P. Weatherill, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia,

*Defendants*.

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion, United States District Judge

Hon. David R. Grand, Magistrate Judge

## DEFENDANTS' MOTION TO DISMISS

Defendants hereby move, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss Plaintiffs' Complaint with prejudice. As explained in the accompanying brief, this 104-page Complaint reflects an unprecedented and coordinated effort to smear United Wholesale Mortgage, LLC ("UWM"), its affiliates, and even its CEO—all of which serves to benefit market speculators. More to the point, the Complaint is legally meritless for dozens of overlapping reasons.

As an initial matter, Plaintiffs failed to comply with the notice-and-cure provision in their mortgage agreements, which bars their suit in full. Plaintiffs'

RICO claims fail for lack of proximate causation, absence of a cognizable enterprise, and failure to plead predicate acts of racketeering. They are also barred by the economic loss doctrine and by the Real Estate Settlement Procedures Act ("RESPA"). Plaintiffs' claims under RESPA are time-barred, and the Complaint fails to state a claim under that statute in any event. Plaintiffs' claims for aiding and abetting a breach of fiduciary duty and civil conspiracy fail for many reasons, including because Plaintiffs failed to plead facts establishing a fiduciary relationship. Plaintiffs cannot state a claim under any of the state consumer protection statutes they invoke. They do not plead unjust enrichment. And their claims against UWM's holding companies and CEO suffer from a number of additional fatal flaws.

For all of these reasons, as explained further in the accompanying brief, this Court should grant Defendants' Motion and dismiss the Complaint with prejudice.

Dated: June 21, 2024

Respectfully submitted,

/s/ *Jeffrey J. Jones*

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Jeffrey J. Jones (P80231)
Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, and Brian P. Weatherill, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia,

*Defendants.*

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
Magistrate Judge

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED ..........................................................xiii

CONTROLLING OR MOST APPROPRIATE AUTHORITY .......................xv

INTRODUCTION...................................................................................................1

BACKGROUND ....................................................................................................4

    A.    UWM's Wholesale Mortgage Business .............................................4

    B.    The Wholesale Broker Agreement ...................................................5

    C.    Plaintiffs' Lawsuit ...............................................................................7

ARGUMENT .........................................................................................................10

    I.    PLAINTIFFS' SUIT IS BARRED BY NOTICE-AND-CURE PROVISIONS...................................................................10

    II.    PLAINTIFFS' RICO CLAIMS FAIL (COUNTS I–II). ..............11

        A.    Plaintiffs Fail to Plead Proximate Causation. .....................13

        B.    Plaintiffs Fail to Plead a RICO Enterprise..........................17

        C.    Plaintiffs Fail to Plead Predicate Acts....................................20

        D.    The Economic Loss Doctrine Precludes Recovery. ............24

        E.    RESPA Precludes Any Remedies Under RICO.................25

    III.    PLAINTIFFS' RESPA CLAIMS FAIL (COUNT III). ...............26

    IV.    PLAINTIFFS' AIDING-AND-ABETTING AND CONSPIRACY CLAIMS FAIL (COUNTS IV–V)........................28

        A.    These Claims Are Governed by State Law...........................28

        B.    The Aiding-and-Abetting Claims Fail.....................................29

        C.    The Civil Conspiracy Claims Fail. ...........................................33

    V.    PLAINTIFFS' CONSUMER PROTECTION CLAIMS FAIL  (COUNTS VII–IX)...................................................................34

    VI.    PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL (COUNT VI). .....................................................................................36

**TABLE OF CONTENTS**
(continued)

**Page**

**VII.   ALL CLAIMS AGAINST THE NON-UWM
DEFENDANTS SHOULD BE DISMISSED.** ...............................37

**CONCLUSION**.......................................................................................40

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*777 Partners LLC v. Pagnanelli*,
2021 WL 2038175 (S.D. Fla. Mar. 8, 2021) .......................................29

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*,
219 F.3d 519 (6th Cir. 2000) ................................................................32

*Alhassid v. Bank of Am., N.A.*,
60 F. Supp. 3d 1302 (S.D. Fla. 2014)..........................................33, 34

*Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*,
2016 WL 5661583 (E.D. Mich. Sept. 30, 2016) ................................14

*Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*,
702 F. App'x 416 (6th Cir. 2017)........................................................21

*Amaral v. Crown Mortg. Grp. & Assocs.*,
2008 WL 1994841 (S.D. Fla. May 5, 2008)........................................31

*Atherton v. F.D.I.C.*,
519 U.S. 213 (1997)..............................................................................28

*Ball v. Fed. Nat'l Mortg. Assoc.*,
2016 WL 4702585 (E.D. Mich. Sept. 8, 2016) ..................................26

*BDM Invs. v. Lenhil, Inc.*,
264 N.C. App. 282 (2019) ..............................................................29, 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................34

*Boyle v. United States*,
556 U.S. 938 (2009).............................................................................17

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Brett v. Toyota Motor Sales, U.S.A*,
2008 WL 4329876 (M.D. Fla. Sept. 15, 2008).....................................................36

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)...........................................................................................17

*Bridgestone Am's, Inc. v. Int'l Bus. Mach. Corp.*,
172 F. Supp. 3d 1007 (M.D. Tenn. 2016) ............................................................34

*Bumpers v. Cmty. Bank of N. Va.*,
367 N.C. 81 (2013) .............................................................................................36

*Cataldo v. U.S. Steel Corp.*,
676 F.3d 542 (6th Cir. 2012) ...............................................................................26

*Chrysler Corp. v. Skyline Indus. Servs., Inc.*,
448 Mich. 113 (1995) ..........................................................................................29

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
615 F.3d 496 (6th Cir. 2010) ...............................................................................14

*Collier v. LoGiudice*,
818 F. App'x 506 (6th Cir. 2020) ........................................................................13

*Cordero v. Transamerica Annuity Serv. Corp.*,
452 F. Supp. 3d 1292 (S.D. Fla. 2020) .................................................................30

*D'Addario v. D'Addario*,
901 F.3d 80 (2d Cir. 2018) ..................................................................................18

*De Los Angeles Aurora Gomez v. Bank of America*,
2013 WL 12165673 (C.D. Cal. Aug. 21, 2013) ...................................15, 16, 17

*E & A Produce Corp. v. Olmo*,
864 So.2d 447 (Fla. Dist. Ct. App. 2003).............................................................39

iv

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*E. River Steamship Corp. v. Transamerica Delaval, Inc.*,
   476 U.S. 858 (1986)...........................................................................24

*EC Term of Years Trust v. United States*,
   550 U.S. 429 (2007)...........................................................................25

*Egerer v. Woodland Realty, Inc.*,
   556 F.3d 415 (6th Cir. 2009) ............................................................27

*El Camino Res., Ltd. v. Huntington Nat'l Bank*,
   722 F. Supp. 2d 875 (W.D. Mich. 2010) ..........................................32

*El Camino Res., Ltd. v. Huntington Nat'l Bank*,
   712 F.3d 917 (6th Cir. 2013) ............................................................32

*Estate of Pilgrim v. Gen. Motors LLC*,
   344 F.R.D. 381 (E.D. Mich. 2023) ....................................................35

*Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*,
   1 So.3d 400 (Fla. Dist. Ct. App. 2009) .............................................40

*Figueroa Ruiz v. Alegria*,
   896 F.2d 645 (1st Cir. 1990).............................................................12

*Freeman Indus., LLC v. Eastman Chem. Co.*,
   172 S.W.3d 512 (Tenn. 2005) ...........................................................37

*Galiano v. Fidelity Nat'l Title Ins. Co.*,
   684 F.3d 309 (2d Cir. 2012) .............................................................27

*Gardner v. Bank of N.Y. Mellon*,
   2014 WL 12623069 (E.D.N.C. Feb. 24, 2014) .................................30

*Gen. Motors LLC v. FCA US LLC*,
   2020 WL 3833058 (E.D. Mich. July 8, 2020)................................13, 14, 15, 16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Gross v. Waywell*,
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) ...............................................................12

*Grow Mich., LLC v. LT Lender, LLC*,
    50 F.4th 587 (6th Cir. 2022) ...............................................................14

*Guerrero v. Target Corp.*,
    889 F. Supp. 2d 1348 (S.D. Fla. 2012) ...............................................................36

*Hardin v. City Title & Escrow Co.*,
    797 F.2d 1037 (D.C. Cir. 1986) ...............................................................26

*Hart v. Ludwig*,
    79 N.W.2d 895 (Mich. 1956) ...............................................................24

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
    668 F.3d 393 (6th Cir. 2012) ...............................................................14, 20

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010) ...............................................................13, 14, 15, 17

*Hill v. Nationstar Mortg. LLC*,
    2015 WL 4478061 (S.D. Fla. July 2, 2015) ...............................................................11

*Hunter v. Bev Smith Ford, LLC*,
    2008 WL 1925265 (S.D. Fla. Apr. 29, 2008) ...............................................................35

*Hutton v. Hydra-Tech, Inc.*,
    2018 WL 1363842 (M.D.N.C. Mar. 15, 2018) ...............................................................36

*In re ClassicStar Mare Lease Litig.*,
    727 F.3d 473 (6th Cir. 2013) ...............................................................12

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ...............................................................17

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Jenkins v. Marvel*,
    683 F. Supp. 2d 626 (E.D. Tenn. 2010)...............................................................39

*JES Props., Inc. v. USA Equestrian, Inc.*,
    2005 WL 1126665 (M.D. Fla. May 9, 2005) ......................................................35

*Jones v. Bock*,
    549 U.S. 199 (2007).............................................................................................26

*KC Leisure, Inc. v. Haber*,
    972 So.2d 1069 (Fla. Dist. Ct. App. 2008) .........................................................39

*Kerrigan v. ViSalus, Inc.*,
    112 F. Supp. 3d 580 (E.D. Mich. 2015) ...........................................14, 20, 37, 38

*Kipnis v. Bayersiche Hypo-Und Vereinsbank, AG*,
    2017 WL 11103938 (S.D. Fla. June 26, 2017).....................................................31

*Kurzban v. Specialized Loan Serv., LLC*,
    2018 WL 1570370 (S.D. Fla. Mar. 30, 2018) ......................................................11

*Lamm v. State Street Bank & Trust*,
    749 F.3d 938 (11th Cir. 2014) .............................................................................32

*Llewellyn-Jones v. Metro Prop. Grp.*,
    22 F. Supp. 3d 760 (E.D. Mich. 2014) ..........................................................24, 39

*M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*,
    2022 WL 875993 (E.D.N.C. Mar. 23, 2022)......................................................37

*Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A.,*
    *Inc.*, 2005 WL 975773 (S.D. Fla. Mar. 4, 2005) ...............................................35

*Mich. Corr. Org. v. Mich. Dep't Corr.*,
    774 F.3d 895 (6th Cir. 2014) ...............................................................................25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Morda v. Klein*,
    865 F.2d 782 (6th Cir. 1989) ...............................................................22

*Moses H. Cone Mem. Hosp. Operating Corp. v. Conifer Physician
Servs., Inc.*,
    2017 WL 1378144 (M.D.N.C. Apr. 11, 2017) ..................................11

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) ...............................................18

*MP, LLC v. Sterling Holding, LLC*,
    231 So. 3d 517 (Fla. Dist. Ct. App. 2017) .........................................30

*Noblee Bottling, LLC v. Gora LLC*,
    2023 WL 4750124 (W.D.N.C. July 25, 2023) ...................................33

*Oak Ridge Precision Indus., Inc., v. First Tenn. Bank N.A.*,
    835 S.W.2d 25 (Tenn. Ct. App. 1992) ................................................30

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*,
    2024 WL 982380 (M.D. Fla. Feb. 6, 2024) ........................................2, 6, 18, 35

*Peebles v. Puig*,
    223 So. 3d 1065 (Fla. Dist. Ct. App. 2017) .......................................29

*Perry v. Am. Tobacco Co.*,
    324 F.3d 845 (6th Cir. 2003) ...............................................................14

*PNC Multifamily Cap. Inst. Fund v. Bluff Cty. Cmty. Dev. Corp.*,
    387 S.W.3d 525 (Tenn. Ct. App. 2012) ..............................................30

*Posner v. Essex Ins. Co., Ltd.*,
    178 F.3d 1209 (11th Cir. 1999) ..........................................................33

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Prime Health Servs., Inc. v. Cap. Bank, N.A.*,
2017 WL 1064360 (M.D. Tenn. Mar. 21, 2017) ................................................32

*Rajaratnam v. Motley Rice, LLC*,
449 F. Supp. 3d 45 (E.D.N.Y. 2020) ...................................................................12

*Ramsey v. Bimbo Foods Bakeries Distrib.*,
2015 WL 1611339 (E.D.N.C. Apr. 10, 2015) ....................................................29

*Raymo v. FCA US LLC*,
475 F. Supp. 3d 680 (E.D. Mich. 2020) .............................................................21

*Richmond v. Nationwide Cassel L.P.*,
52 F.3d 640 (7th Cir. 1995) ...............................................................................19

*Rogers v. Morrice*,
2013 WL 1750004 (D.N.J. Apr. 23, 2013) .........................................................12

*Root, Inc. v. Silver*,
2024 WL 85057 (S.D. Ohio Jan. 8, 2024) ...................................................17, 18

*Rosenson v. Mordowitz*,
2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012) ..............................................12, 13

*Schlater v. Haynie*,
833 S.W.2d 919 (Tenn. Ct. App. 1991) ..............................................................39

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
2007 WL 7124464 (S.D. Fla. Feb. 12, 2007) .....................................................31

*Shibata v. Lim*,
133 F. Supp. 2d 1311 (M.D. Fla. 2000) ..............................................................35

*Simms v. CIT Grp./Consumer Fin.*,
2009 WL 973011 (W.D. Tenn. Apr. 9, 2009) .....................................................27

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Skymark Props. Corp. v. Katebian*,
   2022 WL 1054059 (E.D. Mich. Mar. 14, 2022) ..........................................14, 38

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics*,
   278 F. Supp. 3d 1307 (S.D. Fla. 2017) ................................................................34

*State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*,
   2014 WL 5427170 (E.D. Mich. Oct. 24, 2014) ...................................................37

*Stein v. Hhgregg, Inc.*,
   873 F.3d 523 (6th Cir. 2017) ..........................................................................5, 9

*Story v. Meadows*,
   2020 WL 7779038 (Tenn. Ct. App. Dec. 22, 2020) ..........................................40

*Toomer v. Garrett*,
   155 N.C. App. 462 (2002) .................................................................................33

*Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*,
   117 F. Supp. 3d 722 (M.D.N.C. 2015) ..............................................................34

*Torres v. Vitale*,
   954 F.3d 866 (6th Cir. 2020) ......................................................................25, 26

*Town of Carolina Shores v. Cont'l Ins. Co.*,
   2010 WL 4338437 (E.D.N.C. Oct. 26, 2010) ....................................................40

*United States v. Bestfoods*,
   524 U.S. 51 (1998) .............................................................................................38

*United States v. Frost*,
   125 F.3d 346 (6th Cir. 1997) ................................................................20, 21, 22

*United Wholesale Mortg., LLC v. America's Moneyline, Inc.*,
   647 F. Supp. 3d 587 (E.D. Mich. 2022) ...............................................11, 24, 25

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United Wholesale Mortg., LLC v. America's Moneyline, Inc.*,
  2024 WL 1349301 (E.D. Mich. Mar. 29, 2024) ...................................2, 6, 7, 18

*VanDenBroeck v. CommonPoint Mortg. Co.*,
  210 F.3d 696 (6th Cir. 2000) .......................................................................18, 19

*Waste Servs. of Decatur, LLC v. Cnty. of Decatur*,
  367 F. Supp. 3d 792 (W.D. Tenn. 2019) .............................................................11

*Wolfe v. Wilmington Shipyard, Inc.*,
  135 N.C. App. 661 (1999) ...................................................................................39

*Wrightsville Beach Prop., LLC v. Attwa*,
  2023 WL 8100189 (E.D.N.C. Nov. 21, 2023)......................................................36

*Yousefzadeh v. Wells Fargo Bank, N.A.*,
  2023 WL 105092 (M.D. Tenn. Jan. 4, 2023) .......................................................35

**STATUTES**

12 U.S.C. § 2607.......................................................................................25, 26, 27, 28

12 U.S.C. § 2614......................................................................................................26

18 U.S.C.§ 1952 .................................................................................................22, 23

18 U.S.C. § 1961 .....................................................................................................17

Fla. Stat. Ann. § 501.203 ........................................................................................35

Fla. Stat. Ann. § 838.15 *et seq.* .............................................................................23

N.C. Gen. Stat. § 53-244.109...................................................................................30

N.C. Gen. Stat. § 53-244.030...................................................................................30

N.C. Gen. Stat. § 14-353..........................................................................................23

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

N.C. Gen. Stat. § 75-1.1 ............................................................................36

Tenn. Code. Ann. § 47-18-101 *et seq.* ...............................................34, 35

**OTHER AUTHORITIES**

CFPB Commentary, 12 C.F.R. § 1026.36(e)...............................16, 21, 22

12 C.F.R. §§ 1024.14–15 .........................................................................25

David B. Sentelle, *Civil RICO: The Judges' Perspective*, 12
    CAMPBELL L. REV. 145, 149 (1990)....................................................11

Fed. R. Civ. P. 8 ......................................................................................19

Fed. R. Civ. P. 9 .....................................................................20, 21, 34

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 291 ...........................29

RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 3 ...............24

RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 21 ...............................24

## STATEMENT OF ISSUES PRESENTED

**1.    Do the notice-and-cure provisions in Plaintiffs' mortgages bar this suit?**

      Defendants' answer: Yes

      Plaintiffs' answer: No

      This Court should answer: Yes

**2.    Do Plaintiffs fail to state a claim under RICO?**

      Defendants' answer: Yes

      Plaintiffs' answer: No

      This Court should answer: Yes

**3.    Do Plaintiffs fail to state a claim under RESPA?**

      Defendants' answer: Yes

      Plaintiffs' answer: No

      This Court should answer: Yes

**4.    Do Plaintiffs fail to state a claim for aiding and abetting breach of fiduciary duty and civil conspiracy?**

      Defendants' answer: Yes

      Plaintiffs' answer: No

      This Court should answer: Yes

**5.      Do Plaintiffs fail to state a claim under the consumer protection laws of their respective states?**

> Defendants' answer: Yes

> Plaintiffs' answer: No

> This Court should answer: Yes

**6.      Do Plaintiffs fail to state a claim for unjust enrichment?**

> Defendants' answer: Yes

> Plaintiffs' answer: No

> This Court should answer: Yes

**7.      Do Plaintiffs fail to state a claim against the non-UWM Defendants?**

> Defendants' answer: Yes

> Plaintiffs' answer: No

> This Court should answer: Yes

**8.      Have Plaintiffs otherwise failed to state a claim for relief?**

> Defendants' answer: Yes

> Plaintiffs' answer: No

> This Court should answer: Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*United Wholesale Mortg., LLC v. America's Moneyline, Inc.*,
　　2024 WL 1349301 (E.D. Mich. Mar. 29, 2024)

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*,
　　2024 WL 982380 (M.D. Fla. Feb. 6, 2024)

*Hill v. Nationstar Mortg. LLC*,
　　2015 WL 4478061 (S.D. Fla. July 2, 2015)

*Hemi Grp., LLC v. City of New York, N.Y.*,
　　559 U.S. 1 (2010)

*Gen. Motors LLC v. FCA US LLC*,
　　2020 WL 3833058 (E.D. Mich. July 8, 2020)

*De Los Angeles Aurora Gomez v. Bank of America*,
　　2013 WL 12165673 (C.D. Cal. Aug. 21, 2013)

*VanDenBroeck v. CommonPoint Mortg. Co.*,
　　210 F.3d 696 (6th Cir. 2000)

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
　　668 F.3d 393 (6th Cir. 2012)

*United States v. Frost*,
　　125 F.3d 346 (6th Cir. 1997)

*E. River Steamship Corp. v. Transamerica Delaval, Inc.*,
　　476 U.S. 858 (1986)

*Torres v. Vitale*,
　　954 F.3d 866 (6th Cir. 2020)

*Cataldo v. U.S. Steel Corp.*,
　　676 F.3d 542 (6th Cir. 2012)

*Egerer v. Woodland Realty, Inc.*,
    556 F.3d 415 (6th Cir. 2009)

*BDM Invs. v. Lenhil, Inc.*,
    264 N.C. App. 282 (2019)

*Peebles v. Puig*,
    223 So. 3d 1065 (Fla. Dist. Ct. App. 2017)

*MP, LLC v. Sterling Holding, LLC*,
    231 So. 3d 517 (Fla. Dist. Ct. App. 2017)

*Amaral v. Crown Mortg. Grp. & Assocs.*,
    2008 WL 1994841 (S.D. Fla. May 5, 2008)

*El Camino Res., Ltd. v. Huntington Nat'l Bank*,
    722 F. Supp. 2d 875 (W.D. Mich. 2010)

*Alhassid v. Bank of Am., N.A.*,
    60 F. Supp. 3d 1302 (S.D. Fla. 2014)

*Yousefzadeh v. Wells Fargo Bank, N.A.*,
    2023 WL 105092 (M.D. Tenn. Jan. 4, 2023)

*Guerrero v. Target Corp.*,
    889 F. Supp. 2d 1348 (S.D. Fla. 2012)

*United States v. Bestfoods*,
    524 U.S. 51 (1998)

## INTRODUCTION

This putative class action is a transparent attempt to revive legal theories that two federal district courts have already rejected and to smear United Wholesale Mortgage, LLC's ("UWM") reputation, which serves to benefit speculators betting against UWM in the stock market. The Complaint takes aim at the wholesale mortgage industry, which provides a valuable alternative for borrowers who wish to work with independent mortgage brokers rather than navigate the retail mortgage market alone. Contrary to Plaintiffs' disparaging rhetoric, UWM is the nation's leading wholesale lender because UWM offers not only competitive rates, but also a faster, simpler, and more reliable borrowing experience for consumers using state-of-the-art technologies unmatched in the industry. As a result, mortgage brokers and borrowers return to UWM time and again.

Plaintiffs are individuals who worked with three different mortgage brokers in three different states to obtain three different mortgage loans from UWM. Plaintiffs do not identify a specific lender that would have actually have offered them a better rate or better terms, much less any such lender that would have been able to match the efficiency and other qualitative benefits that UWM provides. Nevertheless, Plaintiffs suggest that their brokers were obligated to survey the universe of other lenders and to identify some unidentified, more favorable mortgage offering. By failing to do that and instead originating their loans with UWM,

Plaintiffs insist that their brokers caused them to pay more in interest or origination fees than they should have.

According to Plaintiffs, however, their brokers were not acting alone. Setting its sights on UWM, the 104-page, media-craving Complaint alleges a vast conspiracy whereby UWM has "corrupted" tens of thousands of brokers and loan officers nationwide to keep borrowers away from supposedly superior mortgage offerings. How? Plaintiffs primarily blame UWM's "All-In Initiative," which restricts brokers who wish to originate loans with UWM from working with just two specific lenders whose business practices posed a threat to the wholesale channel. Plaintiffs also attack a common and economically rational provision allowing brokers to lock in a mortgage rate while a loan remains pending, as well as UWM's program for brokers who participate in trainings, obtain certain levels of quality and compliance, and meet other standards and service requirements.

Plaintiffs' claims are meritless. Two federal courts—including one in this district—have already upheld UWM's "All-In Initiative." *See Okavage Grp., LLC v. United Wholesale Mortg.*, 2024 WL 982380 (M.D. Fla. Feb. 6, 2024); *United Wholesale Mortg., LLC v. America's Moneyline, Inc.*, 2024 WL 1349301 (E.D. Mich. Mar. 29, 2024). In apparent response, entities with a financial interest in UWM's downfall (and its competitors' rise) coordinated with Plaintiffs' counsel to file this suit just days after Judge Michelson ruled in *America's Moneyline*. But this

suit is barred by Plaintiffs' mortgage agreements, which require them to provide UWM notice and an opportunity to cure before racing to the courthouse.  And each of the nine counts in the Complaint suffers from multiple fatal flaws.

Plaintiffs' RICO claims fail for the reasons most civil RICO suits do: lack of proximate causation, absence of a cognizable enterprise, and failure to plead predicate acts of racketeering.  Those claims are also barred by the economic loss doctrine and the Real Estate Settlement Procedures Act ("RESPA").  Plaintiffs' RESPA claims are barred by that statute's one-year limitations period, and Plaintiffs fail to state a claim under that Act in any event.  Plaintiffs' interrelated claims for aiding and abetting a breach of fiduciary duty and civil conspiracy fail for a number of reasons, not the least because mortgage brokers are not per se fiduciaries and Plaintiffs fail to plead facts establishing a fiduciary relationship.  Plaintiffs cannot state a claim under any of the state consumer protection statutes they invoke. Plaintiffs' tacked-on unjust enrichment claim must go the way of the others.  And Plaintiffs' claims against UWM's holding companies and CEO fail for still more reasons—including that Plaintiffs do not allege that those Defendants actually engaged in any unlawful acts.

This Court should put an end to this coordinated effort to tarnish UWM's reputation, grant Defendants' Motion, and dismiss the Complaint with prejudice.

## BACKGROUND

### A.    UWM's Wholesale Mortgage Business

Homebuyers can get a mortgage in two ways.  Compl. ¶ 23.  They can secure a "retail" loan, which means they approach banks and other lenders directly and fend for themselves during the mortgage process.  *See id.* ¶ 24.  Or they can seek out a "wholesale" loan, which means they work with a mortgage broker who can help guide them through the mortgage process.  *See id.* ¶ 25.

Wholesale mortgages offer many advantages over retail mortgages.  Given market dynamics and inefficiencies in the retail space, wholesale loans often offer better rates and lower costs.  Independent brokers can also help provide a better experience for borrowers and, very often, a better deal.  Nevertheless, the retail market is much larger than the wholesale one.  As of the end of 2023, just a quarter of all mortgages were obtained through the wholesale market.  *Id.* ¶ 90 fig. 11.

UWM operates exclusively in the wholesale space.  ("Wholesale," after all, is the "W" in its name.)  Because brokers are UWM's connection to borrowers, supporting brokers in growing their own businesses and cultivating relationships with them is a keystone of UWM's business.  UWM does that by providing brokers and their customers not only with competitive rates and low fees, but also with the many other things important to borrowers—quicker turnaround times, easier approval processes, fewer loan contingencies, more streamlined appraisals, and better service.  Using state-of-the-art, in-house technologies, UWM loans on average

close in just 17 business days, compared to the industry average of 41 business days. UWM Holdings Corp., Annual Report (Form 10-K) at 5 (Feb. 28, 2024).

UWM's commitment to its brokers and their customers has paid off.  Since 2012, it has grown from the eighth largest wholesale lender to the largest.[1]  UWM has achieved that growth because brokers and borrowers are happy with UWM's services and so return to UWM again and again.  While the Complaint tries to cast repeat business as something nefarious, *e.g.*, Compl. ¶¶ 68–69, it is an essential part of growing any business and the result of the unique value UWM provides—tireless customer service, cutting-edge technology, and unmatched speed and reliability.

### B.    The Wholesale Broker Agreement

Brokers and wholesale lenders enter agreements that govern their relationships.  Those agreements generally address the broker's and the lender's responsibilities during the mortgage process, the broker's fee, the underwriter's role, and many other aspects of the broker-lender relationship.  *See, e.g.*, Ex. 1 (Wholesale Broker Agreement).[2]  The Complaint takes aim at two features of UWM's Wholesale Broker Agreement that it labels the "All-In Initiative" and the "Lock-In Provision."

---

[1] *Compare* Inside Mortg. Fin., Top Broker and Correspondent Producers 2012 (Compl. ¶ 39 n.32), https://tinyurl.com/sdtyvdyd, *with* Inside Mortg. Fin., *Top 50 Mortgage Lenders: 12M23* (published Jan. 25, 2024) (Compl. ¶ 40 n.35), https://tinyurl.com/25nkn729.

[2] UWM's Wholesale Broker Agreement is "referred to in the [C]omplaint and central to the claims contained therein," so the Court may consider it.  *Stein v. Hhgregg, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017); *see, e.g.*, Compl. ¶ 48.

*The All-In Initiative.*  In March of 2021, UWM put forward an amendment to its Wholesale Broker Agreement that the Complaint refers to as the "All-In Initiative."  Compl. ¶ 52 fig. 3.  The proposed amendment asked brokers who wish to continue working with UWM to refrain from originating loans with Rocket Mortgage or Fairway Independent Mortgage.  *Id.*  UWM singled out those lenders for a reason:  Rocket and Fairway operated in *both* the retail and wholesale channels (Fairway has since exited the latter), and employed practices designed to convert wholesale borrowers into retail customers—thus cutting out brokers from future loans and refinancings.  *See Okavage*, 2024 WL 982380, at *2.  Those practices weaken the entire broker industry and hurt borrowers by depriving them of the many services brokers provide.  UWM adopted the "All-In Initiative" to protect the integrity of the wholesale channel—and the brokers and borrowers it serves—from lenders who compete against their own brokers.  *See id.*

The "All-In Initiative" has already been upheld by two federal courts, including one in this district.  *See America's Moneyline*, 2024 WL 1349301; *Okavage*, 2024 WL 982380.  In *America's Moneyline*, Judge Michelson adopted a Florida district court's earlier finding that the "All-In Initiative" did not meaningfully constrain consumers, including because UWM represents just 11% of the mortgage lending market.  *America's Moneyline*, 2024 WL 1349301, at *4.  Moreover, the Initiative implicates just two of the more than seventy lenders in the

wholesale mortgage channel alone.  And if a broker wishes to work with Rocket or Fairway, which always remains an option, that broker is free to exit the Wholesale Broker Agreement at any time with seven days' notice.  Ex. 1, Section 7.06.

*The Lock-In Provision.*  The Complaint also mentions a provision of UWM's Wholesale Broker Agreement that it refers to as the "Lock-In Provision."  Compl. ¶¶ 59–62.  That contract term, variations of which are common in the industry, offers temporary "price protection" to brokers who wish to protect against rate increases during the pre-closing period by locking in UWM's rate.  Ex. 1, Section 2.03; Compl. ¶ 60.  In exchange for a rate-lock, which shifts the risk of a rate increase to UWM, brokers agree not to offer the same loan to another lender "during the lock-in period." *Id.*  A rate-lock is purely "at Broker's option"—something a broker may opt to forego.  *Id.*  It does not prevent brokers from shopping loans to other lenders before or after the lock-in period.  *Id.*  And it never binds the borrower, who is free to walk away from UWM's offer and choose another lender at any time before closing.

### C.    Plaintiffs' Lawsuit

This Complaint was filed just days after Judge Michelson rejected the challenge to the "All-In Initiative" in *America's Moneyline*.  Within hours of that filing, a new "media" outfit under the name of "Hunterbrook Media" broke its debut story, *"The Lie That Helped Make UWM America's Largest Mortgage Lender,"* which parrots many of the Complaint's allegations and relies on many of the same

sources, quotes, and figures.  Ex. 2 (Hunterbrook Report).[3]  The article discloses that Hunterbrook "entered into an agreement" with "Boies Schiller Flexner LLP" "in exploration of a class action lawsuit," *id.* at 2—and, indeed, Hunterbrook's logo is embedded in the Complaint itself.  *See, e.g.*, Compl. ¶ 69 fig. 6.  The article further discloses that Hunterbrook's hedge fund arm, New York-based Hunterbrook Capital, "shorted" UWM's stock (a bet that the stock value would drop) and took a "long" position on Rocket Mortgage's stock (a bet that the stock value would rise) just prior to the article's publication.  Ex. 2 at 3.

This Hunterbrook-affiliated lawsuit is a putative class action that raises a kitchen-sink full of claims against UWM, its holding companies, and its CEO.  The Complaint's primary allegation is that UWM "orchestrat[ed] and execut[ed] a deliberate scheme, in coordination with a host of corrupted mortgage brokers, to cheat hundreds of thousands of borrowers out of billions of dollars in excess fees and costs that they paid to finance their homes."  Compl. ¶ 1.  The Complaint alleges that many brokers who work with UWM refer more than 75% of their business to UWM and, as a result, have become "corrupted."  *Id.* ¶ 9.  The Complaint blames the "All-In Initiative" and the "Lock-In Provision," as well as UWM's marketing strategies, which aim to educate borrowers about the wholesale channel's benefits

---

[3] The article's lead author and an additional party to the agreement, Matthew Termine, until recently worked as general counsel to a mortgage broker affiliated with UWM's long-time business adversary, Rocket Mortgage.

and to encourage brokers to work with UWM.  *E.g.*, *id.* ¶¶ 55, 59.  The Complaint says that all of this amounts to a conspiracy that has harmed borrowers by depriving them of cheaper loan options their brokers should have offered them.  *E.g.*, *id.* ¶ 10.

The named Plaintiffs are a married couple and two individuals who used different mortgage brokers in different states for different purposes.  *Id.* ¶¶ 12–14, 112–88.  They seek to represent a nationwide class or state subclasses of individuals who obtained a UWM mortgage through a broker.  Their nine-count complaint alleges RICO violations (Counts I–II), RESPA violations (Count III), aiding and abetting a breach of fiduciary duty (Count IV), civil conspiracy (Count V), unjust enrichment (Count VI), and state consumer protection violations (Counts VII–IX).

Although the Complaint disparages the "All-In Initiative" at length, it alleges no facts showing that Rocket or Fairway (the only two lenders singled out by the "All-In Initiative") would have offered the named Plaintiffs loans at better rates— much less been able to provide the efficiency, reliability, and other qualitative benefits that distinguish UWM.[4]  To the contrary, Plaintiffs' own data reflects that Rocket's fees are generally *higher* than UWM's.  *Id.* ¶ 72.  And their loan documents reflect that UWM offered many other benefits too.  *Compare, e.g.*, Ex. 3-1 (Schelble May 23, 2021 Closing Disclosure) Line B01, *with* Ex. 3-2 (Schelble June 1, 2021

---

[4] Plaintiffs' loan documents can be considered because they are "referred to in the [C]omplaint and central to the claims contained therein."  *Stein*, 873 F.3d at 528; *see, e.g.*, Compl. ¶¶ 129–31, 156–58, 181–83.

Closing Disclosure) Line B (reflecting that UWM waived an appraisal for Plaintiff Schelble).  Moreover, one Plaintiff's contract with his mortgage broker disclaimed the very "agency" relationship and duties on which the Complaint relies.  Ex. 4 (Weatherill Broker Contract).  And each Plaintiff received federal anti-steering disclosures that identify a minimum of three suitable loan options for which they would likely qualify and that provide a safe harbor to brokers.  Exs. 5-1, 5-2, 5-3 (Plaintiffs' Anti-Steering Disclosures).

## ARGUMENT

## I.   PLAINTIFFS' SUIT IS BARRED BY NOTICE-AND-CURE PROVISIONS.

Plaintiffs' mortgages contain notice-and-cure provisions that state:

> Neither Borrower nor Lender may commence, join, or be joined to any judicial action . . . that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party . . . of such alleged breach and afforded the other party . . . a reasonable period after the giving of such notice to take corrective action.

Exs. 6-1 at 12, 6-2 at 11, 6-3 at 12 (Plaintiffs' Mortgages).  Each claim in this "judicial action" hinges on UWM's "actions" in connection with Plaintiffs' mortgages.  *See* Compl. ¶¶ 112–88 (describing each named Plaintiff's mortgage relationship with UWM).  And the damages sought result from alleged overpayments in connection with those mortgages.  *See id.*  The Complaint also alleges breaches of "dut[ies] owed by reason of" those mortgages.  *See, e.g., id.* ¶ 254

(alleging RESPA violations arising from breaches of a duty "[i]n connection with transactions involving federally-related mortgage loans"); *id.* ¶ 290 (alleging unjust enrichment on the basis of funds obtained "from their promotion and sale of mortgage loans"); *cf. United Wholesale Mortg., LLC v. America's Moneyline*, 647 F. Supp. 3d 587, 595 (E.D. Mich. 2022) (analyzing similar "fraud claims" that the court found "would not exist absent the contract" between brokers and UWM).

Because Plaintiffs failed to provide notice and an opportunity to cure before filing this suit, their Complaint must be dismissed. *See, e.g.*, *Kurzban v. Specialized Loan Serv., LLC*, 2018 WL 1570370, at *2 (S.D. Fla. Mar. 30, 2018) (collecting cases and dismissing RESPA and other claims based on lack of notice); *Hill v. Nationstar Mortg. LLC*, 2015 WL 4478061, at *1 (S.D. Fla. July 2, 2015) (dismissing claims involving alleged kickbacks based on lack of notice); *see also Moses H. Cone Mem. Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, 2017 WL 1378144, at *4 (M.D.N.C. Apr. 11, 2017) ("North Carolina generally enforces valid notice and cure clauses in a contract."); *Waste Servs. of Decatur, LLC v. Cnty. of Decatur*, 367 F. Supp. 3d 792, 812 (W.D. Tenn. 2019) (In Tennessee, "[p]ublic policy and good commercial reasons support the use of contractual cure provisions.").

## II.   PLAINTIFFS' RICO CLAIMS FAIL (COUNTS I–II).

"In enacting RICO, Congress was trying to get the Mafia out of legitimate business."  David B. Sentelle, *Civil RICO: The Judges' Perspective*, 12 CAMPBELL

L. REV. 145, 149 (1990).  The statute's combination of "treble damages, attorney's fees, and federal jurisdiction" creates "a powerful incentive for plaintiffs to attempt to fit garden variety fraud claims within the standard of civil RICO." *Rosenson v. Mordowitz*, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012).  But outside the context of organized crime, it is "the rare complaint that actually states a claim for civil RICO[.]" *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020); *see Gross v. Waywell*, 628 F. Supp. 2d 475, 480 (S.D.N.Y. 2009) ("[T]he incidence of favorable judgments for RICO plaintiffs is . . . stunningly awful.").

"[C]ivil RICO claims are subject to demanding pleading standards." *Rogers v. Morrice*, 2013 WL 1750004, at *6 (D.N.J. Apr. 23, 2013).  And in "fairness to innocent parties," courts "should strive to flush out frivolous RICO allegations" quickly. *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990) (warning of the "inevitable stigmatizing effect on those named as [RICO] defendants").  To state a civil RICO claim, Plaintiffs must plead facts showing that the alleged RICO violation was the "proximate cause" of their injuries. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 484 (6th Cir. 2013).  In addition, they must show the existence of "an enterprise" that engaged in "a pattern of racketeering activity." *Id.*

Plaintiffs miss all of those marks.  They fail to plead facts showing proximate causation, a cognizable enterprise, or underlying acts of racketeering.  In addition, the economic loss doctrine and RESPA's remedial scheme bar recovery.  Despite

12

Plaintiffs' "attempt to mold their claims to the RICO form," "their injuries"—which have nothing to do with organized crime—"do not fall within those intended to be addressed" by that statute. *Rosenson*, 2012 WL 3631308, at *4. Dismissal is therefore required.

### A.  Plaintiffs Fail to Plead Proximate Causation.

To satisfy RICO's causation requirement, a plaintiff must "show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (cleaned up). Proximate causation requires a "direct relation between the injury asserted and the injurious conduct alleged." *Id.* "A 'direct relation,'" in turn, "means that the injury occurred at the '*first step*' in the causal chain." *Gen. Motors LLC v. FCA US LLC*, 2020 WL 3833058, at *7 (E.D. Mich. July 8, 2020) (quoting *Hemi Grp.*, 559 U.S. at 10), *aff'd*, 44 F.4th 548 (6th Cir. 2022). A causal link that is "insubstantial, unforeseeable, speculative, or illogical, or [arises] because of intervening causes" is insufficient. *Collier v. LoGiudice*, 818 F. App'x 506, 511 (6th Cir. 2020) (citation omitted); *see Hemi*, 559 U.S. at 10 (affirming dismissal of RICO claim where the plaintiff's "theory of causation [was] far too indirect").

The U.S. Supreme Court articulated this critical issue in *Hemi*. There, the City of New York filed a RICO suit against a company that sold cigarettes online to New York residents. 559 U.S. at 4. The City alleged that the company had failed to

13

comply with a federal law requiring it to submit customer information to the State of New York and, as a result, that it had been unable to collect taxes based on the online sales. *Id.* at 5. The Court held that proximate cause was lacking because there was more than one link the causal chain: The company's "obligation was to file the [tax] reports with the State, not the City, and the City's harm was directly caused by the customers, not [the company]." *Id.* at 11.

Applying the same principles, the Sixth Circuit and courts in this district routinely conclude that RICO claims fail at the pleadings stage. *See, e.g.*, *Gen. Motors*, 2020 WL 3833058, at *7 (dismissing RICO claim where the alleged injury was too many steps removed from the conduct), *aff'd*, 44 F.4th 548; *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 504–06 (6th Cir. 2010) (affirming dismissal of RICO allegations that subprime lending "led to a foreclosure crisis" because the city's injuries "could have been caused by many other factors unconnected to the Defendants' conduct"); *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003) (affirming dismissal of RICO claim because the damages were "contingent on harm to third parties" and thus "indirect").[5]

---

[5] *See also, e.g.*, *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 594–97 (6th Cir. 2022); *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405–07 (6th Cir. 2012); *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 608–09 (E.D. Mich. 2015); *Skymark Props. Corp. v. Katebian*, 2022 WL 1054059, at *28 (E.D. Mich. Mar. 14, 2022); *Am. Biocare, Inc. v. Howard & Howard Att'ys, PLLC*, 2016 WL 5661583, at *12 (E.D. Mich. Sept. 30, 2016).

14

In *General Motors*, for instance, a car manufacturer plaintiff alleged that defendants "used bribes to secure [their lead] position . . . in [collective bargaining agreement] negotiations (first step), which enabled [another car manufacturer] to negotiate its own very generous . . . [collective bargaining agreement] with the [union] (second step), that ensured, . . . that the [the plaintiff's agreement] was 'vastly more expensive' . . . (third step)." 2020 WL 3833058, at *10.  Because this theory required the court to "move well beyond the first step" in the causal chain, Judge Borman held that the plaintiff had failed to "satisfy RICO's direct relationship requirement." *Id.* (quoting *Hemi Grp.*, 559 U.S. at 10), *aff'd*, 44 F.4th at 548.

In *De Los Angeles Aurora Gomez v. Bank of America*, 2013 WL 12165673 (C.D. Cal. Aug. 21, 2013), the Central District of California applied these principles to allegations similar to those in Plaintiffs' Complaint.  There, individuals allegedly injured by a mortgage broker's Ponzi scheme asserted RICO claims against Countrywide, a lender with whom the broker partnered. *Id.* at *1–2.  "The chain of causation from Countrywide's alleged mail and wire frauds," however, was "simply too attenuated" to support a RICO claim. *Id.* at *6.  Although Countrywide had represented that the broker "had been 'carefully screened,'" no plaintiff relied on that representation "in deciding to obtain a Countrywide loan." *Id.*  To the contrary, it was the broker's "misrepresentation that induced [plaintiffs] to invest" and the broker that "defrauded [the p]laintiffs when he did not pay back their investments."

*Id.* That "Countrywide intentionally gave [the broker] an 'aura of legitimacy'" and "wanted to increase its market share" did not change the calculus. *Id.* at *7. Countrywide did not owe a "fiduciary duty . . . during the loan application process," and the plaintiffs' alleged injuries were not proximately caused by their lender. *Id.*

Plaintiffs' theory of causation is even more attenuated and speculative than those other courts have rejected. Plaintiffs allege:

1. that "UWM employs tactics" designed to influence brokers to "steer borrowers into UWM mortgages," Compl. ¶ 47;

2. that Plaintiffs' brokers "advised" them that they "intended to diligently survey the loan options available from numerous other wholesale mortgage lenders," *id.* ¶¶ 85, 125, 125, 152, 177;

3. that those brokers had pre-existing relationships with other lenders from whom they could seek other loan options, *see* CFPB Commentary, 12 C.F.R. § 1026.36(e), *infra* pp. 21–22;

4. that, as a result of UWM's tactics, the brokers failed to survey those other loan options and "funnel[ed]" Plaintiffs to UWM, *see id.* ¶122;

5. that the brokers would have identified another more "affordable option" if they had surveyed additional lenders, *id.* ¶ 132; and

6. that, notwithstanding the advantages of UWM's offering, Plaintiffs would actually have selected a different loan among those other available options absent the allegedly unlawful conduct, *id.*

Merely "[t]o state this theory is to show that the injury alleged is far beyond the first step in the causal chain." *Gen. Motors*, 2020 WL 3833058, at *10. Allowing Plaintiffs' RICO claims to proceed on their tenuous theory would be unprecedented.

Just as in *Bank of America*, Plaintiffs do not allege that they ever saw UWM's statements, much less relied on them. *See Bank of America*, 2013 WL 12165673, at

16

*6; *cf. Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."). And just as in *Bank of America*, there are multiple independent, intervening causes between Plaintiffs' alleged injuries and UWM's alleged actions. *See, e.g.*, Compl. ¶ 125 (alleging that they "relied upon [others'] representations that [they] would diligently and independently shop for a loan in their best financial interests"); *cf. Hemi*, 559 U.S. at 12 (no proximate causation where injury was not "directly caused by" the defendant). Plaintiffs' RICO claims fail for the very same reasons.

### B.    Plaintiffs Fail to Plead a RICO Enterprise.

To allege an "association-in-fact" enterprise under 18 U.S.C. § 1961(4), Plaintiffs must plead facts showing an "ongoing organization" with "a purpose, relationships among those associated with the enterprise, and longevity" sufficient to carry out its goals. *Boyle v. United States*, 556 U.S. 938, 945-46 (2009) (cleaned up). As courts across the country have recognized, enterprises styled as "rimless hub-and-spoke" conspiracies—*i.e.*, "parallel frauds" where all members are not "working together to jointly" execute a scheme—do not suffice. *Root, Inc. v. Silver*, 2024 WL 85057, at *11 (S.D. Ohio Jan. 8, 2024); *see, e.g., In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374–75 (3d Cir. 2010) (rejecting a "steering" enterprise where broker alleged "bilateral agreements" with "its insurer-partners"

but no "collaboration among the insurers"); *D'Addario v. D'Addario*, 901 F.3d 80, 101–02 (2d Cir. 2018) (collecting cases).  Moreover, the enterprise must "function[ ] as a continuous unit."  *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699–700 (6th Cir. 2000).

Plaintiffs' alleged "Steering Enterprise" is exactly the sort of "rimless hub-and-spoke" conspiracy that cannot support a RICO claim.  *Root*, 2024 WL 85057, at *11.  According to the Complaint, UWM and its executives serve as the central "hub," and each broker is a "spoke" connected to UWM through the Wholesale Broker Agreement.  Compl. ¶¶ 210–16.  Even accepting that allegation as true, there is no "rim" connecting the many thousands of mortgage brokers across the country that work with UWM.  Two federal courts have already held exactly that.  *See America's Moneyline*, 2024 WL 1349301, at *2 ("[P]laintiff does not plausibly allege any horizontal agreement between each spoke (the brokers); only a hub (UWM) and vertical agreements between it and each spoke (the brokers)."); *Okavage*, 2024 WL 982380, at *10 (same).  For good reason:  Brokers are independent businesses who respond to market conditions and *compete* with one another for business.  And Plaintiffs allege no specific facts creating a plausible inference their brokers "were acting in any way but in their own independent interests."  *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 (E.D.N.Y. 2017) (cleaned up).

Plaintiffs' claim also fails because it "describe[es]" a "nebulous, open-ended . . . enterprise." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995). In *VanDenBroeck*, for example, a mortgage lender allegedly offered overpriced loans to borrowers and then sold each loan to one of "dozens of secondary lenders," with the primary and secondary lenders sharing the spoils. 210 F.3d at 700. Because the plaintiffs did not identify some "discreet number of secondary lenders" with which the defendant collaborated, however, the "conspiracy could have transpired with any lender in the secondary lending market." *Id.* As a result, the enterprise was "too unstable and fluid an entity to constitute a RICO enterprise." *Id.*

So too here. The Complaint identifies "[m]ortgage brokers and brokerage firms" as members of the so-called "Steering Enterprise." Compl. ¶ 210. But tens of thousands of brokers and loan officers originate loans to UWM each year. *Id.* ¶ 67 (alleging that 28,422 "brokers" originated at least one loan to UWM in 2020). The Complaint likewise concedes, as it must, that thousands of brokers and loan officers originated loans to UWM at high rates *before* the "All-In Initiative" and the other conduct they allege. *Id.* ¶ 69. Plaintiffs' attempt to connect and cast aspersions on thousands of unnamed and unaffiliated individuals and firms is unprecedented under both Sixth Circuit law and the Federal Rules. *See VanDenBroeck*, 210 F.3d at 700; Fed. R. Civ. P. 8(a)(2).

### C.    Plaintiffs Fail to Plead Predicate Acts.

Plaintiffs' RICO claims separately fail because they do not plead predicate acts of racketeering.  Plaintiffs' attempts to plead mail, wire, and honest services fraud fail because they do not identify actionable misrepresentations or plead facts showing an intent to deceive with the specificity required by Rule 9(b).  They also cannot show a fiduciary duty, as required for honest-services fraud.  And their attempts to plead bribery fail because Tennessee does not have an underlying bribery statute and because they do not plead facts showing an intent to interfere with a fiduciary relationship under North Carolina or Florida law.

*Fraud.*  To state a predicate act of fraud, Plaintiffs must "satisfy . . . Rule 9(b)" by "(1) specify[ing] the statements that [they] contend[ ] were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent." *Heinrich*, 668 F.3d at 404 (cleaned up).  The defendant must also "possess the specific intent to deceive or defraud." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997).

Plaintiffs come nowhere close to pleading fraud—of any variety—with the specificity Rule 9(b) requires.  Although Plaintiffs identify specific statements by UWM and Ishbia, Compl. ¶ 224, they never allege that Plaintiffs—or anyone else— heard or relied upon those statements.  So those statements cannot support proximate causation.  *See, e.g.*, *Kerrigan*, 112 F. Supp. 3d at 608–09 (dismissing fraud

predicates on causation grounds where plaintiffs had not "clearly linked their losses to any specific act or communication by defendants"); *see supra* Section II.A.  That leaves the allegations that brokers falsely "advised [Plaintiffs] that [they] would diligently survey the loan options available[.]"  Compl. ¶¶ 125, 152, 177.  But the Complaint does not specify where, when, or how Plaintiffs' brokers made any such statement.  So it fails to satisfy Rule 9(b).  *See, e.g.*, *Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*, 702 F. App'x 416, 421–23 (6th Cir. 2017) (dismissing RICO claims for failing to satisfy Rule 9(b) for predicate acts).

Plaintiffs also fail to plausibly allege that Defendants had a "specific intent to deceive or defraud."  *Frost*, 125 F.3d at 354.  Plaintiffs fault their mortgage brokers for failing to disclose that they signed the "All-In Initiative" and that they send a high percentage of their loans to UWM.  Compl. ¶¶ 127, 154, 179.  But alleging circumstances that are not themselves "indicative of malintent on the part of [defendants]" does not support an inference of specific intent.  *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 703–04 (E.D. Mich. 2020) (dismissing RICO claim on this basis).  And those facts do not suggest fraudulent steering on behalf of the brokers—much less intent to deceive on the part of UWM.  Far from requiring that brokers survey every possible lender in the universe, federal regulations specifically contemplate that brokers can focus on a small number of lenders.  *See* CFPB Commentary, 12 C.F.R. § 1026.36(e) (noting that "three or more . . . creditors" is a

"significant number of . . . creditors" and that § 1026.36(e) "does not require a loan originator to establish a business relationship with any creditor with which the loan originator does not already do business"). And the mere fact that UWM—like every wholesale lender—seeks to foster relationships with mortgage brokers does not show an intent to defraud. *See, e.g.*, Compl. ¶¶ 135, 162, 187, 225(b).

Plaintiffs' nod to "honest services fraud," Compl. ¶ 223, fails for an additional reason. In the context of private parties, a claim for fraud of this type presupposes the existence of a fiduciary duty. *See Frost*, 125 F.3d at 366 (citing *Morda v. Klein*, 865 F.2d 782, 785 (6th Cir. 1989)). As explained below, no such duty exists. *See infra* Section IV.B.

**Bribery.** Plaintiffs' bribery theory fares no better. The Travel Act prohibits the use of interstate commerce to "promote, manage, establish, [or] carry on . . . unlawful activity." 18 U.S.C. § 1952(a)(3). Plaintiffs theorize that UWM violated state bribery laws—and thus the Travel Act—by giving bribes to brokers who allegedly steered loans to UWM in return. Compl. ¶¶ 225–26. But Plaintiffs fail to plead a predicate act of bribery under any state's law.

As an initial matter, Plaintiffs only invoke North Carolina and Florida commercial bribery statutes because Tennessee has no such law. *Id.* That bars any Travel Act predicate for the Escues—who refinanced their home in Tennessee—

because the Travel Act defines "bribery" as an "unlawful activity" only if "in violation of the laws of the State in which committed."  18 U.S.C. § 1952(b)(i)(2).

As for the other Plaintiffs, the North Carolina and Florida bribery laws require intent to interfere with a fiduciary relationship.  *See* N.C. Gen. Stat. § 14-353; Fla. Stat. Ann. §§ 838.15–16.  As explained below, *infra* Section IV.B, Plaintiffs and their brokers had no such relationship.  But even assuming they did, Plaintiffs do not plausibly allege that UWM intended to interfere with it.  Many of the alleged "things of value" in the Complaint—like UWM's "Brand 360"; the MortgageMatchup.com directory; and alleged points in the PRO Ranking Score system for "campus visits," "watching UWM videos," and "communicating with [UWM] account executive[s]," Compl. ¶¶ 94–97, 110 & fig. 13—do not require brokers to originate any specific number of loans with UWM.  Although the PRO Ranking Score system offers some points for loans submitted using UWM's in-house tools and "Memory Makers" ordered along with UWM loans, *id.* ¶ 98, those run-of-the mill incentives are both trivial and entirely lawful.  *See id.* ¶ 96 fig. 13 (showing that points for "Ultimate Loan Submissions" stop after six loans per month and points for "Memory Makers" are capped at a percentage of loans submitted to UWM).  Indeed, Plaintiffs allege that providing "incentives for doing particularly high volume" is normal industry practice.  *Id.* ¶ 75.  And they plead no facts showing that UWM took any specific action intended to interfere with the relationship between Plaintiffs and their brokers.

23

**D.     The Economic Loss Doctrine Precludes Recovery.**

Plaintiffs' RICO claims are also barred by the economic loss doctrine.  This well-established principle precludes recovery in tort for economic losses "more appropriately assigned to contract law."  RESTATEMENT (THIRD) OF TORTS: PROD. LIAB. § 21 cmt. a; RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 3; *see also E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 873–75 (1986) (applying the federal economic loss rule); *Hart v. Ludwig*, 79 N.W.2d 895, 897–98 (Mich. 1956) (applying Michigan's similar rule).  It extends to claims that sound in fraud.  *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 3 cmt b; *America's Moneyline*, 647 F. Supp. 3d at 595.  And it bars RICO claims that are "factually indistinguishable from breach of contract claims."  *Llewellyn-Jones v. Metro Prop. Grp.*, 22 F. Supp. 3d 760, 778–80 (E.D. Mich. 2014) (considering RICO claims under the economic loss doctrine but deciding them on a separate basis).

Plaintiffs' RICO claims go to the heart of the contractual relationship between Plaintiffs and UWM.  At their core, these claims target the rates and fees Plaintiffs paid to UWM pursuant to their mortgage agreements and seek to "undo the terms of [their contractual] relationship."  RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 3 cmt b.  And the predicate acts on which Plaintiffs rely amount to "general fraud claims" that "would not exist absent the [mortgage] contract" with UWM.

*America's Moneyline*, 647 F. Supp. 3d at 595 (cleaned up).   Accordingly, the economic loss doctrine bars their RICO claims.

### E.    RESPA Precludes Any Remedies Under RICO.

Finally, Plaintiffs' RICO claims should be dismissed because RESPA precludes them.   "In a variety of contexts the Supreme Court has held that a precisely drawn, detailed statute precludes more general remedies."   *Torres v. Vitale*, 954 F.3d 866, 871 (6th Cir. 2020) (quoting *EC Term of Years Trust v. United States*, 550 U.S. 429, 433 (2007)); *see also Mich. Corr. Org. v. Mich. Dep't Corr.*, 774 F.3d 895, 904 (6th Cir. 2014) ("The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy . . . .").   Applying this precedent, the Sixth Circuit has held, for example, that "the FLSA's detailed remedial scheme precludes" "[RICO] claims" "seeking damages for wage and hour violations."   *Torres*, 954 F.3d at 876.

In this case, Plaintiffs' RICO claims depend upon the existence of a supposed "Steering Enterprise" by which mortgage brokers received inducements in exchange for steering loans to UWM.   Compl. ¶¶ 210–16.   But RESPA already provides a detailed statutory and regulatory framework for determining the existence of unlawful "steering" arrangements.   *See* 12 U.S.C. § 2607(c); 12 C.F.R. §§ 1024.14–15.   Plaintiffs' RICO theory hinges on allegations of acts that RESPA prohibits, 12 U.S.C. § 2607 (prohibiting "thing[s] of value pursuant to any agreement to refer

mortgage business"), and seeks remedies that RESPA provides, *id.* § 2607(d)(2) (permitting damages for "amount of any charge paid for [a] settlement service"). *Compare* Compl. ¶¶ 228, 230, *with id.* ¶¶ 261–62. RESPA's "precisely drawn, detailed" remedial scheme thus "precludes more general remedies" available under RICO. *Torres*, 954 F.3d at 871.

## III. PLAINTIFFS' RESPA CLAIMS FAIL (COUNT III).

In addition to precluding the RICO claims, Plaintiffs' RESPA claims fail for two of their own reasons: The claims are time-barred, and Plaintiffs do not adequately allege a statutory violation.

Claims under § 2607 are subject to a one-year statute of limitations. 12 U.S.C. § 2614. Each of the mortgages at issue here closed more than one year before this lawsuit was filed on April 2, 2024. Compl. ¶¶ 129, 156, 181. "[T]he allegations in the complaint [thus] affirmatively show that [Plaintiffs' RESPA] claim[s] [are] time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)). At least one Court of Appeals has held that RESPA's statute of limitations is jurisdictional and not subject to equitable tolling. *See Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1041 (D.C. Cir. 1986). But even assuming equitable tolling were available, Plaintiffs have not alleged facts sufficient to support the application of that doctrine here. *See, e.g.*, *Ball v. Fed. Nat'l Mortg. Assoc.*, 2016 WL 4702585, at *6 (E.D. Mich. Sept. 8, 2016) (dismissing time-

barred RESPA claims where plaintiff did not allege that defendants took "affirmative acts" to conceal the claims); *Simms v. CIT Grp./Consumer Fin.*, 2009 WL 973011, at *7 (W.D. Tenn. Apr. 9, 2009) (dismissing time-barred RESPA claims where plaintiffs failed to allege due diligence, such as seeking "independent advice about the loan terms" from "another mortgage broker").

In any event, Plaintiffs' claims also fail on the merits because they do not adequately allege a violation of § 2607(a) or (b).  Section 2607(a), the anti-kickback provision, requires a plaintiff to plead "(1) a payment or thing of value; (2) made pursuant to an agreement to refer settlement business; and (3) an actual referral." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009) (cleaned up).  To do that, a plaintiff must allege "specifics as to the date, time, or amount" of the supposed kickback.  *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 315 (2d Cir. 2012).  "[R]elying on a supposed industry-wide practice" is not enough.  *Id.* And that is what Plaintiffs attempt to do here.  *See, e.g.*, Compl. ¶ 75 (alleging that "incentives for doing particularly high volume" are an industry norm).  Because Plaintiffs do not plead facts showing that specific brokers received a specific kickback in return for referring their specific business, their § 2607(a) claim fails.

Section 2607(b), in turn, prohibits arrangements where mortgage brokers receive a split of origination fees as compensation for anything other than "services actually performed."  Plaintiffs do not dispute that brokers performed services for

Plaintiffs, and they plead no facts showing that any portion of the brokers' fees was attributable to something other than those services.  Because Plaintiffs have therefore failed to allege an illegal fee-splitting arrangement, § 2607(b) does not apply.

## IV. PLAINTIFFS' AIDING-AND-ABETTING AND CONSPIRACY CLAIMS FAIL (COUNTS IV–V).

Plaintiffs' aiding-and-abetting and civil conspiracy claims fail for a host of overlapping reasons.  For starters, both sets of claims are governed by state law— not common law, as Plaintiffs contend.  Most of the aiding-and-abetting claims do not even get off the starting block because North Carolina does not recognize a cause of action for aiding and abetting a breach of fiduciary duty and because the North Carolina and Florida claims are barred by the economic loss doctrine.  Those claims all fail on the merits, in any event.  As for conspiracy, Plaintiffs fail to allege an underlying tort or plead facts showing a conspiratorial agreement.

### A. These Claims Are Governed by State Law.

Plaintiffs argue that their claims should be governed by "common law" because there are no "case-dispositive differences" under state law.  Compl. ¶¶ 264, 275.  But there is no such thing as federal common law aiding-and-abetting or conspiracy claims in this context.  *Cf. Atherton v. F.D.I.C.*, 519 U.S. 213, 216, 225– 26 (1997).  In any event, Plaintiffs' premise is mistaken: As explained below, Florida law, North Carolina law, and Tennessee law differ in many meaningful respects.  Plaintiffs' "alternative" request to consider these claims under the laws of the states

in which they obtained their mortgages is the only correct approach. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 291; *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 125 (1995) (adopting Restatement view).

### B.   The Aiding-and-Abetting Claims Fail.

Plaintiffs' Florida and North Carolina claims for aiding and abetting a breach of fiduciary duty fail for two threshold reasons. *First*, North Carolina does not recognize such a claim as a matter of law. *BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282, 302 (2019). *Second*, under both Florida and North Carolina law, the economic loss doctrine bars fiduciary duty–based claims unless the damages alleged are "independent, separate and distinct from the damages sustained from [a] contract's breach." *777 Partners LLC v. Pagnanelli*, 2021 WL 2038175, at *3 (S.D. Fla. Mar. 8, 2021) (quoting *Peebles v. Puig*, 223 So. 3d 1065, 1068 (Fla. Dist. Ct. App. 2017)); *see Ramsey v. Bimbo Foods Bakeries Distrib.*, 2015 WL 1611339, at *6 (E.D.N.C. Apr. 10, 2015). Because Plaintiffs' claims "arise out of [the brokers'] performance under the terms of the[ir] contract[s]" with Plaintiffs, those claims are barred by the economic loss doctrine. *Ramsey*, 2015 WL 1611339, at *6.

Plaintiffs also fail to state a claim on the merits under any relevant body of law. There are at least four elements to an aiding-and-abetting claim in Florida and Tennessee: "(1) a fiduciary duty on the part of the wrongdoer; (2) a breach of fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4)

the aider and abettor's substantial assistance or encouragement of the wrongdoing." *MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517, 527 (Fla. Dist. Ct. App. 2017); *see PNC Multifamily Cap. Inst. Fund v. Bluff Cty. Cmty. Dev. Corp.*, 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012) (similar). Plaintiffs satisfy *none* of these elements.

*First*, Plaintiffs' mortgage brokers owed them no fiduciary duty. In none of the relevant jurisdictions can a plaintiff allege a cause of action on the basis that mortgage brokers are per se fiduciaries as a matter of law.[6] Plaintiffs must therefore "allege a set of facts" showing that they "reposed an unusual degree of trust and confidence" in their brokers to establish that a duty existed as a matter of fact. *Oak Ridge Precision Indus., Inc., v. First Tenn. Bank N.A.*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992); *see Cordero v. Transamerica Annuity Serv. Corp.*, 452 F. Supp. 3d 1292, 302 (S.D. Fla. 2020) ("[C]ourts typically do not construe . . . 'arms-length' relationships . . . created through contract[] as implying a fiduciary duty"). But one of the broker contracts expressly disclaims the duties alleged by Plaintiffs, Ex. 4, and all of them were accompanied by extensive, arms-length disclosures. *See, e.g.*,

---

[6] Although one North Carolina statute references a duty of loyalty for mortgage brokers, N.C. Gen. Stat. Ann. § 53-244.109, that statute does not create a private right of action. *Gardner v. Bank of N.Y. Mellon*, 2014 WL 12623069, at *4 (E.D.N.C. Feb. 24, 2014). In any event (and again), North Carolina does not recognize claims for aiding and abetting a breach of fiduciary duty. *See BDM Invs.*, 264 N.C. App. at 302. And even if it did, the statute permits some brokers to act "exclusively for a single mortgage lender," § 53-244.030(11a), so Plaintiffs' allegations do not implicate a breach of any duty arising therefrom.

Exs. 3-2, 7, 8 (Plaintiffs' Closing Disclosures); *see Kipnis v. Bayersiche Hypo-Und Vereinsbank, AG*, 2017 WL 11103938, at *11 (S.D. Fla. June 26, 2017) ("Generally, no fiduciary relationship exists where a contract unambiguously disclaims the possibility of a fiduciary relationship."); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 2007 WL 7124464, at *7 (S.D. Fla. Feb. 12, 2007) (similar), *aff'd*, 600 F.3d 1334 (11th Cir. 2010).  And Plaintiffs identify no specific facts that would justify the recognition of a fiduciary duty on the facts of their cases.  *Cf. Amaral v. Crown Mortg. Grp. & Assocs.*, 2008 WL 1994841, at *3–4 (S.D. Fla. May 5, 2008) (finding mortgage broker owed no fiduciary duties to one of the plaintiffs where no prior relationship existed, forms disclosed all information, and he understood English).

***Second***, Plaintiffs fail to plead a breach of any such fiduciary duty.  They suggest that such a breach occurred because (1) brokers betrayed their customers to earn UWM's perks, and (2) brokers did not disclose that they would not shop loans to Rocket and Fairway.  Compl. ¶¶ 266–69.  But even crediting Plaintiffs' allegations regarding UWM's incentives, they concede that providing "incentives for doing particularly high volume" is normal industry practice.  *Id.* ¶ 75.  And they nowhere plead facts showing that they would have saved money with Rocket or Fairway—or that any specific provider used by the brokers at issue would have offered them better service or qualitative benefits.  Moreover, Plaintiffs' loan documents reflect that

their brokers provided federal anti-steering disclosures, which provide brokers a safe harbor from any steering-related claims.  Exs. 5-1, 5-2, 5-3.

*Third*, Plaintiffs did not plead facts showing that Defendants had "actual knowledge" of any actionable breach.  *Lamm v. State Street Bank & Trust*, 749 F.3d 938, 950 (11th Cir. 2014); *Prime Health Servs., Inc. v. Cap. Bank, N.A.*, 2017 WL 1064360, at *4–5 (M.D. Tenn. Mar. 21, 2017).  To clear that bar, Plaintiffs must plausibly allege that Defendants knew of "specific wrongdoing against [Plaintiffs]," not just red flags or knowledge that "something was wrong in general."  *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 922 (W.D. Mich. 2010) (collecting cases), *aff'd*, 712 F.3d 917 (6th Cir. 2013).  Plaintiffs' barebones recital of "actual knowledge," Compl. ¶ 270, therefore does not suffice.  And Plaintiffs cannot plausibly allege that UWM knew that brokers would breach specific fiduciary duties they supposedly owed to Plaintiffs in particular.

*Fourth*, Defendants did not give "substantial assistance."  To qualify as substantial assistance, a defendant's aid to the breacher must have "proximately caused the violation."  *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) (internal quotation marks omitted).  Again, Plaintiffs allege that "incentives for doing particularly high volume" are an ordinary practice, Compl. ¶ 75, and never plead facts showing that either Rocket and Fairway would have offered them a better deal.  At best, Plaintiffs allege that UWM acted pursuant to

broad policies and that independent brokers—seeking to maximize their own profits—responded to those policies. Defendants' conduct is not the proximate cause of any individual broker's alleged breach for the same reason that Plaintiffs' RICO claims fail for lack of causation. *See supra* Section II.A.

### C.     The Civil Conspiracy Claims Fail.

Civil conspiracy requires an actionable, underlying tort. *See, e.g.*, *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999); *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002). Plaintiffs' civil conspiracy claims attempt to piggyback on their aiding-and-abetting claims, and thus fail for the same reasons those claims do.[7] *See supra* Section IV.B.

Even assuming Plaintiffs could plead an underlying tort, they fail to plausibly allege a "conspiratorial agreement." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014). Defendants make the conclusory allegation that "UWM entered into one or more express or implied agreements with mortgage brokers for the purpose of breaching fiduciary duties owed to Plaintiffs." Compl. ¶ 280. But the only *factual* allegations in support of that conclusion relate to UWM's Wholesale Broker Agreement. And the fact that Defendants entered into that

---

[7] That includes the state-law specific grounds. Most notably, because these allegations "relate directly to [Plaintiffs'] claims for aiding and abetting breach of fiduciary duty," they are not cognizable under North Carolina law. *Noblee Bottling, LLC v. Gora LLC*, 2023 WL 4750124, at *2–3 (W.D.N.C. July 25, 2023).

agreement, "absent any allegations of [a separate] agreement to conspire, cannot alone support Plaintiffs' conclusory assertion that Defendants 'engaged in a conspiracy.'" *Alhassid*, 60 F. Supp. 3d at 1319. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some identified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007); *see supra* Section II.B (addressing absence of a RICO enterprise).

## V. PLAINTIFFS' CONSUMER PROTECTION CLAIMS FAIL (COUNTS VII–IX).

Plaintiffs' claims based on the North Carolina, Tennessee, and Florida consumer protection statutes fail for a common reason: All three statutes impose Rule 9(b)'s heightened pleading standard where, as here, the complaint sounds in fraud. *See Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F. Supp. 3d 722, 729 (M.D.N.C. 2015); *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics*, 278 F. Supp. 3d 1307, 1328 (S.D. Fla. 2017); *Bridgestone Am.'s, Inc. v. Int'l Bus. Mach. Corp.*, 172 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2016). Because Plaintiffs fail to satisfy Rule 9(b), *see supra* Section II.C, their consumer protection claims all fail.

Each claim also fails for its own reasons. Start with the Tennessee claim. The TCPA does not apply to "credit terms of a transaction." Tenn. Code. Ann. § 47-18-111(a)(3), and Tennessee courts have consistently held that claims concerning home refinancing implicate the "credit terms of a transaction" for purposes of the TCPA.

*Yousefzadeh v. Wells Fargo Bank, N.A.*, 2023 WL 105092, at *3 (M.D. Tenn. Jan. 4, 2023) (collecting cases). Accordingly, the TCPA does not apply. Even if it did, the TCPA bars class actions. *See* Tenn. Code. Ann. § 47-18-109(g); *Estate of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 405–406 (E.D. Mich. 2023).

Next consider the Florida claim, which fails for three additional reasons. ***First***, FDUTPA's "trade or commerce" element is limited to "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property[.]" Fla. Stat. Ann. § 501.203(8). A "lending relationship" does not come within that definition. *Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*, 2005 WL 975773, at *9 (S.D. Fla. Mar. 4, 2005) (citing *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1320 (M.D. Fla. 2000) ("The parties cite no authority indicating that [F]DUTPA was intended to apply to loans.")). ***Second***, a Florida court has already dismissed FDUTPA claims based on UWM's "All-In Initiative" in part because there was no "harm[]" to "the overall mortgage market" or even the "wholesale market." *See Okavage*, 2024 WL 982380, at *17–20. ***Third***, FDUTPA is only "a simplified statutory cause of action" to provide remedies "in addition to other remedies already available." *Hunter v. Bev Smith Ford, LLC*, 2008 WL 1925265, at *7 (S.D. Fla. Apr. 29, 2008). Because Plaintiffs' other claims fail, so does their FDUTPA claim. *See id.*; *JES Props., Inc. v. USA Equestrian, Inc.*, 2005 WL 1126665, at *19 & n.23 (M.D. Fla. May 9, 2005).

The North Carolina claim fails for similar reasons.  *First*, N.C. Gen. Stat. § 75-1.1 requires Plaintiffs to plead facts showing "reliance" and "proximate[ ] caus[ation]."  *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 87–88 (2013).  As already explained, they have done neither.  *See supra* Section II.A.  *Second*, to the extent Plaintiffs' claims are premised on North Carolina's commercial bribery statute, Compl. ¶ 302, those claims fail for the reasons explained above.  *See supra* Section II.C.  *Third*, the North Carolina claim, like the Florida claim, must fall with the others "because [it] is based on the same allegations."  *Hutton v. Hydra-Tech, Inc.*, 2018 WL 1363842, at *8 (M.D.N.C. Mar. 15, 2018).

## VI.    PLAINTIFFS' UNJUST ENRICHMENT CLAIMS FAIL (COUNT VI).

Finally, Plaintiffs cannot pursue unjust enrichment claims because there is "an express contract governing the same parties and the same course of conduct." *Wrightsville Beach Prop., LLC, v. Attwa*, 2023 WL 8100189, at *9 (E.D.N.C. Nov. 21, 2023).  It is clear "on the face of the Complaint" that Plaintiffs entered into mortgage contracts governing these transactions; they do not dispute those contracts' validity; and they do not plead facts showing "that no adequate remedy at law exists."  *Brett v. Toyota Motor Sales, U.S.A*, 2008 WL 4329876, at *8 (M.D. Fla. Sept. 15, 2008).  Because Plaintiffs' unjust enrichment claims rely on the same allegations as their other claims, Plaintiffs cannot proceed on an unjust enrichment theory.  *Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1356–57 (S.D. Fla. 2012)

(dismissing unjust enrichment claim based on the same alleged conduct as FDUTPA claim); *M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, 2022 WL 875993, at *13 (E.D.N.C. Mar. 23, 2022) (dismissing where related breach of contract claim failed).[8]

## VII.   ALL CLAIMS AGAINST THE NON-UWM DEFENDANTS SHOULD BE DISMISSED.

In all events, United Wholesale Mortgage, LLC, is the only proper Defendant. Even assuming some claims survive against UWM (they should not), all claims against the remaining Defendants—UWM's holding companies, UWM Holdings Corp. and SFS Holding Corp. (collectively, the "Holding Company Defendants"), and its CEO, Mat Ishbia—must be dismissed.   The claims against Mr. Ishbia—a prominent figure who owns an NBA team—are particularly meritless, and only underscore that negative media attention was this suit's primary goal.

***RICO Claims (Counts I–II).***   "Each Defendant is entitled to an individualized analysis of his, her, or its own RICO liability."   *Kerrigan*, 112 F. Supp. 3d at 602. "'[S]hotgun' allegations" do not suffice.   *Id.* at 601; *see State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc*., 2014 WL 5427170, at *2–3 (E.D. Mich. Oct. 24, 2014) (A RICO plaintiff cannot "generally assert all claims against all defendants.").

---

[8] Plaintiffs' Tennessee law claim fails for the additional reason that they failed to exhaust potential remedies against all parties with whom they had privity of contract. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).

And Plaintiffs must plead a "causal connection between their injuries and predicate acts committed by *each Defendant*."  *Id.* at 608 (emphasis added); *accord Skymark Props. Corp. v. Katebian*, 2022 WL 1054059, at *28 (E.D. Mich. Mar. 14, 2022).

Plaintiffs do not even name the Holding Company Defendants as members of the alleged "Steering Enterprise," much less allege that they took any action relevant to their RICO claims.  Compl. ¶¶ 15–19, 210; *see Kerrigan*, 112 F. Supp. 3d at 604 (dismissing claims against "stock holding company" where no direct involvement was alleged).  As for Ishbia, his alleged involvement with the "Steering Enterprise" is limited to alleged misstatements made well before Plaintiffs ever obtained their mortgages.  Compl. ¶ 224(d)–(f).  Plaintiffs never pleaded that they heard, received, or relied upon any of these statements.  *See supra* Sections II.A, C.  So the RICO claims fail with respect to him as well.  *See Kerrigan*, 112 F. Supp. 3d at 608–09 (dismissing defendants on causation grounds where plaintiffs did not "allege[] that they personally received or viewed" any "communications" from those defendants).

**RESPA Claims (Count III).**  Plaintiffs have not asserted RESPA claims against the Holding Company Defendants or Ishbia.  Compl. ¶ 248.

**Aiding and Abetting & Conspiracy Claims (Counts IV–V).**  Plaintiffs' allegations with respect to aiding and abetting and civil conspiracy pertain exclusively to UWM's own alleged actions.  Compl. ¶¶ 263–83.  It is a "general principle of corporate law" that a "parent corporation . . . is not liable for the acts of

its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  And "[o]fficers of a corporation are not liable for corporate acts simply by reason of the officer's relation to the corporation."  *E & A Produce Corp. v. Olmo*, 864 So.2d 447, 448 (Fla. Dist. Ct. App. 2003); *see also Wolfe v. Wilmington Shipyard, Inc.*, 135 N.C. App. 661, 670 (1999); *Schlater v. Haynie*, 833 S.W.2d 919, 924 (Tenn. Ct. App. 1991).

**Consumer Protection Claims (Counts VII–IX).**   Plaintiffs' consumer protection claims refer generally to "Defendants."  Compl. ¶¶ 294–332.  Yet again, however, their allegations relate exclusively to UWM's alleged actions.  *Id.* ¶¶ 299, 301, 312, 315, 327, 329.  Like RICO claims, fraud-based claims cannot group "all of the individual defendants into one wrongdoing monolith."  *Llewellyn-Jones*, 22 F. Supp. 3d at 780.  They must identify each defendant's alleged wrongdoing with specificity.  *See id.*  Because Plaintiffs do not plead facts showing that the non-UWM Defendants were "direct participant[s] in the improper dealings," their consumer protection claims against those Defendants must be dismissed.  *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1074 (Fla. Dist. Ct. App. 2008); *see also Jenkins v. Marvel*, 683 F. Supp. 2d 626, 631 (E.D. Tenn. 2010); *Wolfe*, 135 N.C. App. at 670.

**Unjust Enrichment Claims (Count VI).**   Finally, Plaintiffs' unjust enrichment claims fail against the non-UWM Defendants because they do not plead facts showing that any of those Defendants was actually enriched.  Compl. ¶¶ 284–93 (referring to "Defendants" generally).  Plaintiffs paid UWM, not the Holding

Company Defendants or Ishbia.  Because the non-UWM Defendants obtained no "direct" or "measurable" benefit, Plaintiffs cannot pursue an unjust enrichment claim against them.  *See Extraordinary Title Servs., LLC v. Fla. Power & Light Co.*, 1 So.3d 400, 404 (Fla. Dist. Ct. App. 2009) (requiring a "direct" benefit and dismissing unjust enrichment claim against corporate parent where plaintiff paid subsidiary); *Story v. Meadows*, 2020 WL 7779038, at *9 (Tenn. Ct. App. Dec. 22, 2020) (dismissing unjust enrichment claim where no "measurable benefit" was conferred on the defendant); *Town of Carolina Shores v. Cont'l Ins. Co.*, 2010 WL 4338437, at *4 (E.D.N.C. Oct. 26, 2010) (same).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and dismiss the Complaint with prejudice.

Dated: June 21, 2024

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Respectfully submitted,

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones (P80231)
Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

40

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I caused the foregoing document to be filed with the Clerk of the Court using CM/ECF, which will effectuate service upon all counsel of record.

/s/ *Jeffrey J. Jones*

Jeffrey J. Jones
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 230-7950
jjjones@jonesday.com

*Counsel for Defendants*

41