## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr.,
Kim Schelble, and Brian P.
Weatherill, on behalf of themselves
and all others similarly situated,

*Plaintiffs*,

v.

United Wholesale Mortgage, LLC,
UWM Holdings Corporation, SFS
Holding Corp., and Mathew Randall
Ishbia,

*Defendants.*

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
Magistrate Judge

### DEFENDANTS' MOTION FOR RELIEF UNDER
### RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS

Defendants respectfully move for relief under Rule 11 of the Federal Rules of

Civil Procedure, 28 U.S.C. § 1927, and this Court's inherent powers.  In compliance

with Rule 11(c)(2), Defendants sent this motion to Plaintiffs' counsel on

June 21, 2024,  and requested that they withdraw or amend their Complaint.

Plaintiffs failed to do so within 21 days.  For the reasons set forth in the

accompanying memorandum, Defendants therefore request that the Court grant this

motion and provide appropriate relief.

## NOTICE OF COMPLIANCE WITH SAFE HARBOR PROVISION OF FEDERAL RULE OF CIVIL PROCEDURE 11(c)(2)

1.     Counsel for Defendants served this motion, brief in support, and accompanying exhibits upon Plaintiffs' counsel via overnight mail and electronic mail on June 21, 2024.

2.     On June 24, 2024, Plaintiffs' counsel requested an extension of time to respond or file an amended complaint until August 30, 2024.

3.     On June 26, 2024, Defendants' counsel agreed to the extension of time through August 30.

4.     On July 8, Plaintiffs' counsel informed Defendants' counsel that an amended complaint would be filed on or before August 30.

5.     On August 30, 2024, Plaintiffs filed their First Amended Complaint. Although Plaintiffs deleted or modified certain legal or factual contentions in their First Amended Complaint, they did not withdraw the lawsuit or appropriately correct the grounds for the motion or the relief sought.   Plaintiffs have not otherwise provided any response or defense to the Defendants' Rule 11 motion or the grounds set forth in it.

6.     Some courts have held that Defendants can modify the Rule 11 motion after the safe harbor period has expired, *see e.g.*, *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 243 F.R.D. 322, 338–39 (N.D. Iowa 2007) (holding that safe-harbor requirement was met even though the filed motion differed from the draft

motion served), but other courts have held that the Rule 11 motion should be *identical* to the motion previously served. *See, e.g.*, *Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 46 F.4th 374, 389 (5th Cir. 2022) (holding that "the Rule 11 safe harbor provision requires identicality").

7.     Given this guidance, the Defendants are filing this motion, the brief in support, and the accompanying exhibits in identical form to those previously served on Plaintiffs' counsel (apart from this Notice of Compliance, the redacted portions set forth below, and the dates for signature).  As Defendants explain in their separately filed motion for leave to file an unredacted version of this motion, the Defendants contend that the redacted portions of this motion remain relevant and should be considered by the Court.  But given Rule 11(c)(2), and out of an abundance of caution, Defendants redacted the portions of the original motion and brief that address allegations that were deleted from or substantially modified by the First Amended Complaint pending further guidance from the Court.

8.     Defendants' counsel provided notice of this motion to Plaintiffs' counsel on June 21, 2024, under the procedure set forth in Rule 11(c)(2).

9.     In addition, pursuant to Local Rule 7.1(a), Defendants' counsel conferred with Plaintiffs' counsel on September 17, 2024, and confirmed that Plaintiffs do not agree to the relief sought in this motion.

3

Dated:  September 17, 2024

Respectfully submitted,

/s/ *Jeffrey J. Jones*

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Jeffrey J. Jones (P80231)
Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, and Brian P. Weatherill, on behalf of themselves and all others similarly situated,<br><br>      *Plaintiffs*,<br><br>v.<br><br>United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia,<br><br>      *Defendants.* | Case No. 2:24-cv-10853-BRM-DRG<br><br>Hon. Brandy R. McMillion, United States District Judge<br><br>Hon. David R. Grand, Magistrate Judge |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF UNDER RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS

## <u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUES PRESENTED ...................................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..................................... viii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

LEGAL STANDARD .......................................................................................................6

ARGUMENT ....................................................................................................................8

    I.   This Short-Sale and Media-Staged Lawsuit Has An Improper Purpose.........8

    II.  The Facts, Including Express Written Disclosures, Directly Contradict Plaintiffs' Allegations ....................................................................................11

    III. The Complaint Includes a Series of Other Critical Unsubstantiated Allegations .....................................................................................................18

    IV.  Multiple Claims Lack Any Plausible Legal Basis .......................................22

    V.   Refusing to Withdraw or Amend the Complaint Violates Rule 11 .............24

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Baker v. Urban Outfitters, Inc.*,
   431 F. Supp. 2d 351 (S.D.N.Y. 2006) ...................................................8

*BDM Invs. v. Lenhil, Inc.*,
   264 N.C. App. 282 (2019) ...................................................................23

*Broyles v. Cantor Fitzgerald & Co.*,
   2014 WL 6886158 (M.D. La. Dec. 8, 2014) .......................................24

*Cardinal Health 110, LLC v. Premiere Healthcare, LLC*,
   2019 WL 108837 (E.D. Mo. Jan 4, 2019) ..........................................24

*CBD & Sons, Ltd. v. Setteducati*,
   2019 WL 396982 (D.N.J. Jan. 31, 2019)............................................23

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991)..........................................................................6, 7

*Cohen v. Dulay*,
   94 N.E.3d 1167 (Ohio Ct. App. 2017) (Ohio)....................................24

*Combs v. Bridgestone Ams.*,
   2023 WL 9530592 (E.D. Ky. Nov. 27, 2023) ....................................10

*Dearborn St. Bldg. Assocs. v. Huntington Nat'l Bank*,
   411 F. App'x 847 (6th Cir. 2011) ..................................................8, 25

*Farmland Partners Inc. v. Fortunae*,
   2021 WL 1978739 (D. Colo. May 18, 2021) .......................................9

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
   1998 WL 734365 (S.D.N.Y. Oct. 20, 1998).........................................9

iii

*In re Ruben*,
  825 F.2d 977 (6th Cir. 1987) ............................................................... 7

*In re Verilink Corp.*,
  405 B.R. 356 (Bankr. N.D. Ala. 2009) ............................................... 24

*Jackson v. GreerWalker, LLP*,
  2018 WL 894873 (N.D. Okla. Feb. 14, 2018) .................................... 24

*King v. Whitmer*,
  71 F.4th 511 (6th Cir. 2023) ......................................................... 7, 18

*Knipe v. Skinner*,
  19 F.3d 72 (2d Cir. 1994) ..................................................................... 8

*Mann v. G & G Mfg., Inc.*,
  900 F.2d 953 (6th Cir. 1990) ............................................................. 11

*Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*,
  613 F.3d 609 (6th Cir. 2010) ................................................. 11, 12, 17

*Mullins v. Allstate Ins. Co.*,
  2007 WL 3038028 (E.D. Mich. Oct. 18, 2007) .................................... 7

*Noblee Bottling, LLC v. Gora LLC*,
  2023 WL 4750124 (W.D.N.C. July 25, 2023) .................................... 23

*Nunes v. Lizza*,
  2021 WL 7186264 (N.D. Iowa Oct. 26, 2021) .................................... 10

*Okavage Group, LLC v. United Wholesale Mortg.*,
  2024 WL 982380 (M.D. Fla. Feb. 6, 2024) .................................... 18, 19

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*,
  68 A.3d 697 (D.C. 2013) .................................................................... 24

*Rahaman v. State Farm Mut. Ins. Co.*,
  2022 WL 1421495 (E.D. Mich. May 5, 2022), *objections
  overruled*, 2022 WL 17337817 ............................................................ 7

iv

*Rasmussen v. Fleetwood Enterprises, Inc.*,
    2007 WL 1106138 (E.D. Mich. Apr. 10, 2007) ........................................6, 8, 24

*Sanborn v. Jagen Pty.*,
    2010 WL 1730756 (M.D. Fla. Apr. 28, 2010).....................................................7

*St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*,
    2005 WL 1199045 (D.N.J. May 18, 2005)........................................................23

*White v. Gen. Motors Corp.*,
    908 F.2d 675 (10th Cir. 1990) .......................................................................8, 9

## STATUTES AND OTHER AUTHORITIES

28 U.S.C.
    § 1927....................................................................................................passim

12 C.F.R. § 1026.36 ...............................................................................19, 20, 21

Fla. Stat. Ann.
    § 501.201, *et seq.* .......................................................................................7

    § 501.211(3)..............................................................................................7

N.J. Admin Code § 3:1-16.10(b) ...............................................................23

Fed. R. Civ. P. 11 ....................................................................................11

## STATEMENT OF ISSUES PRESENTED

1.  Should the Court award relief under Federal Rule of Civil Procedure 11(b)(1) for bringing this lawsuit for an improper purpose?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

2.  Should the Court award relief under Federal Rule of Civil Procedure 11(b)(2) for stating plain errors of law and bringing claims that have no sound basis in existing law?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

3.  Should the Court award relief under Federal Rule of Civil Procedure 11(b)(3) for raising factual allegations that a reasonable prefiling investigation would reveal are contradicted by Plaintiffs' own loan documents and lack evidentiary support?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

4.  Should the Court award relief under 28 U.S.C. § 1927 for refusing to withdraw or amend the Complaint after notice from Defendants?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

5.  Should the Court award relief pursuant to the Court's inherent powers?

> Defendants' answer: Yes
>
> Plaintiffs' answer: No
>
> This Court should answer: Yes

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

**CASES**

*Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991)

*King v. Whitmer*, 71 F.4th 511 (6th Cir. 2023)

*BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282 (2019)

**STATUTES & OTHER AUTHORITIES**

Federal Rule of Civil Procedure 11

28 U.S.C. § 1927

12 C.F.R. § 1026.36

## INTRODUCTION

In early April 2024, Defendant United Wholesale Mortgage LLC ("UWM")—an industry-leading wholesale mortgage lender known for its innovative technologies, speed, and service—became the victim of a coordinated campaign to disparage its business and destroy its stock value so that an activist hedge fund could reap the benefits.  Hunterbrook Capital LP, a hedge fund and its media arm, Hunterbrook Media (collectively, "Hunterbrook"), together took aim at UWM.  On April 2, Hunterbrook published a report ("Hunterbrook Report" or "Report") that disparages UWM, using inflammatory rhetoric and unsupportable allegations of potential fraud.  And before the Report's publication date, Hunterbrook "shorted" UWM and went "long" on its competitor, Rocket Mortgage—betting UWM's stock would fall to Rocket's benefit.

The coordinated attack did not stop there.  On the very same day the Hunterbrook Report issued—just a few hours later—Boies-Schiller Flexner and Dickinson Wright (collectively, "Counsel") filed the 104-page Complaint in this case, regurgitating the Hunterbrook Report's claims.  This was no coincidence of timing—Counsel were co-participants in Hunterbrook's campaign.  Hunterbrook has admitted its "nonprofit affiliate" brought Counsel into the fold—that is, it "entered [into] an agreement with [Boies Schiller] in exploration of a class action lawsuit against UWM . . . ."  Ex. 1 (Hunterbrook Report) at 2.  This putative class

action then served as a vehicle to amplify Hunterbrook's efforts to disparage UWM to profit from UWM's stock swings—an "improper purpose" that is alone wrongful under Federal Rule of Civil Procedure 11(b)(1).

The Complaint's problems do not end there. The facts—including written loan disclosures made when Plaintiffs entered mortgage contracts with UWM—directly contradict Plaintiffs' claims, leaving critical allegations without evidentiary support. Material omissions directly undercut other recurring allegations. The Complaint distorts two provisions in UWM's broker contracts ███████████████ ████████████████████████████████████████████████ ██████████████████████████ and dramatically and wrongfully exaggerates allegations regarding claimed "corrupt" "brokers." The Complaint also states plain errors of law. These legal and factual errors, which would have been apparent through reasonable fact and legal investigation prefiling, reflect an obvious failure of Rule 11 duties. And Counsel doubled down, refusing to withdraw or amend the Complaint after notice from UWM, needlessly multiplying these proceedings contrary to 28 U.S.C. § 1927.

The Court should end this abuse, dismiss the Complaint, and award attorney's fees. Or, at a minimum, the Court should strike the unfounded allegations and hold an evidentiary hearing, as needed, requiring Counsel to produce its agreement with

Hunterbrook and any other evidence connecting them to the activist hedge fund betting on UWM's stock or the financial benefits associated with it.

## BACKGROUND

*The Mortgage Industry and UWM.* The home mortgage industry consists of two main groups of lenders: retail and wholesale. Compl. ¶¶ 23–25. Borrowers opting for a "retail" mortgage negotiate directly with a lender (*e.g.*, a bank) to secure financing to purchase homes. *Id.* For "wholesale" mortgages, wholesale mortgage brokers assist borrowers with securing loans from wholesale lenders. *Id.* UWM, based in Pontiac, Michigan, is the industry-leading wholesale mortgage lender. Ex. 2 (UWM 10-K) at 4. Operating solely as a wholesale lender, UWM offers itself as a resource to brokers, providing unmatched support, technologies, service, reliability, and speed—to the benefit of brokers and homebuyers alike. *Id.* at 4–6.

*Hunterbrook.* Hunterbrook, founded just last year, has two arms: Hunterbrook Capital (a hedge fund) and Hunterbrook Media (a purported news outlet). Ex. 3 (*Financial Times*, "Inside Hunterbrook's plans"). Hunterbrook Media is not an independent news source. Once Hunterbrook Capital takes a short position in a target, Hunterbrook Media publishes a report laced with damaging claims masquerading as journalism to cause the target's stock price to drop and Hunterbrook's profits to rise. *See* Exs. 1 (Hunterbrook Report), 8 (Hunterbrook,

About Us).  This troubling business model "combine[s] a newsroom and a hedge fund" to seek profits, as Hunterbrook proudly admits on its website.  Exs. 3, 8.

UWM became one of Hunterbrook's first targets for a coordinated public attack and short-position profit.  Ex. 4 (*Crain's*, "UWM shorted by Hunterbrook"). On April 2, Hunterbrook Media published the Report, rife with disparaging claims against UWM.  Ex. 1.  ***A few hours later***, Counsel filed their 104-page Complaint parroting many of the Report's claims.  ECF No. 1 ("Compl."); Ex. 5 (Docket). What's more, the Report linked to a website titled "WasIRippedOff.com" that allowed site visitors to search the NMLS ID of their "broker" stating:  "If you're a match, you may contact the law firm Boies Schiller" "at UWM.investigation@bsfllp.com."  Ex. 36 at 2.  The explicit reference to and email of Boies has since been removed.  Ex. 37 at 10; Ex. 45 ("Were you ripped off?"). These coordinated efforts had their intended effect.  The day the Report issued and lawsuit hit, UWM's share price reportedly declined by 8.5%.  Ex. 6 (Nasdaq Data). As other commentators noted, the goal of an activist short seller like Hunterbrook is to "destroy value," and destroy value it did.  Ex. 7 (Richard Grossman, et al.).

The nature, contents, and timing of the Hunterbrook Report and this lawsuit demonstrate that Counsel coordinated the filing with Hunterbrook and relied extensively on Hunterbrook in crafting it.  Indeed, the Hunterbrook Report concedes that it "[s]ubmitted data analysis and research – as well as the planned date of

publication – to Boies Schiller[.]" Ex. 1 at 2. The Hunterbrook Report also admits that its "nonprofit affiliate has **entered an agreement with [Boies-Schiller]** in exploration of a class action lawsuit against UWM[.]" *Id.* (emphasis added). And the Complaint in fact relies extensively on Hunterbrook's analysis. *Compare* Ex. 1 at 5, 16, *with* Compl. ¶¶ 69, 147. Hunterbrook's charts are copied and pasted in the Complaint. *E.g.*, Compl. ¶¶ 69 fig.6, 147 fig.22. The Complaint also uses many of the same quotes as the Report. *Compare* Compl. ¶¶ 75, 79, *with* Ex. 1 at 3, 9, 14.

The Complaint uses inflammatory rhetoric throughout, amplifying the false narrative that UWM "corrupted" thousands of independent mortgage brokers across the country. *E.g.*, Compl. ¶ 8. This "corruption" narrative is pervasive. *See, e.g.*, *id.* ¶¶ 1, 8–11, 68 figs. 4–5, 75, 77, 99, 101–02, 108–11, 119, 146, 172, 210, 215, 221–22, 257, 314, 329. It is also an example of the games at play. The Complaint baldly asserts over 8,000 "brokers" are "corrupt" because they gave 99% of their loans to UWM last year. *Id.* ¶ 9. In reality, over 4,000 of the so-called "corrupt brokers" **closed only one loan during the entire year—and it happened to go to UWM.** Declaration of Alex Stricker ("CRA Decl."), at ¶ 9. And some of these referenced "brokers" were not brokers but individual loan officers. *Id.* at ¶ 8. Based on that specious analysis, thousands of hardworking brokers who sent a single loan to UWM are labeled "corrupt"—part of a sinister "enterprise," engaging in "unlawful" activity. Compl. ¶ 1.

That is just one example of such specious analysis.  Because it proceeds from the improper purpose of harming UWM's stock value so a hedge fund can profit, it is unsurprising that the Complaint's critical claims have no sound basis.

## LEGAL STANDARD

Rule 11 provides at least three separate grounds for relief here.   Under Rule 11(b), Counsel certifies that the Complaint meets the following standards:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b).  Violation of any subsection of Rule 11(b) is sufficient to grant relief.  *Rasmussen v. Fleetwood Enterprises, Inc.*, 2007 WL 1106138, at *9 (E.D. Mich. Apr. 10, 2007) ("Rule 11(b) presents four bases for sanctionable conduct"). And the Rule's standard is objective; no bad faith is required.  *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47 (1991).

If a court "determines that Rule 11(b) has been violated, [it] may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).  Appropriate relief includes, among other things, reimbursement of defense costs, nonmonetary relief, or

6

dismissal. *See id.* ("attorney's fees and other expenses"); *King v. Whitmer*, 71 F.4th 511, 533 (6th Cir. 2023) (affirming nonmonetary relief); *Rahaman v. State Farm Mut. Ins. Co.*, 2022 WL 1421495, at \*3 (E.D. Mich. May 5, 2022) (warning of dismissal pursuant to Rule 11), *objections overruled*, 2022 WL 17337817. Courts can also require disclosures and hold evidentiary hearings, as needed, to assess the issues raised. *See, e.g.*, *Mullins v. Allstate Ins. Co.*, 2007 WL 3038028, at \*1 (E.D. Mich. Oct. 18, 2007) (holding hearing and imposing Rule 11 sanctions).[1]

Separately, under 28 U.S.C. § 1927, courts have the power to impose "the excess costs, expenses, and attorneys' fees reasonably incurred" as a result of "multipl[ying] the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927; *King*, 71 F.4th at 530. Relief is awarded under § 1927 "'when an attorney knows or reasonably should know that a claim pursued is frivolous' and yet continues to litigate it." *Id*. Again, there is no bad faith requirement under § 1927— it is an objective test. *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987). And, as always, the Court retains inherent power to guard against potential abuses of the litigation process. *See Chambers*, 501 U.S. at 50.

---

[1] As Plaintiffs bring a claim under Fla. Stat. §§ 501.201, *et seq.*, the Court also has the power to order an evidentiary hearing under those provisions as well. *See* Fla. Stat. Ann. § 501.211(3); *see Sanborn v. Jagen Pty.*, 2010 WL 1730756, at \*2-3 (M.D. Fla. Apr. 28, 2010) (ordering evidentiary hearing).

# ARGUMENT

A review of the Complaint and its context make plain:  Counsel initiated this lawsuit as part of Hunterbrook's campaign to destroy UWM's value and reap profits from the resulting swings in stock price.  That goal—in and of itself—is improper under Rule 11(b)(1).  But it also no doubt contributed to the filing of a Complaint with allegations that in critical ways lack evidentiary or legal support.  Fed. R. Civ. P. 11(b)(2), (3); *see, e.g.*, *Dearborn St. Bldg. Assocs. v. Huntington Nat'l Bank*, 411 F. App'x 847, 852 (6th Cir. 2011).  Even after being served with this motion, Counsel did not withdraw the Complaint.  Relief is therefore appropriate.

## I.    This Short-Sale and Media-Staged Lawsuit Has An Improper Purpose

Rule 11(b)(1) prohibits filing a complaint "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1).  Rule 11 does not limit an "improper purpose" to the listed examples; it "leaves the court with discretion to determine whether an 'improper purpose' exists." *Rasmussen*, 2007 WL 1106138, at *9.  Courts find lawsuits in violation of Rule 11(b)(1) when their purposes include "target[ing] of [defendant] and his firm," *Hertel*, 2013 WL 706903, at *7; "pursuing a personal agenda," *Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994); and "pursuing an unwarranted financial windfall and personal promotion," *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 366 (S.D.N.Y. 2006) (applying § 1927).  And, notably, using or threatening to

8

use "the media to create adverse publicity" can show an improper purpose.  *See White v. Gen. Motors Corp.*, 908 F.2d 675, 683 (10th Cir. 1990).

Here, Counsel's coordinated effort with Hunterbrook evidences the "improper purpose" behind this lawsuit:  targeting UWM to drive down UWM's stock price through allegations, in critical ways, unsupportable in fact or law.   Indeed, "Hunterbrook's nonprofit affiliate" had an "agreement" with Boies and shared "the planned date of publication" "to Boies[.]"  Ex. 1 (Report) at 2.  Then, mere hours after Hunterbrook issued its Report—thus launching one of its first attempts to profit from trades based on its own "reporting"—this lawsuit followed, amplifying the Report's claims and impact on UWM's stock.  Ex. 8 at 1.

This coordinated "target" of UWM in "pursuing an unwarranted financial windfall" is sanctionable conduct under Rule 11(b)(1).  *See Hertel*, 2013 WL 706903, at *7; *White*, 908 F.2d at 683.  In other contexts, too, courts have found that so-called "short-and-distort" schemes akin to this one evidence improper purposes.[2]

---

[2] *See, e.g.*, *Farmland Partners Inc. v. Fortunae*, 2021 WL 1978739, at *1 (D. Colo. May 18, 2021) (defamation) (finding "inference of actual malice" because "record suggests that defendants' decision to publish the article was motivated by personal financial gain"); *In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 WL 734365, at *10 (S.D.N.Y. Oct. 20, 1998) (securities fraud) (finding a "strong inference of scienter" because "defendants had short positions in the stock and issued sell recommendations in order to drive down the price of the stock and thus directly profit their investment").

Further, not only did Counsel file this lawsuit, but they publicized its charges throughout the mortgage broker community by sending overbroad "preservation" letters to at least **61 third-party mortgage brokers or loan officers throughout the country**, attaching the 104-page Complaint and demanding recipients "take . . . steps immediately" on threat of sanctions, without informing them of any discovery-related protections for third parties under Federal Rule of Civil Procedure 45.  Ex. 34 (Preservation Letter) at 1-3; Ex. 35 (listing non-party recipients).  Worse still, Counsel used private investigators to contact and solicit an unknown number of borrowers with misleading phone calls, texts, and voice messages.  Exs. 36–40 (correspondence between counsel on these issues); *see also* Exs. 9 & 10.[3]

During meet-and-confer efforts on these issues, UWM's counsel requested a copy of the "agreement" between Hunterbrook and Boies Schiller, so that UWM could assess Counsel's financial interests in this suit.  Counsel declined to provide that publicly discussed "agreement"—contending it may be "privileged, irrelevant, or both."  Ex. 36 (Apr. 17 Letter) at 9; Ex. 37 (Apr. 26 Letter).  Thus, UWM cannot determine the exact financial arrangements between Hunterbrook and Counsel—including whether Hunterbrook is paying Counsel's fees or expenses, soliciting

---

[3] Such solicitation and misleading communications runs contrary to the Rules of Professional Conduct.  *See, e.g.*, Mich. R.P.C. 7.3, cmt. 1 ("There is a potential for abuse inherent in direct contact by a lawyer  . . . ."); *id*. 8.4(a); Mich. Civ. Juris. Champerty § 5 ("Telephone calls are construed as prohibited solicitation").

plaintiffs for Counsel, or providing other financial support, or whether Counsel is sharing in the hedge fund's profits from shorting UWM's stock. The Court, however, has the authority to compel disclosure of that and other information and should do so here. *See* Fed. R. Civ. P. 11(c)(4); *see also Combs v. Bridgestone Ams.*, 2023 WL 9530592, at *8 (E.D. Ky. Nov. 27, 2023), *R&R adopted*, 2024 WL 188360 (compelling in discovery litigation funding disclosure as "relevant and not privileged"); *Nunes v. Lizza*, 2021 WL 7186264, at *4 (N.D. Iowa Oct. 26, 2021) (inquiring into third-party funding serves "legitimate purpose of determining whether" "coordination exists").

Because this lawsuit has an improper purpose, the action should be dismissed and fees awarded. The Court may also order a hearing to determine the facts.

## II.    The Facts, Including Express Written Disclosures, Directly Contradict Plaintiffs' Allegations

Rule 11 gives the Court power to sanction counsel who fail to conduct a "reasonable inquiry concerning the allegations in the complaint" before filing suit or submit allegations that are "not well grounded in fact." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010); *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 959 (6th Cir. 1990) (similar); Fed. R. Civ. P. 11(a) ("pleading"), (b)(3) (requiring "evidentiary support"). This objective test asks what was "reasonable under the circumstances," and a mere "good faith" belief in the merits will not do. *Mann*, 900 F.2d at 958. Here, Plaintiffs' own loan documents

contradict the allegations, and the data on which Plaintiffs rely do not fit the relevant loan transactions, as any reasonable prefiling investigation would have revealed.



*Weatherill*.  As to Weatherill, the Complaint makes two allegations wholly untethered to fact.  First, it alleges that Plaintiffs' data proves Weatherill's loan was objectively overpriced:   "According to publicly available data"—language repeatedly used to reference the Hunterbrook data—"the mortgage loan [broker] procured for Weatherill was not the most affordable option on the market."  Compl. ¶ 184.  But Plaintiffs cannot possibly base that allegation on the Hunterbrook data because it explicitly *excluded* "second home mortgages" from its analysis.  Ex. 15 at 4 (How We Crunched the Numbers).  And Weatherill's loan application clearly shows his loan was for a *second home*:

| 4a. Loan and Property Information | | | |
|---|---|---|---|
| Loan Amount $ _343,200.00_ | Loan Purpose | ⊗ Purchase   ○ Refinance   ○ Other _____ | |
| Property Address   Street _2257 SE 37TH RD_ | | | |
| Unit # _____   City _BUSHNELL_ | | State _FL_ | Zip _33513_ |
| County _SUMTER_ | Number of Units __1__ | Property Value $ _429,000.00_ | |
| Occupancy  ○ Primary Residence   ⊗ Second Home | | ○ Investment Property | |

Ex. 17 at 4a.  Plaintiffs' data set thus says nothing about Weatherill's mortgage.

The Complaint also falsely states Weatherill's relationship to his broker.  The Complaint alleges that ████████████████████████████████████████ "the entire reason why Weatherill hired [broker]" was "the expectation that [she] would shop for the most affordable loan."  Compl. ¶ 177. But Weatherill signed a Mortgage Loan Origination Agreement expressly contradicting those allegations:

**SECTION 1. NATURE OF RELATIONSHIP.** In connection with this mortgage loan:
- We are acting as an independent contractor and <mark>not as your agent.</mark>
- We will enter into separate independent contractor agreements with various lenders.
- While we seek to assist you in meeting your financial needs, we do not distribute the products of all lenders or investors in the market and <mark>cannot guarantee the lowest price or best terms available in the market.</mark>

Ex. 44.  While the Complaint  alleges ██████████████████████████

"the entire reason" he hired his broker was to "shop for the most affordable loan,"

Compl. ¶ 177, Weatherhill signed an unambiguous agreement that his broker

"cannot guarantee the lowest price or best terms available in the market" ███████

██████████████  Ex. 44.  A simple investigation of Weatherill's own loan

documents would have revealed the fundamental problem with these allegations.





***The Data Used Do Not Match Plaintiffs' Claims***.  Separate from the failure

to read the relevant loan documents, the Complaint repeatedly misuses and

15

misrepresents the data "supporting" its claims.   The Complaint attempts to demonstrate "harm" by using Home Mortgage Disclosure Act data ("HMDA")—data filed with the government that captures certain data for mortgage loans—to compare Plaintiffs' loans to ostensibly "similar" loans.  Compl. ¶¶ 32, 72, 159–60, 184; Ex. 15 (How We Crunched the Numbers) at 2.  But HMDA data does not—and cannot possibly—account for all the material factors that dictated Plaintiffs' loan offers.  For one glaring example, the data does not capture **credit score**, CRA Decl. ¶ 14 ("FICO" scores), and "credit scores . . . have a significant impact on your mortgage interest rate and the fees you pay." Ex. 20 (CFPB, "Your home loan toolkit") at 6.

The Escues, for instance, paid off more than $150,000 of **prior debt** when they closed on their loan by taking equity out of their home in a "cash out" refinancing. Ex. 29 (Escue Application) at 2 L1.  A cash-out refinance can make a loan more expensive by, for example, increasing the loan-to-value ratio ("LTV"), which can lead to cash out price adjustments based on the combination of LTV and FICO scores.  *See* CRA Decl. ¶ 5.  Again, the Hunterbrook Data does not have credit scores, let alone the precise adjustments required for cash-out refinance loans based on a combination of LTV and FICO.  CRA Decl. ¶ 14.  So allegations that the Escues' loan was pricier than "similar" loans lack any support based on the data purportedly compared.

16

As another example, Schelble was self-employed for less than two years, and many lenders require two years of self-employment before even approving a loan. Ex. 30 (Schelble Loan Application) at 2, § 1b; Ex. 31 (FreddieMac.Com, "Qualifying for a Mortgage When You're Self-Employed") ("Most mortgage lenders require at least two years of consistent self-employment . . . ."). Thus, the Complaint's attempts to compare Schelble's loans to "similar" loans using HMDA data—which does not capture length of self-employment, CRA Decl. ¶ 14—are necessarily baseless since "most mortgage lenders" may not even offer a loan to borrowers like Schelble who have less than two years self-employment. Ex. 31.

As for Weatherill, he opted for a 45-day rate-lock period. Ex. 32 (Weatherill Loan Estimate) at 1 (issued April 20 to expire June 4). And an above-average rate lock increases loan cost. Ex. 20 (CFPB, "Your home loan toolkit") at 13 (A "rate lock" "may be expensive to extend[.]"). But, once again, the HMDA data does not even capture this material information. CRA Decl. ¶ 14.

Over and over again, the Complaint claims Plaintiffs' loans had higher "origination fees" or were not the "most affordable" loans relative to other "similar" loans. But their data cannot support these serious accusations. Without controlling for material facts like credit score, self-employment, lock-in period, and more—facts that objectively affect a loan's bottom-line—the core allegation that forms the basis for Plaintiffs' alleged injuries is not well grounded in fact, and Counsel's pre-

complaint "inquiry" was objectively unreasonable.  Fed. R. Civ. P. 11(b)(2).  Relief should be granted under Rule 11.  *See, e.g.*, *Merritt*, 613 F.3d at 626.

## III.   The Complaint Includes a Series of Other Critical Unsubstantiated Allegations

The Complaint also hinges on a series of other key misstatements designed to sully UWM in a public filing when accurate facts would be readily apparent from any "reasonable prefiling investigation."  *See King*, 71 F.4th at 523.  Such "allegations [are] therefore sanctionable under Rule 11(b)(3)."  *Id.*

***All-In Provision.***  There is no plausible basis for Plaintiffs' allegation that the "All-in Provision" in UWM's Wholesale Broker Agreement "meaningfully restrict[s] [brokers'] ability to shop for mortgage loans in [the Plaintiffs'] best interest[s]."  *See* Compl. ¶¶ 127, 154, 179.  That Provision was part of UWM's ongoing attempts to address a significant problem for the wholesale lending industry, whereby a lender uses a broker to find a borrower and then bypasses the broker on future loans.  *See Okavage Group, LLC v. United Wholesale Mortg.*, 2024 WL 982380, at *2 (M.D. Fla. Feb. 6, 2024).  To help protect the integrity of the wholesale channel, UWM asked brokers who opt to do business with UWM to refrain from working with ***just two*** lenders who worked in both the wholesale and retail markets using brokers to identify borrowers but then "cutting out" the brokers on future loans.  Ex. 18 (Wholesale Broker Agreement) at 3.03(x).  But, as Counsel knows, brokers could still use more than ***seventy*** other wholesale lenders and ***hundreds*** of

other lenders offering wholesale loans.  Ex 1 (Hunterbrook Report) at 8; CRA Decl.

¶ 13.  Under federal guidelines, brokers need only consider potential loan options

available from three lenders with whom they regularly conduct business and, in

some cases, even fewer.  12 C.F.R. § 1026.36(e); *see* Ex. 33 (Comment on 12 C.F.R.

§ 1026.36(e)).[4]  Thus, there is no credible basis to allege the so-called "All-In

Provision" meaningfully restricts loans otherwise available to the brokers.

Judge Michelson recently held exactly that in rejecting claims that UWM's

All-In Initiative violates federal and state antitrust laws.  *See United Wholesale*

*Mortg. v. Am.'s Moneyline, Inc.*, 2024 WL 1349301, at *3 (E.D. Mich. Mar. 29,

2024) (adopting ruling in *Okavage Grp. v. United Wholesale Mortg.*, 2024 WL

982380 (M.D. Fla. Feb. 6, 2024)).   "Upon review of the [complaint]," Judge

Michelson reasoned, "it is not facially apparent, nor characteristically likely, that the

anticompetitive conduct alleged here cut off consumer or broker access to the

wholesale mortgage market."  *Id.*  Indeed, if a given broker desires to work with the

two lenders identified in the "All-In" provision, the broker need only terminate its

agreement with UWM, which the broker can opt to do at any time on seven days'

notice.   Compl. ¶ 52 ("*[U]ntil client provides written notice terminating its*

---

[4] Even Hunterbrook acknowledges this guidance.  In the Report, Eddy Perez,
CEO, Equity Prime Mortgage, stated brokers do not need "to be working with 200
wholesale lenders," rather brokers should limit based on their volume.  Mr. Perez
recommended high volume brokers should work with "three to five."  Ex. 1 at 14.

***agreement with UWM***, client . . . will not submit mortgage loan applications . . . to either Rocket Mortgage or Fairway Independent Mortgage[.]" (emphasis added)).[5]

***Federal Disclosures.***   The Complaint also all but ignores the federal regulations that govern the mortgage industry—and that contradict their central thesis that brokers had an obligation to "survey the wholesale market" each time they suggest a loan to a borrower.  *See* Compl. ¶¶ 25, 118, 145, 171 (failing to acknowledge federal guidance regarding obtaining and presenting loan options). Under 12 C.F.R. § 1026.36 (Reg Z), a loan originator presents the borrower with three loan options available from creditors with whom the loan "originator regularly does business."   12 C.F.R. § 1026.36(e)(3)(i).   Further, under 12 C.F.R. § 1026.36(e), a broker may present to prospective borrowers an Anti-Steering Disclosure of Loan Options presenting such options.  *See* Ex. 28 (Anti-Steering Disclosure).  Each of the Plaintiffs received those disclosures with the three options listed.  Exs. 41-43 (Anti-Steering Disclosures).

---

[5] The Complaint also makes sweeping statements regarding UWM's so-called "Lock-In" Provision, which states "[t]he transfer or sale by Broker of a Mortgage Loan locked in by UWM during the lock-in period to another entity, shall constitute a violation of the Agreement[.]" Ex. 18 at 2.03.  But that provision expressly states that any such lock-in "shall be at Broker's option" and applies only during the "lock-in period."  *Id.*  Thus, on its face, the provision does not restrict a broker's ability to "shop" the market.  And similar variations of such lock-in provisions are common in the industry.  *See e.g.*, Exs. 19-1 (Goldstar Broker Agreement), 19-2 (MIMutual Broker Agreement, available online), 19-3 (Sierra Pacific Broker Agreement, available online).  And, of course, borrowers are free to walk away at any time.

Under this settled federal guidance, brokers are ***not*** required to survey the universe of wholesale lenders or the whole "market" in connection with their work. Nor would that make any sense.  To the contrary, the Consumer Finance Protection Bureau's guidance provides just the opposite:  "Possible loan offers are available through the loan originator if they could be obtained from the creditor with which the loan originator regularly does business.  Section 1026.36(e)(1) ***does not require a loan originator to establish a business relationship with any creditor with which the loan originator does not already do business***."  Ex. 33 (commenting on 12 C.F.R. § 1026.36(e)) (emphasis added).  Those guidelines directly undercut the central thesis of the entire Complaint.  *See* Compl. ¶¶ 25, 118, 145, 171.

***Government-Approved APR Calculations.***  The Complaint makes various allegations regarding the comparative benefits of loans offered to Plaintiffs ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Government regulators endorse APR as the most accurate way to compare loans, and that figure captures both the loan's "interest rate plus the additional fees charged with the loan."  Ex. 22. As explained by the U.S. Federal Trade Commission, the "APR makes it easier to compare 'apples to apples' when [borrowers are] choosing a mortgage offer."  Ex. 21.  Industry commentators and regulators recommend utilizing APR in comparing loans, Exs. 23–26, with rate spread (Annual Percentage Rate ("APR") minus Average Prime Offer Rate ("APOR")) an even better calculation for comparing

loans.  CRA Decl. ¶¶ 10–13.  ████████████████████  APR and rate spread

████████  show two of Plaintiffs' loans were ***better than average*** compared to

the top 25 wholesale lenders and the third loan was still better than other metrics.

*Id*.

     ***"Corrupt" Brokers.***  The Complaint deceptively mischaracterizes the publicly

available data to label over 8,000 "brokers" (some of whom are actually individual

loan officers, CRA Decl. ¶ 8) across the country "corrupt" because they each,

individually, gave 99% or more of their loans to UWM in 2023.  Compl. ¶ 9.

However, a reasonable investigation of the data reveals that 6,500 of the so-called

"corrupt brokers" closed just three or fewer loans during the entire year and, of those,

over 4,000 ***closed only one loan during the year and that loan happened to go to***

***UWM***.  CRA Decl. ¶¶ 9–10.  Alleging that these "brokers" are "corrupt," *see* Compl.

¶¶ 9, 210(c), based on a ***single loan***, falls well short of Rule 11's obligations.

## IV.    Multiple Claims Lack Any Plausible Legal Basis

     Last, various legal claims in the Complaint lack any viable basis or otherwise

misstate the law in violation of Rule 11 and 28 U.S.C. § 1927.  Plaintiffs, for

example, make sweeping allegations suggesting that every state imposes fiduciary

duties on mortgage brokers.  *See* Compl. ¶¶ 1, 37, 75, 197(a), 264–66, 275–77.  But

that is not true.



Relatedly, the Complaint alleges classwide claims for aiding and abetting a breach of fiduciary duty based on the laws of every state, asserting class treatment is appropriate because "there are no . . . case-dispositive differences[] among various states' laws." Compl. ¶ 264. That is clearly not true. Some states, including North Carolina—Schelble's home state—do not recognize the tort at all. *See BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282, 302 (2019); *Noblee Bottling, LLC v. Gora LLC*, 2023 WL 4750124, at *2 (W.D.N.C. July 25, 2023); ("There is no dispute that

Plaintiffs' claims for aiding and abetting breach of fiduciary duty and fraud are not cognizable under North Carolina law"); *see also Cohen v. Dulay*, 94 N.E.3d 1167, 1176 (Ohio Ct. App. 2017); *Broyles v. Cantor Fitzgerald & Co.*, 2014 WL 6886158, at *5 (M.D. La. Dec. 8, 2014) (Louisiana); *In re Verilink Corp.*, 405 B.R. 356, 380–81 (Bankr. N.D. Ala. 2009) (Alabama).  And that is to say nothing of the many other states where the status of the tort remains in doubt.  *See, e.g.*, *Cardinal Health 110, LLC v. Premiere Healthcare, LLC*, 2019 WL 108837, at *6-7 (E.D. Mo. Jan 4, 2019); *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 711 (D.C. 2013); *Jackson v. GreerWalker, LLP*,  2018 WL 894873, at *4-5 (N.D. Okla. Feb. 14, 2018).

A reasonable inquiry would have disclosed these fundamental legal mistakes. *See Rasmussen*, 2007 WL 1106138, at *10 (imposing sanctions under inherent authority; "'vigorous advocacy' is no excuse for asserting, and then continuing to assert, legal argument that a party knows is frivolous" and "it should have been clear to [attorney] that its position was untenable, given the existing [caselaw]").

## V.      Refusing to Withdraw or Amend the Complaint Violates Rule 11

Even assuming, however, that Counsel did not violate Rule 11 in filing the Complaint, they have violated Rule 11 in failing to withdraw or amend it after being afforded direct notice of these many flaws.  *See* Fed. R. Civ. P. 11(c)(2).  Multiple Sixth Circuit cases support granting relief when a party refuses to withdraw or

correct a complaint after it becomes clear that allegations were unreasonable or lacked foundation. *E.g.*, *Dearborn St. Bldg.*, 411 F. App'x at 851 (collecting cases).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion, dismiss the Complaint, and order attorney's fees. In the alternative, Defendants request the Court order disclosures and hold an evidentiary hearing to determine appropriate relief.

Dated: September 17, 2024

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Respectfully submitted,

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones (P80231)
Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*