# EXHIBIT 33

# Comment for 1026.36 - Prohibited Acts or Practices and Certain Requirements for Credit Secured by a Dwelling

**consumerfinance.gov**/rules-policy/regulations/1026/interp-36



This version is the current regulation

## Regulation Z

### 36(a) Definitions

1. **Meaning of loan originator.**

**i. General.**

**A.** Section 1026.36(a) defines the set of activities or services any one of which, if done for or in the expectation of compensation or gain, makes the person doing such activities or performing such services a loan originator, unless otherwise excluded. The scope of activities covered by the term loan originator includes:

**1.** Referring a consumer to any person who participates in the origination process as a loan originator. Referring is an activity included under each of the activities of offering, arranging, or assisting a consumer in obtaining or applying to obtain an extension of credit. Referring includes any oral or written action directed to a consumer that can affirmatively influence the

consumer to select a particular loan originator or creditor to obtain an extension of credit when the consumer will pay for such credit. See comment 36(a)-4 with respect to certain activities that do not constitute referring.

**2.** Arranging a credit transaction, including initially contacting and orienting the consumer to a particular loan originator's or creditor's origination process or particular credit terms that are or may be available to that consumer selected based on the consumer's financial characteristics, assisting the consumer to apply for credit, taking an application, offering particular credit terms to the consumer selected based on the consumer's financial characteristics, negotiating credit terms, or otherwise obtaining or making an extension of credit.

**3.** Assisting a consumer in obtaining or applying for consumer credit by advising on particular credit terms that are or may be available to that consumer based on the consumer's financial characteristics, filling out an application form, preparing application packages (such as a credit application or pre-approval application or supporting documentation), or collecting application and supporting information on behalf of the consumer to submit to a loan originator or creditor. A person who, acting on behalf of a loan originator or creditor, collects information or verifies information provided by the consumer, such as by asking the consumer for documentation to support the information the consumer provided or for the consumer's authorization to obtain supporting documents from third parties, is not collecting information on behalf of the consumer. See also comment 36(a)-4.i through .iv with respect to application-related administrative and clerical tasks and comment 36(a)-1.v with respect to third-party advisors.

**4.** Presenting particular credit terms for the consumer's consideration that are selected based on the consumer's financial characteristics, or communicating with a consumer for the purpose of reaching a mutual understanding about prospective credit terms.

**5.** Advertising or communicating to the public that one can or will perform any loan origination services. Advertising the services of a third party that engages or intends to engage in loan origination activities does not make the advertiser a loan originator.

B. The term "loan originator" includes employees, agents, and contractors of a creditor as well as employees, agents, and contractors of a mortgage broker that satisfy this definition.

C. The term "loan originator" includes any creditor that satisfies the definition of loan originator but makes use of "table funding" by a third party. See comment 36(a)-1.ii discussing table funding. Solely for purposes of § 1026.36(f) and (g) concerning loan originator qualifications, the term loan originator includes any creditor that satisfies the

definition of loan originator, even if the creditor does not make use of table funding. Such a person is a creditor, not a loan originator, for general purposes of this part, including the provisions of § 1026.36 other than § 1026.36(f) and (g).

D. A "loan originator organization" is a loan originator other than a natural person. The term includes any legal person or organization such as a sole proprietorship, trust, partnership, limited liability partnership, limited partnership, limited liability company, corporation, bank, thrift, finance company, or credit union. An "individual loan originator" is limited to a natural person. (Under § 1026.2(a)(22), the term "person" means a natural person or an organization.)

E. The term "loan originator" does not include consumers who obtain extensions of consumer credit on their own behalf.

ii. **Table funding.** Table funding occurs when the creditor does not provide the funds for the transaction at consummation out of the creditor's own resources, including, for example, by drawing on a *bona fide* warehouse line of credit or out of deposits held by the creditor. Accordingly, a table-funded transaction is consummated with the debt obligation initially payable by its terms to one person, but another person provides the funds for the transaction at consummation and receives an immediate assignment of the note, loan contract, or other evidence of the debt obligation. Although § 1026.2(a)(17)(i)(B) provides that a person to whom a debt obligation is initially payable on its face generally is a creditor, § 1026.36(a)(1) provides that, solely for the purposes of § 1026.36, such a person is also considered a loan originator. For example, if a person closes a transaction in its own name but does not fund the transaction from its own resources and assigns the transaction after consummation to the person providing the funds, it is considered a creditor for purposes of Regulation Z and also a loan originator for purposes of § 1026.36. However, if a person closes in its own name and finances a consumer credit transaction from the person's own resources, including drawing on a *bona fide* warehouse line of credit or out of deposits held by the person, and does not assign the loan at closing, the person is a creditor not making use of table funding but is included in the definition of loan originator for the purposes of § 1026.36(f) and (g) concerning loan originator qualifications.

iii. **Servicing.** A loan servicer or a loan servicer's employees, agents, or contractors that otherwise meet the definition of "loan originator" are excluded from the definition when modifying or offering to modify an existing loan on behalf of the current owner or holder of the loan (including an assignee or the servicer, if applicable). Other than § 1026.36(c), § 1026.36 applies to extensions of consumer credit. Thus, other than § 1026.36(c), § 1026.36 does not apply if a person renegotiates, modifies, replaces, or subordinates an existing obligation or its terms, unless the transaction constitutes a refinancing under § 1026.20(a) or obligates a different consumer on the existing debt.

iv. **Real estate brokerage.** The definition of "loan originator" does not include a person that performs only real estate brokerage activities (*e.g.,* does not perform mortgage broker or consumer credit referral activities or extend consumer credit) if the person is licensed or registered under applicable State law governing real estate brokerage, unless such person is paid by a loan originator or a creditor for a particular consumer credit transaction subject to § 1026.36. Such a person is not paid by a loan originator or a creditor if the person is paid by a loan originator or creditor on behalf of a buyer or seller solely for performing real estate brokerage activities. Such a person is not paid for a particular consumer credit transaction subject to § 1026.36 if the person is paid compensation by a loan originator or creditor, or affiliate of the loan originator or creditor, solely for performing real estate brokerage activities in connection with a property owned by that loan originator or creditor.

v. **Third-party advisors.** The definition of "loan originator" does not include bona fide third-party advisors such as accountants, attorneys, registered financial advisors, housing counselors, or others who do not receive compensation for engaging in loan origination activities. Advisory activity not constituting loan originator activity would include, for example, licensed accountants advising clients on tax implications of credit terms, registered financial advisors advising clients on potential effects of credit terms on client finances, HUD-approved housing counseling agencies assisting consumers with understanding the credit origination process and various credit terms or collecting and organizing documents to support a credit application, or a licensed attorney assisting clients with consummating a real property transaction or with divorce, trust, or estate planning matters. Such a person, however, who advises a consumer on credit terms offered by either the person or the person's employer, or who receives compensation or other monetary gain, directly or indirectly, from the loan originator or creditor on whose credit offer the person advises a consumer, generally would be a loan originator. A referral by such a person does not make the person a loan originator, however, where the person neither receives nor expects any compensation from a loan originator or creditor for referring the consumer. HUD-approved housing counseling agencies who simply assist a consumer in obtaining or applying to obtain consumer credit from a loan originator or creditor are not loan originators if the compensation is not contingent on referrals or on engaging in additional loan origination activities and either of two alternative conditions is satisfied: The first alternative condition is that the compensation is expressly permitted by applicable local, State, or Federal law that requires counseling and the counseling performed complies with such law (for example, § 1026.34(a)(5) and § 1026.36(k)). The second alternative condition is that the compensation is a fixed sum received from a creditor, loan originator, or the affiliate of a loan originator or a creditor as a result of agreements between creditors or loan originators and local, State, or Federal agencies. However, HUD-approved housing counseling agencies are loan originators if, for example, they receive compensation that is contingent on referrals or on engaging in loan originator activity other than assisting a consumer in obtaining or applying to obtain consumer credit from a loan originator or creditor.

2. **Meaning of mortgage broker.** For purposes of § 1026.36, with respect to a particular transaction, the term "mortgage broker" refers to a loan originator who is not an employee of the creditor. Accordingly, the term "mortgage broker" includes companies that engage in the activities described in § 1026.36(a) and also includes employees of such companies that engage in these activities. Section 1026.36(d) prohibits certain payments to a loan originator. These prohibitions apply to payments made to all loan originators, including payments made to mortgage brokers, and payments made by a company acting as a mortgage broker to its employees who are loan originators.

3. **Meaning of creditor.** For purposes of § 1026.36(d) and (e), a creditor means a creditor that is not deemed to be a loan originator on the transaction under this section. Thus, a person that closes a loan in its own name (but another person provides the funds for the transaction at consummation and receives an immediate assignment of the note, loan contract, or other evidence of the debt obligation) is deemed a loan originator, not a creditor, for purposes of § 1026.36. However, that person is still a creditor for all other purposes of Regulation Z.

4. **Managers, administrative and clerical staff.** For purposes of § 1026.36, managers, administrative and clerical staff, and similar individuals who are employed by (or contractor or agent of) a creditor or loan originator organization and take an application, offer, arrange, assist a consumer in obtaining or applying to obtain, negotiate, or otherwise obtain or make a particular extension of credit for another person are loan originators. The following examples describe activities that, in the absence of any other activities, do not render a manager, administrative or clerical staff member, or similar employee a loan originator:

i. **Application-related administrative and clerical tasks.** The definition of loan originator does not include a loan originator's or creditor's employee who provides a credit application form from the entity for which the person works to the consumer for the consumer to complete or, without assisting the consumer in completing the credit application, processing or analyzing the information, or discussing particular credit terms that are or may be available from a creditor or loan originator to that consumer selected based on the consumer's financial characteristics, delivers the credit application from a consumer to a loan originator or creditor. A person does not assist the consumer in completing the application if the person explains to the consumer filling out the application the contents of the application or where particular consumer information is to be provided, or generally describes the credit application process to a consumer without discussing particular credit terms that are or may be available from a creditor or loan originator to that consumer selected based on the consumer's financial characteristics.

ii. **Responding to consumer inquiries and providing general information.** The definition of loan originator does not include persons who:

A. Provide general explanations, information, or descriptions in response to consumer queries, such as explaining credit terminology or lending policies or who confirm written offer terms already transmitted to the consumer;

B. As employees of a creditor or loan originator, provide loan originator or creditor contact information of the loan originator or creditor entity for which he or she works, or of a person who works for that the same entity to a consumer, provided that the person does not discuss particular credit terms that are or may be available from a creditor or loan originator to that consumer selected based on the consumer's financial characteristics and does not direct the consumer, based on his or her assessment of the consumer's financial characteristics, to a particular loan originator or particular creditor seeking to originate credit transactions to consumers with those financial characteristics;

C. Describe other product-related services (for example, persons who describe optional monthly payment methods via telephone or via automatic account withdrawals, the availability and features of online account access, the availability of 24-hour customer support, or free mobile applications to access account information); or

D. Explain or describe the steps that a consumer would need to take to obtain an offer of credit, including providing general guidance on qualifications or criteria that would need to be met that is not specific to that consumer's circumstances.

iii. **Loan processing.** The definition of loan originator does not include persons who, acting on behalf of a loan originator or a creditor:

A. Compile and assemble credit application packages and supporting documentation;

B. Verify information provided by the consumer in a credit application such as by asking the consumer for supporting documentation or the consumer's authorization for the person to obtain supporting documentation from other persons;

C. Coordinate consummation of the credit transaction or other aspects of the credit transaction process, including by communicating with a consumer about process deadlines and documents needed at consummation, provided that any communication that includes a discussion about credit terms available from a creditor to that consumer selected based on the consumer's financial characteristics only confirms credit terms already agreed to by the consumer;

D. Provide a consumer with information unrelated to credit terms, such as the best days of the month for scheduling consummation; or

E. Communicate on behalf of a loan originator that a written credit offer has been sent to a consumer without providing any details of that offer.

iv. **Underwriting, credit approval, and credit pricing.** The definition of loan originator does not include persons who:

A. Receive and evaluate a consumer's information to make underwriting decisions on whether a consumer qualifies for an extension of credit and communicate decisions to a loan originator or creditor, provided that only a loan originator communicates such underwriting decisions to the consumer;

B. Approve particular credit terms or set particular credit terms available from a creditor to that consumer selected based on the consumer's financial characteristics in offer or counter-offer situations, provided that only a loan originator communicates to or with the consumer regarding these credit terms, an offer, or provides or engages in negotiation, a counter-offer, or approval conditions; or

C. Establish credit pricing that the creditor offers generally to the public, via advertisements or other marketing or via other persons that are loan originators.

v. **Producing managers.** Managers that work for creditors or loan originator organizations sometimes engage themselves in loan origination activities, as set forth in the definition of loan originator in § 1026.36(a)(1)(i) (such managers are sometimes referred to as "producing managers"). The definition of loan originator includes persons, including managers, who are employed by a creditor or loan originator organization and take an application, offer, arrange, assist a consumer with obtaining or applying to obtain, negotiate, or otherwise obtain or make a particular extension of credit for another person, even if such persons are also employed by the creditor or loan originator organization to perform duties that are not loan origination activities. Thus, such producing managers are loan originators.

5. **Compensation.**

**i. General.** For purposes of § 1026.36, compensation is defined in § 1026.36(a)(3) as salaries, commissions, and any financial or similar incentive. For example, the term "compensation" includes:

A. An annual or other periodic bonus; or

B. Awards of merchandise, services, trips, or similar prizes.

ii. **Name of fee.** Compensation includes amounts the loan originator retains and is not dependent on the label or name of any fee imposed in connection with the transaction. For example, if a loan originator imposes a "processing fee" in connection with the transaction and retains such fee, it is compensation for purposes of § 1026.36, including § 1026.36(d) and (e), whether the originator expends the time to process the consumer's application or uses the fee for other expenses, such as overhead.

iii. **Amounts for third-party charges.** Compensation does not include amounts the loan originator receives as payment for bona fide and reasonable charges, such as credit reports, where those amounts are passed on to a third party that is not the creditor, its affiliate, or the affiliate of the loan originator. *See* comment 36(a)-5.v.

iv. **Amounts for charges for services that are not loan origination activities.**

**1.** A payment received by a loan originator organization for bona fide and reasonable charges for services it performs that are not loan origination activities;

**2.** A payment received by an affiliate of a loan originator organization for bona fide and reasonable charges for services it performs that are not loan origination activities; or

**3.** A payment received by a loan originator organization for bona fide and reasonable charges for services that are not loan origination activities where those amounts are not retained by the loan originator but are paid to the creditor, its affiliate, or the affiliate of the loan originator organization. *See* comment 36(a)-5.v.

B. Compensation includes any salaries, commissions, and any financial or similar incentive to an individual loan originator, regardless of whether it is labeled as payment for services that are not loan origination activities.

C. Loan origination activities for purposes of this comment means activities described in § 1026.36(a)(1)(i) (**e.g.,** taking an application, offering, arranging, negotiating, or otherwise obtaining an extension of consumer credit for another person) that would make a person performing those activities for compensation a loan originator as defined in § 1026.36(a)(1)(i).

v. **Amounts that exceed the actual charge for a service.** In some cases, amounts received by the loan originator organization for payment for third-party charges described in comment 36(a)-5.iii or payment for services to the creditor, its affiliates, or the affiliates of the loan originator organization described in comment 36(a)-5.iv.A.*3* may exceed the actual charge because, for example, the loan originator organization cannot determine with accuracy what the actual charge will be when it is imposed and instead uses average charge pricing (in accordance with the Real Estate Settlement Procedures Act). In such a case, the difference retained by the loan originator organization is not compensation if the charge imposed on the consumer or collected from a person other than the consumer was bona fide and reasonable and also complies with State and other applicable law. On the other hand, if the loan originator organization marks up the charge (a practice known as "upcharging"), and the originator retains the difference between the actual charge and the marked-up charge, the amount retained is compensation for purposes of § 1026.36, including § 1026.36(d) and (e). For example:

A. Assume a loan originator organization receives compensation directly from either a consumer or a creditor. Further assume the loan originator organization uses average charge pricing in accordance with the Real Estate Settlement Procedures Act and, based on its past average cost for credit reports, charges the consumer $25 for a credit report provided by a third party. Under the loan originator organization's agreement with the consumer reporting agency, the cost of the credit report is to be paid in a month-end bill and will vary between $15 and $35 depending on how many credit reports the originator obtains that month. Assume the $25 for the credit report is paid by the consumer or is paid by the creditor with proceeds from a rebate. At the end of the month, the cost for the credit report is determined to be $15 for this consumer's transaction, based on the loan originator organization's credit report volume that month. In this case, the $10 difference between the $25 credit report fee imposed on the consumer and the actual $15 cost for the credit report is not compensation for purposes of § 1026.36, even though the $10 is retained by the loan originator organization.

B. Using the same example as in comment 36(a)-5.v.A, the $10 difference would be compensation for purposes of § 1026.36 if the price for a credit report varies between $10 and $15.

vi. **Returns on equity interests and dividends on equity holdings.** The term "compensation" for purposes of § 1026.36(d) and (e) also includes, for example, awards of stock, stock options and equity interests. Thus, the awarding of stock, stock options, or equity interests to loan originators is subject to the restrictions in § 1026.36(d) and (e). For example, a person may not award additional stock or a preferable type of equity interest to a loan originator based on the terms of a consumer credit transaction subject to § 1026.36 originated by that loan originator. However, bona fide returns or dividends paid on stock or other equity holdings, including those paid to owners or shareholders of a loan originator organization who own such stock or equity interests, are not compensation for purposes of § 1026.36(d) and (e). Bona fide returns or dividends are those returns and dividends that are paid pursuant to documented ownership or equity interests and that are not functionally equivalent to compensation. Ownership and equity interests must be bona fide. Bona fide ownership and equity interests are allocated according to a loan originator's respective capital contribution where the allocation is not a mere subterfuge for the payment of compensation based on terms of a transaction. Ownership and equity interests also are not bona fide if the formation or maintenance of the business from which returns or dividends are paid is a mere subterfuge for the payment of compensation based on the terms of a transaction. For example, assume that three individual loan originators form a loan originator organization that is a limited liability company (LLC). The three individual loan originators are members of the LLC, and the LLC agreement governing the loan originator organization's structure calls for regular distributions based on the members' respective equity interests. If the members' respective equity interests are allocated based on the members' terms of

transactions, rather than according to their respective capital contributions, then distributions based on such equity interests are not bona fide and, thus, are compensation for purposes of § 1026.36(d) and (e).

## 36(a)(1)(i)(B) Employee of a retailer of manufactured homes.

1. The definition of loan originator does not include an employee of a manufactured home retailer that "assists" a consumer in obtaining or applying for consumer credit as defined in comment 36(a)-1.i.A.**3,** provided the employee does not advise the consumer on specific credit terms, or otherwise engage in loan originator activity as defined in § 1026.36(a)(1). The following examples describe activities that, in the absence of other activities, do not define a manufactured home retailer employee as a loan originator:

i. Generally describing the credit application process to a consumer without advising on credit terms available from a creditor.

ii. Preparing residential mortgage loan packages, which means compiling and processing loan application materials and supporting documentation, and providing general application instructions to consumers so consumers can complete an application, without interacting or communicating with the consumer regarding transaction terms, but not filling out a consumer's application, inputting the information into an online application or other automated system, or taking information from the consumer over the phone to complete the application.

iii. Collecting information on behalf of the consumer with regard to a residential mortgage loan. Collecting information "on behalf of the consumer" would include gathering information or supporting documentation from third parties on behalf of the consumer to provide to the consumer, for the consumer then to provide in the application or for the consumer to submit to the loan originator or creditor.

iv. Providing or making available general information about creditors or loan originators that may offer financing for manufactured homes in the consumer's general area, when doing so does not otherwise amount to "referring" as defined in comment 36(a)-1.i.A.**1.** This includes making available, in a neutral manner, general brochures or information about the different creditors or loan originators that may offer financing to a consumer, but does not include recommending a particular creditor or loan originator or otherwise influencing the consumer's decision.

## 36(a)(4) Seller Financers; Three Properties

1. **Reasonable ability to repay safe harbors.** A person in good faith determines that the consumer to whom the person extends seller financing has a reasonable ability to repay the obligation if the person complies with § 1026.43(c) of this part or complies with the

alternative criteria discussed in this comment. If the consumer intends to make payments from income, the person considers evidence of the consumer's current or reasonably expected income. If the consumer intends to make payments with income from employment, the person considers the consumer's earnings, which may be reflected in payroll statements or earnings statements, IRS Form W-2s or similar IRS forms used for reporting wages or tax withholding, or military Leave and Earnings Statements. If the consumer intends to make payments from other income, the person considers the consumer's income from sources such as a Federal, State, or local government agency providing benefits and entitlements. If the consumer intends to make payments from income earned from assets, the person considers the relevant assets, such as funds held in accounts with financial institutions, equity ownership interests, or rental property. However, the value of the dwelling that secures the financing does not constitute evidence of the consumer's ability to repay. In considering these and other potential sources of income to determine in good faith that the consumer has a reasonable ability to repay the obligation, the person making that determination may rely on copies of tax returns the consumer filed with the Internal Revenue Service or a State taxing authority.

**2. Adjustable rate safe harbors.**

**i. Annual rate increase.** An annual rate increase of two percentage points or less is reasonable.

**ii. Lifetime increase.** A lifetime limitation of an increase of six percentage points or less, subject to a minimum floor of the person's choosing and maximum ceiling that does not exceed the usury limit applicable to the transaction, is reasonable.

## 36(a)(5) Seller Financers; One Property

1. **Adjustable rate safe harbors.** For a discussion of reasonable annual and lifetime interest rate increases, see comment 36(a)(4)-2.

## 36(b) Scope.

1. **Scope of coverage.** Section 1026.36(c)(1) and (c)(2) applies to closed-end consumer credit transactions secured by a consumer's principal dwelling. Section 1026.36(c)(3) applies to a consumer credit transaction, including home equity lines of credit under § 1026.40, secured by a consumer's dwelling. Paragraphs (h) and (i) of § 1026.36 apply to home equity lines of credit under § 1026.40 secured by a consumer's principal dwelling. Paragraphs (d), (e), (f), (g), (h), and (i) of § 1026.36 apply to closed-end consumer credit transactions secured by a dwelling. Closed-end consumer credit transactions include transactions secured by first or subordinate liens, and reverse mortgages that are not home equity lines

of credit under § 1026.40. See § 1026.36(b) for additional restrictions on the scope of § 1026.36, and §§ 1026.1(c) and 1026.3(a) and corresponding commentary for further discussion of extensions of credit subject to Regulation Z.

## 36(c) Servicing Practices

### Paragraph 36(c)(1)(i)

1. **Crediting of payments.** Under § 1026.36(c)(1)(i), a mortgage servicer must credit a payment to a consumer's loan account as of the date of receipt. This does not require that a mortgage servicer post the payment to the consumer's loan account on a particular date; the servicer is only required to credit the payment *as of* the date of receipt. Accordingly, a servicer that receives a payment on or before its due date (or within any grace period), and does not enter the payment on its books or in its system until after the payment's due date (or expiration of any grace period), does not violate this rule as long as the entry does not result in the imposition of a late charge, additional interest, or similar penalty to the consumer, or in the reporting of negative information to a consumer reporting agency.

2. **Method of crediting periodic payments.** The method by which periodic payments shall be credited is based on the legal obligation between the creditor and consumer, subject to applicable law.

3. **Date of receipt.** The "date of receipt" is the date that the payment instrument or other means of payment reaches the mortgage servicer. For example, payment by check is received when the mortgage servicer receives it, not when the funds are collected. If the consumer elects to have payment made by a third-party payor such as a financial institution, through a preauthorized payment or telephone bill-payment arrangement, payment is received when the mortgage servicer receives the third-party payor's check or other transfer medium, such as an electronic fund transfer.

4. **Temporary loss mitigation programs.** If a loan contract has not been permanently modified but the consumer has agreed to a temporary loss mitigation program, a periodic payment under § 1026.36(c)(1)(i) is the amount sufficient to cover principal, interest, and escrow (if applicable) for a given billing cycle under the loan contract, regardless of the payment due under the temporary loss mitigation program.

5. **Permanent loan modifications.** If a loan contract has been permanently modified, a periodic payment under § 1026.36(c)(1)(i) is an amount sufficient to cover principal, interest, and escrow (if applicable) for a given billing cycle under the modified loan contract.

## Paragraph 36(c)(1)(ii).

1. **Handling of partial payments.** If a servicer receives a partial payment from a consumer, to the extent not prohibited by applicable law or the legal obligation between the parties, the servicer may take any of the following actions:

i. Credit the partial payment upon receipt.

ii. Return the partial payment to the consumer.

iii. Hold the payment in a suspense or unapplied funds account. If the payment is held in a suspense or unapplied funds account, this fact must be reflected on future periodic statements, in accordance with § 1026.41(d)(3). When sufficient funds accumulate to cover a periodic payment, as defined in § 1026.36(c)(1)(i), they must be treated as a periodic payment received in accordance with § 1026.36(c)(1)(i).

## Paragraph 36(c)(1)(iii).

1. **Payment requirements.** The servicer may specify reasonable requirements for making payments in writing, such as requiring that payments be accompanied by the account number or payment coupon; setting a cut-off hour for payment to be received, or setting different hours for payment by mail and payments made in person; specifying that only checks or money orders should be sent by mail; specifying that payment is to be made in U.S. dollars; or specifying one particular address for receiving payments, such as a post office box. The servicer may be prohibited, however, from requiring payment solely by preauthorized electronic fund transfer. *See* section 913 of the Electronic Fund Transfer Act, 15 U.S.C. 1693k.

2. **Payment requirements - Limitations.** Requirements for making payments must be reasonable; it should not be difficult for most consumers and potential successors in interest to make conforming payments. For example, it would be reasonable to require a cut-off time of 5 p.m. for receipt of a mailed check at the location specified by the servicer for receipt of such check.

3. **Implied guidelines for payments.** In the absence of specified requirements for making payments, payments may be made at any location where the servicer conducts business; any time during the servicer's normal business hours; and by cash, money order, draft, or other similar instrument in properly negotiable form, or by electronic fund transfer if the servicer and consumer have so agreed.

## Paragraph 36(c)(2).

1. **Pyramiding of late fees.** The prohibition on pyramiding of late fees in § 1026.36(c)(2) should be construed consistently with the "credit practices rule" of the Federal Trade Commission, 16 CFR 444.4.

## Paragraph 36(c)(3).

1. **Person acting on behalf of the consumer.** For purposes of § 1026.36(c)(3), a person acting on behalf of the consumer may include the consumer's representative, such as an attorney representing the individual, a non-profit consumer counseling or similar organization, or a creditor with which the consumer is refinancing and which requires the payoff statement to complete the refinancing. A creditor, assignee or servicer may take reasonable measures to verify the identity of any person acting on behalf of the consumer and to obtain the consumer's authorization to release information to any such person before the "reasonable time" period begins to run.

2. **Payment requirements.** The creditor, assignee or servicer may specify reasonable requirements for making payoff requests, such as requiring requests to be directed to a mailing address, email address, or fax number specified by the creditor, assignee or servicer or any other reasonable requirement or method. If the consumer does not follow these requirements, a longer timeframe for responding to the request would be reasonable.

3. **Accuracy of payoff statements.** Payoff statements must be accurate when issued.

## 36(d) Prohibited Payments to Loan Originators

1. **Persons covered.** Section 1026.36(d) prohibits any person (including a creditor) from paying compensation to a loan originator in connection with a covered credit transaction, if the amount of the payment is based on a term of a transaction. For example, a person that purchases an extension of credit from the creditor after consummation may not compensate the loan originator in a manner that violates § 1026.36(d).

2. **Mortgage brokers.** The payments made by a company acting as a mortgage broker to its employees who are loan originators are subject to the section's prohibitions. For example, a mortgage broker may not pay its employee more for a transaction with a 7 percent interest rate than for a transaction with a 6 percent interest rate.

## 36(d)(1) Payments Based on a Term of a Transaction

**1. Compensation that is "based on" a term of a transaction.**

**i. Objective facts and circumstances.** Whether compensation is "based on" a term of a transaction does not require a comparison of multiple transactions or proof that any person subjectively intended that there be a relationship between the amount of the compensation paid and a transaction term. Instead, the determination is based on the objective facts and circumstances indicating that compensation would have been different if a transaction term had been different. Generally, when there is a compensation policy in place and the objective facts and circumstances indicate the policy was followed, the determination of whether compensation would have been different if a transaction term had been different is made by analysis of the policy. In the absence of a compensation policy, or when a compensation policy is not followed, the determination may be made based on a comparison of transactions originated and the amounts of compensation paid.

**ii. Single or multiple transactions.** The prohibition on payment and receipt of compensation under § 1026.36(d)(1)(i) encompasses compensation that directly or indirectly is based on the terms of a single transaction of a single individual loan originator, the terms of multiple transactions by that single individual loan originator, or the terms of multiple transactions by multiple individual loan originators. Compensation to an individual loan originator that is based upon profits determined with reference to a mortgage-related business is considered compensation that is based on the terms of multiple transactions by multiple individual loan originators. For clarification about the exceptions permitting compensation based upon profits determined with reference to mortgage-related business pursuant to either a designated tax-advantaged plan or a non-deferred profits-based compensation plan, see comment 36(d)(1)-3. For clarification about "mortgage-related business," see comments 36(d)(1)-3.v.B and -3.v.E.

**A.** Assume that a creditor pays a bonus to an individual loan originator out of a bonus pool established with reference to the creditor's profits and the profits are determined with reference to the creditor's revenue from origination of closed-end consumer credit transactions secured by a dwelling. In such instance, the bonus is considered compensation that is based on the terms of multiple transactions by multiple individual loan originators. Therefore, the bonus is prohibited under § 1026.36(d)(1)(i), unless it is otherwise permitted under § 1026.36(d)(1)(iv).

**B.** Assume that an individual loan originator's employment contract with a creditor guarantees a quarterly bonus in a specified amount conditioned upon the individual loan originator meeting certain performance benchmarks (e.g., volume of originations monthly). A bonus paid following the satisfaction of those contractual conditions is not directly or indirectly based on the terms of a transaction by an individual loan originator, the terms of multiple transactions by that individual loan originator, or the terms of multiple transactions by multiple individual loan originators under § 1026.36(d)(1)(i) as clarified by this comment 36(d)(1)-1.ii, because the creditor is obligated to pay the bonus, in the specified amount, regardless of the terms of transactions of the individual loan originator or multiple individual

loan originators and the effect of those terms of multiple transactions on the creditor's profits. Because this type of bonus is not directly or indirectly based on the terms of multiple transactions by multiple individual loan originators, as described in § 1026.36(d)(1)(i) (as clarified by this comment 36(d)(1)-1.ii), it is not subject to the 10-percent total compensation limit described in § 1026.36(d)(1)(iv)(B)(**1**).

**iii. Transaction term defined.** A "term of a transaction" under § 1026.36(d)(1)(ii) is any right or obligation of any of the parties to a credit transaction. A "credit transaction" is the operative acts (*e.g.,* the consumer's purchase of certain goods or services essential to the transaction) and written and oral agreements that, together, create the consumer's right to defer payment of debt or to incur debt and defer its payment. For the purposes of § 1026.36(d)(1)(ii), this definition includes:

**A.** The rights and obligations, or part of any rights or obligations, memorialized in a promissory note or other credit contract, as well as the security interest created by a mortgage, deed of trust, or other security instrument, and in any document incorporated by reference in the note, contract, or security instrument;

**B.** The payment of any loan originator or creditor fees or charges for the credit, or for a product or service provided by the loan originator or creditor related to the extension of that credit, imposed on the consumer, including any fees or charges financed through the interest rate; and

**C.** The payment of any fees or charges imposed on the consumer, including any fees or charges financed through the interest rate, for any product or service required to be obtained or performed as a condition of the extension of credit.

**D.** The fees and charges described above in paragraphs B and C can only be a term of a transaction if the fees or charges are required to be disclosed in the Good Faith Estimate, the HUD-1, or the HUD-1A (and subsequently in any integrated disclosures promulgated by the Bureau under TILA section 105(b) (15 U.S.C. 1604(b)) and RESPA section 4 (12 U.S.C. 2603) as amended by sections 1098 and 1100A of the Dodd-Frank Act).

**2. Compensation that is or is not based on a term of a transaction or a proxy for a term of a transaction.** Section 1026.36(d)(1) does not prohibit compensating a loan originator differently on different transactions, provided the difference is not based on a term of a transaction or a proxy for a term of a transaction. The rule prohibits compensation to a loan originator for a transaction based on, among other things, that transaction's interest rate, annual percentage rate, collateral type (*e.g.,* condominium, cooperative, detached home, or manufactured housing), or the existence of a prepayment penalty. The rule also prohibits compensation to a loan originator that is based on any factor that is a proxy for a term of a transaction. Compensation paid to a loan originator organization directly by a

consumer in a transaction is not prohibited by § 1026.36(d)(1) simply because that compensation itself is a term of the transaction. Nonetheless, that compensation may not be based on any other term of the transaction or a proxy for any other term of the transaction. In addition, in a transaction where a loan originator organization is paid compensation directly by a consumer, compensation paid by the loan originator organization to individual loan originators is not prohibited by § 1026.36(d)(1) simply because it is based on the amount of compensation paid directly by the consumer to the loan originator organization but the compensation to the individual loan originator may not be based on any other term of the transaction or proxy for any other term of the transaction.

**i. Permissible methods of compensation.** Compensation based on the following factors is not compensation based on a term of a transaction or a proxy for a term of a transaction:

**A.** The loan originator's overall dollar volume (**i.e.,** total dollar amount of credit extended or total number of transactions originated), delivered to the creditor. See comment 36(d)(1)-9 discussing variations of compensation based on the amount of credit extended.

**B.** The long-term performance of the originator's loans.

**C.** An hourly rate of pay to compensate the originator for the actual number of hours worked.

**D.** Whether the consumer is an existing customer of the creditor or a new customer.

**E.** A payment that is fixed in advance for every loan the originator arranges for the creditor (**e.g.,** $600 for every credit transaction arranged for the creditor, or $1,000 for the first 1,000 credit transactions arranged and $500 for each additional credit transaction arranged).

**F.** The percentage of applications submitted by the loan originator to the creditor that results in consummated transactions.

**G.** The quality of the loan originator's loan files (**e.g.,** accuracy and completeness of the loan documentation) submitted to the creditor.

**ii. Proxies for terms of a transaction.** If the loan originator's compensation is based in whole or in part on a factor that is a proxy for a term of a transaction, then the loan originator's compensation is based on a term of a transaction. A factor (that is not itself a term of a transaction) is a proxy for a term of a transaction if the factor consistently varies with a term or terms of the transaction over a significant number of transactions, and the loan originator has the ability, directly or indirectly, to add, drop, or change the factor when originating the transaction. For example:

**A.** Assume a creditor pays a loan originator a higher commission for transactions to be held by the creditor in portfolio than for transactions sold by the creditor into the secondary market. The creditor holds in portfolio only extensions of credit that have a fixed interest rate

and a five-year term with a final balloon payment. The creditor sells into the secondary market all other extensions of credit, which typically have a higher fixed interest rate and a 30-year term. Thus, whether an extension of credit is held in portfolio or sold into the secondary market for this creditor consistently varies with the interest rate and whether the credit has a five-year term or a 30-year term (which are terms of the transaction) over a significant number of transactions. Also, the loan originator has the ability to change the factor by, for example, advising the consumer to choose an extension of credit a five-year term. Therefore, under these circumstances, whether or not an extension of credit will be held in portfolio is a proxy for a term of a transaction.

**B.** Assume a loan originator organization pays loan originators higher commissions for transactions secured by property in State A than in State B. For this loan originator organization, over a significant number of transactions, transactions in State B have substantially lower interest rates than transactions in State A. The loan originator, however, does not have any ability to influence whether the transaction is secured by property located in State A or State B. Under these circumstances, the factor that affects compensation (the location of the property) is not a proxy for a term of a transaction.

**iii. Pooled compensation.** Section 1026.36(d)(1) prohibits the sharing of pooled compensation among loan originators who originate transactions with different terms and are compensated differently. For example, assume that Loan Originator A receives a higher commission than Loan Originator B and that loans originated by Loan Originator A generally have higher interest rates than loans originated by Loan Originator B. Under these circumstances, the two loan originators may not share pooled compensation because each receives compensation based on the terms of the transactions they collectively make.

**3. Interpretation of § 1026.36(d)(1)(iii) and (iv).** Subject to certain restrictions, § 1026.36(d)(1)(iii) and § 1026.36(d)(1)(iv) permit contributions to or benefits under designated tax-advantaged plans and compensation under a non-deferred profits-based compensation plan even if the contributions, benefits, or compensation, respectively, are based on the terms of multiple transactions by multiple individual loan originators.

**i. Designated tax-advantaged plans.** Section 1026.36(d)(1)(iii) permits an individual loan originator to receive, and a person to pay, compensation in the form of contributions to a defined contribution plan or benefits under a defined benefit plan provided the plan is a designated tax-advantaged plan (as defined in § 1026.36(d)(1)(iii)), even if contributions to or benefits under such plans are directly or indirectly based on the terms of multiple transactions by multiple individual loan originators. In the case of a designated tax-advantaged plan that is a defined contribution plan, § 1026.36(d)(1)(iii) does not permit the contribution to be directly or indirectly based on the terms of that individual loan originator's

transactions. A defined contribution plan has the meaning set forth in Internal Revenue Code section 414(i), 26 U.S.C. 414(i). A defined benefit plan has the meaning set forth in Internal Revenue Code section 414(j), 26 U.S.C. 414(j).

**ii. Non-deferred profits-based compensation plans.** As used in § 1026.36(d)(1)(iv), a "non-deferred profits-based compensation plan" is any compensation arrangement where an individual loan originator may be paid variable, additional compensation based in whole or in part on the mortgage-related business profits of the person paying the compensation, any affiliate, or a business unit within the organizational structure of the person or the affiliate, as applicable (*i.e.,* depending on the level within the person's or affiliate's organization at which the non-deferred profits-based compensation plan is established). A non-deferred profits-based compensation plan does not include a designated tax-advantaged plan or other forms of deferred compensation that are not designated tax-advantaged plans, such as those created pursuant to Internal Revenue Code section 409A, 26 U.S.C. 409A. Thus, if contributions to or benefits under a designated tax-advantaged plan or compensation under another form of deferred compensation plan are determined with reference to the mortgage-related business profits of the person making the contribution, then the contribution, benefits, or other compensation, as applicable, are not permitted by § 1026.36(d)(1)(iv) (although, in the case of contributions to or benefits under a designated tax-advantaged plan, the benefits or contributions may be permitted by § 1026.36(d)(1)(iii)). Under a non-deferred profits-based compensation plan, the individual loan originator may, for example, be paid directly in cash, stock, or other non-deferred compensation, and the compensation under the non-deferred profits-based compensation plan may be determined by a fixed formula or may be at the discretion of the person (e.g., the person may elect not to pay compensation under a non-deferred profits-based compensation plan in a given year), provided the compensation is not directly or indirectly based on the terms of the individual loan originator's transactions. As used in § 1026.36(d)(1)(iv) and this commentary, non-deferred profits-based compensation plans include, without limitation, bonus pools, profits pools, bonus plans, and profit-sharing plans. Compensation under a non-deferred profits-based compensation plan could include, without limitation, annual or periodic bonuses, or awards of merchandise, services, trips, or similar prizes or incentives where the bonuses, contributions, or awards are determined with reference to the profits of the person, business unit, or affiliate, as applicable. As used in § 1026.36(d)(1)(iv) and this commentary, a business unit is a division, department, or segment within the overall organizational structure of the person or the person's affiliate that performs discrete business functions and that the person or the affiliate treats separately for accounting or other organizational purposes. For example, a creditor that pays its individual loan originators bonuses at the end of a calendar year based on the creditor's average net return on assets for the calendar year is operating a non-deferred profits-based compensation plan under § 1026.36(d)(1)(iv). A bonus that is paid to an individual loan originator from a source other than a non-deferred profits-based compensation plan (or a deferred compensation plan where the bonus is determined with

6/14/24, 9:59 AM    §1026.36 Prohibited Acts or Practices and Certain Requirements for Credit Secured by a Dwelling. | Consumer Fina…

Case 2:24-cv-01085-BRM-DRC   ECF No. 23-7   PageID.628   Filed 09/17/24   Page 21 of 41

reference to mortgage-related business profits), such as a retention bonus budgeted for in advance or a performance bonus paid out of a bonus pool set aside at the beginning of the company's annual accounting period as part of the company's operating budget, does not violate the prohibition on payment of compensation based on the terms of multiple transactions by multiple individual loan originators under § 1026.36(d)(1)(i), as clarified by comment 36(d)(1)-1.ii; therefore, § 1026.36(d)(1)(iv) does not apply to such bonuses.

**iii. Compensation that is not directly or indirectly based on the terms of multiple transactions by multiple individual loan originators.** The compensation arrangements addressed in § 1026.36(d)(1)(iii) and (iv) are permitted even if they are directly or indirectly based on the terms of multiple transactions by multiple individual loan originators. See comment 36(d)(1)-1 for additional interpretation. If a loan originator organization's revenues are exclusively derived from transactions subject to § 1026.36(d) (whether paid by creditors, consumers, or both) and that loan originator organization pays its individual loan originators a bonus under a non-deferred profits-based compensation plan, the bonus is not directly or indirectly based on the terms of multiple transactions by multiple individual loan originators if § 1026.36(d)(1)(i) is otherwise complied with.

**iv. Compensation based on terms of an individual loan originator's transactions.** Under both § 1026.36(d)(1)(iii), with regard to contributions made to a defined contribution plan that is a designated tax-advantaged plan, and § 1026.36(d)(1)(iv)(A), with regard to compensation under a non-deferred profits-based compensation plan, the payment of compensation to an individual loan originator may not be directly or indirectly based on the terms of that individual loan originator's transaction or transactions. Consequently, for example, where an individual loan originator makes loans that vary in their interest rate spread, the compensation payment may not take into account the average interest rate spread on the individual loan originator's transactions during the relevant calendar year.

**v. Compensation under non-deferred profits-based compensation plans.** Assuming that the conditions in § 1026.36(d)(1)(iv)(A) are met, § 1026.36(d)(1)(iv)(B)(*1*) permits certain compensation to an individual loan originator under a non-deferred profits-based compensation plan. Specifically, if the compensation is determined with reference to the profits of the person from mortgage-related business, compensation under a non-deferred profits-based compensation plan is permitted provided the compensation does not, in the aggregate, exceed 10 percent of the individual loan originator's total compensation corresponding to the time period for which compensation under the non-deferred profits-based compensation plan is paid. The compensation restrictions under § 1026.36(d)(1)(iv)(B)(*1*) are sometimes referred to in this commentary as the "10-percent total compensation limit" or the "10-percent limit."

**A. Total compensation.** For purposes of § 1026.36(d)(1)(iv)(B)(*1*), the individual loan originator's total compensation consists of the sum total of: (1) All wages and tips reportable for Medicare tax purposes in box 5 on IRS form W-2 (or, if the individual loan originator is an independent contractor, reportable compensation on IRS form 1099-MISC) that are actually paid during the relevant time period (regardless of when the wages and tips are earned), except for any compensation under a non-deferred profits-based compensation plan that is earned during a different time period (see comment 36(d)(1)-3.v.C); (2) at the election of the person paying the compensation, all contributions that are actually made during the relevant time period by the creditor or loan originator organization to the individual loan originator's accounts in designated tax-advantaged plans that are defined contribution plans (regardless of when the contributions are earned); and (3) at the election of the person paying the compensation, all compensation under a non-deferred profits-based compensation plan that is earned during the relevant time period, regardless of whether the compensation is actually paid during that time period (see comment 36(d)(1)-3.v.C). If an individual loan originator has some compensation that is reportable on the W-2 and some that is reportable on the 1099-MISC, the total compensation is the sum total of what is reportable on each of the two forms.

**B. Profits of the Person.** Under § 1026.36(d)(1)(iv), a plan is a non-deferred profits-based compensation plan if compensation is paid, based in whole or in part, on the profits of the person paying the compensation. As used in § 1026.36(d)(1)(iv), "profits of the person" include, as applicable depending on where the non-deferred profits-based compensation plan is set, the profits of the person, the business unit to which the individual loan originators are assigned for accounting or other organizational purposes, or any affiliate of the person. Profits from mortgage-related business are profits determined with reference to revenue generated from transactions subject to § 1026.36(d). Pursuant to § 1026.36(b) and comment 36(b)-1, § 1026.36(d) applies to closed-end consumer credit transactions secured by dwellings. This revenue includes, without limitation, and as applicable based on the particular sources of revenue of the person, business unit, or affiliate, origination fees and interest associated with dwelling-secured transactions for which individual loan originators working for the person were loan originators, income from servicing of such transactions, and proceeds of secondary market sales of such transactions. If the amount of the individual loan originator's compensation under non-deferred profits-based compensation plans paid for a time period does not, in the aggregate, exceed 10 percent of the individual loan originator's total compensation corresponding to the same time period, compensation under non-deferred profits-based compensation plans may be paid under § 1026.36(d)(1)(iv)(B)(*1*) regardless of whether or not it was determined with reference to the profits of the person from mortgage-related business.

**C. Time period for which the compensation under the non-deferred profits-based compensation plan is paid and to which the total compensation corresponds.** Under § 1026.36(d)(1)(iv)(B)(*1*), determination of whether payment of compensation under a non-

deferred profits-based compensation plan complies with the 10-percent limit requires a
calculation of the ratio of the compensation under the non-deferred profits-based
compensation plan (*i.e.,* the compensation subject to the 10-percent limit) and the total
compensation corresponding to the relevant time period. For compensation subject to the
10-percent limit, the relevant time period is the time period for which a person makes
reference to profits in determining the compensation (*i.e.,* when the compensation was
earned). It does not matter whether the compensation is actually paid during that particular
time period. For total compensation, the relevant time period is the same time period, but
only certain types of compensation may be included in the total compensation amount for
that time period (see comment 36(d)(1)-3.v.A). For example, assume that during calendar
year 2014 a creditor pays an individual loan originator compensation in the following
amounts: $80,000 in commissions based on the individual loan originator's performance and
volume of loans generated during the calendar year; and $10,000 in an employer
contribution to a designated tax-advantaged defined contribution plan on behalf of the
individual loan originator. The creditor desires to pay the individual loan originator a year-end
bonus of $10,000 under a non-deferred profits-based compensation plan. The commissions
are paid and employer contributions to the designated tax-advantaged defined contribution
plan are made during calendar year 2014, but the year-end bonus will be paid in January
2015. For purposes of the 10-percent limit, the year-end bonus is counted toward the 10-
percent limit for calendar year 2014, even though it is not actually paid until 2015. Therefore,
for calendar year 2014 the individual loan originator's compensation that is subject to the 10-
percent limit would be $10,000 (*i.e.,* the year-end bonus) and the total compensation would
be $100,000 (*i.e.,* the sum of the commissions, the designated tax-advantaged plan
contribution (assuming the creditor elects to include it in total compensation for calendar year
2014), and the bonus (assuming the creditor elects to include it in total compensation for
calendar year 2014)); the bonus would be permissible under § 1026.36(d)(1)(iv) because it
does not exceed 10 percent of total compensation. The determination of total compensation
corresponding to 2014 also would not take into account any compensation subject to the 10-
percent limit that is actually paid in 2014 but is earned during a different calendar year (e.g.,
an annual bonus determined with reference to mortgage-related business profits for calendar
year 2013 that is paid in January 2014). If the employer contribution to the designated tax-
advantaged plan is earned in 2014 but actually made in 2015, however, it may not be
included in total compensation for 2014. A company, business unit, or affiliate, as applicable,
may pay compensation subject to the 10-percent limit during different time periods falling
within its annual accounting period for keeping records and reporting income and expenses,
which may be a calendar year or a fiscal year depending on the annual accounting period. In
such instances, however, the 10-percent limit applies both as to each time period and
cumulatively as to the annual accounting period. For example, assume that a creditor uses a
calendar-year accounting period. If the creditor pays an individual loan originator a bonus at
the end of each quarter under a non-deferred profits-based compensation plan, the payment
of each quarterly bonus is subject to the 10-percent limit measured with respect to each

quarter. The creditor can also pay an annual bonus under the non-deferred profits-based compensation plan that does not exceed the difference of 10 percent of the individual loan originator's total compensation corresponding to the calendar year and the aggregate amount of the quarterly bonuses.

**D. Awards of merchandise, services, trips, or similar prizes or incentives.** If any compensation paid to an individual loan originator under § 1026.36(d)(1)(iv) consists of an award of merchandise, services, trips, or similar prize or incentive, the cash value of the award is factored into the calculation of the 10-percent total compensation limit. For example, during a given calendar year, individual loan originator A and individual loan originator B are each employed by a creditor and paid $40,000 in salary, and $45,000 in commissions. The creditor also contributes $5,000 to a designated tax-advantaged defined contribution plan for each individual loan originator during that calendar year, which the creditor elects to include in the total compensation amount. Neither individual loan originator is paid any other form of compensation by the creditor. In December of the calendar year, the creditor rewards both individual loan originators for their performance during the calendar year out of a bonus pool established with reference to the profits of the mortgage origination business unit. Individual loan originator A is paid a $10,000 cash bonus, meaning that individual loan originator A's total compensation is $100,000 (assuming the creditor elects to include the bonus in the total compensation amount). Individual loan originator B is paid a $7,500 cash bonus and awarded a vacation package with a cash value of $3,000, meaning that individual loan originator B's total compensation is $100,500 (assuming the creditor elects to include the reward in the total compensation amount). Under § 1026.36(d)(1)(iv)(B)(*1*), individual loan originator A's $10,000 bonus is permissible because the bonus would not constitute more than 10 percent of individual loan originator A's total compensation for the calendar year. The creditor may not pay individual loan originator B the $7,500 bonus and award the vacation package, however, because the total value of the bonus and the vacation package would be $10,500, which is greater than 10 percent (10.45 percent) of individual loan originator B's total compensation for the calendar year. One way to comply with § 1026.36(d)(1)(iv)(B)(*1*) would be if the amount of the bonus were reduced to $7,000 or less or the vacation package were structured such that its cash value would be $2,500 or less.

**E. Compensation determined only with reference to non-mortgage-related business profits.** Compensation under a non-deferred profits-based compensation plan is not subject to the 10-percent total compensation limit under § 1026.36(d)(1)(iv)(B)(*1*) if the non-deferred profits-based compensation plan is determined with reference only to profits from business other than mortgage-related business, as determined in accordance with reasonable accounting principles. Reasonable accounting principles reflect an accurate allocation of revenues, expenses, profits, and losses among the person, any affiliate of the person, and any business units within the person or affiliates, and are consistent with the accounting principles applied by the person, the affiliate, or the business unit with respect to, as

6/14/24, 2:38 AM    § 1026.36 Prohibited Acts or Practices and Certain Requirements for Credit Secured by a Dwelling. | Consumer Fina…

Case 2:24-cv-01055-BRM-DRC   ECF No. 22-37, PageID.632   Filed 09/17/24   Page 25 of 41

applicable, its internal budgeting and auditing functions and external reporting requirements. Examples of external reporting and filing requirements that may be applicable to creditors and loan originator organizations are Federal income tax filings, Federal securities law filings, or quarterly reporting of income, expenses, loan origination activity, and other information required by government-sponsored enterprises. As used in § 1026.36(d)(1)(iv)(B) (*1*), profits means positive profits or losses avoided or mitigated.

**F. Additional examples.**

**1.** Assume that, during a given calendar year, a loan originator organization pays an individual loan originator employee $40,000 in salary and $125,000 in commissions, and makes a contribution of $15,000 to the individual loan originator's 401(k) plan. At the end of the year, the loan originator organization wishes to pay the individual loan originator a bonus based on a formula involving a number of performance metrics, to be paid out of a profit pool established at the level of the company but that is determined in part with reference to the profits of the company's mortgage origination unit. Assume that the loan originator organization derives revenues from sources other than transactions covered by § 1026.36(d). In this example, the performance bonus would be directly or indirectly based on the terms of multiple individual loan originators' transactions as described in § 1026.36(d) (1)(i), because it is being determined with reference to profits from mortgage-related business. Assume, furthermore, that the loan originator organization elects to include the bonus in the total compensation amount for the calendar year. Thus, the bonus is permissible under § 1026.36(d)(1)(iv)(B)(*1*) if it does not exceed 10 percent of the loan originator's total compensation, which in this example consists of the individual loan originator's salary and commissions, the contribution to the 401(k) plan (if the loan originator organization elects to include the contribution in the total compensation amount), and the performance bonus. Therefore, if the loan originator organization elects to include the 401(k) contribution in total compensation for these purposes, the loan originator organization may pay the individual loan originator a performance bonus of up to $20,000 (*i.e.,* 10 percent of $200,000 in total compensation). If the loan originator organization does not include the 401(k) contribution in calculating total compensation, or the 401(k) contribution is actually made in January of the following calendar year (in which case it cannot be included in total compensation for the initial calendar year), the bonus may be up to $18,333.33. If the loan originator organization includes neither the 401(k) contribution nor the performance bonus in the total compensation amount, the bonus may not exceed $16,500.

**2.** Assume that the compensation during a given calendar year of an individual loan originator employed by a creditor consists of only salary and commissions, and the individual loan originator does not participate in a designated tax-advantaged defined contribution plan. Assume further that the creditor uses a calendar-year accounting period. At the end of the calendar year, the creditor pays the individual loan originator two bonuses: A "performance" bonus based on the individual loan originator's aggregate loan volume for a calendar year

that is paid out of a bonus pool determined with reference to the profits of the mortgage origination business unit, and a year-end "holiday" bonus in the same amount to all company employees that is paid out of a company-wide bonus pool. Because the performance bonus is paid out of a bonus pool that is determined with reference to the profits of the mortgage origination business unit, it is compensation that is determined with reference to mortgage-related business profits, and the bonus is therefore subject to the 10-percent total compensation limit. If the company-wide bonus pool from which the "holiday" bonus is paid is derived in part from profits of the creditor's mortgage origination business unit, then the combination of the "holiday" bonus and the performance bonus is subject to the 10-percent total compensation limit. The "holiday" bonus is not subject to the 10-percent total compensation limit if the bonus pool is determined with reference only to the profits of business units other than the mortgage origination business unit, as determined in accordance with reasonable accounting principles. If the "performance" bonus and the "holiday" bonus in the aggregate do not exceed 10 percent of the individual loan originator's total compensation, the bonuses may be paid under § 1026.36(d)(1)(iv)(B)(*1*) without the necessity of determining from which bonus pool they were paid or whether they were determined with reference to the profits of the creditor's mortgage origination business unit.

**G. Reasonable reliance by individual loan originator on accounting or statement by person paying compensation.** An individual loan originator is deemed to comply with its obligations regarding receipt of compensation under § 1026.36(d)(1)(iv)(B)(*1*) if the individual loan originator relies in good faith on an accounting or a statement provided by the person who determined the individual loan originator's compensation under a non-deferred profits-based compensation plan pursuant to § 1026.36(d)(1)(iv)(B)(*1*) and where the statement or accounting is provided within a reasonable time period following the person's determination.

**vi. Individual loan originators who originate ten or fewer transactions.** Assuming that the conditions in § 1026.36(d)(1)(iv)(A) are met, § 1026.36(d)(1)(iv)(B)(*2*) permits compensation to an individual loan originator under a non-deferred profits-based compensation plan even if the payment or contribution is directly or indirectly based on the terms of multiple individual loan originators' transactions if the individual is a loan originator (as defined in § 1026.36(a)(1)(i)) for ten or fewer consummated transactions during the 12-month period preceding the compensation determination. For example, assume a loan originator organization employs two individual loan originators who originate transactions subject to § 1026.36 during a given calendar year. Both employees are individual loan originators as defined in § 1026.36(a)(1)(ii), but only one of them (individual loan originator B) acts as a loan originator in the normal course of business, while the other (individual loan originator A) is called upon to do so only occasionally and regularly performs other duties (such as serving as a manager). In January of the following calendar year, the loan originator organization formally determines the financial performance of its mortgage business for the prior calendar year. Based on that determination, the loan originator organization on

February 1 decides to pay a bonus to the individual loan originators out of a company bonus pool. Assume that, between February 1 of the prior calendar year and January 31 of the current calendar year, individual loan originator A was the loan originator for eight consummated transactions, and individual loan originator B was the loan originator for 15 consummated transactions. The loan originator organization may award the bonus to individual loan originator A under § 1026.36(d)(1)(iv)(B)(*2*). The loan originator organization may not award the bonus to individual loan originator B relying on the exception under § 1026.36(d)(1)(iv)(B)(*2*) because it would not apply, although it could award a bonus pursuant to the 10-percent total compensation limit under § 1026.36(d)(1)(iv)(B)(*1*) if the requirements of that provision are complied with.

**4. Creditor's flexibility in setting loan terms.** Section 1026.36(d) also does not limit a creditor from offering or providing different loan terms to the consumer based on the creditor's assessment of the credit and other transactional risks involved. If a creditor pays compensation to a loan originator in compliance with § 1026.36(d), the creditor may recover the costs of the loan originator's compensation and other costs of the transaction by charging the consumer points or fees or a higher interest rate or a combination of these. Thus, in these transactions, a creditor may charge a higher interest rate to a consumer who will pay fewer of the costs of the transaction at or before closing or it may offer the consumer a lower rate if the consumer pays more of the transaction costs at or before closing. For example, if the consumer pays half of the transaction costs at or before closing, a creditor may charge an interest rate of 6.0 percent but, if the consumer pays none of the transaction costs at or before closing, the creditor may charge an interest rate of 6.5 percent. In these transactions, a creditor also may offer different consumers varying interest rates that include a consistent interest rate premium to recoup the loan originator's compensation through increased interest paid by the consumer (such as by consistently adding 0.25 percentage points to the interest rate on each transaction where the loan originator is compensated based on a percentage of the amount of the credit extended).

**5. Effect of modification of transaction terms.** Under § 1026.36(d)(1), a loan originator's compensation may not be based on any of the terms of a credit transaction. Thus, a creditor and a loan originator may not agree to set the loan originator's compensation at a certain level and then subsequently lower it in selective cases (such as where the consumer is able to obtain a lower rate from another creditor). When the creditor offers to extend credit with specified terms and conditions (such as the rate and points), the amount of the originator's compensation for that transaction is not subject to change (increase or decrease) based on whether different credit terms are negotiated. For example, if the creditor agrees to lower the rate that was initially offered, the new offer may not be accompanied by a reduction in the loan originator's compensation. Thus, while the creditor may change credit terms or pricing to match a competitor, to avoid triggering high-cost mortgage provisions, or for other reasons, the loan originator's compensation on that transaction may not be changed for

those reasons. A loan originator therefore may not agree to reduce its compensation or provide a credit to the consumer to pay a portion of the consumer's closing costs, for example, to avoid high-cost mortgage provisions. A loan originator organization may not reduce its own compensation in a transaction where the loan originator organization receives compensation directly from the consumer, with or without a corresponding reduction in compensation paid to an individual loan originator. See comment 36(d)(1)-7 for further interpretation.

**6. Periodic changes in loan originator compensation and terms of transactions.** Section 1026.36 does not limit a creditor or other person from periodically revising the compensation it agrees to pay a loan originator. However, the revised compensation arrangement must not result in payments to the loan originator that are based on the terms of a credit transaction. A creditor or other person might periodically review factors such as loan performance, transaction volume, as well as current market conditions for loan originator compensation, and prospectively revise the compensation it agrees to pay to a loan originator. For example, assume that during the first six months of the year, a creditor pays $3,000 to a particular loan originator for each loan delivered, regardless of the terms of the transaction. After considering the volume of business produced by that loan originator, the creditor could decide that as of July 1, it will pay $3,250 for each loan delivered by that particular loan originator, regardless of the terms of the transaction. No violation occurs even if the loans made by the creditor after July 1 generally carry a higher interest rate than loans made before that date, to reflect the higher compensation.

**7. Permitted decreases in loan originator compensation.** Notwithstanding comment 36(d)(1)-5, § 1026.36(d)(1) does not prohibit a loan originator from decreasing its compensation to defray the cost, in whole or part, of an unforeseen increase in an actual settlement cost over an estimated settlement cost disclosed to the consumer pursuant to section 5(c) of RESPA or an unforeseen actual settlement cost not disclosed to the consumer pursuant to section 5(c) of RESPA. For purposes of comment 36(d)(1)-7, an increase in an actual settlement cost over an estimated settlement cost or a cost not disclosed is unforeseen if the increase occurs even though the estimate provided to the consumer is consistent with the best information reasonably available to the disclosing person at the time of the estimate. For example:

**i.** Assume that a consumer agrees to lock an interest rate with a creditor in connection with the financing of a purchase-money transaction. A title issue with the property being purchased delays closing by one week, which in turn causes the rate lock to expire. The consumer desires to re-lock the interest rate. Provided that the title issue was unforeseen, the loan originator may decrease the loan originator's compensation to pay for all or part of the rate-lock extension fee.

**ii.** Assume that when applying the tolerance requirements under the regulations implementing RESPA sections 4 and 5(c), there is a tolerance violation of $70 that must be cured. Provided the violation was unforeseen, the rule is not violated if the individual loan originator's compensation decreases to pay for all or part of the amount required to cure the tolerance violation.

**8. Record retention. See** comment 25(c)(2)-1 and -2 for commentary on complying with the record retention requirements of § 1026.25(c)(2) as they apply to § 1026.36(d)(1).

**9. Amount of credit extended.** A loan originator's compensation may be based on the amount of credit extended, subject to certain conditions. Section 1026.36(d)(1) does not prohibit an arrangement under which a loan originator is paid compensation based on a percentage of the amount of credit extended, provided the percentage is fixed and does not vary with the amount of credit extended. However, compensation that is based on a fixed percentage of the amount of credit extended may be subject to a minimum and/or maximum dollar amount, as long as the minimum and maximum dollar amounts do not vary with each credit transaction. For example:

**i.** A creditor may offer a loan originator 1 percent of the amount of credit extended for all loans the originator arranges for the creditor, but not less than $1,000 or greater than $5,000 for each loan.

**ii.** A creditor may *not* offer a loan originator 1 percent of the amount of credit extended for loans of $300,000 or more, 2 percent of the amount of credit extended for loans between $200,000 and $300,000, and 3 percent of the amount of credit extended for loans of $200,000 or less.

**10. Amount of credit extended under a reverse mortgage.** For closed-end reverse mortgage loans, the "amount of credit extended" for purposes of § 1026.36(d)(1) means either:

**i.** The maximum proceeds available to the consumer under the loan; or

**ii.** The maximum claim amount as defined in 24 CFR 206.3 if the mortgage is subject to 24 CFR part 206, or the appraised value of the property, as determined by the appraisal used in underwriting the loan, if the mortgage is not subject to 24 CFR part 206.

## 36(d)(2) Payments by Persons Other Than Consumer

### 36(d)(2)(i) Dual Compensation

1. **Compensation in connection with a particular transaction.** Under § 1026.36(d)(2)(i)(A), if any loan originator receives compensation directly from a consumer in a transaction, no other person may provide any compensation to any loan originator, directly or indirectly, in connection with that particular credit transaction, whether before, at, or after consummation. See comment 36(d)(2)(i)-2 discussing compensation received directly from the consumer. The restrictions imposed under § 1026.36(d)(2)(i) relate only to payments, such as commissions, that are specific to, and paid solely in connection with, the transaction in which the consumer has paid compensation directly to a loan originator. In a transaction where a loan originator receives compensation directly from a consumer, a creditor still may provide funds for the benefit of the consumer in that transaction, provided such funds are applied solely toward costs of the transaction other than loan originator compensation. Section 1026.36(d)(2)(i)(C) provides that, if a loan originator organization receives compensation directly from a consumer, the loan originator organization may provide compensation to individual loan originators, and the individual loan originator may receive compensation from the loan originator organization, subject to the restriction in § 1026.36(d)(1). (See comment 36(a)(1)-1.i for an explanation of the use of the term "loan originator organization" and "individual loan originator" for purposes of § 1026.36(d)(2)(i)(C).) For example, payments by a mortgage broker to an individual loan originator as compensation for originating a specific credit transaction do not violate § 1026.36(d)(2)(i)(A) even if the consumer directly pays the mortgage broker a fee in connection with that transaction. However, neither the mortgage broker nor the individual loan originator can receive compensation from the creditor in connection with that particular credit transaction.

2. **Compensation received directly from a consumer.**

**i.** Payments by a consumer to a loan originator from loan proceeds are considered compensation received directly from the consumer, while payments derived from an increased interest rate are not considered compensation received directly from the consumer. However, payments by a consumer to the creditor are not considered payments to the loan originator that are received directly from the consumer whether they are paid directly by the consumer (for example, in cash or by check) or out of the loan proceeds. See the definition of "compensation" in § 1026.36(a)(3) and related commentary.

**ii.** Funds from the creditor that will be applied to reduce the consumer's settlement charges, including origination fees paid by a creditor to the loan originator, that are characterized on the disclosures made pursuant to the Real Estate Settlement Procedures Act as a "credit" are nevertheless not considered to be received by the loan originator directly from the consumer for purposes of § 1026.36(d)(2)(i).

**iii.** Section 1026.36(d)(2)(i)(B) provides that compensation received directly from a consumer includes payments to a loan originator made pursuant to an agreement between the consumer and a person other than the creditor or its affiliates, under which such other person agrees to provide funds toward the consumer's costs of the transaction (including loan originator compensation). Compensation to a loan originator is sometimes paid on the consumer's behalf by a person other than a creditor or its affiliates, such as a non-creditor seller, home builder, home improvement contractor or real estate broker or agent. Such payments to a loan originator are considered compensation received directly from the consumer for purposes of § 1026.36(d)(2) if they are made pursuant to an agreement between the consumer and the person other than the creditor or its affiliates. State law determines whether there is an agreement between the parties. *See* § 1026.2(b)(3). The parties do not have to agree specifically that the payments will be used to pay for the loan originator's compensation, but just that the person will make a payment to the loan originator toward the consumer's costs of the transaction, or "closing costs" and the loan originator retains such payment. For example, assume that a non-creditor seller (that is not the creditor's affiliate) has an agreement with the consumer to pay $1,000 of the consumer's closing costs on a transaction. Any of the $1,000 that is paid by the non-creditor seller to the loan originator and constitutes "compensation" as defined in § 1026.36(a)(3) to the loan originator is compensation received directly from the consumer, even if the agreement does not specify that some or all of $1,000 must be used to compensate the loan originator. Nonetheless, payments by the consumer to the creditor are not payments to the loan originator that are received directly from the consumer. *See* comment 36(d)(2)(i)-2.i. Accordingly, payments in the transaction to the creditor on behalf of the consumer by a person other than the creditor or its affiliates are not payments to the loan originator that are received directly from the consumer.

## 36(d)(3) Affiliates

1. For purposes of § 1026.36(d), affiliates are treated as a single "person." The term "affiliate" is defined in § 1026.32(b)(2). For example, assume a parent company has two mortgage lending subsidiaries. Under § 1026.36(d)(1), subsidiary "A" could not pay a loan originator greater compensation for a loan with an interest rate of 8 percent than it would pay for a loan with an interest rate of 7 percent. If the loan originator may deliver loans to both subsidiaries, they must compensate the loan originator in the same manner. Accordingly, if the loan originator delivers the loan to subsidiary "B" and the interest rate is 8 percent, the originator must receive the same compensation that would have been paid by subsidiary A for a loan with a rate of either 7 or 8 percent.

## 36(e) Prohibition on Steering

1. **Compensation.** See comment 36(d)(1)-1 for guidance on compensation that is subject to § 1026.36(e).

## 36(e)(1) General

1. **Steering.** For purposes of § 1026.36(e), directing or "steering" a consumer to consummate a particular credit transaction means advising, counseling, or otherwise influencing a consumer to accept that transaction. For such actions to constitute steering, the consumer must actually consummate the transaction in question. Thus, § 1026.36(e)(1) does not address the actions of a loan originator if the consumer does not actually obtain a loan through that loan originator.

2. **Prohibited conduct.** Under § 1026.36(e)(1), a loan originator may not direct or steer a consumer to consummate a transaction based on the fact that the loan originator would increase the amount of compensation that the loan originator would receive for that transaction compared to other transactions, unless the consummated transaction is in the consumer's interest.

i. In determining whether a consummated transaction is in the consumer's interest, that transaction must be compared to other possible loan offers available through the originator, if any, and for which the consumer was likely to qualify, at the time that transaction was offered to the consumer. Possible loan offers are available through the loan originator if they could be obtained from a creditor with which the loan originator regularly does business. Section 1026.36(e)(1) does not require a loan originator to establish a business relationship with any creditor with which the loan originator does not already do business. To be considered a possible loan offer available through the loan originator, an offer need not be extended by the creditor; it need only be an offer that the creditor likely would extend upon receiving an application from the applicant, based on the creditor's current credit standards and its current rate sheets or other similar means of communicating its current credit terms to the loan originator. An originator need not inform the consumer about a potential transaction if the originator makes a good faith determination that the consumer is not likely to qualify for it.

ii. Section 1026.36(e)(1) does not require a loan originator to direct a consumer to the transaction that will result in a creditor paying the least amount of compensation to the originator. However, if the loan originator reviews possible loan offers available from a significant number of the creditors with which the originator regularly does business, and the originator directs the consumer to the transaction that will result in the least amount of creditor-paid compensation for the loan originator, the requirements of § 1026.36(e)(1) are deemed to be satisfied. In the case where a loan originator directs the consumer to the transaction that will result in a greater amount of creditor-paid compensation for the loan originator, § 1026.36(e)(1) is not violated if the terms and conditions on that transaction compared to the other possible loan offers available through the originator, and for which the consumer likely qualifies, are the same. A loan originator who is an employee of the creditor on a transaction may not obtain compensation that is based on the transaction's terms or conditions pursuant to § 1026.36(d)(1), and compliance with that provision by such a loan

originator also satisfies the requirements of § 1026.36(e)(1) for that transaction with the creditor. However, if a creditor's employee acts as a broker by forwarding a consumer's application to a creditor **other than** the loan originator's employer, such as when the employer does not offer any loan products for which the consumer would qualify, the loan originator is not an employee of the creditor in that transaction and is subject to § 1026.36(e)(1) if the originator is compensated for arranging the loan with the other creditor.

iii. See the commentary under § 1026.36(e)(3) for additional guidance on what constitutes a "significant number of creditors with which a loan originator regularly does business" and guidance on the determination about transactions for which "the consumer likely qualifies."

3. **Examples.** Assume a loan originator determines that a consumer likely qualifies for a loan from Creditor A that has a fixed interest rate of 7 percent, but the loan originator directs the consumer to a loan from Creditor B having a rate of 7.5 percent. If the loan originator receives more in compensation from Creditor B than the amount that would have been paid by Creditor A, the prohibition in § 1026.36(e) is violated unless the higher-rate loan is in the consumer's interest. For example, a higher-rate loan might be in the consumer's interest if the lower-rate loan has a prepayment penalty, or if the lower-rate loan requires the consumer to pay more in up-front charges that the consumer is unable or unwilling to pay or finance as part of the loan amount.

## 36(e)(2) Permissible Transactions

1. **Safe harbors.** A loan originator that satisfies § 1026.36(e)(2) is deemed to comply with § 1026.36(e)(1). A loan originator that does not satisfy § 1026.36(e)(2) is not subject to any presumption regarding the originator's compliance or noncompliance with § 1026.36(e)(1).

2. **Minimum number of loan options.** To obtain the safe harbor, § 1026.36(e)(2) requires that the loan originator present loan options that meet the criteria in § 1026.36(e)(3)(i) for each type of transaction in which the consumer expressed an interest. As required by § 1026.36(e)(3)(ii), the loan originator must have a good faith belief that the options presented are loans for which the consumer likely qualifies. If the loan originator is not able to form such a good faith belief for loan options that meet the criteria in § 1026.36(e)(3)(i) for a given type of transaction, the loan originator may satisfy § 1026.36(e)(2) by presenting all loans for which the consumer likely qualifies and that meet the other requirements in § 1026.36(e)(3) for that given type of transaction. A loan originator may present to the consumer any number of loan options, but presenting a consumer more than four loan options for each type of transaction in which the consumer expressed an interest and for which the consumer likely qualifies would not likely help the consumer make a meaningful choice.

## 36(e)(3) Loan Options Presented

1. **Significant number of creditors.** A significant number of the creditors with which a loan originator regularly does business is three or more of those creditors. If the loan originator regularly does business with fewer than three creditors, the originator is deemed to comply by obtaining loan options from all the creditors with which it regularly does business. Under § 1026.36(e)(3)(i), the loan originator must obtain loan options from a significant number of creditors with which the loan originator regularly does business, but the loan originator need not present loan options from all such creditors to the consumer. For example, if three loans available from one of the creditors with which the loan originator regularly does business satisfy the criteria in § 1026.36(e)(3)(i), presenting those and no options from any other creditor satisfies that section.

2. **Creditors with which loan originator regularly does business.** To qualify for the safe harbor in § 1026.36(e)(2), the loan originator must obtain and review loan options from a significant number of the creditors with which the loan originator regularly does business. For this purpose, a loan originator regularly does business with a creditor if:

i. There is a written agreement between the originator and the creditor governing the originator's submission of mortgage loan applications to the creditor;

ii. The creditor has extended credit secured by a dwelling to one or more consumers during the current or previous calendar month based on an application submitted by the loan originator; or

iii. The creditor has extended credit secured by a dwelling twenty-five or more times during the previous twelve calendar months based on applications submitted by the loan originator. For this purpose, the previous twelve calendar months begin with the calendar month that precedes the month in which the loan originator accepted the consumer's application.

3. **Lowest interest rate.** To qualify under the safe harbor in § 1026.36(e)(2), for each type of transaction in which the consumer has expressed an interest, the loan originator must present the consumer with loan options that meet the criteria in § 1026.36(e)(3)(i) for which the loan originator has a good faith belief that the consumer is likely to qualify. The criteria are: the loan with the lowest interest rate; the loan with the lowest total dollar amount of discount points, origination points or origination fees; and a loan with the lowest interest rate without negative amortization, a prepayment penalty, a balloon payment in the first seven years of the loan term, shared equity, or shared appreciation, or, in the case of a reverse mortgage, a loan without a prepayment penalty, shared equity, or shared appreciation. The loan with the lowest interest rate for which the consumer likely qualifies is the loan with the lowest rate the consumer can likely obtain, regardless of how many discount points, origination points or origination fees the consumer must pay to obtain it. To identify the loan

with the lowest interest rate, for any loan that has an initial rate that is fixed for at least five years, the loan originator uses the initial rate that would be in effect at consummation. For a loan with an initial rate that is not fixed for at least five years:

i. If the interest rate varies based on changes to an index, the originator uses the fully-indexed rate that would be in effect at consummation without regard to any initial discount or premium.

ii. For a step-rate loan, the originator uses the highest rate that would apply during the first five years.

4. **Transactions for which the consumer likely qualifies.** To qualify under the safe harbor in § 1026.36(e)(2), the loan originator must have a good faith belief that the loan options presented to the consumer pursuant to § 1026.36(e)(3) are transactions for which the consumer likely qualifies. The loan originator's belief that the consumer likely qualifies should be based on information reasonably available to the loan originator at the time the loan options are presented. In making this determination, the loan originator may rely on information provided by the consumer, even if it subsequently is determined to be inaccurate. For purposes of § 1026.36(e)(3), a loan originator is not expected to know all aspects of each creditor's underwriting criteria. But pricing or other information that is routinely communicated by creditors to loan originators is considered to be reasonably available to the loan originator, for example, rate sheets showing creditors' current pricing and the required minimum credit score or other eligibility criteria.

## 36(f) Loan Originator Qualification Requirements

1. **Scope.** Section 1026.36(f) sets forth qualification requirements that a loan originator must meet. As provided in § 1026.36(a)(1) and accompanying commentary, the term "loan originator" includes natural persons and organizations and does not exclude creditors for purposes of the qualification requirements in § 1026.36(f).

2. **Licensing and registration requirements.** Section 1026.36(f) requires loan originators to comply with applicable State and Federal licensing and registration requirements, including any such requirements imposed by the SAFE Act and its implementing regulations and State laws. SAFE Act licensing and registration requirements apply to individual loan originators, but many State licensing and registration requirements apply to loan originator organizations as well.

3. **No effect on licensing and registration requirements.** Section 1026.36(f) does not affect which loan originators must comply with State and Federal licensing and registration requirements. For example, the fact that the definition of loan originator in § 1026.36(a)(1) differs somewhat from that in the SAFE Act does not affect who must comply with the SAFE Act. To illustrate, assume an individual is an employee of an organization that a State has

determined to be a bona fide nonprofit organization and the State has not subjected the employee to that State's SAFE Act loan originator licensing. If that same individual meets the definition of loan originator in § 1026.36(a)(1), the individual is subject to the requirements of § 1026.36, but the State may continue not to subject the employee to that State's SAFE Act licensing requirements. Similarly, the qualification requirements imposed under § 1026.36(f) do not add to or affect the criteria that States must consider in determining whether a loan originator organization is a bona fide nonprofit organization under the SAFE Act.

## Paragraph 36(f)(1)

1. **Legal existence and foreign qualification.** Section 1026.36(f)(1) requires a loan originator organization to comply with applicable State law requirements governing the legal existence and foreign qualification of the loan originator organization. Covered State law requirements include those that must be complied with to bring the loan originator organization into legal existence, to maintain its legal existence, to be permitted to transact business in another State, or to facilitate service of process. For example, covered State law requirements include those for incorporation or other type of legal formation and for designating and maintaining a registered agent for service of process. State law requirements to pay taxes and other requirements that do not relate to legal accountability of the loan originator organization to consumers are outside the scope of § 1026.36(f)(1).

## Paragraph 36(f)(2)

1. **License or registration.** Section 1026.36(f)(2) requires the loan originator organization to ensure that individual loan originators who work for it are licensed or registered in compliance with the SAFE Act and other applicable law. The individual loan originators who work for a loan originator organization include individual loan originators who are its employees or who operate under a brokerage agreement with the loan originator organization. Thus, for example, a brokerage is responsible for verifying that the loan originator individuals who work directly for it are licensed and registered in accordance with applicable law, whether the individual loan originators are its employees or independent contractors who operate pursuant to a brokerage agreement. A loan originator organization can meet this duty by confirming the registration or license status of an individual at *www.nmlsconsumeraccess.org.*

## Paragraph 36(f)(3)

1. **Unlicensed individual loan originators.** Section 1026.36(f)(3) sets forth actions that a loan originator organization must take for any of its individual loan originator employees who are not required to be licensed and are not licensed as a loan originator pursuant to the SAFE Act. Individual loan originators who are not subject to SAFE Act licensing generally

include employees of depository institutions and their Federally regulated subsidiaries and employees of bona fide nonprofit organizations that a State has exempted from licensing under the criteria in 12 CFR 1008.103(e)(7).

## Paragraph 36(f)(3)(i)

1. **Criminal and credit histories.** Section 1026.36(f)(3)(i) requires the loan originator organization to obtain, for any of its individual loan originator employees who is not required to be licensed and is not licensed as a loan originator pursuant to the SAFE Act, a criminal background check, a credit report, and information related to any administrative, civil, or criminal determinations by any government jurisdiction. The requirement applies to individual loan originator employees who were hired on or after January 1, 2014 (or whom the loan originator organization hired before this date but for whom there were no applicable statutory or regulatory background standards in effect at the time of hire or before January 1, 2014, used to screen the individual). A credit report may be obtained directly from a consumer reporting agency or through a commercial service. A loan originator organization with access to the NMLSR can meet the requirement for the criminal background check by reviewing any criminal background check it receives upon compliance with the requirement in 12 CFR 1007.103(d)(1) and can meet the requirement to obtain information related to any administrative, civil, or criminal determinations by any government jurisdiction by obtaining the information through the NMLSR. Loan originator organizations that do not have access to these items through the NMLSR may obtain them by other means. For example, a criminal background check may be obtained from a law enforcement agency or commercial service. Information on any past administrative, civil, or criminal findings (such as from disciplinary or enforcement actions) may be obtained from the individual loan originator.

2. **Retroactive obtaining of information not required.** Section 1026.36(f)(3)(i) does not require the loan originator organization to obtain the covered information for an individual whom the loan originator organization hired as a loan originator before January 1, 2014, and screened under applicable statutory or regulatory background standards in effect at the time of hire. However, if the individual subsequently ceases to be employed as a loan originator by that loan originator organization, and later resumes employment as a loan originator by that loan originator organization (or any other loan originator organization), the loan originator organization is subject to the requirements of § 1026.36(f)(3)(i).

## Paragraph 36(f)(3)(ii).

1. **Scope of review.** Section 1026.36(f)(3)(ii) requires the loan originator organization to review the information that it obtains under § 1026.36(f)(3)(i) and other reasonably available information to determine whether the individual loan originator meets the standards in § 1026.36(f)(3)(ii). Other reasonably available information includes any information the loan originator organization has obtained or would obtain as part of a reasonably prudent hiring

process, including information obtained from application forms, candidate interviews, other reliable information and evidence provided by a candidate, and reference checks. The requirement applies to individual loan originator employees who were hired on or after January 1, 2014 (or whom the loan originator organization hired before this date but for whom there were no applicable statutory or regulatory background standards in effect at the time of hire or before January 1, 2014, used to screen the individual).

2. **Retroactive determinations not required.** Section 1026.36(f)(3)(ii) does not require the loan originator organization to review the covered information and make the required determinations for an individual whom the loan originator organization hired as a loan originator on or before January 1, 2014 and screened under applicable statutory or regulatory background standards in effect at the time of hire. However, if the individual subsequently ceases to be employed as a loan originator by that loan originator organization, and later resumes employment as a loan originator by that loan originator organization (or any other loan originator organization), the loan originator organization employing the individual is subject to the requirements of § 1026.36(f)(3)(ii).

3. **Subsequent determinations.** The loan originator organization must make the required determinations for an individual before the individual acts as a loan originator. Subsequent reviews and assessments are required only if the loan originator organization knows of reliable information indicating that the individual loan originator likely no longer meets the required standards in § 1026.36(f)(3). For example, if the loan originator organization has knowledge of criminal conduct of its individual loan originator through a newspaper article, a previously obtained criminal background report, or the NMLSR, the loan originator organization must determine whether any resulting conviction, or any other information, causes the individual to fail to meet the standards in § 1026.36(f)(3)(ii), regardless of when the loan originator was hired or previously screened.

## Paragraph 36(f)(3)(ii)(B)

1. **Financial responsibility, character, and general fitness.** The determination of financial responsibility, character, and general fitness required under § 1026.36(f)(3)(ii)(B) requires an assessment of all information obtained pursuant to paragraph (f)(3)(i) and any other reasonably available information, including information that is known to the loan originator organization or would become known to the loan originator organization as part of a reasonably prudent hiring process. The absence of any significant adverse information is sufficient to support an affirmative determination that the individual meets the standards. A review and assessment of financial responsibility is sufficient if it considers, as relevant factors, the existence of current outstanding judgments, tax liens, other government liens, nonpayment of child support, or a pattern of bankruptcies, foreclosures, or delinquent accounts. A review and assessment of financial responsibility is not required to consider debts arising from medical expenses. A review and assessment of character and general

fitness is sufficient if it considers, as relevant factors, acts of unfairness or dishonesty, including dishonesty by the individual in the course of seeking employment or in connection with determinations pursuant to the qualification requirements of § 1026.36(f), and any disciplinary actions by regulatory or professional licensing agencies. No single factor necessarily requires a determination that the individual does not meet the standards for financial responsibility, character, or general fitness, provided that the loan originator organization considers all relevant factors and reasonably determines that, on balance, the individual meets the standards.

2. **Written procedures for making determinations.** A loan originator organization that establishes written procedures for determining whether individuals meet the financial responsibility, character, and general fitness standards under § 1026.36(f)(3)(ii)(B) and comment 36(f)(3)(ii)(B)-1 and follows those written procedures for an individual and complies with the requirement for that individual. Such procedures may provide that bankruptcies and foreclosures are considered under the financial responsibility standard only if they occurred within a recent timeframe established in the procedures. Such procedures are not required to include review of a credit score.

## Paragraph 36(f)(3)(iii)

1. **Training.** The periodic training required in § 1026.36(f)(3)(iii) must be sufficient in frequency, timing, duration, and content to ensure that the individual loan originator has the knowledge of State and Federal legal requirements that apply to the individual loan originator's loan origination activities. The training must take into consideration the particular responsibilities of the individual loan originator and the nature and complexity of the mortgage loans with which the individual loan originator works. An individual loan originator is not required to receive training on requirements and standards that apply to types of mortgage loans that the individual loan originator does not originate, or on subjects in which the individual loan originator already has the necessary knowledge and skill. Training may be delivered by the loan originator organization or any other person and may utilize workstation, internet, teleconferencing, or other interactive technologies and delivery methods. Training that a government agency or housing finance agency has established for an individual to originate mortgage loans under a program sponsored or regulated by a Federal, State, or other government agency or housing finance agency satisfies the requirement in § 1026.36(f)(3)(iii), to the extent that the training covers the types of loans the individual loan originator originates and applicable Federal and State laws and regulations. Training that the NMLSR has approved to meet the licensed loan originator continuing education requirement at § 1008.107(a)(2) of this chapter satisfies the requirement of § 1026.36(f)(3)(iii), to the extent that the training covers the types of loans the individual loan originator originates and applicable Federal and State laws and regulations. The training requirements under § 1026.36(f)(3)(iii) apply to individual loan originators regardless of when they were hired.

## 36(g) Name and NMLSR ID on Loan Documents

### Paragraph 36(g)(1)

1. **NMLSR ID.** Section 1026.36(g) requires a loan originator organization to include its name and NMLSR ID and the name and NMLSR ID of the individual loan originator on certain loan documents. As provided in § 1026.36(a)(1), the term "loan originator" includes creditors that engage in loan originator activities for purposes of this requirement. Thus, for example, if an individual loan originator employed by a bank originates a loan, the names and NMLSR IDs of the individual and the bank must be included on covered loan documents. The NMLSR ID is a number generally assigned by the NMLSR to individuals registered or licensed through NMLSR to provide loan origination services. For more information, see the SAFE Act sections 1503(3) and (12) and 1504 (12 U.S.C. 5102(3) and (12) and 5103), and its implementing regulations (12 CFR 1007.103(a) and 1008.103(a)(2)). A loan originator organization may also have an NMLSR unique identifier.

2. **Loan originators without NMLSR IDs.** An NMLSR ID is not required by § 1026.36(g) to be included on loan documents if the loan originator is not required to obtain and has not been issued an NMLSR ID. For example, certain loan originator organizations and individual loan originators who are employees of bona fide nonprofit organizations may not be required to obtain a unique identifier under State law. However, some loan originators may have obtained NMLSR IDs, even if they are not required to have one for their current jobs. If a loan originator organization or an individual loan originator has been provided a unique identifier by the NMLSR, it must be included on the covered loan documents, regardless of whether the loan originator organization or individual loan originator is required to obtain an NMLSR unique identifier. In any event, the name of the loan originator is required by § 1026.36(g) to be included on the covered loan documents.

3. **Inclusion of name and NMLSR ID.** Section 1026.36(g)(1) requires the inclusion of loan originator names and NMLSR IDs on each loan document. Those items need not be included more than once on each loan document on which loan originator names and NMLSR IDs are required, such as by including them on every page of a document.

### Paragraph 36(g)(1)(ii)

1. **Multiple individual loan originators.** If more than one individual meets the definition of a loan originator for a transaction, the name and NMLSR ID of the individual loan originator with primary responsibility for the transaction at the time the loan document is issued must be included. A loan originator organization that establishes and follows a reasonable, written policy for determining which individual loan originator has primary responsibility for the transaction at the time the document is issued complies with the requirement. If the individual loan originator with primary responsibility for a transaction at the time a document

is issued is not the same individual loan originator who had primary responsibility for the transaction at the time that a previously issued document was issued, the previously issued document is not required to be reissued merely to change a loan originator name and NMLSR ID.

## 36(i) Prohibition on financing credit insurance.

1. **Financing credit insurance premiums or fees.** In the case of single-premium credit insurance, a creditor violates § 1026.36(i) by adding the credit insurance premium or fee to the amount owed by the consumer at closing. In the case of monthly-pay credit insurance, a creditor violates § 1026.36(i) if, upon the close of the monthly period in which the premium or fee is due, the creditor includes the premium or fee in the amount owed by the consumer.

## 36(k) Negative amortization counseling.

## 36(k)(1) Counseling required.

1. **HUD-certified or -approved counseling organization.** For purposes of § 1026.36(k), organizations or counselors certified or approved by the U.S. Department of Housing and Urban Development (HUD) to provide the homeownership counseling required by § 1026.36(k) include counselors and counseling organizations that are certified or approved pursuant to section 106(e) of the Housing and Urban Development Act of 1968 (12 U.S.C. 1701x(e)) or 24 CFR part 214, unless HUD determines otherwise.

2. **Homeownership counseling.** The counseling required under § 1026.36(k) must include information regarding the risks and consequences of negative amortization.

3. **Documentation.** Examples of documentation that demonstrate a consumer has received the counseling required under § 1026.36(k) include a certificate of counseling, letter, or email from a HUD-certified or -approved counseling agency or counseling organization indicating that the consumer has received homeownership counseling.

4. **Processing applications.** Prior to receiving documentation that a consumer has received the counseling required under § 1026.36(k), a creditor may not extend credit to a first-time borrower in connection with a closed-end transaction secured by a dwelling that may result in negative amortization, but may engage in other activities, such as processing an application for such a transaction (by, for example, ordering an appraisal or title search).

## 36(k)(3) Steering prohibited.

1. See comments 34(a)(5)(vi)-1 and -2 for guidance concerning steering.