# EXHIBIT 37



VIA E-MAIL                                                                                         April 26, 2024

Jeffrey J. Jones
Stephen J. Cowen
Jones Day
150 West Jefferson, Suite 2100
Detroit, Michigan 48226

Rebekah Kcehowski
Jones Day
500 Grant Street, Suite 450
Pittsburgh, Pennsylvania 15219

   Re: *Therisa D. Escue, et al. v. United Wholesale Mortgage, LLC, et al.* No. 2:24-cv-10853
      (E.D. Mich.)

Dear Counsel:

  We write on behalf of Plaintiffs in the above-referenced action (the "Action") in response to your April 17, 2024 letter and to address certain misconduct your client has engaged in raising time sensitive concerns about UWM's and its counsel's defense of the Action. In short, since Plaintiffs filed their Complaint, it has become clear that your client is engaged in an extra-judicial campaign to interfere with the administration of justice in this Action. UWM's misconduct and the unfounded allegations in your April 17 letter are addressed below.

### I. Improper Conduct by UWM and Defense Counsel

  Since Plaintiffs initiated the Action, UWM and its counsel appear to have been engaged in an improper effort to: (i) interfere with Plaintiffs' attorney-client relationships with both Boies Schiller Flexner LLP ("BSF") and Dickinson Wright PLLC ("DW"); (ii) disseminate false and disparaging statements regarding Plaintiffs and their counsel; (iii) inappropriately contact material witnesses; and (iv) improperly contact and harass Plaintiffs in the action, as well as potential members of the class. This conduct violates applicable law and rules of professional ethics.

#### A. Interfering with Plaintiffs' Attorney-Client Relationships

  Just days after Plaintiffs filed this case, UWM improperly attempted to interfere with Plaintiffs' already established attorney-client relationship with DW. Through its representative, UWM, for example, sent to DW threatening communications in an attempt to coerce DW to withdraw from the case and their representation of Plaintiffs. Jones Day is one of the largest corporate law firms in the world, and UWM is one of the most powerful corporations in Michigan.



UWM's communications to Michigan-based counsel threatening to sue DW, and to otherwise cause DW reputational harm and loss of business opportunities, were directly tied to UWM's demand that DW withdraw from the case and were thus intended to deprive Plaintiffs of having high-caliber legal representation in the Eastern District of Michigan. That is deeply concerning and raises material concerns about whether UWM (and, specifically, the attorneys through which it acts) are complying with their ethical obligations.

Indeed, your client's overt threats to sue DW (and others) were based on UWM's assertions that this Action was the product of purported ethical breaches. Those assertions are flat wrong, as we discuss below in Part II. But even setting that aside, and as you are aware, UWM and its lawyers cannot use the assertion of purported ethical breaches "to suggest to the client that the duty be vitiated for compensation or other concessions or emoluments"—i.e., for the concession that DW withdraw. Mich. Ethics Op. RI-78 (1991). The State Bar of Michigan has addressed similar situations in relevant ethics opinions, finding, for example, that a lawyer cannot use purported lawyer-misconduct "as a means of obtaining an advantageous resolution of the client's own matter." Mich. Ethics Op. RI-88. A lawyer (or its client) therefore cannot threaten to report (invented) attorney-misconduct as a bargaining chip, and yet that is exactly what UWM and its lawyers did here.

Making matters worse, UWM's allegations are frivolous and in bad faith. As you know, MRPC 3.1 prohibits lawyers from making frivolous or bad faith assertions, and MRPC 4.1 prohibits lawyers from knowingly making false statements; nor may any lawyer engage in conduct involving dishonesty, deceit, or misrepresentation. As a threshold matter, UWM's allegations are overtly in bad faith because, as discussed above, they were plainly motivated to try to bully DW into withdrawing as counsel to Plaintiffs in the Action. And they are frivolous because they are the product of UWM's and its counsel's profoundly inadequate understanding of the facts alleged in the Complaint and, in any event, are meritless under the relevant standards. UWM and its counsel, for instance, engaged in these communications *mere days after Plaintiffs filed their complaint*. The claims in the Complaint were developed after extensive factual and legal investigation—including analyzing massive amounts of data to identify UWM's as-yet undisputed overcharges to Plaintiffs and class members. UWM and its counsel cannot reasonably contend that they had sufficient time to carefully analyze the factual foundation of the Action or its genesis, and then to develop a non-frivolous basis for its immediate threats of sanctions, grievances, and litigation. In fact, confirming UWM's and Jones Day's inadequate investigation to support its spurious, cynical threats, the allegations in your letter do not withstand the slightest scrutiny, as discussed below in Part II. UWM effectively conceded this, having requested a 60-day extension of its time to respond to the Complaint so that it could assess Plaintiffs' allegations and claims.

In short, your conduct toward Plaintiffs' counsel raises serious questions about your firm's willingness and ability to abide its ethical duties, even in the face of your client's apparent demands that it not. Please cease and desist, and instruct your clients to cease and desist, from making any communications to any counsel of record for Plaintiffs with any intention to interfere with their representation of Plaintiffs.

### B. Deletion of Evidence and Improper Communications with Witnesses

Since Plaintiffs filed their Complaint, we also are aware that UWM immediately began to delete evidence from the public domain. We likewise have evidence that UWM, directly or indirectly, contacted known fact witnesses.

As you know, Jones Day has an affirmative duty to prevent its clients from causing spoliation of relevant evidence:

> [o]therwise, the lawyer risks violating MRPC 3.4(a), which provides that a lawyer shall not unlawfully obstruct another party's access to evidence; . . . or assist another person to do any such act. The Comment to the Rule emphasizes that: [d]ocuments and other items of evidence are often essential to establish a claim or defense . . . [T]he right of an opposing party . . . to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is . . . concealed or destroyed.

*See* Mich. Ethics Op. RI-345 (2008) (internal quotations omitted). The Opinion points out that "Legal scholars have suggested that the term 'unlawful' in Rule 3.4(a) reaches conduct that violates discovery obligations." *Id.* (citations omitted).

*First*, after Plaintiffs filed the Complaint, UWM deleted evidence on various websites showing its blatant misrepresentations that all the so-called "independent" brokers with whom it does business purportedly "shop dozens of lenders." For example, advertisements on UWM's YouTube page for its FindAMortgageBroker.com directory, which were accessible on the day Plaintiffs filed their Complaint, have since disappeared.[1] At best (from an ethics perspective), UWM's immediate decision to do so is an admission of wrongdoing. But regardless of whether it is attributable to UWM suddenly forming a conscience as to its wrongdoing, it appears plain that it had the additional purpose of obstructing Plaintiffs' access to evidence. And that would be a violation of MRPC 3.4(a). *See also* Fed. R. Civ. Pro. 37(e).

*Second*, in addition to attempting to obscure the documentary record, we have acquired evidence that UWM has contacted brokers and even offered them value in exchange for them continuing with their unlawful behavior. In one particularly bold (and blanket) communication, UWM issued a statement, dated April 9, 2024, addressed to its "valued Partners" (that is, mortgage brokers) stating:

> It is not uncommon nor illegal for a broker to send most or all of their business to a specific lender… We are 100% confident nothing

---

[1] *See* https://www.youtube.com/watch?v=FibLrSmjjO0&t=23s; https://www.youtube.com/watch?v=-X4dvNICep4.



needs to change or will change because of Hunterbrook's disinformation. The only way they win is if UWM or brokers change behavior. If any of our Partners get roped into their frivolous lawsuit, UWM will cover your attorneys' fees in connection with these fraudulent claims.[2]

On the merits, UWM's public statement telling so-called "independent brokers" that there is nothing illegal about them sending "all of their business to" UWM is remarkable. As the Complaint makes clear, over 8,000 "independent" brokers have referred 99% or more of their borrowers to UWM—amounting to hundreds of thousands of loans—despite the fact that UWM's fees and rates exceeded those of offerings available from other wholesale lenders. If Jones Day agrees with UWM's statement, please so state.

It also is deeply problematic from an ethical perspective. Mr. Ishbia transparently is offering brokers value—cash—on the overt threat that the only way they lose is if they "change behavior." The unlawful implications of that are many. For example, this is a clear tactic to motivate so-called "independent" brokers to continue what is clearly unlawful behavior: funneling loans at extreme rates to UWM while they and Mr. Ishbia falsely hold these brokers out to unwitting consumers as being "independent" and shopping around. UWM and its lawyers cannot reasonably take the position that it is lawful and ethical for UWM to fund ongoing fraud.

As another example, Mr. Ishbia's cash offer to brokers under UWM's lawyers' supervision also is a clear effort to induce them to remain loyal, toe the enterprise's line, and to avoid cooperating with Plaintiffs' continuing investigation of UWM's wrongdoing. That violates MRPC 3.4(f)'s prohibition on lawyers requesting any person other than a client, agent of a client, or employee to refrain from voluntarily giving relevant information to another party, unless the lawyer "reasonably believes that the person's interests will not be adversely affected by refraining from giving such information." And you and UWM know full-well that the "interests" of brokers are not aligned. For example, some brokers are identified in the Class Action Complaint as UWM's co-conspirators, and some are not. Some brokers have previously initiated their own litigation against UWM for anti-competitive conduct, some have not. And many brokers believe it is in their best interest to provide evidence to Plaintiffs' counsel—as evidenced by their desire to participate as whistleblowers. UWM has no "reasonable" basis under MRPC 3.4(f) to presume no broker's interests will be adversely impacted by withholding information, and therefore UWM's mass communications are impermissible. To the extent UWM's counsel approved these messages, it appears they have violated their professional obligations.

C. Dissemination of False and Disparaging Information About the Lawsuit

MRPC 4.1 states that "[i]n the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person." UWM and its lawyers have

---

[2] UWM's Linkedin Page, Apr. 9, 2024, https://www.linkedin.com/posts/united-wholesale-mortgage_to-our-valued-partners-activity-7183445571997728769-QFQi?utm_source=share&utm_medium=member_desktop.

4



violated these rules by publishing and disseminating materially false factual and legal statements to third parties in at least three ways.

*First*, as discussed above, in UWM's April 9, 2024 statement, it asserted that "[m]ortgage brokers on average use 3-5 lenders" and compare the "rate and cost/fees," but that it is nevertheless perfectly legal for brokers to send "all their business" to UWM. That is a materially false statement and UWM knows it.

*Second*, UWM also has portrayed the pending litigation as a "frivolous lawsuit" based on "lies" and "fraudulent claims" filed by "ambulance chasing attorneys" for the purpose of "scar[ing] consumers and brokers." As you know, the lawsuit plainly is not frivolous nor "fraudulent" (whatever that would mean), nor filed for the "purpose of 'scar[ing] consumers and brokers," nor filed by "ambulance chasing attorneys." And not only has UWM asserted these obviously false assertions but it supports them by deceptively claiming that two federal judges purportedly rejected the claims in this litigation despite—again—you knowing full-well that the claims in this case are far afield from the antitrust allegations at issue in the other referenced actions.

*Third*, Mr. Ishbia characterized the Action as follows: "That's Rocket Mortgage and Dan Gilbert doing Rocket Mortgage and Dan Gilbert things… and that's just what it's been funded by."[3] His statement in that regard is not only false, but deliberately misleading—BSF, DW, and Plaintiffs are not in any way being "funded by" Rocket Mortgage or Dan Gilbert to prosecute the Action.

The clear, intended effect of these misstatements is to malign class counsel, persuade brokers to remain loyal to the UWM enterprise, and to dissuade potential witnesses or whistleblowers from cooperating in the Action. UWM's counsel's participation in such statements violates MRPC 4.1.

D.    **Improper Contact with and Harassment of Plaintiffs**

Since Plaintiffs filed the Complaint, we have received evidence that UWM—potentially under its counsel's supervision—may have directly or indirectly contacted the named Plaintiffs as well as prospective class members.

Under MRPC 4.2: "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order." The model rules are clear, moreover, that: "A lawyer may not make a communication prohibited by this Rule through the acts of another." MRPC 4.2, cmt.4. The purpose of the "no contact" rule embodied in MRPC 4.2 is to "protect[] clients from being taken advantage of by an opposing lawyer either in (1) tricking a represented party into making ambiguous statements or revealing facts that could later be twisted, manipulated, and potentially

---

[3] @DuaneRankin, X.com, Apr. 4, 2024, https://twitter.com/DuaneRankin/status/1775943646304727198.

5

abused at trial; (2) distorting a represented party's thinking about the case and undermining confidence in that party's litigation position; (3) undermining a represented party's confidence in the lawyer and possibly creating a conflict of interest and a deterioration of trust between the client and the lawyer; and (4) protecting the client from inadvertently revealing confidential (and otherwise privileged) information to opposing counsel, including conversations with the lawyer." Mich. Ethics Op. RI-219 (1994).

On April 3, 2024, Mr. James Elkins—one of the "loyalist" brokers that UWM cultivated who, our investigation shows, funneled *100% of his loan volume to UWM in 2022* as explained in Plaintiffs' Complaint (at ¶ 120)—contacted Plaintiff Therisa Escue to ask "a quick question." Even after Ms. Escue referred him to her attorneys at BSF, Mr. Elkins continued, demanding that Ms. Escue "enlighten [him] what the heck is going on [sic]." And after UWM offered to pay the broker's attorneys' fees, these contacts continued through a third-party intermediary, asserting—nearly verbatim with UWM's April 9, 2024 press release—that the Action is purportedly a "fraud" and "frivolous." It is essentially a foregone conclusion that UWM *knew* that such improper contact would occur. Indeed, UWM's April 9, 2024 statement, along with its (i) efforts to malign the class action as purportedly "fraudulent" and "frivolous," (ii) pledge that UWM is "100% confident" that brokers do not need to "change behavior," (iii) promise to pay the attorneys' fees of any brokers "roped in" to the litigation, and (iv) characterization of Plaintiffs' counsel as "ambulance-chasers," all are transparently intended to embolden brokers to act without regard to the consequence of harassing class members and even the named Plaintiffs. This apparent scheme, and the predictable results, plainly violate the letter and purpose of MRPC 4.2. Please confirm whether UWM is paying the attorneys' fees for any brokers associated with Plaintiffs and cease and desist any further contact with our clients or other similar improper communications with potential class members.

\* \* \*

At bottom, in just a fifteen-day period between the filing of Plaintiffs' Complaint and your April 17 letter: (i) UWM immediately removed and deleted material evidence from the public domain; (ii) UWM, through its lawyers, threatened to bring sanctions and ethics complaints against DW unless they withdrew from representing Plaintiffs; (iii) UWM issued numerous demonstrably false statements disparaging Plaintiffs, their counsel, and the Action; (iv) UWM told so-called "independent" brokers to continue to funnel "most or all" of their loans to UWM, that the brokers would lose only if they "change[d] behavior," and that UWM would cover their resulting legal fees; (v) brokers who funnel loans to UWM predictably contacted at least one named Plaintiff as well as other potential class members repeating UWM's false and malicious statements about the action; and (vi) you sent to us an uninformed letter threatening us with a meritless sanctions motion based on Plaintiffs' proper investigation and development of their claims. This strategic scheme is as transparent as it is unethical. Plaintiffs have every reason to believe that this effort to undermine the Action's proper adjudication was executed with the knowledge and participation of UWM's lawyers, for which they may be held accountable. Jones Day, Howard & Howard



Attorneys PLLC, UWM, Mr. Ishbia, Mr. Wolfe, and their respective agents and/or affiliates are hereby directed to retain and preserve all documents related to the activities referred to above.[4]

## II. Plaintiffs' Counsel Has Not Engaged in Any Improper Communications

Your contentions that BSF has engaged in improper solicitation or advertising are not well-taken, uninformed, and meritless. In particular, your letter identifies three examples of communications that you claim were improper: (1) a voicemail and subsequent text to a UWM borrower; (2) a news article from a journalistic organization published the same day the complaint was filed that accurately identified BSF as a law firm investigating UWM's misconduct; and (3) standard document preservation letters sent to certain brokers. None of these examples supports your claim that BSF has violated any ethical rule.

### A. The Investigator's Outreach Was Appropriate

BSF appropriately investigated Plaintiffs' claims. It is fundamental, and your letter conspicuously omits, that attorneys are entitled to—and indeed, *encouraged to*—investigate potential class action claims and to obtain information useful to a lawsuit. *See Jerry Gradl Motors, Inc. v. ACV Auctions, Inc.*, 2022 WL 949795, at *5 (W.D.N.Y. Mar. 30, 2022) (noting that "Plaintiffs have a right to seek information from putative class members, including evidence in support of their claims") (citation omitted); *see also Mahboob v. Educ. Credit Mgmt. Corp.*, 2021 WL 7448532, at *2 (S.D. Cal. Mar. 31, 2021) ("[a]n attorney who directly contacts individuals for legitimate investigative reasons is not barred from representing those individuals if requested to do so") (citations omitted). Indeed, BSF—mindful of its ethical duties—undertook to investigate Plaintiffs' claims, resulting in their 103-page Complaint replete with statistical evidence that your clients and the brokers with whom UWM and Mr. Ishbia have colluded are routinely violating statutory and common law. Repeatedly, UWM's borrowers have confirmed what Plaintiffs allege: they were led to believe that their so-called "independent" broker shopped around for the best loan for them when, in reality, as a result of UWM's and these brokers' improper conduct, those borrowers were being funneled into UWM mortgages regardless of the other available options. In view of that and your clients' reputation, it is unsurprising that they would try to shut that investigation down even if it required them to assert specious claims. But notwithstanding your clients' meritless efforts to prevent the facts from emerging, your contention that any communications between investigators and borrowers to investigate Plaintiffs' claims somehow constitute a *per se* violation of anti-solicitation rules is simply wrong. They did not violate those rules and, to the contrary, BSF's investigation was appropriate and well-founded.

---

[4] We do not believe UWM is entitled to any of the information or disclosures requested in your letter—all of which is privileged, irrelevant, or both. To the extent you contend the information is relevant and discoverable, the appropriate procedure is to seek the disclosure through written discovery requests so the parties can raise objections and confer within the framework Rule 26. We have no objection to scheduling the Rule 26(f) conference as early as next week so that the parties can commence discovery.



In addition, you incorrectly object to a single text and a single voicemail from one investigator where (i) they are irrelevant to the Action; and (ii) your objection is founded on a contrived interpretation of those communications that cannot be squared with their actual text. Those messages are irrelevant because they were not sent to any of the named Plaintiffs in the Action. And your interpretation of them as reflecting purportedly improper "solicitation" is nonsensical. In particular, the text message clearly identified the investigator as a "private investigator" who was "working on behalf of a consumer protection investigation" and that she was "doing research to support a class action lawsuit." The reference to whether the recipient would like to be "included" refers to being included *in the investigation* that was expressly the subject of both her text message and her voicemail. Indeed, the voicemail likewise explained that the investigator was investigating the facts of the recipient's refinancing. The plain fact is that this investigator truthfully told a potential witness they were an investigator, conducting an investigation, and inquiring as to whether the witness wanted to participate in that investigation. That is normal, appropriate, and ethical. *See Jerry Gradl Motors, Inc.*, 2022 WL 949795, at *5.

For similar reasons, your objection to the investigator disclosing that the investigation was in connection with "a class action lawsuit" is bizarre. That was a true statement, and we do not understand why you would suggest that the investigator should have concealed that fact. As fundamentally, the investigator disclosing the truth to a potential witness cannot reasonably be equated to "masquerading as official or public service communications," as you contend, and you do not even attempt to explain why it would.

Moreover, the investigatory outreach to which you object ceased before we received your unfounded letter. The issue is therefore moot, there is nothing to "cease and desist" (or enjoin), and your threats of seeking injunctive relief to prevent Plaintiffs from properly investigating their claims are baseless both on the merits and procedurally.

Further, the cases you cite in support of your claims are easily distinguishable. In *Shibetti*, for instance, the telephone solicitation was not even claimed to be for the purpose of investigation. Indeed, the outreach occurred at the end of the litigation after the opt-in collective action had already been approved, and counsel effectively conceded it was for purposes of improper solicitation (and the consequence was a $1,000 fine). *Shibetti v. Z Rest., Diner & Lounge, Inc.*, 2021 WL 1738315, at *9 (E.D.N.Y. May 3, 2021). That is not in any way comparable to BSF's pre-suit investigation here, which is proper, as the courts repeatedly have confirmed. *Jerry Gradl Motors, Inc.*, 2022 WL 949795 at *5; *Mahboob*, 2021 WL 7448532 at *2.

Last, consistent with the theme of your letter featuring uninformed accusations, your claim that Console & Associates purportedly is "assisting and signing up putative class members for your lawsuit as well with website advertising" is false. BSF does not even know who Console & Associates is. Perhaps if Jones Day had undertaken some actual investigation of its own before levying the inflammatory accusations in its letter, it would have known that. But, of course, it did not.

8



### B. Hunterbrook's Reference to BSF Was Neither a "Solicitation" Nor Attorney "Advertising"

Your assertions that Hunterbrook's references to BSF on its website constitute improper "solicitation" and "advertising" are equally uninformed and meritless.

A communication constitutes an attorney "solicitation" only if it is, among other things, (i) an "advertisement initiated by or on behalf of a lawyer or law firm"; (ii) directed to, or targeted at, a specific recipient or group of recipients," and (iii) if "a significant motive for which is pecuniary gain." N.Y. R.P.C. 7.3(b); *see also* MRPC 7.3 (solicitation "denotes a communication initiated by or on behalf of a lawyer or law firm that is directed to a specific person the lawyer knows or reasonably should know needs legal services in a particular matter and that offers to provide, or reasonably can be understood as offering to provide, legal services for that matter."). Hunterbrook's article does not meet this standard.

*First*, Hunterbrook's article, and the references to BSF therein, were not issued by or on behalf of BSF. In particular, BSF did not review the "Solicitation" website page to which you object in the Hunterbrook article in advance of its publication. BSF does not control Hunterbrook, and BSF did not direct Hunterbrook to publish its article or website. BSF also did not participate in drafting Hunterbrook's article or website. And the same is true of the quotes by Sam Koppelman to which you object—BSF does not control Mr. Koppelman or what he says.

*Second*, even if the content of Hunterbrook's website could somehow be attributed to BSF (and it cannot), any references to BSF were not "directed to, or targeted at, a specific recipient or group of recipients." Rather, Hunterbrook's article and website were disseminated to the general public at large. Courts routinely hold that references to potential class actions disseminated broadly via the internet and through social media do not constitute direct solicitations of putative class members. *See, e.g.*, *Collado v. 450 N. River Drive, LLC*, 2023 WL 3567857, at *6 (S.D. Fla. May 18, 2023) (TikTok videos referencing the defendants and describing the claims in a putative collective action are not "solicitations"); *Campo v. Granite Servs. Int'l, Inc.*, 584 F. Supp. 3d 1337, 1348–49 (N.D. Ga. 2022) (social media posts encouraging defendants' employees to "reach out to [plaintiffs'] attorneys for more information" and to "[f]ind out if you may be owed unpaid wages" are not direct solicitations); *Hamric v. True N. Holdings, Inc*, 2016 WL 3912482, at *2 (N.D. Ohio July 20, 2016) (posts on Facebook about putative class action do not violate attorney "solicitation" or "advertisement" rules).

*Third*, even if the references to BSF in the Hunterbrook article could somehow be considered direct solicitations (they cannot be), they plainly were not for the purpose of pecuniary gain. As Hunterbrook explained, and consistent with BSF's ethical duties, *BSF was conducting an investigation into Plaintiffs' claims*. As discussed above in Part II.A, that is permissible and Hunterbrook's article in no way directs UWM borrowers to retain BSF as their lawyers. *See Jerry Gradl Motors, Inc.*, 2022 WL 949795, at *5 (W.D.N.Y. Mar. 30, 2022) (purpose of communications with potential class members, which did not discuss a retainer or attorney's fees,

Case 2:24-cv-10853-BRM-DRG ECF No. 23-41, PageID.1377 Filed 09/17/24 Page 11 of 12



was to gather information, not retention or pecuniary gain). Indeed, any suggestion that the purpose of Hunterbrook's reference to BSF was client retention is nonsensical. By the time Hunterbrook's article was published, *Plaintiffs already had retained BSF and BSF filed Plaintiffs' Complaint just hours later*. Rather, as the article itself makes clear, the purpose of the reference to BSF was to disclose BSF's investigation of the facts and "exploration" of a "class action lawsuit against UWM seeking restitution," and to provide a point of contact for potential whistleblowers and witnesses. Indeed, given UWM's and Jones Day's apparently ends-oriented tactics, we have no doubt that if Hunterbrook had *not* disclosed those facts, you would be (misguidedly) characterizing that as some sort of material omission and issuing meritless sanctions threats on that basis too.

Further, you make various other assertions about BSF purportedly using the news article as part of a "wide-ranging campaign to disparage UWM" and "manipulate the company's stock price" and otherwise "coordinating" with Hunterbrook in a variety of ways. These allegations are false. As Hunterbrook explained, Hunterbrook shared with BSF the factual analyses underpinning its article, which BSF used, among other things, to evaluate the rights of the victims of UWM's and Mr. Ishbia's unlawful behavior. As discussed at length herein, BSF investigated that information (in conjunction with a variety of other information referenced in the complaint) and concluded the plaintiffs indeed had valid claims against UWM. BSF will not endeavor to respond to your many mischaracterizations of Hunterbrook, its purported motives, its reporting, or public statements, except to say (again) that BSF does not control Hunterbrook and does not direct Hunterbrook's activity.

Notwithstanding the foregoing, and in an effort to amicably resolve this particular issue, BSF will request that Hunterbrook remove what you have incorrectly referred to as the "Solicitation Page" in your letter.

### C. BSF's Preservation Letters Were Appropriate.

There is also no basis for you to object to BSF sending document preservation letters to certain brokers. These letters are ordinary course preservation letters sent to brokers who BSF reasonably believes are material witnesses. They were, moreover, necessitated by UWM's apparent efforts to obstruct the discovery process as discussed above in Part I. BSF, in fact, sent them after BSF became aware of instances where UWM had deleted and removed evidence from the public domain and some brokers attempted to harass a named Plaintiff and to influence potential class members. The letters were therefore proper and, indeed, we believe necessary.

In addition, you contend that the preservation letters were purportedly "overbroad" in unidentified ways or "omit protections for third parties under the federal rules" but you make no effort to identify what, in your view, those are. To the extent you actually believe that, you are free to contact those third parties to correct any perceived inaccuracies. But, you are hereby on notice that Plaintiffs will hold your clients responsible for any single document that becomes unavailable as a result of them providing inaccurate instructions or guidance to any such brokers

10



in regard to their preservation responsibilities. Further, your passing assertion that BSF sharing the publicly-filed Complaint with material third party witnesses in furtherance of the need for document preservation somehow constitutes "tortious interference with business relations, defamation, and/or disparagement" is baseless. The authorities are clear that BSF's ordinary conduct in that regard is protected by the litigation privilege. *Oesterle v. Wallace*, 725 N.W.2d 470, 474 (Mich. Ct. App. 2006) ("Statements made by judges, attorneys, and witnesses during the course of judicial proceedings are absolutely privileged if they are relevant, material, or pertinent to the issue being tried."). The brokers who received the preservation letters are UWM's alleged coconspirators in a fraudulent scheme. There has been no tortious interference with any business relationships and the cases you cite are plainly inapplicable.

\*   \*   \*

For the reasons set forth above, UWM has engaged in a pattern of misconduct and it must cease and desist from engaging in more such actions. Further, the allegations set forth in your letter are unfounded and the attendant demands are without basis. We are available to discuss the concerns raised above relative to UWM's recent actions at a time that is mutually convenient to the parties. Plaintiffs, BSF, and DW reserve all rights and waive none.

Sincerely,

| DICKINSON WRIGHT PLLC | BOIES SCHILLER FLEXNER LLP |
|---|---|
| Brandon C. Hubbard | John T. Zach |
| James A. Plemmons | Marc Ayala |
|  | Tyler Ulrich |
|  | David L. Simons |
|  | Andrew P. Steinmetz |