## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Therisa D. Escue, Billy R. Escue, Jr.,
Kim Schelble, Brian P. Weatherill,
Kenneth C. Morandi, Jill Jeffries, and
Daniel Singh on behalf of themselves
and all others similarly situated,

                Plaintiffs,

     v.

United Wholesale Mortgage, LLC,
UWM Holdings Corporation, SFS
Holding Corp., and Mathew Randall
Ishbia,

                Defendants.

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
United States Magistrate Judge

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
## FOR RELIEF UNDER RULE 11, 28 U.S.C. § 1927,
## AND THIS COURT'S INHERENT POWERS

## **TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED....................................................v

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..............................vi

INTRODUCTION ..............................................................................1

LEGAL STANDARD..........................................................................2

ARGUMENT ....................................................................................3

I.    Defendants' Assertion That Counsel Commenced This Action for an "Improper Purpose" Is Baseless and Itself Improper. ...............................3

    A.    Defendants' Unfounded Claim That Counsel Is Benefiting From "Shorting" UWM's Stock Is False....................................................3

    B.    Plaintiffs' Claims Are Not Frivolous, Which Itself Precludes a Finding That Counsel Acted with an Improper Purpose. ................5

    C.    None of the Remaining Complained of Conduct Demonstrates Counsel Filed the FAC for an Improper Purpose ...........................7

II.   Plaintiffs' Allegations Are Properly Based in Fact.................................10

    A.    The Statistical Analysis in the FAC Is Well-Founded..................10

    B.    Defendants' Plaintiff-Specific Challenges Fail ...........................14

    C.    Statutory Disclosures Are Not a Basis for Sanctions. ..................17

    D.    "APR Spreads" Are Not the Only Way to Compare Loan Prices. 18

    E.    Plaintiffs Did Not Misrepresent the "All-In Provision." ..............20

    F.    Defendants' Argument About "Corrupted Brokers" Is Incorrect..22

III.  Plaintiffs' Fiduciary Duty-Related Claims Have a Legal Basis..............22

IV.   Plaintiffs' Allegations Were Based on a Reasonable Inquiry .................24

CONCLUSION ................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
   225 Cal. App. 4th 1451 (2014), *as modified* (May 27, 2014) ...........................14

*Baker v. Urb. Outfitters, Inc.*,
   431 F. Supp. 2d 351 (S.D.N.Y. 2006) ................................................................12

*Collins v. DaimlerChrysler Corp.*,
   894 So. 2d 988 (Fla. Dist. Ct. App. 2004) ..........................................................14

*Dayco Prods., LLC v. Kingdom Auto Parts, Ltd.*,
   2008 WL 4387702 (E.D. Mich. Sep. 24, 2008)....................................................3

*E.E.O.C. v. Pines of Clarkston, Inc.*,
   2014 WL 6612375 (E.D. Mich. Nov. 20, 2014)...............................................2, 3

*El-Khalil v. Tedeschi*,
   2023 WL 5827666 (E.D. Mich. Sept. 8, 2023) .....................................................6

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981)..............................................................................................10

*Harrison Prosthetic Cradle Inc.* v. *Roe Dental Lab., Inc.*,
   608 F. Supp. 3d 541 (N.D. Ohio 2022) ................................................................1

*Hertel v. Mortg. Elec. Registration Sys., Inc.*,
   2013 WL 706903 (W.D. Mich. 2013) .................................................................12

*Hofstetter v. Fletcher*,
   1988 WL 107371 (6th Cir. 1988) .......................................................................14

*Holgate v. Baldwin*,
   425 F.3d 671 (9th Cir. 2005)...............................................................................27

*Hookom v. Sensor*,
   121 F.R.D. 63 (S.D. Ohio 1988)...........................................................................3

*In re Amcast Indus. Corp.*,
   365 B.R. 91 (Bankr. S.D. Ohio 2007) .................................................................26

*In re Data Breach Sec. Litig. Against Caesars Ent., Inc.*,
 2024 WL 2959279 (D. Nev. June 12, 2024) .........................................................9

*In re Duramax Diesel Litig.*,
 298 F. Supp. 3d 1037 (E.D. Mich. 2018) ............................................................14

*Int'l Underwriters, Inc. v. Boyle*,
 365 A.2d 779 (App. D.C. 1976) ...........................................................................26

*James v. Caterpillar, Inc.*,
 824 F. App'x 374 (6th Cir. 2020) ..........................................................................2

*Jerry Gradl Motors, Inc. v. ACV Auctions, Inc.*,
 2022 WL 949795 (W.D.N.Y. Mar. 30, 2022) ....................................................10

*King v. Whitmer*,
 71 F.4th 511 (6th Cir. 2023) ...............................................................................11

*Knipe v. Skinner*,
 19 F.3d 72 (2d Cir. 1994) ...................................................................................12

*Land v. Land*,
 222 N.C. App. 317, 2012 WL 3192605 (2012) ..................................................26

*Lee v. Countrywide Home Loans, Inc.*,
 692 F.3d 442 (6th Cir. 2012) ..............................................................................20

*Mendez v. Enecon Ne. Applied Polymer Sys., Inc.*,
 2015 WL 4249219 (E.D.N.Y. July 13, 2015) ....................................................10

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*,
 2024 WL 982380 (M.D. Fla. Feb. 6, 2024) ........................................................24

*Old Blast Inc. v. Operating Eng'rs Local 324*,
 2016 WL 8261733 (E.D. Mich. Aug. 17, 2016) ...................................................2

*Peel Payments, LLC v. First Data Corp.*,
 2016 WL 6407432 (W.D. Okla. Oct. 28, 2016) .................................................26

*Pettrey v. Enter. Title Agency, Inc.*,
 241 F.R.D. 268 (N.D. Ohio 2006) ......................................................................14

*Rosemann v. St. Louis Bank*,
    858 F.3d 488 (8th Cir. 2017) ..............................................................26

*Simpson v. California Pizza Kitchen, Inc.*,
    2013 WL 12114487 (S.D. Cal. Oct. 23, 2013)...................................11

*Stanford v. Corbin*,
    2011 WL 893111 (E.D. Mich. Mar. 14, 2011)..............................7, 12

*Steele v. U.S.*,
    2015 WL 4121607 (D.D.C. June 30, 2015)..........................................9

*Sussman v. Bank of Israel*,
    56 F.3d 450 (2d Cir. 1995) ....................................................................7

*Tahfs v. Proctor*,
    316 F.3d 584 (6th Cir. 2003) ................................................................4

*Tolton v. Jones Day*,
    1:19-cv-00945, Minute Order (D.D.C. June 9, 2020) ..........................3

*White v. Gen. Motors Corp.*,
    908 F.2d 675 (10th Cir. 1990) ............................................................12

*White v. Med. Rev. Inst. of Am., LLC*,
    2022 WL 2905665 (D. Utah July 22, 2022) .........................................8

*Williams v. Verizon Washington, D.C. Inc.*,
    322 F.R.D. 145 (D.D.C. 2017) ...........................................................28

## Statutes

28 U.S.C. § 1927 ............................................................................................5

## Other Authorities

E.D. Mich., *In re: Civility Principles*, Admin. Order No. 08-A0-009 ......................5

## Rules

FED. R. CIV. P. 11 ................................................................. passim

FED. R. CIV. P. 8 ..............................................................................24

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.  Should this Court deny Defendants' request for sanctions under Rule 11(b)(1) where Defendants submit baseless and false accusations that Plaintiffs' counsel commenced this action because of a purported interest in the "shorting" of Defendants' stock?

     Plaintiffs' answer: Yes

     Defendants' answer: No

     This Court should answer: Yes

2.  Should this Court deny Defendants' request for sanctions under Rule 11(b)(2), (3), and 28 U.S.C. § 1927 where Plaintiffs' comprehensive First Amended Complaint is the product of extensive inquiry and based in fact and existing law?

     Plaintiffs' answer: Yes

     Defendants' answer: No

     This Court should answer: Yes

3.  Should this Court deny Defendants' request for sanctions pursuant to this Court's inherent authority where Defendants make no showing that Plaintiffs or their counsel are pursuing Plaintiffs' nonfrivolous claims in bad faith?

     Plaintiffs' answer: Yes

     Defendants' answer: No

     This Court should answer: Yes

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

**Cases:**

*Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003);

*James v. Caterpillar, Inc.,* 824 F. App'x 374 (6th Cir. 2020);

*Stanford v. Corbin*, 2011 WL 893111 (E.D. Mich. Mar. 14, 2011).

**Rules & Statutes:**

FED. R. CIV. P. 11;

28 U.S.C. § 1927.

## **INTRODUCTION**

Defendants are entitled to present a zealous and vigorous defense in this case. If they wish to contest legal theories, they can move to dismiss. If they believe the facts do not ultimately support the allegations, they can later move for summary judgment. But what they cannot do is abuse Rule 11 by making specious allegations of professional misconduct as a tactic intended to prematurely litigate the merits of the case. "Threatening sanctions casually or as a matter of course has no place among officers of the court—again, except in the most egregious cases and, then, only as a last resort." *Harrison Prosthetic Cradle Inc.* v. *Roe Dental Lab., Inc.*, 608 F. Supp. 3d 541, 551 (N.D. Ohio 2022).

The fact that Defendants' Rule 11 motion is an unprofessional litigation tactic is clear from the broad and disparate scope of its claims: it reads as an omnibus motion to dismiss and for summary judgment.  Worse, it is premised on repeated allegations for which Defendants have no factual basis and littered with misleading statistical red herrings that fail to establish even the irrelevant points they attempt to make.  And all of this is framed as an accusation that their adversaries violated their duties of professional conduct. But they did not, by any measure. This is plainly improper gamesmanship and, for the reasons set forth below, the Court should reject the motion and consider imposing costs and attorneys' fees against Defendants for submitting a motion that is transparently inappropriate under Rule 11.

1

## LEGAL STANDARD

Rule 11 is not an appropriate vehicle to adjudicate the merits of a case or to resolve standard factual disputes. *E.E.O.C. v. Pines of Clarkston, Inc.*, 2014 WL 6612375, at *2 (E.D. Mich. Nov. 20, 2014). Accordingly, courts emphasize that "parties should not employ a Rule 11 motion 'to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes.'" *James v. Caterpillar, Inc.,* 824 F. App'x 374, 378 (6th Cir. 2020) (quoting FED. R. CIV. P. 11, 1993 Advisory Committee Notes). Rather, sanctions may be considered only when a claim is "both baseless and made without a reasonable and competent inquiry." *Old Blast Inc. v. Operating Eng'rs Local 324*, 2016 WL 8261733, at *2 (E.D. Mich. Aug. 17, 2016) (citation omitted). Courts "stress[]" that "Rule 11 sanctions are a harsh punishment which a court should impose only when those sanctions are clearly warranted." *Tolton v. Jones Day*, 1:19-cv-00945, Minute Order (D.D.C. June 9, 2020) (citations omitted). A complaint is not baseless unless the movant proves it is "not warranted by existing law or by a nonfrivolous argument for extending . . . existing law," and where the "factual contentions lack *any* evidentiary support." *Pines of Clarkston*, 2014 WL 6612375, at *2 (emphasis added).

Under Rule 11, "the basis for factual allegations in pleadings cannot be determined until such time as the party claiming those facts has had an adequate

opportunity to develop his proof." *Dayco Prods., LLC v. Kingdom Auto Parts, Ltd.*, 2008 WL 4387702, at *3 (E.D. Mich. Sep. 24, 2008) (citation omitted); *see also Hookom v. Sensor*, 121 F.R.D. 63, 64 (S.D. Ohio 1988) ("No litigant should be faced with sanctions without an opportunity to conduct appropriate discovery."). This is because Rule 11 "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Tahfs v. Proctor*, 316 F.3d 584, 594–95 (6th Cir. 2003) (cleaned up).

## ARGUMENT

### I.    Defendants' Assertion That Counsel Commenced This Action for an "Improper Purpose" Is Baseless and Itself Improper.

#### A.    Defendants' Unfounded Claim That Counsel Is Benefiting From "Shorting" UWM's Stock Is False.

Counsel brings this action on behalf of Plaintiffs and the putative class for one purpose: to seek recourse for Plaintiffs and the thousands of consumers (American homeowners) harmed by Defendants' misconduct. Rather than address the substance of Plaintiffs' allegations through proper motion practice, Defendants assert that Counsel purportedly conspired to pursue "an unwarranted financial windfall" and suggest—with no good faith basis for doing so—that Counsel may be sharing in profits from "shorting" UWM's stock. That accusation is false.

Defendants admit they did not have an actual basis to make their "shorting" claim because they do not know "the exact" relationship between Hunterbrook Media's nonprofit affiliate, Hunterbrook Foundation, and Counsel, let alone whether

3

it is improper. Defs. Mot., ECF No. 23, PageID.806. That, however, does not stop Defendants from engaging in rank speculation by asking aloud "whether Counsel is sharing in [Hunterbrook Capital's] profits from shorting UWM's stock." *Id.* at PageID.806–807. In the face of Defendants' unfounded accusations, Counsel will reiterate: Counsel and Plaintiffs—without qualification—had complete control over whether and when to commence this action; Counsel have no interest in this action other than as Plaintiffs' counsel; no Hunterbrook entity is paying Counsel anything or funding this action; and Counsel has no interest—*none*—in any trade by any Hunterbrook entity on UWM's stock.

Because Defendants do not know the facts, they use their Rule 11 Motion to request that the Court compel disclosure of any agreement with a Hunterbrook entity. *See id.*, PageID.806–807. But as Counsel informed Defendants' counsel during meet-and-confer efforts, if Defendants believe such information is relevant and discoverable they must first request the disclosure through written discovery pursuant to Rule 26. Plaintiffs have no objection to scheduling a Rule 26(f) conference and commencing discovery. And, to be clear, Counsel has no objection to providing this Court its agreement for *in-camera* review. Should the Court so desire, it will see that Counsel in no way seek to "profit from UWM's stock swings," notwithstanding Defendants' unfounded speculation. Counsel's sole interest and purpose in commencing this suit is identical to every other attorney representing a

putative class in good faith: succeeding on meritorious claims for the benefit of the named Plaintiffs and the putative class.

Advocates before this Court are expected to comply with basic principles of civility.[1] Defendants' Rule 11 Motion contradicts them. Defendants lob misguided accusations of improper conduct based solely on conjecture, pointing to common practices such as issuing preservation letters as if such routine conduct evidences an improper purpose. Because Defendants submit no evidence warranting their drastic motion, this side-show should end so the parties can litigate the merits.[2]

### B. Plaintiffs' Claims Are Not Frivolous, Which Itself Precludes a Finding That Counsel Acted with an Improper Purpose.

Defendants' Motion does not establish the First Amended Complaint ("FAC") is frivolous, precluding a finding of an improper purpose. *Sussman v. Bank of Israel*,

---

[1] Defendants' Rule 11 Motion compels Plaintiffs to highlight two such principles: "We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety." And, "We will not seek court sanctions without first conducting a reasonable investigation and unless fully justified by the circumstances and necessary to protect our client's lawful interests." E.D. Mich., *In re: Civility Principles*, Admin. Order No. 08-A0-009.

[2] UWM also invokes 28 U.S.C. § 1927 which may apply only where an attorney "so multiplies the proceedings in any case unreasonably and vexatiously." UWM does not (and cannot) explain how Counsel purportedly "multiplied the proceedings" simply by filing and amending the complaint pursuant to a stipulated order. *See e.g., El-Khalil v. Tedeschi*, 2023 WL 5827666, at *8 (E.D. Mich. Sept. 8, 2023) ("[C]ourts in this district have declined to award sanctions under § 1927 based on the filing of allegedly frivolous claims in an initial complaint.").

56 F.3d 450, 458 (2d Cir. 1995); *see also Stanford v. Corbin*, 2011 WL 893111, at *4 (E.D. Mich. Mar. 14, 2011). The claimed deficiencies raised in Defendants' Motion are addressed in detail below. But in assessing whether the FAC is frivolous, it is telling that Defendants leave central allegations wholly unaddressed, saying nothing of:

- Mat Ishbia's, UWM's, and corrupted brokers' persistent misrepresentations that "[b]rokers are independent," and that consumers "got to go to findamortgage.com" because the loan officers found there "shop on your behalf." FAC, ECF No. 21, PageID.401–414 at ¶¶ 40, 42, 45, 47, 49–53, PageID.472, at ¶ 155.

- That such statements were false and misleading and that UWM intended to induce loan officers to funnel consumers "to UWM without shopping for loans that are in those borrower-clients' best financial interests." *Id*., PageID. 453–469 at ¶¶ 119, 122, 130, 132, 134, 146–48, PageID. 482–483, at ¶ 169.[3]

- The purpose and effect of this unscrupulous conduct, which caused Plaintiffs to pay for brokers who were not providing the core functions they advertised and were hired to perform, including to exercise independent judgment, shop on borrowers' behalf, disclose material facts, and not maintain secret loyalty to a single lender. *Id.*, PageID.471–527, at ¶¶ 152, 155, 159–62, 183, 193, 211, 215–17, 224–25, 246, 250–55, 271–75, 277, 299–301; and

- The multiple ways in which Plaintiffs were harmed, including because they paid for but did not receive the benefit of their broker's "independent" and loyal service, while Defendants and the participating brokers richly profited from their deceptive and misleading conduct. *Id.*, PageID.440–532, at ¶¶ 96, 167, 193, 197, 230–35, 258–62, 278–80, 282–87, 302, 312, 314, 317.

---

[3] The closest Defendants come to addressing these points is their reference to the Truth in Lending Act ("TILA") and a challenge to the number of corrupted brokers. Defs. Mot., ECF No. 23, PageID.816–818. Those arguments factually are wrong and cannot remotely serve as bases for sanctions in any event. *See* Part II.C, below.

Simply put, Defendants' Motion does not show—or even try to show—that Plaintiffs' RICO, RESPA, and range of state law claims are frivolous. For this reason alone, Defendants' Motion pursuant to Rule 11(b)(1) should be denied.

### C. None of the Remaining Complained of Conduct Demonstrates Counsel Filed the FAC for an Improper Purpose

Without any factual basis to allege an improper purpose, Defendants attempt to concoct what they claim is circumstantial evidence to support their theory. Those spurious claims do not withstand scrutiny.

For example, Defendants erroneously rely on the timing of the filing of the Complaint following Hunterbrook Media's publication of its investigation. Yes, the instant action was filed shortly after the story was published. But there is nothing improper about that. The timing of the filing was for an obvious and legitimate purpose—being the first to file a class action complaint is a relevant consideration when selecting and appointing class counsel. *See, e.g.*, *White v. Med. Rev. Inst. of Am., LLC*, 2022 WL 2905665, at *2 (D. Utah July 22, 2022) ("Where consideration of other relevant factors does not tilt heavily in either direction…courts may also consider which party was first to file a complaint") (citations omitted) (collecting cases); *see also Steele v. U.S.*, 2015 WL 4121607, at *4 n.2 (D.D.C. June 30, 2015) ("[I]t would be imminently reasonable to select [counsel] on the basis that their complaint was filed first"). Counsel's filing of the Complaint came after substantial investigation, including but not limited to reviewing extensive amounts of data,

7

working directly with an expert and other industry professionals to develop the facts alleged in the FAC, and discussing those same facts with actual wholesale borrowers and brokers to verify their experiences. It is no secret that, after the publication of serious and credible allegations against a company, counsel to harmed consumers seek to file first. There is nothing wrong or surprising about that—the law supports it. *In re Data Breach Sec. Litig. Against Caesars Ent., Inc.*, 2024 WL 2959279, at *6 (D. Nev. June 12, 2024) ("[B]eing first to file bears out a proposed team's preparation and commitment to prosecuting the case").

Defendants also point to investigative communications to putative class members as purported evidence of an improper purpose. That contention fails given that "[p]laintiffs generally have a right to contact members of the putative class." *Mendez v. Enecon Ne. Applied Polymer Sys., Inc.*, 2015 WL 4249219, at *2 (E.D.N.Y. July 13, 2015) (citation omitted); *see also Jerry Gradl Motors, Inc. v. ACV Auctions, Inc.*, 2022 WL 949795, at *6 (W.D.N.Y. Mar. 30, 2022) ("Plaintiffs have a right to seek information from putative class members, including evidence in support of their claims") (cleaned up). The complained of communications were made for that investigative purpose.[4] Defs. Mot., ECF No. 23-41, Ex. 37 at

---

[4] If Defendants genuinely take issue with the contents of these communications, the proper course is to seek, under Rule 23(d), "a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981).

PageID.1374–1375. Simply put, the communications "did not show that counsel were motivated by improper purposes such as harassment or delay," and thus are "irrelevant to the district court's inquiry." *King v. Whitmer*, 71 F.4th 511, 520 (6th Cir. 2023) (cleaned up); *Simpson v. California Pizza Kitchen, Inc.*, 2013 WL 12114487, at *4 n.2 (S.D. Cal. Oct. 23, 2013) (allegations of improper solicitation of prospective clients are "not relevant to a Rule 11 sanctions determination").

Finally, Defendants grasp onto preservation letters Counsel issued to individuals and entities possessing relevant information because that routine litigation communication apparently "publicized" Plaintiffs' already-public claims. But the recipients of those letters funneled at least 90% of their loans to UWM in one or more years since 2021—they indisputably are percipient witnesses and potential defendants. **Exhibit 1**, Gibbons Decl. ¶ 17. Counsel, moreover, issued those letters only after Counsel learned that UWM had removed evidence from the public domain and at least one broker harassed a named Plaintiff.[5] Defs. Mot., ECF No. 23-41, Ex. 37 at PageID.1370–1371. Like all of Counsel's actions, the preservation letters furthered the interests of Plaintiffs and putative class members.[6]

---

[5] Defendants' meritless assertion of any purported improper purpose can be rejected whole cloth. But even if the parties' asserted purposes were seen as competing, this Court should not engage in "weighing of competing purposes, some legitimate and some not." *Stanford*, 2011 WL 893111, at *5 (cleaned up).

[6] The cases on which Defendants rely are readily distinguishable. Both *Hertel v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 706903, at *7 (W.D. Mich. 2013) and *Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994), involved repetitive filings of

## II.     Plaintiffs' Allegations Are Properly Based in Fact.

Defendants contend over twelve pages that "the facts" directly contradict Plaintiffs' allegations or are otherwise unsubstantiated. That is wrong and Plaintiffs respectfully submit that those arguments are an intentional abuse of Rule 11. In making their sweeping claims, Defendants do not even attempt to challenge the legal or factual foundation for the vast majority of the FAC's allegations and instead cite only fifteen paragraphs as allegedly being unsupported from the 583-paragraph FAC.[7] And even as to these discrete challenges, their Rule 11 arguments fail.

### A.     The Statistical Analysis in the FAC Is Well-Founded.

Defendants challenge as "necessarily baseless" Plaintiffs' use of, in partial support of their allegations, an expert's sophisticated comparison of the pricing of UWM loans against comparable loan data in one of the most comprehensive publicly available databases showing the pricing for wholesale mortgages. Their argument is fatally flawed for multiple, independent reasons.

---

complaints that evidenced an improper purpose.  In *Baker v. Urb. Outfitters, Inc.*, 431 F. Supp. 2d 351, 365–66 (S.D.N.Y. 2006) the sanctioned attorney was "pursuing an unwarranted financial windfall" because he had actual knowledge the submitted damages figure was unsupportable, while also stating he was pursuing the action, in part, because the defendants were "deep pocketed."  In *White v. Gen. Motors Corp.*, 908 F.2d 675, 683 (10th Cir. 1990), the court found an improper purpose where the plaintiff's claims were frivolous and made "prefiling threats to contact the media."

[7] *See* Defs. Mot. at PageID.807–818 (citing FAC, PageID.388–490 at ¶¶ 9, 25, 32, 52, 72, 118, 127, 145, 154, 159-60, 171, 177, 179, 184).

***First*,** Defendants incorrectly contend that Plaintiffs' reference to the Home Mortgage Disclosure Act database ("HMDA") means that "the basis for Plaintiffs' alleged injuries is not well grounded in fact." Plaintiffs were harmed in ways that are unrelated to the HMDA data. Indeed, Defendants' motion does not dispute the central allegation that UWM coordinated with brokers to funnel borrowers to UWM and *away* from cheaper loan options using, among other tactics, misrepresentations that borrowers would obtain an "independent" broker in the wholesale market and material omissions regarding the true nature of UWM's relationship with those brokers. In fact, Defendant Ishbia routinely points to this purported "independence" as the reason to use wholesale mortgage brokers. FAC, PageID.406 at ¶ 47(a) ("Mortgage brokers are completely independent. . . . We really believe that the best place for a borrower to get a loan, that's at an independent mortgage broker. That's because the broker has access to multiple lenders instead of just one lender.").

Thus, Plaintiffs paid money to the "independent" brokers and UWM after their scheme successfully induced Plaintiffs into believing they were paying for a service (independent and loyal advice) that they did not get, and that they were getting a product (a UWM mortgage loan) that resulted from the "independent" advice that they, in fact, never received. That alone gives rise to cognizable

11

damages.[8] The named Plaintiffs, accordingly, have suffered damages *regardless of what the HMDA data includes or does not include*—their claims need not even rely on the HMDA data or loan-by-loan comparisons to show that damage.

**Second**, Defendants incorrectly accuse Plaintiffs' counsel of somehow "misrepresent[ing]" the HMDA data. Defs. Mot. at PageID.811–812. Plaintiffs did not state that HMDA data reflected every possible loan characteristic. In fact, the FAC included hyperlinks to a Hunterbrook Media article that identifies the data fields captured by their analysis. At most, Defendants are making a premature (and flawed) *Daubert* challenge by arguing that the data analysis does not yield sufficiently reliable results. There is no basis to resolve that issue under Rule 11 because Defendants have not demonstrated any shortcoming that eliminates its evidentiary value, much less that justifies Rule 11 sanctions. Indeed, unsurprisingly, Defendants do not cite any case in which methodological disputes concerning statistical analysis justified sanctions at the pleading stage.

---

[8] *See e.g.*, *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1071 (E.D. Mich. 2018) (finding RICO plaintiffs may recover all monies paid to defendants due to defendants' misrepresentations) (citing *Hofstetter v. Fletcher*, 1988 WL 107371, at *6 (6th Cir. 1988)); *see also Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 276-77 (N.D. Ohio 2006) (holding that RESPA allows for a calculation of damages based on "the full price paid for the settlement service"); *Collins v. DaimlerChrysler Corp.*, 894 So. 2d 988, 991 (Fla. Dist. Ct. App. 2004) (holding that class claims under FDUTPA could proceed on theory that plaintiff did not get what she bargained for); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1483 (2014), *as modified* (May 27, 2014) ("Disgorgement based on unjust enrichment is an appropriate remedy for aiding and abetting a breach of fiduciary duty.").

***Third,*** the mere fact that the data Hunterbrook Media used does not include certain data points that Defendants claim are relevant does not make the analysis "necessarily baseless," nor sanctionable. Similar analyses are used in a variety of contexts by statisticians, including by Defendants here.[9] *See* Ex. 1, Gibbons Decl. ¶¶ 6, 15.

Defendants, for instance, assert that the HMDA data does not reflect borrowers' credit scores. But that does not render it "useless" for purposes of comparing loans across wholesale lenders. For example, the data analysis focuses on loans purchased by Fannie Mae, Freddie Mac, and Ginnie Mae, which have strict FICO requirements. Ex. 1, Gibbons Decl. ¶ 5. And UWM's loan-weighted credit score is (1) materially similar to that of the next largest lender in the wholesale market (Rocket Mortgage), and (2) consistent with the group average of loans purchased by Fannie Mae, Freddie Mac, and Ginnie Mae. *Id.* ¶ 5. In fact, UWM's *own SEC filings* disclose that it does not originate loans from a disproportionate number of borrowers with lower FICO scores. Therefore, it would be baseless for Defendants to suggest that lower FICO scores of UWM borrowers might explain why UWM's loans are systematically more expensive. Indeed, Rocket Mortgage borrowers have *worse* credit than UWM borrowers on average, and yet Rocket

---

[9] Defs. Mot., ECF No. 23, Stricker Decl. at PageID.825–827 (comparing APR spread of certain of Plaintiffs' loans against alleged average APR spreads).

Mortgage borrowers *on average paid less*. *See* FAC, PageID.466–467 at ¶¶ 143-44. Defendants do not even attempt to show that the named Plaintiffs' FICO scores affected their loans' pricing relative to market benchmarks, much less so materially that it is impossible to draw comparisons in good faith.

### B.    Defendants' Plaintiff-Specific Challenges Fail

Defendants' Motion does not dispute that three Plaintiffs (Morandi, Jeffries, and Singh) did not receive the services they paid for and overpaid for their loans compared to market averages. Instead, it challenges only the allegations specific to Plaintiffs Schelble's, Weatherill's, and the Escues' loans. Those arguments fail.

*First*, Defendants' demand for sanctions in connection with Plaintiffs Schelble's and Weatherill's loans is baseless. With respect to Ms. Schelble, they claim that any "attempt[] to compare Schelble's loans to 'similar' loans using HMDA" data is "necessarily baseless" because HMDA does not capture details about borrowers' self-employment history, which Defendants claim can increase the cost of a loan.  Defs. Mot. at PageID.813. Their only support is a webpage stating that "[m]ost mortgage lenders require at least two years of consistent self-employment in the same industry, so it's important to keep good records of your work history." *Id*. Defendants omit that the same webpage explains that "[i]f you haven't been self-employed for two full years, lenders may accept a W-2 from a previous employer in combination with the documents listed above." Defs. Mot.,

14

ECF No. 23-35, Ex. 31 at PageID.1302. Their demand for sanctions thus relies on a generic webpage showing that different lenders underwrite loans in different ways. They do not link this general hearsay to Ms. Schelble's loan *in any way*—for instance, they do not even attempt to show that her self-employment so materially affected her loan that comparing it to others using HMDA data (including loans to self-employed borrowers) is "necessarily baseless," much less sanctionable.

Defendants' arguments with respect to Mr. Weatherill's loan are equally baseless. They claim he had an "above-average rate-lock" which "increases loan cost" so it cannot be compared to HMDA data. Defs. Mot. at PageID.813. Their sole support is a generic CFPB publication (last updated in 2015) stating: "There *can* be a downside to a rate lock. It *may* be expensive to extend if your transaction needs more time." Defs. Mot., ECF No. 23-24, Ex. 20, at PageID.1221. Again, Defendants fail to link these generic statements to Mr. Weatherill's loan. They do not show whether he was charged for his rate lock at all, much less that any such charge exceeded $2,800—~27% of his entire closing costs—and could explain the above-market costs he paid relative to the median comparable loan. FAC, PageID.515, at ¶ 261. Defendants' sanctions argument on this point is therefore preposterous.[10]

---

[10] Even Defendants' declarant stops short of characterizing information not included in the HMDA data as "material." He does not opine that Plaintiffs' comparisons using that data are "necessarily baseless." Defendants instead rely on their counsels' *ipse dixit*. Defs. Mot., ECF No. 23, Stricker Decl. at PageID.822–827.

In addition, Defendants contend Mr. Weatherill's loan is incomparable to market-wide data because it was for a second home and, they claim, the relevant data set "explicitly *excluded* 'second home mortgages' from its analysis." Defs. Mot. at PageID.809 (emphasis in original). This is false. The data excludes "second home mortgages"—i.e., a second mortgage on a single property. Ex. 1, Gibbons Decl. ¶ 5. Mr. Weatherill's loan was a *first mortgage* on a second home, which the analysis *did* include. FAC, PageID.509, 514, at ¶¶ 239, 256; Ex. 1, Gibbons Decl. ¶ 5.

Defendants' final argument concerning Mr. Weatherill is unrelated to the HMDA data. They claim he lied about his expectation that his broker "would shop for the most affordable loan" because, they argue, that was "contradict[ed]" by a disclosure he allegedly received. Defs. Mot., ECF No. 23, at PageID.809–810. But the document does not disclaim the broker's obligation to shop on her client's behalf to help him procure the most affordable loan available to him. Rather, it states that the broker "cannot *guarantee* the lowest price or best terms available on the market." Defs. Mot., ECF No. 23-48, Ex. 44, at PageID.1405 (emphasis added). Defendants' assertion that this language "contradicts" Mr. Weatherill's allegation is wrong.

***Second***, with respect to the Escues, Defendants claim there is no basis to compare their loan to others in the data because it was a cash-out refinance. That is nonsensical. The Escues were harmed because they paid money for services and a product under false pretenses and, in addition, because (i) their 18-year loan had an

16

interest rate closer to the benchmark *30-year* rate than the 15-year rate, and (ii) their cash-out refinance exceeded a $2,000 threshold set under Fannie Mae Selling Guidelines which resulted in an additional price increase, none of which either UWM or their broker disclosed to them in their haste to steer the couple into a UWM mortgage. FAC, PageID.494–495 at ¶¶ 201–02. Showing those types of harm does not require any reliance on loan comparisons across the HMDA data.

### C. Statutory Disclosures Are Not a Basis for Sanctions.

Defendants assert that certain federally mandated "anti-steering" disclosures "directly undercut the central thesis of the entire Complaint." Defs. Mot. at PageID.817. Defendants do not explain which elements of Plaintiffs' claims (if any) these documents allegedly undercut. But, in any event, their assertion is wrong. It relies on the strawman position that the FAC is based exclusively on the claim that "brokers had an obligation to survey the wholesale market each time they suggest a loan to a borrower." *Id.* at PageID.816. In fact, Plaintiffs' claims are far broader. They allege Defendants had legal obligations—the violation of which gives rise to civil liability—under the common law, state statutes, and federal statutes not to engage in a pattern of fraud, misrepresentation, and commercial bribery; not to provide things of value to brokers to influence their judgment; not to intentionally mislead and withhold information from borrowers or to induce brokers to do so; and not to engage in unfair and deceptive acts under state law.

17

The anti-steering disclosures do not create a safe harbor for Defendants to engage in that misconduct. *See, e.g.*, *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 452 (6th Cir. 2012) (denying defendant broker summary judgment on state civil conspiracy claim for deficient disclosures while granting motion on TILA disclosure claim). If anything, these "disclosures" support Plaintiffs' claims. For example, the "disclosure" to Ms. Schelble listed three loan structures stating that "[t]hese loan options are from creditors with whom the Loan Originator regularly does business" without disclosing the creditors' names much less how the broker purportedly originated them. Defs. Mot., ECF No. 23-46, Ex. 42 at PageID.1401. These bare-bones disclosures thus amplify UWM's and the brokers' misrepresentations, helping to solidify the misimpression that these brokers were "independent" and "regularly do[] business" with multiple lenders when the unchallenged funneling statistics show that is untrue. FAC, PageID.501 at ¶ 217.

### D.   "APR Spreads" Are Not the Only Way to Compare Loan Prices.

Defendants contend that looking at APR spreads is the "better" way to compare two loans across wholesale lenders. They claim that some government regulators agree, citing Exhibit 22 for this proposition although it does not remotely support it. *See* Defs. Mot. at PageID.817. Defendants' Motion also attaches clips from consumer-facing websites of Quicken Loans, Wells Fargo, and U.S. Bank (*id.*, Exs. 23–26), which state that APR is a "good way to compare" two loans, and

18

potentially a "more complete measure" than the interest rate alone.[11] *See id.*, Ex. 25, at PageID.1258. Based on these snippets of hearsay from the internet, Defendants claim Plaintiffs should be sanctioned for relying on a different, more complex analytical process undertaken by a statistician, among other professionals.

This argument is frivolous for the same reason Defendants' HMDA data criticism is frivolous: Plaintiffs' damages *do not need to depend* on comparing their loans to other loans; they were also damaged because UWM's fraudulent scheme caused them to pay for services they never received. In addition, it is irrelevant whether websites suggest comparing APR spreads is a "better" way for consumers to compare two loans, and in any event, it is not a "better" method. *See* Ex. 1, Gibbons Decl. ¶ 13. They also fail to mention that the UWM loan to Jeffries and Singh had a *positive* APR spread and that the APR spread for Schelble's and Stuckey's loans were significantly higher than the average rate spread for comparable loans originated in the same months. *Id.* ¶ 12. Thus, by their own declarant's measure, these Plaintiffs paid more "than the prevailing market APR," which supports Plaintiffs' allegations. Defs. Mot., ECF No. 23-1, Stricker Decl.,

---

[11] Hunterbrook Media's methodology did not compare loans based on "interest rate alone." The method accounted for a range of variables including loan amount, loan year, property geographical information, and other loan-level factors. Ex. 1, Gibbons Decl. ¶ 5. It therefore more accurately captures the cost of a given loan product relative to other wholesale lenders' products than an APR spread comparison. *Id.* ¶¶ 13, 15.

PageID.824–825 at ¶¶ 10-12. None of this comes close to supporting Rule 11 sanctions.

### E.    Plaintiffs Did Not Misrepresent the "All-In Provision."

Defendants' motion fails to identify any specific "misstatement" or "unsubstantiated allegation" about the "All-In Provision" in the Amended Complaint. Instead, Defendants merely offer their own self-serving version of the facts, claiming the provision was intended to "protect the integrity" of and "address a significant problem for the wholesale industry." Defs. Mot., ECF No. 23, at PageID.814. Based on these corporate talking points, Defendants deem Plaintiffs' contrary allegations implausible and sanctionable. This subverts the Rule 11 inquiry.

The FAC contains a detailed factual basis to allege the All-In Provision was part of UWM's scheme to compromise the independence of brokers. Plaintiffs have plausibly alleged that UWM's motive had nothing to do with "integrity" but was instead to fraudulently steer borrowers away from lenders that were "regularly able to offer lower pricing," FAC, PageID.424 at ¶ 67, and to "cultivate loyalist brokers and eliminat[e] their independence." *Id.*, PageID.427 at ¶ 72. These allegations are supported not only by contemporaneous evidence from industry publications but also by admissions from Mr. Ishbia himself. *Id.*, PageID.423–425 at ¶¶ 66–68.

Moreover, Plaintiffs allege that the All-In Provision prevented Plaintiffs' brokers from even *discussing* Rocket Mortgage's products—even when they could

have saved Plaintiffs thousands of dollars. *See, e.g.*, *id.*, PageID.523 at ¶ 287 ("As a direct and proximate result of UWM's scheme" Morandi paid "at least $2,100 more than Rocket loans for similar borrowers with similar loan terms"). Accordingly, UWM wrongly asserts that there is "no plausible basis" to allege the All-In Provision "meaningfully restricted" brokers' ability to shop for their clients' best interest.

UWM also incorrectly asserts that the boycott provision cannot be evidence of a deceptive scheme because there were *non*-boycotted lenders in the market. This misunderstands the FAC. Inducing brokers to boycott UWM's competitors is one part of UWM's overall scheme which, in combination with other tactics alleged in the FAC, cultivated brokers who would steer their clients to UWM. And it worked: Plaintiffs' brokers funneled up to 99% of their business to UWM. The All-In Provision is thus relevant evidence of UWM's alleged scheme and Plaintiffs' related allegations cannot reasonably be deemed sanctionable.

Finally, UWM suggests the claims here are sanctionable because a district court in Florida recently dismissed a federal antitrust claim filed by *brokers* against UWM relating to the All-In Provision. That decision is easily distinguishable: One, it was based on the brokers' failure to adequately allege UWM's *market dominance* under the Sherman Act, which is not an element of any claim here. *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, 2024 WL 982380, at *14 (M.D. Fla. Feb. 6, 2024). Two, the complaint there was filed by an entirely different category of

plaintiffs (brokers, not borrowers) and did not include even a fraction of the allegations here showing UWM's and the brokers' role in misleading and harming borrowers. *See id.*, 2022 WL 20306780 (Second Amended Class Action Complaint).

### F.   Defendants' Argument About "Corrupted Brokers" Is Incorrect.

Defendants also incorrectly claim the FAC over-broadly characterizes some loan officers as "corrupted brokers" where they originated one loan with UWM in 2023. This plainly is not a basis for sanctions: One, the FAC does not allege or imply that UWM corrupted all loan officers who originated one loan with UWM. To the contrary, it defines the putative class as consisting of borrowers whose brokers potentially would be implicated by steering allegations. FAC, PageID.535–536 at ¶ 328. Two, Defendants' statistical argument is a red herring. Looking only at loan officers who brokered at least five loans, the same problem presents: there is a shocking volume of brokers funneling an enormous amount of UWM loans (valued at over $31 billion), and the concentration of corrupted brokers is increasing each year. Ex. 1, Gibbons Decl. ¶¶ 9-10; FAC, PageID.463–464 at ¶¶ 135-37.

### III.   Plaintiffs' Fiduciary Duty-Related Claims Have a Legal Basis.

UWM contends that Plaintiffs should be sanctioned for asserting claims for aiding and abetting breach of fiduciary duty (Count 4) under the common law of four states that allegedly do not recognize the tort (North Carolina, Ohio, Louisiana,

and Alabama).[12] Additionally, Defendants assert that, if Count 4 is not viable under the law of *every* state, it cannot be certified on a "nationwide" basis—and therefore Plaintiffs should be sanctioned for implying otherwise. Defendants are wrong.

Defendants' characterizations about state common law are incorrect. Both Ohio and North Carolina courts have held that claims for aiding and abetting breach of fiduciary duty are viable or potentially viable.[13] And Defendants have not cited authority from Alabama or Louisiana conclusively foreclosing an aiding and abetting theory where the "Erie guess" depends on predicting how the supreme courts in those states would rule and trial court rulings are not dispositive.

More fundamentally, Defendants mistakenly state Plaintiffs pled claims for aiding and abetting breach of fiduciary duty "based on the laws of every state." Defs.

---

[12] Defendants also profess "doubt" about the viability of aiding and abetting claims in Oklahoma, Missouri, and the District of Columbia. Mere "doubt," however, hardly justifies sanctions. Regardless, Defendants have not demonstrated the claims are not viable. *See, e.g.*, *Rosemann v. St. Louis Bank*, 858 F.3d 488, 499–500 (8th Cir. 2017) (stating the elements of aiding and abetting breach of fiduciary duty under Missouri law); *Peel Payments, LLC v. First Data Corp.*, 2016 WL 6407432, at *2 (W.D. Okla. Oct. 28, 2016) (noting there is "reason to believe that Oklahoma courts might recognize a claim [for aiding and abetting breach of fiduciary duty]"); *Int'l Underwriters, Inc. v. Boyle*, 365 A.2d 779, 784 (App. D.C. 1976) (holding third party may be liable for breach of fiduciary duty if party induced the breach).

[13] *See In re Amcast Indus. Corp.*, 365 B.R. 91, 112 (Bankr. S.D. Ohio 2007) (finding that Ohio law recognized a cause of action for aiding and abetting breach of fiduciary duty by adopting the Restatement (Second) of Torts); *Land v. Land*, 222 N.C. App. 317, 2012 WL 3192605, at *8 (2012) (noting it was an open issue whether North Carolina recognizes aiding and abetting breach of fiduciary duty).

Mot., at PageID.819. Plaintiffs are from Florida, Tennessee, California, and North Carolina. At this stage, they are asserting claims on their own behalf. While they eventually intend to move for certification of classes or subclasses under Rule 23 to represent class members from additional states, they have not yet done so and those issues are not before the Court. Further, Plaintiffs are permitted to plead class allegations alternatively, hypothetically, and inconsistently. *See* FED. R. CIV. P. 8(d)(2)-(3). Defendants focus exclusively on Plaintiffs' potential nationwide class. But they ignore that Plaintiffs pled an alternative multi-state subclass, FAC, PageID.536 at ¶ 329, which omits the four states about which Defendants complain.

## IV.   Plaintiffs' Allegations Were Based on a Reasonable Inquiry

Defendants have not (and cannot) demonstrate the absence of a reasonable pre-suit investigation. For a claim to be sanctionable it must be "*both* baseless *and* made without a reasonable and competent inquiry." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (emphasis in original) (citation omitted). The movant must provide "support for the assertion that the steps [counsel] took to investigate his client's factual allegations prior to the filing of the complaint were unreasonable or inadequate" and to "identify particular deficiencies in [counsel]'s prefiling inquiry." *Williams v. Verizon Washington, D.C. Inc.*, 322 F.R.D. 145, 149 (D.D.C. 2017).

Plaintiffs' counsel invested over a thousand hours of time developing the claims' factual and legal foundation, which included (among other things) assessing

and further developing the sophisticated data analysis undertaken by Hunterbrook Media (Ex. 1, Gibbons Decl. ¶¶ 4, 5), investigating the allegations, and communicating with UWM borrowers and wholesale mortgage brokers to verify their experiences, which culminated in a 246-page Amended Complaint, citations to over 100 outside sources, and a 106-page Appendix depicting the types of misleading communications in which Defendants engaged. Defendants cannot reasonably contend that Plaintiffs' counsel's inquiry was inadequate under Rule 11.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' request for relief and consider imposing costs and attorney fees on Defendants for bringing obviously improper Rule 11 claims.

Dated:  October 11, 2024
      Detroit, Michigan

By:  /s/ *Brandon C. Hubbard*

John T. Zach
Marc Ayala
David L. Simons
Andrew P. Steinmetz
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300

Tyler Ulrich
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street, Suite 2800
Miami, Florida 33131
Tel.: (305) 357-8422

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

Mark C. Mao
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Tel.: (415) 293-6800

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2024, I caused the foregoing document

to be filed with the Clerk of the Court using CM/ECF, which will effectuate

service upon all counsel of record.

/s/ *Brandon C. Hubbard*

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

*Attorney for Plaintiffs*

26