## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, Brian P. Weatherill, Kenneth C. Morandi, Jill Jeffries, and Daniel Singh on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia, <br><br> Defendants. | Case No. 2:24-cv-10853-BRM-DRG <br><br> Hon. Brandy R. McMillion, United States District Judge <br><br> Hon. David R. Grand, United States Magistrate Judge |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................xi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ........................... xiii

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................2

ARGUMENT .......................................................................................................7

I.     Notice and Cure Provisions in Plaintiffs' Mortgage Contracts
Do Not Preclude This Action. ...................................................................7

II.    Plaintiffs' RICO Claims Are Well-Pled...................................................8

     A.    Plaintiffs Sufficiently Plead Proximate Causation.........................8

     B.    Plaintiffs Sufficiently Plead a RICO Enterprise. ..........................13

     C.    Plaintiffs Sufficiently Plead a Pattern of
Racketeering Activity....................................................................21

     D.    The Economic Loss Doctrine Does Not Preclude
Recovery Under Plaintiffs' RICO Claims. ...................................24

     E.    RESPA Does Not Preclude Plaintiffs' RICO Remedies. ..............26

III.    Plaintiffs' Claim Under RESPA Is Well-Pled.........................................27

     A.    UWM's Unlawful Kickback Scheme Violated § 2607(a). ............27

     B.    UWM's Payments to Brokers for Settlement Services
They Did Not Perform Violated § 2607(b)....................................29

     C.    Defendants' Fraudulent Concealment Tolled RESPA's
Limitations Period. .......................................................................30

IV.    Plaintiffs' Aiding and Abetting Breach of Fiduciary Duty and
Civil Conspiracy Claims Are Well-Pled. ..................................................33

i

A.  Plaintiffs Sufficiently Plead Aiding and Abetting
    Breach of Fiduciary Duty. ............................................................... 33

B.  Plaintiffs Sufficiently Plead Civil Conspiracy. ............................. 36

V.   Plaintiffs' Consumer Protection Claims Are Well-Pled. ........................ 37

VI.  Plaintiffs' Unjust Enrichment Claim Is Well-Pled. .................................. 40

VII. Plaintiffs' Claims against the Non-UWM Defendants
     Are Well-Pled. ............................................................................................. 41

CONCLUSION ..................................................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Abbitt v. Gregory*,
   160 S.E. 896 (N.C. 1931)......................................................................34

*Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*,
   2005 WL 3710370 (E.D.N.Y. Feb. 22, 2005) ...................................19

*Albright v. Christensen*,
   24 F.4th 1039 (6th Cir. 2022) .............................................................39

*Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*,
   702 F. App'x 416 (6th Cir. 2017) ......................................................22

*Atlas Techs., LLC v. Levine*,
   268 F. Supp. 3d 950 (E.D. Mich. 2017) ...........................................25

*Beck v. FCA US LLC*,
   273 F. Supp. 3d 735 (E.D. Mich. 2017) ...........................................22

*Boyle v. United States*,
   556 U.S. 938 (2009)..................................................... 13, 15, 18, 20

*Brexendorf v. Bank of America, N.A.*,
   319 F. Supp. 3d 1257 (M.D. Fla. 2018)............................................38

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008)........................................................ 8, 12, 13, 20

*Brock v. Consol. Biomedical Lab.*,
   817 F.2d 24 (6th Cir.1987) ................................................................25

*Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*,
   71 F.3d 545 (6th Cir. 1995) ..............................................................26

*Carrier Corp. v. Outokumpu Oyj*,
   673 F.3d 430 (6th Cir. 2012) .............................................. 30, 31, 32

*Chandler v. Wackenhut Corp.*,
   465 F. App'x 425 (6th Cir. 2012)......................................................31

*Cimoli v. Alacer Corp.*,
   546 F. Supp. 3d 897 (N.D. Cal. 2021) ................................................................41

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
   615 F.3d 496 (6th Cir. 2010) ..................................................................... 11, 12

*Colon v. Nationstar Mortg., LLC*,
   2015 WL 7422598 (S.D. Fla. Nov. 17, 2015) ...................................................7, 8

*Colonial Trading, LLC v. Bassett Furniture Ind., Inc.*,
   530 F. App'x 218 (4th Cir. 2013) ......................................................................39

*Condor, S.A. v. Plurinational State of Bolivia*,
   352 So.3d 921 (Fla. Dist. Ct. App. 2022) ........................................................36

*Cox v. Admr. U.S. Steel & Carnegie*,
   17 F.3d 1386 (11th Cir. 1994) .........................................................................10

*Czarnecki v. Roller*,
   726 F. Supp. 832 (S.D. Fla. 1989) ...................................................................34

*D'Addario v. D'Addario*,
   901 F.3d 80 (2d Cir. 2018) ....................................................................... 20, 21

*Datamatics Glob. Servs., Inc. v. Ravi*,
   2024 WL 3997055 (E.D. Mich. Aug. 29, 2024).................................................25

*De Los Angeles Aurora Gomez v. Bank of Am., N.A.*,
   2013 WL 12165673 (C.D. Cal. Aug. 21, 2013) ................................................11

*Detroit Edison Co. v. NABCO, Inc.*,
   35 F.3d 236 (6th Cir.1994) ..............................................................................25

*Diop v. BMW of North America, LLC*,
   511 F. Supp. 3d 679 (E.D.N.C. 2021) ..............................................................37

*Eaton ex rel. Johnson v. Eaton*,
   83 S.W.3d 131 (Tenn. Ct. App. 2001).............................................................34

*Edmonson v. Eagle Nat'l Bank*,
   922 F.3d 535 (4th Cir. 2019) ...........................................................................30

*Egerer v. Woodland Realty, Inc.*,
    556 F.3d 415 (6th Cir. 2009) ...............................................................27

*Elder-Beerman Stores Corp.*,
    459 F.2d 138 (6th Cir. 1972) ...............................................................18

*Empire Title Servs., Inc. v. Fifth Third Mortg. Co.*,
    2013 WL 1337629 (N.D. Ohio Mar. 29, 2013)....................................27

*Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*,
    328 F. Supp. 2d 1319 (S.D. Fla. 2004) ................................................40

*Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*,
    202 F. Supp. 3d 711, (E.D. Mich. 2016) .............................................26

*Gen. Motors LLC v. FCA US LLC*,
    2020 WL 3833058 (E.D. Mich. July 8, 2020) .....................................12

*Grow Mich., LLC v. LT Lender, LLC*,
    50 F.4th 587 (6th Cir. 2022) ................................................................12

*Guyton v. FM Lending Servs., Inc.*,
    681 S.E.2d 465 (N.C. Ct. App. 2009)..................................................34

*Hart v. Ludwig*,
    79 N.W.2d 895 (Mich. 1956)......................................................... 25, 26

*Hemi Grp., LLC v. City of New York, N.Y.*,
    559 U.S. 1 (2010)...........................................................................8, 10

*Hill v. AQ Textiles LLC*,
    582 F. Supp. 3d 297 (M.D.N.C. 2022) ...............................................40

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)...............................................................................8

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) ...............................................................20

*In re Carter*,
    553 F.3d 979 (6th Cir. 2009) ...............................................................29

*In re ClassicStar Mare Lease Litig.*,
  823 F. Supp. 2d 599 (E.D. Ky. 2011) ...................................................13

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
  2023 WL 8190256 (N.D. Ill. Nov. 27, 2023) ....................................19

*In re Duramax Diesel Litig.*,
  298 F. Supp. 3d 1037 (E.D. Mich. 2018) .................................... passim

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice
  Litig.*, 955 F. Supp. 2d 1311 (S.D. Fla. 2013) ...................................40

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ...............................................................20

*In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*,
  709 F. Supp. 3d 478 (M.D. Tenn. 2023) ............................................19

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517, 538 (6th Cir. 2008) ......................................................31

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ..............................................................20

*Jaffe v. Bolton*,
  817 S.W.2d 19 (Tenn. Ct. App. 1991) ................................................40

*Johnson v. KB Home*,
  720 F. Supp. 2d 1109 (D. Ariz. 2010) ................................................27

*Jones v. Thomas*,
  296 S.W.2d 646 (Tenn. Ct. App. 1955) ..............................................34

*Kelley v. Johns*,
  96 S.W.3d 189 (Tenn. Ct. App. 2002) ................................................34

*Kline v. Pyms Suchman Real Est. Co.*,
  303 So. 2d 401 (Fla. Dist. Ct. App. 1974) .........................................35

*Logan v. Morgan, Lewis & Bockius LLP*,
  350 So. 3d 404 (Fla. Dist. Ct. App. 2022) .........................................36

*Lutz v. Chesapeake Appalachia, LLC*,
    717 F.3d 459 (6th Cir. 2013) ...............................................................32

*Martin v. Pierce County*,
    34 F.4th 1125 (9th Cir. 2022) ..............................................................39

*McShannock v. JP Morgan Chase Bank N.A.*,
    354 F. Supp. 3d 1063 (N.D. Cal. 2018) ...............................................7

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*,
    2024 WL 982380 (M.D. Fla. 2024) ............................................. 21, 38

*Ouwinga v. Benistar 419 Plan Servs. Inc.*,
    694 F.3d 783 (6th Cir. 2012) ...............................................................14

*Perry v. Am. Tobacco Co., Inc.*,
    324 F.3d 845 (6th Cir. 2003) ....................................................... 11, 12

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
    838 F.2d 1445 (6th Cir. 1988) .............................................................30

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
    173 F.3d 995 (6th Cir. 1999) ...............................................................18

*Richards v. NewRez LLC*,
    2021 WL 1060286 (D. Md. Mar. 18, 2021) ........................................7

*Ron Medlin Const. v. Harris*,
    681 S.E.2d 807 (N.C. Ct. App. 2009)..................................................40

*Root, Inc. v. Silver*,
    2024 WL 85057 (S.D. Ohio Jan. 8, 2024) .................................. 17, 20

*Ruth v. Unifund CCR Partners*,
    604 F.3d 908 (6th Cir. 2010) ...............................................................32

*Rutherford Holdings, LLC v. Plaza Del Rey*,
    166 Cal. Rptr. 3d 864 (Cal. Ct. App. 2014)........................................40

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)...............................................................................8

vii

*Simms v. CIT Group/Consumer Fin.*,
    2009 WL 973011 (W.D. Tenn. 2009).................................................................32

*Smith v. FirstEnergy Corp.*,
    518 F. Supp. 3d 1118 (S.D. Ohio 2021) ..................................................... 10, 12

*Smith v. Home Loan Funding, Inc.*,
    192 Cal. App. 4th 1331 (Cal. Ct. App. 2011)......................................................34

*Solis v. Emery Fed. Credit Union*,
    459 F. Supp. 3d 981 (S.D. Ohio 2020)................................................................32

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ...............................................................................19

*State of Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288 (S.D. Fla. 2005)...................................................39

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011).............................................................................................10

*Stewart v. Kodiak Cakes, LLC*,
    537 F. Supp. 3d 1103 (S.D. Cal. 2021)................................................................37

*Sutton v. Driver*,
    712 S.E.2d 318 (N.C. App. 2011)........................................................................34

*Tenn. ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*,
    2024 WL 4351650 (E.D. Tenn. 2024)..................................................................38

*Toldy v. Fifth Third Mortg. Co.*,
    721 F. Supp. 2d 696 (N.D. Ohio 2010) ...............................................................29

*Tong v. Dunn*,
    2012 WL 944581 (N.C. Super. Ct. Mar. 19, 2012) .............................................33

*Torres v. Vitale*,
    954 F.3d 866 (6th Cir. 2020) ...................................................................... 26, 27

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) ..............................................................................19

*Trollinger v. Tyson Foods, Inc.*,
    370 F.3d 602 (6th Cir. 2004) ............................................................... 11, 12, 41

*United States v. Bibby*,
    752 F.2d 1116 (6th Cir. 1985) ...........................................................21

*United States v. Daniel*,
    329 F.3d 480 (6th Cir. 2003) .............................................................23

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988) ..............................................................18

*United States v. Goodwin*,
    748 F. App'x 651 (6th Cir. 2018) .......................................................23

*United States v. Householder*,
    2023 WL 23801 (S.D. Ohio Jan. 2, 2023) .........................................17

*United States v. Kennedy*,
    714 F.3d 951 (6th Cir. 2013) .............................................................21

*United Wholesale Mortg., LLC v. Am.'s Moneyline, Inc.*,
    2024 WL 1349301 (E.D. Mich. 2024).................................................21

*United Wholesale Mortgage, LLC v. Am.'s Moneyline, Inc.*,
    647 F. Supp.3d 587 (E.D. Mich. 2022) ...................................... 25, 26

*VanDenBroeck v. CommonPoint Mortg. Co.*,
    210 F.3d 696 (6th Cir. 2000*)* ...........................................................20

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
    714 F.3d 414 (6th Cir. 2013) ................................................... passim

*Weiss v. Bank of Am. Corp.*,
    153 F. Supp. 3d 831 (W.D. Pa. 2015)..................................................18

*Wilson v. Eagle Nat'l Bank*,
    2023 WL 2478933 (D. Md. Mar. 13, 2023) .......................................27

*Wyatt v. Union Mortg. Co.*,
    598 P.2d 45 (Cal. 1979) ........................................................... 33, 35

## Statutes

12 U.S.C. § 2607 ................................................................................... 27, 28, 29

18 U.S.C. § 1961 ......................................................................................... 13, 21

18 U.S.C. § 1962 ...................................................................................................8

18 U.S.C. § 1964 ...................................................................................................8

Cal. Civ. Code § 2923.1 .....................................................................................33

Cal. Penal Code § 641.3 ......................................................................................24

Fla. Stat. Ann. § 501.212 ....................................................................................38

N.C. Gen. Stat. § 14-353 .....................................................................................39

N.C. Gen. Stat. Ann § 53-244.109 ................................................................ 33, 35

Tenn. Code Ann. § 47-18-111 .............................................................................38

## Rules

Fed. R. Civ. P. 9 ............................................................................ 21, 22, 37

## Regulations

12 C.F.R. § 1026.36 .............................................................................................39

12 C.F.R. § 1024.14 ...................................................................................... 27, 29

12 C.F.R. § 1024.2 ...............................................................................................29

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.    Do the notice-and-cure provisions in UWM's mortgage contracts bar Plaintiffs' claims brought under federal and state law where such claims are independent of the mortgage contracts?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

2.    Do Plaintiffs state actionable claims under RICO?

      Plaintiffs' answer: Yes

      Defendants' answer: No

      This Court should answer: Yes

3.    Do Plaintiffs state actionable claims under RESPA?

      Plaintiffs' answer: Yes

      Defendants' answer: No

      This Court should answer: Yes

4.    Do Plaintiffs Weatherill, Morandi, Schelble, and the Escues plausibly allege the fraudulent concealment doctrine tolled RESPA's statute of limitations?

      Plaintiffs' answer: Yes

      Defendants' answer: No

      This Court should answer: Yes

5.    Do Plaintiffs state actionable claims for aiding and abetting breach of fiduciary duty?

    Plaintiffs' answer: Yes

    Defendants' answer: No

    This Court should answer: Yes

6.    Do Plaintiffs state actionable claims for civil conspiracy?

    Plaintiffs' answer: Yes

    Defendants' answer: No

    This Court should answer: Yes

7.    Do Plaintiffs state actionable claims under the consumer protection laws of their respective states?

    Plaintiffs' answer: Yes

    Defendants' answer: No

    This Court should answer: Yes

8.    Do Plaintiffs state actionable claims for unjust enrichment?

    Plaintiffs' answer: Yes

    Defendants' answer: No

    This Court should answer: Yes

9.    Do Plaintiffs state actionable claims against the non-UWM Defendants?

    Plaintiffs' answer: Yes

    Defendants' answer: No

    This Court should answer: Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

**Notice-and-Cure Provisions**

*Richards v. NewRez LLC*, 2021 WL 1060286 (D. Md. Mar. 18, 2021)

**RICO Proximate Cause**

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414 (6th Cir. 2013)

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004)

*In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018)

*Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118 (S.D. Ohio 2021)

**RICO Enterprise**

*Boyle v. United States*, 556 U.S. 938 (2009)

*Ouwinga v. Benistar 419 Plan Servs. Inc.*, 694 F.3d 783 (6th Cir. 2012)

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999)

*United States v. Householder*, 2023 WL 23801 (S.D. Ohio Jan. 2, 2023)

**RICO Predicate Acts**

*United States v. Daniel*, 329 F.3d 480 (6th Cir. 2003)

*In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037 (E.D. Mich. 2018)

**RICO Economic Loss Doctrine**

*Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950 (E.D. Mich. 2017)

*Datamatics Glob. Servs., Inc. v. Ravi*, 2024 WL 3997055 (E.D. Mich. Aug. 29, 2024)

**RICO Preclusion (RESPA)**

*Johnson v. KB Home*, 720 F. Supp. 2d 1109 (D. Ariz. 2010)

**RESPA**

*Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012)

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir. 1988)

*Toldy v. Fifth Third Mortg. Co.*, 721 F. Supp. 2d 696 (N.D. Ohio 2010)

**Aiding and Abetting Breach of Fiduciary Duty**

*Wyatt v. Union Mortg. Co.*, 598 P.2d 45, 50 (Cal. 1979)

*Guyton v. FM Lending Servs., Inc.*, 681 S.E.2d 465 (N.C. Ct. App. 2009)

*Smith v. Home Loan Funding, Inc.*, 192 Cal. App. 4th 1331 (Cal. Ct. App. 2011)

**Consumer Protection**

*Diop v. BMW of North America, LLC*, 511 F. Supp. 3d 679 (E.D.N.C. 2021)

**Unjust Enrichment**

*Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319 (S.D. Fla. 2004)

*Ron Medlin Const. v. Harris*, 681 S.E.2d 807 (N.C. Ct. App. 2009)

*Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. Rptr. 3d 864 (Cal. Ct. App. 2014)

*Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991)

## INTRODUCTION

The wholesale mortgage industry is supposed to be, as Defendants describe in their motion, "a valuable alternative for borrowers who wish to work with independent brokers rather than navigate the retail mortgage market alone." ECF No. 30 ("Mot.") at 1. But for Plaintiffs and other borrowers who financed their homes with United Wholesale Mortgage, LLC ("UWM"), it is anything but.

Through their pervasive advertising, marketing, and public statements— including in marketing materials that UWM supplies to brokers—Defendants have represented that brokers who originate UWM loans are *independent*. Defendants tell borrowers, in substance, the brokers "represent you," "are not limited in the product they can offer you," "have access to all lenders," and "they shop" for the "lower rate" and "best deal" from "multiple lenders" because they are not "captive" to a single lender and not "limited to only one choice." *See, e.g.*, Plaintiffs' First Amended Complaint ("FAC") ¶¶ 9, 47. Representations about broker independence are why borrowers enter the wholesale mortgage market in the first place.

But they are verifiably false. One Plaintiff's broker steers between 99.4% and 100% of her clients to UWM, constituting over half a ***billion*** dollars in business. Another Plaintiff's broker steered 99.5% of his business to UWM, constituting hundreds of millions of dollars and affecting hundreds of borrowers. These borrowers did not get "lower rates," because their brokers were not shopping for

1

lower rates. Instead, they ended up paying for brokerage services never provided and substantially more for their loans. This happened again and again nationwide.

Misrepresentations were only part of the scheme. UWM also financially induced brokers to funnel loans and required brokers to agree to "loyalty" provisions in UWM contracts that were not disclosed to Plaintiffs. The FAC alleges extensive facts about Defendants' efforts to corrupt brokers' independence and prevent them from providing honest services through a system of undisclosed inducements.

Defendants seek to evade accountability by distorting the FAC beyond recognition. They claim, for instance, that this action is an "attempt to revive legal theories" from two entirely unrelated antitrust cases filed by mortgage brokers that failed for reasons irrelevant here.[1] But those cases have no bearing on Plaintiffs RICO, RESPA, consumer protection, or common law claims. And Defendants' remaining arguments are based on legal authorities and theories that do not support dismissal. Defendants' motion should be denied.

## BACKGROUND

### A.    The Wholesale Mortgage Industry

In contrast to retail mortgage loans, which are originated through a direct interaction between a lender and borrower, wholesale mortgage loans are originated

---

[1] *Okavage Grp., LLC v. United Wholesale Mortg.*, No. 21-cv-448 (M.D. Fla.) and *United Wholesale Mortg. v. Am.'s Moneyline, Inc.*, No. 22-cv-10228 (E.D. Mich.). One look at pleadings in those cases demonstrates their irrelevance here.

through a process involving a third-party—an independent mortgage broker—who represents the borrower in the mortgage origination process. *Id.* ¶ 31. Independent brokers are responsible for, among other things (i) surveying the market and presenting a range of loan options, and (ii) helping borrowers evaluate those options and select the loan that best meets their needs. *Id.* ¶¶ 31, 40, Fig. 1. For these services, brokers earn a fee, typically between 1–4% of the principal on the loan. *Id.* ¶ 32.

The essential characteristic of an independent mortgage broker is *independence*. *Id.* ¶¶ 5, 38–39. Unlike a retail loan officer, an "independent" broker owes loyalty to the borrower, not the lender. *Id.* And because the broker is not tied to any particular lender, borrowers trust the broker will provide non-conflicted advice and diligently shop the market. *Id.* ¶¶ 38–44.

### B. UWM's Scheme to Deceive Borrowers, Corrupt Mortgage Brokers' Independence, and Steer Loans to Itself

In pursuit of increased market share, Defendants executed a scheme, leveraging the structure of the wholesale market, to deceive borrowers into hiring brokers who they believe are "independent," but who are in fact loyal to UWM. *Id.* ¶¶ 1–2, 10–11. And once they are engaged, these UWM-loyalist brokers steer borrowers into UWM loans, depriving them of the "independent" advice for which they paid, and regardless of whether better loan options are available. *Id.* ¶¶ 130–55.

The scheme has several components. *First*, Defendants work with brokers to convince consumers that getting a mortgage through an "independent" broker is in

3

their best interest. *Id.* ¶¶ 37–62. They do this through direct marketing to consumers, *id.* ¶¶ 37–38, 45–52, and by coordinating with brokers to control and influence the brokers' marketing to prospective clients. *Id.* ¶¶ 53–62, App'x A. For instance, UWM instructs and incentivizes brokers to use its bespoke marketing tools which embed its preferred messages. *Id.* UWM also conducts training sessions for its brokers in which it instructs them to "not change anything" in UWM's templates, explaining, "[w]e do everything for you." *Id.* ¶¶ 59–62.

*Second*, UWM restricts brokers' ability to shop on their clients' behalf through its Wholesale Broker Agreement, which contains two provisions that force brokers to ignore or conceal more competitive loan offerings from non-UWM lenders. *Id.* ¶¶ 73–89. One is UWM's "All-In" policy, which prohibits brokers who do business with UWM from shopping for loans from Rocket Mortgage and Fairway Independent Mortgage. *Id.* ¶ 75–84. The other is UWM's "Lock-In" policy, which prohibits brokers from shopping with *any* other lender after "locking-in" a rate quote from UWM. *Id.* ¶¶ 85–88. UWM monitors brokers' compliance with these policies and punishes brokers with lawsuits when brokers violate them. *Id.* ¶¶ 90–94.

*Third*, UWM provides brokers value in exchange for the brokers demonstrating their loyalty by funneling loans to UWM. *Id.* ¶¶ 95–129. One example of this is UWM's broker search engine website, Mortgage Matchup (previously called FindAMortgageBroker.com). *Id.* ¶¶ 97–115. While UWM portrays the

website as a tool that helps borrowers connect with an "independent" mortgage broker who "has your best interest in mind" and will "shop dozens of lenders to find the right home loan for your needs" (*id.* ¶ 99), the website's search algorithm deliberately favors brokers who steer loans to UWM. *Id.* ¶¶ 106–14. This creates a powerful, undisclosed incentive for brokers to steer loans to UWM, even if not in the borrower's interest: steering loans provides the broker more visibility on the website and thus more business. *Id.* ¶¶ 115. UWM offers loyal brokers other inducements as well, including faster underwriting times, access to teaser products and discounts, lavish meals, live entertainment, and luxury travel. *Id.* ¶¶ 116–29.

The result of this scheme has been exactly what UWM intended: the number of brokers who steer the vast majority of their loans to UWM, instead of "independently" shopping, has increased dramatically since 2020. *Id.* ¶¶ 130–37. As of 2023, nearly half of all UWM mortgages were originated by brokers who steer 75% or more of their business to UWM. *Id.* ¶ 12, 132–34.[2] Nearly one in eight UWM loans (30,252 loans total) were originated by the ***8,665 brokers*** who sent ***more than 99%*** of their loans to UWM. Consumers hire these brokers believing they will provide "independent," loyal representation, but they end up getting neither. *Id.* ¶ 11. Rather, they get steered into a UWM loan by a captive, UWM-loyalist and are thus

---

[2] The FAC includes an anonymized list of 2,502 brokers who both steer 75% or more of their loans to UWM and are above the 75th percentile of total loan volume brokered. The brokers in this group are among the most prolific steerers. App'x B.

unknowingly deprived of the exact service that drew them into the wholesale channel in the first place and for which they paid. *Id.* ¶¶ 10, 145–49. Worse, the UWM loans these consumers get are almost always more expensive than comparable loans that were available had their broker shopped the market as promised. *Id.* ¶ 138–55.

## C.    Plaintiffs' Class Action

Plaintiffs are seven homeowners who obtained a UWM mortgage through mortgage brokers who each steer 75% or more of their business to UWM. *Id.* ¶¶ 177–319. On August 30, 2024, Plaintiffs filed their First Amended Complaint ("FAC") which alleges: violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts I–II), violations of the Real Estate Settlement Procedures Act ("RESPA") (Count III), claims for aiding and abetting breaches of fiduciary duty and civil conspiracy (Counts IV–V), unjust enrichment (Count VI), and violations of state consumer protection statutes (Counts VII–XI).

In a separate motion, Defendants made the baseless accusation—which they repeat again here—that Plaintiffs brought this action as part of an effort to short UWM's stock (ECF No. 23). Plaintiffs already addressed that false and irresponsible accusation (ECF No. 28) and will not dignify it with a further response here.

## **ARGUMENT**

### I.   **Notice and Cure Provisions in Plaintiffs' Mortgage Contracts Do Not Preclude This Action.**

The "notice-and-cure" provisions in Plaintiffs' mortgage contracts do not foreclose this action. Mot. at 8–9. The provisions apply only to a judicial action "that arises from the other party's actions *pursuant to this Security Instrument* or that alleges that the other party *has breached any provision of, or any duty owed by reason of, this Security Instrument*...." *E.g.*, Mot., Ex 6-1 at 12 (emphasis added). Courts consistently recognize that such provisions apply only to claims arising from rights or obligations under the mortgage, not "claims that exist independent of a contract[] between the parties, such as allegations of deceptive trade practices." *E.g.*, *Richards v. NewRez LLC*, 2021 WL 1060286, at *21 (D. Md. Mar. 18, 2021).[3]

None of Plaintiffs' claims arises under any "provision of, or duty owed by reason of" the mortgage contracts. Rather, Plaintiffs assert that Defendants breached duties they owed to Plaintiffs under federal and state law independent of the mortgage contracts. The notice-and-cure provisions are therefore inapplicable.[4]

---

[3] *See also, e.g.*, *Colon v. Nationstar Mortg., LLC*, 2015 WL 7422598, at *2 (S.D. Fla. Nov. 17, 2015) (holding identical provision "is circumscribed to breaches of provisions, and duties owed, within the Mortgage itself"); *McShannock v. JP Morgan Chase Bank N.A.*, 354 F. Supp. 3d 1063, 1072 (N.D. Cal. 2018) (identical provision inapplicable because plaintiff's California's UCL claims had "an independent basis in statute, not the contract").

[4] Defendants' cases also are inapposite because they concern claims arising from actions that occurred *after* execution of the mortgage contracts, while the claims here

7

## II.     Plaintiffs' RICO Claims Are Well-Pled.

"RICO is to be read broadly" in light of "Congress' self-consciously expansive language" and "express admonition that RICO is to be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) (internal quote omitted). "Any person injured in his business or property by reason of a violation of section 1962" of the statute can sue. 18 U.S.C. § 1964(c). To state a § 1962(c) violation, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496.

### A.     Plaintiffs Sufficiently Plead Proximate Causation.

To state a civil RICO claim, a plaintiff must plead proximate cause. *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). "Proximate cause...does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992)). Courts thus turn to "the many traditional proximate cause considerations found at common law" including whether the harm plaintiff suffered is a "foreseeable" or "logical" consequence of, or has a "direct relation" to, the "injurious conduct alleged." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013); *Hemi*, 559 U.S. at 9

---

concern Defendants' pre-execution conduct. *Colon*, 2015 WL 7422598 at *2 (provision "cannot be stretched to ensnare pre-suit conduct" that is "not directly connected to the performance of the duties in the Mortgage").

(evaluating causation "in light of its common-law foundations"). Where a plaintiff "plausibly assert[s] that the defendant's actions 'increased the likelihood of injury,'" the proximate cause requirement is satisfied. *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1077 (E.D. Mich. 2018) (quoting *Wallace*, 714 F.3d at 422).

*Wallace* is instructive. There, the plaintiff alleged his mortgage lender and broker "acted in concert" in a RICO enterprise "to manufacture misleadingly optimistic real estate valuations that induced him and borrowers like him to enter into larger loans with higher interest rates than they could reasonably afford." 714 F.3d at 417–18. The Sixth Circuit found the plaintiff pled proximate cause where the allegations showed a "direct relation between the injury asserted and the injurious conduct alleged" because the plaintiff was among the "intended target[s] of the defendants' alleged scheme" and "the link between the scheme and the type of injury [plaintiff] suffered [was] plain to see" where it was a "foreseeable" and "logical" result of defendants' scheme. *Id.* at 419–22.

Here, Defendants do not dispute that it was "foreseeable" and "logical" that the RICO scheme alleged would cause the type of harm Plaintiffs suffered. Nor could they. Defendants designed their scheme to "cultivate 'loyalist' brokers" who would funnel unsuspecting borrowers into UWM loans. FAC ¶¶ 2, 10, 72–73. And in furtherance of their scheme, Defendants developed and amplified deceptive marketing communications for the purpose of convincing borrowers (like Plaintiffs)

9

that their brokers were "independent" when they, in fact, were not. *Id.* ¶¶ 2, 6–11, 37–63. The scheme achieved the result it intended: Plaintiffs purchased loans from UWM while remaining unaware their brokers were not shopping the market on their behalf (depriving them of lower-cost loan options). *Id.* ¶¶ 138–47, 367–74.

Hoping to shift blame to brokers, Defendants incorrectly claim that the FAC's causal theory "involves far too many intervening, third-party actions." Mot. at 13. But "proximate cause is not...the same thing as a sole cause." *Wallace*, 714 F.3d at 422 (quoting *Cox v. Admr. U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994)); *Smith v. FirstEnergy Corp.*, 518 F. Supp. 3d 1118, 1133 (S.D. Ohio 2021) ("proximate cause contemplates multiple independent causes, even under the directness standard"). Indeed, a later "decisionmaker's exercise of judgment does not prevent the earlier agent's action...from being the proximate cause of the harm." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (citing *Hemi*, 559 U.S. at 9).

*UWM was the central driver of the alleged scheme*. UWM participated in and even authored the brokers' deceptive consumer-facing marketing that falsely promised broker "independence" (and instructed brokers to "not change anything" when using UWM templates). FAC ¶¶ 53–63, App'x A. It imposed contractual restrictions on brokers to prohibit them from sending loans to competitors. *Id.* ¶¶ 73–89. It created a deceptive search engine to steer consumers to loyalist brokers, and conditioned valuable rewards for brokers on higher loan volume. *Id.* ¶¶ 95–129. It

also monitored brokers' loyalty and punished brokers who refused to go along. *Id.* ¶¶ 90–94. In sum, UWM corrupted brokers' incentives by enriching them for steering and penalizing them when they strayed to other lenders. *Id.* ¶ 159. On these allegations, Defendants cannot reasonably dispute that Plaintiffs have "plausibly assert[ed]" that UWM's "actions increased the likelihood of injury." *Duramax*, 298 F. Supp. 3d at 1077.[5] And in any event, intervening cause disputes are "matters for summary judgment, not dismissal on the pleadings." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 619 (6th Cir. 2004).

Defendants also misapprehend the applicable precedent in claiming that Plaintiffs' injury was "too indirect" to support a claim. Defendants' cases stand for the proposition that "indirectness" may preclude recovery for "derivative or 'passed on' injuries." *Trollinger*, 370 F.3d at 613. These include cases where RICO plaintiffs claimed that tobacco products increased costs to insurers, which in turn increased costs for policy holders (*Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 849 (6th Cir. 2003)), or where a city brought nuisance claims against subprime mortgage lenders for causing mass foreclosures, which in turn harmed the city's budget (*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 504–06 (6th Cir. 2010)).

---

[5] *De Los Angeles Aurora Gomez v. Bank of Am., N.A.*, 2013 WL 12165673 (C.D. Cal. Aug. 21, 2013) is nothing like this case because the RICO predicate alleged was a Ponzi scheme run by a mortgage broker about which the lender had no knowledge.

Those cases do not remotely resemble the allegations in this case. There, the plaintiffs' injuries were derivative of injuries first suffered by intermediate victims.[6] Here, Defendants and their co-conspirator brokers targeted their scheme *directly* at borrowers like Plaintiffs—*there was no intermediate victim*. *Id.* ¶¶ 367–74. The sole victims of the scheme were Plaintiffs, who entered into UWM loans on the false premise that it was selected by an "independent" broker. Those injuries are direct; they are not contingent on an injury to a third party.[7]

Last, Defendants incorrectly assert that proximate cause is not met because (they claim) Plaintiffs fail to allege reliance. Plaintiffs bear no burden to plead reliance. *Bridge*, 553 U.S. at 661 ("[A] plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."). "For RICO purposes, reliance and proximate cause remain

---

[6] *See Gen. Motors LLC v. FCA US LLC*, 2020 WL 3833058, at *10 (E.D. Mich. July 8, 2020) ("the direct victims" are "FCA's workers," not plaintiff); *City of Cleveland*, 615 F.3d at 506 ("more immediate victims can sue to the extent Defendants violated any laws"); *Perry*, 324 F.3d at 849 ("plaintiffs' claims are inherently contingent on injury to third-party smokers"); *Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 594–97 (6th Cir. 2022) ("If there is any proper plaintiff . . . it is Lightning").

[7] *See, e.g.*, *Trollinger*, 370 F.3d at 615–18 (proximate cause alleged where "the law cannot count on a more 'directly injured victim[]'" to bring suit); *Smith*, 518 F. Supp. 3d at 1131–32 (proximate cause alleged where plaintiffs were part of the "only . . . group of individuals or entities who could be injured by Defendants' scheme" and thus "there are no better plaintiffs to vindicate the civil RICO statute").

distinct—if frequently overlapping—concepts. While reliance is 'often used to prove...the element of causation,' it is not the only way to do so, nor does the possibility of proving causation through reliance 'transform reliance itself into an element of the cause of action.'" *Wallace*, 714 F.3d at 420 (quoting *Bridge*, 553 U.S. at 659). Accordingly, "[a] plaintiff need only show use of the mail in furtherance of a scheme to defraud and an injury proximately caused by that scheme." *Id.* "[A] person can be injured 'by reason of' a pattern of mail fraud *even if he has not relied on any misrepresentations*." *Bridge*, 553 U.S. at 649 (emphasis added).

Even so, Plaintiffs *do* allege they relied on Defendants' and their brokers' misrepresentations and omissions, who were co-conspirators in the scheme. *See* FAC ¶¶ 191, 223, 252, 277, 307; *In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 627 (E.D. Ky. 2011), *aff'd*, 727 F.3d 473 (6th Cir. 2013) ("each defendant is liable whether or not that person personally made any misrepresentations").

### B.    Plaintiffs Sufficiently Plead a RICO Enterprise.

Plaintiffs allege in FAC ¶ 351 that the "Steering Enterprise" constitutes an "association-in-fact" enterprise under 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). To establish an such an enterprise, a plaintiff must allege "(1) an ongoing

organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged." *Ouwinga v. Benistar 419 Plan Servs. Inc.*, 694 F.3d 783, 793 (6th Cir. 2012). "[T]he organizational structure need not be hierarchical, can make decisions on an ad hoc basis, and does not require the members to have fixed roles." *Id.* at 794. "Put another way, a plaintiff must show 'simply a continuing unit that functions with a common purpose." *Id.*

Plaintiffs' allegations satisfy all three prongs. *First*, Defendants do not dispute the allegations meet the distinctness requirement in prong three.

*Second*, Plaintiffs alleged a continuing unit with a decision-making framework. The FAC identifies a framework in which Defendants used organized incentives and threats to cause brokers to systematically deceive consumers into retaining them based on their so-called "independence," when they are not independent, but loyal to UWM. FAC ¶¶ 72–155. UWM "knows which brokers are participating in the scheme," and brokers know of the enterprise's fraudulent purpose. *Id.* ¶ 149. The FAC identifies 2,502 participating brokers who funneled 270,393 loans to UWM from 2021-2023 with a value totaling 93 billion. *Id.*,

14

App'x B. These "core participants" are "known, tracked, and identified." *Id*. ¶ 149.[8]

Moreover, the enterprise's hierarchical structure has continued. Days after Plaintiffs filed their complaint, Defendants communicated to their broker "Partners" to reassure them that "[i]t is not uncommon nor illegal for a broker to send most or all of their business to a specific lender" and that they are "100% confident nothing needs to change or will change" so long as brokers do not "change behavior." *Id*. ¶ 170. And to encourage brokers to not "change behavior," Defendants offered to pay the brokers' attorneys' fees if they get "roped into" this litigation. *Id*. ¶ 171.

*Third*, Plaintiffs have alleged that Defendants and their corrupted brokers share the common purpose and motive of "sell[ing] as many mortgages as possible." *Id*. ¶ 360. To achieve this, Defendants provide the participating brokers kickbacks including client referrals and other value in exchange for higher proportions of their loan volume. *Id*. ¶¶ 363, 366, 368. This enables Defendants to increase their market share and revenues without having to honestly compete. *Id*. ¶¶ 360, 365, 368. In short, Defendants depend on the brokers to funnel clients to UWM, brokers depend on Defendants to funnel clients and value to back to them, and they all are interdependent to conceal the true nature of their relationship from consumers. *Id*.

---

[8] Defendants incorrectly claim the enterprise is "far too 'nebulous' and 'open-ended.'" Mot. at 17. But Plaintiffs have identified 2,502 enterprise participants over a three-year period by name and NMLS ID. FAC, App'x B. That is not nebulous. Regardless, participants need not be "fixed" over time. *Boyle*, 556 U.S. at 948.

As the FAC explains, "[t]he brokers who participate in this scheme do so pursuant to a common understanding that they share with one another and with UWM." *Id.* ¶ 156. Participating brokers are uniformly aware, for example, that every other broker that does business with UWM has also agreed to the "All-In" and "Lock-In" policies (because signing the Wholesale Broker Agreement is mandatory to originate any UWM loan). *Id.* ¶¶ 73–88, 156, 162. Brokers likewise uniformly know that UWM disseminates false marketing materials, and that brokers are broadcasting those false messages to the market. *Id.* ¶ 156–60. UWM facilitates the brokers' coordination and sharing of information, including hosting brokers at its campus, UWM's annual event for thousands of brokers, sponsoring networking and training events, and through UWM's prominent social media platforms. *Id.* ¶ 167.

Considering the scheme from the perspective of an individual broker's economic self-interest makes the enterprise's common purpose and uniformity even clearer. The core value proposition of the wholesale market is that borrowers can access cheaper mortgages because an independent mortgage broker will shop offerings from a variety of lenders to find the most affordable options. *Id.* ¶¶ 37–45. Retail loan officers, by contrast, are beholden to their employers. *Id.* ¶¶ 47, 50. Historically, to be competitive in the wholesale market, a broker *had to* survey the market and diligently shop for the best rates—failing to shop effectively turns a broker into a retail loan officer captive to a single lender, which is the antithesis of

16

what consumers seek (and pay for through broker fees) when they enter the wholesale channel. *Id.* ¶ 161. The enterprise participants critically depend on each other to conceal these facts. Otherwise, borrowers would know "that a broker was funneling loans to a particular lender, [and] that broker would be at a 'huge competitive disadvantage' because borrowers would flock to competitors" who actually are independent. *Id.* ¶ 43. Indeed, "UWM and these borrowers are working together to implement a business model that is predicated on providing [] prospective borrowers exactly the opposite of what they came for: an experience where the loan officer they hire as an 'independent' advisor is effectively a retail arm of UWM, working toward the lender's and the broker's interests, rather than the borrower's." *Id.* ¶¶ 168–169. Plaintiffs have thus pled a RICO enterprise.

Defendants incorrectly claim the FAC alleges a "rimless hub-and-spoke" scheme that cannot support a RICO claim (Mot. at 15)—a result that would be unprecedented in this circuit. No Sixth Circuit court ever has foreclosed a RICO claim based on a "hub and spoke" defense. Rather, to determine the existence of a RICO enterprise, the relevant issue is whether the RICO participants "functioned as a continuing unit for a common purpose." *United States v. Householder*, 2023 WL 23801, \*4 (S.D. Ohio Jan. 2, 2023) (rejecting "rimless wheel" defense to RICO claim); *accord Root, Inc. v. Silver*, 2024 WL 85057, \*11 (S.D. Ohio Jan. 8, 2024); *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138, 146 (6th

Cir. 1972) (identifying elements of "rimless wheel" conspiracy, including unlawful "common design"). Under *Boyle*, a "RICO enterprise may be shown through proof of a hierarchical structure and without evidence that the lower level members of the enterprise collaborated directly with each other." *Weiss v. Bank of Am. Corp.*, 153 F. Supp. 3d 831, 847 (W.D. Pa. 2015) (internal citation omitted). Indeed, there is "no basis in the language of RICO for the structural requirements that" Defendants ask this Court "to recognize." *Boyle*, 556 U.S. at 948.

Moreover, even if the Court were to consider Plaintiffs' RICO enterprise under a "hub-and-spoke" analysis, the FAC adequately alleges facts supporting the inference of brokers' participation in a conspiracy. In identifying horizontal conspiracies, courts consider "plus" factors including: "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999). "Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct." *Id.*

All four factors are met here. On the first factor, as discussed above, the brokers' loan steering conduct, if undertaken independently, would be contrary to

their economic self-interest. *See, e.g.*, *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (inferring horizontal conspiracy where plaintiffs alleged "behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals"); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935–36 (7th Cir. 2000) (finding horizontal conspiracy where it was "suspicious" that defendants "deprived [themselves] of a profitable sales outlet"); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 WL 8190256, at *28–31 (N.D. Ill. Nov. 27, 2023) (inferring horizontal conspiracy where alleged "spokes" would have been "economically disadvantaged" if they were "going it alone").

The second and fourth factors are met because the brokers uniformly (i) agreed to the All-In and Lock-In policies, (ii) funneled loans to UWM, (iii) engaged in substantially the same misleading marketing (which, in many cases, featured the exact same text and images), and (iv) concealed the true nature of their relationships with UWM. *See*, *e.g.*, FAC ¶¶ 158–160; *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 507 (M.D. Tenn. 2023) (denying motion to dismiss where plaintiffs plausibly alleged parallel conduct). They also shared the common motive of maximizing their own commissions, and maximizing the deal-flow and other benefits UWM provides. *See, e.g.*, FAC ¶ 165; *see Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370, at *7 (E.D.N.Y. Feb. 22, 2005) ("common purpose to engage in a fraud[]" supported an inference of an enterprise).

The third factor is met because Defendants arrange many opportunities for participating brokers to communicate with one another and share information, of which brokers take advantage. FAC ¶ 167; *see, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (enterprise members' exchange of information at trade association meetings was a plus factor).

*Last*, Defendants' cases are unavailing. Three of them find a RICO enterprise existed, in support of Plaintiffs' position.[9] Two of them (*Okavage* and *Moneyline*) were antitrust cases that do not even consider a RICO claim, much less the enterprise element under *Boyle*. And none dismisses a RICO claim based on a "hub and spoke" defense outside of the antitrust context.[10]  And to the extent any of them did not find a "rim," they lacked the detailed allegations here showing the common scheme.[11]

---

[9] *See Root, Inc.*, 2024 WL 85057 at *11; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 377 (3d Cir. 2010) (finding RICO enterprise where alleged "spokes" shared common purpose "mediated through [a hub]" to "achiev[e] greater business and profits by means of deceiving insurance purchasers."); *D'Addario v. D'Addario*, 901 F.3d 80, 102 (2d Cir. 2018) (finding RICO enterprise where participants had "a shared purpose").

[10] The hub-and-spoke analysis is relevant in the antitrust context because, if horizontal *and* vertical conspiracies are present, the scheme may qualify as a *per se* violation of the Sherman Act whereas a vertical conspiracy is "subject to Rule of Reason scrutiny," because the Sherman Act allows for certain vertical restraints. *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 821 (9th Cir. 2023). The RICO statute does not exempt racketeering on the basis that it is vertically arranged.

[11] *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th Cir. 2000*), abrogated by Bridge*, 553 U.S. 639 (pre-*Boyle*, finding that "[e]vidence of any such hierarchical structure is absent"); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 at 331–34 (declining to infer "rim" where there was absence of allegations showing

### C. Plaintiffs Sufficiently Plead a Pattern of Racketeering Activity.

Defendants also incorrectly argue that Plaintiffs have not alleged a "pattern of racketeering activity," which requires allegations of "at least two" predicate acts that are indictable under various criminal statutes, including statutes related to fraud and bribery. *Duramax*, 298 F. Supp. 3d at 1082 (citing 18 U.S.C. § 1961). The FAC sufficiently pleads multiple predicate acts of fraud and bribery. FAC ¶¶ 361–68.

***Fraud.*** To plead predicate acts of mail or wire fraud, a plaintiff must allege that the defendant "(1) devis[ed] or intend[ed] to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails [or wires]; and (3) for the purpose of executing the scheme or attempting to do so." *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013); *United States v. Bibby*, 752 F.2d 1116, 1126 (6th Cir. 1985) (mail and wire fraud require "essentially the same things").

*First*, Defendants incorrectly argue that Plaintiffs fail to identify misrepresentations with the specificity required under Rule 9(b). Mot. at 19–20. The FAC identifies *hundreds* of false and misleading statements by enterprise participants in furtherance of the scheme, with names, dates, and links for each. *E.g.*, FAC ¶¶ 6–9, 47–57, 98–100, 181, 211–14, Figs. 3, 5, 6, 8, 11, 27–30, App'x A. That

---

"spokes" acting against self-interest but for scheme); *D'Addario*, 901 F.3d at 102 (no allegations of common purpose and schemes not "similar in method or aim"); *Okavage Grp.*, 2024 WL 982380 at *10-11 (declining to infer rim based on single, "conclusory assertion"); *accord Am.'s Moneyline, Inc.*, 2024 WL 1349301 at *2.

suffices for Rule 9(b). *See Duramax*, 298 F. Supp. 3d at 1083–84 (sustaining RICO claim where plaintiffs "identified a number of advertisements" that were material to the scheme "regardless of whether [they] would be actionable on their own").

Moreover, the FAC alleges a scheme concerning not only affirmative misrepresentations but also fraudulent *omissions*. *E.g.*, FAC ¶¶ 11, 159–60, 188–89, 193, 202–03, 211, 225, 230. For omission claims, "plaintiff faces a slightly more relaxed pleading burden" because while "[f]raudulent acts occur at a specific time, fraudulent omissions occur over a period of time" and "are, by very definition, more amorphous." *Duramax*, 298 F. Supp. 3d at 1055 (quoting *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751 (E.D. Mich. 2017)). The FAC's allegations of non-disclosure are more than sufficient to "apprise Defendants of the alleged fraudulent scheme"— all that is required. *Id.* at 1083.[12]

*Second*, Defendants incorrectly argue that Plaintiffs fail to plead specific intent because circumstances alleged in the FAC purportedly are not "indicative of malintent." Mot. at 20. Intent to defraud exists if "the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir.

---

[12] *Am. BioCare Inc. v. Howard & Howard Att'ys PLLC*, 702 F. App'x 416 (6th Cir. 2017) is inapposite because the RICO predicates alleged only concerned affirmative misrepresentations, not omissions, and the complaint failed "to give even one date on which an alleged misrepresentation occurred." *Id.* at 422.

2003). "Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Goodwin*, 748 F. App'x 651, 655 (6th Cir. 2018).

Here, Defendants' concealment and misrepresentation is unquestionably indicative of malintent. Defendants went to great lengths to convince consumers that obtaining a mortgage through a broker is "cheaper, faster, and easier" because brokers are "independent" and "not tied to one lender." FAC ¶¶ 46–54. But Defendants know those messages are not true. *Id.* ¶ 93. They know that over 28.7% of brokers who do business with UWM funnel ***99% or more*** of their loans to UWM. *Id.* ¶¶ 91, 132–33, fig.24. And they conceal these facts because they recognize that borrowers would be unlikely to hire a known UWM loyalist. *Id.* ¶¶ 160–61. The scheme generated massive profits, catapulting UWM to the top of the wholesale mortgage industry. *Id.* ¶¶ 65–66, 71. These allegations show specific intent.[13]

*Third,* Defendants argue that Plaintiffs fail to allege anyone "heard or relied upon" the predicate misrepresentations. Mot. at 19. But as explained in Part II.A *supra*, Plaintiffs have no obligation to allege reliance, but do so in any event.

***Commercial Bribery***. Plaintiffs also plead predicate acts of commercial bribery under California, North Carolina, and Florida bribery laws, as well as the

---

[13] Separately, Defendants contend that Plaintiffs allegations of honest services fraud—an additional predicate act—are insufficient because Plaintiffs fail to establish they were owed fiduciary duties. Mot. at 19–20. Not so. Part IV.A.1 *infra*.

Travel Act. FAC ¶¶ 361, 366. Defendants argue that the North Carolina and Florida statutes do not apply because Plaintiffs cannot demonstrate Defendants possessed an "intent to interfere with a fiduciary relationship." Mot. at 21–22. But, as explained in Part IV.A *infra*, Plaintiffs have sufficiently alleged that Defendants intentionally interfered with such relationships, including through financial incentives (and threats) created to capture brokers' loyalty at their clients' expense. FAC ¶¶ 73–129. Indeed, Defendants' investor presentations explicitly state that a core aim of their business model is to "cultivate 'loyalist' brokers," by which they mean brokers who are loyal to UWM, not their clients. *Id.* ¶ 72. The statutes prohibit such conduct.

In addition, Defendants argue the California bribery statute does not apply. Mot. at 31 (citing Cal. Penal Code § 641.3(a)). They mischaracterize the statute which prohibits employees from accepting bribes "from a [employer] other than his or her employer" to "injure or defraud… a competitor of" the employer from whom he "agrees to receive the money or a thing of value." Cal. Penal Code § 641.3(a)(3), (d)(3). Consistent with that language, Plaintiffs allege that these brokers are accepting bribes from a person (UWM) other than their employer to injure UWM's competitors by helping it unfairly compete in the wholesale mortgage channel.

### D. The Economic Loss Doctrine Does Not Preclude Recovery Under Plaintiffs' RICO Claims.

Defendants' argument that Plaintiffs' claims are barred by the economic loss doctrine garbles two distinct concepts—the economic loss doctrine and the *Hart*

rule, a Michigan common law principle—neither of which provides grounds to dismiss Plaintiffs' tort claims.[14] The economic loss rule is a "judicially created doctrine" that prohibits a party to a contract from bringing tort claims that are factually indistinguishable from breach of contract claims. *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir.1994). The *Hart* rule, derived from *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956), stands for the principle that "an action in tort requires a breach of duty separate and distinct from a breach of contract." *Brock v. Consol. Biomedical Lab.*, 817 F.2d 24, 25 (6th Cir.1987).

*First*, neither of these doctrines applies because Plaintiffs do not assert any claims arising out of rights or obligations under a contract, but rather violations of duties owed under state and federal law. *See* Part I *supra*; *Atlas Techs., LLC v. Levine*, 268 F. Supp. 3d 950, 963 (E.D. Mich. 2017) (economic loss doctrine inapplicable where the "duties that the defendants allegedly violated arise separately and distinctly from the defendants' contractual obligations"); *Datamatics Glob. Servs., Inc. v. Ravi*, 2024 WL 3997055, at *5 (E.D. Mich. Aug. 29, 2024) (denying dismissal under *Hart* rule where conduct breached non-contractual obligations).

*Second*, the economic loss doctrine only applies in U.C.C. cases "involving the sale of goods." *Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*, 202 F. Supp.

---

[14] This garbling is puzzling because it is expressly addressed in *Am.'s Moneyline, Inc.*, 647 F. Supp.3d at 595 n.1, in which UWM was a party.

3d 711, 724 (E.D. Mich. 2016); *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 550 (6th Cir. 1995). This is not a U.C.C. case.

*Last*, Defendants' reliance on *America's Moneyline* is misplaced. In that case, a mortgage broker who signed UWM's Wholesale Broker Agreement brought a fraud claim alleging that UWM falsely represented that it would not enforce its "All-In" policy. 647 F. Supp.3d at 592–94. The court found that plaintiff's claim sounded in contract. *Id.* at 595. The court went to explain: "that said, if the duty that forms the basis of [plaintiff's] fraud claim existed at common law, then [plaintiff's] fraud claim could exist absent the agreement" and, by way of example, noted that "courts continue to recognize fraudulent inducement...as [a] viable tort claim[], notwithstanding *Hart*." *Id.* at 595–96. Here, Plaintiffs' tort allegations are plainly distinct from any contractual obligations between the parties. And by definition, Defendants' statutory and common law tort duties are not contingent on a contract, so *Hart* does not apply.

### E.    RESPA Does Not Preclude Plaintiffs' RICO Remedies.

Defendants rely on *Torres v. Vitale*, 954 F.3d 866 (6th Cir. 2020) to incorrectly assert that RESPA somehow precludes Plaintiffs' RICO claims. But *Torres* is inapposite. There, the court found that the FLSA partially precluded the plaintiff's RICO claim because FLSA provides its "own unique procedural framework for collective actions" that contains "an enforcement mechanism" that

"Congress prescribed" as "the exclusive vehicle through which plaintiffs may remedy its substantive guarantees." *Id.* at 872–75. RESPA provides no such enforcement mechanism or exclusive remedy. The only decision to consider Defendants' preclusion theory rejected it, *Johnson v. KB Home*, 720 F. Supp. 2d 1109, 1116 (D. Ariz. 2010), and RESPA and RICO routinely co-exist. *See, e.g.*, *Wallace*, 714 F.3d at 418–19; *Empire Title Servs., Inc. v. Fifth Third Mortg. Co.*, 2013 WL 1337629, at*5 (N.D. Ohio Mar. 29, 2013).

## III.   Plaintiffs' Claim Under RESPA Is Well-Pled.

### A.   UWM's Unlawful Kickback Scheme Violated § 2607(a).

To state a claim under 12 U.S.C. § 2607(a), a plaintiff must allege: (1) a payment or a thing of value; (2) made pursuant to an agreement or understanding to refer settlement business; and (3) an actual referral.[15] *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009). Plaintiffs sufficiently allege each element.

First, Plaintiffs allege that UWM provided brokers things of value pursuant to an agreement to refer settlement business.[16] Specifically, Plaintiffs allege their brokers received the opportunity to participate in UWM's valuable "Mortgage

---

[15] Contrary to UWM's contention, "§ 2607(a) requires an agreement or understanding to refer business, but not a showing that the kickback agreement is tied in any respect to a charge paid by a particular consumer." *Wilson v. Eagle Nat'l Bank*, 2023 WL 2478933, at *19 (D. Md. Mar. 13, 2023) (internal quote omitted).

[16] "Thing[s] of value" under RESPA include "the opportunity to participate in a money-making program," "trips and payments of another's expenses" and "services of all types at special or free rates." 12 C.F.R. § 1024.14(d).

Matchup" marketing program, while also receiving the comprehensive "Brand Builder" advertising suite, and lavish trips for free. To illustrate, take two of Plaintiffs' brokers, Whitney Bulbrook and Josh McCombs. Because they referred nearly all their customers to UWM, UWM provided them with elevated positions on the consumer-facing Mortgage Matchup platform. FAC ¶¶ 221, 304, 410–411. That preferential treatment provided valuable promotion and exposure to countless potential customers, helping Bulbrook and McCombs attract **hundreds of millions of dollars** in loan volume. *Id.* ¶¶ 217, 301. Bulbrook and McCombs also received comprehensive marketing templates and tools for free. *Id.* ¶¶ 58–59, 213–214, 298. Finally, UWM provided Bulbrook and McCombs with all-expenses paid trips to New York City. *Id.* ¶¶ 220, 302.[17] These things of value were not charity or normal promotional activities, but inducements for continued funneling.[18]

Second, Plaintiffs sufficiently plead an "agreement or understanding to refer settlement business." To plead "agreement or understanding" under § 2607(a), a plaintiff can allege that a "thing of value is received repeatedly and is connected *in*

---

[17] For allegations regarding the other Plaintiffs' brokers, *see* FAC, ¶¶ 250, 252, 262, 411 (Weatherill); ¶¶ 188, 191 203, (the Escues); ¶¶ 275 277, 288, 411 (Morandi).

[18] Such inducements cannot be characterized as "an industry-wide practice." There is no industry-wide practice of providing brokers undisclosed in-kind marketing contributions and other incentives in exchange for brokers' commitment to steering their customers to a single lender. Regardless, Defendants' factual assertion that this unlawful scheme is common is irrelevant at the pleading stage.

*any way* with the volume or value of the business referred." 12 C.F.R. § 1024.14(e) (emphasis added). As the FAC explains in detail, that is exactly how UWM's inducements are designed—the more corrupted brokers steer business to UWM, the more inducements and promotion as "independent" brokers they receive. FAC ¶¶ 106–17. Thus, the receipt of the thing of value is "closely proportional." *Toldy v. Fifth Third Mortg. Co.*, 721 F. Supp. 2d 696, 705 (N.D. Ohio 2010).

### B. UWM's Payments to Brokers for Settlement Services They Did Not Perform Violated § 2607(b).

UWM also violated § 2607(b) by making payments to Plaintiffs' brokers for services never performed. Critically, Plaintiffs allege that they hired—and paid—their brokers to shop the market for a competitive loan and provide Plaintiffs "independent" advice as to available options. *See, e.g.*, FAC ¶¶ 191, 223, 245, 252, 270, 277, 307; 12 C.F.R. § 1024.2(b) (defining "settlement service" to expressly include "counseling" of consumers). But the brokers did not provide that service; instead, they simply funneled Plaintiffs to UWM. FAC ¶¶ 192, 224, 253, 278, 308. UWM's attempt to rewrite Plaintiffs' RESPA claim by arguing it seeks to recover only for "overcharges" contradicts RESPA's text and the Sixth Circuit's instruction to construe RESPA broadly due to its remedial purpose. *E.g.*, *Toldy*, 721 F. Supp. 2d at 706; *In re Carter*, 553 F.3d 979, 985 (6th Cir. 2009). Worse, Defendants ignore the FAC's allegations and draw inferences against the allegations. Plaintiffs are not simply alleging their brokers were overpaid for services provided. Rather, UWM

29

orchestrated and paid brokers for promised services the brokers did not actually perform. Such payments violated § 2607(b).

### C. Defendants' Fraudulent Concealment Tolled RESPA's Limitations Period.

The one-year limitations period on Plaintiffs Weatherill, Morandi, Schelble, and the Escues' RESPA claims is tolled because the FAC alleges fraudulent concealment.[19] To establish fraudulent concealment, Plaintiffs must only plead (1) wrongful concealment of their actions by the defendants; (2) their failure to discover the operative facts that are the basis of the cause of action within the limitations period; and (3) their due diligence until discovery of the facts. *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012). UWM challenges the first and third elements but Plaintiffs plead both with sufficient particularity.

### 1. Plaintiffs Sufficiently Plead Wrongful Concealment.

A plaintiff can plead "wrongful concealment" by alleging "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Carrier*, 673 F.3d at 446–47. "[A]ctivities in furtherance of the conspiracy *which by their nature defy detection*" suffice. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1471–72 (6th Cir. 1988) (emphasis in original).

---

[19] Defendants do not argue equitable tolling does not apply. Indeed, for decades, circuit courts have consistently found equitable tolling applies to RESPA. *See Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 547 (4th Cir. 2019) (collecting cases).

Plaintiffs allege that Defendants built a system to conceal its involvement in false marketing messages about broker "independence." FAC ¶¶ 54–63, App'x A. UWM's "Brand Builder" tool, for instance, produces marketing materials that omits UWM branding. *Id.* ¶ 60–62. During training presentations, UWM explains to brokers "there is nothing UWM" on its marketing and website templates and that brokers should "not change anything." *Id.* ¶¶ 60–61. Borrowers like Plaintiffs who receive these false messages thus have no way of knowing that the broker parroting them is a UWM loyalist. *Id.*[20] And UWM and Ishbia not only rely on brokers to proliferate misrepresentations about "independence" and "shopping," they communicate to borrowers directly as well. *Id.* at ¶¶ 405–407, 433–438. Such affirmative deceit satisfies the wrongful concealment element. *Carrier*, 673 F.3d at 447–48 (allegations of "co-conspirators' misstatements" triggered tolling).

### 2. Plaintiffs Sufficiently Plead Due Diligence.

The FAC alleges Plaintiffs acted with reasonable diligence regarding the RESPA violations. Critically, "only information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence." *Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459,

---

[20] UWM mistakenly relies on *Chandler v. Wackenhut Corp.*, 465 F. App'x 425 (6th Cir. 2012), a case under Michigan's fraudulent concealment doctrine, to claim concealment by co-conspirator brokers is insufficient. Mot. at 26. But for *federal* claims, fraudulent concealment "may be established through the acts of co-conspirators." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008).

475–76 (6th Cir. 2013). When a plaintiff has "no practical way to independently" discover the wrongdoing, the due diligence element is satisfied. *Id.*[21]

Here, Plaintiffs relied on the misrepresentations regarding brokers' independence and had "no practical way to determine" there was a concealed agreement for brokers to steer them to UWM in exchange for hidden kickbacks and unearned fees. FAC ¶ 442. Plaintiffs had no reason to consult additional resources— they hired brokers to shop on their behalf—and Plaintiffs' mortgage disclosures did not suggest wrongdoing on their face. *Id.* ¶ 443–44. And although UWM suggests "publicly available" loan data should have put Plaintiffs on notice of their claims, this data could never have revealed to lay persons the existence and extent of their injuries.[22] *Id.* ¶¶ 446–448; *see also Ruth v. Unifund CCR Partners*, 604 F.3d 908, 911 (6th Cir. 2010) ("mere availability" of records may not suffice).[23]

---

[21] If there is "some question" as to the sufficiency of the alleged diligence, "a plaintiff should be allowed to proceed" past the pleading stage. *Carrier*, 673 F.3d at 448.

[22] Notably, the "publicly available" data that Defendants now claim was sufficient to put Plaintiffs on notice of the RESPA violations is the *same* Home Mortgage Disclosure Act ("HMDA") data that Defendants (incorrectly) argued Plaintiffs' counsel should be sanctioned for relying upon because it is purportedly *insufficient* "account for all the material factors that dictated Plaintiffs' loan offers." *Compare* Mot. at 27 *with* ECF No. 23, PageID.812; ECF No. 32, PageID.2027. The contradiction is revealing.

[23] Defendants' cases are inapposite. *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 995 (S.D. Ohio 2020) (diligence implausible where alleged harm "could easily be discovered by market research"); *Simms v. CIT Group/Consumer Fin.*, 2009 WL 973011, at *6 (W.D. Tenn. 2009) (plaintiff alleged no acts of diligence).

**IV. Plaintiffs' Aiding and Abetting Breach of Fiduciary Duty and Civil Conspiracy Claims Are Well-Pled.**

    **A. Plaintiffs Sufficiently Plead Aiding and Abetting Breach of Fiduciary Duty.**

To state a claim for aiding and abetting breach of fiduciary duty, plaintiffs must allege (i) a fiduciary duty existed, (ii) defendants' knowledge of a breach of such duty, (iii) that defendants provided substantial assistance in the commission of the breach, (iv) a causal relationship between the assistance and the breach, and (v) damages or harm. Plaintiffs adequately allege each element.[24]

    **1. Plaintiffs Had Fiduciary Relationships with Their Brokers.**

Defendants claim that Plaintiffs' mortgage brokers owed them no fiduciary duties under their home states' law, but that is wrong. California and North Carolina, for instance, codify mortgage brokers' fiduciary duties. *See* Cal. Civ. Code § 2923.1 ("A mortgage broker...is the fiduciary of the borrower."); N.C. Gen. Stat. Ann § 53-244.109 ("Any mortgage broker...shall...[h]ave a duty of loyalty to the borrower."). Such statutes can supply brokers' duties, regardless of whether they contain a private right of action. *See Wyatt v. Union Mortg. Co.*, 598 P.2d 45, 50 (Cal. 1979) ("statutory duties created by the Real Estate Law...impose upon mortgage loan brokers" fiduciary responsibilities); *Guyton v. FM Lending Servs., Inc.*, 681 S.E.2d

---

[24] The availability of aiding and abetting liability in North Carolina "remains an open question." *Tong v. Dunn*, 2012 WL 944581, at *4 (N.C. Super. Ct. Mar. 19, 2012).

465, 475 (N.C. Ct. App. 2009) (claim premised on breach of duties imposed under predecessor to the S.A.F.E. Act cognizable). Further, all states recognize that fiduciary duties arise in any principal-agent relationship[25] or any other relationship "in which there is confidence reposed on one side and the resulting superiority and influence on the other." *See, e.g.*, *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931).[26] Brokers are thus consistently recognized as fiduciaries. *See, e.g.*, *Smith v. Home Loan Funding, Inc.*, 192 Cal. App. 4th 1331, 1336 (Cal. Ct. App. 2011); *Jones v. Thomas*, 296 S.W.2d 646, 651 (Tenn. Ct. App. 1955).

Plaintiffs' mortgage brokers here intentionally cultivated trust through a targeted media campaign falsely promising "independence." For example, Bulbrook presented herself as a "trusted guide" for her clients (FAC ¶ 417), while McCombs claimed that he avoided retail mortgage lenders to "get [his] customers the best possible deal" (*id.* ¶ 420). These representations, aimed to persuade borrowers to rely on their brokers' expertise, led Plaintiffs to form confidential relationships with

---

[25] *See, e.g.*, *Sutton v. Driver*, 712 S.E.2d 318, 323 (N.C. App. 2011) ("broker representing a purchaser or seller in the purchase or sale of property owes a fiduciary duty to his client based upon the agency relationship itself"); *Eaton ex rel. Johnson v. Eaton*, 83 S.W.3d 131, 135 (Tenn. Ct. App. 2001) ("An agent, as a fiduciary, is under a duty of loyalty to the principal").

[26] *See also, e.g.*, *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002) (fiduciary duty exists where "the recipient of [] confidence is the dominant personality, with ability . . . to influence . . . dominated party."); *Czarnecki v. Roller*, 726 F. Supp. 832, 839 (S.D. Fla. 1989) ("The law in Florida is that when a broker undertakes to act on behalf of a buyer he stands as a fiduciary to this client").

these "trusted guide[s]." Whether by statute, by the inherent nature of the relationship, or their conduct, Plaintiffs' brokers each owed fiduciary duties.[27]

### 2.    Plaintiffs' Brokers Breached Their Fiduciary Duties.

Plaintiffs likewise sufficiently allege their brokers breached the fiduciary duties they owed. As fiduciaries, mortgage brokers are subject to "the same obligation of undivided service and loyalty" as that owed by "a trustee in favor of his beneficiary," including "the duty of acting in the highest good faith toward his principal," while foregoing "any advantage over the principal in any transaction had by virtue of his agency." *Wyatt*, 598 P.2d at 50. Specifically, a broker must, in all cases, "inform [his principal] with fairness, promptness and completeness concerning all facts within his knowledge which are, or may be, material to the situation in connection with his employment." *Kline v. Pyms Suchman Real Est. Co.*, 303 So. 2d 401, 404 (Fla. Dist. Ct. App. 1974); N.C. Gen. Stat. Ann. § 53-244.109 ("Any mortgage broker...shall...disclose to the borrower material information that may be expected to influence the borrower's decision" and "[r]epresent the borrower's best interest in the course of brokering a mortgage loan").

Defendants try to minimize the alleged wrongdoing by claiming that Plaintiffs only complain that brokers failed to disclose that they (i) try to "earn perks," and (ii) agreed not to shop loans to two UWM competitors. Mot. at 32. But that does not

---

[27] The economic loss doctrine does not bar Plaintiffs' claim. *See* Parts I & II.D *supra*.

remotely capture the full scope of the disloyal conduct alleged in the FAC. Plaintiffs' brokers are alleged to have completely subordinated Plaintiffs' interests in favor of their own. *E.g.*, FAC ¶¶ 130–55. They lured Plaintiffs into a fiduciary relationship by promising diligence, "independence," and loyalty (*e.g.*, *id.* ¶ 53, 181, 211–14, 242, 269, 297), but then steered Plaintiffs into a significantly more expensive UWM loan despite more affordable alternatives (*e.g.*, *id.* ¶¶ 197–202, 231–34, 259, 285, 314–17). Whatever the precise contours of a broker's fiduciary duty, there can be no doubt that the steering scheme alleged in the FAC is out of bounds.

## B.    Plaintiffs Sufficiently Plead Civil Conspiracy.

The elements of civil conspiracy are "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Condor, S.A. v. Plurinational State of Bolivia*, 352 So.3d 921, 926 (Fla. Dist. Ct. App. 2022). Moreover, "[a] conspirator need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Logan v. Morgan, Lewis & Bockius LLP*, 350 So. 3d 404, 412 (Fla. Dist. Ct. App. 2022). The FAC sets forth sufficient factual allegations to satisfy each of those elements. Defendants nonetheless contend that the FAC "fails[s] to plausibly allege a 'conspiratorial agreement.'" Mot. at 34 The FAC, however, is replete with specific allegations regarding the Defendants and the

corrupt brokers' knowledge of, and participation in, the steering scheme as evidenced by, among other things, the thousands of purportedly "independent" brokers that send 99% of borrowers to UWM and UWM's systematic facilitation of that illegal steering activity. *See e.g.*, FAC ¶¶ 104–113, 128–129, 132-137.

## V.    Plaintiffs' Consumer Protection Claims Are Well-Pled.

Plaintiffs assert additional claims under the consumer protection statutes of North Carolina (NCUDPA), Tennessee (TCPA), Florida (FDUTPA), and California (CUCL and CLRA). FAC ¶¶ 506–83. These claims are also adequately alleged.

Defendants first argue that Plaintiffs allegations fail to meet Rule 9(b)'s heightened pleading standard. Mot. at 35. But for the reasons described in Part II.C *supra*, the allegations in the FAC are sufficient (including as to fraudulent omissions, which are subject to "a slightly more relaxed pleading burden.") *Duramax*, 298 F. Supp. 3d at 1055. Because Plaintiffs' allegations provide Defendants adequate notice of their fraudulent conduct, dismissal under Rule 9(b) would be inappropriate. *See Diop v. BMW of North America, LLC*, 511 F. Supp. 3d 679, 686–87 (E.D.N.C. 2021). The FAC also contains sufficient allegations of reliance and proximate cause. *E.g.*, *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1135–36 (S.D. Cal. 2021) (reliance need not be solely caused by the unfair or deceptive act); Part II.A *supra*.

Defendants next raise a litany of arguments aimed at each individual states' statutes—all of which fail. Regarding the Tennessee statute, Defendants claim the

Escue Plaintiffs' claim fails because the TCPA specifically carves out claims concerning the "[c]redit terms of a transaction." Mot. at 35–36 (citing Tenn. Code Ann. § 47-18-111(a)(3)). But when the "credit terms of a transaction" are not at issue—as is the case here, because Plaintiffs' claim concerns Defendants' fraudulent misrepresentations and steering scheme—the exemption is inapplicable. *See, e.g.*, *Tenn. ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, 2024 WL 4351650, at \*16 (E.D. Tenn. 2024) (courts "routinely allow[] TCPA actions against lenders.").

With respect to the Florida statute, Defendants wrongly contend that Plaintiffs cannot invoke FDUTPA merely because a Florida court dismissed a FDUPTA claim in separate antitrust suit against UWM by brokers. Mot. at 36 (citing *Okavage*, 2024 WL 982380, at \*17–20). The *Okavage* case—which asserts different theories of liability, based on different allegations, on behalf of differently situated plaintiffs—bears no resemblance to Plaintiffs' claims. Defendants' erroneous claim that a "lending relationship" is not covered also ignores courts which have specifically held that a mortgage servicer is not exempt from FDUTPA. *See, e.g.*, *Brexendorf v. Bank of America, N.A.*, 319 F. Supp. 3d 1257, 1266 (M.D. Fla. 2018). Finally, Defendants' claimed (yet unsupported) exemption under Fla. Stat. Ann. § 501.212(1) should be rejected as Defendants' unfair and deceptive acts and practices are not specifically authorized by state or federal regulations. *See State of*

*Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005).[28]

With respect to the North Carolina statute, Defendants misstate the relationship between the NCUDTPA and North Carolina's commercial bribery statute, N.C. Gen. Stat. § 14-353. The first prong of § 14-353 can form the basis of an NCUDPA claim, but a failure of the commercial bribery claim does not sink the NCUDPA claim. *See, e.g.*, *Colonial Trading, LLC v. Bassett Furniture Ind., Inc.*, 530 F. App'x 218, 226-27 (4th Cir. 2013). As explained in Part II.C *supra*, however, Plaintiffs' have sufficiently alleged a violation of § 14-353.

Defendants' last argument—that the CLRA's pre-suit notice period precludes Plaintiffs' claim—also fails. Pre-suit notice certification and notice requirements under state statutes do not apply in federal court, as the Federal Rules of Civil Procedure control over the statute's procedural requirements. *See, e.g.*, *Martin v. Pierce County*, 34 F.4th 1125, 1129–30 (9th Cir. 2022); *Albright v. Christensen*, 24 F.4th 1039, 1047 (6th Cir. 2022). Plaintiffs thus sufficiently plead consumer protection claims under Tennessee, North Carolina, Florida, and California law.

---

[28] Federal anti-steering regulations do not somehow condone the deceptive practices alleged in the FAC, as Defendants suggest. Rather, the regulations prohibit brokers from "steer[ing]" consumers into a loan based on value the broker expects to receive "unless the consummated transaction is in the consumer's interest." 12 C.F.R. § 1026.36(e)(1). To fall under the safe harbor provision Defendants cite, a broker must have surveyed "a significant number" of lenders and presented the consumer with the most affordable loans for which he or she qualifies. *Id.* § 1026.36(e)(3).

39

## VI.    Plaintiffs' Unjust Enrichment Claim Is Well-Pled.

Plaintiffs allege valid claims for unjust enrichment under Tennessee, Florida, North Carolina, and California law. Defendants do not dispute that Plaintiffs properly plead the elements of unjust enrichment under any state's law. Instead, they attempt to raise various exceptions, exemptions, and technicalities based on the theory that Plaintiffs' mortgages preclude Plaintiffs' unjust enrichment claims.

In all four states at issue, however, an express contract must cover the same subject matter to preclude asserting unjust enrichment.[29] Here, as explained in Parts I and II.D–E *supra*, Plaintiffs claims do not arise out of their mortgage contracts.

Defendants' final contention that Plaintiffs cannot raise unjust enrichment claims in the alternative because their claims rely on the same allegations similarly fails. Florida and North Carolina only apply this concept when there is an express contract covering the same subject matter, which is not the case here. *See In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1337 (S.D. Fla. 2013); *Hill v. AQ Textiles LLC*, 582 F. Supp. 3d 297, 321-22 (M.D.N.C. 2022). Only California prohibits a standalone, substantive unjust enrichment claim. *E.g.*, *Cimoli v. Alacer Corp.*, 546 F. Supp. 3d 897, 904 (N.D. Cal.

---

[29] *See Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1345 (S.D. Fla. 2004); *Ron Medlin Const. v. Harris*, 681 S.E.2d 807, 810 (N.C. Ct. App. 2009); *Rutherford Holdings, LLC v. Plaza Del Rey*, 166 Cal. Rptr. 3d 864, 872 (Cal. Ct. App. 2014); *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991).

2021). However, because Plaintiffs' UCL and CLRA claims are well-pled, the unjust enrichment claim does not fail. Part V *supra*.

## VII.   Plaintiffs' Claims against the Non-UWM Defendants Are Well-Pled.

Defendants' arguments about dismissal of Ishbia and the "Holding Companies"[30] are inadequate and should not be resolved on the pleadings. Whether these non-UWM Defendants proximately caused Plaintiffs' injuries, for instance, is an issue for summary judgment. *See Trollinger*, 370 F.3d at 615, 619.

*First*, FAC's allegations of Ishbia's involvement with the "Steering Enterprise" are not limited to false statements about UWM's business. Even the paragraphs cited by Defendants allege additional detail specific to Ishbia. *See, e.g.*, FAC ¶ 353 (Ishbia "fund[ed] and influenc[ed] the affairs of trade associations that published information that facilitated the deceptive scheme"). And the FAC specifies numerous relevant allegations concerning Ishbia beyond his deceptive statements. *See e.g.*, *id.* ¶¶ 128, 141. As the CEO of UWM, Ishbia was involved in all aspects of the scheme. *Id.* ¶¶ 35, 70, 103, 128.

*Second*, the Aiding and Abetting, Civil Conspiracy, and Consumer Protection claims (Counts IV, V, and VII–XI) incorporate all the prior allegations in the FAC, not just the specific allegations in those sections. *Id.* ¶¶ 456, 471, 506, 519, 540. The

---

[30] UWM Holdings Corp., UWM Holdings, LLC, and SFS Holding Corp.

prior allegations include descriptions of the relationships between and among UWM, Ishbia, and the Holding Companies that are sufficient to survive a motion to dismiss.

*Third*, as to unjust enrichment, even if it were true that Plaintiffs only made payments to UWM, that does not mean the other Defendants did not also receive benefits from their wrongful conduct. *See* FAC ¶¶ 503–504. Dismissing claims against the non-UWM Defendants would be premature.

## CONCLUSION

The Court should deny Defendants' motion to dismiss in full.

Dated:  December 12, 2024

John T. Zach
Marc Ayala
David L. Simons
Andrew P. Steinmetz
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300

By:  /s/ *Brandon C. Hubbard*
Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

Tyler Ulrich
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami Florida 33131 (305) 357-8422

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2024, I caused the foregoing document to be filed with the Clerk of the Court using CM/ECF, which will effectuate service upon all counsel of record.

/s/ *Brandon C. Hubbard*

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

*Attorney for Plaintiffs*