## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr.,
Kim Schelble, Brian P. Weatherill,
Kenneth C. Morandi, Jill Jeffries, and
Daniel Singh on behalf of themselves
and all others similarly situated,

|                                    *Plaintiffs*,

v.

United Wholesale Mortgage, LLC,
UWM Holdings Corporation, SFS
Holding Corp., and Mathew Randall
Ishbia,

|                                    *Defendants*.

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
Magistrate Judge

**(Oral Argument Requested)**

---

### DEFENDANTS' MOTION FOR RELIEF UNDER
### RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS
### BASED ON NEW ALLEGATIONS IN FIRST AMENDED COMPLAINT

Defendants move for relief under Rule 11 of the Federal Rules of Civil
Procedure, 28 U.S.C. § 1927, and this Court's inherent powers based on new
allegations in Plaintiffs' First Amended Complaint. In compliance with Rule
11(c)(2), Defendants sent this motion to Plaintiffs' counsel on November 11, 2024,
and requested that they withdraw their First Amended Complaint and dismiss this
action or, at a minimum, move to withdraw the offending allegations. Plaintiffs
failed to do so within 21 days. For the reasons set forth in the accompanying

memorandum and in Defendants' previous Motion for Relief, Defendants therefore respectfully request that the Court grant this Motion and provide appropriate relief.

## NOTICE OF COMPLIANCE WITH SAFE HARBOR PROVISION OF FEDERAL RULE OF CIVIL PROCEDURE 11(c)(2)

1.     Defendants have complied with Federal Rule of Civil Procedure 11(c)(2)'s safe-harbor provision, because this "[m]otion" was "served" and "not" "filed" or "presented" "to the court" "within 21 days after service," and Plaintiffs have not "withdrawn or appropriately corrected" "the challenged paper, claim[s]," or "contention[s]." Fed. R. Civ. P. 11(c)(2).

2.     More specifically, Counsel for Defendants served this motion, brief in support, and accompanying exhibits upon Plaintiffs' counsel via overnight mail and electronic mail on November 11, 2024.

3.     On December 5, 2024, Plaintiffs' counsel informed Defendants' counsel via electronic mail that Plaintiffs disagree with the motion papers. *See* Attachment A.

4.     Some courts have held that the Rule 11 motion should be identical to the motion previously served. *See, e.g.*, *Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 46 F.4th 374, 389 (5th Cir. 2022); *see also* ECF No. 23, at 2–3.  Given this guidance, Defendants are filing this motion, the brief in support, and the accompanying exhibits in identical form to those previously served on Plaintiffs' counsel (apart from this Notice of Compliance, one corrected FAC cite, the redacted

portions set forth below, and the dates for signature). As Defendants explain in their separately filed Notice of Filing Redacted Documents, the Defendants have provisionally redacted certain arguments and withheld certain exhibits pending the resolution of Defendants' Motion for Leave (ECF No. 24). *Cf. United States v. Quicken Loans Inc.*, 2021 WL 2562258, at \*1 (E.D. Mich. June 23, 2021) (documents provisionally sealed until parties fully briefed and resolved outstanding issues as to whether documents should remain under seal). As before, Defendants contend that such redactions are not required, and that the redacted portions of this motion and withheld exhibits are relevant and should be considered by the Court. *See* ECF No. 24.

5.      In addition, pursuant to Local Rule 7.1(a), Defendants' counsel conferred with Plaintiffs' counsel on Thursday, December 12, and confirmed that Plaintiffs do not agree to the relief sought in this motion.  During that meet and confer, Plaintiffs' counsel requested that Defendants redact the same information from their brief as before.  Counsel also agreed that Plaintiffs' counsel would let Defendants know by Friday morning if they requested any other redactions.  On Friday, December 13, Defendants' counsel also sent their proposed redactions to Plaintiffs' counsel and Plaintiffs' counsel voiced no objections in response.

6.      For these reasons, Defendants respectfully submit that this motion, brief in support, and accompanying exhibits, are properly before the Court.

Dated:  December 13, 2024

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Respectfully submitted,

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones (P80231)
Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr.,
Kim Schelble, Brian P. Weatherill,
Kenneth C. Morandi, Jill Jeffries, and
Daniel Singh on behalf of themselves
and all others similarly situated,

*Plaintiffs*,

v.

United Wholesale Mortgage, LLC,
UWM Holdings Corporation, SFS
Holding Corp., and Mathew Randall
Ishbia,

*Defendants.*

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
Magistrate Judge

# BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF UNDER RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS BASED ON NEW ALLEGATIONS IN FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ............................................................iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY.....................................vi

INTRODUCTION .........................................................................................1

BACKGROUND............................................................................................2

LEGAL STANDARD .....................................................................................4

ARGUMENT................................................................................................5

    I.   The FAC Continues This Lawsuit's Improper Purpose...................................5

    II.  The FAC's New Liability Theories Lack A Factual Basis. ..............................8

    III. The FAC's Core Theory Runs Afoul Of Accepted Standards.........................15

CONCLUSION............................................................................................19

# TABLE OF AUTHORITIES

**Page**

CASES

*Chambers v. NASCO, Inc.*,
 501 U.S. 32 (1991).............................................................................4, 5

*In re Ruben*,
 825 F.2d 977 (6th Cir. 1987).....................................................................5

*King v. Whitmer*,
 71 F.4th 511 (6th Cir. 2023) ............................................................*passim*

*Mann v. G & G Mfg., Inc.*,
 900 F.2d 953 (6th Cir. 1990)................................................................5, 8

*Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*,
 613 F.3d 609 (6th Cir. 2010)............................................................*passim*

*Mullins v. Allstate Ins. Co.*,
 2007 WL 3038028 (E.D. Mich. Oct. 18, 2007).............................................4

*SEC v. Lemelson*,
 19 F.3d 725 (1st Cir. 2023)......................................................................6

*Silva v. Witschen*,
 19 F.3d 725 (1st Cir. 1994)......................................................................5

*Teno v. Iwanski*,
 464 F. Supp. 3d 924 (E.D. Tenn. 2020) ............................................... 5, 7, 8

*Whitehead v. Food Max of Miss., Inc.*,
 332 F.3d 796 (5th Cir. 2003).....................................................................5

STATUTES

28 U.S.C. § 1927 .................................................................................*passim*

ii

**OTHER AUTHORITIES**

12 C.F.R. § 1026.36 .................................................................................... 7

Fed. R. Civ. P. 11 ....................................................................................... 4

## STATEMENT OF ISSUES PRESENTED

1.  Should the Court award relief under Federal Rule of Civil Procedure 11(b)(1) for maintaining this lawsuit for an improper purpose?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

2.  Should the Court award relief under Federal Rule of Civil Procedure 11(b)(3) for raising factual allegations that a reasonable prefiling investigation would reveal are unsupportable or false?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

3.  Should the Court award relief under Federal Rule of Civil Procedure 11(b)(2) for stating plain errors of law and bringing claims that have no sound basis in existing law?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

4.  Should the Court award relief under 28 U.S.C. § 1927?

    Defendants' answer: Yes

    Plaintiffs' answer: No

    This Court should answer: Yes

5.      Should the Court award relief pursuant to the Court's inherent powers?

       Defendants' answer: Yes

       Plaintiffs' answer: No

       This Court should answer: Yes

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

**CASES**

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)

*King v. Whitmer*, 71 F.4th 511 (6th Cir. 2023)

*Mann v. G & G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)

*Teno v. Iwanski*, 464 F. Supp. 3d 924 (E.D. Tenn. 2020)

**STATUTES & OTHER AUTHORITIES**

Federal Rule of Civil Procedure 11

28 U.S.C. § 1927

12 C.F.R. § 1026.36

# INTRODUCTION

After two motions to dismiss and a motion for relief—which provided ample notice of the fundamental flaws in Plaintiffs' allegations—Plaintiffs' Counsel have continued to press ahead with this improper lawsuit.  This litigation began as a coordinated effort to disparage Defendant United Wholesale Mortgage, LLC ("UWM") to benefit an activist hedge fund.  As the record indicates, it is readily apparent that Counsel—in coordination with Hunterbrook Capital LP and its media apparatus Hunterbrook Media (collectively, "Hunterbrook")—timed and filed this lawsuit to amplify Hunterbrook's messaging so someone could profit from the resulting stock swings.  The greater the adverse PR effect from the "national" class action alleging "corruption," the greater the profits.  Defendants' first Motion for Relief informed Counsel that this was not a proper use of the federal courts.  Rather than withdraw the original Complaint, Counsel filed the First Amended Complaint ("FAC"), which is worse than its predecessor.

The FAC warrants further sanctions for three primary reasons.  ***First***, the FAC exacerbates the inflammatory rhetoric and frivolous allegations, which underscore that this case was illegitimate from conception and continues to be today. ***Second***, the FAC deletes allegations that were demonstrably false and replaces them with *new* allegations that UWM and Plaintiffs' loan officers failed to disclose factors affecting Plaintiffs' loan terms—allegations that are flatly contradicted by Plaintiffs'

1

loan disclosures.   To take just one example, for newly named Plaintiff Kenneth Morandi, the FAC now claims that UWM and his loan officer left Morandi in the dark about "discount points," despite multiple disclosures that *Morandi himself signed* explicitly stating that he would pay those points.   And, ***finally***, the FAC's core allegations as to the pricing of each Plaintiff's loan—namely, that the Plaintiffs were allegedly worse off with UWM's loans—are based on an objectively unreasonable use of data.

This improper lawsuit has gone on long enough.   The Court should put a stop to it and award appropriate relief or, at a minimum, strike the offending allegations.

## BACKGROUND

Much of the relevant background is set forth in Defendants' first Motion for Relief.   ECF No. 23.   In sum, Defendants became the target of a coordinated campaign to devalue UWM's stock.   After locking in its stock trades, Hunterbrook published a Report laced with inflammatory rhetoric, and Plaintiffs' Counsel filed the original Complaint, parroting and amplifying many of the Report's claims, just hours later. ECF No. 1 ("Compl."); ECF No. 23, Ex. 5 (Docket).   After the original Complaint was filed, Hunterbrook publicized the lawsuit on its website, declaring that "Boies Schiller Flexner LLP and home borrowers across multiple states, supported by [Hunterbrook's] data analysis, . . . filed a national class-action lawsuit against UWM."   S. Cowen Decl., Ex. A ("UWM's Shell Game").

This coordinated attack was multi-faceted and went beyond the initial Complaint and Hunterbrook Report.  On the day the Complaint was filed and the Hunterbrook Report published, a popular sports podcaster published a podcast video on YouTube—inflammatorily titled, in relevant part, "How an NBA Owner Fleeced America"—featuring a Hunterbrook Publisher.  *Id.*, Ex. B (Screenshot of Pablo Torre YouTube Video).  This video is laden with discussions of many of the claims contained in Plaintiffs' Complaint—the timed release of which was clearly meant to amplify the damage that UWM's stock price would ultimately suffer.  Notably, the Hunterbrook Publisher went as far as "speculating" about "hypothetical" "legal trouble," including how "UWM would likely just stop being a major mortgage lender in which case its shares would of course fall" and "Isbhia . . . could lose the basketball team that he spent his whole life chasing after."  *Id.*, Ex. C, at 46–47 (Tr. of Podcast Video).  The video cites the Hunterbrook Report and provides a link to Hunterbrook Media's website.  *See id.*, Ex. B.

Defendants moved to dismiss the lawsuit and served their first Motion for Relief on Counsel.  ECF Nos. 16, 23.  In that Motion, Defendants advised Counsel that this lawsuit was filed for an improper purpose and alerted Counsel to multiple frivolous assertions of fact and law in the original Complaint.  ECF No. 23.  But Counsel did not withdraw the lawsuit.  Instead, they doubled down and filed an amended complaint.  Because the FAC did not cure the defects that the Defendants

had identified in their Motion for Relief, Defendants filed that motion with the Court. *Id.* But that motion was limited to the defects in the initial Complaint that were not corrected or withdrawn in the FAC after notice of such defects; it did not address the new allegations and new plaintiffs in the FAC.   This Motion addresses the new grounds for relief presented by the FAC.

## LEGAL STANDARD

There are three separate grounds for relief. ***First***, under Rule 11(b), counsel certifies that each pleading (1) has not been "presented for an improper purpose"; (2) does not make frivolous "legal contentions"; and (3) does not make unsupported "factual contentions." Fed. R. Civ. P. 11(b). That standard is objective; no bad faith is required. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47 (1991). If "Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).   It may also order an evidentiary hearing regarding potential Rule 11 violations. *See, e.g.*, *Mullins v. Allstate Ins. Co.*, 2007 WL 3038028, at *1 (E.D. Mich. Oct. 18, 2007).

***Second***, under 28 U.S.C. § 1927, courts may impose "the excess costs, expenses, and attorneys' fees reasonably incurred" on an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. Relief is warranted under § 1927 "'when an attorney knows or reasonably should

know that a claim pursued is frivolous' and yet continues to litigate it." *King v. Whitmer*, 71 F.4th 511, 530 (6th Cir. 2023).   Again, that standard is objective; no bad faith is required.   *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987).

**Third**, the Court always retains inherent power to guard against potential abuses of the litigation process.   *See Chambers*, 501 U.S. at 50.

## ARGUMENT

### I.   The FAC Continues This Lawsuit's Improper Purpose.

Rule 11(b)(1) prohibits filing a complaint "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."   An "improper purpose" alone can be sanctionable.   *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 805 & n.4 (5th Cir. 2003) (en banc).   The presence of one alleged proper purpose does not absolve another improper one.   *See Silva v. Witschen*, 19 F.3d 725, 730 (1st Cir. 1994).   And an "improper purpose" can "continue[]" beyond an "initial[] fil[ing]."   *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 960 n.6 (6th Cir. 1990) (finding plaintiffs "continuously violated" Rule 11 not only through their "initially filed" complaint but also through "all subsequent pleadings filed against [defendant]"); *see Teno v. Iwanski*, 464 F. Supp. 3d 924, 955–56 (E.D. Tenn. 2020) (awarding relief where "[p]laintiff's conduct infected the entire lawsuit and was continued for an improper purpose").

Defendants' first Motion for Relief lays out why Counsel's coordinated filing of this lawsuit violates this prohibition. ECF No. 23 at 8–11. That the FAC does not redress the original Complaint's inflammatory rhetoric and unsupported core allegations—and instead *increases* them—is further corroborating evidence that Counsel filed and continues to maintain this lawsuit for an improper purpose.[1]

The FAC, for instance, further amplifies its incendiary remarks regarding UWM's President and CEO, Mat Ishbia. *See, e.g.*, FAC ¶¶ 6–8, 15, 24–25, 47, 64–66, 70, 80–81, 97, 103, 118, 128, 141, 151, 220, 353, 360, 365, 378, 432–39, 444. Many of the added allegations have no substantive relevance and are clearly designed to attract negative media attention. Moreover, the FAC not only continues to smear individual brokers as "corrupt" using inaccurate and misleading claims, it has increased and magnified those allegations. *See, e.g.*, *id.* ¶¶ 1–2, 10, 13–15, 57, 122, 124–25, 148, 156, 165, 168–69, 184, 216, 247, 300, 303, 324–35, 409, 412–15, 421–25, 434, 439–40, 444. Those inflammatory allegations strike at the heart of UWM's business model and broker network—providing further support for the

---

[1] The undisputed circumstances surrounding this lawsuit—including Hunterbrook shorting UWM stock, the timing of the initial Complaint, Counsel's "agreement" with "a Hunterbrook entity," and Counsel's use of a declaration from "an Advisor at Hunterbrook," (*see* ECF No. 32, at 1–2)—continue to raise critical and unprecedented questions regarding the use of federal courts to support coordinated efforts to profit off shorting a company's stock. *See SEC v. Lemelson*, 57 F.4th 17, 20–23 (1st Cir. 2023).

already clear inference that this lawsuit was filed for an improper purpose. *Teno*, 464 F. Supp. 3d at 953–54.

And the FAC does not stop there. It has also increased the improper and misleading allegations surrounding the "All-In" provision to argue that the provision "meaningfully restricted [Plaintiffs' brokers'] ability to shop for mortgage loans." FAC ¶¶ 193, 225, 254, 279, 309. Counsel maintained and magnified these allegations despite notice that the All-In Provision leaves available more than seventy wholesale-dedicated lenders and hundreds of additional lenders. ECF No. 23, at 18–19. The FAC also maintains Plaintiffs' improper assertions that loan officers have a duty to "survey the wholesale market," which is contrary to federal law and federal regulatory guidance—all the while largely ignoring that Plaintiffs all received anti-steering disclosures pursuant to 12 C.F.R. § 1026.36(e). *See, e.g.,* FAC ¶¶ 34 n.11, 183, 215, 246, 271, 299; *see* ECF No. 23, at 20–21. And the FAC contains unreasonable legal errors, including by asserting there are no "case dispositive" differences in law when some states do not even recognize Plaintiffs' cause of action at all. *See, e.g.,* FAC ¶¶ 35, 145, 338(a), 457, 472; *see* ECF Nos. 22–24.

Finally, as explained further below, the FAC continues to use misleading and unreliable data, *see infra* Section III, and adds even more baseless allegations to support their newly concocted theories, *see infra* Section II. All of this further

supports Counsel's continued improper purpose in maintaining this lawsuit. *Teno*, 464 F. Supp. 3d at 955–56 (finding that the "meritless nature" of plaintiff's "claims and contentions" reflected improper purpose); *see also Mann*, 900 F.2d at 960 n.6.

## II. The FAC's New Liability Theories Lack A Factual Basis.

Rule 11(b)(3) proscribes factual contentions that a "reasonable inquiry" prior to filing would have exposed as "not well grounded in fact." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010); *see* Fed. R. Civ. P. 11(b)(3). After being confronted with the original Complaint's flaws, Counsel abandoned several of their false Plaintiff-specific theories and instead set out a new line of attack for old and new Plaintiffs alike. But, as set forth below, these new liability theories have no basis in fact. █████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

In response, the FAC ███████████████████████████

████████████████ instead conjures up new theories that claim that Plaintiffs did not "realize" they would be paying "discount points" to secure their interest rate or

they were otherwise misled into paying more for "cash-out refinance[s]." FAC ¶¶ 202, 230, 282. These new theories are just as baseless as the old ones. Plaintiffs' own loan documents clearly show that Plaintiffs' brokers *did* disclose these facts. *See e.g.,* S. Cowen Decl., Exs. F–H, J–N. Thus, Plaintiffs' Counsel did not perform a "reasonable inquiry" before bringing these new allegations. *Merritt*, 613 F.3d at 626.

*Morandi.* The claims made regarding newly added Plaintiff Morandi are perhaps the most egregious. Morandi approached Garrett Todd, a loan officer with National Trust Lending, for a refinancing after having first received a quote from Allied First Bank. Todd Decl. ¶¶ 1, 2, 4; Ex. 2. The FAC falsely alleges that "Todd signed UWM's Wholesale Broker Agreement." FAC ¶ 275. He did not. Todd Decl. ¶ 10. This only highlights how Plaintiffs continue to frivolously lump together loan officers and brokers (a firm that may have multiple loan officers) in the FAC in an effort to disparage all of them. ECF No. 23, Mot. for Relief, at 22.

In May, 2022, Morandi's credit score was very low: 603 as of May 12, 2022, based on one credit pull, and 666 as of May 19, 2022, based on another. *Id.* ¶ 3; Exs. 3–4; *see also id.*, Ex. 2 (referring to Morandi's credit score as a "Bottom Feeder Score"). Unfortunately, Morandi also lost his job on or around May 19, 2022, and had to find a new one. *See* Todd Decl. ¶ 6; *compare* S. Cowen Decl., Ex. D (Morandi 5.19.22 Uniform Residential Loan Application) at 2 *with* Ex. I (Morandi 6.17.22

9

Uniform Residential Loan Application) at 2; Ex. E (Morandi Employment Verification Request).

Despite these circumstances, Todd worked with Morandi to find a loan that Morandi could afford.  Todd Decl. ¶¶ 5–9; Ex. 1.  Given his poor credit score, Morandi would have had to pay a mortgage insurance premium on the FHA mortgage through Allied First Bank.  *Id.* ¶ 4.  Todd worked with Morandi to help him remove certain debts from his credit report, which increased his credit score to 725.  *Id.* ¶ 5; Ex. 3.  Todd was then able to secure a 30-year fixed interest rate of 4.625% for a principal amount of $310,000 from UWM.  FAC ¶ 281; Todd Decl. ¶ 7.  In the process, Todd explained that Morandi would need to purchase discount points to attain the note rate of 4.625% but doing so would be cheaper than securing an FHA loan and paying a mortgage insurance premium.  Todd Decl. ¶ 7.  Todd even fronted the money for the appraisal himself because Morandi indicated he could not afford to pay it prior to closing.  *Id.* ¶ 8; Ex. 4.

Despite this, the FAC claims that Morandi "did not realize, at any point prior to closing, that he would be paying $4,348.31 in 'discount points' as a condition of securing [his] interest rate" and that no one "ever discussed 'points' with [him]." FAC ¶ 282.  But three different closing disclosures show otherwise—expressly listing the amounts to be paid in "points":

10

**Closing Cost Details**

| Loan Costs | Borrower-Paid | | Paid by Others |
|---|---|---|---|
| | At Closing | Before Closing | |
| A. Origination Charges | $11,044.04 | | |
| 01 1.265% of Loan Amount (Points) | $3,794.04 | | |
| 02 Originator Compensation to National Trust Lending | $7,250.00 | | |

**Closing Cost Details**

| Loan Costs | Borrower-Paid | | Paid by Others |
|---|---|---|---|
| | At Closing | Before Closing | |
| A. Origination Charges | $11,133.31 | | |
| 01 1.253% of Loan Amount (Points) | $3,883.31 | | |
| 02 Originator Compensation to National Trust Lending | $7,250.00 | | |

**Closing Cost Details**

| Loan Costs | Borrower-Paid | | Paid by Others |
|---|---|---|---|
| | At Closing | Before Closing | |
| A. Origination Charges | $11,598.31 | | |
| 01 1.403% of Loan Amount (Points) | $4,348.31 | | |
| 02 Originator Compensation to National Trust Lending | $7,250.00 | | |

S. Cowen Decl., Ex. F (June 3) at 2; Ex. G (June 6) at 2; Ex. H (June 16) at 2.

Morandi signed and acknowledged receipt of all three of these disclosures. S. Cowen Decl., Ex. F at 5; Ex. G at 5; Ex. H at 5. Additionally, the "points" were also listed in Morandi's loan application in the amount of $4,348.31.

| L4. Qualifying the Borrower - Minimum Required Funds or Cash Back | | |
|---|---|---|
| **DUE FROM BORROWER(S)** | | |
| A. Sales Contract Price | $ | |
| B. Improvements, Renovations, and Repairs | $ | 0.00 |
| C. Land *(if acquired separately)* | $ | |
| D. For Refinance: Balance of Mortgage Loans on the Property to be paid off in the Transaction *(See Table 3a. Property You Own)* | $ | 254,528.01 |
| E. Credit Cards and Other Debts Paid Off *(See Table 2c. Liabilities - Credit Cards, Other Debts, and Leases that You Owe)* | $ | 29,233.89 |
| F. Borrower Closing Costs *(including Prepaid and Initial Escrow Payments)* | $ | 13,835.36 |
| G. Discount Points | $ | 4,348.31 |
| H. TOTAL DUE FROM BORROWER(s) *(Total of A thru G)* | $ | 301,945.57 |

*See* S. Cowen Decl., Ex. I at 12.

Thus, Plaintiffs' Counsel only needed to look at Morandi's loan documents to realize that he, in fact, received multiple and explicit disclosures regarding the discount points he would pay. The non-disclosure theory is thus "not well grounded in fact." *Merritt*, 613 F.3d at 626. And Counsel's failure to undertake even a basic inquiry—especially after Defendants' prior objections based on Plaintiffs' loan documents—falls far short of Counsel's obligations. *Id.*

**Schelble.**   According to the FAC, Schelble received an interest rate from UWM "that met his expectations." FAC ¶ 230. Yet the FAC claims that he "did not realize, at any point prior to closing, that he would be paying $2,953.41 in 'discount points' as a condition of securing [that] rate" and that neither UWM nor his loan officer discussed this. *Id.* That is ***directly*** contradicted by Schelble's closing documents. Not only did his final, updated closing disclosure list $2,953.41 as the amount to be paid by Schelble for "Points," S. Cowen Decl., Ex. J (Schelble August Disclosure), so too did the disclosures issued to him on June 2 and May 23—three different disclosures in all.

| Closing Cost Details | | | | | |
|---|---|---|---|---|---|
| | **Borrower-Paid** | | **Seller-Paid** | | **Paid by Others** |
| Loan Costs | At Closing | Before Closing | At Closing | Before Closing | |
| A. Origination Charges | $2,953.41 | | | | |
| 01 0.551% of Loan Amount (Points) | $2,953.41 | | | | |
| 02 Origination Fee to Carolina Ventures Mortgage, LLC | | | | | (L) $10,720.00 |

*See id.*, Ex. K (Schelble June Disclosure); Ex. L (Schelble May Disclosure).  Even Schelble's loan estimate mentions "Points."

*Id.*, Ex. M (Schelble Loan Estimate) at 2.  Again, just as with Morandi, Plaintiffs' Counsel only needed to read through their client's loan documents.  If they had conducted this "reasonable inquiry," they would have realized that their non-disclosure allegations "were not well grounded in fact."  *Merritt*, 613 F.3d at 626.

**Escues.**  The FAC now alleges that "because Elkins structured the Escues' loan to provide them $2,452.89 cash back at closing"—exceeding a Fannie and Freddie $2,000 threshold—"the Escues' loan was classified as a 'cash-out refinance' loan, and thus subject to an additional price increase[.]"  FAC ¶ 202.  The FAC claims the Escues were injured because UWM and their brokers "never explained"

13

that the $2,452.89 payment to the Escues caused a price increase. *Id*. But that new liability theory is demonstrably false.

The Escues' loan was classified as a cash-out refinancing because the Escues *themselves secured the loan in order to pay off over $80,000 of debt*, not because the payout at closing exceeded $2,000 standing alone. CRA Decl. ¶ 10; S. Cowen Decl., Ex. N (Escues Closing Disclosure), at 3.   They borrowed $243,200 overall in refinancing their mortgage, but their payoff amount was $155,962.60—resulting in a cash-out amount of $87,237.40.   S. Cowen Decl., Ex. N (Escues Closing Disclosure), at 3.   Thus, the cash-out price adjustment would have been made even if the Escues had received *no cash* at closing.   CRA Decl. ¶ 11. The alleged failure to disclose the $2,000-plus cash received at closing supports no claim of any kind. *Id*. ¶¶ 10, 11.   That renders the Escues' newly made theory alleging non-disclosure frivolous.[2]   Had Counsel conducted a "reasonable inquiry," they would have learned as much.   *Merritt*, 613 F.3d at 626.

---

[2] The suggestion that there was something nefarious about the $2,452.89 that the Escues received at closing is likewise frivolous.   That is simply a function of when the loan closed and what happened in the interim.   Prior to closing, the estimated amount of cash due back to the Escues was $652.00.   CRA Decl. ¶ 11. The amount paid to the Escues at closing increased from the estimated $652.00 to $2,452.89 simply because the final closing cost amount they owed turned out to be less than the estimated closing cost because the payoff amounts owed on their prior mortgage and other debts to be satisfied at closing decreased between the time of application and closing. *Id*.

## III.   The FAC's Core Theory Runs Afoul Of Accepted Standards.

Rule 11(b)(3) further bars Counsel from asserting "technical analys[e]s" and "statistical extrapolations" that are "facially unreliable." *King*, 71 F.4th at 524. And a refusal to withdraw such contentions despite notice of their deficiencies also warrants sanctions under § 1927. *Id.* at 530.   The FAC's central theory of harm relies on a statistical analysis of exactly that sort.   Like the original Complaint, the FAC's central accusation as to each Plaintiff is that "publicly available data" shows that his or her UWM loan was not the "most affordable option on the market" when compared to other loans.   FAC ¶¶ 197, 231, 259, 285, 314.   But that "publicly available data"—*i.e.*, Hunterbrook's analysis—comes from two datasets:   Home Mortgage Disclosure Act data ("HMDA" data) and deed of trust data ("Deed" data). ECF No. 23, Ex. 15 ("How We Crunched the Numbers") at 2.   Neither dataset provides any support for those allegations in the FAC.  ECF No. 23, Ex. 1 at 5.  Since the data does not—and cannot possibly—support the loan comparisons they purport to make, Counsel arrive at their conclusions only by using misleading figures and "statistical extrapolations" that are "facially unreliable." *King*, 71 F.4th at 524.

***False Allegations of "Similar" Loans.***   First, Counsel purports to compare Plaintiffs' loans with other loans that have "the same parameters in all material respects."  FAC ¶¶ 197, 259, 285; *see also id.* ¶¶ 231, 314 ("substantially similar loans" for a borrower of Plaintiff's "profile").   Those allegations are facially

15

unreasonable because the Hunterbrook data upon which the FAC relies omits the key variables needed to support their alleged comparisons. ECF No. 23, Ex. 1 at 5. Failing to account for these variables is tantamount to comparing the cost of flights without knowing the starting point, destination, or number of stops.

For example, Morandi's credit score of 725 was used to price his mortgage, and the price adjustment in the market at that time for a 725 FICO score with a 69.7% Loan to Value ("LTV") ratio for a cash-out refinance loan was a full 1.25%, which amounts to $3,875 of Morandi's $310,000 loan amount. CRA Decl. ¶ 9. Similarly, for Jeffries and Singh, their FICO score of 680 and LTV ratio of 97% would cause a loan level market price adjustment of 1.125%, or, $3,601 of their $320,100 loan. *Id.* ¶ 6. The Escues, Schelble, and Weatherill had material loan level price adjustments too based on their own unique loan circumstances, including FICO and LTV ratios. *Id.* ¶ 7; ECF No. 23, CRA Decl. ¶ 5. These discrepancies are significant by Plaintiffs' own standards. *See, e.g.*, FAC ¶ 317 (alleging that Jeffries and Singh "paid at least $1,505 more in upfront costs than the median comparable loan").

"All seven Plaintiffs had FICO/LTV combinations that were subject to Fannie Mae or Freddie Mac loan level price adjustments of varying magnitudes." CRA Decl. ¶ 7. "These adjustments are critical pieces in understanding whether their individual interest rates and origination charges were consistent with alternatives in the market." *Id.* The only appropriate way to compare Plaintiffs' loans is to identify

16

loans made to borrowers with the similar FICO scores and LTV ratios, but that cannot be done with Plaintiffs' data. *Id.* ¶ 6.

The same goes for a myriad of other crucial factors that determine loan price, like employment history and the length of a rate lock-in period. ECF No. 23, CRA Decl. ¶ 14. Because Plaintiffs' core theory continues to rely upon "facially unreliable" "statistical extrapolations," Counsel has violated Rule 11(b)(3) and § 1927. *King*, 71 F.4th at 524.

***Misleading Use of Monthly Averages.*** Plaintiffs' Counsel also employ misleading and objectively unreasonable averages to compare loans. Instead of comparing loan prices on a given day to determine what is "most affordable," the FAC compares loans over an entire month—sometimes two. FAC ¶¶ 197, 231, 259, 285, 314. That is gamesmanship. Interest rates can fluctuate dramatically over multiple weeks and were especially volatile in 2022 and 2023. CRA Decl. ¶¶ 4–5. It is therefore meaningless to compare the interest rate for Plaintiffs' loans, locked in on specific days, to one or two month-long periods where interest rates fluctuated wildly.

Plaintiffs' Counsel, for example, compares Jeffries and Singh's mortgage to mortgages during "September and October 2023." FAC ¶ 314. According to Freddie Mac, the average 30-year fixed rate mortgage varied between 7.12% and 7.76%—.64 percentage points—during that two-month period. CRA Decl. ¶ 4. A

difference of 0.64 percentage points on a $320,100 30-year loan for the first year alone is estimated at $2,053 and over the course of 30 years is estimated at $50,384.[3] To take another example, the average 30-year fixed rate mortgage rates varied from 5.25% for the week ending May 19, 2022 to 5.81% for the week ending June 23, 2022.  CRA Decl. ¶ 5.  That means the market rate varied by 0.56 percentage points over the period in which Morandi refinanced his mortgage.  *Id*.  On a 30-year $310,000 loan, that is an estimated difference of $1,736 within the first year alone and $39,268 over the course of 30 years.  *See supra* fn. 3.  By Plaintiffs' own standards, those are substantial discrepancies.  *See* FAC ¶ 317 (alleging that Singh and Jeffries overpaid by "at least $1,590").

The only reasonable way to evaluate Plaintiffs' loans would be to compare them to loans obtained on the *same day*.  Otherwise, the drastic swings in interest rates will inevitably misrepresent what the "most affordable" mortgage is.  Even a "layperson" could see why that is "facially unreasonable."  *King*, 71 F.4th at 524.

***Deviation from Accepted Methodology.***  Lastly, as Defendants explained in their first Motion for Relief, government regulators already have an accepted methodology to compare the overall cost of loans using rate spreads.  ECF No. 23 at 21.  The rate spread is the difference between the mortgage loan's APR and the

---

[3]   *See, e.g.*, Mortgage Calculator, NerdWallet, available at https://www.nerdwallet.com/mortgages/mortgage-calculator.

average prime offer rate for similar types of loans as of the date the interest rate is locked. ECF No. 23, CRA Decl. ¶ 10. The rate spread captures various key costs of the loan in addition to the interest rate and origination fees charged. *Id.*

Applying this method here undermines Plaintiffs' claims. For instance, even with the loan level price adjustment for Morandi's cash-out refinance, the rate spread on his mortgage was -0.841, indicating that he paid a *lower* APR than the average 30-year fixed rate loan (an average including mortgages that were not subject to any loan level price adjustments, which a full analysis would address). CRA Decl. ¶ 9. And Weatherill's rate spread was lower than the average wholesale loan from the top 25 wholesale lenders at that time, even when setting aside the factors that would have increased his loan price (which a full analysis would address). ECF No. 23, CRA Decl. ¶ 12. Plaintiffs' Counsel conveniently eschews this generally accepted methodology in favor of Hunterbrook's "facially unreasonable" "statistical extrapolations," no doubt to support the improper purpose for which this lawsuit was filed. *King*, 71 F.4th at 523–24.

## CONCLUSION

Defendants request that the Court grant this Motion, dismiss this action with prejudice, and order attorney's fees or, at a minimum, strike the offending allegations. Alternatively, Defendants request that the Court order disclosures to

determine any additional facts and hold an evidentiary hearing to determine appropriate relief.

Dated: December 13, 2024                     Respectfully submitted,

                                             /s/ *Jeffrey J. Jones*
Rebekah B. Kcehowski                         Jeffrey J. Jones (P80231)
JONES DAY                                    Stephen J. Cowen (P82688)
500 Grant Street, Suite 4500                 Amanda K. Rice (P80460)
Pittsburgh, PA 15219                         Andrew J. Clopton (P80315)
(412) 391-3939                               JONES DAY
rbkcehowski@jonesday.com                     150 W. Jefferson Ave, Suite 2100
                                             Detroit, MI 48226
                                             (313) 733-3939
                                             jjjones@jonesday.com
                                             scowen@jonesday.com
                                             arice@jonesday.com
                                             aclopton@jonesday.com

                                             *Counsel for Defendants*