## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, Brian P. Weatherill, Kenneth C. Morandi, Jill Jeffries, and Daniel Singh on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia,<br><br>       Defendants. | Case No. 2:24-cv-10853-BRM-DRG<br><br>Hon. Brandy R. McMillion,<br>United States District Judge<br><br>Hon. David R. Grand,<br>United States Magistrate Judge |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' SECOND MOTION FOR RELIEF UNDER RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS

**TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED...............................................iv

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..............................vi

INTRODUCTION ................................................................1

LEGAL STANDARD..............................................................2

ARGUMENT ...................................................................4

I.     Defendants' Repeated Accusation That Counsel Brings This Action for
       an "Improper Purpose" Remains Baseless and Is Itself Improper. ...........4

       A.     Defendants Concede the Vast Majority of Plaintiffs' Allegations
              Are Proper Under Rule 11................................................4

       B.     Defendants' "Improper Purpose" Argument Is Meritless................5

              1.   Plaintiffs' Citation of HMDA Data That Defendants'
                   Themselves Rely on Is Proper. ...................................5

              2.   Plaintiffs' Quotations of Defendant Ishbia's Own Public
                   Statements Are Proper. ..........................................7

              3.   Plaintiffs' Characterization of Brokers Who Represent They
                   Are "Independent" But in Fact Funnel Loans to UWM as
                   "Corrupt" Is Proper. ..............................................8

              4.   Plaintiffs' Allegations Regarding the Contractual Terms UWM
                   Openly Requires Brokers to Agree to Are Proper. .....................9

              5.   Plaintiffs' Claims Have a Legal Basis. ....................................10

II.    Defendants Fail to Show That Any Individual Plaintiff's Factual
       Allegations Are "Completely Unwarranted by the Evidence." ...............11

III.   Defendants Do Not Come Anywhere Close to Showing That the
       Statistical Analysis Referenced in the FAC Is "Facially Unreliable."......18

CONCLUSION ...............................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*Agarwal v. Morbarck, LLC*,
  585 F. Supp. 3d 1026 (E.D. Mich. 2021) ............................................................11

*Carlton Grp., Ltd. v. Tobin*,
  2003 WL 21782650 (S.D.N.Y. July 31, 2003)...................................................20

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991).................................................................................................3

*Draper & Kramer, Inc. v. Baskin-Robbins, Inc.*,
  690 F. Supp. 728 (N.D. Ill. 1988).........................................................................3

*E.E.O.C. v. Pines of Clarkston, Inc.*,
  2014 WL 6612375 (E.D. Mich. Nov. 20, 2014)................................... 2, 8, 19, 25

*El-Khalil v. Tedeschi*,
  2023 WL 5827666 (E.D. Mich. Sept. 8, 2023) .....................................................3

*Harrison Prosthetic Cradle Inc.* v. *Roe Dental Lab., Inc.*,
  608 F. Supp. 3d 541 (N.D. Ohio 2022) .................................................................3

*Hookom v. Sensor*,
  121 F.R.D. 63 (S.D. Ohio 1988).............................................................................3

*James v. Caterpillar, Inc.*,
  824 F. App'x 374 (6th Cir. 2020) ......................................................................3, 11

*Julian v. Lee*,
  2020 WL 4913481 (E.D. Mich. July 29, 2020).....................................................21

*Kamerman v. Steinberg*, 113 F.R.D. 511 (S.D.N.Y. 1986) .....................................19

*King v. Whitmer*,
  71 F.4th 511 (6th Cir. 2023) ......................................................................... 19, 20

*Kovach v. Access Midstream Partners, L.P.*,
  2016 WL 1162061 (N.D. Ohio Mar. 23, 2016).....................................................19

*Lee v. Countrywide Home Loans, Inc.*,
  692 F.3d 442 (6th Cir. 2012) ................................................................................10

*PPS Data, LLC v. Athenahealth, Inc.*,
  2012 WL 601208 (M.D. Fla. Feb. 23, 2012)......................................................13

*Rose v. Wash.*,
  2021 WL 3177307 (W.D. Mich. June 28, 2021), *aff'd*, 2023 WL 9316268
  (6th Cir. Nov. 1, 2023)........................................................................................16

*Sanchez v. City of Fresno*,
  914 F. Supp. 2d 1079 (E.D. Cal. 2012) ..............................................................13

*Tahfs v. Proctor*,
  316 F.3d 584 (6th Cir. 2003) .........................................................................3, 10

*Teno v. Iwanski*,
  464 F. Supp. 3d 924 (E.D. Tenn. 2020)................................................................7

*United Wholesale Mortg., LLC v. Am.'s Moneyline, Inc.*,
  647 F. Supp. 3d 587 (E.D. Mich. 2022) .............................................................12

*Zangara v. Travelers Indem. Co. of Am.*,
  2006 WL 8553018 (N.D. Ohio July 20, 2006)...................................................20

**Other Authorities**

Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* §
  14(D)(6) (6th ed. 2023)..................................................................................3, 13

**Rules**

Fed. R. Civ. P. 11 ..................................................................................... 2, 3, 25

**Regulations**

12 C.F.R. 1026.36 ................................................................................................10

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.  Do Defendants establish that Plaintiffs brought this action for an improper purpose?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

2.  Do Defendants establish that any of Plaintiffs' factual allegations are completely unwarranted by the evidence?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

3.  Do Defendants establish that any of Plaintiffs' factual allegations are facially unreliable?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

4.  Should the Court impose sanctions on Plaintiffs under Fed. R. Civ. P. 11?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

5.      Should the Court impose sanctions on Plaintiffs under 28 U.S.C. § 1927?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

6.      Should the Court use its inherent power to impose sanctions on Plaintiffs?

      Plaintiffs' answer: No

      Defendants' answer: Yes

      This Court should answer: No

# <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

**Cases:**

> *James v. Caterpillar, Inc.,*
>     824 F. App'x 374 (6th Cir. 2020)

> *Tahfs v. Proctor*,
>     316 F.3d 584, 594 (6th Cir. 2003)

> *E.E.O.C. v. Pines of Clarkston, Inc.*,
>     2014 WL 6612375 (E.D. Mich. Nov. 20, 2014)

**Rules & Statutes:**

> FED. R. CIV. P. 11

> 28 U.S.C. § 1927

## <u>INTRODUCTION</u>

For the second time, Defendants have filed a motion for sanctions accusing Plaintiffs' counsel of serious misconduct without anything approaching a reasonable justification.  The Civility Principles promulgated by this Court instruct attorneys to (i) "not, absent good cause, attribute bad motives or improper conduct to other counsel" and (ii) "not seek court sanctions without first conducting a reasonable investigation and unless fully justified by the circumstances . . . ."  Admin. Ord. No. 08-AO-009.  Mindful of these principles and the laudable goals they are meant to achieve, Plaintiffs will not respond in kind by speculating why Defendants would choose to file a *second* baseless sanctions motion, or by turning the tables and filing a separate sanctions motion of their own.  But Plaintiffs respectfully submit these motions are a needless waste of time and resources, and if Defendants file additional such motions in the future, Plaintiffs reserve the right to seek appropriate relief.

There is no merit whatsoever in any of Defendants' stated grounds for relief.  This action was not filed for an improper purpose.  It was filed solely to seek redress for the harm Defendants' fraudulent scheme has caused to Plaintiffs and thousands of similarly situated consumers.  Notably, despite claiming this entire action is a sham, Defendants do not dispute the propriety of the vast majority of the allegations in Plaintiffs' 583-paragraph First Amended Complaint (ECF No. 21, the "FAC"), including that Defendants, together with their broker partners, intentionally deceived

1

consumers into believing their brokers were "independent," when they in fact were deliberately steering loans to UWM. And the few specific allegations that Defendants claim are "baseless" plainly are not. Defendants' effort to prematurely litigate the merits, including through their now-redundant challenges to the statistical analysis cited in the FAC, is an abuse of Rule 11. The Court should put an end to this unnecessary diversion and deny this motion in its entirety.

## LEGAL STANDARD

To prevail on a motion for alleged violations of Rule 11, a defendant "must meet" an even "higher burden of proof" than the burden applicable on a motion for summary judgment. *E.E.O.C. v. Pines of Clarkston, Inc.*, 2014 WL 6612375, at *2 (E.D. Mich. Nov. 20, 2014). It is "not enough" to show that there is no genuine issue of material fact and plaintiffs' claims fail as a matter of law. *Id.* Rather, a "defendant must . . . prov[e] that plaintiffs' claims are 'not warranted by existing law . . .' and that the factual contentions lack *any* evidentiary support." *Id.* (citing Fed. R. Civ. P. 11(b)) (emphasis added). Put differently, the "[d]efendant must show that the filing and continuation of [the] lawsuit was so lacking in merit that its pursuit could be said to be objectively unreasonable." *Id.*

As the Sixth Circuit has made clear, a district court should be especially "hesitant" to find violations of Rule 11 at the pleading stage when "ordinarily there is little or no evidence before the court at all." *Tahfs v. Proctor*, 316 F.3d 584, 594

(6th Cir. 2003); *see also Hookom v. Sensor*, 121 F.R.D. 63, 64 (S.D. Ohio 1988) ("No litigant should be faced with sanctions without an opportunity to conduct appropriate discovery.").[1]   Moreover, Rule 11 motions that aim "to test the legal sufficiency or efficacy of allegations in the pleadings" are inappropriate and should be denied.  *James v. Caterpillar, Inc.,* 824 F. App'x 374, 378 (6th Cir. 2020) (quoting Fed. R. Civ. P. 11, 1993 Advisory Committee Notes).

"Rule 11 is not a toy."  *Draper & Kramer, Inc. v. Baskin-Robbins, Inc.*, 690 F. Supp. 728, 732 (N.D. Ill. 1988).  "[A] Rule 11 violation is a serious thing, and an accusation of such wrongdoing is equally serious."  *Id.*  "Threatening sanctions casually or as a matter of course has no place among officers of the court" and should be reserved for "the most egregious cases and, then, only as a last resort." *Harrison Prosthetic Cradle Inc.* v. *Roe Dental Lab., Inc.*, 608 F. Supp. 3d 541, 551 (N.D. Ohio 2022).  Parties that file frivolous Rule 11 motions may be sanctioned themselves. *See* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 14(D)(6) (6th ed. 2023).  And under Rule 11(c)(2), "the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."

---

[1] Courts likewise must exercise their authority to assess fees under 28 U.S.C. § 1927 "with restraint and discretion," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991), and routinely "decline[] to award sanctions under § 1927 based on the filing of allegedly frivolous claims" in an initial or amended complaint.  *See El-Khalil v. Tedeschi*, 2023 WL 5827666, at *8, *10 (E.D. Mich. Sept. 8, 2023).

## **ARGUMENT**

I.   **Defendants' Repeated Accusation That Counsel Brings This Action for an "Improper Purpose" Remains Baseless and Is Itself Improper.**

In their second Rule 11 Motion, Defendants (again) baselessly make the serious accusation that this action was brought for an "improper purpose" and that the FAC "is further corroborating evidence" of sanctionable conduct because the "FAC does not redress the original Complaint's inflammatory rhetoric and unsupported core allegations." ECF No. 38 ("Mot.") at 6.  Even a cursory reading of Defendants' papers makes clear that this accusation is wholly without merit and does not come anywhere close to rising to a Rule 11 violation.  Rather, this second motion is, unfortunately, an inappropriate and irresponsible litigation tactic that experienced defense counsel should not have stooped to engage in.

### A.   **Defendants Concede the Vast Majority of Plaintiffs' Allegations Are Proper Under Rule 11.**

As with their first motion for sanctions, Defendants remarkably contend that this action was brought for an "improper purpose" even though they do not challenge under Rule 11 the vast majority of Plaintiffs' allegations, including that:

- Defendants and their broker partners falsely represented that "[b]rokers are independent," and that the loan officers found on findamortgagebroker.com will "shop on your behalf."  FAC ¶¶ 40, 45, 49–53, 155.

- Such statements were false and UWM intended to induce loan officers to funnel consumers "to UWM without shopping for loans that are in those borrower-clients' best financial interests." *E.g.*, *id*. ¶¶ 119, 129 130, 132, 134.

4

- The purpose and effect of this unscrupulous conduct was to cause Plaintiffs to pay for brokers who were not providing the core functions they advertised and were hired to perform, including to exercise independent judgment, shop on borrowers' behalf, disclose material facts, and not maintain secret loyalty to a single lender. *E.g.*, *id.* ¶¶ 152, 155, 159–62, 211, 217, 224, 250–53, 277.

- Plaintiffs were harmed in multiple ways, including because they paid for but did not receive the benefit of their broker's "independent" and loyal service, while Defendants and the participating brokers richly profited from their deceptive and misleading conduct. *E.g.*, *id.* ¶¶ 147, 150, 152–55, 164.

In the face of their concession that these allegations "have evidentiary support or . . . will likely have evidentiary support" under Rule 11, Defendants cannot seriously contend that the FAC is somehow sanctionable based on (unfounded) speculation about Plaintiffs' motive for asserting well-pled, evidence-based claims.

### B. Defendants' "Improper Purpose" Argument Is Meritless.

Each basis offered by Defendants for their claim that the FAC is sanctionable is wrong. Indeed, the only actual "improper purpose" here is Defendants inappropriate tactical use of Rule 11—*twice*—to engage in a pre-discovery effort to raise what are, at best, potential factual disputes that would not even be proper for resolution at the summary judgment stage.

### 1. Plaintiffs' Citation of HMDA Data That Defendants' Themselves Rely on Is Proper.

Defendants make the perplexing argument that the FAC's citation of a statistical analysis of HMDA data—which the CFPB describes as "the most comprehensive source of publicly available information on the U.S. mortgage

market"[2]—is sanctionable.  That argument—which is hard to view as being in good faith—is all the more remarkable because *Defendants themselves rely on the very same data in their motion to dismiss Plaintiffs' claims*.  In particular, Defendants touted that same HMDA data as a reliable source for a mortgage loan comparison shopper, arguing that Plaintiffs were not "reasonably diligent" in comparing the price and terms of their UWM loans with market prices because they failed to avail themselves of the same HMDA data.  ECF No. 30 at 27.  Defendants cannot contend in good faith that the HMDA data simultaneously is so "unreliable" that Plaintiffs should be *sanctioned* for citing it in a pleading, while at the same time claiming that a "reasonably diligent" plaintiff would have relied on the same HMDA data to compare prices across loans.  Moreover, Defendants' contention that the data is unreliable is not a basis for Rule 11 sanctions at the pleadings stage under the well-established precedent.  *See* Section III, *infra*.

Further, even if it were appropriate for the Court to evaluate the evidentiary value of HMDA data at this stage (it is not), the HMDA data is a reliable repository for Plaintiffs to cite in supporting their allegations that thousands of loan officers who held themselves out as "independent" were, in fact, funneling loans to UWM at rates *often at or above 99%.  See* Section III, *infra*.  Thus, whatever Defendants'

---

[2]   Consumer   Financial   Protection   Bureau,   Mortgage   data   (HMDA), https://www.consumerfinance.gov/data-research/hmda.

opinion is about the HMDA data (which is unclear in view of Defendants' own reliance on it), it is clear that references to HMDA data in the FAC are neither sanctionable nor evidence of some unidentified "improper purpose."  And any factual dispute the parties have about that data is unripe for resolution at this stage.[3]

### 2. Plaintiffs' Quotations of Defendant Ishbia's Own Public Statements Are Proper.

Defendants' displeasure with the FAC's quotation of Defendant Ishbia's own public statements is not grounds for sanctions nor evidence of any improper purpose. Defendants do not dispute that Mr. Ishbia made these statements.  Nor do they claim that any of his statements were misquoted.   Rather, Defendants claim those allegations "have no substantive relevance" and are "clearly designed to attract negative media attention," and that thus justifies sanctions. Mot. at 6.  That is plainly wrong.  Defendant Ishbia's statements are quoted in the FAC because his words and actions are evidence of Defendants' illegal scheme and are relevant to Defendants' intent in pursuing that scheme, which is an element of some of the causes of action.

In fact, the allegations that Defendants claim are "incendiary" are not only rooted in Defendant Ishbia's and UWM's *own statements*, but also *the uncontested*

---

[3] *Teno v. Iwanski*, 464 F. Supp. 3d 924, 953-954 (E.D. Tenn. 2020) provides no support for the imposition of sanctions here and underscores the circular nature of Defendants' argument.  The *Teno* court imposed sanctions for "improper purpose," but only after a full factual record had been developed in discovery, judgment entered in favor of defendants, and the court could use that record to determine that plaintiffs' claims were meritless.  *Teno*, 464 F. Supp. 3d at 953-54.

*fact* that thousands of purportedly "independent" loan officers were funneling up to 100% of their loan volume to UWM.  This demonstrates how deeply inappropriate Defendants' Rule 11 motion is.  Defendants are accusing Plaintiffs and their counsel of acting unethically and in violation Rule 11 despite *not disputing* the accuracy of these core factual allegations, which are obviously relevant and well-plead.  Defendants cannot remotely establish these allegations should be stricken, let alone that they are so divorced from reasonable inquiry that sanctions are appropriate.  *Pines of Clarkston*, 2014 WL 6612375, at *1 ("sanctions are not warranted unless the pursuit of the lawsuit was wholly lacking in arguable legal merit or where the factual allegations were completely unwarranted by the evidence").

### 3. Plaintiffs' Characterization of Brokers Who Represent They Are "Independent" But in Fact Funnel Loans to UWM as "Corrupt" Is Proper.

Defendants' renewed objection to the FAC's characterization of certain loan officers as "corrupted" also is no basis for sanctions under Rule 11.  Defendants correctly admit that these "allegations strike at the heart of UWM's business model and broker network" (Mot. at 6), and they also do not even challenge under Rule 11 the factual allegations underlying this characterization: that is, Plaintiffs paid for, but did not receive, the benefit of their brokers' promised "independent" and loyal services, while Defendants and the participating brokers richly profited from their deceptive and misleading conduct.  FAC ¶¶ 96, 167, 193, 197, 230–35, 258–62, 278–

80, 282–87, 302, 312, 314, 317.  While Defendants may bristle at Plaintiffs' use of the term "corrupted," they fail to refute the core allegations of their unscrupulous— and, yes, corrupt—conduct.

> **4.    Plaintiffs' Allegations Regarding the Contractual Terms UWM Openly Requires Brokers to Agree to Are Proper.**

Defendants take issue with what they call "improper and misleading allegations" that the All-In provision "meaningfully restricted [Plaintiffs' brokers'] ability to shop for mortgage loans."  Mot. at 7.  But the "All-In" provision—which the FAC quotes in full (*see* ¶ 77)—plainly ***does*** "meaningfully restrict" brokers' ability to shop.  As the FAC accurately states, it "contractually prohibits any broker who does business with UWM from shopping for loans from . . . Rocket Mortgage," UWM's chief competitor.  FAC ¶ 75.

Defendants do not attempt to identify *even a single misstatement* about the provision.  Instead, they complain the FAC "magnified" allegations as to the provision's impropriety (whatever that means), despite the fact that it "leaves available more than seventy wholesale-dedicated lenders and hundreds of additional lenders."  Mot. at 7.  But the mere existence of other lenders in the market does not disprove any of Plaintiffs' factual allegations about the provision.  And as the FAC accurately alleges, the "All-In" provision works in tandem with UWM's "Lock-In" provision, which restricts brokers from shopping for loans from *all* other lenders, not just one or two competitors—a policy *unique to UWM*.  FAC ¶¶ 85–89.  At

9

bottom, nothing in Defendants' motion demonstrates that *any* specific allegation about the "All-In" provision is false, much less so devoid of merit as to warrant Rule 11 sanctions at the pleading stage. *Tahfs*, 316 F.3d at 594.

### 5.    Plaintiffs' Claims Have a Legal Basis.

Defendants' claim that the FAC contains sanctionable "legal errors" is wrong.

*First*, Defendants' continued reliance on Truth in Lending Act ("TILA") regulations to attack Plaintiffs' claims is meritless. Defendants do not assert that claimed compliance with 12 C.F.R. 1026.36(e) somehow immunizes their misconduct.[4] Nor could they. *See, e.g.*, *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 452 (6th Cir. 2012) (denying defendant broker summary judgment on state civil conspiracy claim for deficient disclosures while granting motion on TILA disclosure claim). In any event, Plaintiffs do not base their claims on TILA regulations and thus Defendants' citation of TILA regulations is a red-herring.

*Second*, Defendants' vague assertion that "some states do not even recognize Plaintiffs' cause of action at all" is deficient on its face. Mot. at 7. Defendants do not even identify what cause of action they are referring to much less state a

---

[4] In fact, Defendants are the ones ignoring the substance of the TILA anti-steering disclosures. The disclosures are silent as to which lender is offering the presented loan options. *See, e.g.*, ECF No. 23-46. And they do nothing to show whether the disclosing broker satisfied their obligation to "obtain loan options from a significant number of the creditors with which the [broker] regularly does business[.]" 12 C.F.R. 1026.36(e)(3)(i).

cognizable basis for sanctions.  Plaintiffs have addressed the legal sufficiency of their claims at length in their oppositions to Defendants' motion to dismiss (ECF No. 35), motion to strike (ECF No. 36), and first motion for sanctions (ECF No. 28), and thus will not rehash them here.  But even if there were merit in any of Defendants' arguments on the law, that still would not justify sanctions.  *See James*, 824 F. App'x at 378 ("A complaint's failure to satisfy Rule 12(b)(6) is not alone enough to impose sanctions."); *Agarwal v. Morbarck, LLC*, 585 F. Supp. 3d 1026, 1030 (E.D. Mich. 2021) ("If attorneys were sanctioned for pursuing reasonable arguments … attorneys would be practically useless" and "[t]he only legal claims that could be properly brought would be those involving no question at all").

## II.   Defendants Fail to Show That Any Individual Plaintiff's Factual Allegations Are "Completely Unwarranted by the Evidence."

In a renewed and improper attempt to prematurely litigate the merits, Defendants take aim at a total of four paragraphs in Plaintiffs' 583-paragraph FAC, arguing that they purportedly violate Rule 11 because they are "baseless" and Plaintiffs "did not perform a 'reasonable inquiry'" before asserting them.  Mot. at 8–14.  There is simply no merit in any of Defendants' claims.

**FAC ¶ 275.**  *First*, Defendants claim that Plaintiff Morandi "falsely alleges" that the loan officer who originated his UWM Mortgage, Garrett Todd, "signed UWM's Wholesale Broker Agreement."  Mot. at 9 (citing FAC ¶ 275).  Relying on a written Declaration from Todd, Defendants contend that Todd "did not" sign the

11

Agreement, and that Plaintiffs' "egregious" misstatement "highlights how Plaintiffs continue to frivolously lump together loan officers and brokers . . . in an effort to disparage them all." *Id.* (citing ECF No. 38-19 ¶ 10). Defendants' overheated contentions fail to demonstrate a Rule 11 violation and are entirely irrelevant to Plaintiff Morandi's claims.

To start, even if Todd truly did not sign the Agreement, as he claims in his Declaration, Plaintiffs had a reasonable basis to allege that he did. UWM has repeatedly stated that accepting and abiding by the terms of the Agreement, and specifically the shopping restrictions therein, is a non-negotiable precondition for originating mortgage loans with UWM. *See, e.g.*, Hubbard Decl.,[5] Ex. 2 at 5 ("You have until March 15th to sign the addendum. And if you don't sign the addendum . . . you and nobody at your company will work with UWM anymore.").[6] There is no dispute that Todd is a loan officer who has originated, and continues to originate, millions of dollars of mortgage loans with UWM. Ex. 3. And because the identity of the Agreement's signatories is non-public and entirely within UWM's and the signatories' control, no "reasonable inquiry" on Plaintiffs' part could have

---

[5] Exhibits to the Declaration of Brandon C. Hubbard are referenced herein as "Ex."

[6] *See also United Wholesale Mortg., LLC v. Am.'s Moneyline, Inc.*, 647 F. Supp. 3d 587, 593 (E.D. Mich. 2022) (citing UWM's issuance of "conditional approval letters" requiring a broker to "execute the [amended Wholesale Broker Agreement] before UWM would close any further loans originated by" that broker).

uncovered contrary information pre-filing. *See* Joseph, *supra*, § 8(A)(4) ("if pertinent facts are lodged in the possession of opponents or uncooperative third parties, or are otherwise not readily available, to the presenter, the courts will recognize that as a practical limitation on what a reasonable inquiry may include"). Defendants thus fail to show that Plaintiff Morandi's allegation was "completely unwarranted by the evidence," as required to establish a Rule 11 violation. *See PPS Data, LLC v. Athenahealth, Inc.*, 2012 WL 601208, at *2 (M.D. Fla. Feb. 23, 2012) (denying Rule 11 motion where Defendant's affidavit "does not . . . cast doubt on the reasonableness of Plaintiff's reliance on Defendant's public statements").

Moreover—and critically—**neither Defendants nor Todd dispute that Todd was legally bound under the Agreement**.  Rather, they only dispute whether Todd personally "signed" the Agreement (as opposed to whether his brokerage firm, Katzman Enterprises,[7] signed it instead).  But that detail is wholly irrelevant.  As an agent of his firm, Todd was bound under the Agreement when acting within the scope of his agency.  *See Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1120 (E.D. Cal. 2012) ("non-signatories may be bound by the terms of an agreement if

---

[7] In Todd's Declaration, he states that he is "a licensed loan officer working with National Trust Lending in Van Nuys, California."  ECF No. 38-19 ¶ 1.  According to the NMLS database, National Trust Lending is a trade name associated with Katzman Enterprises, a licensed mortgage loan originator in California.  Ex. 4.

they are agents of a signatory"). Thus, regardless of whether he signed it, Todd was obligated to abide by the Agreement's terms when originating Morandi's loan.

Further, even if Defendants could establish that Todd was *not* bound under the Agreement—and again, they do not even contend as much—that would have *no bearing* on the merits of Plaintiff Morandi's claims. For example, even if Todd was never obligated to comply with UWM's "All-In" policy, his conduct demonstrates that he nonetheless has chosen to comply. Between 2021 and 2023, Todd originated 326 mortgage loans (comprising over $199.74 million of loan volume)—301 of which (or over 92%) went to UWM. Ex. 3. *None* went to Rocket or Fairway. *Id.* Todd does not dispute any of this in his Declaration. ECF No. 38-19. Plaintiffs are alleging that UWM has corrupted brokers' and loan officers' independence, converted them into UWM loyalists, and concealed that fact from UWM borrowers. FAC ¶¶ 72–129, 156–69. If Todd is steering *over 92%* of his loans to UWM and failing to shop independently despite *not* being bound under any contract with UWM, that would only underscore the power of UWM's non-contractual incentives as outlined in the Complaint. *See id.* None of Plaintiff Morandi's claims turns solely on the nature or existence of a contractual relationship between Todd and UWM— so the non-existence of such a relationship would not defeat any of his claims.

**FAC ¶¶ 230, 282.** *Next*, Defendants attack the veracity of allegations that Plaintiffs Morandi and Schelble "did not realize, at any point prior to closing, that

[they] would be paying [thousands of dollars for] 'discount points' as a condition of securing [their] interest rate[s]," and that no one "ever discussed 'points' with [them]."   Mot. at 10, 12.   Defendants claim those allegations are "***directly*** contradicted" by closing disclosure forms, *id.* at 12 (emphasis in original), which they claim were presented to Plaintiffs Morandi and Schelble well in advance of their closings. *Id.* at 10–13.  Defendants are wrong.

Plaintiffs Morandi and Schelble do not allege that they were never made aware of the "discount point" line items in their closing disclosures.  Rather, they allege that their loan officers never "explained that [their] interest rate[s] [were] conditioned on [their] purchase of 'points'" or, "[a]s importantly . . . that in achieving a lower interest rate by paying for 'points,' [they] would end up with a loan that was significantly more expensive overall than substantially similar alternatives available in the market."   FAC ¶¶ 230, 282.   In other words, Plaintiffs allege they were unaware not of the *existence* of discount points, but the *connection* between the discount points and the rates they were promised.  *Id.*  And they never understood that by agreeing to pay thousands of dollars in "discount points," they were agreeing to obtain a loan that was more costly than loans available from other lenders.  *Id.*

Nothing in Defendants' motion demonstrates that Plaintiffs' allegations are untrue, much less sanctionable.  The closing disclosures on which Defendants rely do not purport to explain the connection between discount points and interest rates,

and they say nothing about how the points and rates offered on the loan compare to other loans available in the market. *See* Mot. at 10–13. And while Defendants cite Todd's Declaration to dispute Plaintiff Morandi's allegation that Todd never explained that the rate he was offered was conditioned on paying points, *id.* at 10 (citing ECF No. 38-19 ¶ 7), untested, self-serving factual assertions in a written declaration are insufficient to establish facts in the context of a pre-discovery Rule 11 motion. *See, e.g.*, *Rose v. Wash.*, 2021 WL 3177307, at *2 (W.D. Mich. June 28, 2021), *aff'd*, 2023 WL 9316268 (6th Cir. Nov. 1, 2023) (denying Rule 11 motion where movant "failed to provide any evidence" to demonstrate falsity of non-movant's assertions "apart from his own self-serving statements").

**FAC ¶ 202.** *Finally*, Defendants assert that a "new liability theory" concerning the non-disclosure of a loan level price increase applied to the Escue Plaintiffs' mortgage loan is "demonstrably false" and thus sanctionable. Mot. at 13–14. Specifically, Defendants claim that the Escue Plaintiffs' loan would have been classified as a "cash-out refinance" loan and subject to additional price increases regardless of whether the Escues received $2,000 cash back at closing because the loan was part of a transaction that allowed them to pay off thousands of dollars of additional debt. *Id.* at 14. This claim fails as well.

Plaintiffs assert no "new liability theory" concerning the loan level price increase applied to the Escue Plaintiffs' loan. Rather, the theories of liability in the

FAC remain the same as those alleged in the original complaint.  The Escue Plaintiffs, like the other Plaintiffs, believed they had obtained the services of an "independent" loan officer who would shop on their behalf and present them with the most favorable loan options he could find.  FAC ¶¶ 182, 191.  They were never made aware that the loan officer they hired was *not* in fact independent, but rather a UWM-loyalist who steers the vast majority of his loans to UWM in exchange for valuable benefits.  *Id.* ¶¶ 193, 203–04.  As a result, the Escues ended up with a loan that was substantially more expensive than available alternatives.  *Id.* ¶¶ 197–201.  As Plaintiffs explain, both in the FAC (*id.* ¶ 201) and in response to Defendants' first Rule 11 motion (ECF No. 28 at 16–17), the excess expense of the Escues' loan is evident in the fact that their 3.499% interest rate for their 18-year loan was substantially closer to the 30-year benchmark (3.55%) than the 15-year benchmark (2.77%).  FAC ¶ 201 (citing *Mortgage Rates*, Primary Mortgage Market Survey, Freddie Mac, https://www.freddiemac.com/pmms).  Thus, even if Defendants ultimately can prove that the Escues' loan would have been subject to a price increase regardless of how much cash they received at closing, the Escues' claims remain meritorious: they were deceived into hiring a UWM-loyalist broker, deprived of honest services, and ended up paying above-market mortgage costs as a result.

**III.    Defendants Do Not Come Anywhere Close to Showing That the Statistical Analysis Referenced in the FAC Is "Facially Unreliable."**

Defendants' claim that Plaintiffs should be sanctioned based on the purported unreliability of the statistical analysis referenced in the FAC's is utterly meritless. If Defendants' arguments and Plaintiffs' responses on this issue look familiar, that is because, in large part, the Court has seen them already. Defendants made many of the same baseless arguments in their first sanctions motion and continue to forge ahead with them here. They fare no better this second time around.

*First*, Defendants fundamentally misrepresent the role that the statistical analysis plays in this case. Defendants claim "[t]he FAC's central theory of harm relies on a statistical analysis" that shows each Plaintiffs' UWM loan "was not the most affordable options on the market when compared to other loans." Mot. at 15. That is incorrect. Plaintiffs were harmed not solely because UWM's fraudulent scheme caused them to obtain loans that were more expensive than available alternatives, as the statistical analysis shows, but also because they were deceived into paying for "independent" mortgage brokerage services that they never received. FAC ¶¶ 38, 147, 173, 355–56, 361, 364–65. Thus, even if there was merit in each of Defendants' critiques of the statistical analyses cited in the FAC (and, as discussed below, there is not), Plaintiffs' claims would *still* be cognizable. Defendants' premature attempt to litigate the reliability of the statistical analysis is therefore not only procedurally improper but a pointless diversion. Plaintiffs made this point in

18

response to Defendants' last improper Rule 11 motion.  ECF No. 28 at 11–12.

Defendants' instant motion offers no response.

*Second*, Defendants ignore the applicable legal standard.  This is a pleading-stage motion for sanctions under Rule 11.  It is not a motion for summary judgment nor a *Daubert* motion.  To obtain the relief they seek under Rule 11, Defendants must prove that Plaintiffs' "factual contentions lack any evidentiary support" and that "the filing and continuation of this lawsuit was so lacking in merit that its pursuit could be said to be objectively unreasonable."  *Pines of Clarkston*, 2014 WL 6612375, at *2.  Courts routinely hold that "news articles" and "public documents" can be sufficient "evidentiary support" for a plaintiff's factual allegations in a complaint under Rule 11.  *See, e.g.*, *Kovach v. Access Midstream Partners, L.P.*, 2016 WL 1162061, at *7 (N.D. Ohio Mar. 23, 2016) ("plaintiffs can rely on news articles from trusted sources to satisfy . . . Rule 11 pre-filing investigation requirements"); *Kamerman v. Steinberg*, 113 F.R.D. 511, 514–15 (S.D.N.Y. 1986) (plaintiffs "reliance on news articles" and "public documents, such as SEC filings" was "sufficient to meet the requirements of Rule 11").

Attorneys, moreover, are "rarely sanctioned" when their pleadings rely on an expert's analysis because "consulting an expert is itself a way to investigate a claim's factual plausibility."  *King v. Whitmer*, 71 F.4th 511, 524 (6th Cir. 2023); *see also* *Zangara v. Travelers Indem. Co. of Am.*, 2006 WL 8553018, at *2 (N.D. Ohio July

20, 2006) (denying Rule 11 motion where "pre-filing investigation efforts" involved "difficult and complex" analysis of data with "the help of an expert consultant"); *Carlton Grp., Ltd. v. Tobin*, 2003 WL 21782650, at *5 (S.D.N.Y. July 31, 2003) (same).  Indeed, as the Sixth Circuit recently held, a plaintiff's reliance on an expert at the pleading stage is sanctionable only if the expert's opinion is "unreliable on its face—either because of the expert's lack of qualifications, or the substance of the opinion itself." *King*, 71 F. 4th at 522–23.[8]

Because Defendants cannot prove that the FAC's allegations concerning the expensiveness of Plaintiffs' loans "lack any evidentiary support," they instead nitpick certain aspects of the statistical analysis referenced in parts of the FAC.  But lodging what is functionally a *Daubert* challenge before the parties have even retained testifying experts, much less completed expert discovery, is irrelevant to a

---

[8] *King* is instructive because it describes both examples of expert analyses that were "facially unreliable" (and thus sanctionable) and other expert analyses that were "not unreasonable" (and thus not sanctionable). 71 F.4th at 522–24.  The Court held, for instance, that plaintiffs' reliance on an expert "opinion" that "came in the form of four tweets, each 280 characters or less, which said nothing about [the expert's] qualifications or the data he supposedly employed" was sanctionable because the opinion was "unreliable on its face." *Id.* at 523.  By contrast, the Court found that plaintiffs' reliance on expert reports that merely reached "anomalous" conclusions based on assumptions that were "implausible" or "without support" was "not sanctionable" because the reports were "not facially unreasonable." *Id.*  The analysis referenced in the FAC bears no resemblance to the flagrantly unreliable expert opinions in *King*, including because it was conducted by a team of credentialed forensic accountants and data scientists using a sophisticated methodology and a robust data set.  Gibbons Decl. ¶ 5.

Rule 11 analysis and plainly premature. *See Julian v. Lee*, 2020 WL 4913481, at *3 (E.D. Mich. July 29, 2020) (Grand, *M.J.*) ("Clearly, Defendants will be in a much better position to present their *Daubert* arguments . . . and the Court will be in a better position to evaluate them, after Defendants obtain [the expert's] complete file and depose him. . . . [I]n this regard, Defendants' instant motion is premature . . . .").

*Third*, each of the three substantive critiques Defendants level against the statistical analysis cited in the FAC is flatly wrong.

**Validity of Comparisons to "Similar" Loans.**   To assess mortgage loans' expensiveness relative to other loans available in the wholesale market, the statistical analysis cited in the FAC "sorted millions of loans from the top 25 wholesale lenders each year into thousands of much smaller buckets containing similar mortgages." Gibbons Decl. ¶ 4; Ex. 1.   Each smaller comparison "bucket" contains only loans that share, among other characteristics, the same interest rate (rounded to the nearest 0.005%), month of closing, loan term (*e.g.*, 30-year or 15-year), dwelling category (*e.g.*, single-family or multi-family), rate type (*e.g.*, fixed-rate or adjustable-rate), and loan-to-value ("LTV") and debt-to-income ("DTI") ranges. *Id.* ¶ 6. Defendants contend that the analysis is "facially unreasonable" because it "omits key variables," namely FICO scores, and the existence of loan level price adjustments ("LLPAs"). That contention is incorrect.

As Plaintiffs explained in response to the last Rule 11 motion, which also complained that the statistical analysis does not capture FICO scores (*see* ECF No. 28 at 13–14), the absence of FICO scores in the data does not render individual loan-to-loan comparisons invalid, much less destroy the evidentiary value of the entire analysis—as Defendants would need to demonstrate under the Rule 11 standard. Because the data set only includes loans purchased by government-sponsored enterprises (e.g., Fannie Mae and Freddie Mac), which have strict FICO score requirements, all the loans in the data set are within certain FICO ranges, eliminating outliers.  Gibbons Decl. ¶ 8.  Moreover, as previously explained, at an aggregate level, UWM's *own SEC filings* disclose that it does not originate loans from a disproportionate number of borrowers with lower FICO scores relative to other wholesale lenders.  ECF No. 28 at 13.

Defendants' claim that the analysis fails to account for LLPAs is also wrong. By sorting loans into comparison "buckets" using, among other things, LTV ratios, the analysis ensures that individual loans are only compared against other loans with the same LTV ratio and materially similar LLPAs.  Gibbons Decl. ¶ 7.  The fact that Defendants' expert states a different view does not render the entire statistical analysis "facially unreliable."

***Validity of Comparisons to Loans in the Same Month of Closing.***   The statistical analysis compares the cost of individual loans to that of other loans closed

in the same month.  *Id.* ¶ 6.  Defendants claim that grouping loans by month is "gamesmanship" because "[i]nterest rates can fluctuate dramatically over multiple weeks" and thus comparisons of loans that may have closed a month apart from one another is "meaningless."  Mot. at 17.  Again, Defendants are wrong.

As an initial matter, a substantial portion of the overcharges measured in the statistical analysis arises from broker compensation.  Gibbons Decl. ¶ 10.  Broker compensation is set as a flat fee or a percentage of the loan amount.  *Id*.  It does not fluctuate based on interest rate and thus is unaffected by rate volatility.  *Id.*

Additionally, the suggestion that rate volatility destroys the evidentiary value of the analysis is unsupported and overblown.  The Statistical Analysis generates substantially similar conclusions as to the expensiveness of the loans at issue when mechanisms to account for interest rate volatility are applied.  *Id.* ¶ 11.  Defendants rely on atypical data sets that do not accurately reflect interest rate volatility throughout the class period.  Over the class period, the average monthly interest rate volatility (as measured from the highest point in a month to the lowest point in a month) was 0.30%, which is materially less than the volatility seen in the cherry-picked periods Defendants focus on (0.56% volatility in May to June 2022 and 0.64% volatility from September to October 2023).  *Id.*

Further, the alternative approach Defendants' expert suggests—only comparing loans to other loans closed on the same day—brings its own set of

23

drawbacks. *Id*. Artificially limiting the analysis to same day comparisons would obscure broader patterns of cost disparity and reduce the volume and quality of the comparative data set, resulting in lower quality loan comparisons. *Id*. Defendants' expert apparently holds a different opinion—and the parties will have ample opportunity to litigate those differences after discovery. But the mere assertion of an opposing view is not proof of "facially unreliability" as required under Rule 11.

**Relative Validity of APR Spread Comparisons.** Finally, Defendants rehash the same meritless argument they made in their last Rule 11 motion—that comparing individual loans' APR spreads is a better method of evaluating their expensiveness. Mot. at 18–19. As Plaintiffs have already explained (ECF No. 28 at 18–20), using APR spreads to compare the expensiveness of individual loans is highly flawed because (i) APR spreads measure expected loan costs across a mortgage loan's full term, whereas the average mortgage loans is refinanced or paid off well in advance; and (ii) there are material variations in lenders' APR spreads because different lenders use different inputs and calculation methods to determine APR, and the regulations allow for a 0.125% margin of error to reflect disparities. Gibbons Decl. ¶ 12. Moreover, the sole question here is whether the statistical analysis cited in the FAC was so "facially unreliable" that Plaintiffs should be sanctioned for citing it. Even if Defendants' preferred APR spread analysis were as reliable as Defendants'

24

expert claims it is, that would have no bearing on the propriety, under Rule 11, of

Plaintiffs' references to the separate statistical analysis cited in the FAC.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny

Defendants' request for relief in its entirety.  And because Defendants fail to come

anywhere close to meeting their burden under Rule 11, which requires them to show

that Plaintiffs' claims are "wholly lacking in arguable legal merit" and "completely

unwarranted by the evidence," *Pines of Clarkston*, 2014 WL 6612375, at *1,

Plaintiffs respectfully submit there is ample justification for the Court to award costs

to Plaintiffs for having been forced to take part in this unnecessary and wasteful

exercise.  Fed. R. Civ. P. 11(c)(2) ("the court may award to the prevailing party the

reasonable expenses, including attorney's fees, incurred for the motion").


Dated:  January 24, 2025
      Detroit, Michigan

John T. Zach
Marc Ayala
David L. Simons
Andrew P. Steinmetz
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300

By:  /s/ *Brandon C. Hubbard*
Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

Tyler Ulrich
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami Florida 33131
Tel.: (305) 357-8422

*Attorneys for Plaintiffs*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2025, I caused the foregoing document

to be filed with the Clerk of the Court using CM/ECF, which will effectuate

service upon all counsel of record.

/s/ *Brandon C. Hubbard*

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

*Attorney for Plaintiffs*