# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr.,
Kim Schelbe, Brian P. Weatherill,
Kenneth C. Morandi, Jill Jeffries, and
Daniel Singh on behalf of themselves
and all others similarly situated,

      *Plaintiffs*,

v.

United Wholesale Mortgage, LLC,
UWM Holdings Corporation, SFS
Holding Corp., and Mathew Randall
Ishbia,

      *Defendants.*

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
Magistrate Judge

**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF UNDER
RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS
BASED ON NEW ALLEGATIONS IN FIRST AMENDED COMPLAINT**

i

# TABLE OF CONTENTS

Table of Contents...................................................................................... ii

Table of Authorities................................................................................. iii

I. The FAC's improper purpose violates Rule 11(b)(1). ...............................2

II. The FAC's core theory and other contentions violate Rule 11(b)(3)............2

    A. The allegations that "plaintiffs overpaid" violate Rule 11(b)(3)....3

    B. The "discount points" allegations violate Rule 11(b)(3)..............5

    C. The Escues' allegations violate Rule 11(b)(3)...........................6

# TABLE OF AUTHORITIES

**CASES**                                                                **Page**

*SEC v. Lemelson*,
  57 F.4th 17 (1st Cir. 2023)............................................................................1

*Silva v. Witschen*,
  19 F.3d 725 (1st Cir. 1994).........................................................................2

*King v. Whitmer*,
  71 F.4th 511 (6th Cir. 2023) ...................................................................2, 5

*Garr v. U.S. Healthcare, Inc.*,
  22 F.3d 1274 (3d Cir. 1994).......................................................................7

*Whitehead v. Food Max of Miss., Inc.*,
  332 F.3d 796 (5th Cir. 2003) (en banc)......................................................2

**OTHER AUTHORITIES**

88 Fed. Reg. 75100 (Nov. 1, 2023)………………………………………..1

Plaintiffs argue that Rule 11 is a serious matter. We agree. Indeed, this is the first case in 20-plus years in which undersigned counsel has filed a Rule 11 motion. But Plaintiffs' Opposition only confirms that Rule 11 sanctions are warranted. Plaintiffs do not contest that they "signed an agreement" with Hunterbrook under which Hunterbrook expects to earn "*proceeds*" from this litigation. (S. Cowen Decl., Ex. A, at 3). They do not contest that, as part of this unprecedented "experiment," Hunterbrook's hedge fund shorted UWM's stock and invested in a UWM competitor. To help Hunterbrook make good on those bets, Counsel solicited plaintiffs, filed this lawsuit with false and inflammatory allegations five hours after Hunterbrook's report, and sent copies around the country—harming UWM's stock, all to Hunterbrook's benefit. That presents a serious question for the Court that Plaintiffs leave entirely unaddressed: Is it improper to file a lawsuit riddled with false and misleading statements in furtherance of a short-selling scheme?

The answer is yes. Federal courts are not toys for hedge funds to use in short-selling games. In fact, short-and-distort schemes are *illegal*. *See SEC v. Lemelson*, 57 F.4th 17 (1st Cir. 2023); 88 Fed. Reg. 75100 (Nov. 1, 2023), at 75159 (strategies illegal). Allowing federal courts to be used in aid of short-selling efforts would set a dangerous precedent and unleash a flood of suits intended to manipulate stock values for personal gain. The Court should thus impose sanctions or, at the least, set a hearing and order Rule 11 disclosures to resolve this important question.

1

## I.      The FAC's improper purpose violates Rule 11(b)(1).

To begin, Plaintiffs mischaracterize this Motion by asserting that "Defendants concede the vast majority of [the] allegations are proper." Resp. at 4. That is incorrect. The entire "paper" violates Rule 11(b)(1) because it continues "an improper purpose"—to destroy UWM's stock and benefit Hunterbrook. *Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 805 & n.4 (5th Cir. 2003) (en banc) ("improper purpose" alone enough). This is true *even if* Counsel also have a proper purpose. *Cf. Silva v. Witschen*, 19 F.3d 725, 730 (1st Cir. 1994) (purpose of aiding non-party was "improper" even if counsel also "intended to protect plaintiffs' legal rights").

Plaintiffs have no answer. "Hunterbrook" does not appear once in their response. They offer no defense of short-and-distort practices. Instead, they raise strawmen, arguing that using Mat Ishbia's quotes or HMDA data is not improper, none of which is relevant here. They *do not argue* that assisting a hedge fund's short sale using misleading statements is a proper purpose. That silence speaks volumes.

## II.     The FAC's core theory and other contentions violate Rule 11(b)(3).

In furtherance of their improper purpose, Plaintiffs have also violated Rule 11(b)(3) by making "factual assertions they know—or after reasonable investigation should have known—are false." *King v. Whitmer*, 71 F.4th 511, 521 (6th Cir. 2023); Mot., ECF 38, at 8–19. These violations separately warrant sanctions. They also further evidence the suit's improper purpose. FAC ¶¶ 446–49; *supra* Part I.

## A. The allegations that "plaintiffs overpaid" violate Rule 11(b)(3).

Rule 11(b)(3) bars counsel from relying on "technical analysis" and "statistical extrapolations" that are "facially unreliable to a layperson." *King*, 71 F.4th at 524. At its core, the FAC alleges that UWM charged Plaintiffs more than other lenders for "similar loan[s]" with the "same interest rates." FAC ¶¶ 138–39. It alleges that each Plaintiff "overpaid" between "$850" and "2,800." *Id.* ¶¶ 198, 234, 260–261, 286–87, 317, 427–31. Those overpayment allegations form the crux of nearly every claim.[1] They are also false and sanctionable under Rule 11(b)(3).

Here's the problem: Hunterbrook compared loans using HMDA data, which does not capture myriad factors that impact mortgage pricing—like credit scores, loan-to-value ratios, and employment histories. ECF 23-1, ¶ 14. Just consider credit scores. Hunterbrook itself flags as one of the "limitations" that "**[c]redit score, a key input to loan pricing, is not present in HMDA**." ECF 23-15. For that reason, applying Hunterbrook's analysis to the named Plaintiffs is "facially unreliable" as a basis for an overpayment allegation. As in *King*, even a "layperson" can see that Plaintiffs' extrapolations make no sense.

---

[1] The overpayment allegations are indispensable to Plaintiffs' claims. *See, e.g.,* Counts 1 and 2 (RICO), ¶¶ 362, 369, 385; Count 3 (RESPA), ¶¶ 424–31; Count 6 (Unjust Enrichment), ¶ 492; and Counts 7 (NCPUDA), 8 (TCPA), 9 (FDUTPA), 10 (CUCL), and 11 (CLRA), ¶¶ 516, 537, 550, 564, 580. To the extent Plaintiffs now try to assert their claims are not centered on alleged overpayments after all (and instead on brokers' lack of "independence"), their brief is even more troubling— suggesting they may abandon the core inflammatory claims that impaired UWM's stock price at the outset. Nor would such hypothetical claims present an injury in fact or survive UWM's motion to dismiss.

To see why, take an example that any borrower will understand. John and Sam want to purchase the same house. They each want a mortgage for the same amount and the same interest rate (say 3%). But John's credit score is 850, while Sam's is just 620. John will get the 3% rate with lower closing costs, because his credit is "Excellent." Sam, however, will pay higher closing costs to get that same 3% rate, because his credit is merely "Fair." There is nothing controversial (or even surprising) about that result. That is not "overpayment" or evidence of any wrongdoing. Plaintiffs' data does not account for credit scores; it thus can't be used to show that the named Plaintiffs overpaid for anything.

Unable to deny the importance of credit scores and other missing variables critical to any overpayment analysis, Plaintiffs offer two weak arguments in response. *First*, they accuse Defendants of attacking HMDA data itself. But at this stage Defendants take no issue with the HMDA data's accuracy; it simply cannot support Plaintiffs' overpayment allegations because it does not include credit scores or other important factors. *Second*, Plaintiffs assert that everyone in the HMDA data set meets Fannie and Freddie's "strict" credit score requirements, so everyone in the data set must have similar credit scores. But Fannie and Freddie are not strict at all: Their minimum score is only 620, which nearly 80% of Americans with credit scores meet or exceed. *See* S. Cowen Decl., Exs. B & C. The wide variance among scores that exceed that low threshold—ranging from "Fair," to "Good," to "Very Good," to "Excellent"—results in massive variations in pricing.

4

Plaintiffs likewise offer weak arguments in response to the other big problem with their overpayment allegations: rate volatility. Plaintiffs accuse Defendants of "cherry-picking" months in 2022 and 2023 to show rate volatility. Resp. at 23. But those months were chosen because they *appear in the FAC itself*. FAC ¶¶ 285, 314. Plaintiffs respond that some months have less rate volatility than others. That may well be true. But what matters is that Plaintiffs exploited *actual* rate volatility in those particular months to support their misleading claims.

Finally, Plaintiffs argue that *King* shields their unreasonable analysis because they relied on experts. But *King* says the opposite: "[A]n attorney's reliance upon a putative expert opinion must itself meet the standard of reasonableness imposed by Rule 11." 71 F.4th at 522. And here, any layperson can see that the "expert" analysis in the FAC is facially unreliable.

### B.    The "Discount Points" allegations violate Rule 11(b)(3).

Sanctions are also appropriate because Counsel failed to "engage in a reasonable prefiling inquiry" into Morandi and Schelble's mortgage documents, which flatly contradict their claims. *Id.* at 521.[2] The FAC alleges that Morandi and Schelble "did not realize, at any point prior to closing," that they would pay $4,348.31 and $2,953.41, respectively, in "discount points." FAC ¶¶ 230, 282. Those

---

[2] Plaintiffs all but concede they falsely accused Morandi's loan officer, Garrett Todd, of signing UWM's Wholesale Broker Agreement. They now claim the false accusation is simply "irrelevant" even though it represents another example of using false statements to impugn thousands of loan officers for an improper purpose.

allegations were false. Confronted with their own clients' documents, which contradict their allegations, Counsel attempt to rewrite their claims—arguing now that Morandi and Schelble did not understand *why* they were paying discount points.

That pivot does nothing to resuscitate the false allegations in the FAC or explain why Counsel failed to crosscheck them against the underlying documents. Nor is there any reasonable basis for their new argument. Morandi's and Schelble's loan documents expressly state they "received the Your Home Loan Toolkit." *See* S. Cowen Decl., Exs. D & E. That document, published by the CFPB, has an entire section explaining why discount points are paid ("additional money you pay up-front to reduce your interest rate") and a chart explaining how to "understand the trade-off between points and interest rate." ECF 23, Ex. 20.

### C.   The Escues' allegations violate Rule 11(b)(3).

The FAC also alleges false and sanctionable claims on behalf of the Escues. The FAC alleges a new theory that the broker nefariously "structured" a "cash-out refinance loan" to pay $2,452.89 without "inform[ing] [the Escues] of the consequences." FAC ¶ 202. But the Escues' closing disclosures show that they refinanced their mortgage *in order to* "cash out" over $80,000 to pay off other debts. ECF 38-18, at 3. That was the Escues' choice, not the broker's. Thus, Plaintiffs' new theory is demonstrably wrong. And it is apparent from the face of the mortgage documents, which Counsel were obligated to reasonably investigate. *Cf. Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1281 (3d Cir. 1994) ("We are at a total loss to

understand how attorneys … made a reasonable inquiry … when their complaint is predicated on … documents which they have not bothered to read.").

Plaintiffs offer no defense of their frivolous cash-out refinancing theory. Instead, they assert that the Escues' 3.499% interest rate was closer to 30-year rather than 15-year rates. But Plaintiffs' comparison completely ignores the Escues' credit-score related adjustments (ECF 23-1, ¶¶ 5–7). Their comparison also ignores the average associated *fees and points* within the Freddie Mac data. Resp. at 17 (https://www.freddiemac.com/pmms). The Escues paid *no origination fees or points*—so it is meaningless to compare their interest rate to others who *paid fees and points*. ECF 23-14. This is another example of how Plaintiffs' unreasonable comparison fails to account for critical factors. *See supra* Part II.A. At bottom, this lawsuit was filed in coordination with Hunterbrook using false and misleading allegations to malign UWM and impair its stock. That cannot be permitted.

Dated: February 14, 2025                     Respectfully submitted,

                                            /s/ *Jeffrey J. Jones*
                                            Jeffrey J. Jones (P80231)
                                            JONES DAY
                                            150 W. Jefferson Ave, Suite 2100
                                            Detroit, MI 48226
                                            (313) 733-3939
                                            jjjones@jonesday.com

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2025, I caused the foregoing document to be filed with the Clerk of the Court using CM/ECF, which will effectuate service upon all counsel of record.

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones (P80231)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com

*Counsel for Defendants*

9