## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, Brian P. Weatherill, Kenneth C. Morandi, Jill Jeffries, and Daniel Singh on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia,

*Defendants.*

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion, United States District Judge

Hon. David R. Grand, Magistrate Judge

## DEFENDANTS' CONSOLIDATED MOTION FOR RELIEF UNDER RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS

Consistent with this Court's May 8, 2025 Order and its comments during the May 8, 2025 status conference, Defendants hereby file a consolidated Motion for Relief under Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and this Court's inherent powers.  In compliance with Rule 11(c)(2), Defendants sent copies of the two predicate motions this Court ordered consolidated to Plaintiffs' counsel on June 21, 2024, and November 11, 2024, as set forth in our Notice of Compliance below.  For the reasons set forth in the accompanying brief, Defendants respectfully request that the Court grant this Motion and provide appropriate relief.

**NOTICE OF COMPLIANCE WITH SAFE HARBOR PROVISION OF FEDERAL RULE OF CIVIL PROCEDURE 11(c)(2) AND COMPLIANCE WITH 28 U.S.C. § 1927 AND INHERENT POWERS**

1.      By order of this Court, Defendants now submit this Consolidated Motion for Relief under Rule 11, 28 U.S.C. § 1927, and this Court's inherent powers ("Consolidated Motion for Relief"). *See Escue et al v. Ishbia et al*, Docket No. 2:24-cv-10853 (E.D. Mich. Apr 02, 2024), Text-Only Order dated May 8, 2025.

2.      In compliance with Rule 11(c)(2), Defendants previously "served" on Plaintiffs' counsel (but did not file at that time) copies of the two predicate motions that this Court ordered consolidated.

3.      Defendants served the first motion on June 21, 2024.  Following receipt of Defendants' first predicate motion, Plaintiffs did not provide any substantive response or defense to Defendants' Rule 11 motion or the grounds set forth in it. Plaintiffs instead filed a First Amended Complaint on August 30, 2024.  Although Plaintiffs deleted, modified, or corrected certain legal or factual contentions from their first Complaint, they did not withdraw the lawsuit or appropriately correct the grounds for the motion or the relief sought.   After more than 21 days elapsed following service, Defendants filed their first motion on September 17, 2024, because Plaintiffs' counsel failed to "withdraw[] or appropriately correct[]" "the challenged paper, claim[s]," or "contention[s]" at issue.  Fed. R. Civ. P. 11(c)(2).

4.     After Plaintiffs filed their First Amended Complaint, Defendants served their second motion on Plaintiffs' counsel on November 11, 2024.  Following receipt of Defendants' second predicate motion, Plaintiffs' counsel did not provide any substantive response or defense to Defendants' Rule 11 motion or the grounds set forth in it.  Plaintiffs' counsel instead only informed Defendants' counsel via electronic mail that Plaintiffs disagreed with the motion papers.  *See* Exhibit A.  After more than 21 days elapsed following service of the second motion, Defendants filed their second motion on December 13, 2024, because Plaintiffs' counsel failed to "withdraw[] or appropriately correct[]" "the challenged paper, claim[s]," or "contention[s]" at issue.  Fed. R. Civ. P. 11(c)(2).

5.     Pursuant to Local Rule 7.1(a), Defendants' counsel previously conferred with Plaintiffs' counsel on September 17, 2024, and December 12, 2024, and previously confirmed that Plaintiffs do not agree to the relief sought in the motions now consolidated here.

6.     Motions filed under 28 U.S.C. § 1927 and this Court's inherent powers do not require prior service and the expiration of a "safe harbor" period, so no additional procedural steps were required to file those motions.

7.     After the Court's status conference on May 8, 2025, Defendants' counsel met and conferred with Plaintiffs' counsel regarding any redactions. Defendants' counsel understood from the Court's prior order granting the

Defendants' motion to unredact (which was vacated pending further discussions at the Court's status conference) and from the Court's comments at the status conference that no redactions would be required for the consolidated motion. Plaintiffs' counsel disagreed and took the position that the Defendants need to redact the Consolidated Motion again and refile their motion to file unredacted portions. Accordingly, out of an abundance of caution, Defendants are redacting the same information previously redacted and renewing their motion to file an unredacted copy of this brief so the Court has a full record before it to decide the questions presented.

8.     As Defendants explain in their separately filed Notice of Filing Redacted Documents, the Defendants have provisionally redacted certain arguments and withheld certain exhibits pending the resolution of Defendants' separately filed Motion for Leave. *Cf. United States v. Quicken Loans Inc.*, 2021 WL 2562258, at *1–2 (E.D. Mich. June 23, 2021) (documents provisionally sealed until parties fully briefed and resolved outstanding issues as to whether documents should remain under seal). As before, Defendants contend that such redactions are not required and that the redacted portions of this motion and withheld exhibits are relevant and should be considered by the Court.

9.     For these reasons, Defendants respectfully submit that this motion, brief in support, and accompanying exhibits, are properly before the Court.

4

Dated:  May 30, 2025

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Respectfully submitted,

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones (P80231)
Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Therisa D. Escue, Billy R. Escue, Jr.,
Kim Schelble, Brian P. Weatherill,
Kenneth C. Morandi, Jill Jeffries, and
Daniel Singh on behalf of themselves
and all others similarly situated,

                    *Plaintiffs*,

v.

United Wholesale Mortgage, LLC,
UWM Holdings Corporation, SFS
Holding Corp., and Mathew Randall
Ishbia,

                    *Defendants.*

Case No. 2:24-cv-10853-BRM-DRG

Hon. Brandy R. McMillion,
United States District Judge

Hon. David R. Grand,
Magistrate Judge

## BRIEF IN SUPPORT OF DEFENDANTS'
## CONSOLIDATED MOTION FOR RELIEF UNDER
## RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ..........................................................................vi

CONTROLLING OR MOST APPROPRIATE AUTHORITY ...................................... viii

INTRODUCTION...............................................................................................................1

BACKGROUND.................................................................................................................3

LEGAL STANDARD ........................................................................................................6

ARGUMENT .....................................................................................................................7

I.    This Lawsuit Reflects An Improper Purpose...................................................7

II.   Counsel Failed to Conduct a Reasonable Pre-Filing Inquiry. ....................11

      A.    The Complaint Initiating this Lawsuit Had Sanctionable Defects..............11

      B.    The FAC Continues and Supplements the Sanctionable Defects. ..............17

III.  The Lawsuit's Core Theory—In Both The First and Second Complaint—Relies on Glaringly Erroneous And Objectively Unreliable Data. ...........................................21

CONCLUSION ................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*Baker v. Urban Outfitters, Inc.*,
    431 F. Supp. 2d 351 (S.D.N.Y. 2006) ............................................................8, 10

*BDM Invs. v. Lenhil, Inc.*,
    264 N.C. App. 282 (2019) ......................................................................................ix

*BDM Invs. v. Lenhil, Inc.*,
    826 S.E.2d 746 (N.C. Ct. App. 2019)..................................................................17

*Broyles v. Cantor Fitzgerald & Co.*,
    2014 WL 6886158 (M.D. La. Dec. 8, 2014) ......................................................17

*CBD & Sons v. Setteducati*,
    2019 WL 396982 (D.N.J. Jan. 31, 2019)............................................................16

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991)........................................................................................ix, 6, 7

*Cohen v. Dulay*,
    94 N.E.3d 1167 (Ohio Ct. App. 2017).................................................................17

*Combs v. Bridgestone Ams.*,
    2023 WL 9530592 (E.D. Ky. Nov. 27, 2023) .....................................................10

*Cook v. American S.S. Co.*,
    134 F.3d 771 (6th Cir. 1998) .................................................................................6

*Farmland Partners Inc. v. Fortunae*,
    2021 WL 1978739 (D. Colo. May 18, 2021) ......................................................10

*First Bank of Marietta v. Hartford Underwriters Ins. Co.*,
    307 F.3d 501 (6th Cir. 2002) .................................................................................7

*Garr v. U.S. Healthcare, Inc.*,
    22 F.3d 1274 (3d Cir. 1994) ............................................................................12

*Hertel v. Mortg. Elec. Registration Sys., Inc.*,
    2013 WL 706903 (W.D. Mich. Feb. 26, 2013) .............................................7, 10

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
    1998 WL 734365 (S.D.N.Y. Oct. 20, 1998)....................................................11

*In re Kunstler*,
    914 F.2d 505 (4th Cir. 1990) .........................................................................11

*In re Ruben*,
    825 F.2d 977 (6th Cir. 1987) ...........................................................................6

*In re Verilink Corp.*,
    405 B.R. 356 (Bankr. N.D. Ala. 2009)............................................................17

*Jonna v. GIBF GP, Inc.*,
    2023 WL 3244832 (E.D. Mich. May 4, 2023) ..................................................10

*King v. Whitmer*,
    71 F.4th 511 (6th Cir. 2023) ....................................................................passim

*Knipe v. Skinner*,
    19 F.3d 72 (2d Cir. 1994) ................................................................................8

*Kramer v. Tribe*,
    156 F.R.D. 96 (D.N.J. 1994), *aff'd*, 52 F.3d 315 (3d Cir. 1995)........................9

*Lawson v. Bank of Am., N.A.*,
    2015 WL 1886236 (E.D. Mich. Apr. 24, 2015) .................................................6

*Mann v. G & G Mfg., Inc.*,
    900 F.2d 953 (6th Cir. 1990) ................................................................. ix, 8, 11

*Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*,
    613 F.3d 609 (6th Cir. 2010) .........................................................................11

*Mullins v. Allstate Ins.*,
  2007 WL 3038028 (E.D. Mich. Oct. 18, 2007)....................................................6

*Noblee Bottling, LLC v. Gora LLC*,
  2023 WL 4750124 (W.D.N.C. July 25, 2023) ...................................................17

*Nunes v. Lizza*,
  2021 WL 7186264 (N.D. Iowa Oct. 26, 2021)..................................................10

*Odish v. Apple*,
  2016 WL 931184 (E.D. Mich. Mar. 11, 2016)..................................................10

*Okavage Group, LLC v. UWM*,
  2024 WL 982380 (M.D. Fla. Feb. 6, 2024), *aff'd* No. 23-13393,
  Dkt. 29 (11th Cir. May 28, 2025) ....................................................................14

*Rasmussen v. Fleetwood Enterprises, Inc.*,
  2007 WL 1106138 (E.D. Mich. Apr. 10, 2007) ...........................................7, 11

*SEC v. Lemelson*,
  57 F.4th 17 (1st Cir. 2023)........................................................................ ix, 2, 11

*Silva v. Witschen*,
  19 F.3d 725 (1st Cir. 1994)................................................................................8

*St. Matthew's Baptist Church v. Wachovia Bank Nat. Ass'n*,
  2005 WL 1199045 (D.N.J. May 18, 2005).......................................................16

*TD Investments, LLC v. Natl. City Bank*,
  2022 WL 950395 (S.D. Ohio Mar. 30, 2022)...................................................10

*Teno v. Iwanski*,
  464 F. Supp. 3d 924 (E.D. Tenn. 2020)................................................. ix, 8, 11

*White v. Gen. Motors Corp., Inc.*,
  908 F.2d 675 (10th Cir. 1990) .........................................................................10

*Whitehead v. Food Max of Miss., Inc.*,
  332 F.3d 796 (5th Cir. 2003) (en banc) .............................................................8

**STATUTES**

28 U.S.C.
   § 1927.......................................................................................................passim

**OTHER AUTHORITIES**

12 C.F.R. § 1026.36 ..................................................................... ix, 15, 21

N.J. Admin Code § 3:1-16.10 ..................................................................16

88 Fed. Reg. 75100 (Nov. 1, 2023)............................................................2

Federal Rule of Civil Procedure 11 ..................................................passim

## STATEMENT OF ISSUES PRESENTED

1.    Should the Court award relief under Federal Rule of Civil Procedure
      11(b)(1) for bringing and maintaining this lawsuit for an improper purpose?

       Defendants' answer: Yes

       Plaintiffs' answer: No

       This Court should answer: Yes

2.    Should the Court award relief under Federal Rule of Civil Procedure
      11(b)(3) for raising factual allegations that any reasonable prefiling
      investigation would reveal are unsupportable or false?

       Defendants' answer: Yes

       Plaintiffs' answer: No

       This Court should answer: Yes

3.    Should the Court award relief under Federal Rule of Civil Procedure
      11(b)(2) for stating plain errors of law and bringing claims that have no
      sound basis in existing law?

       Defendants' answer: Yes

       Plaintiffs' answer: No

       This Court should answer: Yes

4.    Should the Court award relief under 28 U.S.C. § 1927?

       Defendants' answer: Yes

       Plaintiffs' answer: No

       This Court should answer: Yes

5.      Should the Court award relief pursuant to the Court's inherent powers?

       Defendants' answer: Yes

       Plaintiffs' answer: No

       This Court should answer: Yes

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

## CASES

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)

*King v. Whitmer*, 71 F.4th 511 (6th Cir. 2023)

*Mann v. G & G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)

*Teno v. Iwanski*, 464 F. Supp. 3d 924 (E.D. Tenn. 2020)

*SEC v. Lemelson*, 57 F.4th 17 (1st Cir. 2023)

*BDM Invs. v. Lenhil, Inc.*, 264 N.C. App. 282 (2019)

## STATUTES & OTHER AUTHORITIES

Federal Rule of Civil Procedure 11

28 U.S.C. § 1927

12 C.F.R. § 1026.36

# INTRODUCTION

This lawsuit was filed as part of an improper (and arguably illegal) campaign by an experimental New York hedge fund to destroy UWM's stock value so the hedge fund could reap profits in the stock market. *See* Ex. D (S. Cowen Decl.), Ex. 4, Nick Manes, CRAIN'S DET. BUS. (Apr. 4, 2024) ("UWM is the first target of a new activist short seller."). The hedge fund is called Hunterbrook Capital LP (collectively with its affiliates, "Hunterbrook") and, by all accounts, this is Hunterbrook's lawsuit. Hunterbrook helped solicit plaintiffs to bring it; generated the misleading data used to support it; provided inflammatory allegations for counsel to parrot; coordinated the timing of filing it with the publication of its own disparaging report; and then worked with counsel to publicize the "national class action" alleging "corruption" against UWM to generate the maximum negative effect on UWM's stock price. The greater the destruction to UWM, the greater the profits for Hunterbrook.

The improper scheme has gone like this: First, Hunterbrook placed its first big bet by "shorting" UWM's stock and going "long" on its competitor's stock (Rocket Mortgage). Next, Hunterbrook's media arm published a report (the "Hunterbrook Report" or "Report") disparaging UWM through inflammatory rhetoric and countless unsupportable allegations of fraud. Hours later, Boies Schiller Flexner and Dickinson Wright (collectively, "Counsel") filed a 104-page Complaint

largely regurgitating the Hunterbrook Report's claims.   That timing was no coincidence:  Hunterbrook concedes that its affiliate media organization "entered [into] an agreement with [Boies Schiller] in exploration of a class action lawsuit against UWM," *see* Ex. 1 (Hunterbrook Report) at 2. Hunterbrook likewise admits that it expects to earn "proceeds" from this litigation.  Ex. 46 (*Dear Reader – Hunterbrook Media Launch*) at 3.  A media circus, including through a popular podcast, and national smear campaign then ensued, amplifying the many baseless and inflammatory allegations in the Hunterbrook Report and this lawsuit—all to Hunterbrook's monetary gain.

This lawsuit therefore raises an important and unprecedented question for this Court—can counsel file a lawsuit riddled with false and misleading claims in furtherance of a short-selling scheme?  The answer must surely be no.  Federal courts are not toys for hedge funds to use in their short-selling games.  In fact, the SEC has found short-and-distort schemes to be *illegal*.  *See SEC v. Lemelson*, 57 F.4th 17 (1st Cir. 2023); 88 Fed. Reg. 75100 (Nov. 1, 2023) at 75159.  Allowing federal courts to be used in aid of short-selling campaigns would set a dangerous precedent and unleash a flood of suits intended to tank stock values for investors' gain.  *See, e.g.*, Ex. 46 (*Dear Reader – Hunterbrook Media Launch*) ("UWM is the first of many companies on which Hunterbrook will publish this year.").

This Court should put a stop to this improper lawsuit and award sanctions for

three primary reasons.  ***First*** and most important, this lawsuit was filed—and is being maintained—for an "improper purpose" under Federal Rule of Civil Procedure 11(b)(1): to target UWM for Hunterbrook's financial gain. ***Second***, both of Plaintiffs' complaints contain false factual allegations and rely on unsupportable legal theories.  These blatant errors, which would have been apparent through any reasonable prefiling investigation, reflect a clear failure of Rule 11 duties. ***Third***, the core allegations about the pricing of each Plaintiff's loan are based on a glaringly erroneous and objectively unreasonable use of data in violation of Rule 11(b)(3).

These improper efforts have gone on long enough—and already had their intended negative effect on UWM's stock price.  This Court should grant UWM's Motion, dismiss this action, and award it attorney's fees.  Alternatively, at minimum, this Court should order the disclosure of Counsel's agreements and communications with Hunterbrook and hold an evidentiary hearing to determine what happened here and award appropriate sanctions.

## BACKGROUND

***UWM and the Wholesale Mortgage Industry.***  The home mortgage industry consists of two main groups of lenders: retail and wholesale.  First Amended Complaint, ECF No. 21 ("FAC"), ¶¶ 29–31.  Borrowers opting for a "retail" mortgage negotiate directly with a lender to secure financing. *Id.*  For "wholesale" mortgages, wholesale mortgage brokers assist borrowers with securing loans from

3

wholesale lenders.  *Id.*  UWM, based in Pontiac, Michigan, is an industry-leading wholesale mortgage lender.  Ex. 2 (UWM 10-K) at 4–6.  UWM works closely with wholesale mortgage brokers, providing unmatched support, technologies, service, reliability, and speed—to the benefit of brokers and homebuyers alike.  *Id.*

***Hunterbrook's Campaign.*** Hunterbrook was recently founded in 2023 and has two primary arms: Hunterbrook Capital (a hedge fund) and Hunterbrook Media (a purported news outlet).  Ex. 3 (*Financial Times*, "Inside Hunterbrook's plans"). Despite its pretensions, Hunterbrook Media is not an independent news source. Once Hunterbrook Capital takes a short position in a target company, Hunterbrook Media publishes a report laced with damaging claims masquerading as journalism to cause the target's stock price to drop and Hunterbrook's profits to rise.  *See* Exs. 1 (Hunterbrook Report), 8 (Hunterbrook, About Us).  This troubling business model "combine[s] a newsroom and a hedge fund" into a profit-making machine, as Hunterbrook proudly admits on its website.  Exs. 3 (*Financial Times*, "Inside Hunterbrook's plans"), 8 (Hunterbrook, About Us).

UWM was one of Hunterbrook's first targets.  Ex. 4 (*Crain's*, "UWM shorted by Hunterbrook").  On April 2, Hunterbrook Media published its Report, rife with disparaging claims against UWM.  Ex. 1 (Hunterbrook Report).  A few hours later, Counsel filed a Complaint parroting the Report's central claims.  ECF No. 1 ("Compl."); Ex. 5 (Docket).   Notably, the Report linked to a website titled

"WasIRippedOff.com" that allowed site visitors to search the NMLS ID of their "broker" and stated: "If you're a match, you may contact the law firm Boies Schiller" "at UWM.investigation@bsfllp.com."  Ex. 36 (Apr. 17 Letter) at 2; Ex. 37 (Apr. 26 Letter) at 10; Ex. 45 ("Were you ripped off?").

These efforts had their intended effect.  The day the Report issued and the lawsuit hit, UWM's share price declined by 8.5%—good news (and big money) for short-sellers like Hunterbrook.  Ex. 6 (Nasdaq Data); Ex. 7 (Richard Grossman, *et al*.) (goal of an activist short-seller like Hunterbrook is to "destroy value" and "capitalize on a drop in the target company's stock price").

The nature, content, and timing of this lawsuit make clear that Counsel coordinated the filing with Hunterbrook and relied extensively on Hunterbrook in crafting it.  Indeed, Hunterbrook "[s]ubmitted data analysis and research—as well as the planned date of publication—to Boies Schiller," entered into an agreement with Boies Schiller "in exploration of a class action lawsuit against UWM," and publicized it after it was filed.  Ex. 1 (Hunterbrook Report) at 2; Ex. 47.  Both versions of the Complaint rely extensively on Hunterbrook's analysis.  *Compare, e.g.*, Ex. 1 at 5, 16, *with* Compl. ¶¶ 69, 147.  Indeed, Hunterbrook's charts were duped into the pleadings—complete with Hunterbrook logos.  *E.g.*, Compl. ¶¶ 69 fig.6, 147 fig.22.  Hunterbrook, on the day of the Report, then discussed its claims in a popular podcast speculating about UWM's "legal trouble."  Ex. 48 (Screenshot);

Ex. 49 (Transcript).  For Hunterbrook, the more publicity, the better.

## LEGAL STANDARD

Under Rule 11(b), counsel must certify that each pleading (1) has not been "presented for any improper purpose"; (2) does not make frivolous "legal contentions"; and (3) does not make unsupported "factual contentions." Fed. R. Civ. P. 11(b).  That standard is objective; no bad faith is required.  *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47 (1991).  If "Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party . . . responsible for the violation." Fed. R. Civ. P. 11(c)(1).  It may also order an evidentiary hearing.  *See, e.g.*, *Mullins v. Allstate Ins.*, 2007 WL 3038028, at *1 (E.D. Mich. Oct. 18, 2007); *Cook v. American S.S. Co.*, 134 F.3d 771, 774–75 (6th Cir. 1998) (within court's "discretion" to hold an "evidentiary hearing"); *Lawson v. Bank of Am., N.A.*, 2015 WL 1886236, at *8 (E.D. Mich. Apr. 24, 2015) (ordering show cause).

Under 28 U.S.C. § 1927, courts may impose "excess costs, expenses, and attorneys' fees reasonably incurred" on an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927.  Relief is warranted under § 1927 "'when an attorney knows or reasonably should know that a claim pursued is frivolous' and yet continues to litigate" and "declin[es] to dismiss it" *King v. Whitmer*, 71 F.4th 511, 530 (6th Cir. 2023).  Like the Rule 11 standard, the § 1927 standard is objective; no bad faith is required.  *In re Ruben*, 825 F.2d 977,

984 (6th Cir. 1987). This Court also retains inherent power to respond to abuses of the litigation process. *See Chambers*, 501 U.S. at 50; *First Bank of Marietta v. Hartford Underwriters Ins. Co*., 307 F.3d 501, 519–25 (6th Cir. 2002).

## ARGUMENT

Counsel initiated this lawsuit—and continues to pursue it—as part of Hunterbrook's campaign to destroy UWM's stock value and reap the profits. That is a manifestly improper purpose under Rule 11(b)(1) that alone warrants sanctions. In addition, both complaints contain allegations with no basis in fact or law and rely on glaringly erroneous and facially unreliable data. Fed. R. Civ. P. 11(b)(2), (3); *see King*, 71 F.4th at 524. These not only constitute independently sanctionable defects, but also demonstrate Counsel's improper purpose. The Court should put a stop to Counsel's abuse of the federal courts for Hunterbrook's personal gain.

## I.   This Lawsuit Reflects An Improper Purpose.

Rule 11(b)(1) prohibits filing a complaint "for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." The listed examples (which "such as" makes clear) are merely illustrative; the Rule "leaves the court with discretion to determine whether an 'improper purpose' exists." *Rasmussen v. Fleetwood Enterprises, Inc.*, 2007 WL 1106138, at *9 (E.D. Mich. Apr. 10, 2007). "[T]arget[ing] [a defendant] and his firm," *Hertel v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 706903, at *7 (W.D. Mich. Feb. 26, 2013);

"pursuing a personal agenda," *Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994); and "pursuing an unwarranted financial windfall and personal promotion," *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 366 (S.D.N.Y. 2006) (applying § 1927), are all improper purposes.

An "improper purpose" alone can be sanctionable. *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 805 & n.4 (5th Cir. 2003) (en banc). Moreover, the presence of one alleged proper purpose does not absolve another improper one. *See Silva v. Witschen*, 19 F.3d 725, 730 (1st Cir. 1994). And an "improper purpose" can "continu[e]" beyond an "initial[] fil[ing]." *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 960 n.6 (6th Cir. 1990); *see, e.g.*, *Teno v. Iwanski*, 464 F. Supp. 3d 924, 955–56 (E.D. Tenn. 2020) (awarding relief where "[p]laintiff's conduct infected the entire lawsuit and was continued for an improper purpose").

Counsel's coordinated efforts with Hunterbrook evidence the "improper purpose" behind this lawsuit:  targeting UWM with numerous baseless allegations to drive down its stock price for Hunterbrook's financial gain.  "Hunterbrook's nonprofit affiliate" had an "agreement" with Boies and shared "the planned date of publication" "to Boies."  Ex. 1 (Hunterbrook Report) at 2.  This lawsuit was filed mere hours after Hunterbrook issued its Report, amplifying the Report's claims and adverse impact on UWM's stock through inflammatory allegations designed to garner media attention—including smears of brokers as "corrupt" and irrelevant

8

incendiary remarks about UWM's CEO, Mat Ishbia.  *See, e.g.*, Compl. ¶¶ 1, 2, 9,

41, 74, 75, 79.   Remarkably, Counsel then publicized their baseless claims by

**sending copies of the 104-page Complaint to over sixty third-party mortgage**

**brokers and loan officers who work with UWM nationwide** with overbroad

preservation demands and threats of sanctions.  Ex. 34 at 1-3; Ex. 35 (recipients).

*Cf. Kramer v. Tribe*, 156 F.R.D. 96, 102, 109 (D.N.J. 1994) ("distributing copies"

of the complaint was "indicative of an improper and sanctionable motive"), *aff'd*, 52

F.3d 315 (3d Cir. 1995).  Worse still, Counsel used private investigators to contact

an unknown number of borrowers with misleading phone calls, texts, and voice

messages to solicit plaintiffs to file the suit.  Exs. 36–40 (correspondence on these

issues); *see also* Exs. 9 & 10.[1]

During meet-and-confer efforts, UWM's counsel requested a copy of the

"agreement" between Hunterbrook and Boies Schiller, so that UWM could assess

Counsel's financial interests in this suit—including whether Hunterbrook is paying

Counsel's fees or expenses or offering expert services or other benefits for free.

Counsel refused to provide it, contending that the agreement may be "privileged,

irrelevant, or both."  Ex. 36 (Apr. 17 Letter) at 9; Ex. 37 (Apr. 26 Letter) at 7, n.4.

---

[1] Such communications are inconsistent with multiple Rules of Professional Conduct.  *See*  Mich. R.P.C. 7.3, cmt. ("There is a potential for abuse inherent in direct contact by a lawyer . . . ."); *id*. 8.4(a); Mich. Civ. Juris. Champerty § 5 ("Telephone calls are construed as prohibited solicitation").

The Court, however, has the authority to compel disclosure of the agreement and should exercise that authority here. *See* Fed. R. Civ. P. 11(c)(3) & (4); *see also TD Investments, LLC v. Natl. City Bank*, 2022 WL 950395, at *3 (S.D. Ohio Mar. 30, 2022) (ordering production of documents); *Nunes v. Lizza*, 2021 WL 7186264, at *4 (N.D. Iowa Oct. 26, 2021) (inquiry into third-party funding serves "legitimate purpose of determining whether" "coordination exists"); *Combs v. Bridgestone Ams.*, 2023 WL 9530592, at *8 (E.D. Ky. Nov. 27, 2023), *R&R adopted*, 2024 WL 188360 (compelling funding disclosure as "relevant and not privileged"); *cf. Jonna v. GIBF GP, Inc.*, 2023 WL 3244832, at *2 (E.D. Mich. May 4, 2023) (engagement letter not privileged).

But what is already clear from undisputed facts in the existing record—including Hunterbrook's shorting of UWM stock, the lawsuit's timing, and Counsel's "agreement" with "a Hunterbrook entity"—is that this lawsuit was filed as part of a coordinated effort to "target" UWM in "pursui[t] [of] an unwarranted financial windfall." *Hertel*, 2013 WL 706903, at *7; *Baker*, 431 F. Supp. 2d at 366; *Odish v. Apple*, 2016 WL 931184, at *3 (E.D. Mich. Mar. 11, 2016) (timing supports improper purpose). That is an improper purpose under Rule 11. *See id.*; *White v. Gen. Motors Corp., Inc.*, 908 F.2d 675, 683 (10th Cir. 1990).[2] This Court should

---

[2] *Cf. also, e.g.*, *Farmland Partners Inc. v. Fortunae*, 2021 WL 1978739, at *1–*2 (D. Colo. May 18, 2021) (finding "inference of actual malice" where "record suggest[ed] that defendants' decision to publish [an] article was motivated by

not countenance the use of federal courts to effectuate short-selling campaigns. *See Lemelson*, 57 F.4th at 20–23. To the contrary, it should send a clear message to Hunterbrook and other investors considering filing lawsuits for personal gain by dismissing this suit and awarding attorney's fees to UWM.

## II.   Counsel Failed to Conduct a Reasonable Pre-Filing Inquiry.

Rule 11 requires counsel to conduct a "reasonable inquiry concerning the allegations in the complaint" before filing suit and prohibits allegations that are "not well grounded in fact." *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010); *Mann,* 900 F.2d at 959 (similar); Fed. R. Civ. P. 11(a), (b)(3). Both Rule 11 and 28 U.S.C. § 1927 also prohibit claims that lack any viable legal basis or misstate the law. *King*, 71 F.4th at 528–30. Both complaints are rife with blatant factual and legal errors that are not only an independent basis for sanctions, *Merritt*, 613 F.3d at 626, *Rasmussen*, 2007 WL 1106138, at *10, but also underscore the lawsuit's improper purpose, *see Teno*, 464 F. Supp. 3d at 954; *In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990).

### A.   The Complaint Initiating this Lawsuit Had Sanctionable Defects.

The Complaint counsel used to initiate this lawsuit contained numerous false

---

personal financial gain"); *In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 WL 734365, at *10 (S.D.N.Y. Oct. 20, 1998) (finding "strong inference of scienter" where "defendants had short positions in [a] stock and issued sell recommendations in order to drive down the price of the stock and thus directly profit").

claims and blatant errors on the core underlying allegations that would have been readily apparent from even a cursory review of Plaintiffs' loan documents. *Cf. Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1281 (3d Cir. 1994) ("We are at a total loss to understand how attorneys" made a reasonable inquiry when the complaint is predicated on "documents which they have not bothered to read."). It also included legal assertions that even a simple Westlaw search would have proven false.

*Escues*. In the Complaint, the Escues' claim relied on



*Weatherill*. As to Weatherill, the Complaint alleged that "the entire reason why Weatherill hired [that broker]" was "the expectation that [she] would shop for the most affordable loan." Compl. ¶¶ 170–77. But Weatherill signed an agreement contradicting those allegations:

**SECTION 1. NATURE OF RELATIONSHIP.** In connection with this mortgage loan:
- We are acting as an independent contractor and not as your agent.
- We will enter into separate independent contractor agreements with various lenders.
- While we seek to assist you in meeting your financial needs, we do not distribute the products of all lenders or investors in the market and cannot guarantee the lowest price or best terms available in the market.

Ex. 44  (Origination Agreement).

*Schelble*.  For Schelble, the Complaint alleged that ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

███████████████████████████████

████████████████████████████████████

█████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

*All-In Provision.*   There was also no basis for Plaintiffs' allegations that the "All-in Provision" in UWM's Wholesale Broker Agreement "meaningfully restrict[s] [brokers'] ability to shop for mortgage loans in [Plaintiffs'] best interest[s]."   Compl. ¶¶ 127, 154, 179.   That Provision addresses a significant problem for the wholesale lending industry where a lender uses a broker to find a borrower and then bypasses the broker on all future loans.   *See Okavage Group, LLC v. UWM*, 2024 WL 982380, at *2 (M.D. Fla. Feb. 6, 2024), *aff'd* No. 23-13393, Dkt. 29 (11th Cir. May 28, 2025).   In response to that problem, UWM asked brokers who work with UWM to refrain from working with *two* lenders who work in both the wholesale and retail markets and were known to use brokers to identify borrowers but then "cut out" brokers on future loans.   *Id.*; Ex. 18 (Wholesale Broker Agreement) at 3.03(x).   As Counsel is well aware, brokers who sign the Agreement can still work with more than *seventy* other wholesale lenders and *hundreds* of other lenders offering wholesale loans.   Ex 1 (Hunterbrook Report) at 8; Ex. B ("CRA Decl. 1") ¶ 13.   There is thus no basis to allege that the so-called "All-In Provision" unduly restricts loans—as Judge Michaelson recently held in rejecting claims that the provision violates antitrust laws.   *See UWM v. Am.'s Moneyline, Inc.*, 2024 WL 1349301, at *3 (E.D. Mich. Mar. 29, 2024), reconsideration denied, 2025 WL 502743 (E.D. Mich. Feb. 14, 2025) (adopting ruling in *Okavage*).   And if a broker wanted to work with the two lenders identified in the "All-In" provision, the broker

14

need only terminate its agreement with UWM, ***which the broker can do at any time on seven days' notice.*** Compl. ¶ 52; Ex. 18 at 7.06.[3]

***Federal Disclosures.*** The Complaint also all but ignored the federal regulations governing the mortgage industry that contradict their central thesis that brokers have any obligation to "survey the wholesale market" before suggesting a loan to a borrower. Under 12 C.F.R. § 1026.36 (Reg Z), a loan originator must present borrowers with three loan options from creditors with whom the "originator regularly does business." Consistent with that regulation, brokers are ***not*** required to survey the universe of wholesale lenders or the whole "market." To the contrary, § 1026.36(e)(1) "***does not require a loan originator to establish a business relationship with any creditor with which the loan originator does not already do business***." Ex. 33 (Comment for 1026.36) (emphasis added). Under § 1026.36(e), a broker can present an Anti-Steering Disclosure of Loan Options identifying such options, *see* Ex. 28, as happened here. *See, e.g.*, Exs. 41-43.

***"Corrupt" Brokers.*** The Complaint also deceptively characterized the

---

[3] The Complaint also includes misleading and erroneous statements regarding UWM's so-called "Lock-In" Provision, which prohibits "[t]he transfer or sale by Broker of a Mortgage Loan locked in by UWM during the lock-in period to another entity." Ex. 18 (Wholesale Broker Agreement) at 2.03. But that provision makes clear lock-in "shall be at Broker's option" and applies only during the "lock-in period." *Id.* The provision thus does not restrict a broker's ability to "shop" the market. Variations of the provision are common in the industry. *See, e.g.*, Exs. 19-1 (Goldstar Broker Agreement), 19-2 (MIMutual Broker Agreement), 19-3 (Sierra Pacific Broker Agreement). And borrowers can walk away from a loan at any time.

publicly available data to label over 8,000 "brokers" (some of whom are actually loan officers, CRA Decl. 1 ¶ 8) as "corrupt" because they worked with UWM on 99% or more of their loans in 2023.  Compl. ¶ 9.  Any reasonable investigation of the data would have revealed that 6,500 of the so-called "corrupt brokers" (more than 70%) closed *three or fewer* loans during the entire year—and over 4,000 (about half) closed only *one* loan that year.  CRA Decl. 1 ¶¶ 9–10.  Calling such brokers "corrupt," Compl. ¶¶ 9, 210(c), based on their submission of a single loan is absurd.

*Fiduciary Duties.*  The Complaint also made sweeping claims that "brokers owed fiduciary duties to Plaintiffs and the [nationwide] class" that impose numerous obligations.  *See* Compl. ¶ 266; *see also* ¶¶ 1, 37, 75, 197(a), 264–65, 275–77.  Any reasonable investigation would have revealed that to be wrong.

*Aiding and Abetting Claims.* The Complaint also alleged class claims for aiding and abetting a breach of fiduciary duty based on the laws of every state, asserting that "there are no . . . case-dispositive differences[] among various states' laws." Compl. ¶ 264. That, too, is plainly false. Several states, including North Carolina—Schelble's home state—do not recognize that tort at all. *See Noblee Bottling, LLC v. Gora LLC*, 2023 WL 4750124, at \*2 (W.D.N.C. July 25, 2023) (explaining that these claims "are not cognizable under North Carolina law"); *BDM Invs. v. Lenhil, Inc.*, 826 S.E.2d 746, 763 (N.C. Ct. App. 2019); *see also, e.g.*, *Cohen v. Dulay*, 94 N.E.3d 1167, 1176 (Ohio Ct. App. 2017) (Ohio); *Broyles v. Cantor Fitzgerald & Co.*, 2014 WL 6886158, at \*5 (M.D. La. Dec. 8, 2014) (Louisiana); *In re Verilink Corp.*, 405 B.R. 356, 380–81 (Bankr. N.D. Ala. 2009) (Alabama).

## B.   The FAC Continues and Supplements the Sanctionable Defects.

After being confronted with the Complaint's flaws, Counsel maintained—and in fact doubled down on—their core theories in the FAC. Although the FAC abandons a few false claims, its new attack lines are just as baseless as the old ones.

*Morandi.* Start with Morandi, a new plaintiff. By improperly conflating loan officers and brokers to claim they are all "corrupt" (as Counsel does throughout the FAC), Counsel falsely alleges that Morandi's loan officer "Todd signed UWM's Wholesale Broker Agreement." FAC ¶ 275. *He did not*. Ex. E ("Todd Decl.") ¶ 10. The FAC also falsely claims that Morandi "did not realize, at any point prior to

closing, that he would be paying $4,348.31 in 'discount points' as a condition of securing [his] interest rate."  FAC ¶ 282.  Three closing disclosures show otherwise:

| Closing Cost Details | | | |
| --- | --- | --- | --- |
| | | **Borrower-Paid** | **Paid by Others** |
| **Loan Costs** | | At Closing   Before Closing | |
| A. Origination Charges | | $11,044.04 | |
| 01 1.265% of Loan Amount (Points) | | $3,794.04 | |
| 02 Originator Compensation  to National Trust Lending | | $7,250.00 | |

| Closing Cost Details | | | |
| --- | --- | --- | --- |
| | | **Borrower-Paid** | **Paid by Others** |
| **Loan Costs** | | At Closing   Before Closing | |
| A. Origination Charges | | $11,133.31 | |
| 01 1.253% of Loan Amount (Points) | | $3,883.31 | |
| 02 Originator Compensation  to National Trust Lending | | $7,250.00 | |

| Closing Cost Details | | | |
| --- | --- | --- | --- |
| | | **Borrower-Paid** | **Paid by Others** |
| **Loan Costs** | | At Closing   Before Closing | |
| A. Origination Charges | | $11,598.31 | |
| 01 1.403% of Loan Amount (Points) | | $4,348.31 | |
| 02 Originator Compensation  to National Trust Lending | | $7,250.00 | |

Ex. 50 (June 3 Disclosure) at 2; Ex. 51 (June 6 Disclosure) at 2; Ex. 52 (June 16 Disclosure) at 2.  Morandi signed and acknowledged receipt of all of these disclosures.  Ex. 50 at 5; Ex. 51 at 5; Ex. 52 at 5.  "Discount points" were also listed in Morandi's loan application in the amount of $4,348.31.  Ex. 53 (Loan Application) at 12.  Morandi's loan officer explained that Morandi would need to purchase discount points to attain his note rate but doing so would be cheaper than securing an FHA loan and paying a mortgage insurance premium.  Todd Decl. ¶ 7. And he worked extensively with Morandi to improve his credit score to secure a better loan.  Todd Decl. ¶ 5, Exs. 1–4.

**Schelble.**  According to the FAC, Schelble "did not realize at any point prior

18

to closing, that he would be paying $2,953.41 in 'discount points' as a condition of securing [his mortgage] rate." FAC ¶ 230. That false assertion is directly contradicted by Schelble's closing documents. Not only did his final closing disclosure list $2,953.41 as the amount to be paid for "Points," Ex. 12 (August Disclosure), so too did earlier disclosures issued on June 1 and May 23:







*See id.*, Ex. 17 (June Disclosure); Ex. 16 (May Disclosure). Even Schelble's loan estimate discloses "Points."



Ex. 56 (Loan Estimate) at 2.

Borrowers, like Schelble and Morandi can pay discount "points" at closing to

get a lower interest rate, and both chose to do that. Ex. 15 at 17; Ex. 14 (ConsumerFinance.Gov); Ex. 13 (describing $2,953.41 Schelble charge as a "discount fee"). Further, Morandi's and Schelble's loan documents expressly state they "received the Your Home Loan Toolkit." Exs. 57, 58. That document, published by the CFPB, has an entire section explaining why discount points are paid ("additional money you pay up-front to reduce your interest rate") and a chart explaining how to "understand the trade-off between points and interest rate." Ex. 20 at 3, 9, 19. The Complaint omits all these facts, leaving the false impression that UWM improperly imposed hidden fees.

*Escues.* After abandoning the Escues' false allegations from the opening complaint, Counsel then invents a new false theory. The FAC alleges that "because Elkins structured the Escues' loan to provide them $2,452.89 cash back at closing"— exceeding a Fannie and Freddie $2,000 threshold—"the Escues' loan was classified as a 'cash-out refinance' loan, and thus subject to an additional price increase" that UWM and their brokers "never explained." FAC ¶ 202. That new liability theory, like the initial one, is demonstrably false. The Escues' loan was classified as a cash-out refinance because the Escues used over $80,000 of their home's equity to pay off non-mortgage related debts, not because the payout at closing exceeded $2,000. Ex. C ("CRA Decl. 2") ¶ 10; Ex. 11 (Closing Disclosure) at 3; Ex. 29 at 1. As any reasonable investigation would have made clear, the cash-out price adjustment

would have been made even if the Escues had received **no cash** at closing.  CRA

Decl. 2 ¶ 11.[4]

     *Overarching Theories and Legal Allegations.*   The FAC also maintains the

improper assertions that loan officers have a duty to "survey the wholesale market,"

which is contrary to federal law and regulatory guidance—all while largely ignoring

that Plaintiffs received anti-steering disclosures pursuant to 12 C.F.R. § 1026.36(e).

*See, e.g.*, FAC ¶¶ 34 n.11, 183, 215, 246, 271, 299; *supra* Section II.A.   It then

repeats the baseless assertions about the All-In Provision, Lock-In Provision, and

supposed broker "corruption."  FAC ¶¶ 1, 2, 10, 13, 193, 225, 254, 279, 309; *supra*

Section II.A.  And it reasserts that there are no "case dispositive" differences in law

when several states do not even recognize Plaintiffs' causes of action.  *See, e.g.*, FAC

¶¶ 35, 145, 338(a), 457, 472; *supra* Section II.A.

## III.   The Lawsuit's Core Theory—In Both The First and Second Complaint— Relies on Glaringly Erroneous And Objectively Unreliable Data.

     Rule 11(b)(3) and 28 U.S.C. § 1927 further bar Counsel from asserting and

maintaining "technical analys[e]s" and "statistical extrapolations" that are "facially

unreliable."  *King*, 71 F.4th at 524, 530.  The central theory of harm articulated in

---

[4] The suggestion that there was something nefarious about the $2,452.89 that the Escues received at closing is likewise frivolous.  Prior to closing, the estimated cash due back to the Escues was $652.00.  CRA Decl. 2 ¶ 11. That amount increased to $2,452.89 simply because the payoff amounts on their prior mortgage and other debts to be satisfied at closing decreased between application and closing.  *Id.*

both complaints—that UWM charged Plaintiffs more than other lenders for "similar loan[s]" with the "same interest rates," FAC ¶¶ 138–39—relies on statistical analyses of exactly that sort and is demonstrably false for that reason.

*False Allegations of "Similar" Loans.*   Counsel purports to compare Plaintiffs' loans with other loans that have "the same parameters in all material respects."   FAC ¶¶ 197, 259, 285; *see also id.* ¶¶ 231, 314 ("substantially similar loans").   That is false.   The data on which they relied—*i.e.*, Hunterbrook's data— omits the key variables that inform loan rates and pricing: including credit scores (i.e., "FICO" scores), Loan to Value (LTV) ratios in combination with FICO scores, employment history, and more.   Ex. 1 (Hunterbrook Report) at 5; Ex. 15 at 2; Ex. 20 (CFPB, loan toolkit) at 6 (credit scores have "significant impact" on mortgage interest rate and fees you pay).   Failing to account for these factors is tantamount to comparing the cost of flights without knowing key variables like the duration, destination, or number of stops for the flights being analyzed.

Even a cursory consideration of these key variables undercuts Plaintiffs' core theory.   Indeed, "*[a]ll seven* Plaintiffs had FICO/LTV combinations that were subject to Fannie Mae or Freddie Mac loan level price adjustments of varying magnitudes."   CRA Decl. 2 ¶ 7 (emphasis added).   For example, the market price adjustment for Morandi's FICO score of 725 and LTV ratio of 69.7% was 1.25%, which amounts to $3,875 of his $310,000 loan amount.   CRA Decl. 2 ¶ 9.   And for

Jeffries and Singh's 680 FICO score and 97% LTV ratio, it was 1.125% (or $3,061) for their $320,100 loan. *Id.* ¶ 6. Further, Plaintiffs have other key variables unaccounted for in the HMDA data, like length of employment (Morandi started a new job), self-employment (Scheble), length of lock-in period (Weatherill opted for an above-average 45-day lock), and amount paid by the lender to the broker at closing—to name only a few. *See* CRA Decl. 1 ¶ 14; Todd Decl. ¶ 6; Ex. 54 (Morandi Loan Application); Ex. 55 (Morandi Employment Verification); Ex. 30 (Schelble Loan Application) at 2; Ex. 31 (FreddieMac.Com) ("Most mortgage lenders require at least two years of consistent self-employment . . . ."); Ex. 32 (Weatherill Loan Estimate) at 1 (issued April 20 to expire June 4); Ex. 20 (CFPB, "Your home loan toolkit") at 13 (A "rate lock" "may be expensive to extend[.]").

"These adjustments are critical pieces in understanding whether [Plaintiffs'] individual interest rates and origination charges were consistent with alternatives in the market." CRA Decl. 2 ¶ 7. Indeed, Hunterbrook itself flags as one of the "limitations" its work that "*[c]redit score, a key input to loan pricing, is not present in HMDA*." Ex. 15 at 22 (emphasis added). As even a "layperson" would understand, comparing loans without taking into account credit scores, LTV ratios to credit scores, and other key variables makes no sense and renders Plaintiffs' representation regarding comparing loans with "the same parameters in all material respects" false. *See King*, 71 F.4th at 524.

23

***Misleading Use of Monthly Averages.***  Plaintiffs' Counsel also use highly misleading and objectively unreasonable averages in comparing loans.  Instead of comparing loan prices on a particular day, they compare loans over an entire month—sometimes two.  FAC ¶¶ 197, 231, 259, 285, 314.  But interest rates can fluctuate dramatically day-to-day, and were especially volatile in 2022 and 2023.  CRA Decl. 2 ¶¶ 4–5.  Counsel compares Jeffries and Singh's loan, for instance, to mortgages during "September and October 2023."  FAC ¶ 314.  According to Freddie Mac, the average 30-year fixed rate mortgage varied between 7.12% and 7.76%—.64 percentage points—during that two-month period.  CRA Decl. 2 ¶ 4.  A difference of 0.64 percentage points on a $320,100 30-year loan amounts to approximately $2,053 for the first year alone and $50,384 over the loan's lifespan. (https://www.nerdwallet.com/mortgages/mortgage-calculator). That is a substantial discrepancy by Plaintiffs' own standards, *see* FAC ¶ 317 (alleging that Singh/Jeffries overpaid by "at least $1,590").

***Deviation from Accepted Methodology.***  Finally, both complaints make assertions regarding the comparative benefits of loans offered to Plaintiffs without regard to the government-approved methodology for comparing such loans.  Exs. 23–26.  Government regulators use rate spreads to compare loans because that figure measures not only "interest rate," but also "the additional fees charged with the loan" against the average cost for similar loans on a particular date. Ex. 22 (CFPB); Ex.

21 ("APR makes it easier to compare 'apples to apples'"); CRA Decl. 1 ¶¶ 10–12. Here, Morandi's, Weatherill's, and Schelble's rate spread demonstrates their loans were *at a lower cost* than the prevailing market APR. CRA Decl. 1 ¶¶ 12, CRA Decl. 2 ¶ 9. As for the Escues and Jeffries/Singh, both sets of Plaintiffs were likewise subject to loan-level price adjustments that affected their loan pricing and explain their rate spread. CRA Decl. 1 ¶¶ 5, 6; CRA Decl. 2 ¶¶ 4, 6, 8. Plaintiffs' persistence in making unsupportable extrapolations from facially unreliable data is yet another basis for sanctions. *See King*, 71 F.4th at 524.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court grant the relief requested under Rule 11, 28 U.S.C. § 1927, and this Court's inherent powers and dismiss this action and award attorney's fees. Alternatively, this Court should order the disclosure of all agreements and communications with Hunterbrook and hold an evidentiary hearing on this matter.

Dated: May 30, 2025                    Respectfully submitted,

                                       /s/ *Jeffrey J. Jones*
                                       Jeffrey J. Jones (P80231)
                                       JONES DAY
                                       150 W. Jefferson Ave, Suite 2100
                                       Detroit, MI 48226
                                       (313) 733-3939
                                       jjjones@jonesday.com

Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939
rbkcehowski@jonesday.com

Stephen J. Cowen (P82688)
Amanda K. Rice (P80460)
Andrew J. Clopton (P80315)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
scowen@jonesday.com
arice@jonesday.com
aclopton@jonesday.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2025, I caused the foregoing document to be filed with the Clerk of the Court using CM/ECF, which will effectuate service upon all counsel of record.

/s/ *Jeffrey J. Jones*
Jeffrey J. Jones (P80231)
JONES DAY
150 W. Jefferson Ave, Suite 2100
Detroit, MI 48226
(313) 733-3939
jjjones@jonesday.com

*Counsel for Defendants*