EXHIBIT 19-2



## <u>BROKER APPLICATION</u>

**MiMutual Account Executive**: _____

Corporate Name: _____

Address: _____

City: _____ State: _____ Zip: _____

Primary Contact: _____ Email Address: _____

Telephone No: _____ Fax No: _____

Company NMLS #: _____ EIN: _____

Web Site: _____ Date Incorporated: _____

Service Area: _____
   (List Each State)

Assets: _____ Net Worth: _____

Production Past Year: $_____ CONV _____%; FHA_____%; VA_____%; USDA_____%

Est Production Current Year: $_____ CONV _____%; FHA_____%; VA_____%; USDA_____%

**Please complete <u>all applicable Application fields</u>.**
**Include items listed below & email to [clientrelations@mimutual.com](mailto:clientrelations@mimutual.com):**

☐ • Most recent year end financials with P&L and balance. Must meet applicable state minimum required net worth.

☐ • Resume(s) of owners, principal officers.

MMI Broker Application – August 2023



| Agency Approvals | Yes | No | Mortgagee Number | Date Approved | Approval Attached |
|---|---|---|---|---|---|
| FHA Sponsored Originator | ☐ | ☐ | | | |
| FHA Direct Endorsement | ☐ | ☐ | | | |
| VA Approved | ☐ | ☐ | | | |
| VA Automatic | ☐ | ☐ | | | |
| GNMA Approved | ☐ | ☐ | | | |
| FNMA Approved | ☐ | ☐ | | | |
| FHLMC Approved | ☐ | ☐ | | | |

| Insurance | Yes | No | Expiration Date | Copy Attached |
|---|---|---|---|---|
| Errors & Omissions Insurance | ☐ | ☐ | | |
| Fidelity Bond | ☐ | ☐ | | |

| Officers & Owners Name | Title | Social Security Number | % Ownership |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Has any director or principal officer of the licensee ever been indicted or convicted of a felony?  If yes, please attach a detailed description:

☐ YES     ☐ NO

Has any director or principal officer of the licensee ever been associated with a business whose authority to transact business as a mortgage banker, mortgage Correspondent, or mortgage loan servicer was denied, revoked, or suspended by a state or federal regulatory or law enforcement entity?  If yes, please attach a detailed description:

☐ YES     ☐ NO

**Authorized Signers:**
Please list members authorized to sign documents or contracts on behalf of the company

| Name | Title |
|---|---|
| | |
| | |
| | |
| | |
| | |

2

MMI Broker Application – August 2023



**References:**

<u>**Investor Reference:**</u>

References should be persons with whom the applicant has had previous business experience.

| | | |
|---|---|---|
| (Investor) | (Contact/Title) | (Telephone and/or email address) |
| (Investor) | (Contact/Title) | (Telephone and/or email address) |
| (Investor) | (Contact/Title) | (Telephone and/or email address) |

<u>**Bank Reference:**</u>

| | | |
|---|---|---|
| (Bank) | (Location) | (Last 4 digits of account number) |
| (Bank) | (Location) | (Last 4 digits of account number) |

**I hereby authorize Michigan Mutual, Inc. to make reference inquiries and at the sole expense of Michigan Mutual, Inc. order credit reports and/or independent background investigations.**

The undersigned hereby represents and warrants that the completion of the application and all accompanying documents are complete and correct in all material respects and accurately present the condition of the applicant.

_____
(Company)

_____     _____
(Signature)                                                                              (Date)

_____
(Print Name)

_____
(Title)

3

MMI Broker Application – August 2023



## <u>RESOLUTION OF THE BOARD OF DIRECTORS</u>

OF: _____
(Company)

**RESOLVED FIRST**, that

_____   the   _____, and
(Name of Officer)                          (Title)

_____   the   _____, and
(Name of Officer)                          (Title)

_____   the   _____, and
(Name of Officer)                          (Title)

_____   the   _____,
(Name of Officer)                          (Title)

of this Corporation, or any or more of them or their duly elected or appointed successors in office, be and each of them is hereby authorized and empowered in the name of and on behalf of this corporation and under its corporate seal, from time to time while these resolutions are in effect, to execute any and all agreements, contracts, assignments, endorsements and issuance of checks or drafts, reports, mortgage documents and other papers in connection with documents, and furnish any information required or deemed necessary or proper by Michigan Mutual, Inc. in connection with any of the foregoing.

**CERTIFICATION:**

**I HEREBY CERTIFY** that the foregoing is a true and correct copy of a resolution presented to and

adopted by the Board of Directors of _____ at a

meeting duly called and held at _____,

on the _____ day of _____, 20_____, at which a quorum was present and noted, and that such resolution is duly recorded in the minute book of this Corporation; that the officers name(s) in said resolution have been duly elected or appointed to, and are the present incumbents of, the respective offices set after their respective names.

(Corporate Seal)

_____
(Secretary)

4



## WRITTEN CONSENT OF LLC

Unanimous Written Consent
Without a Meeting of Members of

_____, LLC

The undersigned, being all the members of _____, LLC (the "Company"), a _____ limited liability company, hereby consent to and agree that the following shall and does hereby  constitute their actions taken by unanimous written consent without a meeting:

**RESOLVED:**  That the Company shall be, and it hereby is, authorized and empowered to enter into a Mortgage Banker and/or a Mortgage Sale Agreement with Michigan Mutual, Inc., its affiliates or designees (collectively "Lender") for the purposes of forwarding to Lender, applications for mortgage loans and similar debts and obligations originated by the Company.

**FURTHER RESOLVED:** That the undersigned Manager of the Company shall be, and hereby is, authorized, directed and empowered to do all acts and things necessary for and/to incidental to the implementation of the foregoing Resolutions and, further to execute all agreements and undertakings, including but not limited to, any agreement and other instruments and agreements necessary to effectuate the relationship between the Company and Lender.

**FURTHER RESOLVED:** That these Resolutions may be executed in counterparts, each part together constituting these Resolutions.

**IN WITNESS WHEREOF:** the aforementioned actions of the Members of the Company, taken by unanimous written consent, without a meeting have been read and are hereby ratified, confirmed, and approved by all Members of the Company.

Dated this _____ day of _____, 20_____.

ALL OF THE MEMBERS


_____
Member and Manager


_____    _____    _____
Member                          Member                            Member


_____    _____    _____
Member                          Member                            Member

5

MMI Broker Application – August 2023



## WEBSITE ACCESS

**Please complete information for individuals requiring MiMutual portal access.**

| User's Full Name | E Mail Address | User's Cell Number | NMLS ID | *Access Level (LO or FULL) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**\*Access Level:  Indicate Full or Individual pipe access - See Exhibit A for additional names if needed**

### APPRAISAL MANAGEMENT COMPANY (AMC) ASSIGNMENT:

Due to Appraisal Independence requirements, Brokered loans must use a MiMutual approved AMC. Below is a list of approved AMC that MiMutual will assign based on your geographical location.

| | |
|---|---|
| Equity Solutions | Property Sciences |
| Clear Capital | ARIVS |
| Momentum | United One |
| Dart | Nationwide |

FHA INFORMATION: Please provide FHA Training / Education / Experience for any employee originating or processing FHA loans.

_____

_____

### FHA APPROVAL REQUEST

Clients requesting FHA approval under MiMutual need to complete the following.
Please list investors you are currently approved to originate FHA loans:

1) _____
(Investor)

2) _____
(Investor)

6

MMI Broker Application – August 2023



## **Request for VA Recognition of an Agent Checklist**

Company Name: _____

Below is a listing of the required items for VA Sponsorship under MiMutual:

☐  Copy of Veteran's Administration approval of Agent reflecting VA Lender ID number.

☐  List of geographic areas (states) in which the agent will be originating VA loans (must be licensed in states).

☐  Main Contact of Agent – name, address and phone number (should be someone at agent's main office).

MMI Broker Application – August 2023



## Lender-Paid Compensation Agreement & Affiliation
**\*ALLOW ONE BUSINESS DAY FOR SELECTED COMP RATE ON NEW LOCKS**

In accordance with the Federal Reserve System Regulation Z to the Truth in Lending Act, TILA where the borrower has chosen to have Michigan Mutual, Inc. pay the Broker's compensation, I, Broker of record and authorized signer on behalf of the Broker, choose to be compensated on all loans with Lender-paid compensation for a reasonable period of time.

**For Lender paid Compensation, the following compensation selections are available:**

- Compensation based on a percentage of the total loan amount, and/or
- A Flat Fee, and/or
- Select a minimum and maximum dollar amount of compensation;

**Please fill in the selection(s) below:**

1. Compensation percentage per loan _____% (maximum 2.75%, in Increments of .125%

2. A flat fee of $_____ on each loan. (max $795, Comp max is 2% with flat fee)

3. A minimum dollar amount not less than $_____. ($0 - $3,000 or N/A)

4. A maximum dollar amount not more than $_____. (max $20,000)

This election of compensation will be in effect until the next open compensation period (every 90 days). If for competitive reasons you require a change to the agreed compensation, please contact your Account Executive. Michigan Mutual, Inc. will contact you prior to the next open compensation period to facilitate any changes you may feel necessary. Should no changes in compensation percentages be necessary this election shall remain in effect.

The Broker certifies that the choice of Lender-paid compensation with the said percentage per this Agreement is the sole source of compensation. Broker will not charge in any circumstance any additional fees or charges to the Borrower, except as permitted by the Agreement. Broker shall not accept compensation from any other party other than Michigan Mutual, Inc. Broker will not pay the borrower any additional discounts or credits that may alter the compensation from the Lender.

Broker's compensation is subject to all applicable QM, federal, state and local laws and regulations.

**Affiliation Question:**
- Do you have a controlling interest or common ownership in an Affiliate? Yes _____ No _____
- If Yes, please list Affiliates & corresponding fees (Ex: Title Co.)

_____

_____

**Name:** _____

**Signature:** _____   **Date:** _____

**Name:** _____

**Title:** _____

MMI Broker Application – August 2023



## MICHIGAN MUTUAL, INC. Client BSA/AML COMPLIANCE ATTESTATION

Company Name: _____

Contact Name: _____

I certify that the undersigned mortgage correspondent lender has established an Anti-money Laundering (AML) program that complies with 31 CFR Parts 1010 and 1029.  Michigan Mutual, Inc. reserves the right to request evidence of compliance.  The undersigned mortgage correspondent lender agrees to provide evidence of compliance, if requested.

The designated BSA/AML Compliance Officer for the undersigned mortgage Broker is:

_____

BSA/AML Officer

_____

Signature

_____

Date

MMI Broker Application – August 2023



## EXHIBIT A

## Website Access – Additional Users

**Please complete information for individuals requiring MiMutual portal access.**

| Users Full Name | E Mail Address | User's  Cell Number | NMLS ID | *Access Level (LO or FULL) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**\*Access Level:  Indicate Full or Individual pipe access**

MMI Broker Application – August 2023



# DU REDISTRIBUTION

<u>User Agreement</u>

THIS AGREEMENT ("Agreement") is entered into between _____ ("User") and <u>Michigan Mutual, Inc.</u> ("Licensee").

WHEREAS, Licensee has entered into a Software Subscription Agreement with Fannie Mae that governs Licensee's use of Desktop Underwriter® (the "Licensed Application"), comprised of the Software Subscription License, the General Terms and Conditions ("General Terms") and Desktop Underwriter® Schedule (the "DU Schedule") as they appear in the Consolidated Technology Guide (the "Technology Guide"), and the associated Redistribution Addendum ("Addendum")(collectively, the "SSA"), which sets forth the rights and obligations concerning Licensee's use the "Licensed Application".  Any capitalized terms used in this User Agreement without definition are defined in the SSA.

WHEREAS, User is a Permitted TPO or Subsidiary of Licensee and desires to use the Licensed Application in connection with mortgage loan origination and/or underwriting activities, Early Assessments and Prequalification Analyses.

NOW THEREFORE, in consideration of the above, and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, Licensee and User agree as follows:

1.      <u>Definitions</u>. The following terms are used in this Agreement as defined below:

"<u>Permitted TPO</u>" means any Third-Party Originator that performs Early Assessments or Prequalification Analyses or origination activities in relation to mortgage loans intended to be closed by Licensee or assigned or sold to Licensee.  For avoidance of doubt, the term "Permitted TPO" does not include any officer or employee of Licensee, a mortgage insurer, contract underwriter, mortgage fulfillment service provider, appraisal management company or similar service provider; none of these may have DU redistributed to them by Licensee or its Permitted TPO's.

"<u>Consumer Data</u>" means any information obtained by User, either directly or indirectly, which bears on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living (the "Seven Factors") and which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in underwriting a Mortgage Loan Application or performing an Early Assessment or Prequalification Analysis. Such data may include, but are not limited to, data contained in: (i) residential mortgage credit reports, "in-file" credit reports, or "consumer reports," as defined in the FCRA; (ii) the Uniform Residential Loan Application, including any attachments and/or supplements thereto; and (iii) any correspondence or communication from the consumer or any third party that includes information relating to one of the Seven Factors.

"DU Early Assessment" means the component of the Licensed Application that performs Early Assessments.

"Early Assessment" means a conditional DU recommendation based on the submission of a minimum set of Consumer Data and a soft credit inquiry, including the option of using a single in-file credit report, a bi-merge credit report or a tri-merge credit report, with respect to a prospective loan applicant for the purpose of evaluating such prospective applicant's qualification for financing during the Licensee's prequalification process, other than in connection with a Mortgage Loan Application or a Prequalification Analysis. Early Assessment provides Licensee with the capability to use a soft inquiry credit report from a credit reporting agency through DU that supports DU Early Assessment.

"Mortgage Loan Application" means the submission by a mortgage loan applicant of financial information and identification of the specific property to secure the mortgage loan for the purpose of obtaining an underwriting decision.

"Prequalification Analysis" means the evaluation of Consumer Data with respect to a prospective mortgage loan applicant for the purpose of evaluating such prospective applicant's qualification for mortgage financing, other than in connection with a Mortgage Loan Application.

"Subsidiary" means a mortgage lending entity more than fifty percent (50%) of whose controlling interest or outstanding voting shares or securities are owned or controlled, directly or indirectly, by Licensee.

2.     User represents and warrants that it is a Permitted TPO or Subsidiary of Licensee and that it has received and read the SSA and understands and agrees that it shall be fully obligated to comply with all provisions of such SSA in connection with its use of the Licensed Application. User further represents and warrants that it (i) has not been suspended or terminated by Fannie Mae, (ii) has not had its officers, directors (or managing members), controlling ownership, or other key executives convicted of mortgage fraud or other similar offenses, or is under a Suspension Order by FHFA's Suspended Counterparty Program, and (iii) has not previously had access to the Licensed Application that was suspended or terminated for any reason.

3.     Licensee agrees that its access rights under the SSA will extend to User in connection with the Licensed Application, as set forth in the Agreement. User agrees that the access rights granted to it will not extend to any third party, including, but not limited to, User's customers or any other Related Parties of User.

4.     User agrees that Licensee is User's "agent", as that term is defined in the FCRA, in connection with any use of the Licensed Application by User with respect to Mortgage Loan Applications, Early Assessments or Prequalification Analyses.

5.     In connection with the processing and evaluation of Consumer Data by the Licensed Application for purposes of making an underwriting recommendation or performing an Early Assessment or Prequalification Analysis (if applicable), User agrees that Fannie Mae, as owner of the Licensed Application, is User's agent, as that term is defined in the FCRA. As User's agent, Fannie Mae will, and is hereby expressly authorized by User to, obtain Consumer Data for purposes of making an underwriting recommendation or performing an Early Assessment or Prequalification Analysis. User also expressly acknowledges, understands, and agrees that Fannie Mae's role as User's agent

will not extend beyond the limited purposes set forth in this paragraph, and for all other purposes, there shall be no such principal and agent relationship. In addition, User must in no way misrepresent to third parties the limited extent of this principal/agent relationship. User also agrees that any output or recommendation rendered by the Licensed Application is not a consumer credit report and does not constitute an approval or denial of the Mortgage Loan Application, or a commitment to purchase the loan, by Fannie Mae. User represents and warrants to Licensee that User has provided the prospective user information and certifications set forth in 15 USC §1681e(a) to each consumer reporting agency that provides Consumer Data through the Licensed Application to User.  User agrees to disclose any secondary use of Consumer Data that is facilitated by use of the Licensed Application to the issuing consumer reporting agency (including information relating to the identity of the secondary user).

6.     If User is a Permitted TPO, User agrees to use the Licensed Application for the primary purpose of (i) originating or underwriting mortgage loans intended to be closed by Licensee, or that are assigned or sold to Licensee, and/or (ii) performing Early Assessments or Prequalification Analyses for Licensee (to the extent permitted under the SSA). If User is a Subsidiary, User agrees to use the Licensed Application only in connection with its own Mortgage Loan Applications and/or Early Assessments or Prequalification Analyses or, to the extent permitted under the SSA, those of Licensee.

7.     User may use the Licensed Application's Credit Retrieval Module, underwriting functionality, Early Assessment functionality or Prequalification Analysis functionality only under the following circumstances:

(a)    To request and receive Consumer Reports and analyze and evaluate Consumer Data in such reports for the purpose of performing Early Assessments or Prequalification Analyses of prospective loan applicants who have submitted an express, written authorization to User to obtain such reports and analyze and evaluate such data;

(b)    To request and receive Consumer Reports and analyze and evaluate Consumer Data in such reports in underwriting Mortgage Loan Applications before a decision regarding any such application is made and communicated to any loan applicants;

(c)    With respect to Mortgage Loan Applications previously approved but not yet closed:

    i.    to request and receive additional Consumer Reports through the Credit Retrieval Module, when User is requesting such reports in connection with its own Mortgage Loan Applications and/or Early Assessments or Prequalification Analyses and has obtained the loan applicant(s)' prior written permission to request such additional Consumer Reports,or because other circumstances exist that User believes justify the request for such additional consumer reports under the FCRA;
    ii.   to analyze or evaluate Consumer Data, including Consumer Reports, when User determines that data obtained subsequent to its initial approval may affect its prior underwriting approval decision;
    iii.  to request and receive Consumer Reports and/or analyze or evaluate Consumer Data when the loan applicant(s) request different loan terms or a different loan product than that originally requested by the loan applicant(s); and

(d)    With respect to Mortgage Loan Applications previously denied by User, for which the denial decision has been communicated to the applicant(s):

     i.   to request and receive Consumer Reports through the Credit Retrieval Module, when User is requesting such reports in connection with its own Mortgage Loan Applications and/or Early Assessments or Prequalification Analyses;

    ii.   to analyze or evaluate Consumer Data, including Consumer Reports, when:

       1.   User determines that data obtained subsequent to its initial denial decision may affect its prior underwriting decision; and

       2.   User intends to make and communicate an offer of credit to the applicant(s) if an approval recommendation decision is rendered by the Licensed Application as a result of consideration of the additional data obtained.

8.      The parties acknowledge and agree that Fannie Mae is an intended beneficiary of this Agreement.

9.      This Agreement will remain in full force and effect unless terminated pursuant to the provisions of this Section. The parties acknowledge and agree that this Agreement is subject to the SSA provisions and that this Agreement will automatically terminate upon termination of Licensee's SSA, the Desktop Underwriter® Schedule and/or the Redistribution Addendum by Fannie Mae or Licensee. In the event that User breaches any term or condition of this Agreement, Licensee must terminate this Agreement immediately upon written notice to User. Either party may terminate this Agreement without cause upon thirty (30) days' prior written notice to the other. The parties acknowledge that, pursuant to the terms of that Section of the Redistribution Addendum captioned "Termination of Permitted TPOs and Subsidiaries," Fannie Mae may, in its sole and absolute discretion, immediately suspend or terminate User's access to the Licensed Application.

10.    Immediately upon termination of this Agreement, User must cease using the Licensed Materials and destroy or return all copies of the Licensed Materials in its possession to Licensee. Promptly upon request from Licensee or Fannie Mae, User agrees to provide Licensee or Fannie Mae with written certification, executed by a duly authorized officer of User, of its compliance with the foregoing.

11.    Licensee, and not Fannie Mae, shall be responsible for providing User with (i) first line support with respect to User questions and comments concerning Fannie Mae's automated underwriting guidelines and policies, including, but not limited to, questions concerning the interpretation and applicability of the Licensed Application's findings reports and questions relating to Fannie Mae's Selling Guide or (ii) training relating to such guidelines and policies or use of the Licensed Application. The provisions in Section 24 of the DU Schedule in Licensee's SSA shall apply and expressly control Fannie Mae's obligations.

12.    In the event of a conflict between the terms of this User Agreement and the terms of Licensee's SSA, the terms of the SSA will govern. Fannie Mae is intended to be a third-party beneficiary of this User Agreement and entitled to enforce any of the terms.

13.    This Agreement may not be assigned, either expressly or by operation of law, by User to any other affiliate, subsidiary, successor, person, entity, firm, corporation, or other entity without the prior express written consent of Fannie Mae and Licensee.

14.    Fannie Mae may issue hard-copy bulletins or electronic bulletins (via electronic mail or posted to an applicable Fannie Mae internet site) amending the SSA on a prospective basis, effective on the date specified by Fannie Mae in the bulletin.  Fannie Mae will issue each bulletin at least 20

calendar days before its effective date. Licensee agrees to notify User of bulletins amending the SSA within seven (7) days of issuance, and User agrees to comply with any amendments by the effective date.

15.     All notices, requests, demands, and other communications (other than routine operational communications) required or permitted under this User Agreement must be in writing and will be deemed to have been received by a party if addressed to the recipient's contact person and address set forth below (i) when hand delivered to the intended recipient, (ii) one (1) business day after being given to a reputable overnight courier with a reliable system for tracking delivery, (iii) when sent by confirmed electronic means, including via email, provided such receipt has been confirmed by the recipient, or (iv) seven (7) days after the date of mailing, when sent by United States mail, registered or certified mail, return receipt requested, postage prepaid, and addressed. Any notice delivered by electronic means shall request a receipt thereof confirmed by email or in writing by the recipient and followed by personal or mail delivery of such correspondence and any attachments as may be requested by the recipient.

> Licensee:
> Michigan Mutual, Inc.
> 911 Military Street
> Port Huron, MI 48060
>
> User:
>
> _____
>
>
> _____
>
>
> _____,_____ _____

In the event that the recipient does not so specify a contact person/address, notices will be addressed to the general counsel at the recipient's corporate headquarters. A party may from time to time change its address or designee for notification purposes by giving the other party prior written notice of the new address or contact person.

16.     In the event that any provision of this Agreement conflicts with the law under which such Agreement is to be construed, or if any such provision is held invalid, void or unenforceable by a court with jurisdiction over the parties to this Agreement, such provision will be deemed to be restated to reflect as nearly as possible the original intention of the parties in accordance with applicable law, and the remainder of this Agreement will remain in full force and effect.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the date last written below.

Michigan Mutual, Inc. _____          _____
("Licensee")                                     ("User")
By: _____          By: _____

Name: _____           Name: _____

Title: _____         Title: _____

Date: _____          Date: _____



# BROKER AGREEMENT

**THIS BROKER AGREEMENT** ("Agreement") is made this _____ day of _____,

20_____, by and between _____,

a _____ ("Broker") and **MICHIGAN MUTUAL, INC.**  a Michigan

Corporation ("Lender").

The circumstances pursuant to which this Agreement is made are as follows:

A.  Broker intends to facilitate the taking of applications and other activities described below in connection with the brokerage of Mortgage Loans, as defined below, that are eligible Federal Housing Administration or Veteran's Administration mortgage insurance backed mortgage loans; and

B.  Lender will make such mortgage loans on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.  <u>**DEFINITIONS**</u> The following words and phrases as used in this Agreement shall have the following meanings:

    a.  Application: The written application for a Mortgage Loan submitted by a prospective borrower and a copy of the agreement to purchase the Mortgaged Property, if applicable.
    b.  <u>FHA</u>: Federal Housing Administration.
    c.  <u>Mortgage</u>: A mortgage, deed of trust, deed to secure debt or similar instrument on the Mortgaged Property securing a Mortgage Loan and, if applicable, the lien noted on the certificate of title for the structure which has been affixed to the real property described in the Mortgage.
    d.  <u>Mortgage Loan</u>: A loan evidenced by a Mortgage Note, secured by the related Mortgage, which loan is originated by Lender pursuant to this Agreement.
    e.  <u>Mortgaged Property</u>: The Single-Family Residence subject to a Mortgage.
    f.  <u>Family Residence</u>: A structure which is permanently affixed to real property, including a detached structure (which may be factory-made housing which is permanently affixed to real property), a condominium or a townhouse, to be used as residential housing containing one to four dwelling units, and the land appurtenant to the structure. The term "Single Family Residence" shall not include property which under applicable local law is not a fixture.  The term "factory-made housing which is permanently affixed to real property" shall be deemed to include only factory-made housing (A) which is permanently affixed to a foundation system, including the removal of the wheels and axles, if any, from the factory-made housing; and (B) which is taxed, together with the land on which the factory-made housing is located, as real property.
    g.  <u>VA</u>: Veteran's Administration.

Initial_____

2. **BROKERING OF LOANS**

    a. Subject to the terms of this Agreement, Broker may, from time to time, submit to Lender Applications for Mortgage Loans in accordance with the lending program requirements provided to Broker by Lender, which may be changed from time to time at the sole discretion of Lender. Any such submission, in and of itself, shall not be construed as creating any obligation on the part of Lender to accept any Applications from Broker or, after acceptance, to make Mortgage Loans with respect to those Applications.  Lender shall have complete and sole discretion as to any Mortgage Loan decisions. Mortgage Loans shall be closed by Lender, in Lender's name.  Acceptance of a loan by Lender for closing shall not act as a waiver or relieve Broker in any way from strict compliance with the terms of this Agreement.

    b. Broker shall properly prepare and furnish to Lender Broker's Fannie Mae Desktop Origination Report, credit report on the applicant(s) and real estate appraisal report. Broker shall pay all costs and expenses incurred by Broker in obtaining Fannie Mae Desktop Origination Reports, credit reports and real estate appraisals; all other costs and expenses shall be borne by the applicant or Lender. At Broker's option, Broker may charge the applicant directly for the cost of real estate appraisals.

3. **COMMITMENT** If Broker strictly complies with the terms of this Agreement and the Underwriting Guide in originating the Mortgage Loan, Lender may, in its sole and absolute discretion, issue to Broker, a Lock Confirmation and Underwriting Approval for a Mortgage Loan submitted by Broker to Lender.  Although Broker complies with the terms and conditions of this Agreement, Lender shall not be obligated to issue a Lock Confirmation, or Underwriting Approval.

Upon the issuance of a Lock Confirmation and underwriting Approval Certificate, Lender shall have agreed to accept from Broker the Mortgage Loan identified therein and the associated servicing rights if Broker complies with and subject to all the terms and conditions of this Agreement, the Underwriting Guide and the Lock Confirmation applicable to the Mortgage Loan. *If Broker does not reject the Lock Confirmation by written notice to Lender within three (3) days after issuance of the Confirmation, Broker shall have agreed to transfer to Lender the Mortgage Loan and associated servicing rights in accordance with the terms of the Agreement, the Underwriting Guide and the Lock Confirmation applicable to the Mortgage Loan.*

4. **BROKER'S DUTIES** Unless otherwise directed in writing by Lender, in connection with any Loan submitted by Broker to Lender,

    a. Broker shall:

        i. Analyzing a prospective Applicant's income and debt and pre-qualifying the prospective Applicant to determine the maximum mortgage that the prospective Applicant can afford;

        ii. Educating the Applicant in the home buying and financing process, advising the borrower about the different types of loan products available, and demonstrating how closing costs and monthly payments could vary under each product;

        iii. Collect financial information (tax returns, bank statements) and other related documents that are part of the application process;

        iv. Order verifications of employment and verifications of deposit;

        v. Order requests for mortgage and other loan verifications;

        vi. Ordering appraisals;

        vii. Ordering inspections or engineering reports;

        viii. Assist the borrower in understanding and clearing credit problems;

        ix. Maintaining regular contact with the Applicant, between application and closing to apprise them of the status of the application and gather any additional information as needed for underwriting the loan;

        x. Ordering legal documents;

        xi. Schedule and participate in the loan closing.

Initial_____

b. The Broker shall ensure that each Mortgage Loan transferred by Broker to Lender for closing shall also comply with the following terms and conditions:

    i. Each Mortgage Loan shall be originated so as to be evidenced by a Mortgage Note and secured by a First Mortgage on the subject property.

    ii. Each Mortgage Loan shall be originated so as to be a permanent loan secured by a Single-Family Residence.

    iii. Each Mortgage Loan required by Lender to be insured shall be insured under a Mortgage Insurance Policy issued by a company licensed to do business in the state in which the Mortgaged Property is located and acceptable to Lender, insured by FHA or guaranteed by VA, as specified in the Commitment which insures to the benefit of Lender. As to each Mortgage Loan, Broker has complied with the requirements of the Mortgage Insurance Policy, FHA insurance or VA guaranty, in order to cause such insurance or guaranty to be in full force and effect.

    iv. The Mortgage Loan shall be originated so that the Mortgaged Property shall be covered by a Standard Hazard Insurance Policy with an endorsement in favor of the Lender, in an amount that is not less than the unpaid principal amount of the Mortgage Loan. The Standard Hazard Insurance Policy shall be written by an insurance company qualified to do business in the state in which the Mortgaged Property is located and acceptable to Lender. Any Mortgaged Property located in a federally designated special flood hazard area shall be covered by a Flood Insurance Policy in an amount which is not less than (A) the unpaid principal amount of the Mortgage Loan, or (B) the maximum amount of coverage of such insurance then permitted by applicable law, whichever is greater.

    v. No Mortgage Loan shall have an original principal amount greater than the Loan to Value Percentage stated in the Commitment applied to the appraised value of the Mortgaged Property.

    vi. If the Mortgaged Property is a condominium or townhouse, the project in which such Mortgaged Property is situated shall be approved by Lender.

    vii. The Mortgage Loan shall be originated so as to be closed utilizing MERS and be written on an approved MERS Mortgage.

    viii. All Mortgage Loans shall be originated so as to be closed by a title agency or settlement attorney and that no officer, employee or agent of Broker shall close any Mortgage Loan. Furthermore, all Mortgage Loans will close in the name of the Lender with funds provided by the Lender.

    ix. Broker shall pay all costs and expenses incurred by Broker including real estate appraisals, credit reports and any other costs and expenses in conjunction with the Mortgage Loan.

c. The Fee shall be designated in the Lock Confirmation as paid by Lender or paid by Borrower. Broker agrees to not accept any other compensation or fee from Borrower or any other source, other than the Origination Fee and shall return any excess fee received.

d. Broker will collect and assemble from applicants that information and documentation which is required by Lender to make a Mortgage Loan.

e. Broker shall comply with all applicable federal, state and local laws, regulations and ordinances as they relate to this Agreement, including without limitation, the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act and all federal, state and local laws, regulations and ordinances applicable to mortgage brokers, consumer protection, telephone solicitation and telemarketing. Broker shall obtain and maintain in force during the term of this Agreement all permits and licenses necessary to enable Broker to lawfully provide the Goods and perform the Services required under this Agreement.

f. Broker will administer the Mortgage Loan Application process in a manner consistent with customary business practices followed in the brokering of Mortgage Loans.

Initial_____

5. **LENDER'S OBLIGATIONS**

    a. Lender shall provide all applicable required disclosures and other documents related to a Mortgage Loan decision and, if applicable, the Mortgage Loan, directly to the applicant through postal mail or otherwise, and not through Broker.

    b. With regard to each Application and Mortgage Loan, Lender shall not request that Broker provide an appraisal of real estate unless the applicant has received the loan estimate or validly communicated their Intent to Proceed, pursuant to 12 CFR Part 1026.19(e)(2)(i)-(iii).

    c. Contemporaneous with the disbursement of the proceeds of the Mortgage Loan, Lender OR Escrow Agent at Lender's direction, shall pay any Lender paid Origination Fee for the Mortgage Loan by wire to the account designated by Broker from time to time upon disbursement of the Mortgage Loan proceeds to or for the benefit of the borrower, provided Broker has satisfied those conditions Lender has included in the direction to pay the purchase price.

    d. Notwithstanding anything contained in this Agreement to the contrary, Lender shall only be obligated to purchase the Originated Mortgage Loan for which a Lock Confirmation has been issued if Broker and the Mortgage Loan strictly conform to the terms of the Commitment, the Manual and this Agreement.  In the event a Mortgage Loan or Broker do not strictly comply with the terms of the Commitment, the Manual or this Agreement, Lender may, in its sole discretion, terminate the Commitment as it pertains to each Mortgage Loan which does not strictly conform or modify the terms of the Commitment to conform with the terms of each such Mortgage Loan by written notice to Broker.

6. **REPRESENTATIONS, WARRANTIES AND COVENANTS OF BROKER**  Broker represents, warrants and covenants to Lender, for each such Mortgage Loan origination delivered to Lender, and when any information is delivered by Broker to Lender relating to the Mortgage Loan and when the Mortgage Loan is closed as follows:

    a. Broker will comply with Broker's obligations in accordance with this Agreement;

    b. The brokerage fee charged to the borrower by Broker is reasonable compensation for the services rendered by Broker and is the customary and usual fee for such services in the community in which Broker and the principal residence of borrower is located;

    c. The execution and delivery of this Agreement by Broker, and the performance of the obligations hereunder by Broker, do not, and will not, violate any provision of any contract, law, rule, regulation, order, writ, judgment, injunction, decree, determination or award having applicability to Broker or the articles of incorporation, bylaws or other organizational documents of Broker;

    d. There are no pending or threatened actions against, or affecting, Broker or the properties of Broker before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Broker, would have a material adverse effect on the financial condition, properties or operations of Broker.

    e. Except as separately disclosed by Broker, Broker is not directly or indirectly involved in an Affiliated Business Arrangement as defined in Section 1024.15 of Regulation X promulgated pursuant to RESPA pertaining to the Mortgage Loan

    f. Broker is qualified and licensed by all federal, state and local governmental agencies to perform any and all services, agreements and obligations hereunder and Broker shall, during the term hereof, maintain such qualifications and licenses. Upon request, Broker shall deliver to Lender copies of said licenses at any time during this Agreement and Broker shall immediately notify Lender if any license is not renewed or is suspended or cancelled for any reason.

    g. If Broker is a bank, corporation, partnership, limited liability company or similar entity, Broker is validly existing and in good standing under the laws of the state in which it is organized and it is duly qualified to do business in each state wherein such qualification is necessary.

Initial_____

h. Broker has been duly authorized to enter into this Agreement and this Agreement has been duly executed by an individual authorized to do so on behalf of Broker.

i. Each Mortgage Loan was originated in compliance with applicable laws and requirements as set forth above.

j. In connection with each Loan Application submitted by Broker to Lender.

    i. Each loan application submitted by Broker to Lender hereunder has been fully investigated by Broker, all representations contained in such applications or in any documents related to the Mortgage Loan have been investigated by Broker and are true and correct.

    ii. Each document and all information BROKER provide to the LENDER in connection with an Application and a Mortgage Loan is complete and accurate, has been properly prepared and executed with copies delivered as required by law.

    iii. Each document BROKER furnishes to Lender in connection with an Application and a Mortgage Loan is bona fide, genuine, true, accurate, contains no misrepresentation of fact and is what it purports to be.

    iv. The Application and all other documents obtained by BROKER and delivered to LENDER in connection with an Application or Mortgage Loan

    v. purporting to be signed by the Applicant were executed by the Applicant and contain no forged or unauthorized signatures.

    vi. The real estate appraisals and credit reports delivered by Broker to Lender are accurate and reliable, were obtained from those appraisers and credit reporting agencies that are approved by Lender and were done in compliance with the Underwriting Guidelines, all governmental rules and regulations and those established by GSE's, all governmental agencies, including those rules of the loan program under which the loan was originated and submitted.

    vii. Broker has made prompt, timely, full, accurate and truthful disclosures to Lender of all facts, information and documentation of which Broker may know, suspect or have actual or constructive notice that could or has affected the validity, collectability, or enforceability of any Mortgage Loan including all facts, information and documentation relating to any disputes, proceedings, litigation or governmental action threatened, anticipated, or pending, respecting the borrowers, the Mortgaged Property, or the Mortgage Loan.

    viii. No mortgage broker, other than BROKER, has provided any services to an Applicant in connection with the Application.

    ix. Broker has complied with all applicable state and federal laws and regulations (including providing customers with disclosures as required), with respect to each application or Mortgage Loan, including, but not limited to, the Federal Fair Lending Act, Truth in Lending Act, RESPA, the Fair Housing Act, the Fair Credit Reporting Act, the Home Mortgage Disclosure Act, the Community Reinvestment Act, the Equal Credit Opportunity Act and their implementing regulations as amended from time to time.

k. As part of the broker's hiring procedures, checks are performed on all employees, including management, involved in the origination of mortgage loans (including application through closing), against the U.S. General Services Administration (GSA) Excluded Parties List, the HUD Limited Denial of Participation List (LDP) List and the Federal Housing Finance Agency (FHFA) Suspended Counterparty Program (SCP) list.

l. Broker shall notify the LENDER of any changes with their active users.

7. **REPRESENTATIONS, WARRANTIES AND COVENANTS OF LENDER** Lender represents, warrants and covenants to Broker, as follows:

a. Lender shall comply with all applicable state and federal laws and regulations including, but not limited to, providing all applicants and Mortgage Loan customers  with disclosures as required, with respect to each Application and Mortgage Loan, including, but not limited to, the Federal Truth in Lending Act, the Real Estate Settlement Procedures Act, the Fair Housing Act, the Fair Credit Reporting Act, the

Initial_____

Home Mortgage Disclosure Act, the Community Reinvestment Act, the Equal Credit Opportunity Act and their implementing regulations, as amended from time to time;

b. The execution and delivery of this Agreement by Lender, and the performance of the obligations hereunder by Lender, do not, and will not, violate any provision of any contract, law, rule, regulation, order, writ, judgment, injunction, decree, determination or award having applicability to Lender or the articles of incorporation, bylaws or other organizational documents of Lender;

c. There are no pending or threatened actions against, or affecting, Lender or the properties of Lender before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if determined adversely to Lender, would have a material adverse effect on the financial condition, properties or operations of Lender;

d. Lender is qualified and licensed by all federal, state and local governmental agencies to perform all services, agreements and obligations hereunder and Lender shall, during the term hereof, maintain such qualifications and licenses. Upon request, Lender shall deliver to Broker copies of said licenses at any time during this Agreement and Lender shall immediately notify Broker if any license is not renewed or is suspended or cancelled for any reason;

e. If Lender is validly existing and in good standing under the laws of the state in which it is organized, and it is duly qualified to do business in each state wherein such qualification is necessary;

f. Lender has been duly authorized to enter into this Agreement and this Agreement has been duly executed by an individual authorized to do so on behalf of Lender;

8. **BROKER'S NON-SOLICITATION**  For each Mortgage Loan, for seven (7) months following the date of closing of the Mortgage Loan, Broker shall not directly solicit the borrower to refinance the Mortgage Loan.  Broker shall not be deemed to directly solicit the borrower when Broker engages in general advertising to the public, including, by way of example and not limitation, television and newspaper advertising.

9. **CONFIDENTIALITY**

a. As used herein, "Confidential Information" means all information disclosed by a party ("Disclosing Party") to the other party ("Receiving Party"), whether electronically, orally or in writing.  Confidential Information shall include, but is not limited to, Application and Mortgage Loan customer information, the terms and conditions of the Agreement, as well as business and marketing plans, technology and technical information, product plans and designs, business and marketing plans, strategies and programs, employee and contractor lists and records, business methods and operating and production procedures, technical methodology, devices and processes, trade secrets, pricing, sales data, prospects and customer lists and information, supplier and vendor lists and information and terms of commercial contracts.

b. Each party shall: (a) use no less than commercially reasonable care to protect the confidentiality of the other party's Confidential Information and shall not use Confidential Information for purposes outside the scope of this Agreement; (b) not disclose the other party's Confidential Information to any third party; and (c) return or destroy, at the Disclosing Party's election, the Disclosing Party's Confidential Information upon termination or expiration of this Agreement. Furthermore, Lender will handle any Application and Mortgage Loan customer information in its possession pursuant to and only in compliance with this Agreement and applicable local, state and federal laws and regulations, including, but not limited to, the Gramm-Leach-Bliley Act (15 U.S.C. Section 6801, et seq.) and the implementing regulations thereunder.

Initial_____

    c.   The obligations set forth in this Section shall not apply to any Confidential Information which the Receiving Party can show: (a) is or becomes publicly available without breach of this Agreement; (b) that the Receiving Party has received from any third party in a legally permissible way without being bound by an obligation to preserve confidentiality; (c) by means of written records, that the Receiving Party already knew or has developed independently of disclosure under this Agreement; or (d) that the Disclosing Party otherwise authorizes in writing.

    d.   Notwithstanding the foregoing, the Receiving Party may disclose or preserve the Disclosing Party's Confidential Information: (a) on a confidential basis to legal or financial advisors; or (b) pursuant to the order, proceeding or requirement of a court, administrative agency, or other governmental body; provided that the Receiving Party gives the Disclosing Party adequate prior written notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure via a protective order or other measures deemed appropriate by Disclosing Party in its sole discretion.

    e.   The obligations set forth in this Section 7 shall survive any expiration or termination of this Agreement.

10.  **EARLY PAY OFF**.  In the event a Mortgage Loan is prepaid in full within two hundred ten (210) days after the Mortgage Loan was closed, Broker shall, upon written request by Lender, pay to Lender an amount equal to the amount Lender paid to Broker in connection with the Mortgage.

11.  **EARLY PAYMENT DEFAULT** In the event that the Borrower shall fail to make and pay any of the first four (4) payments prior to the end of the month in which the payment was due and such payment default continues for a period of ninety (90) days, Broker shall, upon written request by Lender, pay to Lender an amount equal to the amount Lender paid to Broker in connection with the Mortgage.

12.  **DEFAULT**   Upon the happening of any one or more of the following events, either party may terminate this Agreement, and shall have the other remedies specified herein:

    a.   Failure by either party to duly observe or perform in any respect any covenant, condition or agreement in this Agreement to be observed or performed for a period of thirty (30) days after written notice given to one party by the other party, specifying such failure and requesting that it be remedied;

    b.   Any representation of either party proves to be false or either party breaches any warranty given to the other party;

    c.    A decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against either party;

    d.   Either party consents to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, relating to all or substantially all of its property;

    e.   Either party admits in writing its inability to pay its debts generally as they become due, files a petition to take advantage of any applicable insolvency or reorganization statute, makes an assignment for the benefit of its creditors, or voluntarily suspends payment of its obligations;

    f.   Without the prior written consent of the other party, a party merges with any other entity, sells or otherwise disposes of all or substantially all of its property and assets or permits a change to occur in its ownership which would transfer effective voting control from persons who, on the date hereof, have voting control of the party;

Initial_____

    g.  Either party is reprimanded, suspended, placed on probation or has its license revoked by any federal or state agency;

    h.  Within twenty-four (24) months after the closing of a Mortgage Loan, Broker solicits the mortgagor to refinance the Mortgage Loan with Broker, in violation of this Agreement;

    i.  In the sole opinion of Lender, there is a substantial reduction in the net worth of the Broker, as compared to the net worth on the date hereof;

13.  **TERM AND TERMINATION** Either party may terminate this Agreement at any time, upon written notice to the other party, with or without cause.  This Agreement shall continue in full force and effect from and after the date hereof until terminated by either party. Upon termination, Lender may, at its sole option, proceed to make the Mortgage Loans in accordance with Applications submitted to Lender by Broker prior to the effective date of termination, or refuse to make such Mortgage Loans. Notwithstanding anything contained herein, Lender shall not be obligated to approve any Mortgage Loan or make any Mortgage Loan, including any time there has been a material adverse change in the creditworthiness of mortgagor or in any element of the transaction, as represented by mortgagor, Broker or anyone whatsoever. The termination of the Agreement shall not relieve either party from liability accruing hereunder for breach of any provision hereof or any representation proving to be false, and the obligations of the parties arising under Paragraphs 7, 8, 9 13 and 14 shall survive termination of this Agreement.

14.  **NONEXCLUSIVE REMEDIES; WAIVER Unless otherwise expressly provided, no remedy herein conferred or reserved is intended** to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Agreement or existing at law or in equity. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof.

15.  **REPURCHASE OF MORTGAGE LOAN** Lender shall notify Broker of any event set forth below which shall give rise to a demand for repurchase of the loan.  The Broker shall cure the defect, breach or misrepresentation within a period of thirty (30) days from the date the Broker discovers such defect or misrepresentation, or the date Lender notifies the Broker of the defect, breach or misrepresentation, whichever is sooner.  In the event any such defect, breach or misrepresentation is not cured within such thirty (30) day period, Broker shall repurchase the loan upon demand from Lender.  The following events, defects or breach shall give rise to the right to demand repurchase:

    a.  Borrower submits any document which is false or fraudulent,

    b.  Broker commits any act of fraud or misrepresentation and any such misrepresentation is not cured within such thirty (30) day period

    c.  The borrower of a Mortgage Loan fails to pay any of the first four (4) installments due after the closing or the transfer of the Mortgage Loan to Lender within sixty (60) days after its regularly scheduled due date,

    d.  A subsequent Investor in the Mortgage Loan demands that Lender repurchase the Mortgage Loan, then Broker shall, not later than ten (10) days after Lender's written demand, which demand may be made at any time after the expiration of the aforesaid thirty   (30) day period in the case of event (a) (b) or (c), or Lender receives a demand from such subsequent Lender to repurchase the related Mortgage Loan,

Broker shall repurchase the Mortgage Loan at a price equal to the sum of:

    a.  the principal balance remaining on such mortgage loan,

    b.  unpaid interest accruing on the unpaid principal balance to the date of such purchase,

    c.  the premium, if any, paid to Broker by Lender as a part of the price at which Lender purchased the Mortgage Loan,

    d.  the cost incurred by Lender in attempting to collect the Mortgage Loan or foreclose the Mortgage; and

Initial_____

e.  advances by Lender to protect the Mortgaged Property or the Mortgage.  Upon such purchase, Lender shall assign its interest in all appropriate Mortgage Loan documents to the Broker.  Lender's right to require repurchase of a Mortgage Loan may be exercised in addition to all other remedies available to Lender under this Agreement and shall not preclude such other remedial action.

16. **INDEMNIFICATION** Broker shall indemnify and hold Lender harmless from and against any and all loss, liability, claim, damage, cost and expense, including attorneys' fees, that Lender may sustain as a result of a) a breach by Broker of any of the warranties or representations contained in this Agreement, b) the failure by Broker to otherwise perform properly its services, duties and obligations under this Agreement, c) Broker's breach of or Default under the terms of this Agreement, d) fraud committed by the borrower, e) the unmarketability of the Mortgage due to any act or omission of Broker or borrower, or f) any circumstance which would give Lender the right to demand that Broker repurchase a Mortgage Loan.  Lender shall also have the right to require that Broker defend Lender, with counsel acceptable to Lender and counsel distinct from borrower's counsel if requested, from any and all such claims. This defense and indemnity obligation, and agreement to hold harmless shall survive the termination of this Agreement.  Broker further agrees to indemnify and hold Lender harmless from and against any and all loss, damage, costs, expenses (including attorneys' fees), obligations and liabilities that Lender may sustain because any Mortgage Loan does not strictly comply with the terms of this Agreement, Lender's Underwriting Guidelines or arising from the origination or processing of any Mortgage Loan.

17. **INDEPENDENT CONTRACTOR** In the performance of its duties or obligations under this Agreement or any other contract, commitment, undertaking or agreement made pursuant to the Agreement, Broker shall not be deemed to be the employee or agent of Lender and shall at all times take whatever measures are necessary to ensure that its status shall be that of an independent contractor operating as a separate entity.

18. **ENTIRE AGREEMENT; MERGER; ASSIGNMENT** This Agreement sets forth the entire understanding between the parties hereto and shall be binding upon all successors of both parties. Nevertheless, neither party shall have the right to assign any of its duties, obligations or rights under this Agreement without the prior written consent of the other, provided, however, that either party may assign its interest in the Agreement to any company controlling, controlled by or under common control with the assigning party.

19. **GOVERNING LAW; VENUE; JURISDICTION** This Agreement shall not be binding on Lender until Lender's acceptance of same at its offices in Michigan. Acceptance of the Agreement by Lender shall be deemed to have occurred in Michigan when the Agreement is signed by an authorized representative of Lender and delivered to Broker. This Agreement shall be construed in accordance with the laws of the State of Michigan and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws. Each party to this Agreement hereby consents to the exclusive jurisdiction and venue of the state and federal courts located in Michigan and herby submits to the personal jurisdiction of such courts.  The Parties agree that they will not raise, in connection with any such suit, action, proceeding or dispute brought in any such federal or state court, any defense or objection based upon lack of personal jurisdiction, improper venue and/or inconvenience of forum.

20. **WAIVER OF JURY TRIAL** Each of the parties hereto knowingly, voluntarily and intentionally waives any rights it may have to a trial by jury in respect of any litigation arising out of, under, or in connection with this agreement or any exhibit hereto or any course of conduct, course of dealing or statements (whether verbal or written) made by the parties herein.

21. **PARTIAL INVALIDITY** If any term, covenant, condition or provision of this Agreement shall, at any time or to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and each other

Initial_____

term, covenant, condition and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

22. **TIME; CAPTIONS** Time is of the essence hereof. The captions of the Sections of this Agreement have been inserted only for the purpose of convenience and such captions are not a part of this Agreement and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

23. **COUNTERPARTS** This Agreement may be executed in one or more counterparts, each of which counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

24. **AMENDMENT** This Agreement may not be amended, changed or modified except by an instrument in writing duly executed and delivered by the parties hereto.

25. **NOTICES** Any notices or other communications required or permitted under this Agreement shall be sufficiently given if in writing and (i) hand-delivered, including delivery by courier service, (ii) sent by email to the email address set forth beneath the signature of the party or (iii) sent by certified mail, return receipt requested, postage prepaid addressed to the recipient at the address stated in the first paragraph of this Agreement, or to such other address or email as the party concerned may substitute by written notice to the other. All notices hand-delivered or emailed shall be deemed received on the day of delivery. All notices by mail shall be deemed received on the date five (5) days (excluding Sundays and legal holidays when the U.S. mail is not delivered) immediately following date of deposit in the U.S. mail; provided, however, the return receipt indicating the date upon which the notice is received shall be prima facie evidence that such notice was received on the date of the return receipt. Addresses may be changed by giving notice of such change in the manner provided herein. Unless and until such written notice is received, the last address given shall be deemed to continue in effect for all purposes.

26. **FINANCIAL STATEMENT** Within ninety (90) days after the end of each fiscal year of Broker, Broker shall deliver to Lender its financial statements for the immediate previous fiscal year.

Signed the day and year first above written.

**Broker:**                                                **Lender:**

_____   **MICHIGAN MUTUAL, INC.**

**By:** _____   **By:** _____

**Printed:** _____   **Printed:** _____

**Its:** _____   **Its:** _____

          **"SELLER"**                              **"PURCHASER"**

Initial_____