## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Therisa D. Escue, Billy R. Escue, Jr., Kim Schelble, Brian P. Weatherill, Kenneth C. Morandi, Jill Jeffries, and Daniel Singh on behalf of themselves and all others similarly situated,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>United Wholesale Mortgage, LLC, UWM Holdings Corporation, SFS Holding Corp., and Mathew Randall Ishbia,<br><br>   *Defendants*. | Case No. 2:24-cv-10853-BRM-DRG<br><br>Hon. Brandy R. McMillion, United States District Judge<br><br>Hon. David R. Grand, United States Magistrate Judge |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' CONSOLIDATED MOTION FOR RELIEF UNDER RULE 11, 28 U.S.C. § 1927, AND THIS COURT'S INHERENT POWERS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF ISSUES PRESENTED.................................................. v

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................ vii

INTRODUCTION ....................................................................................... 1

LEGAL STANDARD.................................................................................. 2

ARGUMENT ............................................................................................... 3

    I.    Defendants' Accusation That Counsel Brings This Action  for an
          "Improper Purpose" Is Baseless and Itself Improper. ................................ 3

        A.    Defendants' Claim That Counsel Is Pursuing This Action in
              Service of a "Short-Selling Campaign" Is False............................. 3

        B.    Plaintiffs' Claims Are Not Frivolous, Which Itself Precludes a
              Finding That Counsel Acted with an Improper Purpose. .............. 6

        C.    None of the Remaining Complained of Conduct Demonstrates
              Counsel Filed the FAC for an Improper Purpose .......................... 7

    II.    Plaintiffs' Allegations Are Properly Based in Fact.................................. 11

    III.    Defendants Do Not Come Anywhere Close to Showing That the
          Statistical Analysis Referenced by Plaintiffs Is "Facially Unreliable."...19

CONCLUSION ........................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baker v. Urb. Outfitters, Inc.*,
  431 F. Supp. 2d 351 (S.D.N.Y. 2006) ................................................................10

*Draper & Kramer, Inc. v. Baskin-Robbins, Inc.*,
  690 F. Supp. 728 (N.D. Ill. 1988) ........................................................................3

*E.E.O.C. v. Pines of Clarkston, Inc.*,
  2014 WL 6612375 (E.D. Mich. Nov. 20, 2014) ............................................2, 11

*El-Khalil v. Tedeschi*,
  2023 WL 5827666 (E.D. Mich. Sept. 8, 2023) ....................................................5

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ...............................................................................................9

*Harrison Prosthetic Cradle Inc.* v. *Roe Dental Lab., Inc.*,
  608 F. Supp. 3d 541 (N.D. Ohio 2022) ................................................................1

*Hertel v. Mortg. Elec. Registration Sys., Inc.*,
  2013 WL 706903 (W.D. Mich. 2013) .................................................................10

*Hookom v. Sensor*,
  121 F.R.D. 63 (S.D. Ohio 1988) ..........................................................................2

*In re Amcast Indus. Corp.*,
  365 B.R. 91 (Bankr. S.D. Ohio 2007) ................................................................15

*In re Data Breach Sec. Litig. Against Caesars Ent., Inc.*,
  2024 WL 2959279 (D. Nev. June 12, 2024) .........................................................8

*James v. Caterpillar, Inc.*,
  824 F. App'x 374 (6th Cir. 2020) .........................................................................3

*Jerry Gradl Motors, Inc. v. ACV Auctions, Inc.*,
  2022 WL 949795 (W.D.N.Y. Mar. 30, 2022) .......................................................9

*Julian v. Lee*,
  2020 WL 4913481 (E.D. Mich. July 29, 2020) (Grand, M.J.) ...........................21

ii

*King v. Whitmer*,
   71 F.4th 511 (6th Cir. 2023) ..................................................... 9, 20, 21

*Knipe v. Skinner*,
   19 F.3d 72 (2d Cir. 1994) ...................................................................10

*Land v. Land*,
   222 N.C. App. 317, 2012 WL 3192605 (2012) ...................................15

*Lee v. Countrywide Home Loans, Inc.*,
   692 F.3d 442 (6th Cir. 2012) ...............................................................13

*Mendez v. Enecon Ne. Applied Polymer Sys., Inc.*,
   2015 WL 4249219 (E.D.N.Y. July 13, 2015)........................................9

*Odish v. Apple, Inc.*,
   2016 WL 931184 (E.D. Mich. 2016)....................................................10

*Okavage Grp., LLC v. UWM*,
   2024 WL 982380 (M.D. Fla. Feb. 6, 2024)..........................................13

*Rose v. Wash.*,
   2021 WL 3177307 (W.D. Mich. June 28, 2021) .................................18

*Sanchez v. City of Fresno*,
   914 F. Supp. 2d 1079 (E.D. Cal. 2012) ...............................................17

*Savignac v. Jones Day*,
   1:19-cv-02443, Minute Order (D.D.C. July 10, 2023) ..........................2

*Simpson v. Cal. Pizza Kitchen, Inc.*,
   2013 WL 12114487 (S.D. Cal. Oct. 23, 2013)......................................9

*Stanford v. Corbin*,
   2011 WL 893111 (E.D. Mich. Mar. 14, 2011) ......................................6

*Steele v. U.S.*,
   2015 WL 4121607 (D.D.C. June 30, 2015)............................................7

*Sussman v. Bank of Israel*,
   56 F.3d 450 (2d Cir. 1995) ...................................................................6

*Tahfs v. Proctor*,
    316 F.3d 584 (6th Cir. 2003) ...................................................................2

*Tolton v. Jones Day*,
    1:19-cv-00945, Minute Order (D.D.C. June 9, 2020) ...........................2

*UWM v. Am.'s Moneyline, Inc.*,
    2024 WL 1349301 (E.D. Mich. Mar. 29, 2024)....................................13

*White v. Gen. Motors Corp.*,
    908 F.2d 675 (10th Cir. 1990) .............................................................10

*White v. Med. Rev. Inst. of Am., LLC*,
    2022 WL 2905665 (D. Utah July 22, 2022) ..........................................8

*Zangara v. Travelers Indem. Co. of Am.*,
    2006 WL 8553018 (N.D. Ohio July 20, 2006)....................................20

## Other Authorities

E.D. Mich. L.R. App'x,
    *In re: Civility Principles*, Admin. Order No. 08-A0-009 (Jan. 23, 2008)......5, 11

## Rules

Fed. R. Civ. P. 11 ........................................................................... 2, 3, 19

Fed. R. Civ. P. 8 ..................................................................................15

## Treatises

Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse*
    § 14(D)(6) (6th ed. 2023)......................................................................3

**<u>STATEMENT OF ISSUES PRESENTED</u>**

1.   Do Defendants establish that Plaintiffs brought this action for an improper purpose?

>    Plaintiffs' answer: No

>    Defendants' answer: Yes

>    This Court should answer: No

2.   Do Defendants establish that Plaintiffs failed to conduct a reasonable inquiry prior to filing?

>    Plaintiffs' answer: No

>    Defendants' answer: Yes

>    This Court should answer: No

3.   Do Defendants establish that any of Plaintiffs' factual allegations are facially unreliable?

>    Plaintiffs' answer: No

>    Defendants' answer: Yes

>    This Court should answer: No

4.   Should the Court impose sanctions on Plaintiffs under Fed. R. Civ. P. 11?

>    Plaintiffs' answer: No

>    Defendants' answer: Yes

>    This Court should answer: No

5.      Should the Court impose sanctions on Plaintiffs under 28 U.S.C. § 1927?

       Plaintiffs' answer: No

       Defendants' answer: Yes

       This Court should answer: No

6.      Should the Court use its inherent power to impose sanctions on Plaintiffs?

       Plaintiffs' answer: No

       Defendants' answer: Yes

       This Court should answer: No

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

**Cases:**

*James v. Caterpillar, Inc.*,
   824 F. App'x 374 (6th Cir. 2020)

*Tahfs v. Proctor*,
   316 F.3d 584, 594 (6th Cir. 2003)

*E.E.O.C. v. Pines of Clarkston, Inc.*,
   2014 WL 6612375 (E.D. Mich. Nov. 20, 2014)

**Rules & Statutes:**

FED. R. CIV. P. 11

28 U.S.C. § 1927

## <u>INTRODUCTION</u>

Defendants are entitled to present a zealous and vigorous defense in this case. If they wish to contest legal theories, they can file a motion under Rule 12 (and they have). If they believe the facts do not ultimately support the allegations, they can later move for summary judgment. But what they cannot do is abuse Rule 11 by making specious allegations of professional misconduct as a tactic intended to prematurely litigate the merits of the case. "Threatening sanctions casually or as a matter of course has no place among officers of the court…except in the most egregious cases and, then, only as a last resort." *Harrison Prosthetic Cradle Inc. v. Roe Dental Lab., Inc.*, 608 F. Supp. 3d 541, 551 (N.D. Ohio 2022).

The fact that Defendants' Rule 11 motion is an unprofessional litigation tactic is clear from the broad and disparate scope of its claims: it reads as an omnibus motion to dismiss and for summary judgment.  Worse, it is premised on repeated allegations for which Defendants have no factual basis and littered with misleading statistical red herrings that fail to establish even the irrelevant points they attempt to make.  And all of this is framed as an accusation that their *adversaries* violated their duties of professional conduct. But if anything, the reverse is true. This is plainly improper gamesmanship, and for the reasons set forth below, the Court should reject the motion and consider imposing costs and attorneys' fees against Defendants for submitting a motion that is transparently inappropriate under Rule 11.

1

## LEGAL STANDARD

A pleading-stage Rule 11 motion cannot succeed unless the defendant meets an even "higher threshold of proof" than the burden applicable on summary judgment. *E.E.O.C. v. Pines of Clarkston, Inc.*, 2014 WL 6612375, at *2 (E.D. Mich. Nov. 20, 2014). It is "not enough" to show that plaintiffs' claims fail as a matter of law. *Id.* Rather, a "defendant must … prove[e] that plaintiffs' claims are 'not warranted by existing law . . .' and that the factual contentions lack any evidentiary support." *Id.* (citing Fed. R. Civ. P. 11(b)). Put differently, the defendant must prove the complaint was "so lacking in merit that its pursuit could be said to be objectively unreasonable." *Id.* Sanctions may only be imposed when they are "clearly warranted." *Tolton v. Jones Day*, 1:19-cv-00945, Minute Order (D.D.C. June 9, 2020); *Savignac v. Jones Day*, 1:19-cv-02443, Minute Order (D.D.C. July 10, 2023).

District courts should be especially "hesitant" to find violations of Rule 11 at the pleading stage because "ordinarily there is little or no evidence before the court at all." *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003); *see also Hookom v. Sensor*, 121 F.R.D. 63, 64 (S.D. Ohio 1988) ("No litigant should be faced with sanctions without an opportunity to conduct appropriate discovery."). Moreover, Rule 11 motions aimed at testing "the legal sufficiency or efficacy of allegations in the pleadings" must be denied. *James v. Caterpillar, Inc.,* 824 F. App'x 374, 378 (6th Cir. 2020) (quoting Fed. R. Civ. P. 11, 1993 Advisory Comm. Notes).

"Rule 11 is not a toy." *Draper & Kramer, Inc. v. Baskin-Robbins, Inc.*, 690 F. Supp. 728, 732 (N.D. Ill. 1988). "[A] Rule 11 violation is a serious thing, and an accusation of such wrongdoing is equally serious." *Id.* Parties that file frivolous Rule 11 motions may be sanctioned themselves. *See* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* § 14(D)(6) (6th ed. 2023). And under Rule 11(c)(2), "[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion."

## ARGUMENT

I.  **Defendants' Accusation That Counsel Brings This Action for an "Improper Purpose" Is Baseless and Itself Improper.**

A.  **Defendants' Claim That Counsel Is Pursuing This Action in Service of a "Short-Selling Campaign" Is False.**

Counsel brings this action on behalf of Plaintiffs and the putative class for one purpose: to seek recourse for Plaintiffs and the thousands of consumers (American homeowners) harmed by Defendants' misconduct. Rather than address the substance of that misconduct through proper motion practice, Defendants have filed a series of motions asserting that Counsel purportedly conspired to pursue "an unwarranted financial windfall" and suggesting—with no good faith basis for doing so—that Counsel may be sharing in profits from "shorting" UWM's stock. *See* Consolidated Motion ("Mot."), ECF No. 51 at PageID.2573–77. That accusation is false.

3

To support their "improper purpose" argument, Defendants rely on nothing more than rank speculation about "Counsel's financial interests in this suit," wondering aloud about who might be paying Counsel's fees and whether the entire suit might have been brought "in furtherance of a short-selling scheme." *Id.* at PageID.2568, 2575–77. In the face of Defendants' unfounded accusations, Counsel will reiterate, pursuant to their continuing Rule 11 obligations and duty of candor to this Court: Counsel and Plaintiffs—without qualification—had complete control over the decision to file this action and the timing and substance of the pleadings; Counsel have no interest in this action other than as Plaintiffs' counsel; no Hunterbrook entity is paying Counsel anything or funding this action; and Counsel has no interest—*none*—in any trade by any Hunterbrook entity on UWM's stock.

Because Defendants do not know the facts, they use their Rule 11 Motion to request that the Court compel disclosure of any agreement with a Hunterbrook entity. *See id.* at PageID.2576. But as Counsel informed Defendants' counsel during meet-and-confer efforts, if Defendants believe such information is relevant and discoverable they must first request the disclosure through written discovery pursuant to Rule 26. Plaintiffs have no objection to scheduling a Rule 26(f) conference and commencing discovery. And, to be clear, Counsel has no objection to providing this Court its agreement for *in-camera* review. Should the Court so

4

desire, it will see that Counsel's sole purpose in this action is pursuing relief on behalf of named Plaintiffs and the putative class.

Moreover, Defendants' assertion that the filing of this lawsuit had the so-called "intended negative effect on UWM's stock price" is false. Plaintiffs filed this action on April 2, 2024 at 5:42 PM, *after the market closed*. Ex. C, (Hubbard Decl.), at Ex. 1. On April 3 and thereafter, the price of UWM's stock *rose* and did not return to its April 2nd value until November 13, 2024, more than seven months later. Ex. 2.

Advocates before this Court are expected to comply with basic principles of civility.[1] Defendants' successive Rule 11 motions contradict them. Defendants lob misguided accusations of improper conduct based solely on conjecture, pointing to common practices such as issuing preservation letters as if such routine conduct evidences an improper purpose. Because Defendants submit no evidence warranting their drastic motion, this sideshow should end so the parties can litigate the merits.[2]

---

[1] Defendants' Motion compels Plaintiffs to highlight two such principles: (1) "We will not, absent good cause, attribute bad motives or improper conduct to other counsel or bring the profession into disrepute by unfounded accusations of impropriety." And (2) "We will not seek court sanctions without first conducting a reasonable investigation and unless fully justified by the circumstances and necessary to protect our client's lawful interests." E.D. Mich. L.R. App'x, *In re: Civility Principles*, Admin. Order No. 08-A0-009, at 2, ¶¶ 4, 5 (Jan. 23, 2008).

[2] UWM also invokes 28 U.S.C. § 1927 which may apply only where an attorney "so multiplies the proceedings in any case unreasonably and vexatiously." UWM does not (and cannot) explain how Counsel purportedly "multiplied the proceedings" simply by filing and amending the complaint pursuant to a stipulated order. *See e.g., El-Khalil v. Tedeschi*, 2023 WL 5827666, at *8 (E.D. Mich. Sept. 8, 2023) ("[C]ourts in this district have declined to award sanctions under § 1927 based on the filing of allegedly frivolous claims in an initial complaint.").

5

**B.    Plaintiffs' Claims Are Not Frivolous, Which Itself Precludes a Finding That Counsel Acted with an Improper Purpose.**

Because Defendants cannot establish the First Amended Complaint ("FAC") is frivolous, a finding of improper purpose is precluded. *Sussman v. Bank of Israel*, 56 F.3d 450, 458 (2d Cir. 1995) ("[A] determination of improper purpose must be supported by a determination of frivolousness when a complaint is at issue."); *see also Stanford v. Corbin*, 2011 WL 893111, at *4 (E.D. Mich. Mar. 14, 2011). The claimed deficiencies Defendants raise are addressed in detail below. But in assessing whether the FAC is frivolous, it is telling that Defendants do not even contest— much less establish as frivolous—Plaintiffs' core allegations, including that:

- Mat Ishbia, UWM, and the corrupted loan officers who took part in the scheme made persistent representations that "[b]rokers are independent," and that consumers should "go to findamortgage.com" because the loan officers found there "shop on your behalf." FAC ¶¶ 40, 42, 45, 47, 49–53, 155.

- Such statements were false, misleading, and made with the intent to induce borrowers to hire loan officers that would funnel loans "to UWM without shopping for loans in their borrower-clients' best financial interests." *Id.* ¶¶ 119, 122, 130, 132, 134, 146–48, 169.[3]

- The purpose and effect of this unscrupulous conduct was to cause Plaintiffs to pay for brokers who were not providing the core functions they advertised and were hired to perform, including to exercise independent judgment, shop on borrowers' behalf, disclose material facts, and not maintain secret loyalty to a single lender. *Id.* ¶¶ 152, 155, 159–62, 211, 216–17, 224, 251–53, 272–74, 277, 300–301.

---

[3] The closest Defendants come to addressing these points is their reference to the Truth in Lending Act ("TILA") and a challenge to the number of corrupted brokers. Mot. at PageID.2581–82. Those arguments factually are wrong and cannot remotely serve as bases for sanctions in any event. *See* Part II, below.

- Defendants' tactics were intended to cause, and did cause, a steadily increasing proportion of mortgage loan officers and brokers to refer the vast majority of their borrower-clients to UWM, such that in 2023, of the 30,229 loan officers who sent at least one loan to UWM, 12,936 loan officers sent more than 75% of their loans to UWM. *Id.* ¶¶ 130–37.

- Plaintiffs suffered *multiple* forms of harm, including because they paid for but did not receive the benefit of their broker's "independent" and loyal service, while Defendants and the participating brokers richly profited from their deceptive and misleading conduct. *Id.* ¶¶ 190–2, 195–96, 198, 223–24, 227–29, 252–53, 256–58, 260, 277–78, 283–84, 307–08, 311–13.

Simply put, Defendants' motion does not show—or even try to show—that Plaintiffs' RICO, RESPA, and range of state law claims are frivolous. For this reason alone, Defendants' Motion pursuant to Rule 11(b)(1) should be denied.

### C.   None of the Remaining Complained of Conduct Demonstrates Counsel Filed the FAC for an Improper Purpose

Without any factual basis to allege an improper purpose, Defendants attempt to concoct what they claim is circumstantial evidence to support their theory. Those spurious claims do not withstand scrutiny.

For example, Defendants erroneously rely on the timing of the filing of the Complaint following Hunterbrook Media's publication of its investigation. Yes, the instant action was filed shortly after the story was published. But there is nothing improper about that. The timing of the filing was for an independent, obvious, and legitimate purpose—being the first to file a class action complaint is a relevant consideration when selecting and appointing class counsel. *See, e.g.*; *Steele v. U.S.*, 2015 WL 4121607, at *4 n.2 (D.D.C. 2015) ("[I]t would be imminently reasonable

7

to select [counsel] on the basis that their complaint was filed first"); *see also White*

*v. Med. Rev. Inst. of Am., LLC*, 2022 WL 2905665, at *2 (D. Utah 2022) ("Where

consideration of other relevant factors does not tilt heavily in either

direction…courts may also consider which party was first to file a complaint")

(citations omitted) (collecting cases). Counsel's filing of the Complaint came after

substantial investigation, including but not limited to reviewing and analyzing

extensive amounts of data, working directly with an expert and other industry

professionals to develop the allegations, and interviewing actual borrowers and loan

officers with experience in the wholesale market to verify the allegations.[4] Indeed,

it is no secret that, after the publication of serious and credible allegations against a

company, counsel to harmed consumers seek to file first. There is nothing wrong or

surprising about that—the law supports it. *In re Data Breach Sec. Litig. Against*

*Caesars Ent., Inc.*, 2024 WL 2959279, at *6 (D. Nev. 2024) ("[B]eing first to file

bears out a proposed team's preparation and commitment to prosecuting the case").

Defendants also point to investigative communications to putative class

members as purported evidence of an improper purpose. That contention fails given

that "[p]laintiffs generally have a right to contact members of the putative class."

*Mendez v. Enecon Ne. Applied Polymer Sys., Inc.*, 2015 WL 4249219, at *2

---

[4] As reflected in the FAC, these efforts did not cease with the filing of the initial
Complaint, and Counsel have continued to refine the allegations and add plaintiffs
as additional facts and injured borrowers come to light.

8

(E.D.N.Y. 2015) (citation omitted); *see also Jerry Gradl Motors, Inc. v. ACV Auctions, Inc.*, 2022 WL 949795, at *6 (W.D.N.Y. 2022) ("Plaintiffs have a right to seek information from putative class members, including evidence in support of their claims") (cleaned up). The complained of communications were made for that investigative purpose.[5] *See* ECF No. 51-44 at PageID.3170–71. Simply put, the communications "did not show that counsel were motivated by improper purposes such as harassment or delay," and thus are "irrelevant to the district court's inquiry." *King v. Whitmer*, 71 F.4th 511, 520 (6th Cir. 2023) (cleaned up); *Simpson v. Cal. Pizza Kitchen, Inc.*, 2013 WL 12114487, at *4 n.2 (S.D. Cal. 2013) (alleged improper client solicitation is "not relevant to a Rule 11 sanctions determination").

Finally, Defendants grasp onto preservation letters Counsel issued to individuals and entities possessing relevant information because that routine litigation communication apparently "publicized" Plaintiffs' already-public claims. But the recipients of those letters funneled at least 90% of their loans to UWM in one or more years since 2021. As such, they indisputably are percipient witnesses and potential defendants. Ex. A, Gibbons Decl. ¶ 17. And Counsel only issued those letters after Counsel learned that UWM had removed evidence from the public

---

[5] If Defendants genuinely take issue with the contents of these communications, the proper course is to seek, under Rule 23(d), "a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981).

domain and at least one loan officer harassed a named Plaintiff. *See* ECF No. 51-44 at PageID.3173. Like all of Counsel's actions, the preservation letters were transmitted solely to advance the interests of Plaintiffs and putative class members and does not evidence an improper purpose.[6]

To summarize the now-protracted sanctions proceeding, Counsel has repeatedly affirmed they bring this action for the sole purpose of vindicating their clients' and the putative class members' rights. Still, Defendants continue to assert Counsel is lying—that Counsel's purpose in pursuing this action is really to reap "an unwarranted financial windfall" by advancing a purported "short-selling campaign[]." Mot. at PageID.2574–77. To support that audacious assertion, Defendants can only muster (i) unfounded conjecture about an agreement through which Counsel received evidence of Defendants' wrongdoing and (ii) groundless

---

[6] Given Defendants' overly aggressive posturing in bringing this Motion, it is unsurprising the cases on which they rely are readily distinguishable. *Kramer v. Tribe*, 156 F.R.D. 96, 110 (D.N.J. 1994) did not find that sending preservation letters and complaints to witnesses evidences improper motive, but sanctioned the plaintiff's efforts "to dragoon a settlement" of "meritless harassing law suits." Similarly, in *White v. Gen. Motors Corp.*, 908 F.2d 675, 683 (10th Cir. 1990), the court found an improper purpose where the plaintiff's claims were frivolous and the plaintiff made "prefiling threats to contact the media." In *Baker v. Urb. Outfitters, Inc.*, 431 F. Supp. 2d 351, 365–66 (S.D.N.Y. 2006), the sanctioned attorney was "pursuing an unwarranted financial windfall" because he had actual knowledge the submitted damages figure was unsupportable, while also stating he was pursuing the action, in part, because the defendants were "deep pocketed." Both *Hertel v. Mortg. Elec. Reg. Sys. Inc.*, 2013 WL 706903, at *7 (W.D. Mich. 2013) and *Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994), involved repetitive filings of frivolous complaints that evidenced an improper purpose. And in *Odish v. Apple, Inc.*, 2016 WL 931814, at *3 (E.D. Mich. 2016), the plaintiff was sanctioned for pursing claims he knew were precluded by a final judgment entered a month prior.

10

complaints about routine pre-litigation conduct. Those submissions fall well short of the good cause necessary to "attribute bad motives or improper conduct to other counsel." *In re: Civility Principles*, Admin. Order No. 08-A0-009, at 2, ¶ 4 .

Mindful of this Court's Civility Principles and the laudable goals they are meant to achieve, Plaintiffs will not respond by speculating why experienced Defense counsel continues to pursue this meritless, irresponsible line of attack. But Plaintiffs respectfully submit that Defendants' successive Rule 11 motions over the last seven months have been a waste of time and resources, and the Court should put a decisive end to this needless diversion.

## II.     Plaintiffs' Allegations Are Properly Based in Fact.

In a thinly veiled attempt to litigate the merits prematurely, Defendants accuse Plaintiffs' counsel of having filed pleadings that "are rife with blatant factual and legal errors" and having failed to conduct a reasonable inquiry before doing so. Mot. at PageID.2577–87. Those accusations are not only wrong—they are themselves an abuse of Rule 11. Defendants' scattershot assertions—which do not even attempt to challenge the foundation for the vast majority of the FAC's allegations—come nowhere close to proving this action is "wholly lacking in arguable legal merit" or that the factual allegations are "completely unwarranted by the evidence." *Pines of Clarkston*, 2014 WL 6612375, at *1.

11

*All-In Provision.* Defendants claim there is "no basis" for Plaintiffs' allegation that the "All-In Provision" in UWM's Wholesale Broker Agreement "meaningfully restrict[s] [brokers'] ability to shop for mortgage loans in [Plaintiffs'] best interest[s]." Mot. at PageID.2580 (original alterations). That is absurd. The FAC quotes the relevant contract language in full, which requires all brokers working with UWM to "not submit loans" to two other lenders and to pay thousands of dollars in liquidated damages for each and every "breach" of the provision. FAC ¶¶ 77–79. Indeed, UWM *concedes* that purpose and effect of the provision is to cause "brokers who work with UWM to refrain from working with" those two other lenders. Mot. at PageID.2580. In a future summary judgment motion, UWM can replicate the (meritless) argument it makes here; that is, its claim that the All-In provision purportedly does not "*meaningfully*" restrict brokers' shopping ability.[7] But the notion that Plaintiffs' allegation is "completely unwarranted by the evidence" is baseless. The FAC contains a detailed factual basis for the allegation, including not only contemporaneous evidence from industry publications but also admissions from Mr. Ishbia himself. FAC ¶¶ 80–81; *see also* Ex. 4, Ishbia Facebook Tr.[8]

---

[7] That argument will fail for numerous reasons, including because one of the two lenders targeted by the provision is UWM's largest competitor—Rocket Mortgage—which originates a significant percentage of wholesale loans in the market and often offers more competitively priced options compared to UWM. *E.g.*, FAC ¶¶ 66–68, 151, 234, 287, 316.

[8] UWM's suggestion that Plaintiffs' claims are sanctionable because two courts dismissed Sherman Act claims concerning "All-In" provision is obviously wrong. Mot. at PageID.2580. The claims in those cases were brought by brokers—not

*Federal Disclosures.* Defendants next assert that certain federally mandated "anti-steering" disclosures "contradict" the Complaint's "central thesis." Mot. at PageID.2581. Defendants do not explain which elements of Plaintiffs' claims (if any) these disclosures allegedly "contradict." In any event, their assertion is wrong.

In particular, Defendants assert that the FAC relies entirely on a theory that brokers are required to survey the entire "universe of wholesale lenders" each time they suggest a loan to a borrower. *Id.* That is not what Plaintiffs allege. Rather, Plaintiffs allege Defendants violated their obligations under the common law, state statutes, and federal statutes not to engage in a pattern of fraud, misrepresentation, and commercial bribery; not to provide things of value to brokers to influence their judgment; not to intentionally mislead and withhold information from borrowers or to induce brokers to do so; and not to engage in unfair and deceptive acts under state law. The anti-steering disclosures do not create a safe harbor for Defendants to engage in that misconduct. *See, e.g.*, *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 452 (6th Cir. 2012) (denying defendant broker summary judgment on state civil conspiracy claim for deficient disclosures while granting motion on TILA disclosure claim). If anything, these "disclosures" corroborate the allegations that Plaintiffs

---

borrowers, like Plaintiffs—and were dismissed due to inadequate allegations of UWM's market dominance, which is not an element of any claim here. *See Okavage Grp., LLC v. UWM*, 2024 WL 982380, at *12–18 (M.D. Fla. Feb. 6, 2024); *UWM v. Am.'s Moneyline, Inc.*, 2024 WL 1349301, at *2–4 (E.D. Mich. Mar. 29, 2024).

were under the misimpression that their brokers were "independent" and "regularly do[] business" with multiple lenders when the unchallenged funneling statistics show that is untrue. ECF No. 51-48, 51-49, 51-50; FAC ¶¶ 160, 217, 443.

***"Corrupt" Brokers.*** Defendants also incorrectly claim the FAC mischaracterizes some loan officers as "corrupted" where they originated only one loan with UWM in 2023. Mot. at PageID.2581–82. This plainly is not a basis for sanctions. First, the FAC does not allege or imply that UWM corrupted loan officers who originated only one loan with UWM. To the contrary, it defines the putative class as consisting of borrowers whose loan officers originated at least five loans with UWM. FAC ¶ 328. Second, Defendants' statistical argument is a red herring. Looking only at loan officers and brokers who originated at least five loans, the same problem presents: there is a shocking volume of brokers funneling an enormous amount of UWM loans (over $31 billion worth), and the concentration of corrupted brokers is increasing each year. *Id.* ¶¶ 135–37; Ex. A ¶¶ 9–10. Defendants notably do not challenge the propriety (or veracity) of those allegations.

***Aiding and Abetting Breach of Fiduciary Duty Claims.*** Defendants further claim that Plaintiffs' aiding and abetting breach of fiduciary duty claim (Count 4) warrants sanctions because four states—North Carolina, Ohio, Louisiana, and Alabama—purportedly "do not recognize that tort at all." Mot. at PageID.2583. But that is incorrect. Both Ohio and North Carolina courts have held that claims for

aiding and abetting breach of fiduciary duty are viable or potentially viable.[9] And Defendants have not cited authority from Alabama or Louisiana conclusively foreclosing aiding and abetting liability—the "Erie guess" depends on how the supreme courts in those states would rule and trial court rulings are not dispositive.

More fundamentally, Defendants mistakenly assert that Plaintiffs assert aiding and abetting claims "based on the laws of every state." *Id.* At this stage, however, Plaintiffs are asserting claims only under their own states' laws on their own behalf. While they eventually intend to move for class certification under Rule 23 to represent similarly situated borrowers from additional states, they have not yet done so and those issues are not before the Court. Moreover, Plaintiffs are permitted to plead class allegations in the alternative, *see* Fed. R. Civ. P. 8(d)(2)–(3), and Defendants ignore that Plaintiffs plead an alternative multi-state subclass, FAC ¶ 329, which omits the states about which Defendants complain.

***Plaintiff-Specific Allegations.*** Finally, Defendants take aim at a handful of allegations specific to certain Plaintiffs, claiming they are "false" and "baseless." Mot. at PageID.2583–87. Here again there is simply no merit in Defendants' claims.

---

[9] *See In re Amcast Indus. Corp.*, 365 B.R. 91, 112 (Bankr. S.D. Ohio 2007) (finding that Ohio law recognized a cause of action for aiding and abetting breach of fiduciary duty by adopting the Restatement (Second) of Torts); *Land v. Land*, 222 N.C. App. 317, 2012 WL 3192605, at *8 (2012) (noting it was an open issue whether North Carolina recognizes aiding and abetting breach of fiduciary duty).

_Morandi (FAC ¶ 275)_. Defendants claim the FAC "falsely alleges" that the loan officer who originated Plaintiff Morandi's mortgage, Garrett Todd, "signed UWM's Wholesale Broker Agreement." Mot. at PageID.2583 (citing FAC ¶ 275). Defendants insist he "**did not**." _Id._ (citing Todd Declaration, ECF No. 51-66) (emphasis in original). Even if that were true, Plaintiffs had a reasonable basis to allege he signed it. UWM has repeatedly stated that accepting the Agreement is a non-negotiable condition for originating loans with UWM. _See, e.g._, FAC ¶¶ 81, 83; Ex. 4 at 6. And because the identity of the Agreement's signatories is non-public and entirely within UWM's control, no "reasonable inquiry" could have uncovered contrary information. _See_ Joseph, _supra_, § 8(A)(4) ("if pertinent facts are lodged in the possession of opponents or uncooperative third parties … the courts will recognize that as a practical limitation on what a reasonable inquiry may include").

In addition, **neither Defendants nor Todd dispute that Todd was legally bound under the Agreement**. Rather, they only dispute whether Todd personally "signed" the Agreement (as opposed, for example, to whether his brokerage firm, Katzman Enterprises, signed it instead). If Todd's firm, for instance, was bound to the Agreement (which Defendants do not dispute), then Todd was bound under the Agreement when acting within the scope of his agency, regardless of whether he personally signed the Agreement or not. _See Sanchez v. City of Fresno_, 914 F. Supp.

16

2d 1079, 1120 (E.D. Cal. 2012) ("non-signatories may be bound by the terms of an agreement if they are agents of a signatory").

Further, even if Todd was *not* bound under the Agreement—and again, Defendants do not even contend as much—that would have *no bearing* on the merits of Morandi's claims. Between 2021 and 2023, Todd originated 326 mortgage loans—301 of which (or over 92%) went to UWM. Ex. 5. *None* went to Rocket or Fairway. *Id.* Todd disputes none of this in his Declaration. ECF No. 51-66. If Todd is failing to shop independently despite *not* being bound under any contract with UWM, that would only underscore the power of UWM's non-contractual incentives as outlined in the FAC. In any event, none of Morandi's claims turns solely on the existence of a contract between Todd and UWM, so the non-existence of such a contract would not defeat any of his claims.

*Schelble and Morandi (FAC ¶¶ 230, 282)*. Defendants also attack the allegations that Plaintiffs Schelble and Morandi "did not realize, at any point prior to closing, that [they] would be paying [thousands of dollars for] 'discount points' as a condition of securing [their] interest rate[s]," and that no one "ever discussed 'points' with [them]." Mot. at PageID.2583–85. Defendants claim those allegations are "directly contradicted" by closing disclosure forms, which they claim were presented to Plaintiffs Morandi and Schelble well in advance of their closings. *Id.* But that is wrong. Plaintiffs Morandi and Schelble do not allege they were unaware

17

they would be paying "discount points." Rather they allege their loan officers never "explained that [their] interest rate[s] [were] conditioned on [their] purchase of 'points'" or, "that in achieving a lower interest rate by paying for 'points,' [they] would end up with a loan that was significantly more expensive overall than substantially similar alternatives available in the market." FAC ¶¶ 230, 282. Nothing in Defendants' motion proves those allegations are untrue, much less sanctionable.[10]

*Escues (FAC ¶ 202)*. Next, Defendants assert that the FAC's "new liability theory" concerning the non-disclosure of a price increase applied to the Escues' loan is "demonstrably false." Mot. at PageID.2586. Specifically, Defendants claim that the Escues' loan was classified as a "cash-out refinance" loan, and therefore subject to additional price increases, not because the loan provided them $2,452.89 cash back at closing, but because the loan was part of a larger debt restructuring transaction. *Id.* at PageID.2586. But that irrelevant detail, even if true, proves nothing. The FAC presents no "new liability theory." Rather, the Escues, like the other Plaintiffs, allege they were damaged because they obtained a higher-priced UWM loan that was originated through a broker whom they believed was

---

[10] While Todd's Declaration disputes the allegation as to Plaintiff Morandi (*see* ECF No. 51-66 ¶ 7), untested, self-serving factual assertions in a declaration are insufficient to establish facts in a pre-discovery Rule 11 motion. *See, e.g.*, *Rose v. Wash.*, 2021 WL 3177307, at *2 (W.D. Mich. June 28, 2021) (denying Rule 11 motion where movant "failed to provide any evidence" to demonstrate falsity of non-movant's assertions "apart from his own self-serving statements").

18

"independent" and acting in their best interest, but who was in fact a UWM-loyalist

steering loans to UWM in exchange for valuable benefits. FAC ¶¶ 193, 197–201,

203–04. The excess expense of the Escues' loan is evident in the fact that their

3.499% interest rate for their 18-year loan was substantially closer to the 30-year

benchmark (3.55%) than the 15-year benchmark (2.77%). *See* FAC ¶ 201. Even if

Defendants ultimately can prove that the Escues would have been subject to a "cash-

out refinance" price increase regardless of the amount they received at closing, the

Escues' claims remain meritorious: they were deceived into hiring a UWM-loyalist

broker, deprived of honest services, and ended up paying above-market mortgage

costs as a result.[11]

## III.    Defendants Do Not Come Anywhere Close to Showing That the Statistical Analysis Referenced by Plaintiffs Is "Facially Unreliable."

Defendants' claim that Plaintiffs should be sanctioned based on the purported

unreliability of the statistical analysis referenced by Plaintiffs is meritless.

---

[11] Separately, Defendants continue to take issue with allegations in five paragraphs of Plaintiffs' original complaint, which do not appear in the FAC. Mot. at PageID.2578–79. As Plaintiffs explained previously, Defendants' contentions with respect to those allegations do not affect the merits of any Plaintiffs' claims. *See* ECF No. 28 at PageID.1460–63. Nonetheless, out of an abundance of caution, Plaintiffs modified or withdrew certain of these allegations when they filed the FAC. Defendants' effort to seek sanctions on the basis of these allegations is meritless and also flagrantly improper under Rule 11's safe harbor provision.  Fed. R. Civ. P. 11(c)(2) (a Rule 11 motion "must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected"); Advisory Committee Note to the 1993 Amendment to Rule 11, reprinted in 146 F.R.D. 577, 591 (1993) ("the timely withdrawal of a contention will protect a party against a motion for sanctions").

*First*, Defendants ignore the applicable legal standard. This is a pleading-stage motion for sanctions under Rule 11. It is neither a motion for summary judgment nor a *Daubert* motion. To obtain the relief they seek under Rule 11, Defendants must prove that Plaintiffs' "factual contentions lack any evidentiary support" such that continued pursuit of this action is "objectively unreasonable." *Pines of Clarkston*, 2014 WL 6612375, at *2. Attorneys are "rarely sanctioned" when their pleadings rely on an expert's analysis because "consulting an expert is itself a way to investigate a claim's factual plausibility." *King*, 71 F.4th at 522; *see also Zangara v. Travelers Indem. Co. of Am.*, 2006 WL 8553018, at *2 (N.D. Ohio July 20, 2006) (denying Rule 11 motion where "pre-filing investigation efforts" involved "difficult and complex" analysis of data with "the help of an expert consultant"). Indeed, as the Sixth Circuit recently held, a plaintiff's reliance on an expert at the pleading stage is sanctionable only if the expert's opinion is "unreliable on its face—either because of the expert's lack of qualifications, or the substance of the opinion itself." *King*, 71 F. 4th at 522–23.[12]

---

[12] *King* is instructive because it describes both examples of expert analyses that were "facially unreliable" (and thus sanctionable) and other expert analyses that were "not unreasonable" (and thus not sanctionable). 71 F.4th at 522–24. The Court held that plaintiffs' reliance on an expert "opinion" that "came in the form of four tweets, each 280 characters or less, which said nothing about [the expert's] qualifications or the data he supposedly employed" was sanctionable because the opinion was "unreliable on its face." *Id.* at 523. By contrast, the Court found that plaintiffs' reliance on expert reports that merely reached "anomalous" conclusions based on assumptions that were "implausible" or "without support" was "not sanctionable" because the reports were "not facially unreasonable." *Id.* at 524. Plaintiffs' analysis here bears no

Because Defendants cannot prove that Plaintiffs' allegations concerning the expensiveness of Plaintiffs' loans "lack any evidentiary support," they instead nitpick certain aspects of the statistical analysis referenced in parts of the FAC. But lodging what is functionally a *Daubert* challenge before the parties have even retained testifying experts is irrelevant to a Rule 11 analysis and plainly premature. *See Julian v. Lee*, 2020 WL 4913481, at *3 (E.D. Mich. July 29, 2020) (Grand, M.J.) ("Clearly, Defendants will be in a much better position to present their *Daubert* arguments … and the Court will be in a better position to evaluate them, after Defendants obtain [the expert's] complete file and depose him.").

**Second**, Defendants misleadingly claim that the FAC's "central theory of harm … relies on a statistical analysis" that shows "UWM charged Plaintiffs more than other lenders for 'similar loan[s]' with the 'same interest rates.'" Mot. at PageID.2587–2588. That is incorrect. Plaintiffs were harmed not solely because UWM's fraudulent scheme caused them to pay more for their mortgages, as the statistical analysis shows, but also because they were deceived into paying fees for purportedly "independent" mortgage brokerage services that they did not receive. FAC ¶¶ 38, 147, 173, 355–56, 361, 364–65. In other words, Plaintiffs can prove they were harmed without relying on the loan comparison analysis Defendants challenge

---

resemblance to the flagrantly unreliable expert opinions in *King*, including because it was conducted by a team of credentialed forensic accountants and data scientists using a sophisticated methodology and a robust data set. Ex. B ¶ 5.

here—for example, Plaintiffs are also seeking to disgorge the fees and commissions they would not otherwise have paid (which can be determined without any comparison of individual loans). Thus, even if there was merit in Defendants' critiques of the statistical analysis (there is not), Plaintiffs' claims would *still* be cognizable. Defendants' attempt to litigate the reliability of the analysis is therefore not only procedurally improper but does not even go to any dispositive issue.

*Third*, each of the three substantive critiques Defendants level against the statistical analysis cited in the FAC is flatly wrong.

***Validity of Comparisons to "Similar" Loans.*** To assess mortgage loans' expensiveness relative to other available wholesale loans, the statistical analysis cited in the FAC "sorted millions of loans from the top 25 wholesale lenders each year into thousands of much smaller buckets containing…similar mortgages." Ex. B, Gibbons Decl. ¶ 6 (citing Ex. 3). Each smaller comparison "bucket" contains loans that share, among other characteristics, the same interest rate (rounded to the nearest 0.005%), month of closing, loan term (*e.g.*, 30-year or 15-year), dwelling category (*e.g.*, single-family or multi-family), rate type (*e.g.*, fixed-rate or adjustable-rate), and loan-to-value ("LTV") and debt-to-income ("DTI") ranges. *Id.* Defendants contend that the analysis is "facially unreliable" because it "omits [] key variables," including FICO scores, the existence of loan level price adjustments ("LLPAs"), and other factors. Mot. at PageID.2587–88. That is incorrect.

22

The absence of FICO scores in the data does not eliminate the evidentiary value of loan comparison analysis as Defendants would need to show under Rule 11. Because the data set only includes loans purchased by government-sponsored entities (*e.g.*, Fannie Mae and Freddie Mac), which have strict FICO requirements, the data does not include FICO outliers. Ex. B ¶ 8. And as the FAC points out, UWM's SEC filings disclose that it does not originate loans from a disproportionate number of borrowers with lower FICO scores relative to other wholesale lenders. FAC ¶ 143. Indeed, for example, Rocket Mortgage borrowers have *worse* credit than UWM borrowers on average, and yet on average *they paid less*. FAC ¶¶ 143–44.[13]

Defendants' claim that the analysis fails to account for LLPAs is also wrong. By sorting loans into comparison "buckets" using, among other things, LTV ratios, the analysis compares individual loans against other loans with the same LTV ratios and materially similar LLPAs. Ex. B ¶ 7. The fact that Defendants' expert expresses a different opinion does not render the entire statistical analysis "facially unreliable."

***Validity of Comparisons to Loans in the Same Month of Closing***. The statistical analysis compares the cost of individual loans to that of other loans closed

---

[13] The same is true of the other factors Defendants cite. Defendants' only support for the purported relevance of employment history and lock-in periods, for example, are a webpage and a CFPB publication. Mot. at PageID.2589 (citing ECF No. 51-27, 51-38). Such generalized hearsay is hardly the kind of definitive proof required on a pleading-stage Rule 11 motion to establish that omitting these variables renders the entire statistical analysis "facially unreliable."

in the same month. *Id.* ¶ 6. Defendants claim that grouping loans by month is "misleading" because "interest rates can fluctuate dramatically day-to-day." Mot. at PageID.2590. But the suggestion that rate volatility invalidates the analysis is wrong. The analysis generates substantially similar conclusions as to the expensiveness of the loans at issue when mechanisms to account for interest rate volatility are applied. Ex. B ¶ 11. And the cherry-picked example that Defendants fixate on—a 0.64% rate fluctuation from September to October 2023—is not representative of monthly rate volatility over the class period, which was far lower (0.30% on average). *Id.* Further, limiting the analysis to same-day comparisons would obscure broader patterns of cost disparity and reduce the volume of the comparative data set, resulting in lower quality loan comparisons. *Id.* While Defendants' expert may hold a different view, the mere assertion of an opposing opinion is not proof of "facial unreliability."[14]

***Relative Validity of APR Spread Comparisons***. Finally, Defendants argue that comparing individual loans' APR spreads is a better method of evaluating their expensiveness. Mot. at PageID.2590–91. But using APR spreads to compare the expensiveness of individual loans is highly flawed, including because (i) APR spreads measure expected loan costs across a mortgage loan's full term, whereas the

---

[14] Additionally, a substantial portion of the fees measured in the statistical analysis constitutes broker compensation. Ex. B ¶ 10. Broker compensation is set as a flat fee or a percentage of the loan amount. *Id.* It does not fluctuate based on interest rate and thus is unaffected by rate volatility. *Id.*

average mortgage loan is refinanced or paid off well in advance; and (ii) there are material variations in lenders' APR spreads because different lenders use different inputs and calculation methods to determine APR, and applicable regulations allow for a margin of error of 0.125% to reflect disparities. Ex. A ¶ 13. Moreover, the relevant issue here is whether the statistical analysis cited in the FAC was so "facially unreliable" that Plaintiffs should be sanctioned for citing it. Even if Defendants' preferred APR spread analysis were as reliable as Defendants' expert claims it is (it is not), that would have no bearing on the propriety, under Rule 11, of Plaintiffs' references to the separate statistical analysis cited in the FAC.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' request for relief in its entirety and consider imposing costs and attorney fees on Defendants for bringing obviously improper Rule 11 claims.

Dated:  June 20, 2025
     Detroit, Michigan

By:  /s/ *Brandon C. Hubbard*
     Brandon C. Hubbard (P71085)
     **DICKINSON WRIGHT PLLC**
     500 Woodward Avenue, Suite 4000
     Detroit, Michigan 48226
     Tel.: (517) 371-1730

John T. Zach
Marc Ayala
Andrew P. Steinmetz
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards
New York, New York 10001
Tel.: (212) 446-2300

     Tyler Ulrich
     **BOIES SCHILLER FLEXNER LLP**
     100 SE Second Street
     Miami Florida 33131
     Tel.: (305) 357-8422

     *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 20, 2025, I caused the foregoing document to be filed with the Clerk of the Court using CM/ECF, which will effectuate service upon all counsel of record.

/s/ *Brandon C. Hubbard*

Brandon C. Hubbard (P71085)
**DICKINSON WRIGHT PLLC**
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226
Tel.: (517) 371-1730

*Attorney for Plaintiffs*

26