# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| THERISA D. ESCUE, BILLY R. ESCUE, JR., KIM SCHELBLE, BRIAN P. WEATHERILL, KENNETH C. MORANDI, JILL JEFFRIES, and DANIEL SINGH on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED WHOLESALE MORTGAGE, LLC, UWM HOLDINGS CORPORATION, SFS HOLDING CORP., and MATHEW RANDALL ISHBIA,<br><br>Defendants. | Case No. 2:24-cv-10853-BRM-DRG<br><br>Hon. Brandy R. McMillion,<br>United States District Judge<br><br>Hon. David R. Grand,<br>United States Magistrate Judge |

## DECLARATION OF NICK GIBBONS

I, Nick Gibbons, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am an Adjunct Professor with the Leonard N. Stern School of Business at New York University and an Advisor at Hunterbrook Media. I am a Certified Fraud Examiner and a Master Analyst of Financial Forensics. I have been retained by counsel for the putative class in this matter.

2. I submit this Declaration based on my personal knowledge and my review of the materials identified below.

1

3. I have reviewed the June 21, 2024, Declaration of Alex Stricker ("Stricker Declaration") in which he makes a variety of statements concerning the methodology that Hunterbrook Media used in support of its April 2, 2024, article.

4. I have personal knowledge of that methodology. It is described in detail and made publicly available for any interested party to review at: https://hntrbrk.com/how-we-crunched-the-numbers-behind-the-uwm-investigation/. The databases that Hunterbrook Media used included the Consumer Financial Protection Bureau's (CFPB) Home Mortgage Disclosure Act Loan Application Register and Modified Loan/Application Data ("HMDA") and a Deed of Trust dataset. The HMDA dataset reflects a broad range of borrower-level and loan-level characteristics for over 25 million loans and over $8 trillion in loan volume for the period 2021-2023. The Deed of Trust dataset includes incremental borrower, lender (identified by lender NMLS ID), brokerage (identified by brokerage NMLS ID), loan officer (identified by loan officer NMLS ID), and property information. Over 2021-2023, this dataset covers approximately 26.6 million loans (91% of loans within HMDA), $8.5 trillion of loan volume (90% of loan volume within HMDA), and approximately 57,000 unique lenders, 47,000 unique brokerages, and 498,000 unique loan officers.

5. Hunterbrook Media spent over a thousand hours designing the databases, algorithms and analytics that supported the analysis featured in the

article. That process was undertaken by a multidisciplinary team which included myself, a machine learning financial data scientist, and a former mortgage-backed securities trader and mortgage loan officer. Although discussed in greater detail at the website linked above, that process included using an algorithm to identify and isolate loans attributable to specific lenders identified in both datasets and controlled for various characteristics, including loan year, loan-level characteristics, property geographic information, and loan amount. Hunterbrook Media's methodology focused on loans that were purchased by Fannie Mae, Freddie Mac, and Ginnie Mae. They have strict requirements with regard to borrower and loan-level characteristics, including FICO and loan-to-value ratio requirements. As further explained in the website linked above, this analysis included the loan type (among many other loan types) of "30-year fixed conventional conforming second home purchase loans," i.e., purchase loans for second homes.  It excluded "[s]econd home mortgages," i.e., a second mortgage on the same home.

6. Mr. Stricker states that he "us[ed] [his] replication of the Hunterbrook file that consists of the merged Deed Data and the HMDA data." (Stricker Decl. ¶ 7.) Mr. Stricker does not provide any further explanation of what his "replication" is. I am, accordingly, unable to assess the particular data set(s) that his assertions apparently rely on. In addition, Mr. Stricker defines his "replication" as the "Hunterbrook Data File." (*Id.*)  However, he does not substantiate his suggestion

3

that the data set that Hunterbrook Media used is the same data set that Mr. Stricker used and which he describes alternately as his "replication" or the "Hunterbrook Data File." (*Id.*)

7. If one considers only loan officers who originated a minimum of five loans in a given year from 2021 through 2023, the proportion of such loan officers who send more than 75% of their loans to UWM has been increasing. In 2020, 18% of all loan officers who originated five or more loans with UWM in that year (2,858 loan officers total) sent 75% or more of their loans to UWM. In 2022, 37% of all loan officers who originated five or more loans in that year with UWM (5,012 total) sent 75% or more of their loans to UWM. In 2023, 42% of all loan officers who originated five or more loans in that year with UWM (5,102 total) sent 75% or more of their loans to UWM.

8. In addition, in 2020, 12.5% of all loan officers who originated five or more loans with any lender in that year (2,972 loan officers total) sent 75% or more of their loans to UWM. In 2022, 24% of all loan officers who originated five or more loans in that year with any lender (5,251 total) sent 75% or more of their loans to UWM. In 2023, 27% of all loan officers who originated five or more loans in that year with UWM (5,385 total) sent 75% or more of their loans to UWM.

9. Loan officers who originated at least five loans in a year and who sent at least 75% of their loans to UWM have accounted for a growing proportion of the

4

total loans and loan volume that UWM originates. In 2020, this set of loan officers brokered 96,761 loans issued by UWM, the collective value of which was $30,730,894,873 (or 21.6% of UWM's total brokered loan volume among brokers who originated at least five loans in 2020). In 2023, this group brokered 86,049 loans for UWM, the collective value of which was $31,601,648,995 (or 39.9% of UWM's total brokered loan volume in 2023).[1] From 2021 to 2023, the total loan volume generated by these loan officers is over $143.1 billion.

10. From 2021-2023, the overall volume of loans brokered by (1) loan officers who broker a minimum of five loans in a year and sent more than 75% of their loans to UWM is of a similar magnitude to that of (2) all loan officers who sent 75% or more of their loans to UWM, including loan officers who brokered fewer than five loans in a year. For example, in 2023, the first category of loan officers sent 86,049 loans to UWM with a collective loan volume of $31,601,648,995. In 2023, the second category of loan officers sent 97,333 loans to UWM with a collective loan volume of $35,993,472,073.

---

[1] The percentages here are based on UWM's total brokered loan volume covered within the Deed of Trust dataset, which is exclusive of correspondent volumes. When compared to aggregate loan volumes disclosed by UWM within its annual reports, which includes correspondence volumes, then the percentage for 2020 would be 16.8% and for 2023 would be 29.2%.

11. These trends are similar at the broker level as compared to the loan officer level. For instance, in 2020, 1,752 brokers sent 75% or more of their total loans brokered to UWM and originated at least five loans with UWM that year, which represents 31.9% of all brokers that brokered at least five loans with UWM that year. By 2023, that number increased to 2,622, representing 45.9% of all brokers that brokered at least five loans with UWM that year.[2]

12. The loan that UWM provided to Jeffries and Singh had a positive APR rate spread—indicating that the APR was higher than the average prime offer rate ("APOR")—of 1.061%, which was higher than the average rate spread among comparable loans originated in the wholesale market in all of 2023 as well as for the month (October 2023). The loans UWM provided to Schelble and Stuckey had a higher APR rate spread than the average rate spread for comparable loans originated during the same month (June 2021 for Schelble and August 2021 for Stuckey) when controlling for criteria such as loan type, loan term, debt-to-income ratio, combined LTV, and others.

13. Rate spread, which is based on APR, is a flawed basis to evaluate the cost of a loan when comparing across lenders. There are a number of reasons for

---

[2] Plaintiffs' First Amended Complaint understates the concentration of brokers (as opposed to loan officers) that sent 75% or more of their loans to UWM between 2020 and 2023. (*See* Dkt. 21 at ¶ 137.)

this. For example, a non-exhaustive list of those reasons includes: (1) APR calculations generally assume that the mortgage at issue will exist for its full term which is not typical;[3] (2) there are variations in how lenders calculate APR figures and the publicly-available data concerning rate spreads does not explain how each lender undertakes its APR calculations (*see* 12 CFR § 1026.22); (3) there is a +/- 0.125% tolerance allowed when lenders calculate APR (*see* 12 CFR § 1026.22(a)(2)); and (4) the publicly-available data does not reflect the inputs necessary to calculate a given loan's true APR or rate spread.

14. Mr. Stricker asserts that, "[i]n 2023, the average rate spread for loans closed by UWM was 0.20%, which was a lower rate spread than the average rate spread for all retails [sic] loans (0.25%) or for all wholesale loans (0.22%)." (Stricker Decl. ¶ 11.) He omits that the claimed difference between the rate spread he assigns to UWM's loans in 2023 and that of all retail loans in 2023 (a difference of 0.05%) and all wholesale loans in 2023 (a difference of 0.02%) are both within the +/- 0.125% allowed tolerance employed by lenders when they calculate APR. Mr. Stricker's observation therefore does not reliably indicate whether the rate spread for UWM's loans in 2023 was actually lower than the retail or wholesale averages in that year.

---

[3] For perspective, between 2021 and 2023, refinancing represented approximately 48% of all loans originated through the wholesale channel.

15. Mr. Stricker's calculation appears to be based on a simple average drawn across all wholesale loans in 2023. It does not appear to utilize control mechanisms for loan-level characteristics. As discussed above, Hunterbrook Media's methodology did utilize such control mechanisms. In addition, when using Hunterbrook Media's methodology but indexing based on either (i) the rate spread; or (ii) the rate spread and the interest rate, the cost of UWM's wholesale mortgage products from 2021-2023 on average was greater than the median cost of all other wholesale lenders' mortgage products.

16. The data set that Hunterbrook Media is the most comprehensive publicly-available data set reflecting United States wholesale mortgage issuances that I am aware of. As a general matter, when looking at data sets featuring millions of entries in a category, individual variances between any individual entry and another do not materially affect the reliability of the data set as a whole in drawing reasonable inferences about the data.

17. I have been provided a list of NMLS ID numbers associated with brokers and loan officers who, it is my understanding, were sent certain document preservation letters in connection with this action. The brokers and loan officers whose NMLS ID numbers were included in the list I reviewed each brokered over 90% of their loan volume with UWM across 2021 through 2023. Collectively,

during that time period, these brokers and loan officers originated approximately $8.9 billion and $4.2 billion in loan volume with UWM respectively.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 11, 2024.

_____
Nick Gibbons

9