## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

THERISA D. ESCUE, *et al.*, *on behalf of themselves and all other similarly situated*

                Plaintiffs,              Case No. 2:24-cv-10853

v.                            Hon. Brandy R. McMillion
                                        United States District Judge

UNITED WHOLESALE
MORTGAGE, LLC, *et al.*,

                Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (ECF NO. 30), DENYING WITHOUT PREJUDICE THE MOTION TO STRIKE CLASS ALLEGATIONS (ECF NO. 31), AND DENYING MOTION FOR SANCTIONS (ECF NO. 51)

Plaintiffs Therisa D. Escue, Billy R. Escue, Jr. (collectively the "Escues"), Kim Schelble (" Schelble"), Kenneth C. Morandi ("Morandi"), Brian P. Weatherill ("Weatherill"), Jill Jeffries ("Jeffries"), and Daniel Singh ("Singh") (collectively, "Plaintiffs") commenced this civil RICO action, on behalf of themselves and others similarly situated, against United Wholesale Mortgage, LLC ("UWM"), UWM Holdings Corporation and SFS Holding Corporation (together "UWM Holding Companies"), and Mathew Randall Ishbia ("Ishbia") (collectively, "Defendants"), for various federal and state law bribery, conspiracy and fraud claims based on

1

conduct arising from UWM wholesale mortgage loans each plaintiff obtained on their respective properties in Tennessee, North Carolina, California, and Florida. ECF Nos. 1, 21.

Before the Court is Defendants' Motion to Dismiss for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); ECF No. 30.  The Motion has been adequately briefed, so the Court will rule without a hearing. *See* ECF Nos. 35, 40; E.D. Mich. L.R. 7.1(f)(2).  For the reasons stated below, the Defendants' Motion to Dismiss (ECF No. 30) is **GRANTED IN PART** and **DENIED IN PART**.  Defendants' Motion to Strike Class Allegations (ECF No. 31) is **DENIED WITHOUT PREJUDICE,** and Defendants' Motion for Sanctions (ECF No. 51) is **DENIED**.

## I.

Seeking assistance in buying a home is one of the most important and daunting decisions one can make.  The action before the Court exposes the behind-the-scenes competitiveness of the mortgage lending industry, especially the wholesale mortgage market.  While the wholesale market is structured to provide more opportunities for homeownership in America, this case claims the independence of mortgage brokers has been compromised, and it is all to the detriment of borrowers.

Plaintiffs filed this case against UWM, the largest wholesale mortgage lender in the United States.  ECF No. 21, PageID.392.  Plaintiffs, who have all received a

UWM mortgage within the last four years, are alleging that UWM orchestrated a scheme with corrupted mortgage brokers to deceive borrowers into paying improper fees and excessive interest rates on loans that were not "the best option" for their residential financing needs. *See generally id*. To truly understand the claims at issue, a bit of background on the residential mortgage industry is instructive.

### *Residential Mortgage Industry*

The residential mortgage industry in the United States operates through two channels: retail and wholesale. ECF No. 21, PageID.385. Borrowers must decide between the two when seeking residential home loans. The retail channel consists of numerous large national and regional financial institutions. To apply for a mortgage via the retail channel, prospective borrowers must contact retail institutions directly and interact with a company loan officer. *Id*. The loan officer provides borrowers with information and pricing details about the mortgage options offered at that institution based on the borrowers' specific qualifications. *Id*.

On the other hand, in the wholesale channel, prospective borrowers must hire a mortgage broker who will then shop around for the best mortgage loan option from prospective lenders based on the buyers' qualifications. *Id*. With wholesale, borrowers never meet with the lenders, and, for many prospective borrowers, this option provides the best choice. *Id*. Key to the integrity of the wholesale channel, as alleged in this lawsuit, is the fact that wholesale mortgage brokers act

independently and do not operate under the guise of any specific national lender.  *Id.* at PageID.400.

### *UWM's Wholesale Mortgage Business*

In the wholesale channel, the independence of brokers allows them to present borrowers with options from multiple lenders, ensuring borrowers receive competitively priced options.  ECF No. 21, PageID.401.  An independent mortgage broker's responsibilities include surveying pricing and options from various wholesale lenders, presenting this information to the borrower, counseling them on available options, and assisting with loan application paperwork and processing.  *Id.* at PageID.402.  Independent mortgage brokers are compensated with a fee of up to 4% of the loan's principal amount upon closing.  *Id.* at PageID.397.  Broker compensation is usually paid through the lender, but in some cases, the borrower may pay directly.  *Id.*  Even when the lender pays the broker's compensation, borrowers often incur additional financing charges to cover these costs.  *Id.*

UWM emphasizes the independence of mortgage brokers as a core value proposition of the wholesale channel, contrasting it with the retail channel, where loan officers owe loyalty to the bank.  *Id.* at PageID.399-421.  Mortgage brokers are generally portrayed as independent professionals who represent the customer, not the lender, and are not limited in the products they can offer.  *Id.* at PageID.402.  In May 2018, United Wholesale Mortgage launched a public-facing website called

FindAMortgageBroker.com, which was designed to serve as a national search engine for prospective borrowers to locate mortgage brokers and as an educational guide on the benefits of using a mortgage broker.  *Id*. at PageID.441.

UWM's CEO, Ishbia, stated that the website provides consumers with a platform to easily find nearby mortgage brokers and understand why brokers are the best choice for obtaining a mortgage.  *Id*. at PageID.402.  Since its launch, the website has highlighted the value proposition of using an independent mortgage broker, emphasizing that brokers are aligned with the borrower's interests rather than a specific lender, allowing them to shop offers from multiple lenders to secure the best deal for the borrower.[1]  *Id*.  UWM uses MortgageMatchup.com to influence brokers by featuring those who steer the most loans to UWM in search results, thereby leveraging its market power.  *Id*. at PageID.446.  The website acts as a tool for UWM to direct brokers to prioritize UWM loans, similar to businesses paying for priority search results on platforms like Google.  *Id*. at PageID.446-47.  Plaintiffs allege the search results on FindAMortgageBroker.com and MortgageMatchup.com are biased towards brokers who predominantly place their loans with UWM,

---

[1]  In January 2024, UWM rebranded its website from FindAMortgageBroker.com to MortgageMatchup.com, retaining much of the original content, including a broker search directory and representations about mortgage brokers' ability to find the best interest rates and loan products for borrowers.  The rebranded website aims to connect prospective borrowers with local, independent, licensed mortgage brokers who can offer more home loan options than banks or online lenders.  ECF No. 21, PageID.444.

regardless of whether UWM offers the most competitive loan terms.  *Id*. at PageID.450.

<u>*UWM Wholesale Broker Agreement*</u>

In September 2020, competitor Rocket Mortgage launched its own rebranded wholesale lending services division, "Rocket Pro TPO."  ECF No. 21 at PageID.424. At that time, Rocket Mortgage was the leading mortgage lender in the country, with UWM ranking third overall and first in wholesale mortgage lending.  *Id.*  Less than a year later, tensions grew between Rocket and UWM, and in March 2021, UWM implemented a contractual ultimatum with mortgage brokers ("the Wholesale Broker Agreement"), which prohibited brokers who do business with UWM from submitting mortgage loan applications to two of its competitors – Rocket Mortgage and Fairway Independent Mortgage.  *Id.* at PageID.424.  This formed the foundation of the dispute at issue in this lawsuit.

The Wholesale Broker Agreement is a key tool used by UWM, which mandates brokers to agree to its terms if they wish to do business with UWM.  ECF No. 21, PageID.427.  The agreement outlines the conditions under which UWM will consider purchasing or funding mortgage loans and governs the payment of fees to brokers.  *Id.*  Included in the terms of the agreement is UWM's "All In" policy.  *Id.* at PageID.428.  This policy prohibits brokers from shopping for loans from Rocket Mortgage and Fairway Independent Mortgage, regardless of whether these lenders

offer lower-cost options that would benefit the broker's clients. *Id*. at PageID.428. This prohibition is absolute and applies under all circumstances. *Id*. Clients were required to agree not to submit mortgage loan applications or loans to competitors – Rocket Mortgage or Fairway Independent Mortgage –unless the loans were locked before March 15, 2021. *Id*. at PageID.431. Breaching this representation and warranty would result in the client paying liquidated damages to UWM. *Id*. at PageID.431. Brokers who had previously done business with UWM were given the option to continue doing business and agree to the terms of the Wholesale Broker Agreement, or decline the offer, close out the currently pending loans, and refrain from doing future business with UWM. *Id.* at PageID.430-431.

In April 2021, the first month after the ultimatum took effect, brokers submitted 17,000 more loan applications to UWM compared to February 2021. *Id*. at PageID.431. During an earnings call in May 2021, Ishbia expressed satisfaction with the "All-In" ultimatum initiative, noting that out of 12,000 brokers, only 600 refused to sign, and 1,000 did not respond. *Id*. at PageID.432. The "All-In" ultimatum introduced by UWM in 2021 resulted in a dramatic rise in loan officers steering 75% or more of their loans to UWM. *Id*. at PageID.459. By 2023, out of 30,229 loan officers who sent at least one loan to UWM, 12,936 directed more than 75% of their loans to UWM. *Id*. at PageID.459-460. UWM has significantly benefited from the increase in loan funneling by brokers, which it facilitates through

its business practices, resulting in a substantial market share of over 48.1% of broker-originated mortgage loans and nearly 8% of all mortgages. In November 2022, UWM became the largest mortgage lender by volume in the United States, surpassing Rocket Mortgage, marking a significant achievement for UWM's leader, Ishbia, who has a rivalry with Rocket Mortgage's founder, Dan Gilbert. *Id.* at PageID.470.

But as with all endeavors, the agreement was not met without criticism. A broker interviewed in August 2023 stated that the ultimatum was a deal breaker, as it removed the ability to choose the best options for clients. *Id.* at PageID.433. Another broker criticized UWM as the "anti-broker model," suggesting that UWM's actions contradicted its claims of supporting brokers. *Id.* One broker confirmed that without the ultimatum, they would have continued using both Rocket and UWM based on client needs. *Id.* Nevertheless, the practice continued. *Id.* In his capacity as CEO, Ishbia stated in a February 2023 interview that brokers who chose not to work with UWM faced significant disadvantages, leading 11,500 out of 12,000 brokers to remain with UWM. *Id.* at PageID.432. Plaintiffs allege that brokers or loan officers steering a high proportion of loans to UWM contradicts the notion of independence and fiduciary duty to clients. *Id.* at PageID.467. It is statistically improbable for brokers and loan officers to fulfill their duties if they predominantly

8

work with UWM, as they are expected to survey multiple lenders for the best mortgage options.

The Wholesale Broker Agreement also includes a "Lock-In Provision." *Id.* at PageID.435. Under that term, the broker has the option to lock in the interest rate for a mortgage loan, but the loan must be presented to UWM for purchase or funding before the lock-in period expires. *Id.* If the mortgage loan is not presented within the lock-in period, UWM may re-price the loan at its sole discretion. *Id.* Transferring or selling a locked-in mortgage loan to another entity during the lock-in period violates the agreement, making the broker liable to indemnify UWM for any resulting loss. *Id.* Brokers must immediately notify UWM if any commitment for a locked-in mortgage loan is canceled, withdrawn, or not set for purchase or funding. *Id.*

### *Previous Lawsuits*

The Plaintiffs allege that UWM and its brokers are structuring their relationships to intentionally make false representations about the independence of brokers. *Id.* at PageID.479. Because of the "All In" ultimatum and "lock-in" provisions, UWM has been suing for enforcement against brokers who defy its terms within the agreement. *Id.* at PageID.438.

Since February 2022, UWM has pleaded and defended itself in litigation against brokers who agreed to the terms of the Wholesale Broker Agreement. *Id.* at

PageID.439.   Several of these lawsuits have been filed in the Eastern District of Michigan, each alleging a breach of contract claim.   Many of the cases before this court have been assigned to the Honorable Laurie J. Michelson.   At both the Motion to Dismiss and Motion for Summary Judgment stages, Judge Michelson has found in favor of UWM, upholding the Wholesale Broker Agreements.   *See United Wholesale Mortg., LLC v. Am. Moneyline, Inc.*, No. 2:22-cv-10228-LJM-EAS, ECF No. 71 (E.D. Mich. July 1, 2025); *United Wholesale Mortg., LLC v. Kevron Invs., Inc.*, No. 2:22-cv-10395-LJM-EAS, ECF No. 55 (E.D. Mich. Mar. 31, 2025); *United Wholesale Mortg., LLC v. Madison Atrina LLC,* No. 2:23-cv-13176-LJM-KGA, ECF No. 23 (E.D. Mich. Mar. 31, 2025).

In another case, *Okavage Group, LLC v. United Wholesale Mortgage, LLC*, U.S. Magistrate Judge Laura L. Lambert recommended dismissal of a complaint filed against UWM for allegedly violating the Sherman Act by attempting to monopolize the wholesale mortgage market.   *See id.,* No. 3:21-cv-00448-WWB-LLL, 2024 WL 982380, at * 1 (M.D. Fla. Feb. 6, 2024).   On a Motion to Dismiss, Judge Lambert found that the plaintiffs failed to state a claim upon which relief could be granted because "it was not facially apparent, nor characteristically likely, that the anticompetitive conduct alleged . . . cut off consumer or broker access to the wholesale mortgage market."   *See Okavage*, 2024 WL 982380, at * 12.   The case was dismissed and affirmed on appeal.

### *Named Plaintiffs' Mortgage Loans with UWM*

#### *Therisa and Billy Escue*

Plaintiffs Therisa and Billy Escue purchased their home in Portland, Tennessee, around 2001. *Id*. at PageID.488. In February 2022, the Escues decided to refinance their mortgage and hired James Elkins, a mortgage broker and senior loan officer at NEXA Mortgage, LLC, instead of approaching a retail lender. *Id.* James Elkins has over 25 years of experience as a mortgage broker and is licensed to originate mortgages in Tennessee and Florida. *Id.* He is currently affiliated with Wholesale Mortgage Group, LLC, based in White House, Tennessee, and was heading a branch of NEXA at the time of the Escues' refinancing. *Id.* NEXA Mortgage, Elkins's prior firm, is a large residential mortgage brokerage headquartered in Chandler, Arizona. *Id.* Jim Elkins, a senior loan officer with 26 years of experience, is highlighted for closing 900 loans in the last three years, providing extensive service and support. *Id.* NEXA Mortgage, LLC is located in Chandler, Arizona, and is an equal housing lender that requires a mortgage loan originator license. *Id.* The Escues hired Elkins, whom they knew through a family connection, to act as their agent in the refinancing process and to advise them on the best and most affordable mortgage loan options, regardless of the lender. *Id*. at 490.

Elkins does not independently shop for competitively priced mortgage loans for his borrowers; instead, he funnels them to UWM. *Id*. at PageID.490. Elkins

signed UWM's Wholesale Broker Agreement, which includes an "All-In" ultimatum prohibiting him from sending loans to Rocket Mortgage, and he has complied with this since March 15, 2021.  *Id*. at PageID.491.  Elkins' agreement not to use Rocket Mortgage was not disclosed to the Escues, despite being a material fact that he had a duty to disclose.  *Id*.

Elkins participates in UWM's loyalty rewards programs and utilizes UWM's technology products and services.  *Id*.  He has visited UWM's campus for networking, attending UWM-sponsored events, and participating in training sessions.  *Id*. at PageID.491-92.  Elkins advised the Escues that he would survey loan options from various wholesale mortgage lenders to find the most affordable and suitable option for their needs, despite knowing he would only refer them to UWM.  *Id*. at PageID.492.  The Escues relied on Elkins' representations, which were supported by UWM's marketing materials, believing he would shop for a loan that best served their financial interests, which was why they hired him.  *Id*.

Contrary to his representations, Elkins did not conduct a meaningful search for loan options from non-UWM lenders and only recommended UWM loan options, never seriously considering other lenders for the Escues.  *Id*. at PageID.492.  Elkins sent most of his clients to UWM and received valuable benefits in return, which he did not disclose to the Escues.  *Id*. at PageID.493.  UWM was aware of Elkins' and NEXA's fiduciary responsibilities to their clients, including the Escues,

12

but still induced and assisted in breaching these duties by restricting their ability to shop multiple lenders.  *Id*.  UWM provided value to Elkins and NEXA in exchange for steering clients to UWM, knowing it breached fiduciary duties.  *Id*.

On February 28, 2022, Elkins originated the Escues' refinancing loan from UWM, which was an 18-year fixed-rate loan with a 3.499% interest rate and a principal amount of $243,200.  *Id*. at PageID.493.  Elkins earned a $2,324 commission for his services, which was paid by UWM.  *Id*.  Plaintiffs allege that the Escues' loan was a fixed-rate loan with an 18-year term, and generally, shorter-term loans have lower interest rates.  *Id*. at PageID.494.  As of February 3, 2022, the benchmark interest rates for a 30-year fixed-rate mortgage and a 15-year fixed-rate mortgage were 3.55% and 2.77%, respectively.  *Id*. at PageID.494-95.  The Escues' interest rate of 3.499% was close to the 30-year benchmark rate, indicating it was above-market for an 18-year term loan.  *Id*.  The loan was structured to provide the Escues with $2,452.89 cash back at closing, exceeding the $2,000 threshold set by Fannie Mae and Freddie Mac Selling Guidelines, classifying it as a "cash-out refinance" loan and subjecting it to additional price increases.  *Id*. at PageID.495.  Neither Elkins nor UWM informed the Escues about the consequences of structuring their loan as a "cash-out refinance," nor did they explain the substantial increase in loan costs due to the $2,452.89 cash back.  *Id*.

*Kim Schelble*

Schelble and his wife purchased a home in Chapel Hill, North Carolina, on June 3, 2021, and sought to finance 80% of the purchase price with a competitively priced mortgage.  ECF No. 21, PageID.496.  Schelble hired Whitney Bulbrook ("Bulbrook") as his mortgage broker.  *Id*.  Bulbrook is the founder, owner, and president of Carolina Ventures Mortgage, LLC—a mortgage brokerage firm.  *Id*. According to Plaintiffs, nowhere in Bulbrook's marketing materials or social media does she disclose her relationship with UWM.  *Id.*  Meanwhile, nearly 100% of her loans go to UWM—99.6% to be exact.  *Id.* at PageID.501.  Unbeknownst to customers, Bulbrook also uses UWM marketing resources for her business.  *Id.* at PageID.496.  Nonetheless, she purports to "shop" on her clients' behalf until she secures them lower interest rates.  *Id.* at PageID.499-500.  Bulbrook signed the Wholesale Broker Agreement with UWM and participates in their loyalty rewards programs.  *Id.* at PageID.502.  She has visited UWM's campus on several occasions and attends UWM events such as parties and training sessions.  *Id.* at PageID.502. She has been selected as the top placement in UWM's directory, and her MortgageMatchup.com profile is among the top three results to show up on the website.  *Id.* at PageID.504.

Bulbrook advised Schelble that she would diligently survey Schelble's loan from various lenders to secure one that was best aligned with his financing needs.

*Id.* at PageID.505. On June 3, 2021, Schelble acquired a conventional 30-year mortgage loan from UWM at a fixed interest rate of 2.750% for a principal amount of $536,000. *Id.* at PageID.506. Bulbrook earned a 2% commission on the principal amount—totaling $10,720.00. *Id.* UWM paid the commission to Bulbrook's company, Carolina Ventures Mortgage, LLC. *Id.* Schelble's closing costs totaled $25,991.16, and $5,383.85 of that amount was categorized as loan costs. *Id.*

Although Schelble was initially satisfied with her 2.750% interest rate, she did not know she would be required to pay $2,953.41 as a condition for securing the 2.750% interest rate. *Id.* at PageID.507. UWM referred to this as "discount points." *Id*. Neither Bulbrook nor UWM informed Schelble about this prior. *Id*. In May and June 2021, various other non-UWM lenders were offering loans very similar to Schelble's UWM loan at a 2.750% interest rate and with much lower upfront costs. *Id*. Schelble paid at least $850 more in upfront costs than he would have paid for a similar loan from a non-UWM wholesale lender. *Id.* at PageID.508. For example, for a median comparable loan from Fairway Independent Mortgage, he could have paid at least $1,000 less, and for Rocket Mortgage, at least $870 less. *Id.* at PageID.508.

### Brian Weatherill

In or around June 2021, Weatherill bought his home in Bushnell, Florida, with the help of Toni Raulerson ("Raulerson"), his mortgage broker. *Id.* at PageID.509.

Raulerson is an affiliate of Plant City Mortgage Corporation—a mortgage firm that markets itself as independent and "[p]rovid[ing] consumers [with] multiple loan options". *Id.* at PageID.509-10. Nationwide, Raulerson is in the top 1% of mortgage brokers in terms of loan volume origination. *Id.* at PageID.511. Raulerson sent the following loan volumes to UWM from 2021 to 2023: 2021, 80.5%; 2022, 86.2%; 2023, 90.3%. *Id.* at PageID.512. She also signed the Wholesale Broker Agreement with UWM, is a participant in the loyalty rewards programs, has visited UWM's campus several times, and attends UWM events such as sponsored meals and training sessions. *Id.* at PageID.512.

When Weatherill and Raulerson entered their business relationship, Raulerson advised that she would diligently survey the available loan options and provide Weatherill with options that were affordable and aligned with his financing needs. *Id.* at PageID.513. Weatherill expected Raulerson to provide the most affordable option. *Id.* However, Weatherill alleges that Raulerson never seriously considered any lender other than UWM. *Id.* On June 8, 2021, Raulerson provided Weatherill with a conventional 30-year mortgage UWM loan, featuring a 2.999% fixed interest rate on a principal amount of $343,200. *Id.* at PageID.514. Weatherill's closing costs totaled $10,682.50, including a $3,071.64 origination fee. *Id.* UWM paid Raulerson a $9,438.00 commission fee. *Id.* Weatherill could have paid at least

$2,800 less in upfront costs if Raulerson had provided him with options from other potential lenders. *Id.* at PageID.515.

*Kenneth Morandi*

In or around July 2005, Morandi purchased a home in Long Beach, California. *Id.* at PageID.516. In or around June 2022, he decided to refinance his home and hired Garrett Bradley Todd ("Todd") as his mortgage broker to assist him with the process. *Id*. Todd is a senior loan officer at National Trust Lending. *Id*. National Trust Lending advertises itself as providing "the best and most customized service possible." *Id.* at PageID.517. In 2020, Todd sent UWM 90% of his loan volume; in 2021, he sent 91%; and in 2022, he sent UWM 96%. *Id.* at PageID.517. Todd also signed the Wholesale Broker Agreement with UWM, and since the agreement became effective on March 15, 2021, he has not sent any loans to Rocket Mortgage. *Id.* at PageID.519. Morandi was not aware that Todd signed the Wholesale Broker Agreement. *Id.* at PageID.521. Todd is also a member of UWM's rewards programs, such as the LO Partner Points program; he has visited UWM's campus on multiple occasions and attends various types of UWM events. *Id.* at PageID.519-20.

At the inception of Morandi and Todd's relationship, Todd informed Morandi that he would diligently survey the available loan options, prioritizing affordability and Morandi's financing needs. *Id.* at PageID.520. On June 16, 2022, Morandi refinanced his loan with UWM under a 30-year conventional loan with a fixed

interest rate of 4.625% for a principal amount of $310,000. *Id.* at PageID.522. While the interest rate initially met Morandi's expectations, he was unaware that the 4.625% interest rate was conditioned upon a "discount points" fee of $4,348.31, as Todd never explained this to him. *Id.* Meanwhile, Todd earned a $7,250 commission, which Morandi paid to UWM, and UWM sent to Todd. *Id.* Morandi's closing costs totaled $14,824.46, which included an origination fee of $11,598.31 that was paid to UWM. *Id.* Morandi paid, at a minimum, $1,800 more than the median market loan available at the time he refinanced his loan. *Id.* at PageID.523. For example, if Morandi refinanced his loan with Rocket in June or July 2022, rather than UWM, he could have saved at least $2,100. *Id.* at PageID.523.

### *Jill Jeffries and Daniel Singh*

Jill Jeffries and Daniel Singh purchased their home in North Port, Florida, on October 3, 2023. *Id.* at PageID.524. The couple aimed to finance over 90% of the home's purchase price and sought a competitively priced mortgage; they hired Josh McCombs ("McCombs") as their mortgage broker to assist in their search. *Id.* McCombs is a loan officer at Core Financial, Inc. ("Core Financial"), a mortgage brokerage based in Florida. *Id.* Over the past several years, McCombs has been a top-producing mortgage broker in Florida, originating over $81 million in mortgages from 2020 to 2023. Core Financial is also among the top-producing firms in the state. *Id.* In 2022, UWM ranked McCombs as one of its top 1% "partners." *Id.* at

PageID.524.  Despite claiming to be an independent mortgage broker, McCombs does not independently shop for competitively priced mortgage loans but instead funnels borrowers to UWM.  *Id.* at PageID.527.

For instance, from 2022 to 2023, McCombs directed 90.3% of his business to UWM, amounting to $29,777,683 in loan volume, while only $3,167,035 was sent to all other wholesale lenders.  *Id.* at PageID.527.  McCombs has signed UWM's Wholesale Broker Agreement.  *Id.*  He also participates in UWM's loyalty rewards programs, has visited UWM's campus multiple times for networking, attends UWM-sponsored events, and participates in training sessions.  *Id.* at PageID.527-528. McCombs has been invited on an all-expenses-paid VIP trip to the New York Stock Exchange for National Mortgage Broker Day.  *Id.* at PageID.528.  In 2020,  he sent 28% of his loan volume to UWM, but after signing UWM's Wholesale Broker Agreement in 2021, he began sending nearly all his loans to UWM.  *Id.* at PageID.529.

McCombs originated a loan for Jeffries and Singh from UWM on October 3, 2023, which was a conventional 30-year mortgage with a fixed interest rate of 7.5% and a principal amount of $320,100. *Id.* at PageID.531.  Jeffries and Singh incurred closing costs totaling $14,497.15, with $8,933.85 categorized as loan costs.  *Id.* McCombs earned a commission of $4,302.40 on the principal amount of Jeffries' and Singh's loan, which was paid by UWM to Core Financial.  *Id.* at PageID.531.

Public data indicated that the mortgage loan procured by McCombs was not the most affordable option available, as other lenders offered similar loans at the same interest rate with significantly lower upfront charges during September and October 2023. *Id.* at PageID.531-532. The median upfront costs for loans with similar characteristics from the top 25 wholesale lenders in 2023 were lower than those charged to Jeffries and Singh.[2] *Id.* at PageID.531.

Rocket Mortgage, for example, offered a less expensive loan with the same characteristics and interest rate. *Id.* at PageID.532. Ultimately, Jeffries and Singh paid at least $1,505 more in upfront costs than the median comparable loan from other non-UWM wholesale lenders and at least $1,590 more than the median comparable loan from Rocket Mortgage. *Id.* Jeffries and Singh allege that UWM's scheme was designed to ensure that McCombs prioritized UWM's financial interests over the borrowers' by restricting McCombs's ability to shop independently and offering benefits for steering clients to UWM. *Id.*

### ***Procedural History***

Plaintiffs proceeded to collectively file this action on April 2, 2024, and subsequently amended the complaint on August 30, 2024. *See* ECF Nos. 1, 21. The

---

[2] The interest rate of 7.5% offered to Jeffries and Singh was available from other lenders, such as A&D Mortgage, NewRez, Paramount Residential Mortgage Group, FannyMac Loan Services, and Rocket Mortgage, at a lower cost for borrowers with similar characteristics. *Id.* at PageID.532.

Amended Complaint[3] alleges (1) a violation of the Racketeer Influenced and Corruption Organization Act ("RICO"), 18 U.S.C. § 1962(c); (2) RICO Conspiracy in violation of 18 U.S.C. § 1962(d); (3) a violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607; (4) California, Florida, Tennessee, and North Carolina common law claims for aiding and abetting a breach of fiduciary duty; (5) common law claims for civil conspiracy; (6) unjust enrichment; (7) a violation of the North Carolina Unfair and Deceptive Practices ACT ("NCUDPA") on behalf of Schelble; (8) a violation of the Tennessee Consumer Protection Act ("TCPA") on behalf of the Escues; (9) a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") on behalf of Weatherill, Jeffries and Singh; (10) a violation of the California Unfair Competition Law ("CUCL") on behalf of Morandi; and (11) a violation of the California Legal Remedies Act ("CLRA") on behalf of Morandi. *See generally* ECF No. 21.

On October 15, 2024, Defendants filed the instant Motion to Dismiss, which was fully briefed. *See* ECF Nos. 30, 35, 40. Concurrent with filing this motion, Defendants also filed a Motion to Strike Class Allegations, which was also fully briefed. *See* ECF Nos. 31, 36, 41.[4] On May 30, 2025, Defendants filed a Motion

---

[3] For the sake of clarity, the Court is referring to the Amended Complaint whenever mentioning "the Complaint" while addressing the merits of this case.

[4] Defendants also filed a Notice of Supplemental Authority in support of the Motion to Strike Class Allegations, to which Plaintiffs filed a Response. *See* ECF Nos. 60-61.

for Sanctions (ECF No. 51) and a separate Motion for Leave to File an Unredacted
Motion for Sanctions (ECF No. 52). Plaintiffs responded to both motions and
separately filed a Motion to Deem Timely Plaintiffs' Response to Defendants'
Motion to file an Unredacted Motion for Sanctions. *See* ECF Nos. 53-55, 57-59.

Having reviewed the parties' briefs, the Court finds oral argument unnecessary
and will decide the pending motions based on the record before the Court. *See* E.D.
Mich. LR 7.1(f).

## II.

A plaintiff has an obligation to file a complaint that is "plausible on its face."
*See City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 503 (6th Cir.
2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To avoid
dismissal under Federal Rule 12(b)(6), a plaintiff's well-pleaded factual allegations
must "allow []the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Mattera v. Baffert*, 100 F.4th 734, 739 (6th Cir. 2024)
(alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

In reviewing a 12(b)(6) motion, the Court must construe the complaint in the
light most favorable to the plaintiff. *See Norris v. Stanley*, 73 F.4th 431, 435 (6th
Cir. 2023). The Court also must "accept[s] all of the complaint's factual allegations
as true and determine[s] whether these facts sufficiently state a plausible claim for
relief." *Fouts v. Warren City Council*, 97 F.4th 459, 464 (6th Cir. 2024) (citing

*Twombly*, 550 U.S. at 555-56).  But pleadings that are no more than legal conclusions are not entitled to the assumption of truth.  *See Iqbal*, 556 U.S. at 679; *see also Twombly*, 550 U.S. at 555 n.3 ("Without some factual allegation in the complaint, it is hard to see how a claim could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.").

Typically, courts must assess the sufficiency of the complaint "without resort to matters outside the pleadings."  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (citation omitted).  If such materials are considered, the court generally must treat the motion to dismiss as one for summary judgment.  *Id.* (citation omitted).  Yet, when reviewing a 12(b)(6) motion, the Court can consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein," without converting the motion to dismiss to one for summary judgment.  *Id.* (citations omitted).

When a complaint alleges fraud, the plaintiff must meet the heightened pleading standard for fraud under Rule 9(b).  *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  To satisfy Rule 9(b)'s heightened pleading standard, "the plaintiff must allege (1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3)

the defendant's fraudulent intent, and (4) the resulting injury." *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017).

### III.

Defendants move to dismiss Plaintiffs' entire case on the following grounds: (1) Plaintiffs' suit is barred by the notice and cure provisions within their respective mortgages, (2) Plaintiffs failed to adequately plead RICO claims under Counts I & II, (3) Plaintiffs' RESPA claims are time-barred and none of them adequately allege a statutory violation, (4) the aiding-and-abetting and civil conspiracy claims fail to be actionable claims for relief, (5) Plaintiffs failed to adequately plead violations of their respective state consumer protection statutes, (6) Plaintiffs are barred from bringing claims for unjust enrichment due to their respective mortgages, and (7) all of the remaining claims are not actionable against the remaining defendants. *See generally* ECF No. 30. The Court will address each issue in turn.

### A.   NOTICE AND CURE PROVISION

At the outset, the Court must resolve whether the notice and cure provision within the Plaintiffs' mortgages bars this action. Defendants argue Plaintiffs failed to comply with the notice and cure provision within their mortgage agreements, and Plaintiffs are therefore barred from bringing a judicial action without prior notice. ECF No. 30, PageID.1524-1525. Plaintiffs, on the other hand, allege the notice and cure provision only applies to a judicial action arising from the security instrument

24

itself, and therefore is not applicable in this case.  ECF No. 35, PageID.2070-2071.

The Court agrees with Plaintiffs.

The relevant provision in the mortgages and deeds of trust states the following:

> **20. Sale of Note; Change of Loan Servicer; Notice of Grievance.**
>
> ***
>
> Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party hereto a reasonable period after the giving of such notice to take corrective action.

*See* ECF No. 30-7, PageID.1660, 1675, 1690, 1705.  Jeffries' and Singh's (Florida)

Mortgage is slightly different and states:

> **23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) allege that the other party has breached any provision of this Security Instrument or the Note.

*See* ECF No. 30-7, PageID.1726.

An elemental principal of contract interpretation is that a contract must be construed in accordance with the intention of the parties.  *See Ingenium Tech. Copr.*

*v. Beaver Aerospace & Defense, Inc.*, 122 F. Supp. 3d 683, 687 (E.D. Mich. 2015) (holding that under California law, "[t]he intention of the parties is to be ascertained from the 'clear and explicit' language of the contract.") (citing *Rideau v. Stewart Title of Cal., Inc.*, 235 Cal. App. 4th 1286, 1294 (2015)); *accord Fredeking v. Triad Aviation, Inc.*, 647 F. Supp. 3d 419, 442 (M.D.N.C. 2022) ("North Carolina's rules of contract interpretation require an agreement to be construed as a whole and to determine the intent of the parties from the entire instrument and not from detached portions."); *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) (same); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703-04 (Tenn. 2008) (same). However, absent proof of ambiguity, contracts are not open to judicial construction and courts must enforce them as written. *See Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 1093, 1117 (N.D. Cal. 2013).

Neither party argues that ambiguity exists within Plaintiffs' mortgage contracts. So, the Court looks to the contracts as written without judicial interpretation. *Id.* The notice and cure provision specifically states that neither party may bring a "judicial action that **arises from** the other party's **actions pursuant to [the] Security Instrument**" without first giving the other party a reasonable time "to take corrective action." *See* ECF No. 30-7, PageID.1660, 1675, 1690, 1705 (emphasis added). Plaintiffs do not dispute that there was no notice provided. Instead, they argue that the claims at issue in this litigation do not "arise from" the

26

mortgages because the claims are independent of the contract and based on federal and state law.  *See* ECF No. 35, PageID.2070-2071.  In contrast, Defendants assert that the claims are ultimately based on the price terms of the mortgage and, therefore, notice and cure is required.  *See* ECF No. 40, PageID.2378.

The Court finds that actions arising from the mortgages would constitute claims relating to the memorialized promise to pay back the loan for Plaintiffs' respective properties.  That is not the case here.  The injurious conduct alleged in the Amended Complaint centers on actions that occurred prior to entering into the mortgage agreements.  *See, e.g.*, ECF No. 21, PageID.548, ¶352.  While the alleged scheme, at a macro-level, contains allegations that mention the mortgages, the mortgages themselves are not the basis for the injurious conduct.  Rather, as Plaintiffs argue, these causes of action arise from the alleged false misrepresentations made by Defendants and their brokers in presenting the loans to Plaintiffs *prior to* entering into the mortgages.  *See* ECF No. 35, PageID.2070-2071, n.4 (emphasis added).

Notably, there is no cause of action for breach of contract alleged in the Amended Complaint.  *See generally* ECF No. 21.  And even if there was, courts have found: ". . . the notice and cure provision is circumscribed to breaches of provisions, and duties owed, within the Mortgage itself."  *See Colon v. Nationstar Mortgage, LLC*, No. 1:15-cv-22961-UU, 2015 WL 7422598, at *2 (S.D. Fla. Nov. 17, 2015)

(citing *St. Breax v. U.S. Bank Nat'l Ass'n*, 919 F. Supp. 2d 1371, 1375-76 (S.D. Fla. 2013) (interpreting identical notice and cure provision in context of a Truth in Lending Act claim and rejecting contention that the provision was a condition precedent to the action because the duty under the TILA was not an obligation contained within the mortgage itself); *Telecom Italia Spa v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) ("[D]isputes that are not related – with at least some directness – to performance of duties specified by the contract do not count as disputes 'arising out of' the contract [.]")); *accord Guerrero v. Citibank, N.A.*, No. 25-cv-01426-JSC, 2025 WL 2483161, at *6 (N.D. Cal. Aug. 28, 2025) (finding persuasive *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1213 (11th Cir. 2021) ("[w]hen a contract uses broad 'arising out of' or 'relating to' phrases, the court generally consider[s] whether the dispute in question 'was an immediate, foreseeable result of the performance of contractual duties.'")); *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 781 S.E.2d 1, 8 (N.C. 2015) ("In an ordinary debtor-creditor transaction, the lender's duties are defined by the loan agreement and do not extend beyond its terms.") (citation omitted).

Here, the conditions of the mortgages themselves are not at issue but rather conduct that occurred leading up to Plaintiffs obtaining the mortgages. Therefore, because there are no claims for breach of the mortgage agreements, the Court finds

that the notice and cure provisions do not bar Plaintiffs from proceeding in this action.  Plaintiffs' claims will be analyzed as alleged.

## B.    HEIGHTENED PLEADING REQUIREMENTS

Before the Court evaluates the plausibility of Plaintiffs' claims, many of Defendants arguments for dismissal hinge on whether Plaintiffs sufficiently alleged their fraud-related claims with the requisite specificity under Fed. R. Civ. P. 9(b). Thus, the Court will first address the heightened pleading standard required collectively.  *See Iqbal*, 556 U.S. at 686-87 (2009).

Given that the alleged racketeering predicates sound in fraud, Plaintiffs must sufficiently plead a misrepresentation or omission, materiality, reliance, causation, and injury, with specificity.  *See In re Takata Airbag Product Liability Litigation*, No. 1:14-cv-24009-MORENO, 2023 WL 6274837, at *9 (S.D. Fla. Aug. 24, 2023) (citing RESTATEMENT (SECOND) OF TORTS §§ 525, 550 (AM. L. INST. 1977))[5].  Rule

---

[5] *Accord Beard v. Worldwide Mortg. Corp.*, 354 F. Supp. 2d 789, 812 (W.D. Tenn. 2005)  ("[T]o establish a claim for fraud, the plaintiff must show: (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation['s] falsity – that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonable relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise.") (citing *Shahrdar v. Global Housing, Inc.*, 938 S.W.2d 230, 237 (Tenn. Ct. App. 1998)); *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 189 (4th Cir. 2007) ("Under North Carolina law, the elements of actual fraud are (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.") (citing *Forbis v. Neal*, 649 S.E.2d 382, 387 (N.C. 2007)); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (citing *Engalla v. Permanente Med Grp., Inc.*, 938 P.2d 903, 917 (Cal. 1997) ("The elements of a cause of action for

9(b) typically requires plaintiffs to articulate the "who, what, when, where, and how" of the alleged fraud. *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quotation marks and citation omitted); *accord U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009); *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019). And generally, to state a claim with the requisite particularity, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Atlas Tech., LLC v. Levin*, 268 F. Supp. 3d 950, 962 (E.D. Mich. 2017) (quoting *Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir. 2009)).

For fraudulent omissions claims—like those here—there is a less stringent (though still strict) standard. *See In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 960-61 (E.D. Mich. 2022) ("Fraudulent concealment or omission claims are subject to a slightly more relaxed pleading burden; the claim can succeed without the same level of specificity required by a normal fraud claim.") (quotation marks and citation omitted). Thus, in alleging the "who, what, when, where, and how" of

---

fraud in California are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage.").

the alleged omission, plaintiffs must plead: "what was omitted, who should have made the representation, the content of the omission, and what the defendant gained by the alleged fraud." *Id.* (citing *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012)).  General allegations raising the "mere possibility of fraud will not do; instead the complaint must provide the factual predicates necessary to convince [the court] that the underlying fraud in all likelihood occurred." *Greer*, 114 F.4th at 615 (cleaned up).

Here, in evaluating the 249-page Amended Complaint, Plaintiffs have provided the Court with enough facts to meet the requisite pleading standard—at this stage of the proceedings.  Plaintiffs allege UWM executed a "deliberate scheme, in coordination with a host of corrupted mortgage brokers, to deceive hundreds of thousands of borrowers into paying billions of dollars in improper fees and excessive interest rates to finance their homes." *See* ECF No. 21, PageID.384.  That's the "who and what."  Plaintiffs further allege "UWM instructs brokers to use marketing tools designed by UWM's in-house marketing team to standardize and coordinate the promotional appeals that these brokers are independent." *See id.* at PageID.414.  The Amended Complaint details what those marketing materials are, who they are distributed to, and how brokers are positioned to use them.  *Id.* at PageID.412, 418-421.  That is sufficient for the "how."  And finally, Plaintiffs allege that when each named Plaintiff hired their respective brokers, prior to entering into their mortgages,

the brokers and UWM failed to disclose the Wholesale Broker Agreement to the borrower.  *See* ECF No. 21, PageID.491, 505, 513, 521, 530.  That's "when and where."  Accordingly, the Court finds that Plaintiffs' allegations sufficiently establish the "who, what, when, where, and how" of their fraud claims, as required by Rule 9(b).

**C.    RICO CLAIMS (Count I & II)**

**1.    *RICO Enterprise (18 U.S.C. § 1962(c))***

Plaintiffs allege "UWM and Ishbia each violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of an Enterprise through a pattern of racketeering activity."  ECF No. 21, PageID.547.  Defendants argue this claim should be dismissed for three reasons: (1) failure to allege the RICO violation was the *proximate cause* of their injuries; (2) failure to show the existence of an *enterprise* that engaged in a *pattern of racketeering activity*; and (3) because the *economic loss doctrine* and *RESPA's remedial scheme* bar recovery.  *See* ECF No. 30, PageID.1526-1541 (emphasis added).

The relevant portion of the RICO statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*See* 18 U.S.C. § 1962(c).  RICO creates a private cause of action for parties seeking civil remedies: "[a]ny person injured in his business or property ***by reason of*** a violation of section 1962" may sue for treble damages and attorney's fees.  *See* 18 U.S.C. § 1964(c) (emphasis added); ECF No. 21, PageID.569.  Thus, to state a plausible civil RICO claim, Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrisson Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 496 (1985)) (emphasis added); *accord Grow Mich., LLC v. LT Lender, LLC*, 50 F.4th 587, 594 (6th Cir. 2022); *Salami v. JP Morgan Chase Bank, N.A.*, No. 1:18 -cv- 794, 2019 WL 2526467, at *4 (M.D.N.C. Jun. 19, 2019) (citing *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 258 (4th Cir. 2011)); *Omnipol, A.S. v. Multinational Def. Servs., Ltd. Liab. Co.*, 32 F.4th 1298, 1308-09 (11th Cir. 2022); *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023).[6]

  A. *Proximate Cause*

  Defendants do not contest that the "conduct" Plaintiffs alleged serves as a RICO violation.   Rather, Defendants challenge Plaintiffs' RICO claim on the grounds that the alleged conduct fails to satisfy the proximate cause requirement for a civil RICO claim, as a matter of law.  *See* ECF No. 30, PageID.1526-1531.

---

[6] The Court notes the Ninth Circuit's test for a civil RICO violation includes a fifth element: "causing injury to plaintiff's business or property." *See Apple*, 85 F.4th at 958.

The "by reason of" language from § 1964(c) makes proximate cause "an essential ingredient" of any civil RICO claim. *See Wallace v. Midwest Fin. & Mortg. Serv., Inc.*, 714 F.3d 414, 419 (6th Cir. 2013); 18 U.S.C. § 1964(c). Thus, the controlling question for proximate cause is "whether the alleged violation led directly to plaintiff's injuries." *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). To allege a valid RICO claim, a plaintiff must show not only that the predicate act was a "but for" cause of the plaintiff's injuries, but also that it was the proximate cause. *See Holme v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

Proximate cause requires some direct relation between the injury asserted and the injurious conduct. *See Medical Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025); *Anza*, 547 U.S. at 461. "But for" causation will not suffice. *Id.* at 456-57. And a link that is "too remote," "purely contingent," or "indirect" is insufficient. *See Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010). Similarly, if the injury is "insubstantial, unforeseeable, speculative, or illogical," or sustained "because of intervening causes," the proximate cause requirement fails. *See Trollinger v. Tyson Foods, Inc.*, 370 F. 3d 602, 614 (6th Cir. 2004). "Whenever [a] plaintiff's theory requires moving 'well beyond the first step,' it 'cannot meet RICO's direct relationship requirement.'" *See Horn*, 604 U.S. at 612.

Here, Defendants argue that Plaintiffs' alleged injuries are too "attenuated and speculative" to be the proximate cause of Defendants' conduct. *See* ECF No. 30,

PageID.1529. As they argue, because Plaintiffs' alleged injuries did not occur as the "first step" in the causal chain, Defendants' conduct cannot serve as the proximate cause to satisfy a RICO claim. *Id.* at PageID.1526 (citing *Gen. Motors LLC v FCA US LLC*, 2020 WL 38330258, at *7 (E.D. Mich July 8, 2020)). The Court agrees.

Plaintiffs spend approximately 138 pages in the Amended Complaint explaining the mortgage industry, UWM's position in the wholesale market, and the alleged "tactics" UWM employs to "cultivate loyalist brokers" that funnel loans to UWM, which they allege costs UWM borrowers billions in above-market costs. *See generally* ECF No. 21, PageID.395-532. But key to the RICO claim is an understanding of what truly causes Plaintiffs' injuries. Plaintiff, in a conclusory fashion, states that "Defendants' conduct is the direct cause of the alleged harms. There are no intermediate causes…" *See id.* at PageID.569. But that is belied by their own allegations in the Amended Complaint. One of the major allegations stated repeatedly is that borrowers are misled into believing that the brokers are "independent" and that they will "shop for the best loan."[7] The Amended Complaint specifically states that when the brokers falsely represented that they would shop the best loan, it resulted in Plaintiffs obtaining an overpriced UWM loan with a higher cost that was "substantially above-market, based on the time and term length of the

---

[7] ECF No. 21, PageID.481, ¶181; PageID.492, ¶191; PageID.497, ¶211; PageID.505, ¶223; PageID.509, ¶242; PageID.512, ¶247; PageID.520, ¶277

loan." *See* ECF No. 21, PageID.494-495; *see e.g.*, ECF No. 21, PageID.494, ¶197; PageID.508, ¶236; PageID.515, ¶259; PageID.523, ¶285; PageID.531, ¶314.

So, as alleged, the false representation would be the proximate cause of Plaintiffs' injuries.  But the false representations about shopping the loan originated from the brokers, **_not_** UWM.  While true, Plaintiffs point to marketing materials and websites that state brokers are "independent," the Court finds that it is the false representation and failure to shop the loan that serves as the proximate cause of Plaintiffs' injuries.  Even Plaintiffs' allegation that UWM's provision of advertising materials, among other things, which the brokers used to induce Plaintiffs into business with them, is nothing more than "but for" causation, and is conclusory at best.  This will not suffice to establish proximate cause because the injury alleged is well beyond the "first step" in the causal chain.  *Gen. Motors LLC v FCA US LLC*, 2020 WL 38330258, at *7.

Plaintiffs allege that, had they known their individual brokers' representations were false, they would not have entered into their mortgage loans.  *See* ECF No. 21, PageID.496, 505, 513, 518.  But this does not connect UWM to the alleged injurious conduct.  If anything, it further supports that the actions of the brokers are the proximate cause of Plaintiffs' injuries—not UWM.  Therefore, because Plaintiffs' allegations fail to show proximate cause, the civil RICO claim fails as a matter of law.

36

B.    *RICO Enterprise*

Even if proximate cause existed here, the Court must still evaluate the heart of Plaintiffs' RICO claim—an enterprise through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c).  Plaintiffs contend that Defendants' conduct, as alleged in the Amended Complaint, "constitute[s] an 'association-in-fact enterprise.'"  *See* ECF No. 21, PageID.548.

An enterprise is any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity.  *See* 18 U.S.C. § 1961(4).  The enterprise must be "separate and apart from the pattern of activity in which it engages."  *See In re Duramax Diesel Litigation*, 298 F. Supp. 3d 1037, 1079 (E.D. Mich. 2018) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Defendants argue Plaintiffs failed to properly plead an association-in-fact enterprise because they failed to allege a connection between the conduct of the mortgage brokers with UWM under a "hub-and-spoke" theory.  *See* ECF No. 30, PageID.1531-1532.  The Court disagrees.

As a general observation, "hub-and-spoke" conspiracy theories are usually invoked in conjunction with antitrust competition violations under the Sherman Act. *See, e.g.*, *In re RealPage, Inc., Rental Software Antitrust Litigation (No. II)*, 709 F. Supp. 3d 478, 500-01 (M.D. Tenn 2023); *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1307 (M.D. Fla. 2016); *In re Musical Instruments and*

*Equipment Antitrust Litigation*, 798 F.3d 1186, 1192 (9th Cir. 2015); *Logisticare Sols., LLC v. California Med. Transportation Ass'n, Inc.*, No. CV 17-8082 SJO (JC), 2018 WL 5099663, at *4 (C.D. Cal. May 21, 2018); *accord D'Addario v. D'Addario*, 901 F.3d 80, 101 (2d Cir. 2018) ("[A] group of individuals related by a structure that mimics so-called 'rimless hub-and-spoke' conspiracies cannot be considered a RICO association-in-fact."). As Plaintiffs aptly point out, no Sixth Circuit court has ever foreclosed a RICO claim based on a "hub-and-spoke" theory.[8] ECF No. 35, PageID.2080.

A civil RICO association-in-fact "must have at least three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associations to pursue the enterprise's purpose." *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 879 (E.D. Mich. 2019) (citing *Boyle v. United States*, 556 U.S. 938, 944 (2009)). It is also well-established that an association-in-fact enterprise requires some structure, but not more than necessary to carry out its purpose. *See Boyle v. United States*, 556 U.S. 938, 944 (2009); *Aversano v. Greenberg Traurig, LLP*, 753 F. Supp. 2d 1063, (C.D. Cal. 2010).

---

[8] While such a claim may still be possible, it does require some form of *per se* illegality and an allegation of an unreasonable restraint on trade, neither of which is at issue here for an association-in-fact enterprise. *See Okavage Grp. v. United Wholesale Mortgage*, 2024 WL 982380 (M.D. Fla. 2024); *United Wholesale Mortgage, LLC v. America's Moneyline, Inc.*, 2024 WL 1349301 (E.D. Mich. 2024).

Here, Plaintiffs have alleged that the Defendants have a common purpose "to sell as many mortgages as possible[] and thereby maximize the revenue and profitability of the enterprise's members."  *See* ECF No. 21, PageID.550, ¶360; ECF No. 35, PageID.2078.  There is a broker-lender relationship between the associates in the enterprise.  *See* ECF No. 21, PageID.550, ¶359; ECF No. 35, PageID.2078. And the enterprise has been operating since at least 2021.  ECF No. 21, PageID.429. Thus, in viewing the Amended Complaint in the light most favorable to Plaintiffs, the Court finds the allegations to be sufficient to establish an association-in-fact enterprise for a civil RICO claim.

## C.    *Predicate Acts – Racketeering Activity*

Whether the complaint sufficiently alleges a pattern of racketeering is a different story.  At a minimum, a plaintiff must plead two acts of racketeering activity within ten years of each other to establish a pattern of racketeering activity.  18 U.S.C. § 1961(5).  The two acts must show "that the racketeering predicates are *related*, and that they amount to or pose a threat of ***continued criminal activity***.  *See Franklin Const. Grp., LLC v. Shore*, ---F. Supp. 3d----, No. 3:24-cv-1255, 2025 WL 2181421, *9 (M.D. Tenn. Aug. 1, 2025) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989)) (emphasis added).  Given that the alleged racketeering predicates sound in fraud, Plaintiffs must sufficiently plead a misrepresentation or omission, materiality, reliance, causation, and injury with enough facts to meet the

heightened pleading standard of Fed. R. Civ. P. 9(b).  *In re Takata Airbag*, 2023 WL 6274837 at *9.

As racketeering predicates, Plaintiffs allege the Defendants conducted or participated in a bribery scheme via (1) mail, wire and honest services fraud (18 U.S.C. §§ 1341, 1343, 1346), (2) violations of the Travel Act (18 U.S.C. § 1952), and (3) violations of Tennessee, California, North Carolina, and Florida state bribery laws (18 U.S.C. § 1961(1)(A)).  *See* ECF No. 21, PageID.551-552.  The Court will address each alleged predicate act in turn.

### i.   *Honest Services, Mail, and Wire Fraud*

The first predicate act alleged is a claim of honest services, mail, and wire fraud.  *See* ECF No. 21, PageID.552-561.  Based on the Amended Complaint, UWM made "use of . . . interstate mail or wire facilities for the purpose of executing a scheme or artifice to deprive another of money, property, and/or the intangible right of honest services[.]"  *See* ECF No. 21, PageID.551.  The Defendants argue against this claim for two reasons: (1) that Plaintiffs come nowhere close to pleading fraud under Rule 9(b) and (2) likewise "fail to plausibly allege the Defendants had a 'specific intent to deceive or defraud.'"  ECF No. 30, PageID.1536.

Honest service fraud is a subset of mail and wire fraud.  *See, e.g.*, *United States v. Langford*, 647 F.3d 1309 (11th Cir. 2011); *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012); *United States v. Solakyan*, 119 F.4th 575 (9th Cir. 2024).  The

40

elements of mail and wire fraud are essentially the same except that one must use the wires, and the other the mail, in furtherance of the scheme. *United States v. Daniel*, 329 F.3d 480, 486 n.1 (6th Cir. 2003); *accord Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *United States Brugnara*, 856 F.3d 1198, 1207 (9th Cir. 2017); *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012). Mail and wire fraud require showing (1) a scheme to defraud, and (2) use of the mails or wires in furtherance of that scheme. *See Heinrich v. Waiting Angles Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (citing *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005)). "A complaint alleging mail fraud or wire fraud must . . . at a minimum allege that a mailing or an interstate electronic communication occurred." *Beard v. Worldwide Mortg. Corp.*, 354 F. Supp.2d 789, 802 (W.D. Tenn. 2005) (citation omitted).

Here, Plaintiffs allege UMW devised a scheme to "deceive homebuyers about the relationship between UWM and brokers, while preventing homebuyers from being presented with affordable mortgage options from other lenders." *See* ECF No. 21, PageID.552. As a result, UWM's "use of the mail . . . and wires" enabled UWM to "charge non-competitive prices, impose over-market closing cost, increase sales, and avoid competition, knowing that the borrower had been influenced to withhold information about the available loan options." *See id.* at PageID.552. These allegations are sufficient to please the first two elements.

41

But, while mail and wire fraud remain actionable "even if [victims] ultimately did not suffer unreimbursed loss[,]" *see Shaw v. United States*, 580 U.S. 63, 67-68 (2016), "[t]o be convicted of mail fraud or wire fraud, a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 106 (4th Cir. 2025) (citation omitted); *accord United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012); *United States v. Bell*, 112 F.4th 1318, 1332 (11th Cir. 2024); *accord Brugnara*, 856 F.3d at 1207 (identifying Ninth Circuit's requirement of intent as a third element to establish mail and wire fraud). The question then becomes whether UWM had the required intent to commit mail and wire fraud against Plaintiffs in connection with the alleged scheme.

Generally, "[a] scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *See Heinrich v. Waiting Angles Adoption Services, Inc.*, 668 F.3d 393, 404 (6th Cir. 2012); *accord Wynn*, 684 F.3d at 478. Plaintiffs must clearly articulate that the scheme involved a plan or course of action *intended* to deceive or to cheat them out of their money or property. *See Wright v. Richardson*, 740 F. Supp. 3d 601, 616 (E.D. Mich. 2024) (citing *Daniel*, 329 F.3d at 485-86, 488; *Cleveland v. United States*, 531 U.S. 12, 18-19 (2000)) (emphasis added); *accord United States v. Miller*, 953 F.3d 1095, 1102 (9th Cir.

2020).  The intent element is satisfied by showing the Defendants acted either with a specific intent to defraud or with reckless disregard for potentially misleading information.  *See Heinrich*, 668 F.3d at 404 (citing *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)); *accord, e.g.*, *United States v. Wheeler*, 16 F.4th 805, 819 (11th Cir. 2021); *Carey v. JAK's Puppies, Inc.*, 763 F. Supp. 3d 952, 983 (C.D. Cal. 2025) (citation omitted).

But here, the Plaintiffs have not sufficiently alleged intent because the underlying fraudulent acts focus on the brokers' conduct, not UWM.   In the Amended Complaint, Plaintiffs allege UWM gave out publicity materials regarding ***brokers'*** "unrestricted ability to work with a variety of lenders," "***brokers*** were categorically restricted from shopping for better prices from any lender," *see* ECF No. 21, PageID.554, "UWM ***brokers*** frequently referred upwards of 95% or even 99% of their business to UWM even though UWM offered the best overall prices only a small percentage of the time," and "UWM participated in ***brokers'*** breach of fiduciary duty[.]"  *See* ECF No. 21, PageID.558, ¶365(i) (emphasis added).

Even though Plaintiffs state, "UWM engaged in these acts with the specific intent to defraud Plaintiffs[,]" none of the acts alleged connect to UWM other than the Wholesale Broker Agreement.  This amounts to nothing more than a conclusory statement to establish intent and is void of any specific factual allegations otherwise.  Conclusory allegations, like "[a]s a result of [its wholesale broker agreement], UWM

participated in the brokers' breach of fiduciary duty, deprived consumers the benefit of honest services, and caused them to pay for mortgages or mortgage-related services under false pretenses and with incomplete disclosures," *see* ECF No. 21, PageID.558, do not satisfy the intent requirements.  First, two courts have already upheld the legitimacy of the Wholesale Broker Agreement, and the agreement itself is not properly before this Court for interpretation to establish intent.  *See Okavage Grp., LLC v. United Wholesale Mortg., LLC*, 2024 WL 982380 (M.D. Fla. 2024); *United Wholesale Mortgage, LLC v. Am.'s Moneyline, Inc.*, 647 F. Supp.3d 587 (E.D. Mich. 2022).  Second, "[s]pecific intent to defraud requires more than allegations of unfair or unethical behavior; it requires a clear indication that the defendants *knowingly* engaged in deceptive practice with the purpose of *causing harm or obtaining an unfair advantage*.  *See Wright*, 740 F. Supp. 3d at 616 (citing *Neder v. United States*, 527 U.S. 1, 21 (1999)) (emphasis added).   And the Amended Complaint is without any specific allegation to plausibly suggest that UWM intentionally defrauded plaintiffs into their mortgage loans.

In *Wallace v. Midwest Fin. & Mortg. Serv., Inc.*, 714 F.3d 414 (6th Cir. 2013), it was clear that the sham appraisal was given to steer the plaintiff into a bad home equity loan because the injuries were foreseeable that an inflated appraisal would create "more than a bare possibility" that the plaintiff "would enter into a large" home equity loan.  *See* 714 F.3d 414, 420-21 (6th Cir. 2013).  It is not clear here that

UWM acted with intent or purposefully to defraud Plaintiffs into a mortgage on its own conduct.  Moreover, even if Plaintiffs are seeking to allege inducement based on the circumstances, "merely inducing someone, by means of trick or deceit, to enter a transaction that [they] otherwise would have avoided is insufficient to show fraud." *See Bell*, 112 F.4th at 1134 (citing *United States v. Takhalov*, 827 F.3d 1307, 1310 (11th Cir. 2016)).  "[A]n ancillary lie will not suffice." *Id.* at 1332.  Therefore, the Court finds that the mail and wire fraud claims are without merit.

Similarly, Plaintiffs' honest services fraud claim, under 18 U.S.C. § 1346, also fails as a predicate act.  *See* ECF No. 21, PageID.551.  Honest services fraud criminalizes only schemes to defraud that involve bribery or kickbacks. *Skilling v. United States*, 561 U.S. 358, 408-09 (2010); *Black v. United States*, 561 U.S. 465, 471 (2010).  This includes state and local corruption, as well as private-sector fraud. *See Skilling*, 561 U.S. at 413, n.45.  However, "the intangible right of honest services" within § 1346 "plainly does not extend a duty to the public to all private persons[.]" *Percoco v. United States*, 598 U.S. 319, 330 (2023).  Undisclosed conflicts of interest, or undisclosed self-dealing, is not sufficient to establish honest service fraud. *Skilling*, 561 U.S. at 409-10.  For a classic kickback scheme, it should be clear that there must be some shared form of payment between the two parties. *See, e.g., Skilling*, 561 U.S. at 410 (2010) (discussing how the kickback scheme violating §1346 involved an arrangement for shared commission between a public

official and a middleman private insurance business, where both parties profited from wealth generated by public contracts).

Here, even accepting all the facts as true, Plaintiffs simply allege a mere failure to disclose a conflict of interest. The only payment or "kickback" alleged in the Amended Complaint was the commission paid for closing the loan. But the Brokers were entitled to that by default, regardless of whether they provided a UWM, Rocket, or Huntington Bank loan. That is how the business works. As the Court understands the process as outlined in the Amended Complaint, once provided with loan options, the plaintiffs pick one, and the brokers earn a commission. Choosing to go with a recommended loan entitled the brokers to a commission. Whereas a kickback would require an unnecessary fraudulent payment that has **not** been earned. *See, e.g., Skilling*, 561 U.S. at 410, 412 ("the term 'kickback' means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to [enumerated person] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]."). And that has not been alleged here. Nor will "calling a commission a kickback …make it one." *See Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1110-11 (11th Cir. 2014).

The Amended Complaint, in a conclusory fashion alleges that UWM is "corrupt" because there are two companies expressly excluded in the broker

agreement.  *See* ECF No. 30-2, PageID.1571.  But nothing in the broker agreement or alleged in the Amended Complaint explains that brokers are prohibited from shopping lenders (other than Rocket and Fairway) or that they are required to exclusively offer UWM loans.  And that is telling for the Court.  Therefore, the Court finds that Plaintiffs fails to state a plausible claim for honest service fraud.

ii.   *Bribery & The Travel Act*

The next issue to address is whether plaintiffs have sufficiently pled a violation of the travel act as a predicate act alleged in the scheme.  *See* ECF No. 21, PageID.551.  The Court finds they have not.

Plaintiffs allege the Defendants committed bribery by:

(1) "giving gifts, discounts, bonuses, gratuity, or other considerations to an agent in return for the agents' efforts to further that person's interest in business dealings with the principal, *see* ECF No. 21, PageID.561

****

(2) "conferred things of value to brokers . . . including advertising, promotion, gifts, templates of marketing materials and related services, discounts, and benefits provided at various loyalty or funneling benchmarks, *see* ECF No. 21, Page562.

*****

(3) provid[ed] . . . incentives, gifts, and consideration to influence brokers in the scope of their agency for Plaintiff, to exploit their position of trust and confidence, and to steer Plaintiffs to UWM. *See* ECF No. 21, PageID.563.

"Bribery" under the Travel Act means "generic" bribery.  *Perrin v. United States*, 444 U.S. 37, 49 (1979).  "A person commits generic bribery when 'he solicits,

accepts, or agrees to accept any benefits as consideration for knowingly violating or agreeing to violate a duty of fidelity,' either as a public servant or as a private individual holding certain positions of trust." *MSP Recovery Claims*, 130 F.4th at 106-07 (4th Cir. 2025) (quoting MODEL PENAL CODE § 224.8 (AM. L. INST. 1980)).

An allegation of bribery as a RICO predicate act need not "incorporate the common law definition of bribery" nor must it be based on a statute specifically designated as a "bribery" statue. *See United States v. Kotvas*, 941 F.2d 1141, 1145 (11th Cir. 1991), *cert. denied*, 506 U.S. 1055 (1993). Most of the states have codified their bribery claims and require intent to allege a claim. *See* FLA. STAT.§ 838.015(1) ("A person commits the crime of bribery if that individual knowingly and intentionally give , offers, or promises to any public servant any pecuniary or other benefit not authorized by law with an ***intent*** or purpose to influence the performance of any act or omission which the person believe to be within the official discretion of a public servant in violation of a public duty or in performance of a public duty. ) (emphasis added); N.C. GEN. STAT. §14-353 ("Any person who give, offers or promises to an agent, employee or servant any gift or gratuity whatever with ***intent*** to influence his action in relations to his principal's employer's or master's business[.]").

Here, as Defendants argue, *see* ECF No. 30, PageID.1537, and the Court previously stated, intent has not been established based on the allegations against

48

UWM.  The Brokers are not the employees nor agents of UWM, so their conduct

cannot be attributed to UWM to establish this element.  As for the alleged violation

of CAL. PENAL CODE. § 641.3(a), Plaintiffs argue "these brokers are accepting bribes

from a person (UWM) other than their employer to injure UWM's competitors by

helping it unfair compete in the wholesale mortgage channel."  *See* ECF No. 35,

PageID.2087.  Section 641.3(a) states:

> (a) Any ***employee*** who solicits, accepts, or agrees to accept
> money or any thing of value from a person other than his or her
> employer, other than in trust for the employer, corruptly and without
> the knowledge or consent of the employer, in return for using or
> agreeing to use his or her position for the benefit of that other person,
> and any person who offers or gives an employee money or any thing of
> value under those circumstances, is guilty of commercial bribery.

CAL. PENAL CODE. § 641.3(a) (emphasis added).  Further, the statutes definition of

"corruptly" means "the person specifically *intends to injure* or defraud (A) his or her

***employer***, (B) the ***employer*** of the person to whom he or she offers, give, or agrees

to give the money or thing of value, (C) the ***employer*** of the person from who he or

she request, receives, or agrees to receive the money or a thing of value, or (D) a

competitor of any such ***employer***."  *Id.* (emphasis added).  A plain reading of this

statute leads the Court to find that this statute applies to "**employees**."  And UWM

is in no way the "employee" of the Plaintiffs, nor are the brokers employees of

UWM.  Thus, this statue is inapplicable to the facts of this case.  Therefore,

Plaintiff's fail to allege bribery as a predicate act for a RICO violation.

iii.    *The Economic Loss Doctrine*

Defendants also argue that pursuant to the economic loss doctrine, Plaintiffs cannot recover in tort for claims that can be properly adjudicated in contract. *See* ECF No. 30, PageID.1539-1540. Defendants assert this doctrine extends to fraud and RICO claims and because the true essence of this dispute is about the rates and fees associated with the mortgage, those claims sound in contract, as the fraud claims would not exist without that contract. *Id.* Plaintiffs dispute that this case is about the terms of their contractual agreements; and consequently, they argue that the economic loss doctrine does not apply. *See* ECF No. 35, PageID.2088-2089. Plaintiffs also assert that the economic loss doctrine only applies in the UCC context and since this case is not a UCC case, it similarly would not apply. *Id.*

Under California law, the economic loss doctrine bars fraud-based omission claims, like Plaintiffs', that simply restate contractual obligations. "The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed exceptions, unless [Plaintiff] can demonstrate harm above and beyond a broken contractual promise." *See Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 272 (Cal. 2004). Plaintiffs fail to allege anything above and beyond the loss of contractual fees paid. And disappointment is not actionable; therefore the economic loss doctrine bars the RICO claim under California law. Florida's economic loss rule similarly bars fraudulent concealment claims. *See In re Takata*

50

*Airbag* 193 F. Supp. 3d at 1338-39.  And for the same reasons, the doctrine prevents Plaintiffs from sufficiently alleging RICO claims based on predicate acts under Florida law.

      iv.   *RESPA Preclusion*

Defendants also argue "Plaintiffs' RICO claims should be dismissed because RESPA precludes them.  *See* ECF No. 30, PageID.1540.  The Court disagrees.  The RESPA violations and RICO claims are "essentially independent events."  *See Ouwinga v. Benistar 419 Plan Services, Inc.*, 649 F.3d 783, 792 (6th Cir. 2012); *Johnson v. KB Home*, 720 F. Supp. 2d 1109, 1115-16 (D. Ariz. 2010) (holding RICO claims were not barred by RESPA).  RESPA addresses the specific settlement services, whereas RICO addresses the overall prohibition of the fraudulent scheme.  It is not uncommon to see claims brought pursuant to both laws.  And "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  *See Morton v. Mancari*, 417 U.S. 535, 551 (1974).  Therefore, Plaintiffs RESPA claim is not precluded by the RICO claims.

## 2.   *RICO CONSPIRACY*

Under Count II, Plaintiffs bring a claim for RICO conspiracy.  *See* ECF No. 21, PageID.570.  Here, because Plaintiffs underlying RICO claim fails, so too must Plaintiffs' RICO conspiracy claim.  *See Courser v. Mich. House of Representatives*,

831 F. App'x 161, 187 (6th Cir. 2020); *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."); *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 559 n.6 (4th Cir. 2010) ("The remaining RICO claims also fail, as they rely on successfully pleading a pattern of racketeering activity."); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004) (same). Therefore, Count II is dismissed as a matter of law.

* * *

In sum, Plaintiffs RICO claims fail for multiple reasons. While the Amended Complaint sufficiently alleges an association-in-fact, the facts fail to sufficiently show that Defendants' conduct was the proximate cause of Plaintiffs injuries or that it meets the requisite elements of the alleged predicate acts. Further, the economic loss doctrine also bars the RICO causes of action under some state law. Accordingly, Counts I and II should be dismissed for failing to state a claim for which relief can be granted.

## D. RESPA CLAIM

Plaintiffs collectively also bring a claim for a violation of RESPA under 12 U.S.C. § 2607. ECF No. 21, PageID.574-595. Defendants argue Plaintiffs' claims under RESPA are largely time-barred as they were filed more than one year after

closing on each Plaintiffs' mortgages.[9]  ECF No. 30, PageID.1541-1545.  Plaintiffs

contend that the doctrine of equitable tolling prevents an argument that their RESPA

claims are time barred due to Defendants' fraudulent concealment.  ECF No. 35,

PageID.2093-2095.  Equitable tolling requires that Plaintiffs show (1) the defendant

concealed conduct that constitutes the cause of action; (2) defendants' concealment

prevented plaintiffs from discovering the cause of action; and (3) plaintiffs exercised

due diligence that would have led to discovery of the concealed conduct.  *See Eger*

*v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009); *accord Supermarket of*

*Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995)

(same).

Plaintiffs assert that "Defendants built a system to conceal its involvement in

false marketing messages about broker 'independence,'" *see* ECF No. 35,

PageID.2094, and they had "'no practical way to determine' there was a concealed

broker agreement for brokers to steer them to UWM…" *Id.* at PageID.2095.  The

Court finds this argument unavailing.  Plaintiffs rely on allegations in the Amended

Complaint which state that UWM provided a "Brand Builder" marketing tool to

brokers which omitted UWM branding, which they claim caused borrowers like

Plaintiffs not to know that the "broker parroting them [was] a UWM loyalist." *Id.*

---

[9] Plaintiffs Jeffries and Singh were the only two plaintiffs that had a mortgage close within one year before this lawsuit was initiated.  *See* ECF No. 30, PageID.1541; *see also* ECF No. 21, PageID.531.

at PageID.2094. But what's telling, and not pointed out in Plaintiffs' briefing, is that the Amended Complaint also alleges that UWM was transparent about its "All-In Initiative" and even went as far as to issue a press release and place on its website, the requirements that brokers working with UWM enter into this broker agreement. ECF No. 21, PageID.431, 452-453.

Plaintiffs cannot have it both ways – they cannot in one breath argue that they relied on all the information that UWM put into the marketplace to their detriment and entered into overpriced loans, while also trying to persuade the Court that they exercised due diligence in seeking to timely uncover these claims when there was information about the broker agreement placed in the same marketplace. *Compare* ECF No. 35, PageID.2094-2095 (stating there was no way to know of a "concealed agreement" between UWM and brokers) and ECF No. 21, PageID.406-410 (UWM public statements, social media posts, blogs and websites statements about broker independence) *with* ECF No. 21, PageID.431, 452-453 (press release announcing brokerages firms "all-in" with UWM; and social media posts about benefits brokers received from doing business with UWM). Consequently, the Court finds that Plaintiffs have failed to sufficiently allege facts to support equitable tolling, so the RESPA claims as to all Plaintiffs except Jeffries and Singh are dismissed as time barred.

Even if the claims were not time barred, Defendants assert that Plaintiffs fail to state a plausible claim under both § 2607(a) and § 2607(b).  Section 2607(a) provides that no person shall give or accept "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).  To state a claim, Plaintiff must allege "(1) a payment or thing of value; (2) made pursuant to an agreement or understanding to refer settlement business; and (3) an actual referral." *Egerer v. Woodland*, 556 F.2d 415, 427 (6th Cir. 2009).

As Defendants point out, the anti-kickback provision of RESPA requires Plaintiffs to allege specifics as to what kickbacks were given for the settlement/closing of the mortgage.  *See* ECF No. 30, PageID.1544 (citing *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 315 (2d Cir. 2012)).  Plaintiffs allege UWM gave brokers a "thing of value" when UWM offered brokers the opportunity to participate in their marketing programs, which included receiving marketing materials and attending lavish trips.  ECF No. 35, PageID.2090-2091.  Plaintiffs further allege that these things were conferred in connection with the continued referral of business to UWM.  *Id.* at PageID.2092 (citing ECF No. 21, PageID.446-452).  And as Plaintiffs aptly point out, the second pleading requirement – agreement or understanding – is met by showing a "thing of value is received repeatedly and is

55

connected *in any way* with the volume or value of the business referred." 12 C.F.R.

§ 1204.14(e) (emphasis added).  Consequently, the Court finds that, as to Plaintiffs

Jeffries and Singh, a RESPA claim under § 2607(a) has been sufficiently alleged.

Section 2607(b) provides that no person shall give or accept "any portion,

split, or percentage of any charge made or received for the rendering of a real estate

settlement service in connection with a transaction involving a federally related

mortgage loan other than for services actually performed."  12 U.S.C. § 2607(b).

Defendants allege that Plaintiffs' claims under this section are essentially claims for

overpayment.  *See* ECF No. 30, PageID.1545.  Plaintiffs counter that they are not

alleging overpayment but rather are seeking recovery for UWM's payments to

brokers for settlement services they did not perform.  *See* ECF No. 35, PageID.2092-

2093.  The Court finds this to be a distinction without a difference.  Assuming the

facts as true, that the brokers did not actually shop the loan despite a representation

that they would, Plaintiffs allege that the brokers were compensated for doing so.

So, whether labeled as a request for return of the portion of their commission fee

that they did not earn, which could be an overpayment, § 2607(b) governs "any

charge made or received for the rendering of a real estate settlement service in

connection with a transaction involving a federally related mortgage loan **other than**

**for services actually performed**."  12 U.S.C. § 2607(b) (emphasis added).  A literal

reading of the statute posits that Plaintiffs have sufficiently alleged facts to state a plausible claim for relief under § 2706(b).

Accordingly, the RESPA claims are dismissed as to all Plaintiffs, other than Jeffries and Singh, as time barred.  Plaintiffs Jeffries and Singh's RESPA claims are sufficiently alleged to survive the Motion to Dismiss.[10]

## E.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND COMMON LAW CIVIL CONSPIRACY

Plaintiffs bring claims for aiding and abetting breach of fiduciary duty and common law of civil conspiracy to breach a fiduciary duty based on UWM's Wholesale Broker Agreement, which it entered into with brokers. ECF No. 21, PageID.595-602.  As detailed below, none of these claims can survive Defendants' Motion to Dismiss.

### 1.   *Aiding and Abetting Breach of Fiduciary Duty*

To start, Plaintiffs' claim for aiding and abetting breach of fiduciary duty in North Carolina is dismissed because, as Defendants aptly point out, "the North Carolina Supreme Court [does] not recognize" that claim as a matter of law.  *See*

---

[10] The Court notes that it is difficult to reconcile Plaintiffs' claims that they are not suing under the terms of the mortgage, *see* ECF No. 35, PageID.2070-2071, but in the same vein add a RESPA claim which undoubtedly addresses the settlement/closing of the mortgage.  And notably, the Amended Complaint is void of any breach of contract or RESPA claims against the broker, which is the person who allegedly was paid for services not rendered.  At this stage of the litigation, the Court allows the RESPA claims to proceed, but notes that at summary judgment, the analysis may be different.

*BDM Invs. v. Lenhil, Inc.*, 826 S.E.2d 746, 763 (N.C. Ct. App. 2019)[11]; ECF No.30, PageID.1546.  Therefore, the aiding and abetting claim under North Carolin law is dismissed.

Generally, all the remaining states follow the Restatement of Torts § 876(b) on the standard for aiding and abetting, requiring that (1) the primary wrongdoer had a fiduciary duty; (2) there was a breach of that duty; (3) the alleged aider and abettor had knowledge of the breach; and (4) the alleged aider and abettor substantially assisted or encouraged the wrongdoing.  *See Taubenfeld v. Lasko*, 324 So. 3d 529, 540-41 (Fla. Dist. Ct. App. 2021); *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012).[12]

The aiding and abetting a breach of fiduciary duty claim fails under Florida law because Plaintiffs failed to sufficiently demonstrate UWM's knowledge of the alleged underlying breach against Weatherill, Jeffries, and Singh.  *See generally*, ECF No. 21, PageID.595-599.  Further, Plaintiff Weatherill appears to have waived

---

[11] *But see Ehrenhaus v. Baker*, 717 S.E.2d 9, 29 (2011) ("[I]t is unclear whether such a cause of action exists in North Carolina," so the Court "elect[ed] not to delve into whether such claim exists."), *appeal dismissed*, and *rev. denied* by *Ehrenhaus v. Baker*, 735 S.E.2d 332 (2012). Relying on *Tong v. Dunn*, 2012 WL 944581, at *4 (N.C. Super. Ct. Mar. 9, 2012), Plaintiffs argue that the law is unsettled in North Carolina on this issue.  *See* ECF No. 35, PageID.2096, n.24. However the Court notes that both *Ehrenhaus* and *Tong* were decided prior to *BDM*, and *BDM* clearly sets forth that the North Carolina Supreme Court does not recognize the aiding and abetting a breach of fiduciary claim.

[12] *Accord Prime Health Servs., Inc. v. Cap. Bank, N.A.*, No. 3:16-CV-00034, 2017 WL 1064360, at *4 (M.D. Tenn. Mar. 21, 2017); *Nasrawi v. Buck Consultants, LLC*, 231 Cal. App. 4th 328, 343 (Cal. Ct. App. 2014).

any duty owed to him in the loan origination agreement he entered with his broker. *See* ECF No. 30-5, PageID.1629; *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, No. 13-23998-CIV, 2017 WL 11103938, at *11 (S.D. Fla. June 26, 2017) ("Generally, no fiduciary relationship exists where a contract unambiguously disclaims the possibility of a fiduciary relationship."). Moreover, even if the brokers owed any of the Florida Plaintiffs a duty, and that duty was subsequently breached, "conclusory allegations of knowledge are insufficient . . . where the facts in the complaint only suggest the defendant should have known." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014). And for these reasons, the Court cannot infer a plausible claim of relief under Florida law.

Similarly, as with Florida, the California claim is dismissed due to Plaintiffs' failure to allege Defendants had actual knowledge of the "specific primary wrong the defendant substantially assisted." *See IIG Wireless, Inc. v. Yi*, 231 Cal.Rptr.3d 771, 794 (Cal. Ct. App. 4th Dist. 2018). Again, the Court cannot take Plaintiffs' "conclusory allegations of knowledge" and read them to sufficiently allege a claim. Accordingly, the California aiding and abetting claim is also subject to dismissal.

Finally, under Tennessee law, Plaintiffs must sufficiently allege that Defendants knew that the broker's conduct constituted a breach of duty,[13] and that

---

[13] Under Tennessee law, a real estate broker is a fiduciary, *Alexander v. C.C. Powell Realty Co., Inc.*, 535 S.W.2d 154, 155 (Tenn.Ct.App.1975), and thus has "a duty to be careful, skillful, diligent

they gave substantial assistance or encouragement to them in their acts. *Prime Health Servs.*, 2017 WL 1064360 at *4. The Court recognizes Defendants' reliance on *Oak Ridge Precision Indus., Inc., v. First Tenn. Bank N.A.*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) to undermine any fiduciary relationship; however, given that other courts have analyzed real estate brokers' fiduciary duty, this Court will assume, for the sake of argument, that one does exist. ECF No. 30, PageID.1547-48; *Carter v. Patrick*, 163 S.W.3d 69, 75 (Tenn. Ct. App. 2004) ("A real estate broker owes undivided fidelity and faithfulness to his principal and may not prejudice the interests of his principal to favor himself or others.").

Even under such a duty, though, the Tennessee claim fails because the extent to which Plaintiffs allege aiding and abetting breach of fiduciary duty is that UWM knew brokers would have to breach their fiduciary duty when they entered into the Wholesale Broker Agreement. ECF No. 21, PageID.493, 506, 514, 521, 530. But, like in *Prime Health Servs.*, Plaintiffs "offer[…] nothing more than conclusory statements to establish that [their] suspicions are analogous to" UWM's knowledge that the brokers were breaching their fiduciary duty to Plaintiffs. *Id* at 4-5. Without more, the Amended Complaint, as alleged, cannot sustain the claim.

---

and loyal in the performance of [the] principal's business." *Thomson McKinnon Securities, Inc. v. Moore's Farm Supply, Inc.*, 557 F. Supp. 1004, 1011 (W.D.Tenn.1983).

### 2.  *Common Law Civil Conspiracy*

Plaintiffs fare no better under the conspiracy to breach fiduciary duty claims. *See* ECF No. 21, PageID.599-602.  Under California law, Plaintiffs' claim of common law civil conspiracy fails because they have not alleged that UWM directly owed them the fiduciary duty it allegedly conspired to breach.  *See Screen Cap. Int'l Corp. v. Libr. Asset Acquisition Co.*, 510 B.R. 248, 263 (C.D. Cal. 2014) ("In order to state a claim for conspiracy to breach fiduciary duty, plaintiff had to allege that defendant owed such a duty; absent allegation that such a duty was owed, defendant could not conspire to breach it.").

The claim also fails in North Carolina because Plaintiffs cannot fully satisfy the required elements: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme."  *Fox v. City of Greensboro*, 866 S.E.2d 270, 287 (N.C. Ct. App. 2021) (citation omitted).  The Amended Complaint is void of any allegation that Defendants committed an unlawful act or unlawfully committed a lawful act.  *See generally* ECF No. 21.  Even if Plaintiffs alleged this element, they still "failed to establish evidence of the conspiracy that was sufficient to create more than a suspicion or conjecture."  *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 659

S.E.2d 442, 449 (N.C. Ct. App. 2008) (citation omitted).  The facts, as alleged, even when accepted as true, do not meet the requisite elements to state a plausible claim.

For a civil conspiracy claim under Tennessee law to survive a motion to dismiss, a plaintiff must allege "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Pagliara v. Moses*, 605 S.W.3d 619, 627 (Tenn. Ct. App. 2020); *see also Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006).  According to Plaintiffs, the brokers and UWM acted in concert under an "express or implied agreement" for the purpose of breach of a fiduciary duty.  ECF No. 21, PageID.601.

But because, in Tennessee, a civil conspiracy is not an independent claim, rather a way to impose liability, it requires an underlying predicate tort allegedly committed pursuant to the conspiracy, which Plaintiffs do not have.  *See Watson's Carpet and Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007); *see also Productive MD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 967 (M.D. Tenn. 2011) ("By its very allegations, the civil conspiracy claim is specifically linked to the alleged theft of trade secrets, and necessarily rises or falls based on whether the defendant is found to have misappropriated a trade secret.") (cleaned up).  Therefore, the Tennessee conspiracy claim must be dismissed.

Like Tennessee, Florida law also requires "an actionable underlying tort or wrong." *In re Hussing*, 659 B.R. 609, 623 (Bankr. S.D. Fla. 2024). "Florida does not recognize an independent action for civil conspiracy[,]" rather, "a civil conspiracy is derived from the underlying claim that forms [its] basis." *Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1360-1361 (S.D. Fla. 2002) (citation modified). Since the aiding and abetting breach of a fiduciary duty claim fails, and the civil conspiracy claim rises and falls with it, "a claim that is not found to be actionable cannot serve as the basis for a conspiracy claim." *Hvide v. Holt Fin. Ltd.*, No. 20-22266-CIV, 2021 WL 8154846, at *10 (S.D. Fla. Sept. 13, 2021).

Consequently, Plaintiffs' Aiding and Abetting and Civil Conspiracy claims fail to state a claim upon which relief can be granted.

## F.    CONSUMER PROTECTION CLAIMS

Plaintiffs also bring individual claims under their respective states' consumer protection laws. *See* ECF No. 21, PageID.607 (Count VII); PageID.611 (Count VIII); PageID.616 (Count IX); PageID.619 (Count X); PageID.623 (Count XI). Defendants allege Plaintiffs cannot state a claim under any of the state consumer protection statutes they invoke because each of their claims fail to meet the heightened pleading standard under Rule 9(b) when the complaint sounds in fraud. *See* ECF No. 30, PageID.1551. Despite this, Defendants also argue that the

consumer protection claims fail for their own reasons, *see id.* at PageID.1551-1554,

and the Court will address each statute in turn.

**1.** ***North Carolina Unfair and Deceptive Trade Practices Act (Count VII)***

Schelble alleges a violation of the North Carolina Unfair and Deceptive Trade

Practices Act ("NCUDTPA"), N.C. GEN. STAT. § 75-1.1.  ECF No. 21, PageID.608.

Specifically, Schelble alleges:

> Defendants' steering scheme constitutes an unfair or deceptive act or practice. They made hundreds of millions of dollars, if not over a billion dollars, by deceiving Plaintiff and the class, and causing them to be deceived by their brokers. Defendants' unfair or deceptive conduct, all of which was affecting commerce, offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

*Id.*  The Defendants argue for dismissal on three grounds: (1) for failure to plead

facts showing reliance and *proximate cause* under the statute; (2) for failure to satisfy

Rule 9(b) requirements to sufficiently allege a violation under North Carolina's

bribery law (*i.e.*, N.C. GEN. STAT. § 14-353); and (3) because the commercial bribery

claims also fail.  *See* ECF No. 30, PageID.1553 (emphasis added).

The NCUDTPA states that "unfair or deceptive acts or practices in or affecting

commerce are declared unlawful."   N.C. GEN. STAT. § 75-1.1(a).   "In order to

establish a *prima facie* claim for unfair trade practices, a plaintiff must show: (1) the

defendant committed an unfair or deceptive act or practice, (2) the action in question

was in or affecting commerce, **and** (3) the act *proximately caused injury* to the

plaintiff." *Manos v. Freedom Mortgage Corp.*, No. 21-1324, 2022 WL 874181, at *2 (4th Cir. Mar. 24, 2022) (citing *Bumpers v. Cmty. Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013)) (emphasis added). But "[t]here can be no recovery 'where the complaint fails to demonstrate that the act of deception ***proximately resulted*** in some adverse impact or actual injury to the plaintiffs.'" *See Pope v. TT of Lake Norman, LLC*, 505 F. Supp. 2d 309, 313 (W.D.N.C. 2007) (quoting *Walker v. Sloan*, 529 S.E.2d 236, 245 (N.C. Ct. App. 2000)) (emphasis added).

As previously stated, Schelble, as well as the other named Plaintiffs, have failed to sufficiently allege facts that establish "proximate causation"—that UWM's conduct was the direct cause of their alleged injury. *See supra,* Section III.C.1.A. The Amended Complaint merely parrots the elements of the NCUDTPA, supported by conclusory statements, which will not suffice in creating a plausible claim for unfair and deceptive trade practices under North Carolina law. *See Richards v. PHH Mortgage Corp.*, No. 1:19-cv-00759, 2020 WL 1234634, at *8 (M.D.N.C. Mar. 13, 2020) (citing *Iqbal*, 556 U.S. at 678). Moreover, Plaintiffs' response fails to address this argument, and therefore any opposition to it has been waived. *See Huml v. Huml*, 826 S.E.2d 532, 542 n.3(N.C. Ct. App. 2019); *accord Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007). Having found that Plaintiffs failed to allege facts sufficient to show "proximate causation," this claim must be dismissed.

The Court is not persuaded by Defendants' argument that Plaintiffs' NCUDTPA claim fails because it is not pled with enough specificity under Rule 9(b). *See* ECF No. 30, PageID.1553.  As detailed above, the Court finds that Plaintiffs have alleged enough to satisfy the Rule 9(b) standard when it comes to the fraud-based claims.  *See supra*, Section III.B.  Nonetheless, Defendants argue that this claim should be dismissed to the extent it is premised on North Carolina's commercial bribery statute, because the bribery claim also fails.  *See* ECF No. 30, PageID.1553.  The Court agrees because, as stated above, Plaintiffs have similarly failed to sufficiently allege a claim for commercial bribery under North Carolina law, which also warrants dismissal of the NCUDTPA claim.  *See supra*, Section III.C.1.C.

### 2.  *Tennessee Consumer Protection Act (Count VIII)*

The Escues also allege a consumer protection claim under the Tennessee Consumer Protection Act ("TCPA"), TENN. CODE. ANN. §47-18-104.  *See* ECF No. 21, PageID.611.  The TCPA creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice…."  *See* TENN. CODE. ANN. §47-18-109(a)(1).  In other words,

> [i]n order to recover under the TCPA, the [Escues] must prove: (1) that the defendant *engaged* in an unfair or deceptive act or practice declared

unlawful by the TCPA and (2) that the defendant's conduct *caused an ascertainable loss* of money or property, real, personal or mixed, or any other article, commodity or thing of value wherever situated[.]

*See Westgate Resorts, Ltd. v. Wasley Financial Grp., LLC*, No. 3:20-cv-00599, 2023

WL 5062065, at *16 (M.D. Tenn. Aug. 8, 2023) (citing *Tucker v. Sierra Builder*, 180

S.W.3d 109, 115 (Tenn. Ct. App. 2005)) (emphasis added).  The Escues assert that

UWM's unfair and deceptive practices violated the following subparts of the Act:

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

****

(7) representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

****

(9) Advertising goods or services with intent not to sell them as advertised;

****

(14) causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction;

****

(21) using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, male, value, age, size, color, usability or origin of the good or services offered, or which may otherwise misrepresent the good or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services;

*See* §47-18-104(a)(5), (7), (9), (14), (21).   Defendants argue for dismissal on two grounds: (1) failure to satisfy Rule 9(b) requirements, and (2) because the TCPA does not apply to "credit terms of a transaction" subject to § 47-18-111(a)(3).   *See* ECF No. 30, PageID.1551-1552.   For similar reasons to Schelble's claim under the NCUDTPA, the Escues' claim also fails.

First, the allegations are quite similar to those alleged under the NCUDTPA and amount to conclusory statements because they lack specific factual allegations to support the claims.   And "plaintiffs asserting claims under the TCPA are required to show that the defendant's wrongful conduct ***proximately caused*** their injury."   *See Westgate*, 2023 WL 5062065, at *17 (citing *Steamfitters Local Union No. 614 Health and Welfare Fund v. Philip Morris, Inc.*, No. W1999-01061-COA-R9-CV, 2000 WL 1390171, at * 7 (Tenn. Ct. App. Sept. 26, 2000) (emphasis added)).   As previously stated, the Escues, as well as the other named Plaintiffs, failed to plead a proximate causal connection against Defendants sufficiently.   *See supra,* Section III.C.1.A. Even when drawing all inferences in favor of Plaintiffs, the TCPA claim fails as a matter of law.

Defendants also argue that the TCPA "does not apply to credit terms of a transaction."   *See* ECF No. 30, PageID.1551.   The Court finds this argument without merit.   As previously stated, Plaintiffs allege these claims concern conduct that occurred before Plaintiffs entered into their mortgage agreements with UWM.   *See*

*supra*, Section III.A.  Therefore, the credit terms themselves are not at issue, and this reading of the TCPA is inapplicable.  Nonetheless, the Escues' claim under the TCPA is dismissed for lack of proximate cause.

### 3. *Florida Deceptive and Unfair Trade Practices Act (Count IX)*

Next, Weatherill, Jeffries, and Singh allege a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. § 500.204, *et seq.  See* ECF No. 21, PageID.616.   Aside from similar allegations as the other Plaintiffs, Weatherill, Jeffries, and Singh allege:

> 547. As the intended and inevitable result of Defendants' conduct, Plaintiff and the class were subject to material omissions and non-disclosures from their agents, who received unauthorized things of value from UWM for the purpose of influencing them in their dealings with Plaintiffs and the class.
>
> 548.  Defendants failed to disclose, actively concealed, and affirmatively misled Plaintiffs and the class about the corrupt relationship between UWM and brokers. Defendants falsely represented and advertised the brokers listed on UWM website as having value or functions that they did not have, with intent that Plaintiffs and class would pay for products or services they did not receive.
>
> 549.  Defendants' misrepresentations and material omissions were likely to deceive a reasonable person under the circumstances, and Defendants knew this. Defendants owed a duty to disclose the true facts about the influence UWM exerted over brokers because:
>
> > (a) Defendants possessed exclusive knowledge that brokers were not and could not have been shopping for the overall best price on behalf of their client;
> >
> > (b) concealed the foregoing from plaintiffs and the class; and

(c) made incomplete representations while purposely withholding material facts that contradicted these representations.

*See* ECF No. 21, PageID.618.  The FDUTPA proscribes any unfair or deceptive acts or practices committed in the conduct of any trade or commerce.  *See* FLA. STAT. § 501.204(1).  Defendants argue this claim should be dismissed because: (1) a lending relationship does not suffice for an FDUTPA violation; (2) FDUTPA does not apply to "an act or practice required or specifically permitted by federal or state law;" and (3) "[b]ecause Plaintiffs' other claims fail, so does their FDUTPA claim."  *See* ECF No. 30, PageID.1552-1553.  The Court disagrees.

First, as Plaintiffs correctly argue, Defendants wrongly contend that the FDUTPA does not apply in the lending context.  *See* ECF No. 35, PageID.2101.  A literal reading of the statute states that FDUTPA applies to all "trade or commerce[,]" and that includes financial transactions.  FLA. STAT. § 500.204; *see e.g.*, *Brexendorf v. Bank of America*, 319 F. Supp. 3d 1257, 1266 (M.D. Fla. 2018); *Diaz v. U.S. Bank*, 2014 WL 4639431, at *5 (S.D. Fla. Sept. 16, 2014) (denying a motion to dismiss FDUTPA claim because the activity at issue was loan servicing); *U.S. Bank v. Capparelli*, 2014 WL 2807648, at *4–5 (S.D. Fla. June 20, 2014) (same).  Second, the Court has found, as discussed above, that Plaintiffs' allegations sufficiently meet the Rule 9(b) standard and therefore they allege fraudulent conduct.  *See supra*,

Section III.B.  Whether that conduct is covered by statute or not would be a question best left for summary judgment.

Lastly, the Defendants' argument that the FDUTPA claim should fail because all of the Plaintiffs' other claims fail is not persuasive.  As discussed, Plaintiffs Jeffries' and Singh's RESPA claim survives the Motion to Dismiss.  *See supra*, Section III.D Therefore, even if FDUTPA "merely provides remedies 'in addition to other remedies already available,'" *see* ECF No. 30, PageID.1552-1553 (quoting *Hunter v. Bev Smith Ford, LLC*, 2008 WL 1925265, at *7 (S.D. Fla. Apr. 29, 2008)), dismissal is not warranted because the FDUTPA can rest on the RESPA claim.

Accordingly, Plaintiff Jeffries, Singh, and Weatherill's FDUTPA claims are not subject to dismissal.

### 4. *California Unfair Competition Law (Counts X)*

Lastly, Morandi alleges a violation of the California Unfair Competition Law ("UCL"), CAL. BUS. & PROF. CODE § 17200, *et seq.  See* ECF No. 21, PageID.616. Aside from similar allegations by the other Plaintiffs,[14] Morandi alleges:

> 556. The CUCL provides civil liability for "any unlawful, unfair or fraudulent business practice." Cal. Bus. & Prof. Code § 17200. Defendants are liable for committing an unlawful, unfair, or fraudulent act or practice, in affecting commerce, that proximately caused injury to Plaintiff and the class.

---

[14] *Compare* ECF No. 21, PageID.612, ¶526 *with* PageID.620, ¶557; PageID.613, ¶527 *with* PageID.620, ¶558; PageID.613, ¶528 *with* PageID.620, ¶559; PageID.613, ¶536 *with* PageID.620, ¶561; PageID.613, ¶531 with PageID.620, ¶562; PageID.613, ¶516 with PageID.620, ¶564; PageID.613, ¶517 with PageID.620, ¶565; PageID.613, ¶527 with PageID.620, ¶558

****

560. Indeed, through Defendants' systematic funding, promotion, and supporting of its brokers' efforts to market themselves as "independent," borrowers believed and relied on the supposed independence of these brokers.

****

563. Defendants' scheme also disseminated or caused to be disseminated before the public untrue or misleading representations, which Defendants knew or should have known were misleading, in violation of California's False Advertising law, Cal. Bus. & Prof. Code § 17500, a violation of which is also an unfair trade practice in violation of §17200 as an unlawful or unfair business practice.

****

556. As a direct and proximate result of Defendant's violations of the CUCL, Plaintiff and the class suffered injury-in-fact and are entitled to restitution.

*See* ECF No. 21, PageID.620-622.  California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE § 17200.  Defendants argue this claim should be dismissed: (1) for failure to comply with Rule 9(b), (2) a lack of proximate cause, and (3) because it is predicated on other claims within the complaint that also fail.[15] *See* ECF No. 30, PageID.1553-1554.

Remarkably, Plaintiffs failed to address any of Defendants' legal arguments relating to the UCL claim.  *See generally* ECF No. 35, PageID.2100-2102.  By failing to address these arguments, Plaintiff concedes them, and the Court deems

---

[15] Defendants alleged a fourth argument that specifically address the CLRA, which will be addressed in the next section. *See infra,* Section III.F.5.

them waived.  *See Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (holding plaintiff who failed to address issues raised in defendant's motion in his opposition brief "has effectively abandoned his claim, and cannot raise it on appeal"); *Sichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[f]ailure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *accord Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (plaintiff abandoned certain claims by failing to raise them in brief in opposition to defendant's motion to dismiss).  This alone is reason enough to dismiss the UCL claim.

However, the Court also notes that to sufficiently plead a UCL claim, similar to RICO and the other consumer protection claims, Plaintiffs must allege proximate cause, which the Court has repeatedly found that the Amended Complaint does not. Therefore, Morandi's claim under the UCL is dismissed.

### 5.  *California Consumer Legal Remedies Act (Count XI)*

Count XI alleges a violation of the Consumer Legal Remedies Act ("CLRA"), CAL. CIV. CODE § 1750 *et seq.*, which prohibits similar misrepresentations, but in

commercial transactions.[16]    *See* § 1770.    Once more, aside from the similar

allegations as the other Plaintiffs,[17] Morandi alleges:

> 578. Defendants violated the CLRA by engaging in unfair or deceptive acts, including representing that "independent" brokers had characteristic or benefits that they did not have; represented the brokers listed on UWM website have value or functions that they did not have; advertising with the intent that plaintiff and the class would not receive what was advertised; misrepresenting the authority of brokers subject to UWM's "Lock-In" Policy to shop for better rates; and making misrepresentations and omissions of material facts relating to broker's independence that tend to deceive borrowers and the public.

*See* ECF No. 21, PageID.625.  "To state a fraudulent omission or misrepresentation

claim under the CLRA, a plaintiff must plead (1) misrepresentation or omission, (2)

reliance, and (3) damages, all with the particularity required by Rule 9(b)."  *See Boyd*

*v. SunButter, LLC*, 762 F. Supp. 3d 931, 941 (C.D. Cal. 2025) (citation omitted).

Defendants argue four grounds for dismissal: (1) the claims sound in fraud

and therefore require Plaintiffs to plead "specific facts" showing their reliance on

the alleged misrepresentation or omission; (2) proximate cause is required; (3)

because the claims are predicated on the same conduct giving rise to the other failed

claims, they too must be dismissed; and (4) the CLRA imposes a 30-day notice and

cure provision which Plaintiffs failed to meet.  *See* ECF No. 30, PageID.1553-1154.

The only argument Plaintiffs refute is the 30-day notice and cure provision, arguing

---

[16] In the Amended Complaint, Plaintiffs incorrectly labeled this as the "California Legal Remedies Act."

[17] *Compare with supra* note 14.

that a state statute does not apply in federal cases where the Federal Rules of Civil Procedure govern procedural requirements. *See* ECF No. 35, PageID.2102.

Again, failure to address an argument deems opposition waived, and for all the reasons stated previously, dismissal is warranted based on causation and the fact that the claims under the CLRA have failed to state a claim upon which relief can be granted. *See supra*, Sections III.C.1.A; III.F.5. However, for the sake of completeness, the Court will address the argument raised regarding the CLRA's 30-day, pre-suit notice and cure period. *See* CAL. CIV. CODE § 1782(a). Plaintiffs rely on *Martin v. Pierce Cnty.*, 34 F.4th 1125 (9th Cir. 2022) and *Albright v. Christensen*, 24 F.4th 1039, 1047 (6th Cir. 2022) in contending that "[p]re-suit notice certification and notice requirements under state statutes do not apply in federal court[.]" *See* ECF No. 35, PageID.2102.

However, neither case is applicable here. *Martin* (relying on *Albright*) addressed how Federal Rules 3 and 8 trumped an arbitration deceleration requirement imposed under Washington state law because the declaration requirement was a state procedural law. *See Martin,* 34 F.4th at 1130-1132. Here, the notice and cure provision under § 1782(a) is substantive California law. S*ee Shu v. Toyota Motor Sales USA, Inc.*, 669 F. Supp. 3d 888, 899 (N.D. Cal. 2023). And, because federal courts sitting in diversity ***must*** apply substantive state law to state claims, the Court must enforce all provisions of § 1782. *See Bakhtiar v. FAC US*

*LLC*, No. 2:20-cv-06522-ODW, 2021 WL4776260, at *6 (C.D. Cal. Oct. 13, 2021), *see also Clark v. Eddie Bauer LLC*, 30 F.4th 1151, 1154 (9th Cir. 2022); *Fox v. Amazon.com, Inc.*, 930 F.3d 415, 422 (6th Cir. 2019).

Plaintiffs' Amended Complaint is void of any factual allegations relating to Morandi providing Defendants with a 30-day notice. Therefore, Morandi's claims under the CLRA are subject to dismissal.

## G.   UNJUST ENRICHMENT CLAIMS

Plaintiffs also bring a claim for unjust enrichment. *See* ECF No. 21, PageID.602. At the outset of any evaluation of an unjust enrichment claim, the Court must look to the nature of the parties' relationship. *Snyder v. Freeman*, 266 S.E.2d 593, 602 (N.C. 1980). Unjust enrichment claims are often brought when there is no contract between the parties or where the claim is pled in the alternative to the contract claim. *Apollo Mgmt. Grp. v. Croxall*, No. 22-62398-CIV, 2023 WL 11799718, at *5 (S.D. Fla. Mar. 29, 2023). Notably, here, Plaintiffs do not allege a breach of contract claim. *See generally* ECF No. 21. However, when a valid contract already governs the same subject matter as the Parties' alleged implied contract, there can be no unjust enrichment claim. *See Snyder*, 266 S.E.2d at 602 ("[W]here there is an express contract between parties, there can be no implied contract between them covering the same subject matter dealt with in the express agreement.")*; Generation 4 Recycling Grp., LLC v. Triumph Aerostructures, LLC -*

76

*Vought Aircraft Div.*, No. M201901668COAR3CV, 2020 WL 5498038, at *5 (Tenn. Ct. App. Sept. 11, 2020) ("As a threshold requirement of an unjust enrichment claim, there can be no valid contract between the parties."); *1021018 Alberta Ltd. v. Netpaying, Inc.*, No.8:10-cv-568-T-27MAP, 2011 WL 1103635, at *5 (M.D. Fla. Mar. 24, 2011) ("[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.") (citations modified).

In this case, the Plaintiffs cannot plausibly allege an unjust enrichment claim, as they have all entered into mortgage agreements with UWM that cover the same subject matter.  ECF No. 21, PageID.493, 506, 514, 522, 531.  While Plaintiffs refrain from referring to their mortgages as agreements in the Amended Complaint, the Court cannot ignore that the essence of a mortgage is a ***contract*** to receive and repay a loan.  ECF No. 21, PageID.493, 506, 514, 522, 531.  Since UWM issued Plaintiffs' mortgages pursuant to an agreement expressly governing the terms of their loans, they cannot plausibly allege an unjust enrichment claim.  *Id.*

Even if the terms of express contracts did not already govern the Parties' relationships—they do—Plaintiffs still cannot maintain their unjust enrichment claim.  Generally, in Plaintiffs' applicable states, elements of an unjust enrichment claim include: (1) plaintiff conferring a benefit upon defendant; (2) defendant's retention of the benefit; and (3) without payment to plaintiff, defendant's retention

would be unjust.[18]  Plaintiffs allege they "conferred direct benefits on and enriched

Defendants in the form of significant payments for closing costs, interest, and other

fees in relation to the mortgage loans UWM sold to them as a result of Defendants'

illicit steering scheme and enterprise."  ECF No. 21, PageID.604.  But "the mere fact

that one party was enriched, even at the expense of the other, does not bring the

doctrine of unjust enrichment into play."  *Crump v. City of Hickory*, 240 N.C. App.

602, 772 S.E.2d 873 (2015) (internal citations omitted).  Simply stated, Plaintiffs'

allegations here do not invoke the unjust enrichment doctrine.[19]  *See e.g.*, *Baptista v.*

*JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011) (*quoting Am.*

---

[18] *See TSC Rsch., LLC v. Bayer Chemicals Corp.*, 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008) ("To establish a claim for quantum meruit, also known as unjust enrichment, a plaintiff must show three elements: (1) plaintiff conferred a measurable benefit to defendant, (2) defendant knowingly and voluntarily accepted the benefit, and (3) the benefit was not given gratuitously."); *see also Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (internal quotations omitted) ("The elements of an unjust enrichment claim are: 1) a benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof."); *see also Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 899 So. 2d 1222, 1227 (Fla. Dist. Ct. App. 2005) (internal quotations omitted) ("The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff."); *see also Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1270 (C.D. Cal. 2007) ("Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another.").

[19] North Carolina has even a higher threshold to raise unjust enrichment claims.  There, "to recover on an unjust enrichment claim, a plaintiff must prove (1) that it conferred a measurable benefit on another party, (2) that the defendant consciously accepted the benefit, and (3) that the plaintiff did not confer the benefit gratuitously or officiously."  *See Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 799-800 (E.D.N.C. 2019), *aff'd sub nom. Fitzgerald Fruit Farms, LLC v. Harris*, 858 F. App'x 625 (4th Cir. 2021).  The allegations in the Amended Complaint do not satisfy the basic elements of an unjust enrichment claim, never mind this higher threshold required under North Carolina law.

*Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331-332 (Fla. Dist. Ct. App. 2007))

("When a defendant has given adequate consideration to someone for the benefit

conferred, a claim of unjust enrichment fails."); *Chase Manhattan Bank, N.A. v.*

*CVE, Inc.*, 206 F. Supp. 2d 900, 909 (M.D. Tenn. 2002) ("The parties simply made

an agreement and both parties performed according to the terms of the agreement.

Although Orr received a larger per-share payment under different circumstances, his

situation does not justify Chase's claim for unjust enrichment.  As CVE argues, a

contrary conclusion would suggest that a cause of action for unjust enrichment

would exist any time a party believed that it could have obtained a better deal.");

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 353 P.3d 319, 326 (Cal. 2015) (internal

citation omitted) ("Restitution is not mandated merely because one person has

realized a gain at another's expense [. . .] the obligation arises when the enrichment

obtained lacks any adequate legal basis and thus 'cannot conscientiously be

retained.'").

Here, Plaintiff fails to meet even the most basic element of an unjust

enrichment claim – a conferred benefit.  At best, Plaintiffs allege that UWM received

the benefit of the mortgage agreements.  But Plaintiffs cannot have it both ways—

on the one hand, allege UWM received the benefit of Plaintiffs' mortgage

agreements, but on the other, ask the Court to ignore those same agreements and

*imply* one instead.  Even if the Court agreed to do as Plaintiffs wish, having failed to

allege a conferred benefit, they cannot prove either of the two remaining elements—that UWM retained the benefit, and such retention would be unjust.[20]  Their allegations simply do not meet the requirements for an unjust enrichment claim in Florida, Tennessee, North Carolina or California[21] and therefore, they must be dismissed.

## H.  CLAIMS AGAINST HOLDING COMPANIES AND ISHBIA

In addition to naming UWM in its Amended Complaint, Plaintiffs assert claims against the UWM Holding Companies (UWM Holdings Corporation and SFS Holding Corporation) and UWM's CEO (Ishbia).  Defendants move to dismiss any

---

[20] *See In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 894 (E.D. Mich. 2014) ("Before turning its attention to the specific arguments, the Court recognizes that although the particular elements of unjust enrichment vary from jurisdiction to jurisdiction, when stripped to its essence, a claim of unjust enrichment requires [plaintiffs] to allege sufficient facts to show that Defendants received a benefit, and under the circumstances of the case, retention of the benefit would be unjust."); *see also Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1321 (S.D. Fla. 2014) ("No unjust enrichment claim will lie unless the plaintiff conferred a benefit on the defendant.").

[21] The Court acknowledges the split between California courts as to whether there is "a standalone cause of action for unjust enrichment, which is synonymous with restitution." *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir.2015) (internal quotation marks omitted).  However, the Central District of California has generally declined to recognize unjust enrichment as an independent claim.  *See In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1114 (C.D. Cal. 2012) ("The court agrees that under California law, a cause of action for unjust enrichment is not cognizable.  Rather, unjust enrichment is a theory that permits recovery on other recognized causes of action, including plaintiffs' UCL and CLRA claims.").  Because Plaintiffs' UCL and CLRA claims fail, so too does their unjust enrichment claim.  More importantly, UWM did not benefit from any additional fees that Morandi—the sole California Plaintiff—paid in connection with his mortgage loan.  ECF No. 21, PageID.522.  As Morandi himself admits, "[a]s a fee for his services, Todd earned a commission of $7,250 (2.33% of the loan amount), which was paid by Morandi to UWM and then sent from UWM to Todd."  *Id.*  If Morandi conferred a benefit upon anyone, therefore, he arguably conferred it to his broker—not UWM. This further undermines any potential independent claim for unjust enrichment against UWM.

claim that survives their Motion to Dismiss against the Holding Companies and Ishbia because the pleadings have not established their individual liability.  *See generally* ECF No. 30, PageID.1555-1558.  The Court agrees.

First, any alleged reference to "Defendants" generally is insufficient to state a plausible claim for relief when there are multiple defendants that are each responsible for their own actions.  Moreover, to meet even the basics of Rule 8 pleading standards, Plaintiffs are required to place each defendant on notice of their alleged wrongdoing.  As Defendants properly note, "there are no references in the complaint to the specific actions of the UWM Holding Companies" other than to state the corporate structure of the entities.  *See* ECF No. 21, PageID.393, 425-426. This is not enough for the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged" and "it fails to sufficiently state a plausible claim for relief."  *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 555-56.

Second, as to Defendant Ishbia, Plaintiffs oppose his dismissal because they allege he was involved in the "Steering Enterprise" and his involvement was not limited to just statements about UWM's business.  *See* ECF No. 35, PageID.2104. But the factual allegations contained in the Amended Complaint belie this argument. As Plaintiffs clearly concede, "*[a]s the CEO* of UWM, Ishbia was involved in all aspects of the scheme."  *Id.* (emphasis added).  But Plaintiffs only assert facts about the statements he made on behalf of the company; and the Amended Complaint fails

to include any facts related to actions taken in his personal capacity.  *See* ECF No.

21, PageID.387-388, 406-408, 423, 432, 441, 445, 470, 588-591.  As such, Ishbia

should be dismissed for any individual liability.

Finally, for the only claims that remain, RESPA and FDUTPA, the Amended

Complaint insufficiently alleges plausible causes of action against the UWM

Holding Companies or Ishbia.  Neither of them is even named in the RESPA claim.

And the factual allegations that support the Florida consumer protection claim,

which is directed at "Defendants" generally, detail the actions of UWM, not the

UWM Holding Companies or Ishbia.

Accordingly, UWM Holdings Corporation, SFS Holding Corporation, and

Ishbia are **DISMISSED** from this action.

## IV.

In addition to the Motion to Dismiss, Defendants also filed several other

motions, which the Court will address here.

### A.    CLASS ALLEGATIONS

Concurrent with filing the Motion to Dismiss, Defendants also filed a Motion

to Strike the Class Allegations in the First Amended Complaint ("FAC").  *See* ECF

No. 31.  The parties fully briefed the motion.  *See* ECF Nos. 31, 36, 41.  In the

motion, UWM seeks to strike the following classes:

(1) The 23(b)(2) class, FAC ¶¶ 329-332;

(2) The nationwide 23(b)(3) class for all federal claims – RICO, RICO Conspiracy, and RESPA, *see, e.g., id.* ¶¶ 328, 347, 376, 392;

(3) Any nationwide and multistate subclass for all remaining claims, *see, e.g., id.* ¶¶ 328, 329 & Tables A & B, 330 & Tables C & D, 331 & Table E, 332 & Table F, 347, 376, 392, 457, 472, 486-87, 488(i)-(iii), 507, 520, 541, 553, 568;

(4) All statewide subclasses or (a) unjust enrichment (¶489), (b) aiding and abetting breach of fiduciary duty (¶458), and (c) civil conspiracy (¶473). *Id.*

UWM did not seek to strike the four single-state classes that are pursuing statutory consumer protection claims in their respective states but reserved the right to do so at a later time. *See* ECF No. 31, PageID.1801, n.1.

Today's ruling on the Motion to Dismiss substantially limits this case. The only remaining claims are the RESPA claim for Jeffries and Singh, and the FUDTPA claim as to Weatherill, Jeffries, and Singh. Among the other arguments made, UWM challenged certification of the RESPA class, arguing that the RESPA Section 8 claims necessarily require a loan-by-loan analysis that is inherently individualized and that undermines class treatment. *See* ECF No. 31, PageID.1827-1832. UWM additionally argues that RESPA's one-year statute of limitations and any considerations of equitable tolling will also require individualized issues to predominate. *Id.* at PageID.1831. Plaintiffs respond that UWM has not met the high burden of demonstrating it is "impossible to certify a class" and discovery could show the Court otherwise. *See* ECF NO. 36, PageID.2134-2135. Plaintiffs also

83

assert that the decision on the class issues is best left for decision after obtaining an evidentiary record on class certification. *Id.* at PageID.2136-2137.

Consequently, rather than try to parse through the issues in this motion that related to claims that have already been dismissed or try to determine if there is enough in the record before the Court to rule on issues of numerosity, typicality, commonality, and predominance; the Court is going to deny the Motion to Strike Class Allegations, ***without prejudice***. The Court grants Defendants leave to either refile their motion limited to the RESPA and FUDTPA claims, or to reserve their arguments to be filed in response to any motion filed at the class certification stage of these proceedings, where the parties can provide the Court a more fulsome set of briefs on the remaining issues.

## B.   SANCTIONS

On September 17, 2024, Defendants filed a Motion for Sanctions and a Motion for Leave to File an Unredacted Motion for Sanctions. *See* ECF Nos. 23, 24. On December 13, 2024, Defendants filed a Second Motion for Sanctions. *See* ECF No. 38. On May 8, 2025, the Court held a status hearing regarding these motions. At that hearing, it was agreed that the Defendants would consolidate the motions for sanctions and file a version that did not require redaction. In conjunction with that, the Court struck the three previously filed motions.

There must have been some confusion resulting from the status conference because on May 30, 2025, Defendants filed a Consolidated Motion for Sanctions (ECF No. 51), but again filed a Motion for Leave to File an Unredacted Consolidated Motion for Sanctions (ECF No. 52).  On June 20, 2025, Plaintiffs filed a response to both motions.  *See* ECF Nos. 53, 54.  Defendants' Reply in support of their motion for leave to file the unredacted motion, among other things, argued that Plaintiffs' Response was untimely.  *See* ECF No. 55, PageID.3546.  This prompted Plaintiffs to file a Motion to Deem Timely Plaintiffs' Response.  *See* ECF No. 56.

As an initial matter, the Court will grant Plaintiffs' Motion to Deem Timely their Response (ECF No. 56) to the motion to file an unredacted motion for sanctions.  Plaintiffs are correct that the Court's directive following the May 8, 2025, status conference was that Defendants were to file ***one*** consolidated motion for the three motions previously stricken.  *See* ECF No. 56, PageID.3557.  Defendants did not do so and again filed a motion for sanctions, which was redacted, and a motion for leave to file an unredacted version.  ECF No. 51, 52.  Plaintiffs filed a response to those two motions by the deadline set by the Court (June 20, 2025); therefore, their response cannot be untimely if it was in accordance with the Court's instruction.

More importantly, moving to the Motion for Sanctions—having resolved the Motion to Dismiss, the Court finds the Motion for Sanctions meritless as several claims have survived the request for dismissal.  Defendants request sanctions under

Rule 11, 28 U.S.C. §1927, and the Court's inherent authority.  *See generally* ECF No. 51, PageID.2558.  However, the ability to impose sanctions is in the sound discretion of the Court.  *See Flournoy v. Hemingway*, No. 20-v-10496, 2020 WL 5878213, at *3 (E.D. Mich. Oct. 2, 2020); *Est. of Kevin Ivie v. Clark*, No. 15-13239, 2016 WL 795899, at *3 (E.D. Mich. Feb. 29, 2016).  And where Plaintiffs have at least stated some plausible claims for relief, the Court declines the request to impose such a drastic remedy (sanctions) on a party in lawful pursuit of their claims.  *Clark*, 2016 WL 795899 at *3; *Meier v. Green*, No. 07-cv-11410, 2007 WL 2646173, at *3 (E.D. Mich. Sept. 6, 2007).

The Court is not persuaded that Plaintiffs filed this case for an improper purpose or that it did not conduct a reasonable pre-filing entry.  To the contrary, the Court believes that Plaintiffs conducted due diligence prior to filing; otherwise, all the claims would have been subject to dismissal.  Therefore, Defendants' Motion for Sanctions (ECF No. 51) is denied.  Having denied that motion, Defendants' Motion for Leave to file an Unredacted Motion for Sanctions (ECF No. 52) is denied as moot.

## V.

Accordingly, Defendants' Motion to Dismiss (ECF No. 30) is **GRANTED IN PART and DENIED IN PART**.  The Motion is **GRANTED** as to Counts I, II, III (as to the Escues, Schelble, and Morandi), IV, V, VI, VII, VIII, X, XI, and **DENIED**

as to Count III (as to Jeffries and Singh) and Count IX (as to Weatherill, Jeffries, and Singh).

**IT IS HEREBY ORDERED** that Counts I, II, IV, V, VI, VII, VIII, X, XI are all **DISMISSED WITH PREJUDICE**.  The only remaining claims are Count III (RESPA) as to Plaintiffs Jeffries and Singh, and Count IX (FDUTPA) as to Plaintiffs Weatherill, Jeffries, and Singh.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Class Allegations (ECF No. 31) is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Sanctions (ECF No. 51) is **DENIED**, the Motion for Leave to File an Unredacted Consolidated Motion for Sanctions (ECF No. 52) is **DENIED AS MOOT**, and Plaintiffs' Motion to Deem Timely Plaintiffs' Response in Opposition to Defendants' Motion for Leave to File an Unredacted Version of Defendants' Consolidated Motion (ECF No. 56) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants UWM Holdings Corporation, SFS Holding Corporation, and Mathew Randall Ishbia are **DISMISSED** from this action.

**IT IS SO ORDERED.**

Dated: September 30, 2025          /s/ Brandy R. McMillion          
      Detroit, Michigan          HON. BRANDY R. MCMILLION  
                              United States District Judge